UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK  
------------------------------------------------------------X

In re:

CBCS WASHINGTON STREET LP,

                          Debtor.

------------------------------------------------------------X

Hearing Dates: 6/21/19 @ 10:00 am  
and 6/26/19 @ 10:00 am

Chapter 11

Case No: 19-22607 (RDD)

SUPPLEMENTAL EXHIBIT TO:

    (I)    DEBTOR'S RESPONSE TO LANDLORD'S MOTION TO COMPEL PERFORMANCE UNDER GROUND LEASE OR, IN THE ALTERNATIVE, TO LIFT THE AUTOMATIC STAY [ECF DOC NO. 73]; AND

    (II)    DEBTOR'S MOTION TO EXTEND DEADLINE TO ASSUME OR REJECT GROUND LEASE [ECF DOC NO. 87]

LETTER OF DEFINITIVE TERMS AND CONDITIONS FOR LOAN COMMITMENT DATED JUNE 17, 2019 FROM HANA FINANCIAL INVESTMENT FOR $120,000,000

ROBINSON BROG LEINWAND GREENE  
  GENOVESE & GLUCK P.C.  
875 Third Avenue  
New York, New York 10022

{01013055.DOCX;1 }

# LETTER OF DEFINITIVE TERMS AND CONDITIONS

June 17, 2019

CBCS Washington Street LP
C/O Messrs. Ivaylo Ninov and Joshua Caspi
589 Fifth Avenue
New York, NY 10017

Dear Messrs. Ivaylo Ninov and Joshua Caspi

Hana Financial Investment is pleased to offer this definitive terms and conditions to make a loan in the maximum amount of $120,000,000.00 ("Loan") to CBCS Washington Street LP. The Loan is subject to the key terms and conditions summarized in this letter and Borrower's written acceptance of this letter on or before the deadline set forth herein and mutual execution of all Loan Documents in form and substance acceptable to Hana Financial Investment.

This letter contains key terms and conditions of Hana Financial Investment's willingness to make the Loan and intended to provide description of all of the terms that will govern the loan. The terms and conditions of the Loan may be modified prior to closing based on re-organization of the chapter 11 filed in the bankruptcy court of the Southern District of New York.

Borrower is required to provide to Hana Financial Investment hereunder or by changes in the conditions and/or legal status of Borrower or of collateral. Subject to such limitations, however, this letter is intended to be a stand-by loan facility on both parties upon Borrower's acceptance of this letter under the terms and conditions of set forth below.

| | |
|---|---|
| **Lender** | Hana Financial Investment, or its affiliate, or a single purpose, bankruptcy remote entity managed by Hana Financial Investment and one or more co-investors. |
| **Borrower** | CBCS Washington Street LP is an existing special purpose company, will be the mortgage loan borrower and is a debtor in possession in a chapter 11 case no. 19-22609 (RDD) currently pending in the Southern District of New York. |
| **Sponsor** | Affiliates of Mactaggart Family and Partners, Caspi Development, which jointly invest in and together control the Borrower. The Borrower shall be controlled by Mactaggart Family and Partners and Caspi Development entities who shall make all management decisions including decisions relating to Loan. |
| **Property/Project** | The Property will contain a 96-room full-service hotel building with a total of 95,872 square feet, and the hotel will be located on an approximately 11,750 square foot parcel of land located on 456 Greenwich Street, New York, NY 10013, entitled to 99-year ground leasehold. (the "Property" or "Project"). |
| **Initial Term** | 36 Months from the date of initial drawdown. |
| **Anticipated Loan Closing Date** | On or about August 16, 2019, subject to the bankruptcy court confirmation of a plan of reorganization submitted by Borrower. |
| **Loan Amount** | The Loan Amount shall be equal to the lesser of (i) up to $120,000,000, (ii) |

| | |
|---|---|
| | an amount which equals 75.0% of Lender-approved Project costs (based on an estimated total project cost of approximately $167,000,000), and (iii) an amount which equals 60% of loan to stabilized appraisal value determined by Lender-approved appraisal firm **(the "Loan Amount")**. |
| **Interest Rate** | The Loan shall bear current interest at LIBOR 1M + 7.25% (subject to a LIBOR floor of 1.00%) per annum (the **"Interest Rate"**), calculated on the basis of the actual number of days in the month and a 360-day year. Interest shall be payable monthly in arrears. |
| **Interest Rate Protection** | At Closing, Borrower shall enter into an interest rate cap agreement in a notional principal amount equal to the Loan Amount, capping LIBOR at the strike rate of 5.5% for the initial Term of the Loan. The notional principal amount of the interest rate cap may track 100% of the projected outstanding principal balance of the projected Loan based on a projected draw schedule agreed upon at Closing. |
| **Closing Payment** | 1.0% of the Loan Amount, earned and payable at Closing. |
| **Prepayment Penalty** | 1.0% of the Loan Amount, payable concurrently with any prepayment (in part or in whole) of the Loan in accordance with the Distribution Waterfall. |
| **Extension of the Initial Term** | One 12-month extension option subject to following conditions:<br>  i) 60-day notice to Lender;<br>  ii) No event of default under the Senior Loan;<br>  iii) Payment of an extension fee equal to 1.00% of the Loan Amount;<br>  iv) Lien-free Substantial completion of the project, issuance of TCO, and completion by Borrower and Sponsor of each of the covenants set forth in "Covenants" section below;<br>  v) Fully funded reserves for payment of interest, the Administrative Fee during the applicable extension term;<br>  vi) All reserves required by the documents evidencing the Senior Loan (the "Senior Loan Documents") for the applicable extension term have been fully funded;<br>  vii) In-place DSCR of 1.1x at the time of extension and if in-place DSCR is less than 1.1x, then cash reserve from Borrower, Sponsor or Key Men shall be deposited in the Escrow Account to fulfill the DSCR requirement; and<br>  viii) Other customary conditions. |
| **Default Rate** | The Default Rate shall be equal to the Interest Rate plus 5.0% |
| **Minimum Multiple (Defeasance Premium)** | The Loan may be repaid, in part or in whole, at any time subject to payment of the positive amount (the **"Minimum Multiple Payment"**), if any, that shall cause the aggregate sum of (i) repaid/prepaid Loan Amount, (ii) all interest paid (excluding default interest), plus (iii) the Minimum Multiple Payment paid, to be equal to 115% of the Loan Amount (whether or not drawn), excluding the Closing Payment, Repayment Premium, Default Rate interest, Extension Fees, and other fees. In the event of a non-monetary default (other than an unpermitted transfer, unpermitted encumbrance of the Property, entry into a Lease in violation of the loan documents, a bankruptcy (or similar event), voluntary abandonment or willful delay of construction, or other intentional, knowing, and willful default) and Lender elects to accelerate the Loan, then the Minimum Multiple Payment shall be reduced to 110% |
| **Guarantors** | Mactaggart Family and Partners, Caspi Development and any other equity |

| | |
|---|---|
| | investor owning more than 20% of the Project, only if the investor(s) is/are managing member or partner of the Borrower entity (**the "Guarantors"**), on a joint and several basis, subject to Lender's satisfaction with the financial condition and creditworthiness. |
| **Special Guarantor** | Sam Chang (the "Special Guarantor") is a special guarantor having previously executed a completion guarantee pursuant to a separate agreement between Borrower and Sam Chang. In case of any event of default triggered by Borrower, Sponsor and Guarantor, the Landlord and Lender shall provide notice in writing to Sam Chang. If such event(s) is not cured within 90 days from the notice date, Sam Chang shall, without court approval or Landlord's approval, become a sole controlling party to manage, operate the Property and develop the Project. Sam Chang will assume the Loan without any further modification and responsible for the Loan under the terms and conditions set forth in Loan Documents. |
| **Key Men** | Ivaylo Ninov and Joshua Caspi, managing members of the Sponsor, (collectively, the "Key Men") shall, at all times, control (directly or indirectly) Borrower entity and, as of the Closing, not less than twenty (20%) percent of the direct and indirect equity interests in Borrower. Key Men's failure to do so shall constitute an event of default under the loan documents. An affiliate of the Key Men shall at all times be the managing, operating or administrative member of the Borrower, directly or indirectly. All transfers of direct or indirect ownership interest that are (i) completely passive and (ii) not greater than 10% together with all affiliate transfers between Borrower, Sponsor and/or Key Men and third parties which shall be set forth in the operating agreement of Borrower (subject to Lender's review and approval, not to be unreasonably withheld) shall be permitted, provided at all times, [? missing a word or two?] construction of the project and subsequent to completion and Lender approved guarantors remain in place at all times. Notwithstanding anything to the contrary herein, all transfers that result in any transferee together with its affiliates owning 20% or more of the direct or indirect ownership interests in Borrower shall be subject to Lender's KYC requirements and customary background checks. |
| **Borrower Equity** | Borrower has contributed and/or will contribute equity in an amount that is not less than 20% of Lender-approved Project costs prior to any disbursements under the Loan. Borrower's equity shall include the $42,000,000 invested prior to the Closing Date. |
| **Guarantor Financial Covenants** | Based on assets and bank accounts within the United States of America, an aggregate minimum net worth of $120 million, excluding the subject Project, and minimum aggregate liquidity of $5 million. Subject to due diligence, the above covenants may be partially satisfied by assets and bank accounts held in the United States by CBCS Washington Street LP and/or its affiliates. These liquidity requirements shall be tested quarterly based on unaudited compiled financial statements with supporting account/bank statements. |
| **Special Guarantor Financial Covenants** | Based on assets and bank accounts within the United States of America, an aggregate minimum net worth of $120 million, excluding the subject Project, and minimum aggregate liquidity of $10 million. Subject to due diligence, the above covenants may be partially satisfied by assets and bank accounts held in the United States by Sam Chang. Theses requirement shall be tested annually based on unaudited compiled financial statements with supporting account/bank statements. |

부서: 포트폴리오금융팀 / 성명: 강* / 출력시간: 2019-06-19 09:08:25

| | |
|---|---|
| **Contractors** | The general contractor Aecom Tishman shall be acceptable to Lender and its Project Monitor, the general contract shall be in the form of a lump sum contract or a Guaranteed Maximum Price Contract ("**GMP**") in form and substance acceptable and satisfactory to Lender. The final GMP will be executed before Closing. |
| **Construction Management Bonding** | All Major Sub-Contracts shall be bought-out, which shall represent no less than 80% of the total Project Budget prior to the funding of the Loan and shall be based on construction drawings that are at least 90% complete. All Major Sub – Contractors shall be bonded by a S&P or Moody's A-grade bonding company on terms and from an insurance company reasonably approved by Lender. |
| **Distribution Waterfall** | Prior to an Event of Default, Total Net Operation Income from operations shall be deposited into a lockbox account under the sole control of Lender at a Lender-designated bank, and applied in the following order (after funding of reserves acceptable by Lender):<br>i) First, cash flow from operations shall be deposited into the Property's operating account for operating expenses, per the Lender-approved budget;<br>ii) Next, to all fees, costs, and expenses (excluding interest payments and late fees) due to Lender under the Loan documents;<br>iii) Next, to all reserves reasonably required by Lender;<br>iv) Next, to the Interest due on the Loan, to the extent the Interest Reserve is insufficient to pay the same;<br>v) Next, to all remaining amounts due under the final and binding Loan documents until the Loan is repaid in full; and<br>vi) Thereafter, to Borrower. |
| **Subordinating of Agreements** | All agreements, including management and franchise (license) agreements, encumbering the Property and Project shall be subject to Lender's review and reasonable approval and shall, at Lender's request, include customary lender protection rights, including assignability, "will-serve" provisions (including tenants with respect to operating the Retail and Office Leases), and termination rights for the benefit of Lender. Borrower shall deliver an assignment and subordination agreement with respect to each management agreement and franchise (license) agreement at the Property (including, without limitation, any office management agreement or retail management agreement), and Lender shall have the right (but not the obligation) to terminate any such management agreements, franchise (license) agreement. |
| **Collateral** | The Loan shall be secured by, inter alia,<br>i) a first priority position in Leasehold Mortgage<br>ii) a first priority position in UCC-1<br>iii) a first priority security interest in and, as applicable, assignment of all rents, permits, licenses, leases, contracts, agreements, accounts, receivables, personal property, furniture, fixtures and equipment, any intellectual property including software and IT systems, used or useful in the operation of the Property and owned or licensed for use by Borrower and any other personal property relating to the Property<br>iv) a first priority collateral assignment of interest rate hedge agreement |

{01011883.DOCX;2 }

| | |
|---|---|
| | v) a pledge of all direct and indirect membership interests in Property/Project Owner (which shall be certificated interests) and<br>vi) such other security as customarily required by the Lender. |
| **Substantial Completion Date** | 24 months from the Closing Date, subject to the provisions of the Business Plan. |
| **Completion Guaranty** | Special Guarantor shall guarantee lien-free completion of construction of the Property in accordance with the approved plans and specifications and the approved construction schedule and payment of all costs of completion in excess of the approved construction budget and available contingency. At Closing, Borrower shall obtain an Insurance Policy or Surety Bond, issued by an AA-graded financial institution, reasonably approved by the Lender, which shall provide an additional ground lease completion guarantee to landlord in the event of a foreclosure by Lender. |
| **Recourse Carve-outs** | The Guarantors shall guarantee (i) environmental matters, and (ii) customary non-recourse carve-outs, including, without limitation, failure to pay reserved and funded project carrying costs and transfer fees to landlord, if any, due in connection with Lender's exercise of remedies. |
| **Title Insurance** | Borrower shall, at Borrower's sole expense, obtain title insurance through Lender-approved Title Agency reasonably satisfactory to Borrower, including (i) a mortgagee's policy of title insurance and a UCC policy of title insurance, and (ii) a survey of the Property prepared by a surveyor reasonably acceptable to Lender. |
| **Interest Reserve** | Monthly Interest due on the Loan shall be funded on an ongoing basis at Interest is due on the Loan as part of the monthly draw process which amount shall be established as a line item in the Project cost budget ("**Interest Budget**") (and not from the Interest Reserve which will be set at $0.00 and established at the Closing). If Lender determines that at any time the Interest Budget, along with Projected cash flow from operations (if any), is insufficient to fund the interest payment calculated at the Interest Rate (as applicable), Borrower shall fund into the Interest Reserve an amount equal to such shortfall ("**Interest Reserve Rebalancing Payment**"). Borrower's failure to make the Interest Reserve Rebalancing Payment within 20-days shall constitute an Event of Default. |
| **Carry Cost Reserve** | All carry costs (including, without limitation, taxes and insurance) payable during the term of the Loan, (collectively "**Carry Costs**"), as reasonably determined by Lender, will be included as a line item in the Project budget and will be advanced by the Loan on an ongoing basis when payable. |
| **Rebalancing Reserve** | Based upon a percentage of completion analysis as determined by Lender and its Project Monitor, if at any time the undrawn amount of the Loan including Contingency, to the extent the same is, subject to rebalancing, available to be drawn, is less than all remaining hard costs, soft costs, and interest due under the Loan to complete and stabilize the Project as well as fund required reserves, Borrower shall fund into an account within 20-days, subject to Lender's approval a rebalancing reserve (the "**Rebalancing Reserve**") the amount of such shortfall ("**Rebalancing Reserve Payment**"). The Rebalancing Reserve shall, subject to Lender's approval, be utilized to pay any such shortfall. After determination by Lender that a Rebalancing Reserve Payment is due, Rebalancing Reserve funds will be disbursed by Lender to Borrower for the purpose of paying approved costs related to the Project until |

| | |
|---|---|
| | the Loan is back in balance. To the extent there are any proven costs savings (as determined by Lender in its discretion), Borrower shall be permitted to reallocate those proven cost savings from line items that are complete to other line items in the budget prior to funding a Rebalancing Reserve Payment. |
| **Guarantor and Project Reporting** | Customary, but unaudited. |
| **Representational and Warranties** | Customary |
| **Negative Covenants** | Customary |
| **Out-of-Pocket Expenses** | Borrower and Guarantor(s) shall be liable for all of Lender's reasonable third-party out-of-pocket costs and expenses incurred in connection with the proposed Loan, regardless of whether the transaction contemplated herein closes. An initial expense deposit of $300,000, to be paid by the Sponsors, is required upon execution of this Term Sheet and prior to Lender commencing its Due Diligence Review. Additional deposits shall be required in amounts of $50,000 upon utilization of 80% of the deposit. This section shall be binding on the Guarantor(s) and Sponsors, and any of their respective affiliates. In the event that Lender determines it will not go forward with the Loan based on the terms set forth herein, Lender shall refund the expense deposit less third-party costs incurred to date. In the event that Lender determines it will not go forward with the Loan based on the terms set forth herein, Lender shall refund the expense deposit less third-party costs incurred to date. |
| **Closing Conditions** | Closing of the Loan shall be subject to, but not limited to, the satisfaction of the following conditions:<br>i) completion of all Loan agreements and documentation in a manner mutually acceptable to Lender and Borrower and approved by the Bankruptcy Court;<br>ii) approval by Lender's final investment committee;<br>iii) customary legal opinions in form and content satisfactory to Lender, received from Lender's counsel; |
| **Special Conditions** | Closing of the Loan shall be subject to, the satisfaction of the following special conditions:<br><br>i) Bankruptcy court to order providing for assumption of Ground Lease and Court's determination that any defaults under the Ground Lease have been cured as of the confirmation of the Plan and Ground Lease is in full force and effect.<br>ii) Borrower and Sponsor will endeavor to obtain from the Ground Lessor an extension of the completion date to August 15, 2022 or 36 months from the Loan Closing whichever is later.<br>iii) Provided the above terms are presented to the bankruptcy court as part of a re-organization plan, Hana Financial Investment approves the use of this term sheet and the name of the firm as the designated Lender in the re-organization plan. |
| **US Patriot Act** | As part of our customer identification and verification procedures, Lender may ask Borrower and Sponsor to provide additional information as necessary to verify their identity and comply with the USA PATRIOT Act. |

{01011883.DOCX;2 }

부서: 포트폴리오금융팀 / 성명: 강* / 출력시간: 2019-06-19 09:08:25

| | |
|---|---|
| | Until such additional information or documentation is provided, Lender may not be able to affect any transactions for Borrower or Sponsor. |
| Governing Law | THIS LETTER AND ANY RESULTING LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.) |
| Jurisdiction | The Bankruptcy Court shall have exclusive jurisdiction to construe and enforce the terms of the foregoing *Indicative Loan Terms and Conditions* and any resulting loan agreement and loan documents. |

**If the above described terms and conditions are satisfactory, please indicate your acceptance of this letter by signing and returning an original of this letter on or before June 24, 2019.**

**This Loan offer will expire if not accepted and received by us by June 24, 2019 5PM EST.**

**Lender**

Hana Financial Investment

By: _[signature]_

Name: Mincheol Jeon.

Title: Head of Portfolio Finance Team, Hana Financial Investment. Co.

Address: 32 Uisadang-daero, Yeongdeungpo-gu, Seoul 07321, Korea

**Borrower**

CBCS Washington Street LP

By: _____

Name:

Title:

Address: _____

{01011883.DOCX;2 }