UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re:                                                      Chapter 11

**CBCS WASHINGTON STREET LP,**                              Case No:  19-22607-rdd

                                    Debtor.
------------------------------------------------------------X


<u>**SECOND PLAN SUPPLEMENT**</u>


Dated: New York, New York
         October 3, 2019


                                        ROBINSON BROG LEINWAND GREENE
                                        GENOVESE & GLUCK P.C.
                                        875 Third Avenue
                                        New York, NY 10022
                                        Counsel for the Debtor

P.  [DRAFT] LOAN DOCUMENTS-SUBJECT TO FURTHER NEGOTIATION

P-1. Building Loan Note – Please see Plan Supplement, ECF No. 175

P-2. Revised Building Loan Mortgage [10/1/19]

P-3. Building Loan Assignment of Leases and Rents - Please see Plan Supplement, ECF No. 175

P-4. Building Loan Assignment of Contracts - Please see Plan Supplement, ECF No. 175

P-5. Revised Building Loan Agreement [10/3/19]

P-6. Recourse Guaranty (Building Loan) - Please see Plan Supplement, ECF No. 175

P-7. Completion Guaranty (Building Loan) - Please see Plan Supplement, ECF No. 175

P-8. Project Loan Note - Please see Plan Supplement, ECF No. 175

P-9. Revised Project Loan Mortgage [10/1/19]

P-10. Project Loan Assignment of Leases and Rents - Please see Plan Supplement, ECF No. 175

P-11. Project Loan Agreement - Please see Plan Supplement, ECF No. 175

P-12. Mezzanine Loan Note - Please see Plan Supplement, ECF No. 175

P-13. Revised Mezzanine Loan Pledge [9/27/19]

P-14. Revised Mezzanine Loan Agreement [9/23/19]

P-15. Recourse Guaranty (Mezzanine Loan) - Please see Plan Supplement, ECF No. 175

R.  RECOGNITION AGREEMENT AND LANDLORD ESTOPPEL

S.  FIFTH AMENDMENT TO AGREEMENT OF LEASE

**EXHIBIT P-2**

**GT DRAFT 10/1/19**

---

**[CBCS WASHINGTON STREET LP]**
(Mortgagor)

to

**[_____]**
(Mortgagee)

---

**BUILDING LOAN LEASEHOLD MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT**

---

Dated:  As of [_____ __], 2019

Property Location:    456 Greenwich Street
New York, New York

DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:

Greenberg Traurig, LLP
200 Park Avenue
New York, New York 10166
Attention:  Howard S. Schochet, Esq.

**BUILDING LOAN LEASEHOLD MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT** (this "*Mortgage*"), made as of [_____ ____], 2019, by [**CBCS WASHINGTON STREET LP**, a Delaware limited partnership] (together with its permitted successors and assigns, "*Mortgagor*"), having an address at [_____] to [_____], a [_____] (together with its successors and assigns, hereinafter referred to as "*Mortgagee*"), having it principal place of business as c/o [_____].

Mortgagor and Mortgagee have entered into that certain Building Loan Agreement dated as of the date hereof (as amended, modified, restated, consolidated or supplemented from time to time, the "*Loan Agreement*") pursuant to which Mortgagee is making a secured building loan to Mortgagor in the aggregate original principal amount not to exceed [_____Dollars and No/100 ($_____)] (the "*Loan*"). Capitalized terms used herein without definition are used as defined in the Loan Agreement. The Loan is evidenced by that certain Building Loan Promissory Note dated the date hereof made by Mortgagor to Mortgagee in such principal amount (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced, or supplemented from time to time, the "*Note*").

To secure the payment of the Note and all sums which may or shall become due thereunder or under any of the other documents evidencing, securing or executed in connection with the Loan (the Note, this Mortgage, the Loan Agreement and such other documents, as any of the same may, from time to time, be modified, amended or supplemented, being hereinafter collectively referred to as the "*Loan Documents*"), including (i) the payment of interest and other amounts which would accrue and become due but for the filing of a petition in bankruptcy (whether or not a claim is allowed against Mortgagor for such interest or other amounts in any such bankruptcy proceeding) or the operation of the automatic stay under Section 362(a) of Title 11 of the United States Code (the "*Bankruptcy Code*"), and (ii) the costs and expenses of enforcing any provision of any Loan Document (all such sums being hereinafter collectively referred to as the "*Debt*"), Mortgagor hereby irrevocably mortgages, grants, bargains, sells, conveys, transfers, pledges, sets over and assigns, and grants a security interest, to and in favor of Mortgagee, WITH POWER OF SALE, all of Mortgagor's right, title and interest in and to (a) the leasehold interest in the land described on Exhibit A, as evidenced by that certain Ground Lease between 445 Washington LLC, a New York limited liability company, as lessor, and Mortgagor (as successor by merger with CBCS Washington Street LLC), as lessee, dated June 19, 2013 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "*Ground Lease*"), as memorialized by that certain Memorandum of Ground Lease dated [_____] and recorded on [_____] as CRFN [_____] in the Office of the City Register of the City of New York, together with any after acquired property which is the subject of the Ground Lease (collectively, the "*Land*") and (b) all additional title, estates, interests, development rights and air rights hereafter acquired by Mortgagor for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Mortgage (together with the Land, collectively, the "*Premises*"), and the buildings, structures, fixtures and other improvements now or hereafter located thereon (the "*Improvements*");

**TOGETHER WITH:** all right, title, interest and estate of Mortgagor now owned, or hereafter acquired, in and to the following property, rights, interests and estates (the Premises, the Improvements, and the property, rights, interests and estates hereinafter described are collectively referred to herein as the "***Mortgaged Property***"):

(a)     all credits, deposits (including, without limitation, any deposit of cash or securities or any other property which may be held to secure Mortgagor's performance of its obligations under the Ground Lease), options, privileges and rights of Mortgagor as tenant under the Ground Lease;

(b) all easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the Improvements; and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road, highway, alley or avenue, opened, vacated or proposed, in front of or adjoining the Premises, to the center line thereof; and all the estates, rights, titles, interests, dower and rights of dower, courtesy and rights of courtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Mortgagor of, in and to the Premises and the Improvements and every part and parcel thereof, with the appurtenances thereto, including any and all of the foregoing under or by virtue of the Ground Lease;

(c)     all machinery, furniture, furnishings, equipment, computer software and hardware, fixtures (including all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), inventory, materials, supplies and other articles of personal property and accessions thereof, renewals and replacements thereof and substitutions therefor, and other property of every kind and nature, tangible or intangible, owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Premises or the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements (hereinafter collectively referred to as the "***Equipment***"), including any leases of, deposits in connection with, and proceeds of any sale or transfer of any of the foregoing, and the right, title and interest of Mortgagor in and to any of the Equipment that may be subject to any "security interest" as defined in the Uniform Commercial Code, as in effect in the State where the Mortgaged Property is located (the "***UCC***"), superior in lien to the lien of this Mortgage;

(d)     all awards or payments, including interest thereon, that may heretofore or hereafter be made with respect to the Premises or the Improvements, whether from the exercise of the right of eminent domain or condemnation (including any transfer made in lieu of or in anticipation of the exercise of such right), or for a change of grade, or for any other injury to or decrease in the value of the Premises or Improvements;

(e)     all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Premises or the Improvements, including any extensions, renewals, modifications or amendments thereof (hereinafter collectively referred to as the "***Leases***") and all rents, rent

2

equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding or in lieu of rent or rent equivalents), royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits but subject to the rights of any tenants to security deposits under the Leases), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Mortgagor or its agents or employees from any and all sources arising from or attributable to the Premises and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Premises or the Improvements, or rendering of services by Mortgagor or any of its agents or employees, and proceeds, if any, from business interruption or other loss of income insurance (hereinafter collectively referred to as the "***Rents***"), together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(f)     all proceeds of and any unearned premiums on any insurance policies covering the Mortgaged Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Mortgaged Property;

(g)     the right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to commence any action or proceeding to protect the interest of Mortgagee in the Mortgaged Property;

(h)     all accounts (including reserve accounts), escrows, documents, instruments, chattel paper, claims, deposits and general intangibles, as the foregoing terms are defined in the UCC, and all franchises, trade names, trademarks, symbols, service marks, books, records, plans, specifications, designs, drawings, surveys, title insurance policies, permits, consents, licenses, management agreements, contract rights (including any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair or other work upon the Mortgaged Property), approvals, actions, refunds of real estate taxes and assessments (and any other governmental impositions related to the Mortgaged Property) and causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon (hereinafter collectively referred to as the "***Intangibles***");

(i)     all accounts and accounts receivable, including all present and future rights to payment from any consumer credit or charge card organization or entity (such as those organizations which sponsor or administer the American Express, Carte Blanche, Discover Card, Diners Club, Visa, Master Card and similar charge and credit cards) arising out of the leasing and operation of, or the business conducted at or in relation to, any of the Mortgaged Property;

(j)     all revenue and income received by or on behalf of Mortgagor, Hotel Manager or Manager resulting from the operation of the Mortgaged Property as a hotel, including all sums (i) paid by customers for the use of hotel rooms located within the Mortgaged Property, (ii)

3

derived from food and beverage operations located within the Mortgaged Property (including, without limitation, from the sale of alcoholic beverages), (iii) generated by other hotel operations, including without limitation any parking, convention, sports, banquet facilities, golf courses and recreational facilities and (iv) business interruption insurance proceeds;

(k) all deposit, operating or other accounts including the entire balance therein (now or hereafter existing) maintained by or on behalf of Mortgagor, Hotel Manager or Manager (to the extent related to Hotel Manager's or Manager's management and operation of the Mortgaged Property) with any other banking or financial institution, and all money, instruments, securities, documents, chattel paper, credits, demands, and any other property, rights, or interests of Mortgagor, Hotel Manager or Manager related to the Mortgaged Property which at any time shall come into the possession, custody or control of any other banking or financial institution;

(l) the Hotel Management agreement and all agreements now or hereafter entered into by or on behalf of Mortgagor with any party with respect to the management, hotel management, franchising, leasing, brokerage, promotional, marketing or consulting services rendered or to be rendered, with respect to the franchising, leasing, promotion, marketing, operation or sale of any portion of the Mortgaged Property, and the proceeds thereof (including distributions and other payments thereunder) and any license agreements;

(m) all books, records and computer software in which Mortgagor has an ownership or licensing interest concerning any of the foregoing;

(n) the Interest Rate Cap Agreement and any replacements, amendments or supplements thereto, including, but not limited to, all "accounts", "chattel paper", "general intangibles" and "investment property" (as such terms are defined in the Uniform Commercial Code as from time to time in effect) constituting or relating to the foregoing, and all claims of Mortgagor for breach by the counterparty thereunder of any covenant, agreement, representation or warranty contained in the Interest Rate Cap Agreement; and

(o) all proceeds, products, offspring, rents and profits from any of the foregoing, including those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

Without limiting the generality of any of the foregoing, in the event that a case under the Bankruptcy Code is commenced by or against Mortgagor, pursuant to Section 552(b)(2) of the Bankruptcy Code, the security interest granted by this Mortgage shall automatically extend to all Rents acquired by the Mortgagor after the commencement of the case and shall constitute cash collateral under Section 363(a) of the Bankruptcy Code.

**TO HAVE AND TO HOLD** the Mortgaged Property unto Mortgagee and its successors and assigns, forever;

**PROVIDED, HOWEVER**, these presents are upon the express condition that, if Mortgagor shall well and truly pay to Mortgagee the Debt at the time and in the manner provided in the Loan Documents and shall well and truly abide by and comply with each and every covenant and condition set forth in the Loan Documents in a timely manner, these presents and the estate hereby granted shall cease, terminate and be void;

4

**AND** Mortgagor represents and warrants to and covenants and agrees with Mortgagee as follows:

## PART I - GENERAL PROVISIONS

**1.** **Payment of Debt and Incorporation of Covenants, Conditions and Agreements**. Mortgagor shall pay the Debt at the time and in the manner provided in the Loan Agreement, the Note and the other Loan Documents. All the covenants, conditions and agreements contained in the Loan Documents are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein. Without limiting the generality of the foregoing, Mortgagor (i) agrees to insure, repair, maintain and restore damage to the Mortgaged Property, pay Taxes and Other Charges, and comply with Legal Requirements, in accordance with the Loan Agreement, and (ii) agrees that the Proceeds of Insurance and Awards for Condemnation shall be settled, held and applied in accordance with the Loan Agreement.

**2.** **Leases and Rents**.

(a) Mortgagor does hereby absolutely and unconditionally assign to Mortgagee all of Mortgagor's right, title and interest in all current and future Leases and Rents, it being intended by Mortgagor that this assignment constitutes a present, absolute assignment, and not an assignment for additional security only. Such assignment shall not be construed to bind Mortgagee to the performance of any of the covenants or provisions contained in any Lease or otherwise impose any obligation upon Mortgagee. Nevertheless, subject to the terms of this paragraph, Mortgagee grants to Mortgagor a revocable license, prior to the occurrence of and for so long as no Event of Default is continuing, to operate and manage the Mortgaged Property and to collect the Rents and to do all things which Mortgagor or any lessor is or may become entitled to do under the Leases and to exercise any and all rights thereunder, including all rights, powers, privileges and other benefits thereunder, subject to the requirements of the Loan Agreement (including the deposit of Rents into the Deposit Account (including all Subaccounts thereof)). Upon the occurrence and during the continuance of an Event of Default, without the need for notice or demand, the license granted to Mortgagor herein shall automatically be revoked, and Mortgagee shall immediately be entitled to possession of all Rents in the Deposit Account (including all Subaccounts thereof) and all Rents collected thereafter (including Rents past due and unpaid), whether or not Mortgagee enters upon or takes control of the Mortgaged Property. Mortgagor hereby grants and assigns to Mortgagee the right, at its option, upon revocation of the license granted herein, to enter upon the Mortgaged Property, subject to the rights of tenants and other occupants, in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of such license may be applied toward payment of the Debt in such priority and proportions as Mortgagee in its sole discretion shall deem proper.

(b) Mortgagor shall not enter into, modify, amend, cancel, terminate or renew any Lease except as provided in Section 5.10 of the Loan Agreement.

**3.** **Use of Mortgaged Property**. Mortgagor shall not initiate, join in or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Mortgaged Property except as otherwise permitted in the Loan Agreement. If under applicable zoning provisions the use of the

5

Mortgaged Property is or shall become a nonconforming use, Mortgagor shall not cause or permit such nonconforming use to be discontinued or abandoned without the consent of Mortgagee. Mortgagor shall not, except as otherwise set forth in the Loan Agreement (i) change the use of the Mortgaged Property, (ii) permit or suffer to occur any waste on or to the Mortgaged Property or (iii) take any steps to convert the Mortgaged Property to a condominium or cooperative form of ownership.

### 4.    **Transfer or Encumbrance of the Mortgaged Property**.

(a)    Mortgagor acknowledges that (i) Mortgagee has examined and relied on the creditworthiness and experience of the principals of Mortgagor in owning and operating properties such as the Mortgaged Property in agreeing to make the Loan, (ii) Mortgagee will continue to rely on Mortgagor's ownership of the Mortgaged Property as a means of maintaining the value of the Mortgaged Property as security for the Debt, and (iii) Mortgagee has a valid interest in maintaining the value of the Mortgaged Property so as to ensure that, should an Event of Default occur and be continuing, Mortgagee can recover the Debt by a sale of the Mortgaged Property in accordance with applicable law. Mortgagor shall not sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Mortgaged Property or any part thereof, or suffer or permit any Transfer to occur, other than a Permitted Encumbrance and/or a Permitted Transfer.

(b)    Mortgagee shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Transfer in violation of this <u>Section 4</u>. This provision shall apply to every sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property (and every other Transfer) regardless of whether voluntary or not. Any Transfer made in contravention of this <u>Section 4</u> shall be null and void and of no force or effect. Mortgagor agrees to bear and shall pay or reimburse Mortgagee on demand for all reasonable out-of-pocket expenses (including reasonable attorneys' fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Mortgagee in connection with the review, approval and documentation of any Permitted Transfer.

### 5.    **Ground Lease**.

(a)    This Mortgage is subject to the terms and subordinate to the Ground Lease.

(b)    No purchaser at any foreclosure sale shall acquire any right, title or interest in or to the Ground Lease, unless such purchaser (or the person, firm or corporation to whom or to which such purchaser's right has been assigned) shall, in the instrument transferring to such purchaser (or to such assignee) the Mortgagor as tenant's interest under the Ground Lease, assume and agree to perform all of the terms, covenants and conditions of the Ground Lease to be observed or performed on the part of Mortgagor as tenant, and moreover, that no further or additional mortgage or assignment of the Ground Lease shall be made, except in accordance with the provisions contained in Articles 10 and 11 of the Ground Lease, and that a duplicate original of said assumption agreement, duly executed and acknowledged by such purchaser (or such assignee) is delivered to Landlord promptly after the consummation of such sale.

(c)     Mortgagee waives all rights and does not have an option to retain and apply the proceeds of any insurance or the proceeds of any condemnation award toward payment of the sum secured by this Mortgage to the extent such proceeds are either (A) payable to Landlord in accordance with the provisions of the Ground Lease or (B) are required to be used for the repair or restoration of the Premises in accordance with the provisions of the Ground Lease.

6.     **Changes in Laws Regarding Taxation**.  If any law is enacted or adopted or amended after the date of this Mortgage which deducts the Debt from the value of the Mortgaged Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Mortgagee's interest in the Mortgaged Property, Mortgagor will pay such tax, with interest and penalties thereon, if any.  If Mortgagee is advised by its counsel that the payment of such tax or interest and penalties by Mortgagor would be unlawful, taxable to Mortgagee or unenforceable, or would provide the basis for a defense of usury, then Mortgagee shall have the option, by written notice of not less than 120 days, to declare the Debt immediately due and payable without premium, penalty or fee, but in all events subject to the Minimum Multiple Payment.

7.     **No Credits on Account of the Debt**.  Mortgagor shall not claim or demand or be entitled to any credit on account of the Debt for any part of the Taxes or Other Charges assessed against the Mortgaged Property, and no deduction shall otherwise be made or claimed from the assessed value of the Mortgaged Property for real estate tax purposes by reason of this Mortgage or the Debt.  If such claim, credit or deduction shall be required by law, Mortgagee shall have the option, by written notice to Mortgagor of not less than 90 days, to declare the Debt immediately due and payable.

8.     **Further Acts, Etc.**  Mortgagor shall, at its sole cost, perform, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, transfers and assurances as Mortgagee shall, from time to time, in Mortgagee's reasonable discretion, require, for the better assuring, conveying, assigning, transferring, and confirming unto Mortgagee the property and rights hereby mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, pledged, assigned and hypothecated or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign to Mortgagee, or for carrying out the intention or facilitating the performance of the terms of this Mortgage, or for filing, registering or recording this Mortgage or for facilitating the sale and transfer of the Loan and the Loan Documents in connection with a "Secondary Market Transaction" as described in Section 9.1 of the Loan Agreement; provided, however, that in connection therewith, under no circumstance shall Mortgagor be required to incur, suffer or accept any materially lesser rights or materially greater obligations hereunder or under any Loan Document (unless otherwise set forth in the Loan Agreement).  Upon foreclosure, the appointment of a receiver or any other relevant action, Mortgagor shall, at its sole cost, cooperate fully and completely to effect the assignment or transfer of any license, permit, agreement or any other right necessary or useful to the operation of the Mortgaged Property.  Mortgagor grants to Mortgagee an irrevocable power of attorney coupled with an interest for the purpose of, during the continuance of an Event of Default, exercising and perfecting any and all rights and remedies available to Mortgagee at law and in equity, including such rights and remedies available to Mortgagee pursuant to this paragraph.

7

**9.** **Recording of Mortgage, Etc.**  Mortgagor forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, shall cause this Mortgage, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Mortgaged Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest hereof upon, and the interest of Mortgagee in, the Mortgaged Property.  Mortgagor shall pay all filing, registration or recording fees, all expenses incident to the preparation, execution and acknowledgment of and all federal, state, county and municipal, taxes, duties, imposts, documentary stamps, assessments and charges arising out of or in connection with the execution and delivery of, this Mortgage, any Mortgage supplemental hereto, any security instrument with respect to the Mortgaged Property or any instrument of further assurance, except where prohibited by law so to do.  Mortgagor shall hold harmless and indemnify Mortgagee, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making or recording of this Mortgage.

**10.** **Right to Cure Defaults**.  Upon the occurrence and during the continuance of any Event of Default, Mortgagee may, but without any obligation to do so and without notice to or demand on Mortgagor except as expressly required hereunder or in the Loan Agreement, and without releasing Mortgagor from any obligation hereunder, perform the obligations in Default in such manner and to such extent as Mortgagee may deem necessary to protect the security hereof.  Mortgagee is authorized to enter upon the Mortgaged Property for such purposes or appear in, defend or bring any action or proceeding to protect its interest in the Mortgaged Property or to foreclose this Mortgage or collect the Debt, and the actual out-of-pocket cost and expense thereof (including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest thereon at the Default Rate for the period after notice from Mortgagee that such cost or expense was actually incurred to the date of payment to Mortgagee, shall constitute a portion of the Debt, shall be secured by this Mortgage and the other Loan Documents and shall be due and payable to Mortgagee upon demand.

**11.** **Remedies**.

(a)    Upon the occurrence and during the continuance of any Event of Default, Mortgagee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Mortgaged Property, by Mortgagee itself or otherwise, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Mortgagee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Mortgagee:

(i)    declare the entire Debt to be immediately due and payable;

(ii)    institute a proceeding or proceedings, judicial or nonjudicial, to the extent permitted by law, by advertisement or otherwise, for the complete foreclosure of this Mortgage, in which case the Mortgaged Property may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(iii)    with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of

8

this Mortgage for the portion of the Debt then due and payable, subject to the continuing lien of this Mortgage for the balance of the Debt not then due;

(iv)    sell for cash or upon credit the Mortgaged Property and all estate, claim, demand, right, title and interest of Mortgagor therein and rights of redemption thereof, pursuant to the power of sale, to the extent permitted by law, or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(v)    institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein or in any other Loan Document;

(vi)    recover judgment on the Note either before, during or after any proceeding for the enforcement of this Mortgage;

(vii)    apply for the appointment of a trustee, receiver, liquidator or conservator of the Mortgaged Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Mortgagor or of any person, firm or other entity liable for the payment of the Debt;

(viii)    enforce Mortgagee's interest in the Ground Lease, Leases and Rents and enter into or upon the Mortgaged Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and employees therefrom, and thereupon Mortgagee may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with the Mortgaged Property and conduct the business thereat; (B) complete any construction on the Mortgaged Property in such manner and form as Mortgagee deems advisable; (C) make alterations, additions, renewals, replacements and improvements to or on the Mortgaged Property; (D) exercise all rights and powers of Mortgagor with respect to the Mortgaged Property, whether in the name of Mortgagor or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive Rents; and (E) apply the receipts from the Mortgaged Property to the payment of the Debt, after deducting therefrom all actual out-of-pocket expenses (including reasonable attorneys' fees and disbursements) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, insurance and other charges in connection with the Mortgaged Property, as well as just and reasonable compensation for the services of Mortgagee, and its counsel, agents and employees;

(ix)    require Mortgagor to pay monthly in advance to Mortgagee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of any portion of the Mortgaged Property occupied by Mortgagor, and require Mortgagor to vacate and surrender possession of the Mortgaged Property to Mortgagee or to such receiver, and, in default thereof, evict Mortgagor by summary proceedings or otherwise; or

(x)    pursue such other rights and remedies as may be available at law or in equity or under the UCC, including the right to receive and/or establish a lock box for all Rents and proceeds from the Intangibles and any other receivables or rights to payments of Mortgagor relating to the Mortgaged Property.

In the event of a sale, by foreclosure or otherwise, of less than all of the Mortgaged Property, this Mortgage shall continue as a lien on the remaining portion of the Mortgaged Property.

(b)    The proceeds of any sale made under or by virtue of this Section 10, together with any other sums which then may be held by Mortgagee under this Mortgage, whether under the provisions of this Section 10 or otherwise, shall be applied by Mortgagee to the payment of the Debt in such priority and proportion as Mortgagee in its sole discretion shall deem proper.

(c)    Mortgagee may adjourn from time to time any sale by it to be made under or by virtue of this Mortgage by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable law, Mortgagee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(d)    Upon the completion of any sale or sales pursuant hereto, Mortgagee, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold. Mortgagee is hereby irrevocably appointed the true and lawful attorney of Mortgagor, in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose Mortgagee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, Mortgagor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any sale or sales made under or by virtue of this Section 10, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Mortgagor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Mortgagor and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under Mortgagor.

(e)    Upon any sale made under or by virtue of this Section 10, whether made under a power of sale or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Mortgagee may bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Debt the net sales price after deducting therefrom the expenses of the sale and costs of the action and any other sums which Mortgagee is authorized to deduct under this Mortgage or any other Loan Document.

(f)    No recovery of any judgment by Mortgagee and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of Mortgagor shall

10

affect in any manner or to any extent the lien of this Mortgage upon the Mortgaged Property or any part thereof, or any liens, rights, powers or remedies of Mortgagee hereunder, but such liens, rights, powers and remedies of Mortgagee shall continue unimpaired as before.

(g)     Mortgagee may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in this Section 10 at any time before the conclusion thereof, as determined in Mortgagee's sole discretion and without prejudice to Mortgagee.

(h)     Mortgagee may resort to any remedies and the security given by this Mortgage or in any other Loan Document in whole or in part, and in such portions and in such order as determined by Mortgagee's sole discretion.  No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by any Loan Document.  The failure of Mortgagee to exercise any right, remedy or option provided in any Loan Document shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by any Loan Document.  No acceptance by Mortgagee of any payment after the occurrence of any Event of Default and no payment by Mortgagee of any obligation for which Mortgagor is liable hereunder shall be deemed to waive or cure any Event of Default, or Mortgagor's liability to pay such obligation.  No sale of all or any portion of the Mortgaged Property, no forbearance on the part of Mortgagee, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Mortgagee to Mortgagor, shall operate to release or in any manner affect the interest of Mortgagee in the remaining Mortgaged Property or the liability of Mortgagor to pay the Debt unless and until the Debt shall have been indefeasibly repaid in full.  No waiver by Mortgagee shall be effective unless it is in writing and then only to the extent specifically stated.   All actual out-of-pocket costs and expenses of Mortgagee in exercising its rights and remedies under this Section 10 (including reasonable attorneys' fees and disbursements to the extent permitted by law), shall be paid by Mortgagor within five (5) days following written demand therefor from Mortgagee, with interest at the Default Rate for the period after notice from Mortgagee, and such actual out-of-pocket costs and expenses shall constitute a portion of the Debt and shall be secured by this Mortgage.

(i)     The interests and rights of Mortgagee under the Loan Documents shall not be impaired by any indulgence, including (i) any renewal, extension or modification which Mortgagee may grant with respect to any of the Debt, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Mortgagee may grant with respect to the Mortgaged Property or any portion thereof or (iii) any release or indulgence granted to any maker, endorser, guarantor or surety of any of the Debt.

**12.     Right of Entry**.  In addition to any other rights or remedies granted under this Mortgage, Mortgagee and its agents shall have the right to enter and inspect the Mortgaged Property at any reasonable time during the term of this Mortgage in accordance with Section 5.3 of the Loan Agreement.  The cost of such inspections or audits shall be borne by Mortgagor should Mortgagee determine that an Event of Default has occurred and is continuing, including the actual out-of-pocket cost of all follow up or additional investigations or inquiries deemed reasonably necessary by Mortgagee.  The cost of such inspections, if not paid for by Mortgagor following five (5) days' written demand therefor, may be added to the principal balance of the

11

sums due under the Note and this Mortgage and shall bear interest thereafter until paid at the Default Rate.

**13.** **Security Agreement**. This Mortgage is both a real property mortgage and a "security agreement" within the meaning of the UCC. The Mortgaged Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Mortgaged Property. Mortgagor by executing and delivering this Mortgage has granted and hereby grants to Mortgagee, as security for the Debt, a security interest in the Mortgaged Property to the full extent that the Mortgaged Property may be subject to the UCC (such portion of the Mortgaged Property so subject to the UCC being called in this paragraph the "*Collateral*"). This Mortgage shall also constitute a "fixture filing" for the purposes of the UCC. As such, this Mortgage covers all items of the Collateral that are or are to become fixtures. Information concerning the security interest herein granted may be obtained from the parties at the addresses of the parties set forth in the first paragraph of this Mortgage. If an Event of Default shall occur and be continuing, Mortgagee, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the UCC, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Mortgagee may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Mortgagee, Mortgagor shall at its expense assemble the Collateral and make it available to Mortgagee at a convenient place acceptable to Mortgagee. Mortgagor shall pay to Mortgagee within five (5) days of written demand therefor any and all actual out-of-pocket expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Mortgagee in protecting the interest in the Collateral and in enforcing the rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Collateral, sent to Mortgagor in accordance with the provisions hereof at least ten (10) days prior to such action, shall constitute commercially reasonable notice to Mortgagor. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Mortgagee to the payment of the Debt in such priority and proportions as Mortgagee in its sole discretion shall deem proper. In the event of any change in name, identity or structure of Mortgagor, Mortgagor shall notify Mortgagee thereof and promptly after request shall execute, file and record such UCC forms as are necessary to maintain the priority of Mortgagee's lien upon and security interest in the Collateral, and shall pay all expenses and fees in connection with the filing and recording thereof. If Mortgagee shall require the filing or recording of additional UCC forms or continuation statements, Mortgagor shall, promptly after request, execute, file and record such UCC forms or continuation statements as Mortgagee shall deem necessary, and shall pay all actual out-of-pocket expenses and fees in connection with the filing and recording thereof, it being understood and agreed, however, that no such additional documents shall increase Mortgagor's obligations under the Loan Documents. Mortgagor hereby irrevocably appoints Mortgagee as its attorney-in-fact, coupled with an interest, to file with the appropriate public office on its behalf any financing or other statements signed only by Mortgagee, as secured party, in connection with the Collateral covered by this Mortgage.

**14.** **Actions and Proceedings**. Mortgagee has the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of Mortgagor, which Mortgagee, in its sole

12

discretion, decides should be brought to protect its or their interest in the Mortgaged Property. Mortgagee shall, at its option, be subrogated to the lien of any mortgage or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

15.    **Marshalling and Other Matters**.  Mortgagor hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Mortgaged Property or any part thereof or any interest therein.  Further, to the extent permitted pursuant to applicable law, Mortgagor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Mortgage on behalf of Mortgagor, and on behalf of each and every person acquiring any interest in or title to the Mortgaged Property subsequent to the date of this Mortgage and on behalf of all persons to the extent permitted by applicable law.  The lien of this Mortgage shall be absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever of Mortgagee and, without limiting the generality of the foregoing, the lien hereof shall not be impaired by (i) any acceptance by Mortgagee of any other security for any portion of the Debt, (ii) any failure, neglect or omission on the part of Mortgagee to realize upon or protect any portion of the Debt or any collateral security therefor or (iii) any release (except as to the property released), sale, pledge, surrender, compromise, settlement, renewal, extension, indulgence, alteration, changing, modification or disposition of any portion of the Debt or of any of the collateral security therefor; and Mortgagee may foreclose, or exercise any other remedy available to Mortgagee under other Loan Documents without first exercising or enforcing any of its remedies under this Mortgage, and any exercise of the rights and remedies of Mortgagee hereunder shall not in any manner impair the Debt or the liens of any other Loan Document or any of Mortgagee's rights and remedies thereunder.

16.    **Notices**.    All notices, consents, approvals and requests required or permitted hereunder shall be in writing, and shall be sent, and shall be deemed effective, as provided in the Loan Agreement.

17.    **Inapplicable Provisions**.   If any term, covenant or condition of this Mortgage is held to be invalid, illegal or unenforceable in any respect, this Mortgage shall be construed without such provision.

18.    **Headings**.  The paragraph headings in this Mortgage are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

19.    **Duplicate Originals**.  This Mortgage may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original.

20.    **Definitions**.   Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Mortgage may be used interchangeably in singular or plural form; and the word "***Mortgagor***" shall mean "each Mortgagor and any subsequent owner or owners of the Mortgaged Property or any part thereof or any interest therein," the word "***Mortgagee***" shall mean "Mortgagee and any subsequent holder

13

of the Note," the words "***Mortgaged Property***" shall include any portion of the Mortgaged Property and any interest therein, the word "***including***" means "including but not limited to" and the words "***attorneys' fees***" shall include any and all attorneys' fees, paralegal and law clerk fees, including fees at the pre-trial, trial and appellate levels incurred or paid by Mortgagee in protecting its interest in the Mortgaged Property and Collateral and enforcing its rights hereunder.

      **21.**    **Homestead**.  Mortgagor hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States and of any state, in and to the Mortgaged Property as against the collection of the Debt, or any part thereof.

      **22.**    **Assignments**.  Mortgagee shall have the right to assign or transfer its rights under this Mortgage without limitation.  Any assignee or transferee shall be entitled to all the benefits afforded Mortgagee under this Mortgage.

      **23.**    **Waiver of Jury Trial**.  EACH OF MORTGAGOR AND MORTGAGEE HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS MORTGAGE OR ANY OTHER LOAN DOCUMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY MORTGAGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.

      **24.**    **Consents**.  Any consent or approval by Mortgagee in any single instance shall not be deemed or construed to be Mortgagee's consent or approval in any like matter arising at a subsequent date, and the failure of Mortgagee to promptly exercise any right, power, remedy, consent or approval provided herein or at law or in equity shall not constitute or be construed as a waiver of the same nor shall Mortgagee be estopped from exercising such right, power, remedy, consent or approval at a later date.  Any consent or approval requested of and granted by Mortgagee pursuant hereto shall be narrowly construed to be applicable only to Mortgagor and the matter identified in such consent or approval and no third party shall claim any benefit by reason thereof, and any such consent or approval shall not be deemed to constitute Mortgagee a venturer or partner with Mortgagor nor shall privity of contract be presumed to have been established with any such third party.  If Mortgagee reasonably deems it to be in its best interest to retain assistance of persons, firms or corporations (including attorneys, title insurance companies, appraisers, engineers and surveyors) with respect to a request for consent or approval, Mortgagor shall reimburse Mortgagee for all out-of-pocket costs reasonably incurred in connection with the employment of such persons, firms or corporations, in addition to any obligations of Mortgagor set forth in Section 5.29 of the Loan Agreement.

      **25.**    **Loan Repayment.**  Provided no Event of Default has occurred and is continuing, this Mortgage will be assigned or satisfied and discharged of record by Mortgagee

*ACTIVE 45113551v6*

prior to the Maturity Date only in accordance with the terms and provisions set forth in Section 2.3 of the Loan Agreement.

### 26.    **Other Properties; No Election of Remedies**.

(a)    Mortgagor acknowledges that Mortgagee has made the Loan to Mortgagor upon the security of its collective interest in the Mortgaged Property and in reliance upon the aggregate of the Mortgaged Property taken together being of greater value as Mortgaged Property than the sum of the Premises taken separately.  Mortgagor covenants and agrees that upon the occurrence and during the continuance of an Event of Default, Mortgagee may proceed under this Mortgage against either the Mortgaged Property and/or any individual Premises and in such manner and order as Mortgagee shall elect.  Mortgagor hereby irrevocably waives and releases, to the extent permitted by law, and whether now or hereafter in force, any right to have the Mortgaged Property and/or any individual Premises marshaled upon any foreclosure of this Mortgage.

(b)    Without limiting the generality of the foregoing, and without limitation as to any other right or remedy provided to Mortgagee in this Mortgage or the other Loan Documents, following the occurrence and continuance of an Event of Default (i) Mortgagee shall have the right to pursue all of its rights and remedies under this Mortgage and the Loan Documents, at law and/or in equity, in one proceeding, or separately and independently in separate proceedings from time to time, as Mortgagee, in its sole and absolute discretion, shall determine from time to time, (ii) Mortgagee shall not be required to either marshal assets, sell the Mortgaged Property and/or any individual Premises in any particular order of alienation (and may sell the same simultaneously and together or separately), or be subject to any "one action" or "election of remedies" law or rule with respect to the Mortgaged Property and/or any individual Premises, (iii) the exercise by Mortgagee of any remedies against any one item of Mortgaged Property and/or any individual Premises will not impede Mortgagee from subsequently or simultaneously exercising remedies against any other item of Mortgaged Property and/or any individual Premises, (iv) all liens and other rights, remedies or privileges provided to Mortgagee herein shall remain in full force and effect until Mortgagee has exhausted all of its remedies against the Mortgaged Property and all Mortgaged Property has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt, and (v) Mortgagee may resort for the payment of the Debt to any security held by Mortgagee in such order and manner as Mortgagee, in its discretion, may elect and Mortgagee may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Mortgagee thereafter to foreclose this Mortgage.

(c)    Without notice to or consent of Mortgagor and without impairment of the lien and rights created by this Mortgage, Mortgagee may, at any time (in its sole and absolute discretion, but Mortgagee shall have no obligation to), execute and deliver to Mortgagor a written instrument releasing all or a portion of the lien of this Mortgage as security for any or all of the obligations of Mortgagor now existing or hereafter arising under or in respect of the Note, the Loan Agreement and each of the other Loan Documents, whereupon following the execution and delivery by Mortgagee to Mortgagor of any such written instrument of release, this Mortgage shall no longer secure such obligations of Mortgagor so released.

*ACTIVE 45113551v6*

27.    **Governing Law**.    With respect to matters relating to the creation, perfection and procedures relating to the enforcement of the Liens created pursuant to this Mortgage, this Mortgage shall be governed by, and construed in accordance with, the laws of the State in which the Mortgaged Property is located (without regard to conflict of law provisions thereof), it being understood that, except as expressly set forth above in this paragraph and to the fullest extent permitted by the law of such State, the law of the State of New York (without regard to conflict of law provisions thereof) shall govern all matters relating to this Mortgage and the other Loan Documents and all of the indebtedness or obligations arising hereunder or thereunder.    All provisions of the Loan Agreement incorporated herein by reference shall be governed by, and construed in accordance with, the laws of the State of New York, as set forth in the governing law provision of the Loan Agreement.

28.    **Exculpation**.    The liability of Mortgagor hereunder is limited pursuant to Section 10.1 of the Loan Agreement.

29.    **Intentionally Omitted**.

30. **Joint and Several Liability**.    If there is more than one party identified in this Security Instrument as a "Mortgagor", then each such party so identified shall be liable, jointly and severally, for all obligations of any Mortgagor hereunder.    As used herein, "Mortgagor" and "Mortgagors" shall also refer to any subsequent owners or lessees of all or any portion of the Mortgaged Property.

# PART II

## STATE-SPECIFIC PROVISIONS

31.    **Conflicts With Part I**.    In the event of any conflict between the provisions of this Part II and any provision of Part I, then the provisions of this Part II shall control.

(a) The terms, covenants and conditions contained herein shall be construed as affording to Mortgagee rights additional to, and not exclusive of, the rights conferred under the provisions of Section 254 of the Real Property Law of the State of New York.

(b) In compliance with Section 13 and Article 3-A of the Lien Law of the State of New York, Mortgagor will receive all advances secured by this Mortgage and will hold the right to receive all such advances as a trust fund to be applied first for the purpose of paying the cost of improvements, and will apply all such advances first to the payment of the cost of improvements before using any part of such advances for any other purpose.    Mortgagor will indemnify and hold Mortgagee harmless from and against any actual loss, liability, cost or expense, including, without limitation, any judgments, reasonable attorneys' fees, costs of appeal bonds and printing costs, arising out of or relating to any proceeding instituted by any claimant alleging a violation by Mortgagor of any applicable lien law provisions including, without limitation, any section of Article 3-A of the New York Lien Law.

(c) NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS SECURED BY

16

THIS MORTGAGE AT THE TIME OF EXECUTION OR WHICH UNDER ANY CONTINGENCY MAY HEREAFTER BECOME SECURED HEREBY AT ANY TIME IS [_____ DOLLARS AND NO/100 ($_____)] PROVIDED THAT SUCH LIMITATION SHALL NOT LIMIT THE SECURITY OF THIS MORTGAGE WITH RESPECT TO (I) INTEREST ON THE AFORESAID MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS AT THE RATES SET FORTH IN THE NOTE, (II) SUMS TO PAY TAXES, (III) SUMS TO PAY PREMIUMS ON INSURANCE POLICIES COVERING THE MORTGAGED PROPERTY, (IV) EXPENSES INCURRED AFTER AN EVENT OF DEFAULT IN UPHOLDING OR ENFORCING THE LIEN OF THIS MORTGAGE, INCLUDING, BUT NOT LIMITED TO, THE EXPENSES OF ANY LITIGATION TO PROSECUTE OR DEFEND THE RIGHTS AND LIEN CREATED BY THIS MORTGAGE, (V) ANY REASONABLE AMOUNT, COST OR CHARGE TO WHICH MORTGAGEE BECOMES SUBROGATED, UPON PAYMENT, WHETHER UNDER RECOGNIZED PRINCIPLES OF LAW OR EQUITY, OR UNDER EXPRESS STATUTORY AUTHORITY, AND (VI) ANY OTHER AMOUNT SECURED BY THIS MORTGAGE WHICH, IF NOT LIMITED BY SUCH LIMITATION, WOULD NOT INCREASE THE AMOUNT OF MORTGAGE RECORDING TAXES, IF ANY, PAYABLE WITH RESPECT TO THIS MORTGAGE.

(d) This Mortgage does not cover real property principally improved or to be improved by one or more structures containing in the aggregate not more than six residential dwelling units, each having their own separated cooking facilities.

(e) Reference is made to Section 291-f of the Real Property Law of New York for purposes of obtaining the benefit of said Section in connection with this Mortgage.

(f) Upon the occurrence and during the continuance of an Event of Default and acceleration of the indebtedness secured hereby, Mortgagee shall have the right to sell the Mortgaged Property, including, without limitation, pursuant to Article 14 of the New York Real Property Actions and Proceedings Law, as same may have been or may hereafter be amended.

(g) Mortgagee shall, at the request of Mortgagor, deliver an assignment of this Mortgage (together with the Note) in lieu of a release or satisfaction hereof upon or in connection with the payment of the Debt in full, in accordance with Section 24 hereof, provided that (i) other than containing a representation that Mortgagee shall not have previously transferred its rights under the Mortgage and the amount of the then outstanding indebtedness secured by the Mortgage, the instrument of assignment shall be without representation or warranty by, or recourse to, Mortgagee, in any event whatsoever, (ii) the assignee shall be a third party that is refinancing the Loan, (iii) Mortgagee is permitted by law to deliver an assignment in lieu of recording a satisfaction and (iv) Mortgagor shall pay all reasonable out-of-pocket fees and expenses of Mortgagee in connection with such assignment.

[NO FURTHER TEXT ON THIS PAGE]

*ACTIVE 45113551v6*

IN WITNESS WHEREOF, Mortgagor has executed this instrument as of the day and year first above written.

**MORTGAGOR:**

[***BORROWER'S COUNSEL TO CONFIRM SIGNATURE BLOCK***],
a [_____]

By:    _____
          Name:
          Title:

**GT DRAFT 10/1/19**

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK   )


On the _____ day of _____in the year 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


_____
Signature and Office of individual taking
acknowledgment


[Acknowledgment Page to Building Leasehold Mortgage]

**<u>EXHIBIT A</u>**

<u>Legal Description</u>

*ACTIVE 45113551v6*

**<u>EXHIBIT P-5</u>**

GT Draft 10/3/19

---

BUILDING LOAN AGREEMENT


Dated as of _____ __, 2019


Between


CBCS WASHINGTON STREET LP
as Borrower


And


[HANA FINANCIAL INVESTMENT OR AFFILIATE]
as Lender

---

*ACTIVE 45138641v14*

## TABLE OF CONTENTS

1.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION .................................................... 1
    1.1    Specific Definitions ........................................................................................ 1
    1.2    Principles of Construction ............................................................................ 26

2.    GENERAL LOAN TERMS .................................................................................... 27
    2.1    The Loan ....................................................................................................... 27
    2.2    Interest; Monthly Payments ......................................................................... 27
        2.2.1    Generally ........................................................................................... 27
        2.2.2    Default Rate ...................................................................................... 27
        2.2.3    Taxes .................................................................................................. 27
        2.2.4    Breakage Indemnity .......................................................................... 30
        2.2.5    New Payment Date ............................................................................ 31
        2.2.6    Requirements of Law ........................................................................ 31
    2.3    Loan Repayment ........................................................................................... 32
        2.3.1    Repayment ......................................................................................... 32
        2.3.2    Mandatory Prepayments .................................................................. 32
        2.3.3    Optional Prepayments ...................................................................... 33
    2.4    Release ........................................................................................................... 33
    2.5    Payments and Computations ....................................................................... 33
        2.5.1    Making of Payments ......................................................................... 33
        2.5.2    Computations .................................................................................... 33
        2.5.3    Late Payment Charge ....................................................................... 33
    2.6    Interest Rate Protection Agreements ........................................................... 33
        2.6.1    Interest Rate Protection Agreement ................................................ 33
        2.6.2    Execution of Documents .................................................................. 36
        2.6.3    No Obligation of Lender ................................................................... 37
        2.6.4    Receipts from Interest Rate Protection Agreements ....................... 37
        2.6.5    Downgrade of Counterparty ............................................................ 37
    2.7    Fees ............................................................................................................... 37
        2.7.1    Prepayment Fee ................................................................................ 37
        2.7.2    Minimum Multiple Payment ............................................................ 37
        2.7.3    Reserved ............................................................................................ 37
    2.8    Extension Option .......................................................................................... 37
    2.9    Advances ....................................................................................................... 40
        2.9.1    Conditions to Advances .................................................................... 40
        2.9.2    Amount, Timing and Procedure of Advances .................................. 43
        2.9.3    Requisitions ....................................................................................... 44
        2.9.4    Cost Overruns ................................................................................... 45
        2.9.5    Budget Reallocation ......................................................................... 45
        2.9.6    Construction Contingency ................................................................ 45
        2.9.7    Loan Balancing ................................................................................ 46
        2.9.8    Trust Funds ....................................................................................... 46
        2.9.9    Stored Materials; Deposits ............................................................... 46
        2.9.10   Quality of Work ................................................................................ 47
        2.9.11   Requisition as Affirmation ............................................................... 47

i

2.9.12 Advance Not Waiver ................................................................ 48
2.9.13 Conditions to Final Advance ................................................... 48
2.9.14 Lien Law Section 22 Compliance ............................................ 49
2.9.15 Advances to Pay Fees and Expenses ........................................ 49
2.9.16 Unfunded Portions of the Loan ............................................... 49
2.9.17 Miscellaneous ....................................................................... 49
2.10 Rate Conversion ............................................................................. 50

3. CASH MANAGEMENT AND RESERVES ................................................ 50
3.1 Cash Management Arrangements ...................................................... 50
3.2 Rebalancing Reserve Subaccount ..................................................... 50
3.3 Taxes and Insurance Subaccount ...................................................... 51
3.4 Leasehold Rents ............................................................................. 51
3.5 Operating Expense Subaccount ........................................................ 51
3.6 Casualty/Condemnation Subaccount ................................................. 52
3.7 Security Deposits ........................................................................... 52
3.8 Grant of Security Interest; Application of Funds ................................. 52
3.9 Property Cash Flow Allocation ........................................................ 53
3.10 FF&E Reserves ............................................................................. 53

4. REPRESENTATIONS AND WARRANTIES ............................................. 54
4.1 Organization; Special Purpose ........................................................ 54
4.2 Proceedings; Enforceability ............................................................ 55
4.3 No Conflicts ................................................................................. 55
4.4 Litigation ..................................................................................... 55
4.5 Agreements .................................................................................. 55
4.6 Title ............................................................................................ 55
4.7 No Bankruptcy Filing ..................................................................... 56
4.8 Full and Accurate Disclosure .......................................................... 56
4.9 Tax Filings ................................................................................... 57
4.10 No Plan Assets ............................................................................. 57
4.11 Compliance .................................................................................. 57
4.12 Contracts ..................................................................................... 57
4.13 Federal Reserve Regulations; Investment Company Act ...................... 58
4.14 Easements; Utilities and Public Access ............................................. 58
4.15 Physical Condition ........................................................................ 58
4.16 Leases ......................................................................................... 58
4.17 Fraudulent Transfer ....................................................................... 58
4.18 Ownership of Borrower and Borrower Representative .......................... 59
4.19 Purchase Options .......................................................................... 59
4.20 Management Agreement .................................................................. 59
4.21 Hazardous Substances .................................................................... 59
4.22 Name; Principal Place of Business .................................................... 60
4.23 Other Debt ................................................................................... 60
4.24 Anti-Money Laundering .................................................................. 60
4.25 Project Loan; Mezzanine Loan ........................................................ 60
4.26 Ground Lease Representations .......................................................... 61

ii

4.27  Hotel Management Agreement ................................................................. 62
4.28  Liquor License ...................................................................................... 62
4.29  Additional Representations .................................................................... 62
    4.29.1  Construction Manager's Agreement ........................................ 62
    4.29.2  Architect's Agreement ............................................................ 63
    4.29.3  Plans and Specifications ......................................................... 63
    4.29.4  Construction Budget ............................................................... 63
    4.29.5  Current Construction Licenses ............................................... 63
    4.29.6  Construction Manager Payment and Performance Bond ......... 63
    4.29.7  Construction Schedule ............................................................ 63

5.  COVENANTS ................................................................................................. 64
5.1  Existence ............................................................................................... 64
5.2  Taxes and Other Charges ...................................................................... 64
5.3  Access to Property ................................................................................ 65
5.4  Repairs; Maintenance and Compliance; Alterations............................. 65
    5.4.1  Repairs; Maintenance and Compliance ................................... 65
    5.4.2  Alterations .............................................................................. 65
5.5  Performance of Other Agreements ........................................................ 66
5.6  Cooperate in Legal Proceedings ........................................................... 66
5.7  Further Assurances................................................................................ 66
5.8  Environmental Matters .......................................................................... 67
    5.8.1  Hazardous Substances ............................................................ 67
    5.8.2  Environmental Monitoring ...................................................... 67
    5.8.3  Intentionally Omitted .............................................................. 69
5.9  Title to the Property; Liens ................................................................... 69
5.10  Leases .................................................................................................. 69
    5.10.1  Generally .............................................................................. 69
    5.10.2  Approval of Leases ............................................................... 69
    5.10.3  Additional Covenants with respect to Leases........................... 70
5.11  Estoppel Statement .............................................................................. 70
5.12  Property Management ........................................................................... 70
    5.12.1  Management Agreements ....................................................... 70
    5.12.2  Termination of Manager ........................................................ 71
5.13  Special Purpose Bankruptcy Remote Entity ........................................ 71
5.14  Subordination of Agreements ............................................................... 71
5.15  Change in Business or Operation of Property....................................... 71
5.16  Debt Cancellation................................................................................ 72
5.17  Affiliate Transactions .......................................................................... 72
5.18  Zoning ................................................................................................. 72
5.19  No Joint Assessment ............................................................................ 72
5.20  Principal Place of Business .................................................................. 72
5.21  Change of Name, Identity or Structure ................................................ 72
5.22  Indebtedness........................................................................................ 72
5.23  Licenses .............................................................................................. 73
5.24  Compliance with Restrictive Covenants, Etc........................................ 73
5.25  ERISA ................................................................................................. 73

iii

5.26  Prohibited Transfers ................................................................................ 73
5.27  Liens ........................................................................................................ 73
5.28  Dissolution .............................................................................................. 74
5.29  Expenses .................................................................................................. 74
5.30  Indemnity ................................................................................................ 74
5.31  Patriot Act Compliance ........................................................................... 75
5.32  Minimum Cash Equity ............................................................................ 76
5.33  Anti-Money Laundering .......................................................................... 76
5.34  Construction Manager's Agreement; Contracts, Subcontracts ............... 77
5.35  Architect's Contract ................................................................................ 77
5.36  Application of Loan Proceeds .................................................................. 78
5.37  Costs of Construction .............................................................................. 78
5.38  Substantial Completion; Final Completion of Construction.................... 78
        5.38.1  Substantial Completion ................................................................ 78
        5.38.2  Final Completion of Construction ................................................ 79
5.39  Inspection of Property ............................................................................. 79
5.40  Construction Consultant.......................................................................... 80
5.41  Construction Consultant/Duties and Access ........................................... 80
5.42  Correction of Defects .............................................................................. 81
5.43  Approval of Change Orders ..................................................................... 81
5.44  Laborers, Subcontractors and Materialmen ............................................ 81
5.45  Payment and Performance Bonds ............................................................ 81
5.46  Ownership of Personalty ......................................................................... 82
5.47  Purchase of Material Under Conditional Sale Contract .......................... 82
5.48  Assignment of Claims .............................................................................. 82
5.49  Ground Lease ........................................................................................... 82
5.50  Hotel Management Agreement ................................................................ 86
        5.50.1  Affirmative Covenants ................................................................. 86
        5.50.2  Negative Covenants ..................................................................... 87
        5.50.3  Rights of Lender; Termination of Franchise ............................... 87
        5.50.4  Default; Right to Cure ................................................................. 87
        5.50.5  Expiration or Termination of Hotel Management Agreement ................. 88
5.51  Hotel Operation ....................................................................................... 88
5.52  Cooperation with Regard to Liquor Licenses ......................................... 88

6.  NOTICES AND REPORTING................................................................................. 89
    6.1  Notices ..................................................................................................... 89
    6.2  Borrower Notices and Deliveries ............................................................ 89
    6.3  Financial Reporting ................................................................................. 90
        6.3.1  Bookkeeping .................................................................................. 90
        6.3.2  Annual Reports .............................................................................. 90
        6.3.3  Monthly/Quarterly Reports............................................................ 90
        6.3.4  Other Reports ................................................................................. 91
        6.3.5  Annual Budget ............................................................................... 91
        6.3.6  Business Plan ................................................................................. 92
        6.3.7  Major Milestones ........................................................................... 92
        6.3.8  Breach ............................................................................................ 92

iv

|  | 6.3.9 | Inspection | 92 |
| 7. | | INSURANCE; CASUALTY; AND CONDEMNATION | 93 |
| | 7.1 | Insurance | 93 |
| | | 7.1.1 Coverage | 93 |
| | | 7.1.2 Policies | 97 |
| | | 7.1.3 Miscellaneous Insurance Provisions | 97 |
| | 7.2 | Casualty | 99 |
| | | 7.2.1 Notice; Restoration | 99 |
| | | 7.2.2 Settlement of Proceeds | 99 |
| | 7.3 | Condemnation | 99 |
| | | 7.3.1 Notice; Restoration | 99 |
| | | 7.3.2 Collection of Award | 100 |
| | 7.4 | Application of Proceeds or Award | 100 |
| | | 7.4.1 Application to Restoration | 100 |
| | | 7.4.2 Application to Debt and Project Loan Debt | 101 |
| | | 7.4.3 Procedure for Application to Restoration | 101 |
| 8. | | DEFAULTS | 101 |
| | 8.1 | Events of Default | 101 |
| | 8.2 | Remedies | 106 |
| | | 8.2.1 Acceleration | 106 |
| | | 8.2.2 Remedies Relating to Project Improvements | 106 |
| | | 8.2.3 Remedies Cumulative | 107 |
| | | 8.2.4 Severance | 108 |
| | | 8.2.5 Delay | 108 |
| | | 8.2.6 Lender's Right to Perform | 108 |
| 9. | | SPECIAL PROVISIONS | 109 |
| | 9.1 | Sale of Note and Secondary Market Transaction | 109 |
| | | 9.1.1 General; Borrower Cooperation | 109 |
| | | 9.1.2 Severance of Loan | 110 |
| 10. | | MISCELLANEOUS | 111 |
| | 10.1 | Exculpation | 111 |
| | 10.2 | Brokers and Financial Advisors | 114 |
| | 10.3 | Retention of Servicer | 114 |
| | 10.4 | Survival | 115 |
| | 10.5 | Lender's Discretion | 115 |
| | 10.6 | Governing Law | 115 |
| | 10.7 | Modification, Waiver in Writing | 116 |
| | 10.8 | Trial by Jury | 116 |
| | 10.9 | Headings/Exhibits | 116 |
| | 10.10 | Severability | 117 |
| | 10.11 | Preferences | 117 |
| | 10.12 | Waiver of Notice | 117 |
| | 10.13 | Remedies of Borrower | 117 |

v

10.14 Prior Agreements ............................................................................... 117
10.15 Offsets, Counterclaims and Defenses ................................................ 117
10.16 Publicity .............................................................................................. 118
10.17 No Usury ............................................................................................. 118
10.18 Conflict; Construction of Documents ................................................ 118
10.19 No Third Party Beneficiaries ............................................................. 118
10.20 Minimum Multiple Payment ............................................................. 119
10.21 Assignment ......................................................................................... 119
10.22 Certain Additional Rights of Lender .................................................. 119
10.23 Set-Off ................................................................................................ 120
10.24 Counterparts ....................................................................................... 120
10.25 Proof of Claim .................................................................................... 121
10.26 Waiver of Stay .................................................................................... 121

11.    PROJECT LOAN ............................................................................................. 121
       11.1  Compliance with Project Loan Documents ....................................... 121
       11.2  Project Loan Defaults ......................................................................... 121

12.    INTERCREDITOR AGREEMENT ................................................................. 122

Schedule 1 -   Form of Anticipated Costs Report
Schedule 2 -   Form of Requisition
Schedule 3 -   Architect's Completion Certificate
Schedule 4 -   Form of Lien Waiver
Schedule 5 -   Exceptions to Representations and Warranties
Schedule 6 -   Intentionally Omitted
Schedule 7 -   Organization of Borrower
Schedule 8 -   Definition of Special Purpose Bankruptcy Remote Entity
Schedule 9 -   Dual Obligee and Modification Rider to Dual Obligee Payment and Performance
               Bonds
Schedule 10 -  Section 22 Lien Law Affidavit
Schedule 11 -  Consultant's Reports
Schedule 12 -  Forms of U.S. Tax Compliance Certificate
Schedule 13 -  Major Milestones
Schedule 14 -  Reserved
Schedule 15 -  Bankruptcy Conditions to Lend

vi

## BUILDING LOAN AGREEMENT

BUILDING LOAN AGREEMENT dated as of [_____], 2019 (as the same may be modified, supplemented, amended or otherwise changed, this "*Agreement*") between **CBCS WASHINGTON STREET LP**, a Delaware limited partnership (together with its permitted successors and assigns, "*Borrower*"), and **[HANA FINANCIAL INVESTMENT OR AFFILIATE]**, a [_____] [_____] (together with its successors and assigns, "*Lender*").

## 1.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**1.1**    **Specific Definitions**.  The following terms have the meanings set forth below:

*Advance* **or** *Advances*:  any disbursement of the proceeds of the Loan by Lender pursuant to the terms of this Agreement.

*Affiliate*:  as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

*Agreement*:  shall mean as described in the introductory paragraph.

*Alternate Index*:  a floating rate index determined by Lender (a) that is commonly accepted by market participants in similarly situated loans as an alternative to LIBOR and (b) that is publicly recognized by the International Swaps and Derivatives Association, or any successor organization, as an alternative to LIBOR.

*Alternate Rate*:  with respect to each Interest Period, the per annum rate of interest of the Alternate Index, determined as of the Determination Date related to such Interest Period.

*Alternate Rate Loan*:  the Loan at such time as interest thereon accrues at a per annum rate of interest equal to (a) the greater of (i) the Alternate Rate and (ii) the LIBOR Floor plus (b) the Alternate Rate Spread following a conversion in accordance with Section 2.10 hereof.

*Alternate Rate Spread*:  in connection with any conversion of the Loan from a LIBOR Loan to an Alternate Rate Loan, the difference (expressed as the number of basis points) between (a) LIBOR, averaged for the last three (3) Interest Periods, as of the Determination Date for which LIBOR was last available, plus the Spread minus (b) the Alternate Rate as of such Determination Date; provided, however, that if such difference is a negative number, then the Alternate Rate Spread shall be zero.

*Annual Budget*:  shall mean as described in Section 6.3.5.

*Applicable Taxes*:  shall mean as described in Section 2.2.3(a).

*Approved Annual Budget:*  shall mean as described in Section 6.3.5.

*Approved Business Plan*:  shall mean as described in Section 6.3.6.

*ACTIVE 45138641v14*

***Approved Capital Budget:*** shall mean as described in Section 6.3.5.

***Approved Capital Expenses***: Capital Expenses incurred by Borrower which Capital Expenses shall either be (i) included in the Approved Capital Budget for the current calendar year, (ii) expressly permitted under this Agreement or (iii) approved by Lender, such approval not to be unreasonably withheld, conditioned or delayed.

***Approved Operating Budget***: shall mean as described in Section 6.3.5.

***Approved Operating Expenses***: operating expenses incurred by Borrower which (i) are included in the Construction Budget or, following Final Completion, the Approved Operating Budget for the current calendar month, (ii) are for Taxes, Insurance Premiums, Leasehold Rents, electric, gas, oil, water, sewer or other utility service to the Property or (iii) have been approved by Lender.[1]

***Architect***: shall mean, collectively, Stephen B. Jacobs Group P.C. and Andi Pepper Interior Design, as described in Schedule 3.

***Architect's Agreement***: shall mean that certain Agreement between Owner and Architect, dated as of December 17, 2014, between Borrower and Architect.

***Award***: shall mean as described in Section 7.3.2.

***Bankruptcy Code***: shall mean as described in the Mortgage.

***Bankruptcy Proceeding***: shall mean as described in Section 4.7.

***Borrower***: shall mean as described in the introductory paragraph.

***Borrower's Recourse Liabilities***: shall mean as described in Section 10.1.

***Borrower Representative***: shall mean Washington Street Hotel GP LLC, a Delaware limited liability company.

***Broker***: shall mean as described in Section 10.2.

***Building Costs***: all direct and indirect costs and expenses of designing and constructing the Project Improvements, including, without limitation, Hard Costs and Soft Costs, together with all Debt Service, Project Loan Debt Service, Mezzanine Loan Debt Service, Operating Expenses and all other costs and expenses associated with the Property during the Construction Period.

***Building Loan Budget***: that portion of the Construction Budget that includes only Building Loan Costs.

***Building Loan Costs***: all Building Costs that are Cost of the Improvements.

---

[1] NTD: See note to Section 3.5 below.

2

**Building Permits**:  shall mean as described in Section 4.29.5.

**Business Day**:  any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York are authorized or required to close.

**Business Plan**: shall mean as described in Section 6.3.6[2].

**Capital Expenses:**  the amounts expended for items capitalized under GAAP, including, without limitation, expenditures for building improvements or major repairs.

**Carrying Costs**:  the sum of the following costs associated with the Property for any specified period: (i) Taxes, (ii) Other Charges, (iii) Insurance Premiums and (iv) other Operating Expenses.

**Cash Management Accounts**:  shall mean as described in Section 3.8.

**Casualty**:  shall mean as described in Section 7.2.1.

**Casualty/Condemnation Prepayment**:  shall mean as described in Section 2.3.2.

**Casualty/Condemnation Subaccount**:  shall mean as described in Section 3.6.

**Clearing Account**:  the account established by Borrower for the benefit of Lender at the Clearing Bank for the direct deposit by tenants of all Rents.

**Clearing Account Agreement**:  shall mean as described in Section 1.1 (definition of Loan Documents).

**Clearing Bank**:  as of the Closing Date shall be [_____].

**Closing Business Plan**:  means the business plan presented to Lender and approved by Lender as of the Closing Date.

**Closing Date**:  the date of this Agreement.

**Closing Fee**:  shall mean as described in Section 2.7.

**Code**:  the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

**Completion Date**:  a date which is [DATE THIRTY-SIX (36) MONTHS FOLLOWING THE CLOSING DATE].[3]

---

[2] Construction financial model and hotel operation forecast model to be attached as exhibits
[3] Note:  Per term sheet, closing contingent on Borrower obtaining from Ground Lessor an extension of the project completion date under the Ground Lease to the date 36 months from the Closing Date.

3

***Condemnation***:  shall mean as described in Section 7.3.1.

***Connection Income Taxes***:  Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise taxes or branch profits taxes.

***Construction Budget***:  the budget setting forth all Building Costs, as approved by Lender as of the Closing Date and the Construction Consultant and for which the Construction Manager has provided a guaranteed maximum price, as the same may be amended from time to time in accordance with the terms and provisions of this Agreement.

***Construction Consultant***:  such Person as Lender may designate and engage to inspect the Property as construction progresses.

***Construction Documents***:  the Construction Manager's Agreement, the Architect's Agreement, each Contract, the Construction Budget and each other document relating to and/or executed in connection with the construction of the Project Improvements.

***Construction Period***:  the period commencing on the date hereof and ending on the earliest to occur of (i) the Maturity Date, whether by acceleration or otherwise, (ii) the Completion Date and (iii) the final Advance.

***Construction Schedule***:  the schedule, broken down by trade, of the estimated dates of commencement and completion of the Project Improvements, as certified by Borrower and approved by Lender and the Construction Consultant [as of the Closing Date, as the same may be amended from time to time in accordance with the terms and provisions of this Agreement].

***Construction Consultants' Reports***:  the reports described on Schedule 11 hereof and shall mean as described in Section 2.9.1(r).

***Construction Manager***:  Tishman Construction Company Inc. d/b/a Aecom Tishman.

***Construction Manager's Agreement***:  that certain Guaranteed Maximum Price Contract dated as of December 15, 2017, by and between Borrower and the Construction Manager, as amended by [_____].

***Construction Manager Payment and Performance Bond***:  the unconditional dual obligee payment and performance bond relating to the Construction Manager, as approved by Lender. [NEED TO DISCUSS REQUEST WITH CLIENT AND CONSULTANT]

***Contract***:  any agreement entered into by Borrower or by Construction Manager, in which the Contractor or Subcontractor thereunder agrees to provide services, labor and/or materials in connection with the Project Improvements.

***Contractor***:   any contractor supplying services, labor and/or materials in connection with the Project Improvements.

4

**Control**:  with respect to any Person, either (i) ownership directly or indirectly of forty-nine percent (49%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise.

**Converted Interest Rate Protection Agreement**:  shall mean as described in Section 2.6.1(e)(i).

**Costs**:  collectively, Hard Costs and Soft Costs.

**Cost of the Improvement**:  those items defined as an "improvement" and/or a "cost of improvement" under Section 2 of Article 1 of the Lien Law.

**Current Construction Licenses**:  shall mean, with respect to any phase or portion of the Project Improvements for which work is then being performed and/or for which Borrower is then requesting an Advance, all Licenses and approvals from all Governmental Authorities then required by law to commence and complete such phase or portion of the Project Improvements in accordance with the Plans and Specifications. or any part thereof or the commencement or continuance of construction thereof, as the case may be, including but not limited to, building permits, environmental permits, certificates of appropriateness, landmarks approvals and special use permits necessary for the construction of the Project Improvements.

**Debt**:  the Outstanding Principal Balance, all interest accrued and unpaid thereon, all Prepayment Fees, Minimum Multiple Payments, Extension Exit Fees (if applicable) and all other sums due to Lender in respect of the Loan or under any Loan Document.

**Debt Service**:  with respect to any particular period, the interest payments due under the Note in such period.

**Debt Service Coverage Ratio**:  as of any date, the ratio calculated by Lender of (i) the Net Operating Income for the three (3) month period ending with the most recently completed calendar month to (ii) the sum of (a) the Debt Service with respect to such period, plus (b) the Project Loan Debt Service with respect to such period, plus (c) the Mezzanine Loan Debt Service with respect to such period.

**Default**:  the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

**Default Rate**:  a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above then applicable Interest Rate, compounded monthly.

**Deposit Account**:  shall mean as described in Section 3.1 of this Agreement.

**Deposit Account Agreement**:  shall mean as described in Section 1.1 (Definition of Loan Documents).

5

**Deposit Bank**:  [_____], or such other bank or depository selected by Lender in its discretion.

**Determination Date**:  shall mean as described in the definition of LIBOR.

**Draw Request**:  with respect to each Advance, Borrower's Requisition for such Advance, along with such other documents required by this Agreement to be furnished to Lender as a condition to such Advance.

**Easements**:  shall mean as described in Section 4.14.

**Eligible Account**:  a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts (A) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (B) as to which Lender has received a Rating Comfort Letter from each of the applicable Rating Agencies with respect to holding funds in such account, or (ii) a segregated trust account or accounts maintained with the corporate trust department of a federal depository institution or state chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations §9.10(b), having in either case corporate trust powers, acting in its fiduciary capacity, and a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authorities.  An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

**Eligible Institution**:   a depository institution insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's and F-1+ by Fitch, in the case of accounts in which funds are held for thirty (30) days or less or, in the case of letters of credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's.

**Environmental Laws**:  shall mean as described in Section 4.21.

**Environmental Report**:  [_____].

**Equipment**:  shall mean as described in Mortgage.

**ERISA**:  the Employment Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

**ERISA Affiliate**:  all members of a controlled group of corporations and all trades and business (whether or not incorporated) under common control and all other entities which, together with Borrower, are treated as a single employer under any or all of Section 414(b), (c), (m) or (o) of the Code.

**Eurodollar Business Day**:  shall mean as described in Section 1.1 (Definition of LIBOR).

**Event of Default**:  shall mean as described in Section 8.1.

6

*ACTIVE 45138641v14*

***Excluded Taxes***:  any of the following Applicable Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to any Recipient: (i) Applicable Taxes imposed on or measured by net income (however denominated), franchise Applicable Taxes, and branch profits Applicable Taxes, in each case, (a) imposed as a result of such Recipient being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Applicable Tax (or any political subdivision thereof), or (b) that are Other Connection Taxes, (ii) in the case of a Lender, Applicable Taxes that are U.S. federal withholding taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (a) any Lender acquires such interest in the Loan or (b) any Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.2.3, amounts with respect to such Applicable Taxes were payable either to Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) Applicable Taxes attributable to a Recipient's failure to comply with Section 2.2.3(d) and (iv) any Applicable Taxes imposed under FATCA.

***Existing Proceeding***:  shall mean as described in Section 4.7.

***Extended Maturity Date***:  shall mean, collectively, the First Extended Maturity Date and the Second Extended Maturity Date.

***Extension Exit Fee***:  an amount equal to one percent (1%) of the Outstanding Principal Balance.

***Extension Option DSCR***:  shall mean as described in <u>Section 2.8(a)(viii)</u>.

***F&B Agreements***:  shall mean any food and beverage agreements or other agreements which Borrower may enter into with respect to the Hotel or the Property (or with respect to which Borrower has the right to grant or withhold approval pursuant to the Hotel Management Agreement).

***FATCA***:  Sections 1471 through 1474 of the Code, as in effect on the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with and any current or future regulation or official interpretation thereof), or any Treasury regulations promulgated thereunder or official administrative interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code.

***FF&E***:  all machinery, furniture, furnishings, equipment, fixtures (including, without limitation, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), inventory and articles of personal property, and all accessions, renewals, replacements and substitutions thereof (including, without limitation, beds, bureaus, chiffonniers, chests, chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies, venetian blinds, screens, paintings, hangings, pictures, divans, couches, luggage carts, luggage racks, stools, sofas, chinaware, linens, pillows, blankets, glassware, foodcarts, cookware, dry cleaning facilities, dining

7

room wagons, keys or other entry systems, bars, bar fixtures, liquor and drink dispensers, ice makers, radios, clock radios, television sets, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, Wi-Fi systems, reservation systems, medical equipment, potted plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washer and dryers), and all other customary hotel equipment and other tangible property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located at the Property, or appurtenant thereto, and useable in connection with the present or future operation and occupancy at the Property and all building equipment, material and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located at the Property, or appurtenant thereto, and useable in connection with the present or future operation, enjoyment and occupancy of the Property.

**Final Completion**:  shall be deemed to have occurred when, in addition to the Substantial Completion of the Project Improvements, (i) all Punch List Items shall have been completed substantially in accordance with the Plans and Specifications, all Legal Requirements, the Loan Documents and the Project Loan Documents, and (ii) Borrower shall have delivered to Lender evidence satisfactory to Lender that all other Governmental Approvals have been issued and all other Legal Requirements have been satisfied so as to allow the Property to be used and operated in accordance with the Loan Documents.

**First Extended Maturity Date**:  shall mean as described in Section 2.8(a).

**Fitch**:  shall mean as described in Section 1.1 (Definition of Rating Agency).

**Force Majeure Delay Cap**:  one hundred twenty (120) days in the aggregate with respect to any and all delays caused by any Force Majeure Events.

**Force Majeure Event**:  any event or condition beyond the reasonable control of Borrower, including, without limitation, strikes, labor disputes, acts of God, the elements, governmental restrictions, regulations or controls, enemy action, civil commotion, fire, casualty, accidents, mechanical breakdowns or shortages of, or inability to obtain, labor, utilities or materials, which causes an actual delay; provided, however, that (i) with respect to any of the foregoing circumstances, any period of Force Majeure shall apply only to such Person's performance of the obligations necessarily affected by such circumstance and shall continue only so long as such Person is continuously and diligently using all reasonable efforts to minimize the effect and duration thereof, and (ii) notwithstanding the foregoing, Force Majeure shall not include (a) any lack of funds, i.e., the same shall not be deemed to be a condition beyond the control of Borrower, (b) any breach of contract or default by the Architect, the Construction Manager or any Contractor or Subcontractor under their respective contracts and agreements concerning the Project Improvements, or (c) any event, condition or delay (A) within Borrower's reasonable control or (B) caused by any action or inaction (including, without limitation, payment of any

8

required fees) by Borrower or Persons, directly or indirectly, under Borrower's control or under common control with Borrower; and provided, further, that, in all cases, (I) Borrower shall have delivered to Lender, by not later than five (5) Business Days after Borrower knows of same, a written notice of the occurrence of an Force Majeure Event, together with an explanation of the Force Majeure Event, in order to extend the applicable time period, (II) the time limit for performance shall be extended for a period equal to the period of any such Force Majeure Event, subject, in all cases, to the Force Majeure Delay Cap, and (III) Borrower shall, from time to time, upon Lender's request, keep Lender informed, in writing, of all developments (other than *de minimis* matters) concerning any such Force Majeure Event.

*Foreign Lender*:  any Lender that is not a U.S. Person.

*GAAP*:  generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

*Governmental Authority*:  the government of the United States or any other nation, or of any political subdivision thereof, including any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) now or hereafter in existence.

*Government Lists*:  shall mean as described in Section 5.31(b).

*Gross Income*:  shall mean all income, computed in accordance with GAAP, derived from the ownership and operation of the Property from whatever source, including, but not limited to, the Rents, utility charges, escalations, service fees or charges, license fees, parking fees, rent concessions or credits, and other required pass-throughs, but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, Insurance Proceeds (other than business interruption or other loss of income insurance), Awards, security deposits, utility and other similar deposits, interest on the Subaccounts, and any disbursements to Borrower from the Reserve Funds.

*Ground Lease*:  shall mean that certain Agreement of Lease dated June 19, 2013 between 445 Washington LLC, as ground lessor, and CBCS Washington Street LLC (which subsequently merged into CBCS Washington Street LP), as ground lessee, as such lease was amended by (i) that certain First Amendment to Agreement of Lease dated January 9, 2017 ("*First Amendment*"), (ii) that certain Second Amendment to Agreement of Lease, dated October 16, 2018 ("*Second Amendment*"), (iii) that certain Third Amendment To Agreement of Lease dated October 16, 2018 ("*Third Amendment*"), (iv) that certain Fourth Amendment of Agreement of Lease, dated December 28, 2018 ("*Fourth Amendment*"), and (v) that certain Fifth Amendment of Agreement of Lease, dated as of the Closing Date ("*Fifth Amendment*"), together with all documents and agreements ancillary and incidental thereto.

*Ground Lessor*:  445 Washington LLC.

*Guarantor*:  individually and collectively, jointly and severally, Joshua Caspi and James Parks, and, after a Special Guarantor Assumption has occurred, Special Guarantor.

9

***Guarantor Financial Covenants***:  means those covenants specified in Section 6 of the Guaranty.

***Hard Costs***:  those Building Loan Costs which are for labor, materials, equipment and fixtures.

***Hazardous Substances***:  shall mean as described in Section 4.21.

***Hotel Management Agreement***:  that certain Hotel Management Agreement, dated as September 14, 2015, by and between Hotel Manager, pursuant to which the Property is operated as a hotel.

***Hotel Manager***:  Hotel Barriere Management USA Company LLC, a Delaware limited liability company.

***Hotel SNDA***: that certain Subordination, Non-Disturbance, and Attornment Agreement, dated as of the Closing Date, by and among Borrower, Lender and Hotel Manager.

***Immediate Family Members***:  shall mean parents, spouses, siblings, children, other lineal descendants and any spouses of such siblings, children or other lineal descendants.

***Improvements***:  shall mean as described in the Mortgage.

***Indemnified Liabilities***:  shall mean as described in Section 5.30.

***Indemnified Party***:  shall mean as described in Section 5.30.

***Indemnified Taxes***:  (a) Applicable Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

***Independent Director***:  shall mean as described in Schedule 8.

***Initial Advance***:  the first advance of the Loan proceeds to be made hereunder.

***Insurance Premiums***:  shall mean as described in Section 7.1.2.

***Insured Casualty***:  shall mean as described in Section 7.2.2.

***Interest Period***:  (i) the period from the Closing Date through the last day of a calendar month in which the Closing Date occurs and (ii) each period thereafter from the first day of each calendar month through the last day of each such calendar month; except that the Interest Period, if any, that would otherwise commence before and end after the Maturity Date shall end on the Maturity Date.  Notwithstanding the foregoing, if Lender exercises its right to change the Payment Date to a New Payment Date in accordance with Section 2.2.5, then from and after such election, each Interest Period shall be the period from the New Payment Date in each calendar month through the day in the next succeeding calendar month immediately preceding the New Payment Date in such calendar month.

10

*Interest Rate*:  for any Interest Period, the Spread plus the greater of (i) LIBOR for such Interest Period and (ii) the LIBOR Floor (or, when applicable pursuant to this Agreement or any other Loan Document, the Default Rate).

*Interest Rate Protection Agreement*:  shall mean as described in Section 2.6.1.

*Inventory:*  as defined in the UCC, and including items which would be entered on a balance sheet under the line items for "Inventories" or "china, glassware, silver, linen and uniforms" under USALI.

*JVA*:  that certain First Amended and Restated Agreement of Limited partnership of NYREIC 456 LP, a Delaware limited partnership, dated as of [the Closing Date], by and among Washington Street Hotel GP LLC, a Delaware limited liability company, its general partner and each of 456 Lux Hotel NYC, LLC, a Delaware limited liability company, TriBeCa Hotel II LP, a Delaware limited partnership, Greenwich Street Holdco Trust and APW Tribeca LLC, its limited partners.

*Key Principal(s)*:  Joshua Caspi and James Parks, each, an individual or, following a Special Guarantor Assumption, Sam Chang.

*Late Payment Charge*:  shall mean as described in Section 2.5.3.

*Leasehold Rents*:  all rent, additional rent, percentage rent, payments-in-lieu-of-tax or other charges mentioned in or made payable to the Ground Lessor by Borrower pursuant to the terms of the Ground Lease.

*Leasehold Rents Subaccount*:  shall mean as described in Section 3.4.

*Leases*:  all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property or the Improvements, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder, and any F&B Agreements.

*Legal Requirements*:  statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower, any Loan Document or all or part of the Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower, at any time in force affecting all or part of the Property.

*Lender*:  shall mean as described in the introductory paragraph.

*Lender's Consultant*:  shall mean as described in Section 5.8.1.

*LIBOR*:  with respect to any Interest Period, a floating interest rate per annum (rounded upwards to the next 1/8 of 1%) equal to the rate for U.S. dollar deposits with one month

11

maturities which appears on Reuters Screen LIBOR 01 Page as of 11:00 am, London time on the related Determination Date; provided, however, that if such rate does not appear on Reuters Screen LIBOR 01 Page, "LIBOR" shall mean a rate per annum equal to the rate at which U.S. dollar deposits in an amount approximately equal to the Loan, and with one month maturities, are offered in immediately available funds in the London Interbank Market to the London office of National Westminster Bank, Plc by leading banks in the Eurodollar market at 11:00 a.m., London time. "*Reuters Screen LIBOR 01 Page*" means the display designated as "LIBOR 01 Page" on the Reuters Service (or such other page as may replace LIBOR 01 Page on the Reuters Service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Banker's Association interest settlement rates for U.S. Dollar deposits). Any LIBOR determined on the basis of the rate displayed on Reuters Screen LIBOR 01 Page in accordance with the provisions hereof shall be subject to corrections, if any, made in such rate and displayed by the Reuters Service within one (1) hour of the time when such rate is first displayed by such Service. For purposes hereof, (i) "*Determination Date*" shall mean, with respect to any Interest Period, the date which is two Eurodollar Business Days prior to the commencement of such Interest Period; and (ii) "*Eurodollar Business Day*" shall mean any day other than a Saturday, Sunday or other day on which banks in the City of London, England are closed for interbank or foreign exchange transactions.

*LIBOR Conversion*:  shall mean as described in Section 2.6.1(e).

*LIBOR Floor*:  One percent (1.0%).

*LIBOR Loan*:  the Loan at such time as interest thereon accrues at a rate of interest based upon LIBOR.

*Licenses*:  shall mean all certifications, permits, licenses and approvals, including certificates of completion and occupancy permits (including, without limitation, any applicable liquor license or hotel operator licenses) required for the legal use, occupancy and operation of the Property.

*Lien*:  any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting (i) all or any part of the Property or any interest therein or (ii) any direct or indirect interest in Borrower or Borrower Representative, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

*Lien Law:*  the Lien Law of the State of New York.

*Loan*:  shall mean as described in Section 2.1.

*Loan Documents*:  this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender by Borrower, Borrower Representative; Guarantor or Affiliate of any thereof in connection with the Loan, including the following, each of which is dated as of the date hereof:  (i) the Building Loan Promissory Note or

12

Building Loan Promissory Notes made by Borrower to Lender in the aggregate principal amount equal to the Loan (the "*Note*"), (ii) the Building Loan Leasehold Mortgage, Assignment of Leases and Rents and Security Agreement made by Borrower in favor of Lender which covers the Property (the "*Mortgage*"), (iii) the Building Loan Assignment of Leases and Rents made by Borrower in favor of Lender, (iv) the Assignment of Agreements, Licenses, Permits and Contracts made by Borrower in favor of Lender, (v) [the Blocked Account Control] Agreement (the "*Clearing Account Agreement*") among Borrower, Lender, Manager and the Clearing Bank], (vi) [the Cash Management Agreement] (the "*Deposit Account Agreement*") among Borrower, Lender, Manager and the Deposit Bank], (vii) the Guaranty of Recourse Obligations, Debt Service and Carry made by Guarantor (the "*Guaranty*"), (viii) the Consent and Subordination of Manager by Borrower and Manager in favor of Lender, and (ix) the Completion Guaranty made by Special Guarantor in favor of Lender (the "*Completion Guaranty*"); and as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time.

*Major Contractor*:  any Contractor hired by Borrower, including, without limitation, the Construction Manager, and any Subcontractor, in each case, supplying services, labor and/or materials in connection with the Project Improvements which either (a) is for an aggregate contract price equal to or greater than $300,000.00 whether pursuant to one contract or agreement or multiple contracts or agreements, after taking into account all change orders, and/or (b) relates to excavation, foundation, superstructure, window/curtain wall, steel, concrete, and any other structural mechanical electrical and/or plumbing work.

*Major Contracts*:  any contract with a Major Contractor.

*Major Milestones*:  individually and collectively, the milestones set forth on Schedule 13.

*Management Agreement*:  means any property management agreement to be entered into by Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

*Manager*:  shall mean any Qualified Manager engaged by Borrower with respect to the property management of all or any portion of the Property in accordance with the terms hereof.

*Material Agreement*:  shall mean as described in Section 5.24.

*Material Alteration*:  any alteration affecting (A) structural elements of the Property, (B) a roof of the Property or (C) any building system of the Property, or (ii) non-structural alteration the cost of which exceeds $300,000; provided, however, that in no event shall (i) any tenant improvement work performed pursuant to any Lease existing on the date hereof or entered into hereafter in accordance with the provisions of this Agreement, (ii) alterations performed as part of a Restoration or (iii) alterations expressly permitted by, and performed in accordance with, this Agreement and the Project Loan Agreement, or otherwise approved in writing by Lender, constitute a Material Alteration.

*ACTIVE 45138641v14*

***Maturity Date***:  the date on which the final payment of principal of the Note becomes due and payable as therein provided, whether at the Stated Maturity Date, or if applicable, the First Extended Maturity Date or the Second Extended Maturity Date, by declaration of acceleration, or otherwise.

***Maximum Loan Commitment Amount***:  $[_____].[4]

***Mezzanine Borrower***:  CBCS Washington Mezz Borrower LP, a Delawere limited partnership.

***Mezzanine Lender***:  [_____], a [_____] [_____].

***Mezzanine Loan***:[5] that certain mezzanine loan in the maximum principal amount of up to $[_____] and 00/100 Dollars ($[_____]) made by Mezzanine Lender to Mezzanine Borrower pursuant to the Mezzanine Loan Documents.

***Mezzanine Loan Agreement***:  that certain Mezzanine Loan Agreement, dated of even date herewith, between Mezzanine Lender, as lender, and Mezzanine Borrower, as borrower, as the same may be modified, supplemented, amended or otherwise changed.

***Mezzanine Loan Debt Service***:  the "Debt Service" as defined in the Mezzanine Loan Agreement.

***Mezzanine Loan Documents***:  the "Loan Documents" as defined in the Mezzanine Loan Agreement.

***Mezzanine Loan Undisbursed Loan Proceeds***:  the "Undisbursed Loan Proceeds" as defined in the Mezzanine Loan Agreement.

***Milestone Non-Compliance***:  failure of Borrower to satisfy any Major Milestone as of the date set forth for the compliance with such Major Milestone on Schedule 13.

***Minimum Multiple Payment***:  the positive amount, if any, that shall cause the aggregate sum of (i) the repaid or prepaid Principal, (ii) all interest paid on the Principal (excluding any interest at the Default Rate), plus (iii) the Minimum Multiple Payment paid, to be equal to 115% of the Loan (including any Undisbursed Loan Proceeds but excluding the Closing Fee, Prepayment Fees, Extension Exit Fees, and any interest paid at the Default Rate); provided, however, that in the event repayment of the Loan is required in connection with Lender's declaration of acceleration of the Loan following the occurrence of any Event of Default described in Sections 8.1(c), (e), (h), (i), (l), (m), (n), (p), (q), (r), (s), (t), (u), (v), (w), (y), (aa), (bb), (cc), (dd), (ee), (ff), (gg), (hh), (ii), (jj), (kk), (ll), (mm) or (nn), then 110% of the Loan (including any Undisbursed Loan Proceeds but excluding the Closing Fee, Prepayment Fees, Extension Exit Fee, and any interest paid at the Default Rate).

---

[4] Aggregate of mortgage and mezzanine loan amount shall be the lesser of (i) up to $135,000,000, (ii) 80.0% of Lender-approved project costs based upon an estimated total project cost of $185,000,000 and (iii) 65% of loan-to-stabilized appraised value determined by Lender.   Include allocation of a portion to a term loan if applicable.
[5] Mezzanine Loan amount to be determined prior to closing.

14

*Moody's*:  shall mean as described in Section 1.1 (Definition of Rating Agency).

*Mortgage*:  shall mean as described in Section 1.1 (Definition of Loan Documents).

*New Borrower*:  shall mean the new borrower that assumes the Loan and the Loan Documents upon the consummation of a Special Guarantor Assumption.

*New Ground Lease*:  shall mean as described in Section 4.26(i).

*New Mezzanine Borrower*:  shall mean the new mezzanine borrower that assumes the Mezzanine Loan and the Mezzanine Loan Documents upon the consummation of a Special Guarantor Assumption.

*New Payment Date:*  shall mean as described in Section 2.2.5.

*Net Operating Income*:  shall mean, for any period, the amount obtained by subtracting (i) Operating Expenses and (ii) reserves required under this Agreement from Gross Income.

*Note*:  shall mean as described in Section 1.1 (Definition of Loan Documents).

*Notice*:  shall mean as described in Section 6.1.

*OFAC*:  shall mean as described in Section 5.31(b).

*Officer's Certificate*:  a certificate delivered to Lender by Borrower which is signed by a senior executive officer of Borrower Representative.

*Open Date*:  the date that is sixty (60) days prior to the Stated Maturity Date or, if extended pursuant to this Agreement, the Extended Maturity Date

*Operating Expenses*:  shall mean the total of all expenditures, computed in accordance with GAAP, of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic  basis, including without limitation, Taxes, Other Charges, Insurance Premiums, Leasehold Rents, electric, gas, oil, water, sewer and other utility service to the Property, ordinary repairs and maintenance, insurance premiums, license fees, property taxes and assessments, advertising and marketing expenses, legal fees, third-party management and/or franchise fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation, Debt Service, Capital Expenses and contributions to the Subaccounts.

*Operating Expense Subaccount*:  shall mean as described in Section 3.5.

*Other Charges*:  all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

15

***Other Connection Taxes***:  with respect to any Lender, Applicable Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Applicable Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

***Other Taxes***:  all present or future stamp, court or documentary, intangible, recording, filing or similar Applicable Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Applicable Taxes that are Other Connection Taxes imposed with respect to an assignment.

***Outside Advance Date***:  shall mean the earlier to occur of (i) [_____][6] and (ii) the Stated Maturity Date.  Notwithstanding the foregoing terms, conditions and provisions of this definition of "Outside Advance Date" to the contrary, if the Loan is accelerated pursuant to the terms, conditions and provisions of this Agreement, the Outside Advance Date shall mean the date of acceleration.

***Outstanding Principal Balance***:  shall mean, as of the date of determination, the outstanding principal amount of the Loan as evidenced by the Note.

***Patriot Act***:  shall mean as described in Section 5.31(a).

***Patriot Act Offense***:  shall mean as described in Section 5.31(b).

***Payment and Performance Bond***:  a dual-obligee payment and performance bond insured through Subguard or issued by a surety company or companies having a rating of no less than AA by S&P and Aa2 by Moody's and authorized to do business in the State and in form and substance reasonably acceptable to Lender and the Construction Consultant together with a dual obligee and modification rider substantially in the form attached hereto as <u>Schedule 9</u> subject to only such changes as may be approved by Lender and Construction Consultant in their sole discretion.

***Payment Date***:  the first (1st) day of each calendar month or, upon Lender's exercise of its right to change the Payment Date in accordance with Section 2.2.5, the New Payment Date (in either case, if such day is not a Business Day, the Payment Date shall be the first Business Day thereafter).  The first Payment Date hereunder shall be [_____] 1, 2019.

***Permitted Encumbrances***:  (i) the Liens created by the Loan Documents, (ii) the Liens created by the Project Loan Documents, (iii) all Liens and other matters disclosed in the Title Policy, (iv) Liens, if any, for Taxes or Other Charges not yet due and payable and not delinquent, (v) any workers', mechanics' or other similar Liens on the Property, provided that any such Lien is bonded or discharged within forty-five (45) days after Borrower first receives notice

---

[6] LENDER TO CONFIRM.

*ACTIVE 45138641v14*

of such Lien, (vi) the Liens created by the Mezzanine Loan Documents and (vi) such other title and survey exceptions as Lender approves in writing in Lender's reasonable discretion.

    ***Permitted Indebtedness***:  shall mean as described in Section 5.22.

    ***Permitted Investments***:  shall mean as described in Section [___] of the Deposit Account Agreement.

    ***Permitted Transfers***:[7]  (i) a Lease entered into in accordance with the Loan Documents, (ii) a Permitted Encumbrance, (iii) provided that no Event of Default shall then exist, a Transfer of an interest in Borrower other than the interests in Borrower held by Borrower Representative, or a Transfer of an interest in Borrower Representative to any Person, provided that (A) such Transfer shall not (x) cause the transferee (together with its Affiliates) to acquire Control of Borrower or Borrower Representative, (y) result in Sponsor or, subject to Section 5.11 of the JVA, the Key Principals (or, following a Special Guarantor Assumption, the Special Guarantor) no longer possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower (or, with respect to Special Guarantor, New Borrower) or Borrower Representative through the ownership of voting securities, by contract or otherwise or (z) result in the Sponsor no longer owning, directly or indirectly, at least fifty-one percent (51%) of all equity interests (direct or indirect) in Borrower or Borrower Representative, (B) after giving effect to such Transfer, Key Principals shall continue to own at least twenty percent (20%) of all equity interests (direct or indirect) in Borrower, (C) Borrower shall give Lender notice of such Transfer together with copies of all instruments effecting such Transfer not less than ten (10) days prior to the date of such Transfer, (D) the legal and financial structure of Borrower and its members and the single purpose nature and bankruptcy remoteness of Borrower and its members after such Transfer, shall satisfy Lender's then current applicable underwriting criteria and requirements, (E) if, immediately following any such Transfer, the transferee owns twenty percent (20%) or more of the direct or indirect ownership interests in Borrower then, to the extent such transferee does not own twenty percent (20%) or more of the direct or indirect ownership interests in Borrower on the date hereof, Borrower shall deliver, or cause to be delivered, at Borrower's sole cost and expense, such searches (including credit, negative news, OFAC, litigation, judgment, lien and bankruptcy searches) as Lender may reasonably require with respect to such transferee, its owners and controlling Persons, the results of which must be reasonably acceptable to Lender, and such transferee, its owners and controlling Persons shall otherwise satisfy (in Lender's reasonable discretion) Lender's then current applicable underwriting criteria and requirements, and (F) subject to Section 5.11 of the JVA, an Affiliate of the Key Principal(s) shall, directly or indirectly, at all times be the managing, operating or administrative member of Borrower, (iv) a Transfer for estate planning purposes of any Key Principal's or Special Guarantor's direct or indirect interests in Borrower to an Immediate Family Member of such Key Principal or Special Guarantor's, or to a trust for the benefit of such Key Principal or Special Guarantor or for the benefit of the Immediate Family Member of such Key Principal or Special Guarantor so long as Key Principal (or, following a Special Guarantor Assumption, Special Guarantor) continues to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower through the ownership of voting securities, by contract or otherwise, (v) foreclosure or assignment-in-lieu of foreclosure of the Mezzanine Loan,

---

[7] NTD: Subject to further review by Lender.

17

or (vi) a Special Guarantor Assumption. Notwithstanding the foregoing, any Permitted Transfer must be expressly permitted under the Hotel Management Agreement, and/or Borrower shall have obtained any consents required from Hotel Manager in connection with such Permitted Transfer, otherwise such Permitted Transfer shall not be allowed under this Agreement without Lender's prior written consent.

*Person*:  any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

*Plan*:  (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is subject to Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

*Plans and Specifications*:  collectively, the plans and specifications for the Project Improvements, delivered to Lender and the Construction Consultant as of the Closing Date, as the same may be amended and/or supplemented, from time to time, in Lender's sole but reasonable discretion. Lender and the Construction Consultant have approved the Plans and Specifications in form attached as Schedule 6 to the Project Loan Agreement as of the Closing Date.

*Policies*:  shall mean as described in Section 7.1.2.

*Prepayment Fee*:  with respect to any prepayment of Principal prior to the then-applicable Open Date or repayment of Principal following the continuance of an Event of Default, an amount equal to one percent (1%) of the amount of Principal being prepaid or repaid.

*Principal*:  shall mean as described in Section 2.1.

*Proceeds*:  shall mean as described in Section 7.2.2.

*Project Improvements*:  the construction at the Property which will consist of a [97]-room full-service hotel with a total of [approximately 98,218] square feet located on an approximately [12,079] square foot parcel; and which will be shown in detail on the Plans and Specifications.[8]

*Project Loan*:  the loan in the original principal amount of $[_____] made by Lender to Borrower pursuant to the Project Loan Documents.

*Project Loan Agreement*:  the Project Loan Agreement dated as of the date hereof, made by Borrower in favor of Lender, as the same may be modified, supplemented, amended or otherwise changed.

---

[8] To be confirmed by consultant and land use counsel; numbers provided by Borrower differ from final term sheet.

**Project Loan Budget**:  that portion of the Construction Budget that includes only Project Loan Costs.

**Project Loan Costs**:  all Building Costs that are not Cost of the Improvements as well as costs incurred in connection with the leasing of space at the Property, in each case, whether or not any such costs are incurred during or after the Construction Period.

**Project Loan Debt**:  the "Debt" as defined in the Project Loan Agreement.

**Project Loan Debt Service**:  the "Debt Service" as defined in the Project Loan Agreement.

**Project Loan Documents**:  the "Loan Documents" as defined in the Project Loan Agreement.

**Project Loan Undisbursed Loan Proceeds**:  the "Undisbursed Loan Proceeds" as defined in the Project Loan Agreement.

**Property**:  a leasehold interest in and all of Borrower rights to that certain parcel of real property and Improvements thereon known as 456 Greenwich Street and located in New York, New York pursuant to the terms of the Ground Lease; together with all other collateral for the Loan, as more particularly described in the Granting Clauses of the Mortgage and referred to therein as the Mortgaged Property.

**Proposed Lease**:  shall mean as described in Section 5.10.2.

**Provided Information**:  shall mean as described in Section 9.1.1.

**Punch List Items**:  such details of construction, decoration, mechanical adjustment or installation which, in the professional judgment of Borrower's Architect, do not hinder or interfere with the use, occupancy, operation or maintenance of the Property for its intended use or the ability to obtain a temporary certificate of occupancy with respect thereto.

**Qualified Carrier**:  shall mean as described in Section 7.1.1(n).

**Qualified Manager**:  a manager approved by Lender in its sole but reasonable discretion.

**Quality Assurance Report**:  any quality assurance reports of inspection or compliance from a Hotel Manager under a Hotel Management Agreement with respect to the Property.

**Rating Agency**:  each of Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("**S&P**"), Moody's Investors Service, Inc. ("**Moody's**"), and Fitch, Inc., a division of Fitch Ratings Ltd. ("**Fitch**") or any other nationally-recognized statistical rating organization acceptable to Lender.

**Rebalancing Reserve Account**:  shall mean as described in Section 3.2.

19

*Recipient*:  any Lender.

*Remedial Work*:  shall mean as described in Section 5.8.2(c).

*Rents*:  all rents, rent equivalents, amounts payable to Borrower pursuant to the Hotel Management Agreement, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, tax refunds or tax credits (received by Borrower or any direct or indirect owner of Borrower on behalf of the Property) and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower, Manager or any of their agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Manager or any of their agents or employees and proceeds with respect to the Property, if any, from business interruption or other loss of income insurance.

*Requested Advance Date*:  shall mean as described in Section 2.9.3(a).

*Required Records*:  shall mean as described in Section 6.3.8.

*Requisition*:  with respect to each Advance, Borrower's request for such Advance together with all documents required by this Agreement to be furnished to Lender as a condition to such Advance.

*Restoration*:  shall mean as described in Section 7.4.1.

*Retainage*:  with respect to each Contract and Subcontract, (a) upon execution of such Contract or Subcontract, the greater of (i) ten percent (10%) of all Costs funded to the Contractor or Subcontractor under such Contract or Subcontract and (ii) the actual retainage required under such Contract or Subcontract and (b) upon completion of fifty percent (50%) of the work required to be performed under such Contract or Subcontract, the Retainage with respect to such work may be reduced to not less than five percent (5%) until Substantial Completion; provided, however, that Lender acknowledges and agrees that no Retainage shall be required for the following Contract or Subcontract expressly requires Retainage for such items, (2) Soft Costs or (3) general conditions, Construction Manager's insurance, bonding premiums and/or "Sub-Guard" insurance costs under the Construction Manager Agreement.

*Reuters Screen LIBOR 01 Page*:  shall mean as described in the definition of LIBOR.

*RevPAR*:  shall mean for any period of time, the revenue per available room as reasonably determined by Lender based upon the estimated or actual average daily room rate for such period of time, multiplied by the estimated or actual occupancy rate during the same period of time.

20

***S&P***: shall mean as described in Section 1.1 (Definition of Rating Agency).

***Second Extended Maturity Date***:  shall mean as described in Section 2.8(b).

***Secondary Market Transaction***:  shall mean as described in Section 9.1.1.

***Security Deposit***:  shall mean as described in Section 3.5.

***Security Deposit Subaccount***:  shall mean as described in Section 3.5.

***Servicer***:  a servicer selected by Lender to service the Loan.

***Servicing Fee***:  shall mean as described in Section 10.3.

***Shortfall***:  shall mean as described in Section 2.9.7.

***Shortfall Notice***:  shall mean as described in Section 2.9.7.

***Significant Casualty***:  shall mean as described in Section 7.2.2.

***Soft Costs***:  those Building Loan Costs which are not Hard Costs, including, without limitation, architect's, engineer's, surveyor's and Construction Manager's fees, interest on the Loan, recording taxes and title charges in respect of the Mortgage and such other non-construction costs as are part of the Cost of the Improvements.

***Special Guarantor***:  Sam Chang, an individual.

***Special Guarantor Assumption***:  shall mean, following the occurrence of a Special Guarantor Assumption Trigger Event, the assumption of the Loan and the Loan Documents by a New Borrower and the assumption of the Mezzanine Loan and the Mezzanine Loan Documents upon satisfaction of all Special Guarantor Assumption Conditions.

***Special Guarantor Assumption Conditions***:  shall mean, as of the date that is ninety (90) days following the date Lender delivers notice to Borrower and Special Guarantor of the occurrence of any Special Guarantor Assumption Trigger Event which remains uncured as of such date, (i) no monetary Default and, except for the applicable Special Guarantor Assumption Trigger Event, material non-monetary Default or Event of Default shall exist; (ii) no monetary Default, material non-monetary Default or Event of Default shall occur as a result of the assumption of the Loan and the Loan Documents by the New Borrower; (iii) New Borrower assumes and agrees to pay the Debt as and when due and, prior to or concurrently with the closing of the Special Guarantor Assumption, Special Guarantor and New Borrower, its subsidiary and its constituent partners, members, shareholders, Affiliates or sponsors as Lender may require, shall execute and deliver to Lender, without any cost or expense to Lender, such documents and agreements as Lender shall reasonably require to evidence and effectuate said assumption (including, without limitation, an assumption agreement (which may, for the avoidance of doubt, require that the New Borrower comply with any provisions of any Loan Document which previously may have been waived by Lender for Borrower), a new version of the Mortgage and any new ownership certificates evidencing New Mezzanine Borrower's ownership in New

21

Borrower); (iv) Borrower, New Borrower and New Mezzanine Borrower shall have satisfied all transfer and/or assignment conditions set forth in the Ground Lease; (v) Borrower and New Borrower shall have executed and delivered an assignment and assumption agreement pursuant to which Borrower shall assign to New Borrower, and New Borrower shall assume from Borrower, all of Borrower's rights and obligations as the "Tenant" under the Ground Lease; (vi) Borrower, New Borrower and New Mezzanine Borrower shall have satisfied all transfer and/or assignment conditions set forth in the Hotel Management Agreement; (vii) Borrower and New Borrower shall have executed and delivered an assignment and assumption agreement pursuant to which Borrower shall assign to New Borrower, and New Borrower shall assume from Borrower, all of Borrower's rights and obligations under the Hotel Management Agreement, which assignment and assumption agreement shall be in form and substance reasonably acceptable to Lender; (viii) the proposed New Borrower shall fully satisfy all of Lender's then-applicable eligibility, credit, management, and other loan underwriting standards, and Special Guarantor shall satisfy the Net Worth (as defined in the Completion Guaranty) and Liquid Assets (as defined in the Completion Guaranty) covenants set forth in Section 6 of the Completion Guaranty; (ix) New Borrower shall have furnished to Lender all appropriate documents and instruments evidencing New Borrower's and New Mezzanine Borrower's organization, structure and good standing, and the qualification of the signers to execute the assumption of the Debt, which documents and instruments shall include certified copies of all documents relating to the organization and formation of New Borrower and of the entities, if any, which are director or indirect members, partners or other constituent members of New Borrower, and each of New Borrower, New Mezzanine Borrower and any manager, managing member, sole member and/or general partner of New Borrower and New Mezzanine Borrower, as applicable, shall be a Special Purpose Bankruptcy Remote Entity, and New Mezzanine Borrower's organizational documents shall contain such terms and provisions as may be required by Lender and shall otherwise be acceptable to Lender in form and substance; (x) Borrower shall have delivered to Lender, at Borrower's sole cost and expense, such searches (including credit, negative news, OFAC, litigation, judgment, lien and bankruptcy searches) as Lender may reasonably require with respect to New Borrower, New Mezzanine Borrower, Special Guarantor and any other direct or indirect owners of New Borrower and/or New Mezzanine Borrower, the results of which must be reasonably acceptable to Lender; (xi) the New Borrower shall have (A) if required by Lender, delivered to the Title Company for filing or recording, all applicable Loan Documents including the assumption agreement to correctly evidence the assumption and the confirmation, continuation, perfection, and priority of the Liens created hereunder and under the other Loan Documents; and (B) delivered to Lender a "date-down" endorsement to the Title Policy acceptable to Lender (or a new title insurance policy if a "date-down" endorsement is not available); (xii) Special Guarantor has executed (A) a ratification, confirmation and assumption agreement acceptable to Lender that ratifies and confirms Special Guarantor's obligations under the Completion Guaranty and assumes all obligations Special Guarantor to assume and perform all obligations of Guarantor under the Guaranty given by Guarantor in connection with the Loan Documents (provided that, at Lender's option, Special Guarantor will have delivered to Lender a substitute Guaranty of Recourse Obligations, Debt Service and Carry in form identical to the Guaranty); (xiii) Borrower and New Borrower, without any cost to Lender, shall furnish any information reasonably requested by Lender for the preparation of, and shall authorize Lender to file, new financing statements and financing statement amendments and other documents to the fullest extent permitted by applicable Legal Requirements, and shall execute any additional documents reasonably requested by Lender; (xiv)

22

Borrower shall have paid to Lender all out-of-pocket costs and expenses, including reasonable attorneys' fees, incurred by Lender in connection with the Special Guarantor Assumption; (xv) Borrower shall have paid all fees, costs and expenses of all third parties incurred by Borrower, Lender and/or New Borrower in connection therewith; (xvi) New Borrower shall furnish to Lender an opinion of counsel satisfactory to Lender and its counsel (A) that New Borrower's formation documents provide for the matters described in subclause (ix) above, (B) that the assumption of the Debt has been duly authorized, executed and delivered, and that the assumption agreement and the other Loan Documents are valid, binding and enforceable against Transferee in accordance with their terms, (C) that New Borrower, New Mezzanine Borrower and any entity which is a Controlling stockholder, member or general partner of New Borrower and/or New Mezzanine Borrower, have been duly organized, and are in existence and good standing, (D) with respect to such other matters as Lender and Mezzanine Lender may reasonably request (including, without limitation, as to Lender's perfected security interest in the Property under the Mortgage and as to Mezzanine Lender's perfected security interest in the Collateral) and (E) such other conditions and/or legal opinions as Lender shall determine in its reasonable discretion to be in the interest of Lender; (xvii) Mezzanine Borrower, New Mezzanine Borrower and Special Guarantor shall have satisfied all of the "Special Guarantor Assumption Conditions" (as such term is defined in the Mezzanine Loan Agreement) and the Special Guarantor Assumption shall have occurred pursuant to the Mezzanine Loan Agreement; [(xvii) Mortgage Borrower, New Mortgage Borrower and Special Guarantor shall have satisfied all of the "Special Guarantor Assumption Conditions" (as such term is defined in the Mortgage Loan Agreement)] [9]; (xviii) Mezzanine Lender shall have received a new UCC Policy and a new Owner's Policy insuring New Borrower's leasehold interest in the Property, which shall include (A) the UCC Policy shall (x) provide coverage in the aggregate amount of the Loan and the Mezzanine Loan, (y) insure Mezzanine Lender that the Pledge Agreement creates a valid first priority security interest in the Collateral, free and clear of all exceptions from coverage other than the Permitted Encumbrances, and (z) name Lender, its successors and assigns, as insured, (B) the Owner's Policy shall include a mezzanine endorsement naming Lender, its successors and assigns, for the ratable benefit of the Lender, as the "Mezzanine Lender" entitled to the rights and benefits set forth in such endorsement, (C) Lender  shall have received evidence that all premiums in respect of the UCC Policy and the Owner's Policy have been paid; (xix) New Borrower shall furnish evidence reasonably acceptable to Mezzanine Lender that New Borrower is New Mezzanine Borrower's 100% owned and Controlled direct subsidiary and that New Borrower has assigned and assumed the interest of Mortgage Borrower as Tenant under the Ground Lease concurrently with the Special Guarantor Assumption.

    ***Special Guarantor Assumption Trigger Event***:  shall mean the failure by Borrower to cure any Event of Default described in Section 8.1 of the Loan Agreement within ninety (90) days following notice from Lender to Borrower and to Special Guarantor.

    ***Special Purpose Bankruptcy Remote Entity***:   shall mean as described in Section 5.13.

---

[9] For Mezzanine Loan.

*ACTIVE 45138641v14*

*Sponsor*: collectively, (i) JLA Tribeca LLC, a Delaware limited liability company, an Affiliate of Caspi Development which is Controlled by Joshua Caspi and (ii) APW Avenue Group LTD., an entity Controlled by James Parks.

*Spread*: shall mean, from an after the Closing Date through and including the Original Stated Maturity Date, (i) eight percent (8.0%) and (ii) if applicable, commencing upon the day following the Original Stated Maturity Date through the First Extended Maturity Date (and, if applicable, through the Second Extended Maturity Date), four and one half of one percent (4.5%).

*Springing Recourse Event*: shall mean as described in Section 10.1.

*State*: the state in which the Property is located.

*Stated Maturity Date*: **[_____, 201_][INSERT DATE THIRTY SIX (36) MONTHS FROM CLOSING DATE] (the "*Original Stated Maturity Date*"),** and as such date may be changed in accordance with Section 2.2.5 and extended in accordance with Section 2.8.

*Stored Materials*: shall mean as described in Section 2.9.9.

*Subaccounts*: shall mean as described in Section 3.1 of this Agreement.

*Subcontract:* any agreement (other than the Architect's Contract and the Construction Manager's Agreement) entered into by Borrower or by Construction Manager in which the Subcontractor thereunder agrees to provide services, labor and/or materials in connection with the Project Improvements.

*Subcontractor:* any subcontractor supplying services, labor and/or materials in connection with the Project Improvements.

*Substantial Completion*: collectively, (i) the occurrence of substantial completion of the Project Improvements (other than Punch List Items) substantially in accordance with the Plans and Specifications (as the same may be amended in accordance with this Agreement), all applicable Legal Requirements, all Permitted Encumbrances and this Agreement, (ii) Borrower has delivered to Lender an AIA Form G704 (Certificate of Substantial Completion) executed by Borrower's Architect and Borrower in connection with the Project Improvements, (iii) the Project Improvements shall contain all fixtures, furniture and equipment required for the use and operation of the Improvements for their intended use or which may be required by any Governmental Authority or under any Legal Requirement and (iv) all utilities necessary to serve the Property have been connected and are in operation, with completion of such requirements set forth in (i) through (iv) above to be evidenced to the satisfaction of Lender, together with the delivery to Lender of a temporary certificate of occupancy with regard to the Project Improvements as a whole (other than the retail component of the Project Improvements) and with no conditions to the future issuance of a permanent certificate of occupancy for the same, other than those approved by Lender acting in its reasonable discretion; together with evidence that all other applicable governmental approvals, to the extent required under applicable Legal Requirements, have been issued and all other applicable Legal Requirements have been satisfied to the extent necessary so as to allow the Project Improvements to be used, operated and/or sold in accordance with the Loan Documents.

24

***Substantial Completion Date***:   [INSERT DATE THIRTY (30) MONTHS FOLLOWING CLOSING DATE], as the same may be extended from time to time as a result of the occurrence of any Force Majeure Event, such extensions, together with all extensions of any deadlines with respect to any other Major Milestones due to the occurrence of any Force Majeure Events, collectively not to exceed the Force Majeure Delay Cap.

***Substitute Interest Rate Protection Agreement***:  shall mean as described in Section 2.6.1(e)(ii).

***Survey***: [_____].

***Tax and Insurance Subaccount***:  shall mean as described in Section 3.3.

***Taxes***:  all real estate and personal property taxes, assessments, water rates or sewer rents, maintenance charges, impositions, vault charges and license fees, now or hereafter levied or assessed or imposed against all or part of the Property.

***Term***:  the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

***Title Company***:  Old Republic National Title Insurance Company.

***Title Policy***:  the ALTA mortgagee title insurance policy in the form acceptable to Lender issued with respect to Borrower's interest in the Property and insuring the Lien of the Mortgage.

***Toxic Mold***:  shall mean as described in Section 4.21.

***Transfer***:  (i) any sale, conveyance, transfer, lease, assignment or preferred equity investment, or the entry into any agreement to sell, convey, transfer, lease or assign, whether by law or otherwise, of, on, in or affecting (x) all or part of the Property (including any legal or beneficial direct or indirect interest therein), any direct or indirect interest in Borrower (including any profit interest) or (ii) any change of Control of a Borrower or Borrower Representative.  For purposes hereof, (i) a Transfer of an interest in Borrower shall be deemed to include (A) if Borrower or Borrower Representative or controlling shareholder of Borrower or Borrower Representative is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock in one or a series of transactions by which an aggregate of more than 10% of such corporation's stock shall be vested in a party or parties who are not now stockholders or any change in the control of such corporation and (B) if Borrower, Borrower Representative or controlling shareholder of Borrower or Borrower Representative is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a general partner, managing partner, limited partner, joint venturer or member or the transfer of the partnership interest of any general partner, managing partner or limited partner or the transfer of the interest of any joint venturer or member and (ii) a change of Control of a Borrower or Borrower Representative shall be deemed to have occurred if (A) there is any change in the identity of any individual or entity or any group

25

of individuals or entities who have the right, by virtue of any partnership agreement, articles of incorporation, by-laws, articles of organization, operating agreement or any other agreement, with or without taking any formative action, to cause a Borrower (or Borrower Representative) to take some action or to prevent, restrict or impede a Borrower (or Borrower Representative) from taking some action which, in either case, a Borrower (or Borrower Representative) could take or could refrain from taking were it not for the rights of such individuals or (B) the individual or entity or group of individuals or entities that Control a Borrower (and Borrower Representative) as described in clause (A) ever cease to own at least fifty percent (50%) of all equity interests (direct or indirect) in such Borrower (and Borrower Representative).

*TRIPRA*:  shall mean as described in Section 7.1.1.

*UCC*:  the Uniform Commercial Code as in effect in the State or the state in which any of the Cash Management Accounts are located, as the case may be.

*USALI*:  shall mean the Uniform System of Accounts for the Lodging Industry, 11th edition (or most current edition).

*Undisbursed Loan Proceeds*:    A portion of the Loan proceeds equal to $[_____] not disbursed to Borrower on the Closing Date, less any amounts disbursed to Borrower pursuant to Section 2.9.

*U.S. Person* means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

*Welfare Plan*:  an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

**1.2    Principles of Construction**.

(a)  Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP.

(b)  With respect to any cross-reference to the Project Loan Documents or the Loan Documents or any combination thereof, as the case may be, for terms defined therein or provisions set forth therein or Schedules or Exhibits thereto, such cross-references shall be deemed to refer to defined terms or provisions or Schedules or Exhibits, as the case may be, as the same are set forth in the Project Loan Documents or the Loan Documents or any combination thereof, as the case may be, as of the date hereof, and as the same may be amended, modified, supplemented, extended, replaced or restated or any combination thereof from time to time, and shall survive the repayment or satisfaction of the Loan or the Project Loan, as the case may be, or the termination of the Project Loan Agreement or this Agreement or any combination thereof, as the case may be, for so long as the Loan remains outstanding.

26

## 2.    GENERAL LOAN TERMS

**2.1    The Loan**. Lender is making a loan (the "***Loan***") to Borrower on the date hereof, in the original principal amount (the "***Principal***") up to the Maximum Loan Commitment Amount, which shall mature on the Stated Maturity Date. Borrower acknowledges that the proceeds of the Loan are to be used for Building Loan Costs actually incurred by Borrower in connection with the construction of the Project Improvements if and to the extent that such Building Loan Costs are reflected in the Building Loan Budget, subject to reallocation pursuant to Sections 2.9.4, 2.9.5 and 2.9.6 (or other reallocations approved by Lender in accordance therewith). Notwithstanding anything herein to the contrary, prior to and as a condition precedent to the closing of the Loan, (i) all of the conditions set forth on Schedule 15 attached hereto shall have been satisfied and (ii) all of the documents and other closing deliveries set forth on Lender's closing checklist shall have been delivered by Borrower and/or Guarantor, provided, however, that if Lender closes the Loan and funds the initial Advances on the Closing Date, the foregoing conditions shall be deemed satisfied.

**2.2    Interest; Monthly Payments**.

**2.2.1    Generally**. From and after the date hereof, interest on the Outstanding Principal Balance shall accrue at the Interest Rate and be payable as hereinafter provided. On the date hereof, Borrower shall pay interest on the Outstanding Principal Balance from the date hereof through and including [_____], 2019. On [_____] 1, 2019 and each Payment Date thereafter through and including the Maturity Date, Borrower shall pay interest on the Outstanding Principal Balance which has accrued through the last day of the Interest Period immediately preceding such Payment Date. All accrued and unpaid interest shall be due and payable on the Maturity Date.

**2.2.2    Default Rate**. After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, and shall be payable upon demand from time to time, to the extent permitted by applicable law. If interest at the Default Rate is not paid currently, then the amount of such unpaid interest at the Default Rate will be added to the Principal and will itself bear interest thereafter at the Default Rate.

**2.2.3    Taxes**.

(a)    Any and all payments by Borrower hereunder and under the other Loan Documents shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on Lender's income, and franchise taxes imposed on Lender by the law or regulation of any Governmental Authority (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to in this Section 2.2.3 as "***Applicable Taxes***"). If Borrower shall be required by law to withhold or deduct (as determined in the good faith discretion of Borrower) any Applicable Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply: (i) if such Applicable Tax is an Indemnified Tax, the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.2.3), Lender receives an amount equal to the sum it would have received had no such

27

deductions been made, (ii) Borrower shall make such withholding or deductions and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. In addition, Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law. Payments pursuant to this Section 2.2.3 shall be made within thirty (30) days after the date Lender makes written demand therefor.

(b)    Borrower shall indemnify Lender, within thirty (30) Business after written demand therefore, for the full amount of any Applicable Taxes paid by Lender on or with respect to any payment by or on account of any obligation of Borrower under this Agreement or the Note (including Applicable Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Applicable Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.

(c)    As soon as practicable after any payment of Applicable Taxes by Borrower to a Governmental Authority, Borrower shall deliver to Lender the original or a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(d)    (a) Lender shall furnish to Borrower, at the time or times reasonably requested by Borrower, such properly completed and executed forms, certifications, statements and other documents as Borrower may reasonably request from time to time to evidence Lender's exemption from such withholding taxes or to enable Borrower to comply with any applicable laws relating thereto. In addition, Lender, if reasonably requested by Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not Lender is subject to backup withholding or information reporting requirements. Borrower shall not be obligated to make any payments hereunder to Lender in respect of the Loan until Lender shall have furnished to the Borrower the requested form, certification, statement or document pursuant to this Section 2.2.3(d).

(i)    Without limiting the generality of the forgoing:

(A)    any Lender that is a U.S. Person shall deliver to Borrower on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), executed copies of IRS Form W-9 certifying that such Lender is a U.S. Person and is exempt from U.S. federal backup withholding Tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower (in such number of copies as shall be requested by Borrower) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), whichever of the following is applicable:

28

1.    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

2.    executed copies of IRS Form W-8ECI;

3.    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Schedule 12-A to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Schedule 12-B or Schedule 12-C, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit C-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower (in such number of copies as shall be requested by Borrower) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), executed copies of any other form prescribed by applicable legal requirements as a basis for claiming exemption from or a reduction in U.S. federal withholding Applicable Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable legal requirements to permit Borrower to determine the withholding or deduction required to be made;

(D)    if a payment made to Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), Lender shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower such documentation prescribed by legal requirements (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with its obligations under FATCA and to determine that Lender has complied with Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.

29

Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower in writing of its legal inability to do so.

(e)    Lender shall promptly notify Borrower in writing of any event of which it has knowledge, occurring after the date of this Agreement, which will entitle Lender to compensation pursuant to this Section 2.2.3. If Lender requests compensation under Section 2.2.3, or requires Borrower to pay any Indemnified Taxes or additional amounts to Lender or any Governmental Authority for the account of Lender pursuant to this Section 2.2.3, then Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the good faith judgment of Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to this Section 2.2.3, in the future, and (ii) would not subject Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to Lender.

(f)    If Lender determines, in its reasonable discretion, that it has received a refund of any Applicable Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section, it shall pay over such refund to Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this Section with respect to the Applicable Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses incurred by Lender in connection with receipt of such refund and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided, that Borrower, upon the request of Lender, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Lender in the event Lender is required to repay such refund to such Governmental Authority. This Section shall not be construed to require Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to Borrower or any other Person, but Lender otherwise agrees to reasonably cooperate with Borrower hereunder.

(g)    The agreements in this Section 2.2.3 shall survive the termination of this Agreement and the payment of the Loan and all other amounts payable hereunder for a period of sixty (60) days.

**2.2.4    Breakage Indemnity**.  Borrower shall indemnify Lender against any actual loss or out-of-pocket expense which Lender may actually sustain or incur in liquidating or redeploying deposits from third parties acquired to effect or maintain the Loan or any part thereof as a consequence of (i) any payment or prepayment of the Loan or any portion thereof made on a date other than a Payment Date and (ii) any default in payment or prepayment of the Principal or any part thereof or interest accrued thereon, as and when due and payable (at the date thereof or otherwise, and whether by acceleration or otherwise).  Lender shall deliver to Borrower a statement for any such sums which it is entitled to receive pursuant to this Section 2.2.4, which statement shall be binding and conclusive absent manifest error.  Borrower's obligations under this Section 2.2.4 are in addition to Borrower's obligations to pay any Prepayment Fee and Minimum Multiple Payment applicable to a payment or prepayment of Principal.

30

**2.2.5    New Payment Date.** Lender shall have the right to be exercised not more than once during the term of the Loan, to change the Payment Date to a date other than the first day of each month (a "***New Payment Date***"), on thirty (30) days' written notice to Borrower; provided, however, that any such change in the Payment Date: (i) shall not modify the amount of regularly scheduled monthly interest payments, except that the first payment of interest payable on the New Payment Date shall be accompanied by interest at the interest rate herein provided for the period from the Payment Date in the month in which the New Payment Date first occurs to the New Payment Date, and (ii) shall extend the Stated Maturity Date to the New Payment Date occurring in the month set forth in the definition of Stated Maturity Date.

**2.2.6    Requirements of Law**.

(a)    If any Legal Requirement or any change in the interpretation or application thereof or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)    shall subject Lender to any tax of any kind whatsoever with respect to this Agreement, the Note or the Loan (other than (A) Indemnified Taxes, (B) Taxes described in clauses (ii) through (iv) of the definition of Excluded Taxes and (C) Connection Income Taxes) or change the basis of taxation of payments to Lender in respect thereof;

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances or other extensions of credit by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of the LIBOR hereunder;

(iii)    shall impose on Lender any other condition;

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender deems to be material, of making or maintaining the Loan or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall, from time to time, upon receipt of prior written notice of not less than thirty (30) days of such fact and a reasonably detailed description of the circumstances, promptly pay Lender such additional amount or amounts as will compensate Lender for such increased cost or reduced amount receivable (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally) and are not prohibited by such Legal Requirement to be charged back.

(b)    If Lender shall have determined that the adoption of or any change in any Legal Requirement regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on Lender's or such corporation's capital as a consequence of its obligations hereunder by an amount deemed by Lender to be material (taking into consideration Lender's or such corporation's policies with respect to capital adequacy), then from time to time, Borrower shall within thirty (30)

31

days of written notice from Lender, pay to Lender such additional amount or amounts as will compensate Lender for such reduction (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally).

(c)    If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.6, it shall promptly notify Borrower of the event by reason of which it has become so entitled.  A certificate as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error or the provision of immediate proof by Borrower to the contrary. Notwithstanding anything to the contrary contained herein, Lender shall only require payment from Borrower under this Section 2.2.6 to the extent Lender also requires payment from similarly-situated borrowers in comparable loans.

### 2.3    <u>Loan Repayment</u>.

**2.3.1    Repayment**.  Borrower shall repay the entire Outstanding Principal Balance in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents.  Except during the continuance of an Event of Default, all proceeds of any repayment, including any prepayments of the Loan, shall be applied by Lender as follows in the following order of priority:  *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal; and *Third,* to the Minimum Multiple Payment, Extension Exit Fees (if applicable) and any other amounts then due and owing under the Loan Documents.  If prior to the Stated Maturity Date the Debt is accelerated by reason of an Event of Default, then Lender shall be entitled to receive, in addition to the Outstanding Principal Balance and accrued interest and other sums due under the Loan Documents, an amount equal to the Minimum Multiple Payment, Extension Exit Fee (if applicable) and the Prepayment Fee applicable to such Principal so accelerated.  During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on the Property (whether through foreclosure, deed-in-lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

**2.3.2    Mandatory Prepayments**.    The Loan is subject to mandatory prepayment in certain instances of Insured Casualty or Condemnation (each a "*Casualty/Condemnation Prepayment*"), in the manner and to the extent set forth in Section 7.4.2.  Each Casualty/Condemnation Prepayment, after deducting Lender's out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) in connection with the settlement or collection of the Proceeds or Award, shall be applied in the same manner as repayments under Section 2.3.1.  Notwithstanding the foregoing, neither the Minimum Multiple Payment nor the Prepayment Fee shall apply to any such mandatory prepayment under this Section 2.3.2, but such mandatory prepayment shall be subject to the Extension Exit Fee (if applicable).  Further, notwithstanding anything to the contrary contained herein, each Casualty/Condemnation Prepayment shall be applied in inverse order of maturity and shall not extend or postpone the due dates of the monthly installments due under the Note or this Agreement, or change the amounts of such monthly installments.

    **2.3.3**    **Optional Prepayments**.  Provided no Event of Default has occurred and is continuing, Borrower shall have the right to prepay the Loan in whole but not in part on any Payment Date provided that Borrower gives Lender at least thirty (30) days prior revocable written notice thereof and such prepayment is accompanied by the Minimum Multiple Payment, the Extension Exit Fee (if applicable) and, prior to the then-applicable Open Date, the Prepayment Fee; provided that if Borrower subsequently revokes such notice, Borrower shall be responsible for Lenders' reasonable out-of-pocket costs and expenses actually incurred in connection with the same.  If any such prepayment is not made on a Payment Date, Borrower shall also pay interest that would have accrued on such prepaid Principal to but not including the next Payment Date.

    **2.4**    <u>**Release**</u>.  Lender shall, upon the written request and at the expense of Borrower, upon payment in full of the Debt in accordance herewith, release or, if requested by Borrower, assign to Borrower's designee (without (i) any representation or warranty by and without any recourse against Lender whatsoever and (ii) any cost to Borrower except for Lender's reasonable, out-of-pocket attorneys' fees) the Lien of the Loan Documents if not theretofore released.

    **2.5**    <u>**Payments and Computations**</u>.

    **2.5.1**    **Making of Payments**.  Each payment by Borrower shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 3:00 p.m. New York City time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower. Whenever any such payment shall be stated to be due on a day that is not a Business Day, such payment shall be made on the first Business Day thereafter.  All such payments shall be made irrespective of, and without any deduction, set-off or counterclaim whatsoever and are payable without relief from valuation and appraisement laws and with all costs and charges incurred in the collection or enforcement thereof, including attorneys' fees and court costs.

    **2.5.2**    **Computations**.  Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over a 360-day year.

    **2.5.3**    **Late Payment Charge**.  If any Principal, interest or other sum due under any Loan Document (other than the payment of Principal due on the Maturity Date) is not paid by Borrower within five (5) days of the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law (the "***Late Payment Charge***"), in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Such amount shall be secured by the Loan Documents.

    **2.6**    <u>**Interest Rate Protection Agreements**</u>.

    **2.6.1**    **Interest Rate Protection Agreement**.  As of the date hereof, Borrower has entered into, made all payments required under, and satisfied all conditions precedent to the effectiveness of, an interest rate protection agreement that satisfies all of the following conditions (such interest rate protection agreement together with (i) any extension thereof or (ii) any other

*ACTIVE 45138641v14*

interest rate protection agreement entered into pursuant to Section 2.8, being referred to herein as the "***Interest Rate Protection Agreement***"):

(a)    the Interest Rate Protection Agreement is with a financial institution having a long term, unsecured and unsubordinated debt rating of at least (i) "AA" by S&P and "Aa2" by Moody's or, (ii) if such financial institution is an Affiliate of Lender, "A" by S&P or "A2" by Moody's; has a term ending no earlier than the Stated Maturity Date; is an interest rate cap in respect of a notional amount not less than the maximum principal amount of the Loan that shall have the effect of capping LIBOR at 4% per annum; and provides that the only obligation of Borrower thereunder is the making of a single payment upon the execution and delivery thereof.

(b)    Borrower's interest in such Interest Rate Protection Agreement has been assigned to Lender pursuant to documentation satisfactory to Lender in form and substance, and  the counterparty to such Interest Rate Protection Agreement has executed and delivered to Lender an acknowledgment of such assignment, which acknowledgment shall be satisfactory to Lender in form and substance and, without limitation, shall include such counterparty's agreement to (i) pay directly into the Clearing Account all sums payable by such counterparty pursuant to the Interest Rate Protection Agreement and (ii) designate a successor counterparty under the Interest Rate Protection Agreement, which successor counterparty shall satisfy the criteria set forth in subsection (a) above and this subsection (b), not later than ten (10) Business Days after the long term, unsecured and unsubordinated debt rating of such counterparty is downgraded below (i) "A" by S&P or "A2" by Moody's or, (ii) if such counterparty is an Affiliate of Lender, "A–" by S&P or "A3" by Moody's, unless, in either case, such counterparty deposits with Lender collateral, in form, value and substance acceptable to Lender in its sole discretion and pursuant to documentation acceptable to Lender in its sole discretion.

(c)    Notwithstanding anything in herein to the contrary, prior to purchasing an Interest Rate Protection Agreement, Borrower shall send a written notification to Lender (which notice shall contain the price and other applicable terms relating to the proposed Interest Rate Protection Agreement) and Lender or its Affiliate shall be permitted to submit a bid. If another financial institution submits a lower bid, prior to purchasing the Interest Rate Protection Agreement from such financial institution, Lender or its Affiliate shall have the right to provide an Interest Rate Protection Agreement to Borrower at the same (or lower) price and upon substantially similar terms and conditions as proposed by the other financial institution.  If Lender or its Affiliate declines to provide the Interest Rate Protection Agreement to Borrower, Borrower may proceed to purchase the Interest Rate Protection Agreement from any financial institution having a rating of at least that specified in Section 2.6.1(a) above.

(d)    In connection with an Interest Rate Protection Agreement entered into pursuant to Section 2.8 or Section 2.6.1(e), Borrower shall obtain and deliver to Lender an opinion of counsel from counsel for the counterparty (which counsel may be in–house counsel for the counterparty) (upon which Lender and its successors and assigns and the Rating Agencies may rely) which shall provide, in relevant part, that:

(i)    the counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation or organization and has the

34

organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Protection Agreement;

(ii)    the execution and delivery of the Interest Rate Protection Agreement by the counterparty, and any other agreement which the counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by–laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)    all consents, authorizations and approvals required for the execution and delivery by the counterparty of the Interest Rate Protection Agreement, and any other agreement which the counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)    the Interest Rate Protection Agreement, and any other agreement which the counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the counterparty and constitutes the legal, valid and binding obligation of the counterparty, enforceable against the counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(e)    Notwithstanding anything to the contrary contained in this Section 2.6.1 or elsewhere in this Agreement, if, at any time, Lender converts the Loan from a LIBOR Loan to an Alternate Rate Loan in accordance with Section 2.10 (each, a "*LIBOR Conversion*"), then:

(i)    within thirty (30) days after such LIBOR Conversion, Borrower shall either (A) enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of, a Substitute Interest Rate Protection Agreement (and in connection therewith, but not prior to Borrower taking all the actions described in this clause (i), Borrower shall have the right to terminate any then-existing Interest Rate Protection Agreement) or (B) cause the then-existing Interest Rate Protection Agreement to be modified such that such then-existing Interest Rate Protection Agreement satisfies the requirements of a Substitute Interest Rate Protection Agreement as set forth below in the definition thereof (a "***Converted Interest Rate Protection Agreement***"); and

(ii)    following such LIBOR Conversion (provided Lender has not converted the Loan back to a LIBOR Loan in accordance with Section 2.10 hereof), in lieu of satisfying the condition described in Section 2.8(a)(vii) or Section 2.8(b)(vi) with respect to any extension option, Borrower shall instead enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of a Substitute Interest Rate Protection Agreement on or prior to the exercise of such extension option.

35

(f)    As used herein, "*Substitute Interest Rate Protection Agreement*" shall mean an interest rate cap agreement between a counterparty and Borrower, obtained by Borrower and collaterally assigned to Lender pursuant to this Agreement that contains each of the following:

(i)    a term expiring no earlier than the end of the Interest Period related to the then-applicable Maturity Date;

(ii)    the notional amount of the Substitute Interest Rate Protection Agreement shall be equal to or greater than the then Outstanding Principal Balance;

(iii)    it provides that the only obligation of Borrower thereunder is the making of a single payment to the counterparty thereunder upon the execution and delivery thereof;

(iv)    it provides to Lender and Borrower (as determined by Lender in its sole but good faith discretion), for the term of the Substitute Interest Rate Protection Agreement, a hedge against rising interest rates that is no less beneficial to Borrower and Lender than (A) in the case of clause (e)(i) above, that which was provided by the Interest Rate Protection Agreement being replaced by the Substitute Interest Rate Protection Agreement and (B) in the case of clause (e)(ii) above, that which was intended to be provided by the Interest Rate Protection Agreement that, but for the operation of this Section 2.6.1(f), would have been required to have been delivered by Borrower pursuant to Section 2.8(a)(vii)  or 2.8(b)(vi) below as a condition to the requested extension period; and

(v)    without limiting any of the provisions of the preceding clauses (i) through (iv) above, it satisfies all of the requirements set forth in Section 2.6.1(a), (b) and (d) hereof.

From and after the date of any LIBOR Conversion, all references to "*Interest Rate Protection Agreement*" herein (other than in the definition of "*Interest Rate Protection Agreement*") shall be deemed to refer or relate, as applicable, to a Substitute Interest Rate Protection Agreement or a Converted Interest Rate Protection Agreement, as the case may be.

Notwithstanding anything to the contrary set forth in Section 2.6.1(e) and (f), Borrower shall not be required to obtain a Substitute Interest Rate Protection Agreement or Converted Interest Rate Protection Agreement, as applicable, during any period when the Loan is outstanding as an Alternate Rate Loan, as applicable, if such a Substitute Interest Rate Protection Agreement or Converted Interest Rate Protection Agreement, as the case may be, is not then commercially available, in which event Borrower and Lender shall work together to find a mutually agreeable alternative to a Substitute Interest Rate Protection Agreement or Converted Interest Rate Protection Agreement that would afford Lender substantially equivalent protection from increases in the interest rate.

**2.6.2    Execution of Documents**.  Borrower shall promptly execute and deliver to the counterparty of the Interest Rate Protection Agreement such confirmations and agreements as may be requested by such counterparty in connection with such Interest Rate Protection Agreement.

36

**2.6.3    No Obligation of Lender**.  Borrower agrees that Lender shall not have any obligation, duty or responsibility to Borrower or any other Person by reason of, or in connection with, any Interest Rate Protection Agreement (including any duty to provide or arrange any Interest Rate Protection Agreement, to consent to any mortgage or pledge of the Property or any portion thereof as security for Borrower's performance of its obligations under any Interest Rate Protection Agreement, or to provide any credit or financial support for the obligations of Borrower or any other Person thereunder or with respect thereto).  No Interest Rate Protection Agreement shall alter, impair, restrict, limit or modify in any respect the obligation of Borrower to pay interest on the Loan as and when the same becomes due and payable in accordance with the provisions of the Loan Documents.

**2.6.4    Receipts from Interest Rate Protection Agreements**.  All payments made by the counterparty to the Interest Rate Protection Agreement shall be deposited into the Clearing Account [and applied in the same manner as Rents are applied under Section 3.9.]

**2.6.5    Downgrade of Counterparty**.  Borrower shall cause any counterparty under any Interest Rate Protection Agreement to be replaced with a successor counterparty, which successor counterparty shall satisfy the criteria set forth in Section 2.6.1(a), not later than ten (10) Business Days after the long term unsecured and unsubordinated debt rating of such counterparty is downgraded below (i) "A" by S&P or "A2" by Moody's or, (ii) if such counterparty is an Affiliate of Lender, "A–" by S&P or "A3" by Moody's.

**2.7    Fees**.  On the date hereof, Borrower shall pay to Lender a closing fee of $_____ **[1% of the entire amount of the Loan]** (the "***Closing Fee***").

**2.7.1    Prepayment Fee.**  Upon any prepayment of Principal prior to the then-applicable Open Date or repayment of Principal, following the continuance of an Event of Default prior to the then applicable Open Date, Borrower shall pay to Lender, on the date of such prepayment or repayment, the Prepayment Fee.  All Prepayment Fees hereunder shall be deemed to be earned by Lender upon the funding of the Loan.

**2.7.2    Minimum Multiple Payment**.  Upon any repayment or prepayment of Principal (including in connection with an acceleration of the Loan), Borrower shall pay to Lender on the date of such repayment or prepayment the Minimum Multiple Payment applicable thereto. All Minimum Multiple Payment hereunder shall be deemed to be earned by Lender upon the funding of the Loan.

**2.7.3    Reserved**.

**2.8    Extension Option**.

(a)    Borrower shall have the right, at its option, to extend the Term until [ _____ ] 1, 201__ [INSERT DATE TWELVE (12) MONTHS FOLLOWING ORIGINAL STATED MATURITY DATE] (the "***First Extended Maturity Date***") by giving revocable notice of such extension to Lender at least ninety (90) days prior to the Original Stated Maturity Date; provided that if Borrower subsequently revokes such notice, Borrower shall be responsible for Lenders' reasonable out-of-pocket costs and expenses actually incurred in connection with the same.  Upon receipt of such request to extend the Term until the First Extended Maturity Date

37

Lender shall promptly confirm to Borrower in writing whether or not the Stated Maturity Date will be so extended, which extension shall be granted upon the satisfaction of the following conditions:

(i)        no Event of Default exists at the time such request is made and on the Original Stated Maturity Date;

(ii)       Borrower delivers to Lender an Officer's Certificate confirming the accuracy of the information contained in clause (i) above;

(iii)      if the option to extend the Term until First Extended Maturity Date is exercised, Borrower agrees to pay to Lender upon the subsequent repayment of the Principal an extension exit fee in an amount equal to one percent (1.0%) (the "*Extension Exit Fee*") of any repayment of the Outstanding Principal Balance which shall be deemed earned on the date that the term of the Loan is so extended.

(iv)      Borrower has made a deposit in the Tax and Insurance Subaccount, Leasehold Rents Subaccount, the Monthly Debt Service Account and the Rebalancing Reserve Account in an amount determined by Lender so that after such deposit there are sufficient funds in such Subaccounts to pay all Taxes, Other Charges and Insurance Premiums, Leasehold Rents, Debt Service and Shortfalls, respectively, through the First Extended Maturity Date;

(v)       Borrower has extended the term of the Project Loan pursuant to Section 2.8(a) of the Project Loan Agreement and the term of the Mezzanine Loan pursuant to Section [2.8(a)] of the Mezzanine Loan Agreement to a date that is conterminous with the Loan;

(vi)      On or prior to the Original Stated Maturity Date, Borrower has achieved Substantial Completion of the Project Improvements;

(vii)     on or prior to Original Stated Maturity Date Borrower either (i) extends the term of the Interest Rate Protection Agreement until _____ or (ii) enters into a new interest rate protection agreement which expires on _____ , and which extension or new agreement is on the same terms set forth in Section 2.6.1 and has the effect of capping LIBOR at ____% per annum; and

(viii)    on Original Stated Maturity Date the Debt Service Coverage Ratio is at least 1.10 to 1.00 (the "*Extension Option DSCR*"), as measured as of the end of the calendar month immediately preceding the Original Stated Maturity Date, provided that if the Debt Service Coverage Ratio is less than 1.10 to 1.00, provided that in order to satisfy such requirement, Borrower shall be permitted to post cash collateral in an account controlled by Lender (and in which account Borrower shall grant a security interest in favor of Lender), in either case in an amount necessary to satisfy the Extension Option DSCR.

If Borrower is unable to satisfy all of the foregoing conditions within the applicable time frames for each, Lender shall have no obligation to extend the Stated Maturity Date hereunder.

(b)       Borrower shall have the right, at its option, to extend the Term until [ _____] 1, 201__ [INSERT DATE TWELVE (12) MONTHS FOLLOWING FIRST

38

EXTENDED MATURITY DATE] (the "*Second Extended Maturity Date*") by giving revocable notice of such extension to Lender at least ninety (90) days prior to the First Extended Maturity Date; provided that if Borrower subsequently revokes such notice, Borrower shall be responsible for Lenders' reasonable out-of-pocket costs and expenses actually incurred in connection with the same.  Upon receipt of such request to extend the Term until the Second Extended Maturity Date Lender shall promptly confirm to Borrower in writing whether or not the First Extended Maturity Date will be so extended, which extension shall be granted upon the satisfaction of the following conditions:

(i)    no Event of Default exists at the time such request is made and on the First Extended Maturity Date;

(ii)    Borrower delivers to Lender an Officer's Certificate confirming the accuracy of the information contained in clause (i) above;

(iii)    if the option to extend the Term until Second Extended Maturity Date is exercised, Borrower agrees to pay to Lender on the subsequent repayment of the Principal the Extension Exit Fee of any repayment of the Outstanding Principal Balance with respect to the second extension which shall be deemed earned on the date that the term of the Loan is so extended. For the avoidance of doubt the Extension Exit Fee paid in connection with the second extension of the Loan shall be in addition to the Extension Exit Fee paid in connection with the first extension of the Loan.

(iv)    Borrower has made a deposit in the Tax and Insurance Subaccount, Leasehold Rents Subaccount, the Monthly Debt Service Account and the Rebalancing Reserve Account in an amount determined by Lender so that after such deposit there are sufficient funds in such Subaccounts to pay all Taxes, Other Charges and Insurance Premiums, Leasehold Rents, Debt Service and Shortfalls, respectively, through the Second Extended Maturity Date;

(v)    Borrower has extended the term of the Project Loan pursuant to Section 2.8(b) of the Project Loan Agreement and the term of the Mezzanine Loan pursuant to Section [2.8(b)] of the Mezzanine Loan Agreement to a date that is conterminous with the Loan;

(vi)    on or prior to First Extended Maturity Date Borrower either (i) extends the term of the Interest Rate Protection Agreement until _____ or (ii) enters into a new interest rate protection agreement which expires on _____ , and which extension or new agreement is on the same terms set forth in Section 2.6.1 and has the effect of capping LIBOR at ____% per annum; and

(vii)    on the First Extended Maturity Date the Debt Service Coverage Ratio is at least 1.10 to 1.00, as measured as of the end of the calendar month immediately preceding the First Extended Maturity Date, provided that if the Debt Service Coverage Ratio is less than 1.10 to 1.00, provided that in order to satisfy such requirement, Borrower shall be permitted to post cash collateral in an account controlled by Lender (and in which account Borrower shall grant a security interest in favor of Lender), in either case in an amount necessary to satisfy the Extension Option DSCR.

39

If Borrower is unable to satisfy all of the foregoing conditions within the applicable time frames for each, Lender shall have no obligation to extend the Stated Maturity Date hereunder.

**2.9     Advances**.

**2.9.1     Conditions to Advances.**  Lender's obligation to make each Advance shall be subject to the satisfaction of the following conditions on the date of each Advance:

(a)   no monetary Default, material non-monetary Default or Event of Default shall exist, nor shall any monetary Default, material non-monetary Default or Event of Default result from the making of the Advance;

(b)   the representations and warranties made to Lender herein, in the other Loan Documents and in any other document, certificate or statement executed or delivered to Lender in connection with the Loan shall be true and correct in all material respects on and as of the date of the advance with the same effect as if made on such date, (except to the extent that any representations and warranties are not true due to a change in facts or circumstances, the occurrence of any event and/or the existence of any conditions which is permitted to have occurred pursuant to this Agreement or which does not and will not result in a Default);

(c)   Lender shall have received a written continuation report to the date of such Advance with respect to the title insurance policy insuring the lien of the Mortgage (the "*Title Policy*") and an endorsement to the Title Policy, which endorsement shall increase the coverage of the Title Policy by the amount of such Advance (but not the overall policy amount which shall be for the full amount of the Loan), amend the effective date of the Title Policy to the date of such Advance and continue to insure the first lien of the Mortgage subject to no additional exceptions (including survey exceptions) except those exceptions expressly approved in writing by Lender's counsel, together with other evidence reasonably satisfactory to Lender that no mechanic's Liens or other Liens have been filed and remain filed with respect to the Property which have not been bonded or discharged of record;

(d)   Lender and the Construction Consultant shall have received a Requisition, together with such other documentation and information as either of them may reasonably require, including, without limitation, copies of all invoices evidencing the costs and expenses in respect of which such Advance is being requested;

(e)   all fees and expenses payable to Lender, including, without limitation, the fees and expenses described in Section 5.29, to the extent then due and payable, and all title and survey charges shall have been paid in full (or paid contemporaneously are being from the Advance in question);

(f)   Lender shall have received such other documents relating to the Advance or the Property as Lender may reasonably request;

(g)   Lender and Construction Consultant shall have received certificates of the Construction Manager stating that (i) all of the work which is the subject of the Advance has been done in a good and workmanlike manner in compliance with the Plans and Specifications and all applicable Legal Requirements, (ii) the disbursement of such Advance is required to

40

reimburse payments of Building Loan Costs incurred or to pay Building Loan Costs incurred and due to, Contractors and Subcontractors, engineers, architects or other Persons providing services, labor and/or materials or paying for such work and identifying each Person that provided services, labor and/or materials with respect to such work and (iii) each such Person has been or upon receipt of the requested Advance will be paid in full for work for which the Advance has been made or is being requested;

(h)   all work performed through the date on which the requested Advance is made shall have been performed in compliance with this Agreement and the other Loan Documents;

(i)   Borrower shall have delivered to Lender lien waivers (which may provide that they shall become effective immediately upon payments made from the Advance), duly executed and delivered by the Construction Manager and Contractors, Subcontractors and other Persons requested by Lender for all work for which an Advance has previously been made and for which the Advance in question is being requested;

(j)   Unless approved by Lender in accordance with Section 2.9.5 or Section 2.9.6 hereof, the aggregate amount of Advances on account of any line item shall not exceed the budgeted amount for such line item without the prior written consent of Lender;

(k)   in no event shall the aggregate amount of all Advances under Section 2.9 exceed the Undisbursed Loan Proceeds;

(l)   Lender shall have received evidence satisfactory to Lender that there are adequate funds remaining from the Undisbursed Loan Proceeds hereunder, the Project Loan Undisbursed Loan Proceeds under the Project Loan Agreement and the Mezzanine Loan Undisbursed Loan Proceeds under the Mezzanine Loan Agreement, in the aggregate, to complete the Project Improvements and to cover all Building Costs;

(m)   the Project Improvements shall not have been injured or damaged by fire, explosion, accident, floor or other casualty, unless insurance proceeds sufficient in Lender's reasonable judgment, to effect the satisfactory restoration of the Project Improvements and to permit the Final Completion prior to the Stated Maturity Date (subject to Borrower's right to extend the Stated Maturity Date pursuant to Section 2.8) shall be made available for such restoration in accordance with Section 7.4 hereof;

(n)   Lender shall have received a Construction Manager Affirmation of Payment (AIA Form G706);

(o)   Lender shall have received an anticipated cost report substantially in the form attached hereto as Schedule 1 executed by the Construction Manager which sets forth the anticipated costs to complete construction of the Project Improvements, after giving effect to costs incurred during the previous month and any anticipated change orders;

(p)   Lender shall have received evidence that all Government Approvals necessary for the construction of the phase of the work then being undertaken as contemplated by the Plans and Specifications have been obtained, including, without limitation, a building permit

41

and that Borrower shall have complied with all Legal Requirements in all material respects, including all land use, building, subdivision, zoning and similar ordinances and regulations promulgated by any Governmental Authority and applicable to the construction of the phase of the work then being undertaken and to permit construction to continue and be completed substantially in accordance with the timelines set forth in the Construction Schedule;

(q)    Lender shall have received evidence that the Construction Manager Payment and Performance Bond and any other payment and performance bonds that Lender may, from time to time, require pursuant to Section 5.45 hereof are in full force and effect;

(r)    Lender shall have received a written report (each, a "***Construction Consultant's Report***") from the Construction Consultant as to Construction Consultant's determination based on on-site inspections of the Project Improvements and the date submitted to and reviewed by it as part of Borrower's Requisition, in which the Construction Consultant shall (i) indicate the value of the labor and materials in place, (ii) confirm that the construction of the Project is proceeding satisfactorily and according to the Construction Schedule, (iii) verify that the work on account of which the Advance is sought has been or will be completed in a good and workmanlike manner to the Construction Consultant's reasonable satisfaction substantially in accordance with the Plans and Specifications, (iv) state its estimate of (A) the percentages of the construction of the Project Improvements completed as of the date of such site observation, on the basis of work in place as part of the Project Improvements and the Construction Budget, (B) the Hard Costs actually incurred for work in place as part of the Project Improvements as of the date of such site observation, (C) the sum necessary to complete construction of the Project Improvements in accordance with the Plans and Specifications; and (D) the amount of time from the date of such inspection that will be required to achieve Final Completion of the Project Improvements. The Construction Consultant shall complete its on-site inspection promptly after Lender's request therefore and shall deliver the Construction Consultant's Report with respect to each such inspection within five (5) Business Days after such inspection;

(s)    each request for an Advance shall include wiring instructions for each Person to whom any portion of such Advance is to be paid; and

(t)    Borrower shall have complied with the provisions of Section 2.9.7.

(u)    With respect to the Initial Advance, Borrower shall have entered into executed contracts, in form and substance satisfactory to Lender, with respect to Subcontracts for at least eighty (80%) of the Hard Costs set forth in the Construction Budget approved by Lender as of the Closing Date, and pertaining to no less than ninety percent (90%) of the final Plans and Specifications.

(v)    with respect to the Initial Advance, Borrower shall have paid, with funds other than proceeds of this Loan or the Project Loan, in the aggregate, not less than twenty percent (20%) of the total cost of the Project Improvements, including amounts spent prior to the Closing Date, which costs are not intended to be, and shall not be, funded by Lender;

(w)    Borrower shall be current in the payment of all Debt Service and Carrying Costs, which payments, unless contemplated under this Agreement to be paid from the

42

proceeds of the Loan, the Project Loan or the Mezzanine Loan, shall be made with funds other than the proceeds of this Loan, the Project Loan or the Mezzanine Loan; and

(x)    Lender shall have received, and Lender and the Construction Consultant shall have approved, the Plans and Specifications for the Project Improvements.

2.9.2    **Amount, Timing and Procedure of Advances.**  Lender's obligation to make each Advance shall be subject to the satisfaction of the following conditions on the date of each Requisition and on the date of each Advance:

(a)    Lender shall not be required to Advance funds hereunder for any category or line item of Building Loan Costs in excess of the amount specified for such category or line item in the Building Loan Budget, subject to Sections 2.9.4, 2.9.5, 2.9.6 or 2.9.7 (or other reallocations approved by Lender in accordance therewith).  Any fees or payments to be made pursuant to any contract with any Affiliate of Borrower or Guarantor shall only be disbursed hereunder at such times provided under and otherwise in accordance with said contract (but in no event shall such payments exceed from time to time the amount allocated therefor in the Building Loan Budget).

(b)    In no event shall any Advance exceed the full amount of Building Loan Costs theretofore paid or to be paid with the proceeds of such Advance plus any Building Loan Costs incurred by Borrower through the date of the Draw Request for such Advance minus (i) the applicable Retainage for each Contract and Subcontract and (ii) the aggregate amount of any Advances previously made by Lender.  It is further understood that the Retainage is intended to provide a contingency fund protecting Lender against the failure of Borrower or Guarantor to fulfill any of their respective obligations under the Loan Documents, and that Lender may charge amounts to pay for Building Loan Costs against such Retainage in the event Lender is required or elects to expend funds to cure any Event of Default.

(c)    The Retainage shall be advanced on a contract-by-contract basis upon completion of performance by the applicable Contractor or Subcontractor of all of its obligations under the applicable Contract or Subcontract, subject to approval thereof by the Construction Consultant and receipt by Lender of final lien waivers for such Contract or Subcontract.

(d)    Lender shall have no obligation to make Advances more often than once in each calendar month, except that Lender, in its sole discretion, shall have the right, but not the obligation, to make additional advances per month for interest, fees and expenses due under the Loan Documents.

(e)    All Advances shall be in minimum amounts of $50,000.00 (with the exception of the final Advance for which there shall be no minimum).

(f)    Lender shall not be obligated to make any disbursement of the Loan unless Lender is satisfied that the conditions precedent to the making of such disbursement, as set forth in this Agreement, have been satisfied by the Borrower.

43

(g)    Each Advance shall be made by Lender by wire transfer to such account of Borrower, Construction Manager or the applicable Contractor or Subcontractor as specified to Lender in writing or as provided in clause (h) below.  All proceeds of all Advances shall be used by Borrower only for the purposes for which such Advances were made as set forth in the Requisition.

(h)    Lender may make, at Lender's option, any or all Advances directly or through the Title Company to Construction Manager or any Contractor or Subcontractor, as applicable, for Building Loan Costs which shall theretofore have been approved by Lender and for which Borrower shall have failed to make payment after receipt by Borrower of such applicable Advance.  The execution of this Agreement by Borrower shall, and hereby does, constitute an irrevocable authorization so to advance the proceeds of the Loan directly to any such Person or through the Title Company to such Persons in accordance with this Section 2.9.2 as amounts become due and payable to them hereunder and any portion of the Loan so disbursed by Lender shall be deemed disbursed as of the date on which the Person to whom payment is made receives the same.  No further authorization from Borrower shall be necessary to warrant such direct Advances to such relevant Person, and all such Advances shall satisfy pro tanto the obligations of Lender hereunder and shall be secured by the Mortgage and the other Loan Documents as fully as if made directly to Borrower.

Notwithstanding anything to the contrary contained in this Agreement, the Project Loan Agreement, Lender shall not be obligated to make any Advance after the Outside Advance Date.

### 2.9.3    Requisitions.

(a)    At least ten (10) Business Days prior to the date on which Borrower shall request an Advance be made (the "***Requested Advance Date***"), Borrower shall complete, execute and deliver to Lender and the Construction Consultant a Requisition which shall be in the form attached hereto as Schedule 2.  Each Requisition shall be for Advances for Building Loan Costs and shall be accompanied by a completed and itemized Application and Certificate for Payment (AIA Document No. G702) or similar form reasonably approved by Lender, containing the certification of the Construction Manager or Contractor or Subcontractor to whom such payment is to be made, as applicable, together with invoices relating to all items of Building Loan Costs covered thereby and accompanied by a cost breakdown showing the cost of work on, and the cost of materials incorporated into, the Project Improvements to the date of the Requisition.  The cost breakdown shall also show the percentage of completion of each line item, and the accuracy of the cost breakdown shall be certified by Borrower and by Borrower's Architect.  All such applications for payment shall also show all Contractors and Subcontractors, including Major Contractors, by name and trade, the total amount of each Contract or Subcontract, the amount theretofore paid to each Contractor or Subcontractor as of the date of such application, and the amount to be paid from the proceeds of the Advance to each Contractor and Subcontractor.

(b)    Lender shall make the requested Advance on the Requested Advance Date so long as all conditions to such Advance are satisfied or waived.

(c)    Each Requisition shall be accompanied by (i) copies of all executed change orders, (ii) to the extent requested by Lender, copies of all inspection or test reports and

other documents relating to the construction of the Project Improvements, in either case, not previously delivered to Lender and (iii) such other information, documentation and certifications as Lender may request.

### 2.9.4    Cost Overruns.

(a)    If at any time, the budgeted amount for any category or line item is, in Lender's reasonable judgment, excessive or deficient, the excess or deficiency may be reallocated to or from any other category or line item which Lender deems to be excessive or insufficient, as the case may be.

(b)    If Borrower becomes aware of any change in actual or projected Building Costs which will increase a category or line item reflected in the Construction Budget, Borrower shall immediately notify Lender in writing and promptly thereafter submit to Lender for its approval a revised Construction Budget.  Any reallocation of any category or line items in the Construction Budget in connection with cost overruns shall be subject to Lender's approval in Lender's sole but reasonably exercised discretion, except with respect to reallocations expressly permitted under, and made in accordance with, Sections 2.9.5, 2.9.6 or 5.43; provided, however, that under no circumstances shall Borrower be permitted, or Lender obligated to approve, the reallocation of line items from the Building Loan Budget to the Project Loan Budget.  Lender shall have no obligation to make any further Advances unless and until the revised Construction Budget so submitted by Borrower is approved by Lender in accordance with the standards set forth in the preceding sentence with respect to reallocations.  Lender reserves the right to approve or disapprove any revised Construction Budget in its sole but reasonably exercised discretion (except with respect to reallocations expressly permitted under, and made in accordance with, Sections 2.9.5, 2.9.6 and 5.43).

### 2.9.5    Budget Reallocation.  Borrower may, with the prior written approval of Lender in its sole but reasonably exercised discretion, allocate verifiable cost savings actually achieved (via completion of work or other verifiable means reasonably satisfactory to Lender) in any line item of the Building Loan Budget to the contingency line item or to other line items of the Building Loan Budget which Borrower reasonably determines are underfunded, provided that Borrower shall provide evidence of such costs savings to Lender, which evidence shall be reasonably satisfactory to Lender; provided further, that Borrower shall in no event or under any circumstances have the right to reallocate (A) any portion of the interest and fees line item(s) to any other line item, (B) any savings in a Hard Costs line item to a Soft Costs line item (unless Lender consents in its sole and absolute discretion) or (C) any line item to any other line item of the Building Loan Budget that in the opinion of Lender, its counsel or the Title Company may be in contravention of the Lien Law, or that in the opinion of Lender, its counsel or the Title Company may adversely affect or impair in any manner whatsoever the Lien or the priority of the Lien of the Mortgage.

### 2.9.6    Construction Contingency.  Subject to the prior written approval of Lender in its sole but reasonably exercised discretion, Borrower may revise the Building Loan Budget to move (a) amounts available under any line item for Hard Costs that are designated "contingency" to other line items for Hard Costs in the Building Loan Budget, or (b) amounts available under any line item for Soft Costs that are designated "contingency" to other line items

45

for Soft Costs in the Building Loan Budget. Borrower shall promptly deliver to Lender a revised Building Loan Budget reflecting such reallocations. In no event may the contingency line item of the Building Loan Budget be reallocated to any line item in the Project Loan Budget. The contingency line item in the Building Loan Budget for Hard Costs shall contain at least an amount equal to the greater of (i) two and one half percent (2.5%) of the Building Loan Budget for Hard Costs and (ii) Two Million Three Hundred Thousand and 00/100 ($2,300,000.00), separate from the contingency line items in the Project Loan Budget.

    **2.9.7**  **Loan Balancing.** Lender shall be obligated to fund Advances only at such times as the Loan is "in balance". The Loan shall be "in balance" only at such times as the Undisbursed Loan Proceeds are sufficient, as determined by Lender in its sole discretion, in the aggregate and individually as to each line item in the Building Loan Budget, to pay all Building Loan Costs. If at any time and from time to time, Lender determines, in its sole discretion, that the cost of completing or satisfying any line item in the Building Loan Budget exceeds the Undisbursed Loan Proceeds allocated to such line item in the Building Loan Budget ("*Shortfall*") and Lender notifies Borrower of same in writing (a "*Shortfall Notice*"), Lender shall have the right to cease making any further Advances, until Borrower has deposited an amount equal to the Shortfall in the Rebalancing Reserve Account in accordance with Section 3.2 hereof.

    **2.9.8**  **Trust Funds.** All proceeds advanced hereunder shall be subject to the trust fund provisions of Section 13 of the Lien Law. Borrower covenants that (i) it will receive all advanced proceeds and will hold the right to receive such proceeds as trust funds to be first applied to the payment of trust claims as defined in Section 71 of the New York Lien Law and (ii) it will apply all such advanced proceeds to the payment of trust claims (as so defined) only, before using any part of such advanced proceeds for any other purpose.

    **2.9.9**  **Stored Materials; Deposits.**

      Lender shall not be required to disburse any funds for any materials, machinery or other Personal Property not yet incorporated into the Project Improvements (the "*Stored Materials*"), unless the following conditions are satisfied:

      (i)  Borrower shall deliver to Lender bills of sale or other evidence satisfactory to Lender of the cost of, and, subject to the payment therefor, Borrower's title in and to such Stored Materials;

      (ii)  The Stored Materials are identified as relating to the Property and Borrower, are segregated so as to adequately give notice to all third parties of Borrower's title in and to such materials, and are components in substantially final form ready for incorporation into the Project Improvements within no more than one hundred twenty (120) days from the date on which such Stored Materials are received by Borrower;

      (iii)  The Stored Materials are stored at the Property or at such other third-party owned and operated site as Lender shall approve in its sole discretion, and are protected against theft and damage in a customary manner;

      (iv)  The Stored Materials will be paid for in full with the funds to be disbursed, and all lien rights or claims of the supplier will be released upon full payment;

46

(v)    Lender has or will have upon payment with disbursed funds a perfected, first priority security interest in the Stored Materials;

(vi)    The Stored Materials are insured for an amount equal to their replacement costs in accordance with Section 7.1 of this Agreement;

(vii)    The aggregate cost of Stored Materials stored at the Property is approved by the Construction Consultant and, if required by Lender, the Construction Consultant shall certify that it has inspected such Stored Materials and they are in good condition and suitable for use in connection with the Project; and

(viii)    The cost of Stored Materials stored at the Property, in the aggregate at any time, is not more than $[_____] and the aggregate cost of Stored Materials stored off-site of the Property at any one time shall not exceed $[_____].

(b)    Lender agrees that, subject to Borrower's compliance with all of the other requirements of this Agreement governing Advances, Lender will make an Advance of the Loan for deposits on materials to be purchased under Trade Contracts, provided that the following conditions are satisfied:

(i)    such deposits are Building Loan Costs and are in commercially reasonable and customary amounts by Lender;

(ii)    no Event of Default shall have occurred and be continuing under this Agreement; and

(iii)    Construction Consultant determines such deposit is commercially reasonable and customary.

**2.9.10    Quality of Work.**  No Advance or any portion thereof shall be made with respect to defective work that has not been cured or to any Contractor or Subcontractor that has performed work that is defective and that has not been cured, as confirmed by the report of the Construction Consultant, provided that Lender may disburse all or part of any Advance before the sum shall become due if Lender believes it advisable to do so, and all such Advances or parts thereof shall be deemed to have been made pursuant to this Agreement.

**2.9.11    Requisition as Affirmation.**  Each Requisition shall constitute an affirmation by Borrower that it has paid or actually incurred Building Loan Costs in the amount of the requested advance and that such Building Loan Costs have not been made the basis for any other request for an advance of Loan proceeds, and shall be accompanied by such documentary evidence (including paid bills, conditional lien waivers and contractors' certifications) as Lender shall require.  Each Requisition shall also constitute Borrower's representation and warranty to Lender that (a) any completed construction has been performed in accordance with the Plans and Specification and the Construction Budget, (b) all of the representations and warranties contained herein and in the other Loan Documents are true and correct in all material respects, (except to the extent that any representations and warranties are not true due to a change in facts or circumstances, the occurrence of any event and/or the existence of any conditions which is

47

permitted to have occurred pursuant to this Agreement or which does not and will not result in a Default);.

**2.9.12    Advance Not Waiver.**  No Advance made prior to or without the fulfillment by Borrower of all of the conditions precedent thereto, whether or not known to Lender, shall constitute a waiver by Lender of the requirement that all conditions, including the non-performed conditions, shall be required with respect to all future advances nor, in the event that Borrower is unable to satisfy any such condition, shall any Advance have the effect of precluding Lender from thereafter declaring the inability to satisfy such condition to be an Event of Default hereunder.

**2.9.13    Conditions to Final Advance.**  In addition to the conditions set forth in Section 2.9.1 above, Lender's obligation to make the final Advance of Retainage pursuant to this Agreement shall be subject to receipt by Lender of the following:

(a)    Evidence satisfactory to Lender of the Final Completion of the Project Improvements, which shall be satisfied by written notification from the Construction Consultant that Final Completion of the Project Improvements has occurred.

(b)    A certificate of the Architect substantially in the form (but containing the substance) of the Architect's Completion Certificate attached hereto as Schedule 3.

(c)    Duly executed final lien waivers substantially in the form attached hereto as Schedule 4 from all Contractors (including, without limitation, the Construction Manager) and Subcontractors who have performed work, for the work so performed, and/or who have supplied labor and/or materials for the labor and/or materials so supplied.

(d)    Evidence reasonably satisfactory to Lender that all sums due in connection with the construction of the Project Improvements have been paid in full (or will be paid out of the funds requested to be advanced) and that no party claims or has a right to claim any statutory or common law lien arising out of the construction of the Project Improvements or the supplying of labor, material, and/or services in connection therewith.

(e)    A full and complete set of final Plans and Specifications certified to as final by Borrower's Architect.

(f)    Completed AIA Forms G704 (Certificate of Substantial Completion) from each of the Architect and the Construction Manager and completed AIA Form G707 (Consent of Surety to Final Payments) from each surety issuing any of Payment and Performance Bonds in respect of the Project Improvements (including, without limitation, the Construction Manager Payment and Performance Bond).

(g)    A final as-built survey for the Property certified to Lender in form reasonably satisfactory to Lender showing all Improvements.

(h)    An endorsement to the Title Policy deleting any exception pertaining to construction of improvements.

48

(i)    Lender may commission an appraisal of the Property upon substantial completion of the Project Improvements or at such other times required by legal requirements or accounting policy from an appraiser reasonably satisfactory to Lender.

**2.9.14    Lien Law Section 22 Compliance.**    The affidavit attached hereto as Schedule 10 is made pursuant to and in compliance with Section 22 of the Lien Law, and, if so indicated in said affidavit, a portion of the proceeds of the Loan will be used, in part, for reimbursement for payments made by Borrower prior to the Initial Advance but subsequent to the commencement of the construction of the Project Improvements, for items constituting Cost of the Improvement.

**2.9.15    Advances to Pay Fees and Expenses.**    Borrower hereby irrevocably authorizes Lender to make Advances (without requisition by Borrower) to any and all fees and expenses under the Loan Documents that are then due to Lender and/or Construction Consultant, as applicable. Notwithstanding anything to the contrary contained in this Agreement, Lender shall have no obligation to make any disbursement for fees if the conditions set forth in Section 2.9.2, if applicable, are not satisfied, or (iii) if a Default or Event of Default shall have occurred and be continuing. The provisions of this Section 2.9.15 are not intended to limit or derogate from Borrower's absolute and unconditional obligation to pay such fees, regardless of whether Loan proceeds are available or advanced therefore.

**2.9.16    Unfunded Portions of the Loan.**    If any Undisbursed Loan Proceeds remain on the Outside Advance Date, Lender will not make any further Advances under this Agreement, and Lender's commitment to make any Advances hereunder shall be deemed to have terminated.

**2.9.17    Miscellaneous**.

(a)    The making of an Advance by Lender shall not constitute Lender's approval or acceptance of the construction theretofore completed. Lender's inspection and approval of the Plans and Specifications, the construction of the Project Improvements, or the workmanship and materials used therein, shall impose no liability of any kind on Lender, the sole obligations of Lender as the result of such inspection and approval being to make the Advances if and to the extent required by this Agreement.

(b)    ALL POTENTIAL LIENORS ARE HEREBY CAUTIONED TO EXERCISE SOUND BUSINESS JUDGMENT IN THE EXTENSION OF CREDIT TO BORROWER.   NO POTENTIAL LIENOR SHOULD EXPECT LENDER TO MAKE ADVANCES OF THE LOAN IN AMOUNTS AND AT TIMES SUCH THAT IT WILL NOT BE NECESSARY FOR EACH SUCH POTENTIAL LIENOR TO EXERCISE SOUND BUSINESS JUDGMENT IN THE EXTENSION OF CREDIT TO BORROWER. MOREOVER, ALL POTENTIAL LIENORS ARE REMINDED THAT SUBDIVISION (3) OF SECTION 13 OF THE NEW YORK LIEN LAW PROVIDES THAT "NOTHING IN THIS SUBDIVISION SHALL BE CONSIDERED AS IMPOSING UPON LENDER ANY OBLIGATION TO SEE TO THE PROPER APPLICATION OF SUCH ADVANCES BY THE BORROWER," AND LENDER DOES NOT IMPOSE SUCH AN OBLIGATION ON ITSELF.

**2.10**    **Rate Conversion**.  If at any time the Loan is outstanding as a LIBOR Loan and Lender has determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that LIBOR cannot be determined and LIBOR has been succeeded by an Alternate Index, then the Loan shall be converted from a LIBOR Loan to an Alternate Rate Loan. Lender shall provide notice of the foregoing conversion to an Alternate Rate Loan to Borrower at least one (1) Eurodollar Business Day prior to the next succeeding Determination Date, with a written confirmation of such determination promptly thereafter.  If such notice is given, the Loan shall be converted, as of the first day of the Interest Period for which LIBOR was unavailable, to an Alternate Rate Loan.  Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert a LIBOR Loan to an Alternate Rate Loan. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to elect to have the Loan bear interest either based on LIBOR or based on the Base Rate or the Alternate Rate.

**3.**    **CASH MANAGEMENT AND RESERVES**

**3.1**    **Cash Management Arrangements**.  On the Closing Date, Borrower shall deposit $[0.00] into an account maintained at the Servicer and controlled by Lender (the "***Deposit Account***").  Funds in the Deposit Account shall be invested at Lender's discretion only in Permitted Investments.  Lender will also establish subaccounts of the Deposit Account which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "***Subaccounts***").  The Deposit Account and any Subaccount will be under the sole control and dominion of Lender, and Borrower shall have no right of withdrawal therefrom.  Borrower shall pay for all expenses of opening and maintaining all of the above accounts.  Borrower shall cause all Rents to be transmitted directly by Hotel Manager and/or tenants of the Property into the Clearing Account as more fully described in the Clearing Account Agreement.  All Rents received by Borrower or Hotel Manager shall be deposited into the Clearing Account in accordance with the terms of the Hotel Management Agreement and otherwise within three (3) Business Days of receipt.  Funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into the Deposit Account and applied and disbursed in accordance with this Agreement.

Notwithstanding anything to the contrary in the Project Loan Documents or any duplication of the provisions set forth in this Article 3 in the Project Loan Documents, for the avoidance of doubt, the terms, conditions and provisions of this Article 3 of each of this Agreement and the Project Loan Agreement shall be applied and administered on an aggregate basis across this Agreement and the Project Loan Agreement.

**3.2**    **Rebalancing Reserve Subaccount**.  As and when required under Section 2.9.7 of this Agreement, Borrower shall deposit, within thirty (30) days after receipt of a Shortfall Notice from Lender, the Shortfall amount into the Deposit Account.  All Shortfall amounts shall be transferred into a Subaccount (the "***Rebalancing Reserve Account***").  Provided no Event of Default shall have occurred and be continuing, amounts on deposit in the Rebalancing Reserve Account from time to time shall be disbursed to pay for Building Costs pursuant to and in accordance with the same terms and conditions for the making of Advances.

50

**3.3** **Taxes and Insurance Subaccount**.  To the extent the amount of Advances available for the payment of any Taxes, Other Charges and Insurance Premiums are insufficient to pay the same, Borrower shall deposit into a Subaccount (the "*Tax and Insurance Subaccount*") the amount of the Shortfall that the funds in the Tax and Insurance Subaccount will be insufficient to pay (or in excess of) the Taxes, Other Charges or Insurance Premiums next coming due, not later than the earlier of (x) thirty (30) days following Lender's determination of the Shortfall and (y) ten (10) Business Days before the applicable Taxes, Other Charges or Insurance Premiums are required to be paid. Provided that no Event of Default has occurred and is continuing, Lender will (a) apply funds in the Tax and Insurance Subaccount to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 5.2 and 7.1.2, provided that Borrower has promptly supplied Lender with notices of all Taxes, Other Charges and Insurance Premiums due, or (b) reimburse Borrower for such amounts upon presentation of evidence of payment and an Officer's Certificate in form and substance satisfactory to Lender; subject, however, to Borrower's right to contest Taxes in accordance with Section 5.2.  In making any payment relating to Taxes and Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.

**3.4** **Leasehold Rents**.  To the extent the amount of Advances available for the payment of Leasehold Rents are insufficient to pay the same, Borrower shall deposit into a Subaccount (the "*Leasehold Rents Subaccount*") the amount of the Shortfall that the funds in the Tax and Insurance Subaccount will be insufficient to pay (or in excess of) the Leasehold Rents next coming due, not later than the earlier of (x) thirty (30) days following Lender's determination of the Shortfall and (y) ten (10) Business Days before the applicable the Leasehold Rents are required to be paid. Provided that no Event of Default has occurred and is continuing, Lender will (a) apply funds in the Leasehold Rents Subaccount to payments of Leasehold Rents required to be made by Borrower pursuant to Section 5.49 or (b) reimburse Borrower for such amounts upon presentation of evidence of payment and an Officer's Certificate in form and substance satisfactory to Lender.

**3.5** **Operating Expense Subaccount**.[10]  Rents shall be transferred into a Subaccount (the "*Operating Expense Subaccount*") as provided in Section 3.9.  Provided no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Operating Expense Subaccount to Borrower, within fifteen (15) days after delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $1,000, provided (i) such disbursement is for an Approved Operating Expense; and (ii) such disbursement is accompanied by (A) an Officer's Certificate certifying (w) that such funds will be used to pay Approved Operating Expenses and a description thereof, (x) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (y) that the same has not been the subject of a previous disbursement, and (z) that all previous disbursements have been or will be used to pay the previously identified Approved Operating Expenses, and (B) such other documentation required for the making of Advances.

---

[10] NTD:  Subject to further review of cash management provisions of the Hotel Management Agreement.

51

**3.6** **Casualty/Condemnation Subaccount**.  Borrower shall pay, or cause to be paid, to Lender all Proceeds or Awards due to any Casualty or Condemnation to be transferred to a Subaccount (the "***Casualty/Condemnation Subaccount***") in accordance with the provisions of Section 7.  All amounts in the Casualty/Condemnation Subaccount shall be disbursed in accordance with the provisions of Section 7.

**3.7** **Security Deposits**.  To the extent Borrower is permitted to do so under applicable Legal Requirements, Borrower shall keep all security deposits under Leases (other than F&B Agreements)  at a separately designated account under Borrower's control at the Clearing Bank so that the security deposits shall not be commingled with any other funds of Borrower.  Borrower shall, upon Lender's request, if permitted by applicable Legal Requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) under Leases, to be held by Lender in a Subaccount (the "***Security Deposit Subaccount***") subject to the terms of the Leases.  Security deposits held in the Security Deposit Subaccount will be released by Lender upon notice from Borrower together with such evidence as Lender may reasonably request that such security deposit is required to be returned to a tenant pursuant to the terms of a Lease or may be applied as Rent pursuant to the rights of Borrower under the applicable Lease.  Any letter of credit or other instrument that Borrower receives in lieu of a cash security deposit under any Lease entered into after the date hereof shall (i) be maintained in full force and effect in the full amount unless replaced by a cash deposit as hereinabove described and (ii) if permitted pursuant to any Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender).]

**3.8** **Grant of Security Interest; Application of Funds**.  As security for payment of the Debt and the performance by Borrower of all other terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all of Borrower's right, title and interest in and to all Rents and in and to all payments to or monies held in the Clearing Account, the Deposit Account and all Subaccounts created pursuant to this Agreement (collectively, the "***Cash Management Accounts***").  Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all Rents in its possession prior to the (i) payment of such Rents to Lender or (ii) deposit of such Rents into the Deposit Account.  Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Cash Management Account, or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC financing statements, except those naming Lender as the secured party, to be filed with respect thereto. This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC.  Upon the occurrence and during the continuance of an Event of Default, Lender may apply any sums in any Cash Management Account in any order and in any manner as Lender shall elect in Lender's discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the Lien of the Security Instrument or exercise its other rights under the Loan Documents. Cash Management Accounts shall not constitute trust funds and may be commingled with other monies held by Lender.  Borrower shall be entitled to receive on a semi–annual basis interest on any balance in the Deposit Account and any Subaccounts other than Subaccounts established for the collection of reserves at a rate equal to the U.S. and Regional Composite National Bank Average Retail Savings Money Market CD Yield, from time to time.  All interest which accrues on the funds in any Subaccount shall be taxable to

52

Borrower.  Upon repayment in full of the Debt, all remaining funds in the Subaccounts, if any, shall be promptly disbursed to Borrower or credited against the Debt.

**3.9**    **Property Cash Flow Allocation**.  So long as no Event of Default has occurred and is continuing, any Rents deposited into the Deposit Account up to and including the Business Day prior to a Payment Date shall be applied on such Payment Date as follows in the following order of priority:

(i)    First, to the Tax and Insurance Subaccount to pay Taxes, Other Charges and Insurance Premiums;

(ii)    Second, to the Leasehold Rents Subaccount to pay the Leasehold Rents;

(iii)    Third, to the Operating Expense Subaccount to pay the Approved Operating Expenses (which have not been otherwise paid pursuant to clauses (i) and (ii) of this Section 3.9);

(iv)    Fourth, to the payment of all fees, costs and expenses due to Lender under the Loan Documents and the Project Loan Documents (other than Debt Service and the Project Loan Debt Service);

(v)    Fifth, to pay the Debt Service and the Project Loan Debt Service due on such Payment Date (plus, if applicable, interest at the Default Rate and all other amounts, other than those described under other clauses of this Section 3.9, then due to Lender under the Loan Documents and the Project Loan Documents), which payments shall be made into a Subaccount (the "***Monthly Debt Service Subaccount***") to be established for such purpose under the Deposit Account Agreement;

(vi)    Sixth, to pay the Mezzanine Loan Debt Service due on such payment date under the Mezzanine Loan Agreement (plus, if applicable, interest at the default rate set forth in the Mezzanine Loan Agreement and all other amounts, other than those described under other clauses of this Section 3.9, then due to Mezzanine Lender under the Mezzanine Loan Documents), which payments shall be made in accordance with the Mezzanine Loan Documents; and

(vii)    Seventh, to all remaining amounts due and payable under the Loan Documents and Project Loan Documents until the Debt and the Project Loan Debt is repaid in full; and

(viii)    Lastly, (A) if the Mezzanine Loan (or any portion thereof) is outstanding, all remaining amounts shall be deposited into the deposit account established under the Mezzanine Loan and (B) if the Mezzanine Loan has been paid in full, to Borrower.

**3.10**    **FF&E Reserves**.  Following Substantial Completion of the Project Improvements, and to the extent same is not reserved pursuant to and in accordance with the terms and provisions of the Hotel Management Agreement, Borrower shall pay to Lender on each Payment Date an amount equal to [_____] percent (__%) of gross Rents for the immediately preceding calendar

53

month.  Lender will transfer such amount into a Subaccount (the "***FF&E Reserve Subaccount***"). The foregoing payments comprise the amounts reasonably estimated by Lender in its sole discretion to be necessary for the purpose of funding repair and replacement of the FF&E and any Approved Capital Expenses (collectively, the "***FF&E Replacements***") that are reasonably necessary or appropriate in accordance with sound hotel management practices in order to keep the Property in operating condition and repair consistent with other hotel properties in the same market segment and in the metropolitan area in which the Property is located and to keep the Property or any portion thereof from deteriorating.  Upon thirty (30) days' prior notice to Borrower, Lender may reassess the amount of the monthly payment required under this Section 3.4 from time to time in its reasonable discretion (based upon its then current underwriting standards).  Provided that no Event of Default has occurred and is continuing, Lender shall disburse funds held in the FF&E Reserve Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, provided that (i) such disbursement is for FF&E Replacements; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrower's expense) performance of the work associated with such FF&E Replacements; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (v) that such funds will be used to pay or reimburse Borrower for FF&E Replacements and a description thereof, (w) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (x) that the same has not been the subject of a previous disbursement, (y) that all previous disbursements have been used to pay the previously identified FF&E Replacements and (z) that any construction work associated with such FF&E Replacements has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) reasonably detailed documentation satisfactory to Lender as to the amount, necessity and purpose therefor, (C) copies of appropriate Lien waivers or other evidence of payment reasonably satisfactory to Lender in connection with any construction work associated with such FF&E Replacements and (D) at Lender's option, a title search for the Property indicating that it is free from all Liens (other than Permitted Encumbrances) not previously approved by Lender.  Any such disbursement of more than $10,000 to pay (rather than reimburse) FF&E Replacements may, at Lender's option, be made by joint check payable to Borrower and the payee on such FF&E Replacements.

## 4.    REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender as of the date hereof that, except to the extent (if any) disclosed on Schedule 5 with reference to a specific Section of this Article 4:

**4.1    Organization; Special Purpose**.  Each of Borrower and Borrower Representative has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses (including, without limitation, any applicable liquor license or hotel operator licenses), permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged.  Each of Borrower and Borrower Representative is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations.  Each of Borrower and Borrower Representative is a Special Purpose Bankruptcy Remote Entity.

54

**4.2** **Proceedings; Enforceability**.  Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents.  The Loan Documents have been duly executed and delivered by Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity.  The Loan Documents are not subject to, and Borrower has not asserted, any right of rescission, set-off, counterclaim or defense, including the defense of usury. No exercise of any of the terms of the Loan Documents, or any right thereunder, will render any Loan Document unenforceable.

**4.3** **No Conflicts**.  The execution, delivery and performance of the Loan Documents by Borrower and the transactions contemplated hereby will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower pursuant to the terms of, any agreement or instrument to which Borrower is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of its properties.  Borrower's rights under the Licenses, the Current Construction Licenses and the Management Agreement will not be adversely affected by the execution and delivery of the Loan Documents, Borrower's performance thereunder, the recordation of the Mortgage, or the exercise of any remedies by Lender.  Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of the Loan Documents has been obtained and is in full force and effect.

**4.4** **Litigation**.  There are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or threatened (in writing) against or affecting Borrower, Borrower Representative, or the Property, which, if adversely determined, might materially and adversely affect the condition (financial or otherwise) or business of Borrower (including the ability of Borrower to carry out its obligations under the Loan Documents), Borrower Representative, or the use, value, condition or ownership of the Property.

**4.5** **Agreements**.  Borrower is not a party to any agreement or instrument or subject to any restriction which might adversely affect Borrower or the Property, or Borrower's business, properties, operations or condition, financial or otherwise.  Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance, Construction Document or any other agreement or instrument to which it is a party or by which it or the Property is bound.

**4.6** **Title**.  Borrower has good, insurable and indefeasible leasehold title to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid.  The Mortgage, when properly recorded in the appropriate records, together with any UCC financing statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on the Borrower's interest in the Property and (ii) valid and perfected first priority security interests in

55

and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case, subject only to any applicable Permitted Encumbrances. All mortgage, recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid. The Permitted Encumbrances do not materially and adversely affect the value, operation or use of the Property or Borrower's ability to repay the Loan. No Condemnation or other proceeding has been commenced or, to the best of Borrower's knowledge, is contemplated with respect to all or part of the Property or for the relocation of roadways providing access to the Property. There are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents. There are no outstanding options to purchase or rights of first refusal affecting all or any portion of the Property. The Survey for the Property delivered to Lender does not fail to reflect any matters affecting the Property or the title thereto. No improvement on an adjoining property encroaches upon the Property. Each parcel comprising the Property is a separate tax lot and is not a portion of any other tax lot that is not a part of the Property. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, or any contemplated improvements to the Property that may result in such special or other assessments.

4.7    **No Bankruptcy Filing**. Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of its property (a "***Bankruptcy Proceeding***"), and Borrower has no knowledge of any Person contemplating the filing of any such petition against it, which has not been disclosed in the filings and proceedings in the Borrower's chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, In re CBCS Washington Street LP, Chapter 11 Case No. 19-22607 (RDD) (the "***Existing Proceeding***"). In addition, other than the Existing Proceeding, neither Borrower nor Borrower Representative nor any principal nor Affiliate of either has been a party to, or the subject of a Bankruptcy Proceeding for the past ten (10) years.

4.8    **Full and Accurate Disclosure**. No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading. There is no material fact presently known to Borrower that has not been disclosed to Lender which adversely affects, or, is reasonably likely to materially adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower. All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower and the Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP consistently applied throughout the periods covered, except as disclosed therein. Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or the Property from that set forth in said financial statements.

56

**4.9**    __Tax Filings__.  To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and have paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower.  Borrower believes that its tax returns (if any) properly reflect the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**4.10**    __No Plan Assets__.  As of the date hereof and throughout the Term (i) Borrower is not and will not be an "employee benefit plan," as defined in Section 3(3) of ERISA, (ii) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, (iii) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with Borrower are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans.  As of the date hereof, neither Borrower, nor any member of a "controlled group of corporations" (within the meaning of Section 414 of the Code) maintains, sponsors or contributes to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA).

**4.11**    __Compliance__.  Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements (including with respect to parking and applicable zoning and land use laws, regulations and ordinances), Licenses and Current Construction Licenses.  Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially and adversely affect the condition (financial or otherwise) or business of Borrower.  The Property is vacant and zoned for both Use Group 5A (Transient Hotel) and Use Group 6A (Retail and Service Establishments). Following Completion, in the event that all or any part of the Project Improvements are destroyed or damaged, said Project Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits based on current Legal Requirements in effect of the date hereof. No legal proceedings are pending or, to the best of Borrower's knowledge, threatened with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property.

**4.12**    __Contracts__.  There are no service, maintenance or repair contracts affecting the Property that are not terminable on one month's notice or less without cause and without penalty or premium.  All service, maintenance or repair contracts affecting the Property have been entered into at arms-length in the ordinary course of the business of Borrower and provide for the payment of fees in amounts and upon terms comparable to existing market rates.  Borrower has delivered to Lender true, correct and complete copies of all Construction Documents, each of which is full force and effect and has not been amended, restated, supplemented or otherwise modified except as delivered to Lender.  There is no default, breach or violation existing under any Construction Document, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto.

57

**4.13    Federal Reserve Regulations; Investment Company Act**.    No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document.    Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**4.14    Easements; Utilities and Public Access**.    All easements, cross easements, licenses, air rights and rights-of-way or other similar property interests (collectively, **"*Easements*"**), if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are described in the Title Policy and are in full force and effect without default thereunder.    The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service it for its intended uses.    All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid easement.    All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

**4.15    Physical Condition**.    Borrower has not received notice from any insurance company or bonding company of any defect or inadequacy in the Property, or any part thereof, which would adversely affect its insurability or cause the imposition of extraordinary premiums or charges thereon or any termination of any policy of insurance or bond.    Except as disclosed on Schedule 5 attached hereto, no portion of the Property is located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards. The Improvements have suffered no material casualty or damage which has not been fully repaired and the cost thereof fully paid.

**4.16    Leases**.    The Property is not subject to any Leases and there are no tenants or other parties in possession of the Property.

**4.17    Fraudulent Transfer**.    Borrower has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total probable liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.    Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.    Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent

58

liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

**4.18    Ownership of Borrower and Borrower Representative**.    Borrower Representative is the owner of one hundred percent (100%) of the issued and outstanding general partner ownership interests in Borrower, free and clear of all Liens and encumbrances.  No other ownership interests in Borrower have been issued or are issuable.  All of the ownership interests in Borrower have been duly and validly issued, have been fully paid for and are non-assessable. There are no options or rights to acquire any ownership interests in Borrower. [_____] is the owner of one hundred percent (100%) of the issued and outstanding membership interests in Borrower Representative and the membership interests in Borrower Representative are owned free and clear of all Liens, warrants, options and rights to purchase.  Borrower has no obligation to any Person to purchase, repurchase or issue any ownership interest in it.  The organizational chart attached hereto as Schedule 7 is complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Borrower.

**4.19    Purchase Options**.  Neither the Property nor any part thereof is subject to any purchase options or other similar rights in favor of third parties.

**4.20    Management Agreement**.  As of the Closing Date, no Management Agreement (other than the Hotel Management Agreement) is in effect with respect to the Property.

**4.21    Hazardous Substances**.  Except as disclosed in the Environmental Report:  (i) the Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right-to-Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any state super-lien and environmental clean-up statutes (including with respect to Toxic Mold), any local law requiring related permits and licenses and all amendments to and regulations in respect of the foregoing laws (collectively, "***Environmental Laws***"); (ii) the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic and/or dangerous substances, toxic mold or fungus of a type that may pose a risk to human health or the environment or would negatively impact the value of the Property (***"Toxic Mold"***) or any other substances or materials which are included under or regulated by Environmental Laws (collectively, "***Hazardous Substances***"), provided that "Hazardous Substances" shall not include commercially reasonable amounts of such materials used in the ordinary course of the operation of the Property and Improvements which are used and stored in accordance with all applicable environmental laws, ordinances and regulations, including, without limitation, cleaning solvents and gasoline present in vehicles parked on the Property; (iii) to the best of Borrower's knowledge, no Hazardous Substances are or have been (including the period prior to Borrower's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) to the best of  Borrower's knowledge, after due inquiry no Hazardous Substances are present in, on or under any adjoining or adjacent real property which could migrate to or otherwise affect

the Property; (v) to the best of Borrower's knowledge, no Toxic Mold is on or about the Property which requires remediation; (vi) no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vii) to Borrower's knowledge, there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower which have not been provided to Lender.

**4.22    Name; Principal Place of Business**. Borrower does not use and will not use any trade name and has not done and will not do business under any name other than its actual name set forth herein. Borrower does not use any trade name nor do any business under any name other than "CBCS Washington Street LP". The principal place of business of Borrower is the primary address for notices as set forth in Section 6.1, and Borrower has no other place of business.

**4.23    Other Debt**. There is no indebtedness with respect to the Property or any excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

**4.24    Anti-Money Laundering**.    None of the funds of Borrower, Borrower Representative or any Guarantor, as applicable, that are used to consummate this transaction are derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure. Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

**4.25    Project Loan; Mezzanine Loan**

(a)    Project Loan. $[_____] of the Project Loan has been advanced as of the date hereof. The outstanding principal balance of the Project Loan as of the date hereof is $[_____]. No default, breach, violation or event of default has occurred under the Project Loan Documents which remains uncured or unwaived and no circumstance, event or condition has occurred or exists which, with the giving of notice and/or the expiration of the applicable period would constitute an Event of Default under the Project Loan Documents. Each and every representation and warranty of Borrower and/or any guarantor or indemnitor under any of the Project Loan Documents, made to Lender contained in any one or more of the Project Loan Documents is true, correct, complete and accurate in all material respects as of the date hereof.

(b)    Mezzanine Loan. $[_____] of the Mezzanine Loan has been advanced as of the date hereof. The outstanding principal balance of the Mezzanine Loan as of the date hereof is $[_____]. No default, breach, violation or event of default has occurred under the Mezzanine Loan Documents which remains uncured or unwaived and no circumstance, event or condition has occurred or exists which, with the giving of notice and/or the expiration of the applicable period would constitute an Event of Default under the Mezzanine Loan Documents. Borrower has delivered to Lender true, correct and complete copies of all Mezzanine Loan Documents. The Mezzanine Loan Documents delivered to Lender (i) represent all

60

agreements between Mezzanine Lender and Mezzanine Borrower related to the Property, (ii) are in full force and effect and (iii) have not been modified, amended or supplemented.

### 4.26    Ground Lease Representations.

(a)    There is no and shall not be any mortgage or deed of trust now or hereafter placed on the fee title to the Property held by Ground Lessor that is not subject to the terms of the Ground Lease;

(b)    Intentionally Omitted;

(c)    if there shall be a casualty under the Ground Lease, subject to Borrower's right to terminate such Ground Lease contained therein (which right Borrower shall not be permitted to exercise without the prior written consent of Lender which Lender may provide or deny in its sole and absolute discretion), either there is an obligation to use insurance proceeds for a restoration of the Improvements or Borrower is entitled to receive insurance proceeds attributable to such destruction or damage;

(d)    Intentionally Omitted;

(e)    Borrower has the right under the Ground Lease to mortgage the leasehold estate thereby created without the prior notice to or the consent of Ground Lessor, and such mortgage may be further transferred by Lender without the prior notice to or the consent of Ground Lessor;

(f)    Intentionally Omitted;

(g)    if any default by Borrower shall occur under the Ground Lease, Lender is entitled under the Ground Lease to receive written notice of such default from Ground Lessor and an opportunity to cure any such default as provided in the Ground Lease;

(h)    Intentionally Omitted;

(i)    if the Ground Lease is terminated by reason of a default by Borrower, then Lender or its designee is entitled under the Ground Lease to enter into a new lease (the "***New Ground Lease***") with Ground Lessor for the remainder of the term of the Ground Lease upon the same terms, covenants, conditions and agreements as are contained in the Ground Lease;

(j)    the Ground Lease requires the Ground Lessor to give copies of all notices of default which are given under the Ground Lease to Borrower to Lender;

(k)    the Ground Lease represents the entire agreement between Ground Lessor and Borrower related to the Property and is in full force and effect and has not been modified, amended or supplemented;

(l)    the Ground Lease cannot be canceled solely by Ground Lessor and requires Lender's consent for all modifications and amendments;

61

(m) the Ground Lease is in full force and effect; there is no default, breach or violation existing thereunder, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto.

(n)  Intentionally Omitted;

(o)  Intentionally Omitted;

(p)  Intentionally Omitted;

(q)  the Ground Lease or a memorandum thereof has been duly recorded;

(r)  Intentionally Omitted;

(s)  Borrower's interest in the Ground Lease is not subject to any Liens other than Permitted Encumbrances; and

(t)  the Ground Lease requires the Ground Lessor to enter into a New Ground Lease upon termination of the Ground Lease for any reason, including rejection of the Ground Lease in a bankruptcy proceeding.

**4.27**   **Hotel Management Agreement**.  Borrower has delivered to Lender a true, correct and complete copy of the Hotel Management Agreement, which is full force and effect and has not been amended, restated, supplemented or otherwise modified except as delivered to Lender. The Hotel Management Agreement is in full force and effect.  All management fees, reservation fees, royalties and other sums due under the Hotel Management Agreement have been paid in full to date, there is no default, breach or violation existing under the Hotel Management Agreement, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation under the Hotel Management Agreement, by either party thereto.  All sums due under the Hotel Management Agreement, and the terms and provisions of the Hotel Management Agreement, are subordinate to the Loan Documents.  The Loan and the encumbrance of the Property as security for the Loan will not cause Borrower to violate any covenants in the Hotel Management Agreement.  The current expiration date of the Hotel Management Agreement is [_____ __, 20__].

**4.28**   **Liquor License**.  Borrower does not, as of the date hereof, have a Liquor License.

**4.29**   **Additional Representations**.

**4.29.1**   **Construction Manager's Agreement.**   Borrower has delivered to Lender a true, correct and complete copy of the Construction Manager's Agreement.  The Construction Manager's Agreement is in full force and effect and each of Borrower and the Construction Manager is in compliance in all material respects with its obligations under the Construction Manager's Agreement.  The work to be performed by the Construction Manager under the Construction Manager's Agreement includes the work delineated by the Plans and Specifications.  All work on the Project Improvements that has heretofore been completed, if any,

62

has been completed substantially in accordance with the Plans and Specifications in a good and workmanlike manner and free of any defects.

4.29.2    **Architect's Agreement** .    Borrower has delivered to Lender a true, correct and complete copy of the Architect's Agreement.  The Architect's Agreement is in full force and effect and each of Borrower and the Architect is in compliance in all material respects with its obligations under the Architect's Agreement.  All architectural services required to design the Project Improvements and all architectural services required to complete the Project Improvements in accordance with the Plans and Specifications is provided for under the Architect's Agreement.

4.29.3    **Plans and Specifications.**    Borrower has delivered to Lender true, correct and complete copies of the Plans and Specifications.  The Plans and Specifications will comply with all applicable Legal Requirements and the requirements of the Hotel Management Agreement, the Leases, if any, and will be required to be approved by the Construction Manager, the Architect and each Governmental Authority as is required for the construction and development of the Project.

4.29.4    **Construction Budget.**    Borrower has delivered to Lender a true, correct and complete copy of the Construction Budget.  The Construction Budget accurately reflects all anticipated Costs.  Borrower is not aware of any event or condition which could prevent the construction of the Project Improvements from being completed in accordance with the Construction Budget.

4.29.5    **Current Construction Licenses.**    Borrower has obtained, or will obtain prior to the Initial Advance, all Current Construction Licenses necessary for the construction of the Project Improvements pursuant to and in accordance with the Plans and Specifications or any part thereof or the commencement or continuance of construction thereof., All Current Construction are and will remain in full force and effect, and no Current Construction License has expired, been revoked, or has or will be subject to any revocation, amendment, release, suspension, forfeiture or the like, or has expired or will have expired prior to completion of the portion of the Project Improvements for which such Current Construction License is required.  Borrower is not in violation of any of the terms, provisions, covenants or conditions of any of the Current Construction Licenses.  Borrower has delivered to Lender true, complete and correct copies of all Current Construction Licenses.  Borrower has obtained all approvals from, and has given all such notices to, and has taken all such other actions with respect to such Governmental Authority as may be required under applicable Legal Requirements for the commencement of the construction of the Project Improvements.

4.29.6    **Construction Manager Payment and Performance Bond.**    Borrower has delivered to Lender a true, correct and complete copy of the Construction Manager Payment and Performance Bond.  The Construction Manager Payment and Performance Bond is in full force and effect.

4.29.7    **Construction Schedule.**    Borrower has delivered to Lender a true, correct and complete copy of the Construction Schedule.  Borrower is not aware of any event or

63

condition which could prevent the construction of the Project Improvements from being completed in accordance with the Construction Schedule.

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender, unless Borrower specifically notifies Lender in writing of any material change therein prior to the funding of each Advance (or any portion thereof), such funding shall constitute an affirmation that the same remain true and correct in all material respects on the applicable date of the Advance, and shall survive for as long as the Debt remains owing by Borrower to Lender, unless a longer survival period is expressly stated in a Loan Document with respect to a specific representation or warranty, in which case, the same shall survive for such longer period, and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in Section 4.21 shall survive in perpetuity.

## 5.    COVENANTS

Until the end of the Term, Borrower hereby covenants and agrees with Lender that:

**5.1    Existence**.  Each of Borrower and Borrower Representative shall (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights and franchises, (ii) continue to engage in the business presently conducted by it, (iii) obtain and maintain all Licenses and Current Construction Licenses, and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case, as and to the extent required for the ownership, maintenance, management and operation of the Property.

**5.2    Taxes and Other Charges**.  Borrower shall pay all Taxes and Other Charges as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes and Other Charges have been so paid no later than thirty (30) days before they would be delinquent if not paid (provided, however, that Borrower need not pay such Taxes and Other Charges nor furnish such receipts for payment of Taxes and Other Charges paid by Lender pursuant to Section 3.3 of this Agreement or as part of the Advances made hereunder).  Borrower shall promptly pay for all franchise fees, income taxes and other impositions and taxes imposed by Governmental Authorities on Borrower, subject to Borrower's right to protest the same in accordance with this Section 5.2.  Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien against the Property, and shall promptly pay for all utility services provided to the Property.  After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Taxes or Other Charges, provided that (i) no Event of Default has occurred and is continuing, (ii) such proceeding shall suspend the collection of the Taxes or such Other Charges, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject, and shall not constitute a default thereunder, (iv) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost, (v) Borrower shall have furnished such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges (unless such amounts have been paid and Borrower is seeking a refund thereof), together with all interest and penalties thereon, which

64

shall not be less than one hundred ten percent (110%) of the Taxes and Other Charges being contested, and (vi) Borrower shall promptly upon final determination thereof pay the amount of such Taxes or Other Charges, together with all costs, interest and penalties, and (vi) Borrower shall promptly upon final determination thereof pay the amount of such Taxes or Other Charges, together with all costs, interest and penalties.  Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the reasonable judgment of Lender, the entitlement of such claimant is established.

**5.3**    **Access to Property**.  Subject to the rights of tenants under the Leases and the Hotel Management Agreement, Borrower shall permit agents, representatives, consultants and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice, and provided that such inspections do not unreasonably interfere with the construction of the Project Improvements or the operation of the Property and such agents, representatives and employees of Lender and Construction Consultant comply with all safety and other reasonable rules and requirements instituted by Borrower or Construction Manager with respect to the Project Improvements and the Property.

**5.4**    **Repairs; Maintenance and Compliance; Alterations**.

**5.4.1**    **Repairs; Maintenance and Compliance**.  Borrower shall at all times maintain, preserve and protect all franchises and trade names, and Borrower shall cause the Property to be maintained in a good and safe condition and repair and shall not remove, demolish or alter the Improvements or Equipment (except in connection with the Project Improvements in accordance with this Agreement or for alterations performed in accordance with Section 5.4.2 and normal replacement of Equipment with Equipment of equivalent value and functionality). Borrower shall promptly comply with all Legal Requirements and immediately cure properly any violation of a Legal Requirement.  Borrower shall notify Lender in writing within three (3) Business Days after Borrower first receives notice of any such non-compliance.  Borrower shall promptly repair, replace or rebuild any part of the Property that becomes damaged, worn or dilapidated and shall complete and pay for any Improvements at any time in the process of construction or repair. Notwithstanding anything to the contrary contained herein, provided that no Event of Default has occurred and is continuing, after prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the validity or application of any Legal Requirement, provided that (i) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject, and shall not constitute a default thereunder, (ii) Borrower shall post such bonds and security in connection with such dispute as Lender may reasonably require, not to exceed 110% of the amount in controversy, and (iii) during the pendency of such dispute, no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost.

**5.4.2**    **Alterations**.    Borrower may, without Lender's consent, perform alterations to the Improvements and Equipment which (i) do not constitute a Material Alteration, (ii) do not adversely affect Borrower's financial condition or the value or net operating income of the Property, (iii) constitute the work contemplated by the Construction Budget, to the extent approved by Lender under, and performed in accordance with, this Agreement and/or the Project Loan Agreement, and (iv) are in the ordinary course of Borrower's business.  Borrower shall not

65

perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that Lender may, in its sole and absolute discretion, withhold consent to any alteration, the cost of which is reasonably estimated to exceed the thresholds for Material Alterations. Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deliver to Lender security for payment of the cost of such Material Alteration in an amount equal to one hundred ten percent (110%) of the cost of the Material Alteration as estimated by Lender. Upon substantial completion of any Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) such Material Alteration was constructed in accordance with applicable Legal Requirements and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld, conditioned or delayed), (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of lien, and (iii) all material Licenses necessary for the use, operation and occupancy of such Material Alteration (other than those which depend on the performance of tenant improvement work) have been issued. Borrower shall reimburse Lender upon demand for all out-of-pocket costs and expenses (including the reasonable fees of any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.4.2.

       **5.5**    <u>**Performance of Other Agreements**</u>. Borrower shall observe and perform, or cause to be observed and performed, each and every term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property, including the Construction Documents, the Loan Documents and the Project Loan Documents. Borrower shall not, without the prior written consent of Lender (not to be unreasonably withheld, conditioned or delayed), enter into any agreement relating to the operation of the Property (or replacements thereof), which has a value in excess of $[_____][11] (except for agreements to which Section 5.4.2(iii) in the first grammatical sentence thereof applies).

       **5.6**    <u>**Cooperate in Legal Proceedings**</u>. Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which may in any way adversely affect the rights of Lender under any Loan Document.

       **5.7**    <u>**Further Assurances**</u>. Borrower shall, at Borrower's sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Debt and/or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time; and (ii) upon Lender's request therefor given from time to time after the occurrence of any Event of Default, pay for (a) reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to Borrower and Borrower Representative and (b) searches of title to the Property, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

---

[11] LENDER TO CONFIRM.

5.8 **Environmental Matters**.

5.8.1 **Hazardous Substances**. So long as Borrower owns or is in possession of the Property, Borrower shall (i) keep the Property free from Hazardous Substances and in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower shall become aware that (A) any Hazardous Substance is on or adjacent to or adjoining the Property, (B) the Property is in violation of any Environmental Laws or (C) any condition on or adjacent to or adjoining the Property shall pose a threat to the health, safety or welfare of humans and (iii) remove such Hazardous Substances and/or cure such violations and/or remove such threats, as applicable, as required by Environmental Law (or as shall be required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer or other qualified environmental consulting firm engaged by Lender ("*Lender's Consultant*")), promptly after Borrower becomes aware of same, at Borrower's sole expense.  Nothing herein shall prevent Borrower from recovering such expenses from any other party that may be liable for such removal or cure.

5.8.2 **Environmental Monitoring**.

(a) Borrower shall give prompt written notice to Lender of (i) any proceeding or inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened (in writing) by any third party (including any Governmental Authority) against Borrower or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law.  Upon becoming aware of the presence of mold or fungus at the Property, Borrower shall (i) undertake an investigation to identify the source(s) of such mold or fungus and shall develop and implement an appropriate remediation plan to eliminate the presence of any Toxic Mold, (ii) perform or cause to be performed all acts reasonably necessary for the remediation of any Toxic Mold (including taking any action necessary to clean and disinfect any portions of the Property affected by Toxic Mold, including providing any necessary moisture control systems at the Property), and (iii) provide evidence reasonably satisfactory to Lender of the foregoing.  Borrower shall permit Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance, and Borrower shall pay all reasonable attorneys' fees and disbursements incurred by Lender in connection therewith.

(b) Upon Lender's request, at any time and from time to time, Borrower shall provide an inspection or audit of the Property prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm approved by Lender assessing the presence or absence of Hazardous Substances on, in or near the Property, and if Lender in its good faith judgment determines that reasonable cause exists for the performance of such environmental inspection or audit, then the cost and expense of such audit or inspection shall be paid by Borrower.  Such inspections and audit may include soil borings and ground water monitoring.  If Borrower fails to provide any such inspection or audit within thirty (30) days after such request, Lender may order same, and, subject to Section 5.3 hereof, Borrower hereby grants

67

to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit.

(c)    If any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for any Hazardous Substance, whether such Hazardous Substance existed prior to the ownership of the Property by Borrower, or presently exists or is reasonably suspected of existing, Borrower shall cause such operations and maintenance plan to be prepared and implemented at its expense upon request of Lender, and with respect to any Toxic Mold, Borrower shall take all action necessary to clean and disinfect any portions of the Improvements affected by Toxic Mold in or about the Improvements, including providing any necessary moisture control systems at the Property.  If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law ("***Remedial Work***"), Borrower shall commence all such Remedial Work within thirty (30) days after written demand by Lender and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law.  All Remedial Work shall be performed by licensed contractors approved in advance by Lender and under the supervision of a consulting engineer approved by Lender.  All costs of such Remedial Work shall be paid by Borrower, including Lender's reasonable attorneys' fees and disbursements incurred in connection with the monitoring or review of such Remedial Work.  If Borrower does not timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense. Notwithstanding the foregoing, Borrower shall not be required to commence such Remedial Work within the above specified time period:  (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in Borrower or such Remedial Work violating any Environmental Law, or (z) if Borrower, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work.  Borrower shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrower is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower fails to promptly perform the Remedial Work being contested, and if Borrower fails to prevail in contest, Borrower would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrower has not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished additional security as provided in clause (4) below, as a result of the failure to perform such Remedial Work, and (4) Borrower shall have furnished to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrower's failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than one hundred ten percent (110%) of the cost of such Remedial Work as estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrower's failure to prevail in such contest.

(d)    Borrower shall not install or permit to be installed on the Property any underground storage tank.

68

### 5.8.3 Intentionally Omitted.

**5.9** <u>**Title to the Property; Liens**</u>. Borrower will warrant and defend the title to the Property, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, against the claims of all Persons. Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property or any Lien on any direct or indirect legal or beneficial ownership interest in Borrower or Borrower Representative, except Liens in favor of Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within forty five (45) days after Borrower first receives notice of such Lien.

### 5.10 <u>Leases</u>.

**5.10.1** **Generally**.  Upon request, Borrower shall furnish Lender with executed copies of all Leases then in effect.  All renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to existing local market rates and shall be arm's length transactions with bona fide, independent third-party tenants.

**5.10.2** **Approval of Leases**.  Borrower shall not enter into a proposed Lease or a proposed renewal, extension or modification of an existing Lease without the prior written consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld, conditioned or delayed.  Prior to seeking Lender's consent to any Lease, Borrower shall deliver to Lender a copy of such proposed lease (a "***Proposed Lease***") blacklined to show changes from the standard form of Lease approved by Lender and then being used by Borrower, if any.  Lender shall approve or disapprove (with reasonable explanation for such disapproval) each Proposed Lease or proposed renewal, extension or modification of an existing Lease (unless such existing Lease expressly provides for such renewal, extension or modification) within ten (10) Business Days of the receipt by Lender of a written request for such approval (the "***First Lease Notice***"), accompanied by a final copy of the Proposed Lease or proposed renewal, extension or modification of an existing Lease, if applicable.  If requested by Borrower, Lender will grant conditional approvals of Proposed Leases or proposed renewals, extensions or modifications of existing Leases (unless such existing Lease expressly provides for such renewal, extension or modification) at any stage of the leasing process, from initial "term sheet" through negotiated lease drafts, provided that Lender shall retain the right to disapprove any such Proposed Lease or proposed renewal, extension or modification of an existing Lease if, subsequent to any preliminary approval, material changes are made to the terms previously approved by Lender or additional material terms are added that had not previously been considered and approved by Lender in connection with such Proposed Lease or proposed renewal, extension or modification of an existing Lease. If Lender has failed to timely provide to Borrower its approval or disapproval as set forth above, and no earlier than the date that is ten (10) Business Days following the delivery of the First Lease Notice, Borrower has delivered to Lender a second notice containing the applicable documents, with the notation "SECOND NOTICE:  IMMEDIATE RESPONSE REQUIRED, FAILURE TO RESPOND TO THIS APPROVAL REQUEST WITHIN FIVE (5) BUSINESS DAYS FROM RECEIPT SHALL BE DEEMED TO BE LENDER'S APPROVAL" prominently displayed in bold, all caps and fourteen (14) point or larger font in the transmittal letter requesting approval (the "***Second Lease Notice***"), and Lender does not approve or disapprove (with a reasonable explanation) the applicable request within five (5) Business Days

69

from the date Lender receives the Second Lease Notice as evidenced by a certified mail return receipt or confirmation by a reputable national overnight delivery service that the same has been delivered, then such failure shall be deemed to be the consent and approval of Lender.

      **5.10.3    Additional Covenants with respect to Leases**.  Borrower (i) shall observe and perform the material obligations imposed upon the lessor under the Leases and shall not do or permit anything to impair the value of the Leases as security for the Debt; (ii) shall promptly send copies to Lender of all notices of default that Borrower shall send or receive under any Lease; (iii) shall enforce, in accordance with commercially reasonable practices for properties similar to the Property, the terms, covenants and conditions in the Leases to be observed or performed by the lessees, short of termination thereof; (iv) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (v) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents and/or the Project Loan Documents); (vi) shall not modify any Lease in a manner inconsistent with the Loan Documents; (vii) shall not convey or transfer or suffer or permit a conveyance or transfer of the Property so as to effect a merger of the estates and rights of, or a termination of diminution of the obligations of, lessees under Leases; (viii) shall not consent to any assignment of or subletting under any Lease unless required in accordance with its terms without the prior consent of Lender, which, with respect to a subletting, may not, so long as no Event of Default is continuing, be unreasonably withheld, conditioned or delayed; and (ix) shall not cancel or terminate any Lease or accept a surrender thereof without the prior consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed.

      **5.11    Estoppel Statement**.  After request by Lender, Borrower shall, within ten (10) days, furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal, (ii) the Interest Rate, (iii) the date installments of interest and/or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, and (v) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

      **5.12    Property Management**.

      **5.12.1    Management Agreements**.  Borrower shall not, without the prior written approval of Lender, which may be granted or withheld in Lender's sole and absolute discretion, enter into any management agreement, property management agreement or similar agreement with respect to the Property, other than the Hotel Management Agreement. In the event Borrower enters into any Management Agreement, Borrower shall (i) cause the Property to be managed and operated pursuant to the Management Agreement; (ii) promptly perform and observe all of the covenants required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its rights thereunder; (iii) promptly notify Lender of any default under the Management Agreement of which it is aware; (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditure plan, and property improvement plan and any other material notice, report and estimate received by Borrower under the Management Agreement; and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.  Without Lender's prior written consent, not to be unreasonably withheld, conditioned

70

or delayed, Borrower shall not (a) surrender, terminate, cancel, extend or renew the Management Agreement or otherwise replace the Manager or enter into any other management agreement (except pursuant to Section 5.12.2); (b) reduce or consent to the reduction of the term of the Management Agreement; (c) increase or consent to the increase of the amount of any charges under the Management Agreement; (d) otherwise modify, change, supplement, alter or amend in any material respect, or waive or release any of its rights and remedies under, the Management Agreement; (e) permit or knowingly suffer the occurrence and continuance of a default beyond any applicable cure period under the Management Agreement (or any successor management agreement or development agreement) if such default permits the Manager to terminate the Management Agreement (or such successor management agreement); or (f) knowingly suffer or permit the ownership, management or control of the Manager to be transferred to a Person other than an Affiliate of Borrower or Key Principal.

      **5.12.2****Termination of Manager**.  If (i) there is a change in Control of Manager, (ii) an Event of Default shall be continuing, (iii) Manager is in default under the Management Agreement, or (iv) upon the gross negligence, malfeasance, willful misconduct of Manager, or misappropriation of funds by the Manager, Borrower shall at the request of Lender, terminate the Management Agreement and replace Manager with a Qualified Manager or another replacement manager acceptable to Lender in Lender's reasonable discretion, on terms and conditions reasonably satisfactory to Lender.  Borrower's failure to appoint an acceptable manager within thirty (30) days after Lender's request of Borrower to terminate the Management Agreement shall constitute an immediate Event of Default.  Borrower may from time to time appoint a successor manager to manage and develop the Property, provided that such successor manager and Management Agreement shall be approved in writing by Lender in Lender's reasonable discretion. If at any time Lender consents to the appointment of a new manager, such new manager and Borrower shall, as a condition of Lender's consent, execute a consent and subordination of management agreement substantially in the form of the Consent and Subordination of Manager of even date herewith executed and delivered by Manager to Lender.

      **5.13****Special Purpose Bankruptcy Remote Entity**.  Each of Borrower and Borrower Representative shall at all times be a Special Purpose Bankruptcy Remote Entity.  Neither Borrower nor Borrower Representative shall directly or indirectly make any change, amendment or modification to its organizational documents, or otherwise take any action which could result in Borrower or Borrower Representative not being a Special Purpose Bankruptcy Remote Entity.  A "*Special Purpose Bankruptcy Remote Entity*" shall have the meaning set forth on Schedule 8 hereto.

      **5.14****Subordination of Agreements**.  Except as otherwise expressly set forth in this Agreement, all agreements, including the management affecting or encumbering the Property or the Project Improvements shall be subject to Lender's review and approval, not to be unreasonably withheld; shall, upon Lender's request, include customary lender protection rights reasonably acceptable to Lender, including assignability, "will-serve" provisions, and termination rights for the benefit of Lender; and Borrower shall deliver an assignment and subordination agreement with respect to each management agreement and in form reasonably satisfactory to Lender.

      **5.15****Change in Business or Operation of Property**.  Borrower shall not purchase or own any real property other than the Property and shall not enter into any line of business other

71

than the ownership and operation of the Property, or materially change Borrower's Closing Business Plan, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Property as an office and retail property or terminate such business for any reason whatsoever.

**5.16    Debt Cancellation**.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**5.17    Affiliate Transactions**.  Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or any of the members of Borrower except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

**5.18    Zoning**.    Borrower shall not initiate, permit or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

**5.19    No Joint Assessment**.  Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**5.20    Principal Place of Business**.  Borrower shall not change its principal place of business or chief executive office without first giving Lender thirty (30) days' prior notice.

**5.21    Change of Name, Identity or Structure**.  Borrower shall not change its name, identity (including its trade name or names) or Borrower's corporate, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender.  Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

**5.22    Indebtedness**.  Borrower shall not directly or indirectly create, incur or assume any indebtedness other than the (i) Debt, (ii) the Project Loan, and (iii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property which (A) are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate

72

amount of one percent (1%) of the original amount of the aggregate Outstanding Principal Balance of the Loan and the Project Loan[12] and (C) are paid within thirty (30) days of the date incurred (collectively, "***Permitted Indebtedness***").

     **5.23**    <u>**Licenses**</u>.  Borrower shall not Transfer any License required for the operation of the Property.

     **5.24**    <u>**Compliance with Restrictive Covenants, Etc.**</u>  Borrower will not enter into, modify, waive in any material respect or release any Easements, restrictive covenants or other Permitted Encumbrances, or suffer, consent to or permit the foregoing, without Lender's prior written consent, which consent may be granted or denied in Lender's sole discretion.  Subject to Sections 5.10 and 5.34, Borrower will not enter into or modify any Material Agreement without the consent of Lender.  A "***Material Agreement***" shall be any agreement that materially affects the use and operation of the Property (except for the Construction Documents, Hotel Management Agreement and the Ground Lease (but without limiting Borrower's obligations and Lender's rights under in this Agreement, the other Loan Documents or any other agreement of Borrower or Lender concerning the same)).

     **5.25**    <u>**ERISA**</u>.

     (a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

     (b)    Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Borrower or Borrower Representative to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower to become "plan assets," whether by operation of law or under regulations promulgated under ERISA.

     (c)    Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender in its sole discretion, that (A) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(3) of ERISA; (B) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) the assets of Borrower do not constitute "plan assets" within the meaning of 29 C.F.R. Section 2510.3-101.

     **5.26**    <u>**Prohibited Transfers**</u>.  Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer.

     **5.27**    <u>**Liens**</u>.  Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property or any direct or indirect legal or beneficial ownership interest in Borrower or Borrower Representative, except Liens in favor of Lender and Permitted Encumbrances, unless such Lien is bonded or discharged

---

[12] NTD:  $25,000 for Mezzanine Borrower.

*ACTIVE 45138641v14*

within forty-five (45) days after the earlier of (i) Borrower first receives notice of such Lien or (ii) the date the Lien is filed.

**5.28    Dissolution**. Borrower shall not (i) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership and operation of the Property or (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents.

**5.29    Expenses**. Borrower shall reimburse Lender upon receipt of notice for all reasonable, out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender or Servicer in connection with the Loan, including, (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions by counsel for Borrower; (ii) Borrower's and Lender's ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Lender; (iv) filing and recording of any Loan Documents; (v) title insurance, surveys, inspections and appraisals; (vi) the creation, perfection or protection of Lender's Liens in the Property and the Cash Management Accounts (including fees and expenses for title and lien searches, intangibles taxes, mortgage recording taxes, personal property taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan; (viii) fees charged by Servicer in connection with the Loan or any modification thereof and (ix) enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Property or in connection with any refinancing or restructuring of the Loan in the nature of a "work-out", or any insolvency or bankruptcy proceedings and (x) the making of Advances hereunder (including, without limitation, costs, fees and expenses of inspecting construction consultants, architects and engineers); provided, however, Lender shall not seek reimbursement of duplicative third-party and internal costs with respect to the same review, approval or other action of Lender of the same type. Any costs and expenses due and payable by Borrower hereunder which are not paid by Borrower within twenty (20) days after demand may be paid from any amounts in the Deposit Account, with notice thereof to Borrower. The obligations and liabilities of Borrower under this Section 5.29 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**5.30    Indemnity**. Borrower shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "***Indemnified Party***"), from and against any and all liabilities, obligations, losses, damages, (excluding punitive, special and consequential damages,

*ACTIVE 45138641v14*

except to the extent of reimbursement to Lender for any such punitive, special and consequential damaged actually incurred by Lender in connection with third party claims), penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "***Indemnified Liabilities***") in any manner, relating to or arising out of or by reason of the Loan, including:  (i) any breach by Borrower of its obligations under, or any misrepresentation by Borrower contained in, any Loan Document; (ii) the use or intended use of the proceeds of the Loan; (iii) any information provided by or, on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Mortgage, the Property or any interest therein, or receipt of any Rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of the Property to comply with any Legal Requirement; (xiii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against Lender with respect thereto; and (xiv) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder to the extent that it is finally judicially determined that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.   Any amounts payable to any Indemnified Party by reason of the application of this paragraph shall be payable on demand and shall bear interest at the Default Rate from the date that is twenty (20) days following the date demanded in writing by any Indemnified Party until paid.  The obligations and liabilities of Borrower under this Section 5.30 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure. This Section 5.30 shall not apply with respect to Applicable Taxes other than any Applicable Taxes that represent losses, claims, damages, etc. arising from any non-tax claim.

      **5.31**   **Patriot Act Compliance**.

        (a)  Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act (as defined below) and all applicable requirements of governmental authorities having jurisdiction over Borrower and the Property, including those relating to money laundering and terrorism.  Lender shall have the right to audit Borrower's

compliance with the Patriot Act and all applicable requirements of governmental authorities having jurisdiction over Borrower and the Property, including those relating to money laundering and terrorism.  In the event that Borrower fails to comply with the Patriot Act or any such requirements of governmental authorities, then Lender may, at its option, cause Borrower to comply therewith and any and all reasonable costs and expenses incurred by Lender in connection therewith shall be secured by the Mortgage and the other Loan Documents and shall be immediately due and payable.  For purposes hereof, the term *"Patriot Act"* means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

(b)   Neither Borrower nor any partner in Borrower or member of such partner nor any owner of a direct or indirect interest in Borrower (a) is listed on any Government Lists (as defined below), (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense (as defined below), or (d) is currently under investigation by any governmental authority for alleged criminal activity.  For purposes hereof, the term *"Patriot Act Offense"* means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (a) the criminal laws against terrorism; (b) the criminal laws against money laundering, (c) the Bank Secrecy Act, as amended, (d) the Money Laundering Control Act of 1986, as amended, or the (e) Patriot Act.  "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.   For purposes hereof, the term *"Government Lists"* means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by Office of Foreign Assets Control (*"OFAC"*), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Governmental Lists", or (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Governmental Lists".

**5.32**   **Minimum Cash Equity**.  Borrower represents on and warrants that on the date hereof it has and it shall at all times during the term of the Loan maintain a minimum cash equity in the Property of $[_____], which is not less than twenty percent (20%) of the total cost of the Project Improvements, including amounts spent prior to the Closing Date.  As part of all quarterly and annual financial statements delivered to Lender pursuant to Section 6.3 hereof, Borrower shall deliver to Lender a certificate of its cash equity in the Property as well as evidence reasonably acceptable to Lender supporting such certification.

**5.33**   **Anti-Money Laundering**.  At all times throughout the Term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, none of the funds of Borrower, Borrower Representative or any Guarantor, as applicable, that are used to

76

consummate this transaction or to repay the Loan shall be derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure.  Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

5.34   **Construction Manager's Agreement; Contracts, Subcontracts**.  Borrower shall (a) enforce the Construction Manager's Agreement in a commercially reasonable manner, (b) waive none of the obligations of any of the parties thereunder, (c) not take any action or fail to take any action which would relieve the Construction Manager from its obligations to construct the Project Improvements substantially in accordance with the Plans and Specifications, and (d) make no amendments to or change orders under the Construction Manager's Agreement without the prior written approval of Lender, except to the extent permitted under Section 5.43 hereof.  The Construction Manager's Agreement shall provide that the work to be performed by Construction Manager under the Construction Manager's Agreement is the work called for by the Plans and Specifications; and that all work on the Improvements shall be completed in accordance with the Plans and Specifications in a good and workmanlike manner and shall be free of any defects. Borrower shall, from time to time, upon request by Lender, use commercially reasonable efforts to cause Construction Manager to provide Lender with reports in regard to the status of construction of the Project Improvements, in such form and detail as requested by Lender. Borrower shall not, and shall not permit the Construction Manager to, enter into, or extend or modify an existing Major Contract in any manner which is not immaterial, any Major Contract without Lender's prior written consent, except to the extent permitted under Section 5.43 hereof.  Provided that no Event of Default is continuing, if Borrower delivers the proposed Major Contract to Lender and Construction Consultant for its review and provides Lender with a written request for approval (which written request shall specifically refer to this Section 5.34(B) and shall explicitly state that failure by Lender to approve or disapprove within five (5) Business Days will constitute a deemed approval) and Lender fails to reject the request in writing delivered to Borrower within five (5) Business Days after receipt by Lender of the request, the proposed Major Contract, or proposed extension or modification of an existing Major Contract shall be deemed approved by Lender, and Borrower shall be entitled to enter into such Major Contract or proposed extension or modification of an existing Major Contract.  Borrower shall promptly deliver copies of all executed Contracts to Lender.  Borrower shall, and shall cause the Construction Manager to, (a) enforce the Contracts and Subcontracts in a commercially reasonable manner, (b) waive none of the obligations of any of the parties thereunder, (c) not take any action or fail to take any action which would relieve the Contractor or the Subcontractor from its obligations to construct the Project Improvements substantially in accordance with the Plans and Specifications, and (d) make no change orders under the Contracts or Subcontracts without the prior written approval of Lender.  The Contractors and Subcontractors shall provide that the work to be performed by such Contractor or Subcontractor, as applicable, under its Contract or Subcontract, respectively, is the work called for by the Plans and Specifications; and that all work being performed by such Contractor or Subcontractor on the Improvements shall be completed in accordance with the Plans and Specifications in a good and workmanlike manner and shall be free of any defects.  **Architect's Contract**.  Borrower shall (a) enforce the Architect's Contract in a commercially reasonable manner, (b) waive none of the obligations of Borrower's Architect(s)

77

thereunder, (c) take no action or fail to take any action which would relieve Borrower's Architect from its or their obligations under the (applicable) Architect's Contract and (d) make no amendments to the Architect's Contract without the prior written approval of Lender. Borrower shall, from time to time, upon the request by Lender, use commercially reasonable efforts to cause Borrower's Architect to provide Lender with reports in regard to the status of construction of the Improvements, in such form and detail as requested by Lender.

5.36    **Application of Loan Proceeds**.    Borrower shall use the Undisbursed Loan Proceeds solely and exclusively for the purposes of paying Building Loan Costs in accordance herewith and in accordance with the Building Loan Budget which shall be subject to no change except as permitted hereby. Borrower will receive the Advances to be made hereunder and, in accordance with Section 2.9.8 hereof, will hold the right to receive the same in trust for the purpose of paying the Building Loan Costs and it will apply the same first to such payment before using any part thereof for any other purpose.

5.37    **Costs of Construction**.    Borrower shall promptly pay when due all Building Loan Costs. Borrower may contest the amounts due to Contractors and Subcontractors in good faith provided that (a) such amounts are not the subject of an Advance (or if such funds are escrowed), (b) no Event of Default has occurred and is continuing; (c) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost as determined by Lender; (d) Borrower shall not permit or suffer and shall promptly discharge any Lien (other than Permitted Encumbrances) against the Property, by payment, bonding or otherwise; and (e) Borrower shall promptly upon final determination thereof pay the amount due such Contractor or Subcontractor, together with all costs, interest and penalties which may be payable in connection therewith.

5.38    **Substantial Completion; Final Completion of Construction**.

5.38.1    **Substantial Completion**.

(a)    Borrower shall cause the Substantial Completion of the Project Improvements to occur on or before the Substantial Completion Date.

(b)    Borrower shall diligently pursue the Substantial Completion of the Project Improvements on or prior to the Substantial Completion Date in accordance with the Plans and Specifications and in compliance with all applicable Legal Requirements and all Licenses, Building Permits, governmental approvals, all restrictions, covenants and easements affecting the Property, and all terms and conditions of this Agreement and the other Loan Documents; pay all sums and perform such duties as may be necessary to complete such construction of the Project Improvements substantially in accordance with the Plans and Specifications and in compliance with all applicable Legal Requirements and all Licenses, Building Permits, governmental approvals, restrictions, covenants and easements affecting the Property, and all terms and conditions of this Agreement and the other Loan Documents, all of which shall be completed by the Completion Date, free from any liens, claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith. Evidence of satisfactory compliance with the foregoing shall be furnished by Borrower to Lender on or before the Substantial Completion Date. In addition, Borrower shall diligently pursue

construction of the Project Improvements to Substantial Completion in accordance with the Construction Schedule.

### 5.38.2    Final Completion of Construction.

(a)    Borrower shall cause the Final Completion of the Project Improvements to occur on or before the Completion Date.

(b)    Borrower shall diligently pursue the Final Completion of the Project Improvements on or prior to the Completion Date (subject only to Force Majeure and extensions approved by Lender in writing in its sole and absolute discretion) substantially in accordance with the Plans and Specifications and in compliance with all applicable Legal Requirements and all Licenses, Building Permits, governmental approvals, all restrictions, covenants and easements affecting the Property, and all terms and conditions of this Agreement and the other Loan Documents; pay all sums and perform such duties as may be necessary to complete such construction of the Project Improvements substantially in accordance with the Plans and Specifications and in compliance with all applicable Legal Requirements and all Licenses, Building Permits, governmental approvals, restrictions, covenants and easements affecting the Property, and all terms and conditions of this Agreement and the other Loan Documents all of which shall be completed by the Substantial Completion Date, free from any liens, claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith.  Evidence of satisfactory compliance with the foregoing shall be furnished by Borrower to Lender on or before the Completion Date.  In addition, Borrower shall diligently pursue construction of the Project Improvements to Final Completion in accordance with the Construction Schedule.

(c)    Borrower shall obtain Lender's prior written consent in connection with any and all material design aspects of the Project Improvements to the extent same has not been approved by Lender prior to the Closing Date or not included in the Closing Business Plan, any other Annual Business Plan approved by Lender in accordance with this Agreement or Plans and Specifications previously approved by Lender; provided, however, that, subject to the provisions of Section 5.43,  Borrower shall have the right to make certain immaterial changes to and further develop the Plans and Specifications so long as such modifications are consistent in all material respects with the Plans and Specifications previously approved by Lender and Borrower promptly delivers copies of such modified Plans and Specifications to Lender.  Borrower shall submit proposed modified Plans and Specifications to Lender and the Construction Consultant in connection with any design decisions requiring Lender's approval in this Section 5.38(c) and Lender shall use reasonable efforts to respond to such written requests for approvals required under this Section 5.38(c) within ten (10) Business Days of receipt of such request.

**5.39    Inspection of Property**.  Subject to the rights of Tenants, if any, Borrower shall permit Lender, the Construction Consultant and their respective representatives, to enter upon the Property, inspect the Project Improvements and all materials to be used in the construction and renovation thereof and to examine the Plans and Specifications which are or may be kept at the construction site at all reasonable times and with advance notice and will cooperate, and use reasonable efforts to cause the Construction Manager, the Major Contractors to cooperate with the Construction Consultant to enable him or her to perform his or her functions hereunder.

79

**5.40** **Construction Consultant**. Borrower acknowledges that (a) the Construction Consultant has been retained by Lender, at Borrower's sole cost and expense (not to exceed $2,600 per month) in accordance with the Construction Budget and Section 5.41 below to act as a consultant and only as a consultant to Lender in connection with the construction of the Improvements and has no duty to Borrower, (b) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Lender, (c) Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Lender under this Agreement and to accept or not accept any matter or thing required to be accepted by Lender under this Agreement, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto, (d) Lender reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Lender or any other person or party, and (e) Lender reserves the right to replace the Construction Consultant with another construction consultant at any time and without prior notice to or approval by Borrower.

**5.41** **Construction Consultant/Duties and Access**. Lender shall have the right to retain the Construction Consultant, at Borrower's sole cost and expense, to perform the following services on behalf of Lender:

(a) To review and advise Lender whether, in the opinion of the Construction Consultant, the Plans and Specifications are satisfactory;

(b) To review Requisitions and change orders;

(c) To review design modifications to the Project Improvements as described in Section 5.38(c); and

(d) To make periodic inspections for the purpose of assuring that construction of the Improvements to date is substantially in accordance with the Plans and Specifications and to approve Borrower's then current Requisition as being consistent with Borrower's obligations under this Agreement, including *inter alia*, an opinion as to Borrower's continued compliance with the provisions of Section 2.9.1.

Borrower shall pay the fees of the Construction Consultant within thirty (30) days after billing therefor and expenses incurred by Lender on account thereof shall be reimbursed to Lender within thirty (30) days after request therefor, but neither Lender nor the Construction Consultant shall have any liability to Borrower on account of (i) the services performed by the Construction Consultant, (ii) any neglect or failure on the part of the Construction Consultant to properly perform its services or (iii) any approval by the Construction Consultant of construction of the Project Improvements. Neither Lender nor the Construction Consultant assumes any obligation to Borrower or any other Person concerning the quality of construction of the Project Improvements or the absence therefrom of defects.

80

5.42  **Correction of Defects**.  Borrower shall promptly correct all defects in the Project Improvements or any deviation from the Plans and Specifications not previously approved or deemed approved by Lender to the extent required hereunder.  Borrower agrees that the advance of any proceeds of the Loan whether before or after such defects or departures from the Plans and Specifications are discovered by, or brought to the attention of, Lender shall not constitute a waiver of Lender's right to require compliance with this covenant.

5.43  **Approval of Change Orders**.  Borrower shall not permit any deviations from the Plans and Specifications without Lender's prior written consent (which consent shall be given or withheld in Lender's sole but reasonable discretion); provided, however, that Borrower may make changes without Lender's prior written consent so long as (a) such changes do not exceed, in the case of any Contract or Subcontract, two percent (2%) of the amount of the applicable Contract or Subcontract, (b) such changes do not exceed the greater of (i)  $300,000 and (ii) two and one half percent (2.5%) of the amount of the Construction Budget  in the aggregate, (c) such changes do not increase any line item in the Construction Budget in excess of $150,000 (after taking into account use of the contingency line item to the extent permitted under and reallocations under Sections 2.9.4, 2.9.5 and 2.9.6 and other reallocations approved by Lender in its sole and absolute discretion), (d) the total Construction Budget does not increase, (e) Borrower uses reasonable efforts to deliver to Lender and Construction Consultant prior notice of such change orders or, if Borrower is unable to deliver prior notice, Borrower shall submit to Lender and Construction Consultant copies of all change orders entered into with respect to the Improvements within ten (10) days after the same are entered into, irrespective of whether the same require the prior approval of Lender and Construction Consultant pursuant to this Agreement, (f) such changes will not (i) decrease or increase (other than in a de minimis respect) the gross square feet or the net rentable square feet of the office or retail space to be contained in the Project Improvements, (ii) materially change the basic layout or material design aspects of the Project Improvements except as expressly permitted in Section 5.38(c), or (iii) involve the use of materials, furniture, fixtures and equipment that are not at least equal in quality to the materials, furniture, fixtures and equipment originally specified in or required by the approved Plans and Specifications and (g) such changes will not prevent Borrower from completing the Project Improvements on or prior to the Completion Date.  Lender shall use reasonable efforts to respond to written requests for approval of change orders within ten (10) days of receipt of such request.

5.44  **Laborers, Subcontractors and Materialmen**.  Borrower shall notify Lender promptly, and in writing, if Borrower receives any default notice, notice of lien or demand for past due payment, written or oral, from any laborer, subcontractor or materialmen.

5.45  **Payment and Performance Bonds**.  Borrower shall maintain in full force and effect the Construction Manager Payment and Performance Bond and any other Payment and Performance Bonds required by Lender pursuant to this Agreement.  All Major Contractors shall be required to obtain and maintain a Payment and Performance Bond and Borrower shall deliver such Payment and Performance Bond to Lender prior to the performance of any work at the Property by such Major Contractor.  In the event that any payments under any Payment and Performance Bond (including the Construction Manager Payment and Performance Bond) are issued jointly to Borrower and Lender, Borrower shall endorse any such jointly issued payments to the order of Lender upon Lender's request.  Provided no Default or Event of Default shall have occurred and be continuing, Lender shall, at Lender's option, either (a) apply any payment received

81

in respect of any Payment and Performance Bond to pay for the unpaid work, labor or services giving rise to such payment or (b) make such payment available for disbursement to Borrower in the same manner as Loan proceeds are disbursed to Borrower pursuant to and in accordance with Section 2.9 hereof, subject to Borrower's compliance with the terms and provisions of said Section.

**5.46** **Ownership of Personalty**.  Borrower shall furnish to Lender photocopies of the fully executed contracts, bills of sale, receipted vouchers and agreements, or any of them, under which Borrower claims title to the materials, articles, fixtures and other personal property used or to be used in the construction or operation of the Project Improvements.

**5.47** **Purchase of Material Under Conditional Sale Contract**.  Borrower shall not permit any materials, equipment, fixtures or any other part of the Project Improvements to be purchased or installed under any security agreement or other arrangements wherein the seller reserves or purports to reverse the right to remove or to repossess any such items or to consider them personal property after their incorporation in the Property, unless authorized by Lender in writing and in advance.

**5.48** **Assignment of Claims**.  Borrower hereby collaterally assigns to Lender, as additional security for the Loan, to the extent permitted, all rights and claims Borrower may have against all Contractors and Subcontractors, provided that Lender may not pursue any such right or claim unless an Event of Default has occurred and is continuing.

**5.49** **Ground Lease**.

(a)    Borrower will comply in all respects with the terms and conditions of the Ground Lease.  Borrower will not do or permit anything to be done, the doing of which, or refrain from doing anything, the omission of which, will impair or is reasonably likely to impair the security of the Property under the Ground Lease or will be grounds for declaring a forfeiture of the Ground Lease.

(b)    Borrower shall enforce in a commercially reasonable manner the Ground Lease and will not, without the prior written consent of Lender, terminate, modify, cancel, change, supplement, alter or amend the Ground Lease, or waive, excuse, condone or in any way release or discharge Ground Lessor of or from any of the material covenants and conditions to be performed or observed by the Ground Lessor under the Ground Lease.  Borrower hereby expressly covenants with Lender not to cancel, surrender, amend, modify or alter in any way the terms of the Ground Lease without Lender's prior written consent. Upon the occurrence and during the continuance of an Event of Default,  Borrower hereby assigns to Lender, as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of this Loan Agreement, all of the rights, privileges and prerogatives of Borrower, as tenant under the Ground Lease, to surrender the leasehold estate created by the Ground Lease or to terminate, cancel, modify, change, supplement, alter or amend the Ground Lease, and any such surrender of the leasehold estate created by the Ground Lease or termination, cancellation, modification, change, supplement, alteration or amendment of the Ground Lease without the prior written consent of Lender shall be void and of no force and effect.

82

(c)    Borrower will give Lender prompt (and in all events within five (5) Business Days) written notice of any default under the Ground Lease or of the receipt by Borrower of any notice of default from Ground Lessor.  Borrower will promptly (and in all events within five (5) Business Days) furnish to Lender copies of all information furnished to Ground Lessor by the terms of the Ground Lease or the provisions of this Section.  Borrower will provide to Lender an exact copy of any written notice, material notice or material communication, plan, specification or other instrument or document received or given by Borrower in any way relating to or affecting the Ground Lease which may concern or affect the estate of Ground Lessor or Borrower thereunder in or under the Ground Lease or in the real estate thereby demised.

(d)    Lender shall have the right upon Borrower's failure, but not the obligation, to perform any obligations of Borrower under the terms of the Ground Lease.  All out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) so incurred, shall be treated as an advance secured by this Loan Agreement, shall bear interest thereon at the Default Rate from the date of payment by Lender until paid in full and shall be paid by Borrower to Lender within twenty (20) days after demand.  No performance by Lender of any obligations of Borrower shall constitute a waiver of any default arising by reason of Borrower's failure to perform the same.  If Lender shall make any payment or perform any act or take action in accordance with this Section, Lender will notify Borrower of the making of any such payment, the performance of any such act, or the taking of any such action.  In any such event, subject to the rights of lessees, sublessees and other occupants under the Leases or the Hotel Management Agreement, Lender and any person designated by Lender shall have, and are hereby granted, the right to enter upon the Property, subject to Section 5.3 hereof,  at any time and from time to time for the purpose of taking any such action.

(e)    To the extent permitted by law, the price payable by Borrower or any other person or entity in the exercise of any right of redemption following foreclosure of the Property shall include all rents paid and other sums advanced by Lender, together with interest thereon at the Default Rate as lessee under the Ground Lease, on behalf of Borrower on account of the Property.

(f)    Unless Lender shall otherwise consent in writing, the fee and leasehold estates in the Property shall not merge but shall always be kept separate and distinct, notwithstanding the union of said estates either in Ground Lessor or in Borrower, or in a third party, by purchase or otherwise.

(g)    If the Ground Lessor shall deliver to Lender a copy of any notice of default sent by the Ground Lessor to Borrower, as lessee under the Ground Lease, such notice shall constitute full protection to Lender and against Borrower, Borrower Representative, Guarantor or any of their Affiliates for any action taken or omitted to be taken by Lender in reliance thereon.

(h)    To the extent there are any renewal terms under the Ground Lease, Borrower shall exercise each individual option, if any, to extend or renew the term of the Ground Lease promptly (and in all events within five (5) days) after written demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised, and Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower to so exercise such option if Borrower fails to

83

exercise as herein required, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.

(i)     Each Lease hereafter made and each renewal of any existing Lease shall provide that, (i) in the event of the termination of a Ground Lease, the Lease shall not terminate or be terminable by the lessee; (ii) in the event of any action for the foreclosure of the Mortgage, the Lease shall not terminate or be terminable by the subtenant by reason of the termination of the Ground Lease unless the lessee is specifically named and joined in any such action and unless a judgment is obtained therein against the lessee; and (iii) in the event that a Ground Lease is terminated as aforesaid, the lessee under the Lease shall attorn to the lessee under the Ground Lease or to the purchaser at the sale of the Property on such foreclosure, as the case may be.

(j)     Borrower hereby assigns, transfers and sets over to Lender all of Borrower's claims and rights to the payment of damages arising from any rejection by the Ground Lessor of the Ground Lease under the Bankruptcy Code.  Borrower shall promptly notify Lender in writing (and in any event within ten (10) days) of any claim, suit action or proceeding relating to the rejection of the Ground Lease.  Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the Ground Lessor under the Bankruptcy Code during the continuance of any default.  Borrower may make any compromise or settlement in connection with such proceedings (subject to Lender's prior written approval, which may be granted or withheld in Lender's sole and absolute discretion); provided, however, that Lender shall be authorized and entitled to compromise or settle any such proceeding if such compromise or settlement is made after the occurrence and during the continuance of any Event of Default, and following an Event of Default, Borrower shall not, without the prior written approval of Lender, which may be granted or withheld in Lender's sole and absolute discretion, make any such compromise or settlement. Borrower shall promptly execute and deliver to Lender any and all instruments reasonably required in connection with any such proceeding after request therefor by Lender.

(k)     Borrower shall not, without Lender's prior written consent, elect to treat the Ground Lease as terminated under Section 365(h)(l) of the Bankruptcy Code.  Any such election made without Lender's prior written consent shall be void.

(l)     If pursuant to Section 365(h)(1)(B) of the Bankruptcy Code, Borrower seeks to offset against the rent reserved in the Ground Lease the amount of any damages caused by the non-performance by the Ground Lessor of any of the Ground Lessor's obligations under the Ground Lease after the rejection by the Ground Lessor of the Ground Lease under the Bankruptcy Code, Borrower shall, prior to effecting such offset, notify Lender of its intention to do so, setting forth the amounts proposed to be so offset and the basis therefor.  If Lender has failed to object as aforesaid within ten (10) days after notice from Borrower in accordance with the first sentence of this Section, Borrower may proceed to effect such offset in the amounts set forth in Borrower's notice.  Neither Lender's failure to object as aforesaid nor any objection or other communication between Lender and Borrower relating to such offset shall constitute an approval of any such offset by Lender.  Borrower shall indemnify and save Lender harmless from and against any and all claims, demands, actions, suits, proceedings, damages (excluding punitive,

84

special and consequential damages unless asserted against Lender by Ground Lessor or any other third party), losses, and actual of-of-pocket costs and expenses of every nature whatsoever (including, without limitation, reasonable attorneys' fees and disbursements) arising from or relating to any such offset by Borrower against the rent reserved in the Ground Lease.

(m)  If any action, proceeding, motion or notice shall be commenced or filed in respect of Borrower or, after the occurrence and during the continuance of any Event of Default, the Property in connection with any case under the Bankruptcy Code, Lender shall have the option, to the exclusion of Borrower, exercisable upon notice from Lender to Borrower, to conduct and control any such litigation with counsel of Lender's choice.  Lender may proceed in its own name or in the name of Borrower in connection with any such litigation, and Borrower agrees to execute any and all powers, authorizations, consents and other documents required by Lender in connection therewith.  Borrower shall pay to Lender all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) paid or incurred by Lender in connection with the prosecution or conduct of any such proceedings within five (5) days after notice from Lender setting forth such costs and expenses in reasonable detail.  Any such costs or expenses not paid by Borrower as aforesaid shall be secured by the lien of this Loan Agreement, shall be added to the principal amount of the Debt and shall bear interest at the Default Rate. Borrower shall not commence any action, suit, proceeding or case, or file any application or make any motion, in respect of the Ground Lease in any such case under the Bankruptcy Code without the prior written consent of Lender, which, consent or approval shall not be unreasonably withheld, conditioned or delayed, other than with respect to the Existing Proceeding, with respect to which Lender's consent may be granted or withheld in Lender's sole and absolute discretion.

(n)  Borrower shall promptly, but in no event later than (1) Business Day after obtaining knowledge thereof, notify Lender of any filing by or against the Ground Lessor of a petition under the Bankruptcy Code.  Borrower shall thereafter forthwith give written notice of such filing to Lender, setting forth any information available to Borrower as to the date of such filing, the court in which such petition was filed, and the relief sought therein.  Borrower shall promptly deliver to Lender following receipt any and all notices, summonses, pleadings, applications and other documents received by Borrower in connection with any such petition and any proceedings relating thereto.

(o)  If there shall be filed by or against Borrower a petition under the Bankruptcy Code, and Borrower, as the lessee under the Ground Lease, shall determine to reject the Ground Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than thirty (30) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Ground Lease.  Lender shall have the right, but not the obligation, to serve upon Borrower within such 30-day period a notice stating that (i) Lender demands that Borrower assume and assign the Ground Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of prompt cure of all defaults and provide adequate assurance of future performance under the Ground Lease. If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Ground Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

85

(p)   Effective upon the entry of an order for relief in respect of Borrower under the Bankruptcy Code, Borrower hereby assigns and transfers to Lender, in the event Borrower fails to promptly file a motion under Section 364(d)(4) to extend Borrower's time to assume or reject the Ground Lease, then in such a event, a non-exclusive right to apply to the Bankruptcy Court under Section 365(d)(4) of the Bankruptcy Code for an order extending the period during which the Ground Lease may be rejected or assumed.

(q)   To the extent any purchase option exists under the Ground Lease, Borrower hereby agrees that Lender shall have the right to exercise any option to purchase the Property held by Borrower as lessee under the Ground Lease, and Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower to so exercise such option if Borrower fails to exercise as herein required, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.

(r)   Borrower shall not, without the prior consent of Lender, (i) surrender the leasehold estate created by the Ground Lease or terminate or cancel the Ground Lease or modify, change, supplement, alter or amend the Ground Lease, either orally or in writing, or (ii) consent to, acquiesce in, or fail to object to, any attempt by the Ground Lessor, as debtor in possession or by a trustee for Ground Lessor, to sell or transfer the fee estate of Ground Lessor free and clear of the Ground Lease under section 363(f) of the Bankruptcy Code or otherwise. Borrower shall object to any such attempt by the Ground Lessor, as debtor in possession or by a trustee for the Ground Lessor, to sell or transfer the fee estate of Ground Lessor free and clear of the Ground Lease under section 363(f) of the Bankruptcy Code or otherwise, and in such event shall affirmatively assert and pursue its right to adequate protection under section 363(e) of the Bankruptcy Code.

**5.50    Hotel Management Agreement.**

**5.50.1    Affirmative Covenants.**  The Project Improvements shall be operated under the terms and conditions of the Hotel Management Agreement.  Borrower shall (i) pay all sums required to be paid by Borrower under the Hotel Management Agreement, (ii) diligently perform, observe and enforce all of the terms, covenants and conditions of the Hotel Management Agreement on the part of Borrower to be performed, observed and enforced to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under the Hotel Management Agreement, (iii) promptly notify Lender of any default under the Hotel Management Agreement of which it is aware and notify Lender of the giving of any notice to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of the Hotel Management Agreement on the part of Borrower to be performed and observed and deliver to Lender a true copy of each such notice, (iv) promptly deliver to Lender a copy of each financial statement, budget, projection, business plan, property improvement plan, capital expenditure plan, notice, report (including but not limited to Pace reports), Quality Assurance Report and estimate received by it under the Hotel Management Agreement, (v) promptly enforce in a commercially reasonable manner the performance and observance of all of the material covenants required to be performed and observed by the Hotel Manager under the Hotel Management Agreement, and (vi) deliver to Lender the Hotel SNDA and any other subordination, non-disturbance and attornment agreements reasonably requested by Lender in form and substance reasonably acceptable to Lender.

86

5.50.2    **Negative Covenants**.  Borrower shall not, without the prior consent of Lender, (a) surrender, terminate or cancel the Hotel Management Agreement; (b) reduce or consent to the reduction of the term of the Hotel Management Agreement; (c) increase or consent to the increase of the amount of any charges under the Hotel Management Agreement; (d) otherwise materially modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Hotel Management Agreement or (e) suffer or permit the occurrence continuance a default beyond any applicable cure period under the Hotel Management Agreement if such default permits the franchiser to terminate or cancel the Hotel Management Agreement. Following the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Hotel Management Agreement without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.

5.50.3    **Rights of Lender; Termination of Franchise**.  Borrower hereby assigns to Lender as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of this Agreement, all the rights, privileges and prerogatives of Borrower to surrender the Hotel Management Agreement or to terminate, cancel, modify, change, supplement, alter or amend the Hotel Management Agreement, and any such surrender of the Hotel Management Agreement or termination, cancellation, modification, change, supplement, alteration or amendment of the Hotel Management Agreement without the prior consent of Lender shall be void and of no force and effect.  Borrower shall not enter into any franchise or similar agreement other than the Hotel Management Agreement without the prior written consent of Lender, which may be granted or withheld in Lender's sole and absolute discretion.  If (i) an Event of Default has occurred and is continuing (ii) Hotel Manager shall become insolvent or the subject of any proceeding under any state or federal bankruptcy or insolvency law or for the liquidation of all or a major portion of its property, or (iii) a default by Hotel Manager occurs under the Hotel Management Agreement, or Hotel Manager is grossly negligent or commits malfeasance, provided Borrower shall not exercise any termination right under the Hotel Management Agreement, it being understood that Borrower shall only be permitted exercise any termination or other right or remedy upon the written request of Lender, and Lender shall have the sole right to designate any replacement Hotel Manager or hotel manager in Lender's sole and absolute discretion.

5.50.4    **Default; Right to Cure**.  If Borrower shall default in the performance or observance of any material term, covenant or condition of the Hotel Management Agreement on the part of Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of the Hotel Management Agreement on the part of Borrower to be performed or observed to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under the Hotel Management Agreement shall be kept unimpaired and free from default.  Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time, subject to Section 5.3, for the purpose of taking any such action.  If Hotel Manager shall deliver to Lender a copy of any notice sent to Borrower of default under the Hotel Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon.  Borrower shall, from time to time, use commercially

87

reasonable efforts to obtain from Hotel Manager such certificates of estoppel with respect to compliance by Borrower with the terms of the Hotel Management Agreement as Hotel Manager is required to deliver by the terms Hotel Management Agreement, and shall use reasonable efforts to deliver such other certificates of estoppel with respect to compliance by Borrower as may be requested by Lender.  Borrower shall exercise each individual option, if any, to extend or renew the term of the Hotel Management Agreement upon demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised, and Borrower hereby expressly authorizes and appoints Lender as its attorney-in-fact to, upon and during the continuance of an Event of Default, exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.  Any sums expended by Lender pursuant to this paragraph shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, shall be deemed to constitute a portion of the Debt, shall be secured by the Lien of the Security Instrument and the other Loan Documents and shall be due and payable within twenty (20) days following demand by Lender therefor.

       **5.50.5**   **Expiration or Termination of Hotel Management Agreement**.  In the event that the Hotel Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination, surrender, cancellation, release, amendment, or modification of the Hotel Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall not replace or enter into a new Hotel Management Agreement or any hotel management agreement with any Person without the prior written consent of Lender, which may be granted or withheld in Lender's sole and absolute discretion, including, without limitation, the identity of any Hotel Manager or hotel manager and all terms and conditions of any agreement with the same, and such approval may further be conditioned upon, among other things, a requirement by such Hotel Manager or hotel manager to deliver to Lender a Hotel SNDA in form and substance acceptable to Lender in its sole and absolute discretion.

       **5.51**   **Hotel Operation**.  Without in any way limiting the covenants set forth elsewhere in the Loan Documents, Borrower shall:  (i) cause the hotel located on the Property to be operated, repaired and maintained as a well-maintained "first-class hotel" which shall mean a hotel providing amenities, services and facilities substantially equivalent or superior to hotels of similar average room rate and targeted market segment from time to time operating in the same or comparable geographic area of the Property, taking into consideration the age and location of the hotel located on the Property and (ii) maintain Inventory in amounts sufficient to meet the hotel industry standard for hotels comparable to the hotel located on the Property and at levels sufficient for the operation of the hotel located on the Property at full occupancy levels.

       **5.52**   **Cooperation with Regard to Liquor Licenses**.  To the extent permitted by applicable Legal Requirements, Borrower shall (and shall cause Hotel Manager and/or any applicable Affiliates of Borrower to) execute and deliver to Lender such additional documents, instruments, certificates, assignments and other writings, and otherwise provide (and cause Hotel Manager and/or any applicable Affiliates of Borrower to provide) such cooperation, in each case as may be necessary to transfer any liquor licenses or other Licenses with respect to the Property into, or obtain the issuance of new Licenses in, the name of Lender or its designee after the occurrence of an Event of Default and/or completion of a foreclosure, in each case to the extent

88

permitted by Legal Requirements applicable thereto.  Such cooperation shall include, without limitation, completing transfer requests, surrendering or cancelling any existing Licenses, and making representatives of Borrower, Hotel Manager, and their respective Affiliates available for meetings with any applicable Governmental Authority in connection with the transfer or issuance of such Licenses, subject in all instances to applicable Legal Requirements.  Furthermore, neither Borrower nor any of its Affiliates shall intentionally hinder or interfere with the License transfers or issuances made or contemplated by this Agreement, or with efforts of Lender or its successors and assigns to obtain temporary or permanent Licenses.  Subject to applicable Legal Requirements, effective during the existence of an Event of Default, Borrower hereby irrevocably appoints Lender as its agent and attorney-in-fact to execute all such documents and instruments as Lender shall require or deem advisable in order to cause the transfer or issuance of such Licenses as Lender may require (and to the extent permitted by applicable Legal Requirements) and to cause a cancellation of such existing Licenses as Lender may require.  The foregoing power of attorney is coupled with an interest and shall be irrevocable.  In addition to all other remedies which Lender may have at law or in equity for the enforcement of the terms and provisions of this Agreement, Borrower expressly agrees that Lender shall have the right to bring an action in specific performance to enforce each and every term and provision of this Section 5.52.

6.    **NOTICES AND REPORTING**

6.1    **Notices**.  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "*Notice*") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by notice to the other party):  If to Lender:  [_____], Attention:  [_____];with a copy to:  Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166, Attention:  Howard S. Schochet, Esq.; if to Borrower:  c/o Caspi Development Company, 120 Bloomingdale Road Suite 105, White Plains, NY 10605, with a copy to:  Rosenberg & Estis, P.C., 733 Third Avenue, New York, New York 10017, Attention: Michael E. Lefkowitz, Esq.  A notice shall be deemed to have been given:  in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of overnight delivery, upon the first attempted delivery on a Business Day.

6.2    **Borrower Notices and Deliveries**.  Borrower shall (a) give prompt written notice to Lender of:  (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower or Borrower Representative which might materially and adversely affect Borrower's or Borrower Representative's condition (financial or otherwise) or business or the Property; (ii) any material and adverse change in Borrower's or Borrower Representative's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and provide to Lender:  (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, Borrower Representative or any Affiliate of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender in the possession or control of Borrower.  In addition, after request by Lender (but no more

89

frequently than twice in any year), Borrower shall furnish to Lender (x) within ten (10) days, a certificate addressed to Lender, its successors and assigns reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes, and (y) within thirty (30) days, tenant estoppel certificates addressed to Lender, its successors and assigns from each tenant at the Property in form and substance reasonably satisfactory to Lender.

**6.3**    **Financial Reporting**.

      **6.3.1**    **Bookkeeping**.    Borrower shall keep on a calendar year basis, in accordance with GAAP (and the Uniform System of Accounts for Hotels, current edition), proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property, whether such income or expense is realized by Borrower, Hotel Manager, any Manager or any Affiliate of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall desire.  Upon the occurrence and during the continuance of an Event of Default, Borrower shall pay any out-of-pocket costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

      **6.3.2**    **Annual Reports**.  Borrower shall furnish to Lender annually, within one hundred twenty (120) days after each calendar year, a complete copy of Borrower's annual financial statements prepared by an independent certified public accountant (accompanied by an unqualified opinion from such accounting firm or other independent certified public accountant) reasonably acceptable to Lender, each in accordance with GAAP (and the Uniform System of Accounts for Hotels, current edition), and containing balance sheets and statements of profit and loss for Borrower and the Property in such detail as Lender may request.  Each such statement (x) shall be in form and substance reasonably satisfactory to Lender, (y) shall set forth the financial condition and the income and expenses for the Property for the immediately preceding calendar year, including statements of annual net operating income as well as [(1) a list of tenants, if any, occupying more than twenty percent (20%) of the rentable space of the Property, (2) a breakdown showing (a) the year in which each Lease then in effect expires, (b) the percentage of rentable space covered by such Lease, (c) the percentage of base rent with respect to which Leases shall expire in each such year, expressed both on a per year and cumulative basis] and (z) shall be accompanied by an Officer's Certificate certifying (1) that such statement is true, correct, complete and accurate and presents fairly the financial condition of the Property and has been prepared in accordance with GAAP and (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

      **6.3.3**    **Monthly/Quarterly Reports**.  Borrower shall furnish to Lender within twenty (20) days after the end of each calendar month or calendar quarter (as indicated below) the following items:  (i) monthly and year-to-date operating statements, noting net operating income and other information necessary and sufficient under GAAP (and the Uniform System of Accounts for Hotels, current edition) to fairly represent the financial position and results of operation of the Property during such calendar month, all in form satisfactory to Lender; (ii) a balance sheet for

90

such calendar month; (iii) a comparison of the budgeted income and expenses and the actual income and expenses for each month and year-to-date for the Property, together with a detailed explanation of any variances of ten percent (10%) or more between budgeted and actual amounts for such period and year-to-date; (iv) a statement of the actual Capital Expenses made by Borrower during each calendar quarter as of the last day of such calendar quarter; (v) a statement that Borrower has not incurred any indebtedness other than indebtedness permitted hereunder detailing all accounts payable and how long they have been outstanding; (vi) an aged receivables report, (vii) from and after the execution of any Lease (other than an F&B Agreement) by Borrower rent rolls identifying the leased premises, names of all tenants, units leased, monthly rental and all other charges payable under each Lease, date to which paid, term of Lease, date of occupancy, date of expiration, material special provisions, concessions or inducements granted to tenants, and a year by year schedule showing by percentage the rentable area of the Improvements and the total base rent attributable to Leases expiring each year and a delinquency report for the Property, (viii) monthly occupancy statistics for the Property (including an average daily room rate and RevPAR calculations), and (ix) monthly, the most current Smith Travel Research Reports (or, if Smith Travel Research Reports are no longer produced, a replacement thereof reasonably acceptable to Lender) then available to Borrower, reflecting market penetration and relevant hotel properties competing with the Property.  Each such statement shall be accompanied by an Officer's Certificate certifying (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with GAAP (and the USALI) (subject to normal year-end adjustments) and (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

   **6.3.4**  **Other Reports**.  Borrower shall furnish to Lender, within ten (10) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower or Borrower Representative as may be reasonably requested by Lender.  All monthly and other operating statements to be delivered by Borrower hereunder shall be (and all accompanying Officer's Certificates shall state that they have been) prepared in accordance with GAAP or based upon the Uniform System of Accounts for Hotels, current edition.

   **6.3.5**  **Annual Budget**.  Borrower shall prepare and submit to Lender by November 30th of each year during the Term following Substantial Completion, for approval by Lender, which approval shall not be unreasonably withheld, conditioned or delayed, a proposed pro forma budget for the Property for the succeeding calendar year (the "***Annual Budget***", and each Annual Budget approved by Lender is referred to herein as the "***Approved Annual Budget***")), and, promptly after preparation thereof, any revisions to such Annual Budget.  The Annual Budget shall consist of (i) an operating expense budget showing, on a month-by-month basis, in reasonable detail, each line item of the Borrower's anticipated operating income and operating expenses (on an accrual basis), including amounts required to establish, maintain and/or increase any monthly payments required hereunder (and once such Annual Budget has been approved by Lender, such operating expense budget shall be referred to herein as the "***Approved Operating Budget***"), and (ii) a Capital Expense budget showing, on a month-by-month basis, in reasonable detail, each line item of anticipated Capital Expenses (and once such Annual Budget has been approved by Lender, such Capital Expense budget shall be referred to herein as the "***Approved Capital Budget***").  Until such time that any Annual Budget has been approved by Lender, the prior Approved Annual

Budget shall apply for all purposes hereunder; provided that, such Approved Annual Budget shall be adjusted to reflect increases in Taxes, Insurance Premiums, utilities expenses, expenses under the Hotel Management Agreement, and such other adjustments as reasonably determined by Lender (including increases for any non-discretionary expenses)).

      **6.3.6**      **Business Plan**. Lender has approved the Closing Business Plan. Borrower shall prepare and submit to Lender, for approval by Lender, not to be unreasonably withheld or delayed, a proposed updated business plan for the Property and the Project Improvements, in form substantially similar to the Closing Business Plan (the "**Business Plan**", and each Business Plan approved by Lender is referred to herein as the "***Approved Business Plan***"), at any time Borrower has knowledge of any facts or circumstances which will materially affect the then-current Approved Business Plan, and promptly after preparation thereof, any revisions to such Business Plan, and without limiting the foregoing, delivery to Lender of such updates and revisions shall occur no less frequently than each anniversary of the Closing Date that occurs during the Term of the Loan, unless during the preceding 12-month period, no failure to achieve the projections set forth in the Approved Business Plan or other material underperformance of the Approved Business Plan that was in effect for such 12-month period has occurred. Borrower shall not amend, restate, supplement or otherwise modify an Approved Business Plan without Lender's approval, not to be unreasonably withheld or delayed, except as otherwise permitted under Sections 2.9.5, 2.9.6 and 5.43. Until such time that any proposed Business Plan has been approved by Lender, the prior Approved Business Plan shall apply for all purposes (subject to Sections 2.9.5, 2.9.6 and 5.43).

      **6.3.7**      **Major Milestones**. Borrower shall comply with the Major Milestones on or before the dates set forth therefor on Schedule 13.

      **6.3.8**      **Breach**. If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "***Required Records***") required by this Section 6.3.8 within thirty (30) days after the date upon which such Required Record is due, and continues to fail to provide such Required Record for five (5) days after notice of such failure from Lender, such failure at the option of Lender shall constitute an Event of Default under this Agreement.

      **6.3.9**      **Inspection**. Borrower shall permit any authorized representatives designated by Lender to visit, examine, audit, and inspect, upon reasonable notice and during normal business hours, the Property (subject to Section 5.3 hereof), including Borrower's financial and accounting records, and to make copies and take extracts therefrom, and to discuss its and their affairs, finances and business with its and their officers and independent public accountants (with Borrower's representative(s) present in all instances), at such reasonable times during normal business hours, as often as reasonably requested by Lender but in no event more than once per quarter prior to the continuance of an Event of Default. Borrower shall cause its Affiliates to make all books of account and records so available at the office where the same are regularly maintained. Lender shall have the right to copy, duplicate and make abstracts from such books and records as Lender may reasonably require, at Lender's sole cost and expense and accompanied by a representative of Borrower. During the continuance of an Event of Default, Borrower shall pay any costs incurred by Lender to examine such books, records and accounts. Borrower acknowledges and agrees that (i) all of such audits, inspections and reports shall be made for the

92

sole benefit of Lender, and not for the benefit of Borrower or any third party, and neither Lender nor Lender's auditors or inspectors or any of Lender's representatives, agents or contractors assumes any responsibility or liability (except to Lender) by reason of such audits, inspections or reports, (ii) Borrower will not rely upon any of such audits, inspections or reports for any purpose whatsoever, and (iii) the performance of such audits, inspections and reports will not constitute a waiver of any of the provisions of this Agreement or any other Loan Document or any of the obligations of Borrower hereunder or thereunder. Borrower further acknowledges and agrees that neither Lender nor Lender's inspector, representatives, agents or contractors shall be deemed to be in any way responsible for any matters related to design or construction of the Improvements or any construction work. At any time during the term of the Loan, Borrower shall reasonably cooperate with Lender and use reasonable efforts to assist Lender in obtaining an appraisal of the Property; provided that prior to the existence of an Event of Default Borrower shall not be required to pay for more than one (1) appraisal per year at a cost not to exceed $20,000. Such cooperation and assistance from Borrower shall include but not be limited to the obligation to provide Lender or Lender's appraiser with the following: (i) reasonable access to the Property subject to Section 5.3 hereof, (ii) from and after the execution of any Lease (except an F&B Agreement) by Borrower, a current certified rent roll for the Property in form and substance reasonably satisfactory to Lender, including current asking rents and a history of change in asking rents and historical vacancy for the period commencing on the Closing Date, (iii) current and budgeted income and expense statements for the period commencing on the Closing Date, (iv) the then existing site plan and survey of the Property, (v) the building plans and specifications, including typical elevation and floor plans; (vi) the current and prior year real estate tax bills, (vii) a detailed list of past and scheduled capital improvements and the costs thereof, (viii) all environmental reports and other applicable information relating to the Property, subject to Section 5.3 hereof, and (ix) copies of all recent appraisals/property description information or brochures, including descriptions of amenities and services relating to the Property. The appraiser performing any such appraisal shall be engaged by Lender and Lender shall be responsible for any fees payable to said appraiser in connection with an appraisal of the Property. Borrower shall reasonably cooperate with Lender with respect to any proceedings before any Governmental Authority which may in any material way affect the rights of Lender hereunder or any rights obtained by Lender under any of the Loan Documents and, in connection therewith, not prohibit Lender, at its election, from participating in any such proceedings.

## 7. **INSURANCE; CASUALTY; AND CONDEMNATION**

    **7.1**   **Insurance**. [SUBJECT TO INSURANCE CONSULTANT REVIEW]

       **7.1.1**   **Coverage**. Borrower, at its sole cost, for the mutual benefit of Borrower and Lender, shall obtain and maintain during the Term the policies of insurance described in this Section 7.1.1:

       (a)   Property insurance insuring against loss or damage customarily included under so called "all risk" or "special form" policies including windstorm (including named windstorm) and, if required by Lender, flood (including seepage and sewer backup) and/or earthquake (including all sorts of earth movement) coverage and terrorism coverage (defined as certified and non-certified in the Terrorism Risk Insurance Program Reauthorization Act of 2007 ("***TRIPRA***") subject to subsection (n) below and such other insurable hazards as, under good

93

insurance practices, from time to time are insured against for other property and buildings similar to the premises in nature, use, location, height, and type of construction. Such insurance policy shall also include ordinance and law insurance covering (i) loss to the undamaged portion of the property that is required to be demolished, (ii) the cost to demolish and clear the site of undamaged property, and (iii) the increased cost of construction to rebuild, in accordance with building codes and regulations in excess of the cost to rebuild with same materials and specifications as existed prior to the loss or damage in amounts satisfactory to Lender. Such insurance policy shall (I) be in an amount equal to 100% of the then current replacement cost of the Improvements without deduction for physical depreciation, (II) have deductibles no greater than $10,000 per occurrence, (III) be paid annually in advance (IV) be on a replacement cost basis and contain either no coinsurance or, if coinsurance, an agreed amount endorsement waiving coinsurance, and shall cover, without limitation, all tenant improvements and betterments that Borrower is required to insure on a replacement cost basis (V) cover soft costs including, but not limited to, real estate taxes, interest on the Loan, fees and other recurring expenses and (VI) include a standard joint loss agreement. Lender shall be named Mortgagee and Loss Payee on a Standard Mortgagee Endorsement.

(b)     Flood insurance if any part of the Property is located in an area now or hereafter designated by the Federal Emergency Management Agency as a Zone "A" & "V" Special Hazard Flood Area, or such other Special Hazard Flood Area if Lender so requires in its sole discretion. Such policy shall (i) be in an amount equal to the maximum available through the National Flood Insurance Program plus any additional limits the Lender may require and (ii) have a maximum permissible deductible of $25,000.

(c)     Commercial General Liability insurance utilizing the Insurance Services Organization form No. CG0001 or its equivalent. Such policy(ies) shall (i) be written on an occurrence form; (ii) maintain limits of liability of (A) $1,000,000 bodily injury and property damage, (B) $2,000,000 general aggregate per location, (C) $2,000,000 products and completed operations and in the aggregate (D) $1,000,000 personal and advertising injury and in the aggregate, (E) liquor law liability if applicable to operations of Borrower in amounts satisfactory to Lender (F) garage liability if applicable to operations of Borrower in amounts satisfactory to Lender, (G) garage keeper's legal liability, including per vehicle limit if applicable to operations of Borrower in amounts satisfactory to Lender, (H) innkeeper's legal liability if applicable to operations of Borrower in amounts satisfactory to Lender, (I) $1,000,000 employers liability if the property is located in North Dakota, Ohio, Washington, West Virginia or Wyoming (if applicable to operations of Borrower); (iii) include contractual liability covering the indemnity of this Loan, to the extent it applies to the coverage provided in this policy; (iv) not maintain any deductible, without written permission of the Lender; (v) provide XCU coverage with regard to construction projects; (vi) include three (3) years extended completed operations coverage after completion of any construction project; (vii) include Knowledge of Accident endorsement acknowledging that notice of a claim or an incident that may lead to a claim is not considered notice to the insured unless an executive officer has notice of such claim or incident; and (viii) be primary to any other insurance that may be maintained by the Lender.

(d)     Automobile Insurance which shall cover all owned, hired or leased vehicles and include non-owned and hired car coverage in amounts satisfactory to Lender.

94

(e)    Umbrella Liability Insurance which shall (i) include all the terms required in Section 7.1.1(c) of this Agreement; (ii) include limits of liability of $25,000,000, or as otherwise specified by the Lender; (iii) be excess of, and at least following form of the primary commercial general liability, employers liability and automobile liability policies and; (iv) follow form of aggregate limits of the commercial general liability.

(f)    "All Risk" or Special Form" business income insurance including rental value and extra expense which shall (i) name Lender as "Lender Loss Payee"; (ii) be in an amount equal to one hundred percent (100%) of the projected business income (including Rents) from the Property during the period of restoration; (iii) contain an unlimited indemnity period during the period that it takes to repair, restore and/or rebuild the damaged property and (iv) contain an extended period of indemnity endorsement which provides that after the physical loss to the Property has been repaired and restored the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of eighteen (18) months from the date that the Property is repaired and restored and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; such insurance shall contain all of the same provisions of Sections 7.1.1(a), (b) and (g).  The amount of such insurance shall be increased from time to time (but not less than annually) during the Term as and when the estimated or actual Rents (or business income) increase(s).

(g)    Boiler and Machinery "all risk" policy, utilizing the standard "comprehensive" policy form, or its equivalent, covering steam boilers, pipes, turbines engines miscellaneous electrical apparatus, elevators, escalators, machinery, air conditioning equipment and other pressure vessels.  Such policy (or policies) shall (i) include all the terms required in Sections 7.1.1 (a) and (g) of this Agreement; (ii) include replacement cost coverage on a new for old basis; (iii) include insurance limits in an amount no less than the greater of (a) $25,000,000, or (b) 25% of the 100% replacement value of the building erected on the Property; (iv) include a property damage deductible not greater than $10,000 for property damage and a twenty four (24) hour waiting period for business income and extra expense.

(h)    Worker's Compensation statutory coverage including employer's liability insurance limits or no less than $1,000,000/$1,000,000/$1,000,000 (if applicable to the operations of Borrower).

(i)    At all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the property coverage form does not otherwise apply, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection 7.1.1(a) and (f) above which policies shall (i) be written on a completed value form, covering 100% of the total costs of construction as well as coverage for any existing structure consistent with the requirements set forth in Section 7.1.1(a); (ii) include all the terms required in Sections 7.1.1, 7.1.2, 7.1.3 of this Agreement; (iii) include foundations, excavations, underground machinery or equipment, retaining walls, and all paved surfaces; (iv) maintain sub-limits for each of the perils of Flood and Earthquake to be the greater of (a) $10,000,000, (b) 25% of the 100% replacement value of the project, or (c) the amount otherwise specified by Lender; (v) allow for permission to occupy as

95

Lender may request, in form and substance acceptable to Lender and (vi) shall contain an agreed amount endorsement waving coinsurance.

(j)    Environmental Liability for the sole benefit of the Lender (if applicable).  Such policy shall; (i) respond in the event of a "pollution incident" (as defined in the policy to the reasonable satisfaction of Lender) and a default of the Borrower as defined in the Loan Agreement; (ii) maintain limits of $5,000,000 per occurrence and $10,000,000 annual aggregate or greater limits satisfactory to Lender, covering existing pollution conditions and pollution conditions emanating from, (a) operations of Borrower, (b) Borrowers contractors or sub-contractors, (c) tenants, or (d) tenant contractors or sub-contractors; (iii) include (a) bodily injury, sickness, disease, mental anguish or shock sustained by any person, or death, (b) property damage, including physical injury to, or destruction of tangible property, including the resulting the loss of use thereof, (c) clean up costs, on or off the Property, (d) the loss of use of tangible property that has not been physically damaged or destroyed, and (e) defense, including costs, charges and expenses incurred in the investigation adjustment or defense of claims for damages.

(k)    Employee Dishonesty (Fidelity Bond).  Such policy shall (i) cover all employees of the Borrower; (ii) maintain limits required by the Lender; and (iii) cover all members of the cooperative board if the project is a cooperative entity.

(l)    Professional Liability insurance (Errors & Omissions), shall be maintained for each architect, engineer and other professionals (as required by Lender).  Such policy shall:  (i) maintain limits of $10,000,000, or other limits as satisfactory to Lender, per occurrence, and in the aggregate; (ii) be written on a claims made basis, with a retroactive date no later than the commencement of the professional's effective date of service; (iii) be maintained in full force and effect for a period of three (3) years after the completion of the project; (iv) if policy is terminated, an extended discovery period (tail coverage) shall be purchased for a period of no less than three (3) extended years, specific to this project; and (v) maintain a deductible not to exceed $50,000.

(m)    Such other insurance coverages or amounts of existing insurance requirements as may from time to time be reasonably required by Lender in order to protect its interests (or required pursuant to the terms of the Hotel Management Agreement); or

(n)    Notwithstanding anything in subsection (a) above to the contrary, Borrower shall be required to obtain and maintain coverage in its property and business income (including Rents) insurance Policies (or by separate Policies) against loss or damage by terrorism in an amount equal to 100% of the "Full Replacement Cost" of the Property and following the terms and conditions of Sections 7.1(a) and (f); provided that such coverage is commercially available.  In the event that such coverage with respect to terrorist acts is not included as part of the "all risk" property and business income (including rents) policy required by subsection (a) and (f) above, Borrower shall, nevertheless be required to obtain coverage for terrorism (as standalone coverage) in an amount equal to 100% of the "Full Replacement Cost" of the Property; provided that such coverage is available.  Borrower shall obtain the coverage required under this subsection (j) from a carrier which otherwise satisfies the rating criteria specified in Section 7.1.2 (a *"Qualified Carrier"*) or in the event that such coverage is not available from a Qualified Carrier,

*ACTIVE 45138641v14*

Borrower shall obtain such coverage from the highest rated insurance company providing such coverage.

      **7.1.2**     **Policies**.  All policies of insurance (the "***Policies***") required pursuant to Section 7.1.1 shall (i) be issued by companies approved by Lender and licensed to do business in the State, with a claims paying ability rating of "A+" or better by S&P (and the equivalent by any other Rating Agency) and a rating of A:X or better in the current Best's Insurance Reports; (ii) contain a waiver of subrogation against Lender; (iii) be assigned and the originals thereof delivered to Lender; (iv) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer under the Policies, (B) that Lender shall receive at least thirty (30) days' prior written notice of any modification, reduction or cancellation of any of the Policies, (C) an agreement whereby the insurer waives any right to claim any premiums and commissions against Lender, provided that the policy need not waive the requirement that the premium be paid in order for a claim to be paid to the insured and (D) providing that Lender is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums; (v) in the event any insurance policy (except for general public and other liability and workers compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (vi) be satisfactory in form and substance to Lender and approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds.  Borrower shall pay the premiums for such Policies (the "***Insurance Premiums***") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Lender pursuant to Section 3.3 or as part of the Advances made hereunder) receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender.  If Borrower does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate.  Within thirty (30) days after written request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.

      **7.1.3**     **Miscellaneous Insurance Provisions**.

         (i)     Policy Endorsements:  All endorsements of the Policies or attachments to certificates of insurance, shall reflect the terms and conditions of the insurance requirements and administration provisions and shall indicate the effective date, policy number, insurance company, and shall be appropriately executed by authorized representatives of the insurance companies so as to confirm their validity.

*ACTIVE 45138641v14*

(ii)    Loss Payable and/or Additional Insured Provisions:  As respects the following policies (i) All property (including but not limited to separate property policies such as flood, terrorism), business income, boiler & machinery and builders risk policies shall name the Borrower as the named insured (except with respect to environmental liability) and shall include a New York State standard mortgagee clause, or its equivalent, which is acceptable to Lender, it's successors and/or assigns as their interests may appear, as mortgagee and loss payee, (ii) the environmental liability policy shall name the Lender and it's successors and/or assigns as their interests may appear, as sole named insured and loss payee; (iii) commercial general liability and umbrella liability policies shall name the Borrower as the named insured, and shall include the Lender and it's successors and/or assigns as their interests may appear, as additional insureds: (iv) employee dishonesty policies shall name the Borrower as named insured and shall include Lender as loss payee.

(iii)    Mortgage and/or Additional Insured Clauses:  (i) all original or certified copies of the original property, business income, boiler & machinery, builders risk, terrorism, federal flood and employee dishonesty policies shall be provided to the Lender including required Lender and/or additional named insured and/or loss payable clauses, as noted above; (ii) all original or certified copies of the original commercial general liability and umbrella liability policies shall be provided to the Lender including required additional insured endorsements; (iii) original environmental liability policies shall be provided to Lender, written in the name of Lender as named insured; (iv) certificates of Insurance, complying with all terms of this agreement, shall be provided to the Lender with respect to the workers compensation and employee dishonesty policies.

(iv)    Certificates of Insurance:  Where appropriate, and at the sole discretion of the Lender certificates of insurance satisfactory to Lender may be accepted, in lieu of original or certified original policies.

(v)    Policy Term and Premium Payment:  (i) with the exception of the environmental policy (if required), every policy must be written for a term of not less than one year.  An existing policy with fewer than 12 months remaining on its term on the Closing Date may be, at Lender sole discretion, acceptable on a case by case basis; (ii) the environmental policy must be written for a term equal to the lesser of (A) the term of the loan or (B) ten (10) years, and must be paid in full at inception by Borrower; and (iii) Borrower must provide evidence that all policies have been paid in full prior to the Closing Date.

(vi)    Blanket Policies:  The Borrower may comply with and satisfy the requirements of this insurance section through the use of a blanket or package policy (or policies) of insurance covering the Property and other properties and liabilities of the Borrower, provided that the (i) policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder or shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions contained herein; and (ii) property is listed and identifiable in the policy and it contains the required Lender and additional insured clauses, naming Lender specifically to the applicable Property.  In addition, if not shown on the policy itself, a schedule of all values reported for the specific property shall be provided as part of the blanket property policies.

98

7.2    **Casualty**.

7.2.1    **Notice; Restoration**.  If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "*Casualty*"), Borrower shall give prompt notice thereof to Lender.  Following the occurrence of a Casualty, Borrower, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

7.2.2    **Settlement of Proceeds**.  Subject to the terms of the Ground Lease, if a Casualty covered by any of the Policies (an "*Insured Casualty*") occurs where the loss does not exceed $2,000,000, provided no Default or Event of Default has occurred and is continuing, Borrower may settle and adjust any claim without the prior consent of Lender; provided such adjustment is carried out in a competent and timely manner, and Borrower is hereby authorized to collect and receipt for the insurance proceeds (the "*Proceeds*").  In the event of an Insured Casualty where the loss equals or exceeds $2,000,000 (a "*Significant Casualty*") Lender may, in its discretion, settle and adjust any claim without the consent of Borrower, and agree with the insurer(s) on the amount to be paid on the loss, and the Proceeds shall be due and payable solely to Lender and held by Lender in the Casualty/Condemnation Subaccount and disbursed in accordance herewith.  If Borrower or any party other than Lender is a payee on any check representing Proceeds with respect to a Significant Casualty, Borrower shall promptly endorse, and cause all such third parties to endorse, such check payable to the order of Lender.  Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to endorse such check payable to the order of Lender.  The out-of-pocket expenses incurred by Lender in the settlement, adjustment and collection of the Proceeds shall become part of the Debt and shall be reimbursed by Borrower to Lender within twenty (20) days of Lender's written demand therefor. Notwithstanding anything to the contrary contained herein, if in connection with a Casualty any insurance carrier makes a payment under a property insurance Policy that Borrower proposes be treated as business or rental interruption insurance, then, notwithstanding any designation (or lack of designation) by the insurance carrier as to the purpose of such payment, as between Lender and Borrower, such payment shall not be treated as business or rental interruption insurance proceeds unless Borrower has demonstrated to Lender's satisfaction that the remaining net Proceeds that will be received from the property insurance carriers are sufficient to pay one hundred percent (100%) of the cost of fully restoring the Improvements or, if such net Proceeds are to be applied to repay the Debt in accordance with the terms hereof, that such remaining net Proceeds will be sufficient to pay the Debt in full.

7.3    **Condemnation**.

7.3.1    **Notice; Restoration**.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "*Condemnation*") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation.  Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character (and to have the same utility) as prior to such Condemnation and in accordance with the terms of the Ground Lease.

99

7.3.2    **Collection of Award**.  Subject to the terms of the Ground Lease, Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment in respect of a Condemnation (an "*Award*") and to make any compromise, adjustment or settlement in connection with such Condemnation.  Notwithstanding any Condemnation (or any transfer made in lieu of or in anticipation of such Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Loan Documents, and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt.  Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of the Award sufficient to pay the Debt.  Subject to the rights of Lender under the Acquisition Loan Agreement, Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender.  Lender shall hold such Award in the Casualty/Condemnation Subaccount and disburse such Award in accordance with the terms hereof.

7.4    <u>**Application of Proceeds or Award**</u>.

7.4.1    **Application to Restoration**.  Subject to the terms of the Ground Lease, if an Insured Casualty or Condemnation occurs where (i) the loss is in an aggregate amount less than fifteen percent (15%) of the unpaid Principal and the principal amount of the Project Loan, collectively, (ii) in the reasonable judgment of Lender, the Property can be restored within six (6) months, and prior to six (6) months before the Stated Maturity Date, or any shorter period required by the Hotel Management Agreement, and prior to the expiration of the rental or business interruption insurance with respect thereto, to the Property's pre-existing condition and utility as existed immediately prior to such Insured Casualty or Condemnation and to an economic unit not less valuable and not less useful than the same was immediately prior to the Insured Casualty or Condemnation, and after such restoration will adequately secure the Debt; (iii) less than (x) thirty percent (30%), in the case of an Insured Casualty or (y) fifteen percent (15%), in the case of a Condemnation, of the gross leasable area of the Improvements (including the Hotel and any retail space) has been damaged, destroyed or rendered unusable as a result of such Insured Casualty or Condemnation; (iv) the Hotel Management Agreement and the Leases remain in full force and effect and any Lease; and (v) no Default or Event of Default shall have occurred and be then continuing, then the Proceeds or the Award, as the case may be (after reimbursement of any expenses incurred by Lender), shall be applied to reimburse Borrower for the cost of restoring, repairing, replacing or rebuilding the Property (the "*Restoration*"), in the manner set forth herein.  Borrower shall commence and diligently prosecute such Restoration.  Notwithstanding the foregoing, in no event shall Lender be obligated to apply the Proceeds or Award to reimburse Borrower for the cost of Restoration unless, in addition to satisfaction of the foregoing conditions, both (x) Borrower shall pay (and if required by Lender, Borrower shall deposit with Lender in advance) all costs of such Restoration in excess of the net amount of the Proceeds or the Award made available pursuant to the terms hereof; and (y) Lender shall have received evidence reasonably satisfactory to it that during the period of the Restoration, the Rents will be at least equal to the sum of the Operating Expenses, the Debt Service, the Project Loan Debt Service and other reserve payments required hereunder, as reasonably determined by Lender.

100

    **7.4.2**  **Application to Debt and Project Loan Debt**.  Except as provided in Section 7.4.1, any Proceeds and/or Award may, at the option of Lender in its discretion, subject to the rights of Lender under the Project Loan Agreement, be applied, pursuant to Section 2.3.3 hereof and Section 2.3.2 of the Project Loan Agreement, to the payment of the Loan and the Project Loan in the same order as specified in Section 3.9 hereof with respect to Rents or applied to reimburse Borrower for the cost of any Restoration, in the manner set forth in Section 7.4.3.  Any such prepayment of the Loan shall not be subject to the Prepayment Fee and the Minimum Multiple Payment but shall be subject to the Extension Exit Fee (if applicable).

    **7.4.3**  **Procedure for Application to Restoration**.  If Borrower is entitled to reimbursement out of the Proceeds or an Award held by Lender, such Proceeds or Award shall be disbursed from time to time from the Casualty/Condemnation Subaccount upon Lender being furnished with (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration, (ii) a fixed price or guaranteed maximum cost construction contract for Restoration satisfactory to Lender, (iii) prior to the commencement of Restoration, all immediately available funds in addition to the Proceeds or Award that in Lender's reasonable judgment are required to complete the proposed Restoration, (iv) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey, permits, approvals, licenses and such other documents and items as Lender may reasonably require and approve in Lender's reasonable discretion, and (v) all plans and specifications for such Restoration, such plans and specifications to be approved by (1) by Hotel Manager, if such approval is required pursuant to the Hotel Management Agreement, and (2) Lender, such approval not to be unreasonably withheld, conditioned or delayed, in each case prior to commencement of any work.  Lender may, at Borrower's expense, retain a consultant to review and approve all requests for disbursements, which approval shall also be a condition precedent to any disbursement.  No payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than the Proceeds or Award shall be disbursed prior to disbursement of such Proceeds or Award; and at all times, the undisbursed balance of such Proceeds or Award remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien.  Provided no Default or Event of Default then exists, any surplus that remains out of the Proceeds held by Lender after payment of such costs of Restoration shall be paid to Borrower.  Any surplus that remains out of the Award received by Lender after payment of such costs of Restoration shall, in the discretion of Lender, be retained by Lender and applied to payment of the Debt or returned to Borrower.

## 8. **DEFAULTS**

    **8.1**  **Events of Default**.  An "Event of Default" shall exist with respect to the Loan if any of the following shall occur:

      (a) any portion of (i) the Debt is not paid in full on the Maturity Date or (ii) any regularly scheduled monthly payment of interest hereunder or any other amount under Section 3.9(a)(i) through (v) of this Agreement is not paid in full on each Payment Date; provided, however, that no Event of Default under this clause (ii) shall be deemed to have occurred if no other Event of Default exists and the funds reserved hereunder for the payment of regularly

101

scheduled monthly interest are sufficient to pay the same and Lender fails to pay the same when due and when Borrower is otherwise entitled to receive the funds;

(b)    any of the Taxes, Other Charges or Insurance Premiums are not paid when due (unless Lender is paying same pursuant to Section 3.3 or as part of the Advances), subject to Borrower's right to contest Taxes in accordance with Section 5.2; *provided*, that no Event of Default under this clause (b) shall be deemed to have occurred if no other Event of Default then exists and the funds reserved hereunder for the payment of Taxes, Other Charges or Insurance Premiums are sufficient to pay the same and Lender fails to pay the same when due;

(c)    the Policies are not kept in full force and effect or are not delivered to Lender upon request;

(d)    a Transfer other than a Permitted Transfer occurs;

(e)    any representation or warranty made by Borrower or Guarantor or in any Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower or Guarantor in connection with any Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made, which breach, to the extent the same was not intentional on the part of Borrower or Guarantor, as determined by Lender in its sole, but good faith judgment, is not cured within ten (10) Business Days after notice of such breach from Lender (provided such ten (10) Business Day cure period shall only apply if the nature of the breach is one that is reasonably susceptible of being cured within such ten (10) Business Day period). For the avoidance of doubt, in order to cure such breach, Borrower or Guarantor, as applicable, shall be required to cure the underlying state of facts and circumstances which caused such representation or warranty to be false or misleading as of the date made;

(f)    Borrower, Borrower Representative or Guarantor shall (i) make an assignment for the benefit of creditors or admit in writing its inability to pay its own debts as they become due, or (ii) shall generally not be paying its debts as they become due;

(g)    a receiver, liquidator or trustee shall be appointed for Borrower, Borrower Representative or Guarantor; or Borrower, Borrower Representative or Guarantor shall be adjudicated a bankrupt or insolvent; or any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Borrower Representative or Guarantor, as the case may be; or any proceeding for the dissolution or liquidation of Borrower, Borrower Representative or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Borrower Representative or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within ninety (90) days;

(h)    Borrower breaches any covenant contained in Sections 5.13, 5.15, 5.21, 5.22, 5.25, 5.27, 5.28, 5.31 or 5.32;

(i)    except as expressly permitted hereunder, the actual alteration, improvement, demolition or removal of all or any portion of the Improvements without the prior

102

written consent of Lender, except in connection with and in the ordinary course of the construction of the Project Improvements;

(j)    an Event of Default as defined or described elsewhere in this Agreement or in any other Loan Document occurs;

(k)    a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(l)    the occurrence of a Milestone Non-Compliance;

(m)    a default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this Section 8.1, for ten (10) days after notice to Borrower (or Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after written notice from Lender in the case of any other default; provided, however, that if such non-monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period, and Borrower (or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for an additional period of time as is reasonably necessary for Borrower (or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed sixty (60) days;

(n)    voluntary abandonment of the construction of the Project Improvements by Borrower, Borrower Representative, Guarantor or any Affiliate thereof;

(o)    an Event of Default as defined or described in the Project Loan Documents occurs;

(p)    if Substantial Completion has not occurred on or before the Substantial Completion Date;

(q)    if Borrower fails to comply with the Construction Schedule, subject to delays as a result of the occurrence of any Force Majeure Event, provided same shall be subject to the Force Majeure Delay Cap;

(r)    if Final Completion of the Improvements has not occurred on or prior to the Completion Date;

(s)    if any voucher or invoice is fraudulently submitted by Borrower or in connection with any Advance for services performed or for materials used in or furnished for the Property;

(t)    if other than as a result of Force Majeure; the construction of the Project Improvements is, at any time, (i) discontinued due to acts or matters within Borrower's control for a period of thirty (30) or more consecutive days; (ii) not carried on with reasonable dispatch; (iii) if Borrower is unable to satisfy any condition of Borrower's right to receive

103

Advances hereunder for a period in excess of thirty (30) days after Lender's refusal to make any further Advances; or (iv) the Construction Consultant determines that the construction of the Improvements will not be completed on or before the Substantial Completion Date;

(u)    if Borrower expressly confesses in writing to Lender its inability to continue or complete construction of the Project Improvements in accordance with this Agreement;

(v)    if Lender, the Construction Consultant or their representatives are not permitted at all reasonable times upon not more than two (2) Business Days' notice to enter upon the Property, inspect the Improvements and the construction thereof and all materials, fixtures and articles used or to be used in the construction and to examine all the Plans and Specifications, or if Borrower shall fail to furnish to Lender or its authorized representative, when requested upon not more than three (3) Business Days' notice, copies of the Plans and Specifications;

(w)    intentionally omitted;

(x)    failure of Guarantor to maintain at all times the Guarantor Financial Covenants;

(y)    Borrower fails to comply fully, completely and timely with the covenants and agreements set forth in Article 9;

(z)    Borrower shall fail, beyond any applicable grace or cure period, in the payment of any Leasehold Rents payable under the Ground Lease;

(aa)    there shall occur any default by Borrower under the Ground Lease, in the observance or performance of any term, covenant or condition of the Ground Lease on the part of Borrower to be observed or performed, and said default is not cured prior to the expiration of any applicable grace period therein provided;

(bb)    there shall occur any one or more of the events referred to in the Ground Lease which would permit the Ground Lessor to terminate the Ground Lease without notice or action by the Ground Lessor or which would permit the Ground Lessor to terminate the Ground Lease and the term thereof by giving notice to Borrower;

(cc)    if the leasehold estate created by the Ground Lease shall be surrendered or merged into the fee estate, or the Ground Lease shall be terminated or canceled for any reason or under any circumstances whatsoever without the prior written consent of Lender;

(dd)    if any of the terms, covenants or conditions of the Ground Lease shall in any manner be modified, changed, supplemented, altered or amended without the prior written consent of Lender;

(ee)    if one or more judgments or decrees shall be entered against Borrower involving in the aggregate a liability in excess of $1,000,000 or Guarantor involving in the aggregate a liability that would cause Guarantor to fail to satisfy the Guarantor Financial

*ACTIVE 45138641v14*

Covenants, and in either case, the same shall not have been vacated, bonded, satisfied or stayed pending appeal within sixty (60) days from the date of entry of such judgment (or within sixty (60) days after the termination of any stay thereon obtained within such aforementioned sixty (60) day period);

(ff)  if, after appointment and retention of a Manager, (i) a default by Borrower has occurred and continues beyond any applicable notice and cure periods under the Management Agreement, such default permits the Manager to terminate or cancel the Management Agreement, and the Manager so terminates or cancels the Management Agreement or (ii) the Management Agreement is terminated by Borrower or required by Lender to be terminated in accordance with the terms hereof, and, in either such case, a replacement manager approved by Lender in accordance with the terms hereof is not timely appointed pursuant to the provisions of this Agreement following such termination; or

(gg) a default beyond all applicable grace or notice and cure periods occurs under any term, covenant or provision set forth in the Hotel Management Agreement or Hotel SNDA, which default permits a party to terminate or cancel the Hotel Management Agreement or Hotel SNDA;

(hh) Borrower (i) voluntarily terminates or cancels the Hotel Management Agreement, or (ii) amends or modifies the Hotel Management Agreement in a manner that decreases, adversely impacts or impair Borrower's rights thereunder, or (iii) enters in any new Hotel Management Agreement or hotel management agreement, in each case, without Lender's prior written consent, or (iv) operates the Property under the name of any hotel chain or system other than "Hotel Barrière Le Fouquet's New York" without Lender's prior written consent;

(ii)  without Lender's prior written consent, any hotel and/or other material license relating to the operation of the Property as a hotel (including, but not limited to, any liquor licenses) ceases to be in full force and effect;

(jj)  the termination of the Hotel Management Agreement by Hotel Manager prior to the expiration date of the Hotel Management Agreement, or (ii) the expiration of the term of the Hotel Management Agreement prior to the Maturity Date.

(kk) Borrower's failure to pay any transfer or assignment fees required under or in connection with the Hotel Management Agreement and/or Hotel SNDA;

(ll)  If after the initial opening to the public of the hotel component of the Project Improvements, the Borrower ceases to continuously operate the Property or any material portion thereof as a hotel for any reason whatsoever (other than temporary cessation in connection with any repair or renovation thereof undertaken with the consent of Lender);

(mm)     If after the initial opening to the public of the hotel component of the Project Improvements, any liquor license relating to the Property ceases to be in full force and effect, and such liquor license is not restored within thirty (30) days, except with Lender's prior written consent;

*ACTIVE 45138641v14*

(nn) If, following a Special Guarantor Assumption Trigger Event, a Special Guarantor Assumption fails to occur; or

(oo) If Borrower fails to obtain or maintain the Interest Rate Protection Agreement, the Converted Interest Rate Protection Agreement or the Substitute Interest Rate Protection Agreement, as applicable, in accordance with the terms and provisions of this Agreement, and such failure continues for ten (10) Business Days after written notice thereof from Lender to Borrower.

**8.2** <u>Remedies</u>.

**8.2.1** **Acceleration**. Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in paragraph (f) or (g) of Section 8.1), and at any time and from time to time thereafter, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property; including declaring the Debt to be immediately due and payable (including unpaid interest, Default Rate interest (as applicable), Late Payment Charges, Minimum Multiple Payment, Extension Exit Fee (if applicable), Prepayment Fee and any other amounts owing by Borrower), without notice or demand (other than notice of the amounts due); and upon any Event of Default described in paragraph (f) or (g) of Section 8.1, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges, Minimum Multiple Payment, Extension Exit Fee (if applicable), Prepayment Fee and any other amounts owing by Borrower) shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

**8.2.2** **Remedies Relating to Project Improvements**.

(a) Upon the occurrence and during the continuation of an Event of Default, Lender may (but shall not be obligated to) cause the Project Improvements to be completed and may enter upon the Property and construct, equip and complete the Improvements in accordance with the Plans and Specifications, with such changes therein as Lender may, from time to time, and in its sole discretion, deem appropriate. In connection with any construction of the Project Improvements undertaken by Lender pursuant to the provisions of this Section, Lender may:

(i) use any funds of Borrower, including any balance which may be held by Lender as security or in escrow and any Undisbursed Loan Proceeds;

(ii) employ existing Contractors and Subcontractors, agents, architects, engineers, and the like, or terminate the same and employ others;

(iii) employ security watchmen to protect the Property;

(iv) make such additions, changes and corrections in the Plans and Specifications as shall, in the judgment of Lender, be necessary or desirable;

106

(v)    take over and use any and all personal property contracted for, leased or purchased by Borrower, if appropriate, or dispose of the same as Lender sees fit;

(vi)    execute all applications and certificates on behalf of Borrower which may be required by any Governmental Authority or Legal Requirement or contract documents or agreements;

(vii)    pay, settle or compromise all existing or future bills and claims which are or may be Liens against the Property, or may be necessary for the completion of the Improvements or the clearance of title to the Property, including all Taxes and Other Charges;

(viii)    complete the marketing, sale and leasing of saleable or leasable space in the Improvements, enter into leases and modify or amend existing leases, all as Lender shall deem to be necessary or desirable and all on terms acceptable to Lender;

(ix)    prosecute and defend all actions and proceedings in connection with the construction of the Project Improvements or in any other way affecting the Property, the Improvements and take such action and require such performance as Lender deems necessary under the Payment and Performance Bonds; and

(x)    take such other action under any Loan Document, or refrain from acting under any Loan Document, as Lender may, in its sole and absolute discretion, from time to time determine, and without any limitation whatsoever, to carry out the intent of this Section.  Borrower shall be liable to Lender for all costs paid or incurred for the construction, completion and equipping of any of the Improvements, whether the same shall be paid or incurred pursuant to the provisions of this Section or any other provisions hereof or of any other Loan Document, and all payments made or liabilities incurred by Lender hereunder of any kind whatsoever shall be deemed Advances made to Borrower under this Agreement and shall be secured by the Mortgage and the other Loan Documents.

(b)    To the extent that any costs so paid or incurred by Lender, exceed the original principal amount of the Loan, such excess costs shall be paid by Borrower to Lender on demand, with interest thereon at the Default Rate until paid; and Borrower shall execute such notes or amendments to the Note as may be requested by Lender to evidence Borrower's obligation to pay such excess costs and until such notes or amendments are so executed by Borrower, Borrower's obligation to pay such excess costs shall be deemed to be evidenced by this Agreement. In the event Lender takes possession of the Property and assumes control of such construction as aforesaid, Lender shall not be obligated to continue such construction longer than Lender shall see fit and may thereafter, at any time, change any course of action undertaken by it or abandon such construction and decline to make further payments for the account of Borrower whether or not the Property shall have been completed.

**8.2.3    Remedies Cumulative**.    Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall

107

have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Mortgage has been foreclosed, the Property has been sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.  To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its discretion.

        **8.2.4**      **Severance**.  Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents in such denominations and priorities of payment and liens as Lender shall determine in its discretion for purposes of evidencing and enforcing its rights and remedies.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.

        **8.2.5**      **Delay**.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon.  Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Mortgage to the extent necessary to foreclose on all or any portion of the Property, the Rents, Cash Management Accounts or any other collateral.

        **8.2.6**      **Lender's Right to Perform**.  If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of five (5) Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon

demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Mortgage and other Loan Documents) and shall bear interest thereafter at the Default Rate. Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

## 9.    **SPECIAL PROVISIONS**

### 9.1    **Sale of Note and Secondary Market Transaction**.

**9.1.1    General; Borrower Cooperation**.  Lender shall have the right at any time and from time to time, at no cost or expense to Borrower other than the fees and expenses of its own counsel, (i) to sell or otherwise transfer the Loan or any portion thereof or the Loan Documents or any interest therein to one or more investors or (ii) to sell participation interests in the Loan to one or more investors (each such sale, assignment, participation, is referred to herein as a "*Secondary Market Transaction*").  In connection with any Secondary Market Transaction, Borrower shall, at Borrower's reasonable expense, use all reasonable efforts and cooperate fully and in good faith with Lender and otherwise assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace in connection with any such Secondary Market Transactions, including:  (a) to (i) to provide such financial and other information with respect to the Property, Borrower and its Affiliates, (ii) provide business plans and budgets relating to the Property and (iii) perform or permit or cause to be performed or permitted such site inspection, appraisals, surveys, market studies, environmental reviews and reports, engineering reports and other due diligence investigations of the Property, as may be reasonably requested from time to time by Lender or as may be necessary or appropriate in connection with a Secondary Market Transaction (the items provided to Lender pursuant to this paragraph (a) being called the "*Provided Information*"), together, if customary, with appropriate verification of and/or consents to the Provided Information through letters of auditors or opinions of counsel of independent attorneys acceptable to Lender; (b) at Borrower's expense, cause counsel to render opinions as to non-consolidation and any other opinion customary in transactions with respect to the Property, Borrower and its Affiliates, which counsel and opinions shall be reasonably satisfactory to Lender; (c) make such representations and warranties as of the closing date of any Secondary Market Transaction with respect to the Property, Borrower and the Loan Documents as are customarily provided in such transactions and as may be reasonably requested by Lender and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents; (d) provide current certificates of good standing and qualification with respect to Borrower and Borrower Representative from appropriate Governmental Authorities; and (e) execute such amendments to the Loan Documents and Borrower's organizational documents, as may be requested by Lender or otherwise to effect a Secondary Market Transaction, provided that nothing contained in this subsection (e) shall result in a material economic change in the transaction.  The Secondary Market Transaction shall be undertaken at no cost or expense to Borrower other than the fees of its own counsel.  Borrower's cooperation obligations set forth herein shall continue until the Loan has been paid in full.

The initial Lender, acting solely for this purpose as an agent of Borrower, shall maintain such books and records as are necessary for the recordation of the names and addresses of Lenders, the amount of each Lender's proportionate share of the Loan and the name and address of each

109

Lender's agent for service of process (the "**_Register_**"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Administrative Agent, and any Lender may treat each person or entity whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection and copying by the Borrower or any Lender during normal business hours upon reasonable prior notice to the initial Lender.

If Lender sells participation interests in the Loan, Lender shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loan or other obligations under the Loan Documents (the "**_Participant Register_**"). Lender shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in the Loan or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

      **9.1.2**    **Severance of Loan**. Lender shall have the right, at any time (whether prior to, in connection with, or after any Secondary Market Transaction), with respect to all or any portion of the Loan, to modify, split and/or sever all or any portion of the Loan as hereinafter provided. Without limiting the foregoing, Lender may (i) cause the Note and the Mortgage to be split into a first and second mortgage loan, (ii) create one more senior and subordinate notes (*i.e.*, an A/B or A/B/C structure), (iii) create multiple components of the Note or Notes (and allocate or reallocate the principal balance of the Loan among such components) or (iv) otherwise sever the Loan into two or more loans secured by mortgages and by a pledge of partnership or membership interests (directly or indirectly) in Borrower (*i.e.,* a senior loan/mezzanine loan structure), in each such case, in whatever proportion and whatever priority Lender determines; provided, however, in each such instance the outstanding principal balance of all the Notes evidencing the Loan (or components of such Notes) immediately after the effective date of such modification equals the Outstanding Principal Balance immediately prior to such modification and the weighted average of the interest rates for all such Notes (or components of such Notes) immediately after the effective date of such modification equals the interest rate of the original Note immediately prior to such modification. If requested by Lender, Borrower (and Borrower's constituent members, if applicable, and Guarantor) shall execute within three (3) Business Days after such request, such documentation as Lender may reasonably request to evidence and/or effectuate any such modification or severance.

      This Section 9.1 shall be construed so that this Agreement and the Note are at all times maintained in "registered form" within the meanings of the Code Sections 163(f), 871(h)(2) and 881(c)(2) and any related United States Treasury Regulations.

*ACTIVE 45138641v14*

## 10.    **MISCELLANEOUS**

**10.1    Exculpation**.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest and rights under the Loan Documents, or in the Property, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document.  The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (iii) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) constitute a prohibition against Lender to commence any other appropriate action or proceeding in order for Lender to fully realize the security granted by the Mortgage or to exercise its remedies against the Property; or (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any actual losses, damages (excluding punitive, special and consequential damages unless asserted against Lender by a third party), out-of-pocket costs and expenses, liabilities, claims or other obligations actually incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "***Borrower's Recourse Liabilities***"):

(a)    Fraud or intentional misrepresentation by Borrower, Borrower Representative, or Guarantor in connection with the Loan;

(b)    intentional physical waste of the Property or any portion thereof, or after an Event of Default, the removal or disposal of any portion of the Property;

(c)    any Proceeds paid by reason of any Insured Casualty or any Award received in connection with a Condemnation or other sums or payments attributable to the Property not applied in accordance with the provisions of the Loan Documents (except to the extent that Borrower did not have the legal right, because of a bankruptcy, receivership or similar judicial proceeding, to direct disbursement of such sums or payments);

(d)    all Rents of the Property received or collected by or on behalf of the Borrower after an Event of Default and not applied to payment of Principal and interest due under the Note, and to the payment of actual and reasonable operating expenses of the Property, as they become due or payable (except to the extent that such application of such funds is prevented by bankruptcy, receivership, or similar judicial proceeding in which Borrower is legally prevented

111

from directing the disbursement of such sums); the making of any assignment of Rents for the benefit of another Person not permitted hereunder;

(e)    misappropriation (including failure to turn over to Lender on demand following an Event of Default) of tenant security deposits and rents collected in advance, or of funds held by Borrower for the benefit of another party; the failure to adhere to the cash management system or any of the provisions of Article III of this Agreement;

(f)    the failure to pay Taxes and Other Charges, provided Borrower shall not be liable to the extent funds to pay such amounts are available in the Tax and Insurance Subaccount and Lender failed to pay same upon the satisfaction by Borrower of the conditions to release same;

(g)    the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including Sections 4.21 and 5.8, and clauses (viii) through (xi) of Section 5.30; provided, that the obligations and liabilities pursuant to this Section 10.1(g) shall fully survive the repayment in full of the Debt until the date (the "**Termination Date**") that is two (2) years from the repayment of the Loan in full accordance with the terms of the Loan Documents (the "**Qualified Anniversary**") provided that the Lender receives an environmental report (and any follow up recommended reports or actions) satisfactory to the Lender in the Lender's sole discretion regarding the Property (the "**Report**"), which Report must: (i) be obtained at Borrower's sole cost and expense, (ii) dated no earlier than 60 days following the Qualified Anniversary; (iii) be from an environmental engineer or consultant that is on the Lender's then-current approved list and engaged under an engagement agreement with Indemnitee; (iv) show that the Property is free from Hazardous Substances (except those previously disclosed in the Environmental Report and as may be otherwise permitted under the terms and conditions of this Agreement or the other Loan Documents); (v) not identify any condition or circumstance that could reasonably be expected to lead to contamination by Hazardous Substances; and (vi) not identify any threat of any Hazardous Substances on the Property or of the Property contaminating adjacent properties with Hazardous Substances, in Lender's sole discretion, and *provided*, *however*, that to the extent that, as of the Termination Date, there shall be pending or overtly threatened any environmental claim, investigation, violation or action related to the Property, or related to this Agreement or Section 4.21, 5.8 or clauses (viii) through (xi) of Section 5.30 of this Agreement, then the Termination Date will be extended until the date upon which all such claims, investigations, violations and actions have been resolved to the satisfaction of Lender in its sole discretion.  Notwithstanding the provisions of this Agreement to the contrary, the liabilities and obligations of Borrower under this clause (g) shall not apply to the extent that Borrower can prove that such liabilities and obligations (i) first arose (as distinguished from arising prior to but first discovered) solely from the introduction and initial release of Hazardous Substances on the Premises subsequent to the date that Lender or its nominee acquired title to the Premises, whether at a foreclosure sale, private power of sale or Lender's acceptance of a tender of a deed in lieu of foreclosure by Borrower and (ii) were not the result of any act or omission of Borrower or any of Borrower's affiliates, agents or contractors in, on, under or near the Premises;

(h)    the gross negligence, willful misconduct, criminal acts of Borrower;

(i)     failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property unless such charges are the subject of a bona fide dispute in which Borrower is contesting the amount or validity thereof;

(j)     a breach of the covenants set forth in Section 5.13;

(k)     the failure of Borrower to maintain the Interest Rate Protection Agreement, the Converted Interest Rate Protection Agreement or the Substitute Interest Rate Protection Agreement, as applicable, in accordance with the terms and provisions of this Agreement;

(l)     any amendment, modification, change, supplement, alteration, termination or cancellation of the Management Agreement without Lender's consent;

(m)     the appointment of a Manager by Borrower without the prior written consent of Lender;

(n)     the failure to pay any recording taxes, documentary stamp and intangible taxes, if any, due in connection with Lender's exercise of its remedies hereunder in accordance with this Agreement;

(o)     all amounts paid by Lender in connection with any transfer or assignment fees payable under or in connection with the Hotel Management Agreement and/or Hotel SNDA;

(p)     (1) the termination of the Hotel Management Agreement by either Borrower or Hotel Manager prior to the expiration date of the Hotel Management Agreement without Lender's consent, (2) any amendment or modification of the Hotel Management Agreement by Borrower or Hotel Manager without Lender's consent, or (3) the expiration of the term of the Hotel Management Agreement prior to the Maturity Date;

(q)     Any transfer fees required to be paid by Lender or its Affiliates pursuant to the terms of the Ground Lease in connection with any enforcement action, foreclosure or subsequent transfer of the Property after a foreclosure;

(r)     The failure by APW Avenue Group LTD. to maintain $50,000,000 in net worth in accordance with Section 16(b) of that certain Guaranty, dated as of [the Closing Date], made by APW Avenue Group LTD. in favor of Ground Lessor; or

(s)     Any extension payments paid by Lender to Ground Lessor to extend the Hotel Opening Deadline (as defined in the Ground Lease).

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no

113

further force and effect, and the Debt shall be fully recourse to Borrower in the event that one or more of the following occurs (each, a "***Springing Recourse Event***"):  (i) an Event of Default described in Section 8.1(d) shall have occurred or (ii) a breach of the covenants set forth in Section 5.13 which results in the substantive consolidation of Borrower with another entity, or (iii) the occurrence of any condition or event described in either Section 8.1(f)(i) or Section 8.1(g) with respect to Borrower or Borrower Representative and, with respect to such condition or event described in Section 8.1(g), either Borrower, Borrower Representative, Guarantor or any Person owning an interest (directly or indirectly) in Borrower, Borrower Representative or Guarantor consents to, aids, solicits, supports, or otherwise cooperates or colludes to cause such condition or event, (iv) Borrower creates, incurs, assumes, permits or suffers to exist any Lien on all or any portion of the Property or any direct or indirect legal or beneficial ownership interest in Borrower, excepting only the Permitted Encumbrances, or incurs any indebtedness other than the Permitted Indebtedness; (v) an act or omission of any of Borrower, Borrower Representative or Guarantor or Affiliate of any thereof, taken or made in bad faith, which hinders, delays or interferes with Lender's enforcement of its rights hereunder or under any other Loan Document or the realization of the collateral, including the assertion by any of Borrower, Borrower Representative or Guarantor of defenses or counterclaims unless Borrower, Borrower Representative or Guarantor, as the case may be, is the prevailing party in the action in which such defense or counterclaim is asserted; (vi) the amendment, modification or termination of the Ground Lease or the waiver of any terms or provision of the Ground Lease made without Lender's prior written consent; or (vii) the Hotel Management Agreement (or the right to operate the Property thereunder) is cancelled, surrendered or terminated by, or as a result of, the acts or omissions of Borrower or an Affiliate of Borrower without the prior consent of Lender.

**10.2** **Brokers and Financial Advisors**.  (1) Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loan other than [_____] ("***Broker***") whose fees shall be paid by Borrower pursuant to a separate agreement.  Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person (including Broker) that such Person acted on behalf of Borrower in connection with the transactions contemplated herein.  The provisions of this Section 10.2 shall survive the expiration and termination of this Agreement and the repayment of the Debt.

(a)    Notwithstanding anything in Section 10.2(a) above to the contrary, Borrower hereby acknowledges that (i) at Lender's sole discretion, Broker may receive further consideration from Lender relating to the Loan or any other matter for which Lender may elect to compensate Broker pursuant to a separate agreement between Lender and Broker and (ii) Lender shall have no obligation to disclose to Borrower the existence of any such agreement or the amount of any such additional consideration paid or to be paid to Broker whether in connection with the Loan or otherwise.

**10.3** **Retention of Servicer**.  Lender reserves the right to retain the Servicer to act as its agent hereunder with such powers as are specifically delegated to the Servicer by Lender, whether pursuant to the terms of this Agreement, any pooling and servicing agreement or similar agreement entered into as a result of a Secondary Market Transaction, the Deposit Account Agreement or

114

otherwise, together with such other powers as are reasonably incidental thereto. Borrower shall pay any reasonable fees and expenses of the Servicer (the "*Servicing Fee*") payable in monthly installments on each Payment Date in addition to the payment of any interest and Principal due under the Note on such Payment Date, provided, however, that prior to the continuance of an Event of Default, the servicing fee shall equal not less than 0.10% of the Maximum Loan Commitment Amount per annum.

**10.4    Survival**.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement.  All Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender, but not any third party purchaser at any foreclosure sale.

**10.5    Lender's Discretion**.  Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

**10.6    Governing Law**.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE VALIDITY AND THE ENFORCEABILITY OF ALL LOAN DOCUMENTS AND THE DEBT.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE

115

STATE OF NEW YORK PURSUANT TO § 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE, AT LENDER'S ELECTION, INSTITUTED IN ANY FEDERAL OR STATE COURT IN (I) NEW YORK COUNTY, NEW YORK, (II) THE STATE IN WHICH THE PROPERTY IS LOCATED, (III) THE STATE OF DOMICILE OF THE BORROWER OR (IV) THE STATE OF DOMICILE OF THE GUARANTOR AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, NEW YORK.

**10.7** **Modification, Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount.

**10.8** **Trial by Jury**.  BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**10.9** **Headings/Exhibits**.  The Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other

116

purpose.  The Exhibits attached hereto, are hereby incorporated by reference as a part of the Agreement with the same force and effect as if set forth in the body hereof.

**10.10  Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**10.11  Preferences**.  Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Debt.  To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.  This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**10.12  Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly requires the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to Borrower.

**10.13  Remedies of Borrower**.  If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf.

**10.14  Prior Agreements**.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**10.15  Offsets, Counterclaims and Defenses**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against

117

it by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents. Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**10.16    Publicity**. All news releases, publicity or advertising by Borrower, Lender or any of their respective Affiliates through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender or any affiliate of Lender, a Loan purchaser, the Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of the other party, such approval not to be unreasonably withheld, delayed or conditioned.

**10.17    No Usury**. Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 10.17 shall control every other agreement in the Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the Outstanding Principal Balance and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**10.18    Conflict; Construction of Documents**. In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation and drafting of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them.

**10.19    No Third Party Beneficiaries**. The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer

118

upon anyone other than the Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**10.20**   **Minimum Multiple Payment**.  Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents and (b) if payments of Principal are made to Lender prior to the Stated Maturity Date, for any reason whatsoever, whether voluntary, as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs.  For these reasons, and to induce Lender to make the Loan, Borrower agrees that, all prepayments, if any, whether voluntary or involuntary, will be accompanied by the Minimum Multiple Payment provided, notwithstanding the foregoing to the contrary, no Minimum Multiple Payment shall be due in connection with any Casualty/Condemnation Prepayment.  Such Minimum Multiple Payment shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale. Borrower further acknowledges that (A) it is a knowledgeable real estate developer and/or investor; (B) it fully understands the effect of the provisions of this Section 10.20, as well as the other provisions of the Loan Documents; (C) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay the Minimum Multiple Payment; and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions.  Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Minimum Multiple Payment and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

**10.21**   **Assignment**.  The Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may be assigned by Lender and any of its successors and assigns to any Person at any time in its discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise.  Upon such assignment, all references to Lender in this Loan Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender.  Borrower may not assign its rights, title, interests or obligations under this Loan Agreement or under any of the Loan Documents.

**10.22**   **Certain Additional Rights of Lender**.  Notwithstanding anything to the contrary which may be contained in this Agreement, Lender shall have:

(i)      the right to routinely consult with Borrower's management regarding the significant business activities and business and financial developments of Borrower, provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances.  Consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times;

(ii)     the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower at any time upon reasonable notice;

119

(iii)    the right, in accordance with the terms of this Agreement, to receive monthly, quarterly and year-end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding indebtedness;

(iv)    the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict financing to be obtained with respect to the Property so long as any portion of the Debt remains outstanding;

(v)    the right, without restricting any other right of Lender under this Agreement or the other Loan Documents (including any similar right), to restrict, upon the occurrence of an Event of Default, Borrower's payments of management, consulting, director or similar fees to Affiliates of Borrower from the Rents;

(vi)    the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any operating budget and/or capital budget of Borrower;

(vii)    the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any other significant property (other than personal property required for the day to day operation of Property); and

(viii)    the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict the transfer of interests in Borrower held by its members, and the right to restrict the transfer of interests in such member, except for any transfer that is a Permitted Transfer.

The rights described above may be exercised directly or indirectly by any Person that owns substantially all of the ownership interests in Lender.  The provisions of this Section are intended to satisfy the requirement of management rights for purposes of the Department of Labor "plan assets" regulation 29 C.F.R., Section 2510.3-101.

**10.23  Set-Off**.  In addition to any rights and remedies of Lender provided by this Loan Agreement and by law, Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

**10.24  Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

120

**10.25  Proof of Claim**.  In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other proceedings affecting Borrower or Guarantor, or any of their respective creditors or property, Lender, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have the claims of Lender allowed in such proceedings for the entire Debt at the date of the institution of such proceedings and for any additional amount which may become due and payable by Borrower hereunder after such date.

**10.26  Waiver of Stay**.  Borrower agrees (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury or other law wherever enacted, now or at any time hereafter in force, which would prohibit or forgive Borrower from paying all or any portion of the Debt or which may affect the covenants or the performance of this Agreement; and Borrower (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the holders, but will suffer and permit the execution of every such power as though no such law had been enacted.

## 11.  PROJECT LOAN

**11.1  Compliance with Project Loan Documents**:  Borrower shall (a) pay all principal, interest and other sums required to be paid by Borrower under and pursuant to the provisions of the Project Loan Documents and (b) diligently perform and observe all of the terms, covenants and conditions of the Project Loan Documents on the part of Borrower to be performed and observed, unless such performance or observance shall be waived in writing by Lender.

**11.2  Project Loan Defaults**.  Without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, if there shall occur any default under the Project Loan Documents, Borrower hereby expressly agrees that Lender shall have the immediate right, upon the occurrence of an "Event of Default" under any of the Project Loan Documents (or, if the Loan shall have been sold, transferred or otherwise assigned to an unaffiliated third-party, at any time after the date which is three (3) Business Days prior to the date on which such default will become an "Event of Default" under any of the Project Loan Documents (whether as a result of passage of time and/or the giving of notice or otherwise)), without prior notice to Borrower, but shall be under no obligation:  (i) to pay all or any part of the Project Loan and any other sums that are then due and payable, and to perform any act or take any action on behalf of Borrower as may be appropriate, to cause all of the terms, covenants and conditions of the Project Loan Documents on the part of Borrower to be performed or observed thereunder to be promptly performed or observed; and (ii) to pay any other amounts and take any other action as Lender, in its sole and absolute discretion, shall deem advisable to protect or preserve the rights and interests of Lender in the Project Loan.  All sums so paid and the costs and expenses incurred by Lender in exercising rights under this Section 11.2 (including, without limitation, reasonable attorneys' fees) (i) shall constitute additional advances of the Loan to Borrower, (ii) shall increase the then unpaid Principal, (iii) shall bear interest at the Default Rate for the period from the date that such costs or expenses were incurred to the date of payment to Lender, (iv) shall constitute a portion of the Debt, and (v) shall be secured by the Mortgage.

121

12.    **<u>INTERCREDITOR AGREEMENT</u>**.    Borrower hereby acknowledges and agrees that any intercreditor agreement entered into between Lender and Mezzanine Lender will be solely for the benefit of Lender and Mezzanine Lender, and that Borrower shall not be intended third-party beneficiary of any of the provisions therein, shall have no rights thereunder and shall not be entitled to rely on any of the provisions contained therein.    Lender and Mezzanine Lender shall have no obligation to disclose to Borrower the contents of the intercreditor agreement.    Borrower's obligations hereunder are and will be independent of such intercreditor agreement and shall remain unmodified by the terms and provisions thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

*ACTIVE 45138641v14*

**IN WITNESS WHEREOF**, the parties hereto have caused this Building Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**

**CBCS WASHINGTON STREET LP**,

By: _____
      Name:
      Title:

**LENDER**

**[HANA FINANCIAL INVESTMENT OR AFFILIATE]**,

By: _____
      Name:
      Title:

123

**<u>Schedule 1</u>**

**<u>FORM OF ANTICIPATED COST REPORT (ACR)</u>**

*ACTIVE 45138641v14*

GT Draft 10/3/19

## Schedule 2

### Form of Requisition

FORM OF BORROWER'S REQUISITION

**BORROWER'S REQUISITION**
**([BUILDING LOAN][PROJECT LOAN])**

[Letterhead of Borrower]

_____ __, 20__

[_____]
c/o [_____].
[_____]
[_____]

        Re:     [_____], New York, New York

Ladies and Gentlemen:

        In accordance with that certain [Building][Project] Loan Agreement (the "**Loan Agreement**") dated as of _____ __, 201__, between [_____], a [_____] ("**Lender**"), and [_____], a [_____] ("**Borrower**"), this letter will serve as the Borrower's Requisition requesting the sum of $_____ under the Loan Agreement.  All capitalized terms used herein, and not otherwise defined herein, have the same meaning as in the Loan Agreement.

The draw amount for this month is as follows:

| | |
|---|---|
| Current Total Draw Amount: | $_____ |
| less interest/fees already capitalized this period: | ($_____) |
| Amount of New loan proceeds: | $_____ |
| less Lender holdbacks for reimbursements: | ($_____) |
| Net Amount of Wire: | $_____ |

Please wire the funds on **[DATE]** as follows:

        Amount:
        Bank:
        ABA#:
        Account:
        Account Number:

        The support for the above Advance is provided in the attached draw schedules.  In addition, attached hereto as Schedule 1 is a true, correct and complete Construction Budget Status

2 — 1

Report as of the date hereof.  Please advise the undersigned as soon as the Advance has been credited.

Borrower hereby acknowledges that it has no outstanding defenses, claims, counterclaims or offsets against Lender under the Loan Documents.

Borrower represents and warrants to Lender as of the date hereof as follows:

(i)     All amounts shown on all previous Borrower's Requisitions have been paid in full and all amounts requested herein have been paid or will be paid in full from the proceeds of the disbursement requested hereby.

(ii)    All work on the Property to the date of this Requisition has been performed in accordance with the Plans and Specifications, as defined in the Loan Agreement, and there have been no changes to the Plans and Specifications except as approved by Lender or as authorized by the Loan Agreement.

(iii)   All labor, materials, and/or services shown on each draw schedule, for which funds have been or are requested, are incorporated into the Property, as defined in the Loan Agreement, at this date, or in the case of Stored Materials, have been stored and/or deposited in accordance with, and otherwise satisfy the requirements of, the Loan Agreement.

(iv)    None of the amounts for which payment is requested in this Requisition have been included in any prior Borrower's Requisition.

(v)     All required Governmental Approvals of the Plans and Specifications by any Governmental Authority have been obtained.

(vi)    There have been obtained all required Governmental Approvals by all Governmental Authorities required to complete the work described in the Plans and Specifications which work is now in progress or was previously completed.

(vii)   All work on the Property, which has been completed or which is in progress as of this date and which is described on the Plans and Specifications, does not violate any applicable Legal Requirement.

(viii)  There is no Event of Default under the Loan Agreement.

(ix)    The representations and warranties reaffirmed by this request for disbursement of Loan proceeds pursuant to the Loan Agreement are true and correct in all material respects on and as of the date of this Borrower's Requisition and will be true and correct in all material respects on and as of the date of such disbursement (except to the extent that any representations and warranties are not true due to a change in facts or circumstances, the occurrence of any event and/or the existence of any conditions which is permitted to have occurred pursuant to this Agreement or which does not and will not result in a Default);.

(x)     The Improvements have not been injured or damaged by fire, explosion, accident, flood or other casualty, except as previously disclosed in writing to Lender.

2 — 2

*ACTIVE 45138641v14*

2 — 3

Very truly yours,

[_____],
a [_____]

By:_____
Name:  [_____]
Title:  [_____]

2 — 4

## Schedule 3

## ARCHITECT'S COMPLETION CERTIFICATE

[Letterhead of Borrower's Architect]

[_____]
c/o [_____].
[_____]
[_____]

Re:     [_____], New York, New York

Ladies and Gentlemen:

The undersigned ("**Architect**") understands that [_____], a [_____  _____] ("**Lender**") has made a loan (the "**Loan**") to [_____], a [_____  _____] ("**Borrower**"), which Loan, among other things, was used to finance construction and renovation by Borrower of the improvements (the "**Improvements**") on the premises more particularly described in **Exhibit A** hereto (the "**Land**") and was advanced pursuant to that certain Building Loan Agreement and that certain Project Loan Agreement entered into by Lender and Borrower as of _____, 201_. Capitalized terms not defined herein shall have the meanings ascribed to them in the Building Loan Agreement.

Architect prepared certain Plans and Specifications in connection with the construction and renovation of the Improvements. In addition, Architect has been engaged to act as the Architect for the Improvements and such engagement has been confirmed by that certain Agreement for Architectural Services between Borrower and Architect dated [_____].

Based on its on-site observation of the Improvements, including, without limitation, the review of the Plans and Specification, each to the date of this Certificate, to its best professional knowledge, Architect states to Lender that except as the same relates to Punch List Items (as hereinafter defined), the Improvements and its contemplated uses, as identified to us by Borrower (that is, as a [_____]), comply with all applicable building codes and all other governmental rules, laws and regulations relating to its design and engineering, to the extent applicable and in effect as of the date hereof, and a permanent certificate of occupancy for the Property.

To the best of its professional knowledge, Architect states to Lender that the Improvements comply (and after the completion of the Punch List Items will comply) with all applicable requirements of the applicable zoning and building laws and ordinances which are in effect as of the date hereof.

To the best of its professional knowledge, there is (and after the completion of the Punch Line Items will be) sufficient access and egress to and from the Land and the Improvements for their use for their intended purposes.

Architect hereby certifies to the best of its professional knowledge to Lender that subject only to the completion of the Punch List Items, the Improvements have been completed in

3 — 1

*ACTIVE 45138641v14*

a good and workmanlike manner in accordance with the Plans and Specifications. The term "Punch List Items" shall mean the work set forth on **Exhibit B** hereto, the completion of which will not cost in excess of $**[X]** in the aggregate, and such work shall be limited to site work, interior finishes, mechanical adjustments, landscaping and decorative work. If the completion of the Punch List Items is diligently pursued, completion of all Punch List Items is expected within [_____(__)] months from the date hereof.

Signed this ___ of __ 20_.

**[Architect]**

By:_____
         Name:
         Title:

By signing below, [_____] hereby estimates, to the best of its professional knowledge, that the cost to complete the Punch List Items will not exceed $**[X]** in the aggregate.

**[Construction Manager]**

By:_____
         Name:
         Title:

3 — 2

**Exhibit A**

**(Legal Description of Land)**

*ACTIVE 45138641v14*

GT Draft 10/3/19

### Schedule 4

## FORM OF LIEN WAIVER

### *FORM OF LIEN WAIVER BY TRADE CONTRACTOR*

**WAIVER OF LIEN** dated as of _____, 20___, made by _____, a _____ having an office at _____ ("**Contractor**") to and for the benefit of **[INSERT FULL NAME OF CONSTRUCTION MANAGER]**, a _____ [corporation] having an office at _____ ("**Construction Manager**"), [_____] LLC a [_____ _____] having an office at c/o [_____], [_____], [_____], [_____] ("**Owner**") and [_____], a [_____ _____] ("**Lender**"), pursuant to that certain Trade contract dated as of _____, 20__, between Contractor and Construction Manager (as amended and supplemented from time to time, the "**Contract**"). Words and phrases defined in that certain [Guaranteed Maximum Price Contract] dated as of _____, 20__, between Construction Manager and Owner, as amended and supplemented from time to time, shall have the same meanings in this instrument.

This waiver of lien is given in connection with the construction of the Project and the payment to Contractor of sums in the amount of $_____ requisitioned by Contractor pursuant to its Requisition No. _____ dated _____, 20__ (the "**Requisition**") for Work supplied, furnished, or performed for the Project to the date of the Requisition.

For the benefit of Construction Manager, Owner and Lender, Contractor does hereby certify and acknowledge that:

(a) Contractor has supplied Construction Manager with a list of all subcontractors of Contractor supplying, furnishing, or performing Work or services, or furnishing materials or equipment, for the Project, and that such list is true and complete as of the date of the Requisition;

(b) Contractor has received all sums due and owing to Contractor, other than sums (if any) withheld by Construction Manager pursuant to the Contract, for Work, materials and equipment performed, furnished, or supplied for the Project to the date of the Requisition immediately prior to the Requisition (the "**Prior Requisition Date**");

(c) in consideration of such payment, Contractor (for itself and its subcontractors and their respective successors and assigns) does hereby forever release and waive any and all rights, claims and demands which Contractor has, or may have, to file any Lien or notice of Lien against the Project or any property of Construction Manager or Owner, on account of, or deriving from, Work, materials and/or equipment supplied, furnished and/or performed for the Project to the Prior Requisition Date; and

(d) Contractor hereby agrees to indemnify and hold harmless Construction Manager, Owner and Lender from and against any and all rights, claims and demands of any of Contractor's subcontractors on account of, or deriving from, Work,

4— 1

materials and/or equipment supplied, furnished and/or performed by any of them for the Project to the Prior Requisition Date.

(e)     the following amounts are true and accurate as of the date hereof:

| | |
|---|---|
| Original Contract Amount: | $_____ |
| Change Order Amount: | $_____ |
| Adjusted Contract Amount: | $_____ |
| Amount of Work Done to Date: | $_____ |
| Retainage Amount Not Yet Due: | $_____ |
| Net Amount Due to Date: | $_____ |
| | |
| Total Payments Received to Date: | $_____ |

**IN WITNESS WHEREOF**, Contractor has caused this Waiver of Lien to be duly executed, and the seal of Contractor to be affixed, as of the date of the Requisition, by the undersigned officer of Contractor, who is duly authorized to do so.

_____

By:_____
        Name:
        Title:

Subscribed and sworn to before
me this ___ day of _____,200___.


Notary Public

4— 2

## **Schedule 5**

## **Exceptions to Representations and Warranties**

*ACTIVE 45138641v14*

GT Draft 10/3/19

## Schedule 6

## Intentionally Omitted

*ACTIVE 45138641v14*

GT Draft 10/3/19

## Schedule 7

## Organization of Borrower

[Attached Hereto]

*ACTIVE 45138641v14*

GT Draft 10/3/19

## Schedule 8

## Definition of Special Purpose Bankruptcy Remote Entity

A "*Special Purpose Bankruptcy Remote Entity*" means (x) a limited liability company that is a Single Member Bankruptcy Remote LLC or (y) a corporation, limited partnership or limited liability company which at all times since its formation and at all times thereafter

(i)        was and will be organized solely for the purpose of (A) owning the Property or (B) acting as a general partner of the limited partnership that owns the Property or member of the limited liability company that owns the Property;

(ii)        has not engaged and will not engage in any business unrelated to (A) the ownership of the Property, (B) acting as general partner of the limited partnership that owns the Property or (C) acting as a member of the limited liability company that owns the Property, as applicable;

(iii)        has not had and will not have any assets other than those related to the Property or its partnership or member interest in the limited partnership or limited liability company that owns the Property, as applicable;

(iv)        except with respect to the Existing Proceeding, has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable);

(v)        if such entity is a limited partnership, has and will have, as its only general partner, a Special Purpose Bankruptcy Remote Entity;

(vi)        if such entity is a corporation, has and will have at least one (1) Independent Director, and has not caused or allowed and will not cause or allow the board of directors of such entity to take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless all of the directors and all Independent Directors shall have participated in such vote; the Independent Director may not be replaced on less than five (5) days prior written notice to Lender accompanied by a certification which includes the name of the successor Independent Director certifying that such Person meets the requirements of an Independent Director;

(vii)        if such entity is a limited liability company, has and will have at least one member that has been and will be a Special Purpose Bankruptcy Remote Entity that is the managing member of such limited liability company;

(viii)        if such entity is a limited liability company, has and will have articles of organization, a certificate of formation and/or an operating agreement, as applicable, providing that (A) such entity will dissolve only upon the bankruptcy of the managing member, (B) the vote of a majority-in-interest of the remaining members is sufficient to continue the life of the limited liability company in the event of such bankruptcy of the managing member and (C) if the vote of

8 — 1

a majority-in-interest of the remaining members to continue the life of the limited liability company following the bankruptcy of the managing member is not obtained, the limited liability company may not liquidate the Property without the consent of the Lender for as long as the Loan is outstanding;

(ix)    except with respect to the Existing Proceeding, has not, and without the unanimous consent of all of its partners, directors or members (including all Independent Directors and/or Independent Managers), as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest, take any Bankruptcy Action;

(x)    has remained and intends to remain solvent and has maintained and intends to maintain adequate capital in light of its contemplated business operations provided the foregoing shall not be construed to require any Member or other Person to contribute additional capital to Borrower;

(xi)    has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(xii)    has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns except to the extent that it (a) has been or is required to file consolidated tax returns by law or (b) is treated as a disregarded entity for federal or state tax purposes;

(xiii)    has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)    has not commingled and will not commingle its funds or assets with those of any other Person;

(xv)    has held and will hold its assets in its own name;

(xvi)    has conducted and will conduct its business in its name only, and has not and will not use any trade name,

(xvii)    has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person except as permitted by GAAP, *provided* that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(xviii)    has paid and will pay its own liabilities, including the salaries of its own employees (if any), out of its own funds and assets;

(xix)    has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(xx)    has maintained and will maintain an arm's-length relationship with its Affiliates;

8 — 2

(xxi)    (a)    if such entity owns the Property, has and will have no indebtedness other than the Permitted Indebtedness, or

(b)    if such entity acts as the general partner of a limited partnership which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as general partner of the limited partnership which owns the Property which (1) do not exceed, at any time, a maximum aggregate amount of one percent (1%) of the Original Principal Balance and the original principal balance of the Project Loan and the Mezzanine Loan, in the aggregate, [FOR MEZZANINE BORROWER: (1) $25,000] and (2) are paid within thirty (30) days of the date incurred, or

(c)    if such entity acts as a managing member of a limited liability company which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as a member of the limited liability company which owns the Property which (1) do not exceed, at any time, [a maximum aggregate amount of one percent (1%) of the Original Principal Balance and the original principal balance of the Project Loan and the Mezzanine Loan, in the aggregate, [FOR MEZZANINE BORROWER: (1) $25,000] and (2) are paid within thirty (30) days of the date incurred;

(xxii)    has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except for the Loan;

(xxiii)    has not and will not acquire obligations or securities of its partners, members or shareholders;

(xxiv)    has allocated and will allocate fairly and reasonably shared expenses, including shared office space;

(xxv)    except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xxvi)    has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxvii)    has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxviii) has not made and will not make loans to any Person;

(xxix)    has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it;

(xxx)    has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party;

8 — 3

(xxxi)   has and will have no obligation to indemnify its partners, officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation; and

(xxxii)   will consider the interests of its creditors in connection with all corporate, partnership or limited liability company actions, as applicable and its Independent Directors or Independent Managers shall owe duties to such entity as a stand-alone business entity, shall not consider the interests of the member or any direct or indirect beneficial owner of the member and shall consider the interests of the Lender;

(xxxiii)   its organizational documents shall provide upon the occurrence of a Bankruptcy Action, relief from the automatic stay arising under section 362 of the Bankruptcy Code shall automatically be granted in favor of the Lender, its successors and/or assigns, and such entity (a) shall consent to and not contest or oppose any motion made by the Lender for such relief and shall not seek to reinstate the automatic stay pursuant to section 105 or any other provision of the Bankruptcy Code, and (b) acknowledges and agrees that the occurrence or existence of an event of default under any of the Loan Documents shall, in and of itself, constitute "cause" for relief from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code.

"***Independent Director***" means in the case of a corporation, a natural person who, is employed by a Corporate Service Provider and for the five (5) year period prior to his or her appointment as Independent Director has not been, and during the continuation of his or her service as Independent Director is not, directly or indirectly:

(i)   an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the corporation or any of its Affiliates (other than his or her service as an Independent Director of the corporation),

(ii)   a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the corporation or any of its shareholders or Affiliates (other than his or her service as an Independent Director if such Person has been provided by a nationally-recognized company that provides professional independent managers),

(iii)   a Person controlling or under common control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

(iv)   any member of the immediate family (including a grandchild or sibling) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the foregoing definition shall not be disqualified from serving as an Independent Director of the corporation because such person is an independent director of a "Special Purpose Bankruptcy Remote Entity" affiliated with the corporation that does not own a direct or indirect equity interest in the corporation or any entity that is a co-borrower with the corporation if such individual is an independent director provided by a nationally-recognized company that provides professional independent directors.

8 — 4

"*Independent Manager*" means in the case of a limited liability company, (a) a member that is a Special Purpose Bankruptcy Remote Entity, (b) a Special Purpose Bankruptcy Remote Entity that is not a member or (c) a natural person who is employed by a Corporate Service Provider and for the five (5) year period prior to his or her appointment as Independent Manager is not, directly or indirectly:

      (i)      an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the limited liability company or any of its Affiliates (other than his or her service as an Independent Manager or Special Member of the limited liability company),

      (ii)      a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the limited liability company or any of its members or Affiliates (other than his or her service as an Independent Manager if such Person has been provided by a nationally-recognized company that provides professional independent managers),

      (iii)      a Person controlling or under common control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

      (iv)      any member of the immediate family (including grandchildren or siblings) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the foregoing definition shall not be disqualified from serving as an Independent Manager of the limited liability company because such person is an independent manager of a "Special Purpose Bankruptcy Remote Entity" affiliated with the limited liability company that does not own a direct or indirect equity interest in the limited liability company or any entity that is a co-borrower with the limited liability company if such individual is an independent manager provided by a nationally-recognized company that provides professional independent managers.

"*Corporate Service Provider*" means one of the following nationally-recognized companies that provides professional independent managers, directors and or trustees:  (i) Corporation Service Company, (ii) CT Corporation, (iii) National Registered Agents, Inc., and (iv) Independent Directors Services, Inc. (provided that the Borrower and the Lender may add or replace, by mutual agreement, any one or more of the foregoing Corporate Service Providers with other nationally-recognized companies that have been used by other borrowers for commercial mortgage loans).

"*Single Member Bankruptcy Remote LLC*" means a limited liability company organized under the laws of the State of Delaware which at all times since its formation and at all times thereafter

      (i)      complies with the following clauses of the definition of Special Purpose Bankruptcy Remote Entity above:  (i)(A), (ii)(A), (iii), (iv), (ix), (x), (xi) and (xiii) through (xxxii);

      (ii)      has maintained and will maintain its accounts, books and records separate from any other person;

      (iii)      has and will have an operating agreement which provides that the business and affairs of Borrower shall be managed by or under the direction of

8 — 5

(a)    a board of one (1) or more directors designated by the sole member of the Single Member Bankruptcy Remote LLC (the "***Sole Member***"), and at all times there shall be at least one (1) duly appointed Independent Director on the board of directors, and the board of directors will not take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless, at the time of such action there is at least one (1) member of the board of directors who is Independent Director, and all of the directors and all Independent Directors shall have participated in such vote or

(b)    Sole Member, provided that at all times there shall be at least one (1) Independent Manager designated by Sole Member and the operating agreement provides that Sole Member shall not take any Bankruptcy Actions without the unanimous affirmative vote of one hundred percent (100%) of the Independent Managers;

(iv)    has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding,

(a)    upon the occurrence of any event that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), one of the Independent Managers shall, without any action of any Person and simultaneously with Sole Member ceasing to be a member of Borrower, automatically be admitted as the sole member of Borrower (the "Special Member") and shall preserve and continue the existence of Borrower without dissolution,

(b)    no Special Member may resign or transfer its rights as Special Member unless (x) a successor Special Member has been admitted to Borrower as a Special Member, and (y) such successor Special Member has also accepted its appointment as an Independent Manager and

The Independent Managers or Directors as applicable may not be replaced on less than five (5) days prior written notice to Lender accompanied by a certification which includes the name of the successor Independent Manager or Independent Director and certifying that such Person meets the requirements of an Independent Manager or Independent Director as the case may be.

(c)    except as expressly permitted pursuant to the terms of this Agreement, Sole Member may not resign and no additional member shall be admitted to Borrower;

(v)    has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding,

(a)    Borrower shall be dissolved, and its affairs shall be would up only upon the first to occur of the following:  (x) the termination of the legal existence of the last remaining member of Borrower or the occurrence of any other event which terminates the continued membership of the last remaining member of Borrower in Borrower unless the business of Borrower is continued in a manner permitted by its operating agreement or the Delaware Limited

8 — 6

Liability Company Act (the "*Act*") or (y) the entry of a decree of judicial dissolution under Section 18-802 of the Act;

(b)    upon the occurrence of any event that causes the last remaining member of Borrower to cease to be a member of Borrower or that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), to the fullest extent permitted by law, the personal representative of such member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing to continue the existence of Borrower and to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of such member in Borrower;

(c)    the bankruptcy of Sole Member or a Special Member shall not cause such member or Special Member, respectively, to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution;

(d)    in the event of dissolution of Borrower, Borrower shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of Borrower in an orderly manner), and the assets of Borrower shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and

(e)    to the fullest extent permitted by law, each of Sole Member and the Special Members shall irrevocably waive any right or power that they might have to cause Borrower or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of Borrower, to compel any sale of all or any portion of the assets of Borrower pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of Borrower.

"*Bankruptcy Action*" means, with respect to any Person, if such Person

(i)    makes an assignment for the benefit of creditors,

(ii)    files a voluntary petition in bankruptcy,

(iii)    is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings,

(iv)    consents to or files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation,

(v)    files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any bankruptcy or insolvency proceeding,

8 — 7

(vi)     seeks, consents to or acquiesces in the appointment of a trustee, receiver, liquidator, sequestrator, custodian or any similar official of or for such Person or of all or any substantial part of its properties,

(vii)    one hundred twenty (120) days after the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed,

(viii)   within ninety (90) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated or

(ix)     takes any action in furtherance of any of the foregoing.

8 — 8

GT Draft 10/3/19

## Schedule 9

## Dual Obligee and Modification Rider to Dual Obligee Payment and Performance Bonds

SIGNED, SEALED AND DATED this     day of _____, 200__.

SURETY:                                        CONTRACTOR:


Countersigned by:                              OWNER:



Name:
Title:

9 — 2

GT Draft 10/3/19

**Schedule 10**

SECTION 22 AFFIDAVIT

AFFIDAVIT UNDER SECTION 22
OF THE
LIEN LAW OF NEW YORK

STATE OF NEW YORK        )
                                               )ss.:
COUNTY OF NEW YORK      )

The undersigned, being duly sworn, deposes and says that:

1.      He has an address c/o [_____] and is an authorized signatory of [_____], a [_____], the sole member of [_____] ("**Borrower**").

2.      He gives this Affidavit in connection with that certain Building Loan Agreement, dated as of _____ __, 201__ (the "**Building Loan Agreement**"), between Borrower, and [_____], a [_____] (the "**Lender**").

3.      The amount of the loan (the "**Building Loan**") under the Building Loan Agreement is: $_____.

4.      The consideration for the Building Loan paid or to be paid from the Building Loan is:  $ _____.

5.      All other expenses incurred or to be incurred in connection with the Building Loan for the costs of the improvements and to be advanced pursuant to the Building Loan Agreement during the construction of the Improvement are:

|  |  |  |
|---|---|---|
| (a) | Interest on Building Loan during construction | $_____ |
| (b) | Taxes, assessments, and water and sewer rents paid or to be paid for periods prior to or during construction | $_____ |
| (c) | Title examination charges, insurance premiums and recording fees which are allocable to the Building Loan | $_____ |
| (d) | Borrower Architect/Engineer's fees | $_____ |
| (e) | Lender's Architect/Engineer/Consultant's fees | $_____ |
| (f) | Legal fees of Lender's counsel which are allocable to the Building Loan | $_____ |

10 — 1

(g)  Mortgage recording taxes allocable to the Building Loan    $_____

(h)  Contingency cost of the improvement other than the    $_____
"improvement" as defined in subdivision 4 of Section 2 of
the Lien Law

TOTAL    $_____

6.    The net sum available to Borrower from the Building Loan for the Cost of the Improvements is:  $_____, less such amounts (i) as may not be advanced and disbursed under the Building Loan Agreement due to the non-satisfaction of conditions to the advance and disbursement of such amount contained in the Building Loan Agreement and (ii) as may become due and payable for insurance premiums, interest on the Building Loan, taxes, assessments, and water and sewer rents accruing during the construction of the improvement.

7.    This affidavit is made pursuant to and in compliance with Section 22 of the Lien Law of the State of New York and is a part of the Building Loan Agreement.

8.    The facts stated above and any costs itemized on this statement are true, to the knowledge of the undersigned.

[End of Page]

10 — 2

[SIGNATURE PAGE TO SECTION 22 AFFIDAVIT]

_____,

SWORN TO BEFORE ME THIS
_____ DAY OF _____, 201__.

NOTARY PUBLIC

10 — 3

GT Draft 10/3/19

## **Schedule 11**

### **Consultant's Reports**

*ACTIVE 45138641v14*

## Schedule 12 -A

## Forms of U.S. Tax Compliance Certificate

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Agreement dated as of [      ] (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among [   ], and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.12(d) of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished Administrative Agent and Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform Borrower and Administrative Agent, and (2) the undersigned shall have at all times furnished Borrower and Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF LENDER]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

12 — 1

## Schedule 12 -B

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Agreement dated as of [     ] (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among [   ], and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.12(d) of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF PARTICIPANT]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

12 — 2

*ACTIVE 45138641v14*

## Schedule 12 -C

FORM OF

### U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Agreement dated as of [      ] (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among [   ], and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.12(d) of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF PARTICIPANT]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

12 — 3

FORM OF

## U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Agreement dated as of [     ] (as amended, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"), among [   ], and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.12(d) of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Loan Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished Administrative Agent and Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform Administrative Agent and Borrower, and (2) the undersigned shall have at all times furnished Administrative Agent and Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF LENDER]


By:_____
Name:
Title:

Date: _____ __, 20[  ]


12 — 4

**Schedule 13**

**Major Milestones**

|  | Major Milestone | Major Milestone Deadline |
|---|---|---|
| 2. | Building top-off for the Project Improvements shall have been completed. | [October 15, 2020][13], as the same may be extended from time to time as a result of the occurrence of any Force Majeure Event, such extensions, together with all extensions of any deadlines with respect to any other Major Milestones due to the occurrence of any Force Majeure Events, collectively not to exceed the Force Majeure Delay Cap. |
| 3. | Substantial Completion shall have occurred. | Substantial Completion Date |
| 5. | The opening of the Hotel (without any material conditions subsequent) | [April 15, 2022][14] |

---

[13] Lender to confirm.
[14] Lender to confirm.

13 — 1

*ACTIVE 45138641v14*

## Schedule 15

## Bankruptcy Conditions to Lend[15]

1.    The Bankruptcy Court enters an order (the "Confirmation Order"), in form and substance acceptable to Lender, in the Borrower's Bankruptcy Case confirming the Borrower's plan of reorganization (the "Bankruptcy Plan"). Any amendments or modifications to the Bankruptcy Plan filed as docket number 135 shall be in form and substance acceptable to Lender.

2.    The Confirmation Order shall be a "***Final Order***" -- an order which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such Confirmation Order.

3.    The Confirmation Order shall, among other things:

a)    authorize the Borrower's assumption of the Ground Lease, with findings of the Bankruptcy Court that:  (i) the Borrower has cured all defaults under the Ground Lease and provided adequate assurance of future performance thereunder; (ii) the completion guaranty and the third party guarantee under the sections 39 and 10.03 of the Ground Lease, respectively, are deemed fully satisfied; and (iii) as of the Effective Date of the Bankruptcy Plan, the leasehold interest in the Ground Lease and all other of the Borrower's assets constituting the Mortgaged Property (as such term is defined in the Building Loan Leasehold Mortgage, Assignment of Leases and Rents and Security Agreement being executed contemporaneously herewith) are held by the Borrower free and clear of all liens, claims and encumbrances (other than the Lender's liens); and

b)    Bankruptcy Court findings that:  (i) the Borrower did not enter into this Agreement and related Loan Documents with the actual intent to hinder, delay, or defraud any creditor; (ii) the Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents; (iii) giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceeds, after taking into account the equity infusions contemplated by the Bankruptcy Plan, Borrower's total probable liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured; (iv) Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will

---

[15] Subject to further review by Lender's bankruptcy counsel.

not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted, and (v) Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

## EXHIBIT P-9

**GT DRAFT 10/1/19**

[CBCS WASHINGTON STREET LP]
(Mortgagor)

to

[_____]
(Mortgagee)

---

**PROJECT LOAN LEASEHOLD MORTGAGE, ASSIGNMENT OF LEASES AND RENTS
AND SECURITY AGREEMENT**

---

Dated:  As of [_____ __], 2019

Property Location:    456 Greenwich Street
New York, New York

DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:

Greenberg Traurig, LLP
200 Park Avenue
New York, New York 10166
Attention:  Howard S. Schochet, Esq.

**GT DRAFT 10/1/19**

**PROJECT LOAN LEASEHOLD MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT** (this "*Mortgage*"), made as of [_____ ____], 2019, by [**CBCS WASHINGTON STREET LP**, a Delaware limited partnership] (together with its permitted successors and assigns, "*Mortgagor*"), having an address at [_____] to [_____], a [_____] (together with its successors and assigns, hereinafter referred to as "*Mortgagee*"), having it principal place of business as c/o [_____].

Mortgagor and Mortgagee have entered into that certain Project Loan Agreement dated as of the date hereof (as amended, modified, restated, consolidated or supplemented from time to time, the "*Loan Agreement*") pursuant to which Mortgagee is making a secured project loan to Mortgagor in the aggregate original principal amount not to exceed [_____Dollars and No/100 ($_____)] (the "*Loan*"). Capitalized terms used herein without definition are used as defined in the Loan Agreement. The Loan is evidenced by that certain Project Loan Promissory Note dated the date hereof made by Mortgagor to Mortgagee in such principal amount (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced, or supplemented from time to time, the "*Note*").

To secure the payment of the Note and all sums which may or shall become due thereunder or under any of the other documents evidencing, securing or executed in connection with the Loan (the Note, this Mortgage, the Loan Agreement and such other documents, as any of the same may, from time to time, be modified, amended or supplemented, being hereinafter collectively referred to as the "*Loan Documents*"), including (i) the payment of interest and other amounts which would accrue and become due but for the filing of a petition in bankruptcy (whether or not a claim is allowed against Mortgagor for such interest or other amounts in any such bankruptcy proceeding) or the operation of the automatic stay under Section 362(a) of Title 11 of the United States Code (the "*Bankruptcy Code*"), and (ii) the costs and expenses of enforcing any provision of any Loan Document (all such sums being hereinafter collectively referred to as the "*Debt*"), Mortgagor hereby irrevocably mortgages, grants, bargains, sells, conveys, transfers, pledges, sets over and assigns, and grants a security interest, to and in favor of Mortgagee, WITH POWER OF SALE, all of Mortgagor's right, title and interest in and to (a) the leasehold interest in the land described on Exhibit A, as evidenced by that certain Ground Lease between 445 Washington LLC, a New York limited liability company, as lessor, and Mortgagor (as successor by merger with CBCS Washington Street LLC), as lessee, dated June 19, 2013 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "*Ground Lease*"), as memorialized by that certain Memorandum of Ground Lease dated [_____] and recorded on [_____] as CRFN [_____] in the Office of the City Register of the City of New York, together with any after acquired property which is the subject of the Ground Lease (collectively, the "*Land*") and (b) all additional title, estates, interests, development rights and air rights hereafter acquired by Mortgagor for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Mortgage (together with the Land, collectively, the "*Premises*"), and the buildings, structures, fixtures and other improvements now or hereafter located thereon (the "*Improvements*");

**TOGETHER WITH:** all right, title, interest and estate of Mortgagor now owned, or hereafter acquired, in and to the following property, rights, interests and estates (the Premises, the Improvements, and the property, rights, interests and estates hereinafter described are collectively referred to herein as the "***Mortgaged Property***"):

(a) all credits, deposits (including, without limitation, any deposit of cash or securities or any other property which may be held to secure Mortgagor's performance of its obligations under the Ground Lease), options, privileges and rights of Mortgagor as tenant under the Ground Lease;

(b) all easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the Improvements; and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road, highway, alley or avenue, opened, vacated or proposed, in front of or adjoining the Premises, to the center line thereof; and all the estates, rights, titles, interests, dower and rights of dower, courtesy and rights of courtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Mortgagor of, in and to the Premises and the Improvements and every part and parcel thereof, with the appurtenances thereto, including any and all of the foregoing under or by virtue of the Ground Lease;

(c) all machinery, furniture, furnishings, equipment, computer software and hardware, fixtures (including all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), inventory, materials, supplies and other articles of personal property and accessions thereof, renewals and replacements thereof and substitutions therefor, and other property of every kind and nature, tangible or intangible, owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Premises or the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements (hereinafter collectively referred to as the "***Equipment***"), including any leases of, deposits in connection with, and proceeds of any sale or transfer of any of the foregoing, and the right, title and interest of Mortgagor in and to any of the Equipment that may be subject to any "security interest" as defined in the Uniform Commercial Code, as in effect in the State where the Mortgaged Property is located (the "***UCC***"), superior in lien to the lien of this Mortgage;

(d) all awards or payments, including interest thereon, that may heretofore or hereafter be made with respect to the Premises or the Improvements, whether from the exercise of the right of eminent domain or condemnation (including any transfer made in lieu of or in anticipation of the exercise of such right), or for a change of grade, or for any other injury to or decrease in the value of the Premises or Improvements;

(e) all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Premises or the Improvements, including any extensions, renewals, modifications or amendments thereof (hereinafter collectively referred to as the "***Leases***") and all rents, rent

2

equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding or in lieu of rent or rent equivalents), royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits but subject to the rights of any tenants to security deposits under the Leases), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Mortgagor or its agents or employees from any and all sources arising from or attributable to the Premises and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Premises or the Improvements, or rendering of services by Mortgagor or any of its agents or employees,  and proceeds, if any, from business interruption or other loss of income insurance (hereinafter collectively referred to as the "***Rents***"), together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(f)      all proceeds of and any unearned premiums on any insurance policies covering the Mortgaged Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Mortgaged Property;

(g)      the right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to commence any action or proceeding to protect the interest of Mortgagee in the Mortgaged Property;

(h)      all accounts (including reserve accounts), escrows, documents, instruments, chattel paper, claims, deposits and general intangibles, as the foregoing terms are defined in the UCC, and all franchises, trade names, trademarks, symbols, service marks, books, records, plans, specifications, designs, drawings, surveys, title insurance policies, permits, consents, licenses, management agreements, contract rights (including any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair or other work upon the Mortgaged Property), approvals, actions, refunds of real estate taxes and assessments (and any other governmental impositions related to the Mortgaged Property) and causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon (hereinafter collectively referred to as the "***Intangibles***");

(i)  all accounts and accounts receivable, including all present and future rights to payment from any consumer credit or charge card organization or entity (such as those organizations which sponsor or administer the American Express, Carte Blanche, Discover Card, Diners Club, Visa, Master Card and similar charge and credit cards) arising out of the leasing and operation of, or the business conducted at or in relation to, any of the Mortgaged Property;

(j)  all revenue and income received by or on behalf of Mortgagor, Hotel Manager or Manager resulting from the operation of the Mortgaged Property as a hotel, including all sums (i) paid by customers for the use of hotel rooms located within the Mortgaged Property, (ii)

3

derived from food and beverage operations located within the Mortgaged Property (including, without limitation, from the sale of alcoholic beverages), (iii) generated by other hotel operations, including without limitation any parking, convention, sports, banquet facilities, golf courses and recreational facilities and (iv) business interruption insurance proceeds;

(k) all deposit, operating or other accounts including the entire balance therein (now or hereafter existing) maintained by or on behalf of Mortgagor, Hotel Manager or Manager (to the extent related to Hotel Manager's or Manager's management and operation of the Mortgaged Property) with any other banking or financial institution, and all money, instruments, securities, documents, chattel paper, credits, demands, and any other property, rights, or interests of Mortgagor, Hotel Manager or Manager related to the Mortgaged Property which at any time shall come into the possession, custody or control of any other banking or financial institution;

(l) the Hotel Management agreement and all agreements now or hereafter entered into by or on behalf of Mortgagor with any party with respect to the management, hotel management, franchising, leasing, brokerage, promotional, marketing or consulting services rendered or to be rendered, with respect to the franchising, leasing, promotion, marketing, operation or sale of any portion of the Mortgaged Property, and the proceeds thereof (including distributions and other payments thereunder) and any license agreements;

(m) all books, records and computer software in which Mortgagor has an ownership or licensing interest concerning any of the foregoing;

(n) the Interest Rate Cap Agreement and any replacements, amendments or supplements thereto, including, but not limited to, all "accounts", "chattel paper", "general intangibles" and "investment property" (as such terms are defined in the Uniform Commercial Code as from time to time in effect) constituting or relating to the foregoing, and all claims of Mortgagor for breach by the counterparty thereunder of any covenant, agreement, representation or warranty contained in the Interest Rate Cap Agreement; and

(o) all proceeds, products, offspring, rents and profits from any of the foregoing, including those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

Without limiting the generality of any of the foregoing, in the event that a case under the Bankruptcy Code is commenced by or against Mortgagor, pursuant to Section 552(b)(2) of the Bankruptcy Code, the security interest granted by this Mortgage shall automatically extend to all Rents acquired by the Mortgagor after the commencement of the case and shall constitute cash collateral under Section 363(a) of the Bankruptcy Code.

**TO HAVE AND TO HOLD** the Mortgaged Property unto Mortgagee and its successors and assigns, forever;

**PROVIDED, HOWEVER**, these presents are upon the express condition that, if Mortgagor shall well and truly pay to Mortgagee the Debt at the time and in the manner provided in the Loan Documents and shall well and truly abide by and comply with each and every covenant and condition set forth in the Loan Documents in a timely manner, these presents and the estate hereby granted shall cease, terminate and be void;

4

**AND** Mortgagor represents and warrants to and covenants and agrees with Mortgagee as follows:

## PART I - GENERAL PROVISIONS

**1.    Payment of Debt and Incorporation of Covenants, Conditions and Agreements**.  Mortgagor shall pay the Debt at the time and in the manner provided in the Loan Agreement, the Note and the other Loan Documents.  All the covenants, conditions and agreements contained in the Loan Documents are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein.  Without limiting the generality of the foregoing, Mortgagor (i) agrees to insure, repair, maintain and restore damage to the Mortgaged Property, pay Taxes and Other Charges, and comply with Legal Requirements, in accordance with the Loan Agreement, and (ii) agrees that the Proceeds of Insurance and Awards for Condemnation shall be settled, held and applied in accordance with the Loan Agreement.

**2.    Leases and Rents**.

(a)    Mortgagor does hereby absolutely and unconditionally assign to Mortgagee all of Mortgagor's right, title and interest in all current and future Leases and Rents, it being intended by Mortgagor that this assignment constitutes a present, absolute assignment, and not an assignment for additional security only.  Such assignment shall not be construed so to bind Mortgagee to the performance of any of the covenants or provisions contained in any Lease or otherwise impose any obligation upon Mortgagee.  Nevertheless, subject to the terms of this paragraph, Mortgagee grants to Mortgagor a revocable license, prior to the occurrence of and for so long as no Event of Default is continuing, to operate and manage the Mortgaged Property and to collect the Rents and to do all things which Mortgagor or any lessor is or may become entitled to do under the Leases and to exercise any and all rights thereunder, including all rights, powers, privileges and other benefits thereunder, subject to the requirements of the Loan Agreement (including the deposit of Rents into the Deposit Account (including all Subaccounts thereof)).  Upon the occurrence and during the continuance of an Event of Default, without the need for notice or demand, the license granted to Mortgagor herein shall automatically be revoked, and Mortgagee shall immediately be entitled to possession of all Rents in the Deposit Account (including all Subaccounts thereof) and all Rents collected thereafter (including Rents past due and unpaid), whether or not Mortgagee enters upon or takes control of the Mortgaged Property.  Mortgagor hereby grants and assigns to Mortgagee the right, at its option, upon revocation of the license granted herein, to enter upon the Mortgaged Property, subject to the rights of tenants and other occupants, in person, by agent or by court-appointed receiver to collect the Rents.  Any Rents collected after the revocation of such license may be applied toward payment of the Debt in such priority and proportions as Mortgagee in its sole discretion shall deem proper.

(b)    Mortgagor shall not enter into, modify, amend, cancel, terminate or renew any Lease except as provided in Section 5.10 of the Loan Agreement.

**3.    Use of Mortgaged Property**.  Mortgagor shall not initiate, join in or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Mortgaged Property except as otherwise permitted in the Loan Agreement.  If under applicable zoning provisions the use of the

5

Mortgaged Property is or shall become a nonconforming use, Mortgagor shall not cause or permit such nonconforming use to be discontinued or abandoned without the consent of Mortgagee.  Mortgagor shall not, except as otherwise set forth in the Loan Agreement (i) change the use of the Mortgaged Property, (ii) permit or suffer to occur any waste on or to the Mortgaged Property or (iii) take any steps to convert the Mortgaged Property to a condominium or cooperative form of ownership.

### 4.    **Transfer or Encumbrance of the Mortgaged Property**.

(a)    Mortgagor acknowledges that (i) Mortgagee has examined and relied on the creditworthiness and experience of the principals of Mortgagor in owning and operating properties such as the Mortgaged Property in agreeing to make the Loan, (ii) Mortgagee will continue to rely on Mortgagor's ownership of the Mortgaged Property as a means of maintaining the value of the Mortgaged Property as security for the Debt, and (iii) Mortgagee has a valid interest in maintaining the value of the Mortgaged Property so as to ensure that, should  an Event of Default occur and be continuing, Mortgagee can recover the Debt by a sale of the Mortgaged Property in accordance with applicable law. Mortgagor shall not sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Mortgaged Property or any part thereof, or suffer or permit any Transfer to occur, other than a Permitted Encumbrance and/or a Permitted Transfer.

(b)    Mortgagee shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Transfer in violation of this Section 4.  This provision shall apply to every sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property (and every other Transfer) regardless of whether voluntary or not.  Any Transfer made in contravention of this Section 4 shall be null and void and of no force or effect.  Mortgagor agrees to bear and shall pay or reimburse Mortgagee on demand for all reasonable out-of-pocket expenses (including reasonable attorneys' fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Mortgagee in connection with the review, approval and documentation of any Permitted Transfer.

### 5.    **Ground Lease**.

(a)    This Mortgage is subject to the terms and subordinate to the Ground Lease.

(b)    No purchaser at any foreclosure sale shall acquire any right, title or interest in or to the Ground Lease, unless such purchaser (or the person, firm or corporation to whom or to which such purchaser's right has been assigned) shall, in the instrument transferring to such purchaser (or to such assignee) the Mortgagor as tenant's interest under the Ground Lease, assume and agree to perform all of the terms, covenants and conditions of the Ground Lease to be observed or performed on the part of Mortgagor as tenant, and moreover, that no further or additional mortgage or assignment of the Ground Lease shall be made, except in accordance with the provisions contained in Articles 10 and 11 of the Ground Lease, and that a duplicate original of said assumption agreement, duly executed and acknowledged by such purchaser (or such assignee) is delivered to Landlord promptly after the consummation of such sale.

6

(c)     Mortgagee waives all rights and does not have an option to retain and apply the proceeds of any insurance or the proceeds of any condemnation award toward payment of the sum secured by this Mortgage to the extent such proceeds are either (A) payable to Landlord in accordance with the provisions of the Ground Lease or (B) are required to be used for the repair or restoration of the Premises in accordance with the provisions of the Ground Lease.

6.     **Changes in Laws Regarding Taxation**.  If any law is enacted or adopted or amended after the date of this Mortgage which deducts the Debt from the value of the Mortgaged Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Mortgagee's interest in the Mortgaged Property, Mortgagor will pay such tax, with interest and penalties thereon, if any.  If Mortgagee is advised by its counsel that the payment of such tax or interest and penalties by Mortgagor would be unlawful, taxable to Mortgagee or unenforceable, or would provide the basis for a defense of usury, then Mortgagee shall have the option, by written notice of not less than 120 days, to declare the Debt immediately due and payable without premium, penalty or fee, but in all events subject to the Minimum Multiple Payment.

7.     **No Credits on Account of the Debt**.  Mortgagor shall not claim or demand or be entitled to any credit on account of the Debt for any part of the Taxes or Other Charges assessed against the Mortgaged Property, and no deduction shall otherwise be made or claimed from the assessed value of the Mortgaged Property for real estate tax purposes by reason of this Mortgage or the Debt.  If such claim, credit or deduction shall be required by law, Mortgagee shall have the option, by written notice to Mortgagor of not less than 90 days, to declare the Debt immediately due and payable.

8.     **Further Acts, Etc.**  Mortgagor shall, at its sole cost, perform, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, transfers and assurances as Mortgagee shall, from time to time, in Mortgagee's reasonable discretion, require, for the better assuring, conveying, assigning, transferring, and confirming unto Mortgagee the property and rights hereby mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, pledged, assigned and hypothecated or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign to Mortgagee, or for carrying out the intention or facilitating the performance of the terms of this Mortgage, or for filing, registering or recording this Mortgage or for facilitating the sale and transfer of the Loan and the Loan Documents in connection with a "Secondary Market Transaction" as described in Section 9.1 of the Loan Agreement; provided, however, that in connection therewith, under no circumstance shall Mortgagor be required to incur, suffer or accept any materially lesser rights or materially greater obligations hereunder or under any Loan Document (unless otherwise set forth in the Loan Agreement).  Upon foreclosure, the appointment of a receiver or any other relevant action, Mortgagor shall, at its sole cost, cooperate fully and completely to effect the assignment or transfer of any license, permit, agreement or any other right necessary or useful to the operation of the Mortgaged Property.  Mortgagor grants to Mortgagee an irrevocable power of attorney coupled with an interest for the purpose of, during the continuance of an Event of Default, exercising and perfecting any and all rights and remedies available to Mortgagee at law and in equity, including such rights and remedies available to Mortgagee pursuant to this paragraph.

7

9.    **Recording of Mortgage, Etc.**    Mortgagor forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, shall cause this Mortgage, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Mortgaged Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest hereof upon, and the interest of Mortgagee in, the Mortgaged Property.  Mortgagor shall pay all filing, registration or recording fees, all expenses incident to the preparation, execution and acknowledgment of and all federal, state, county and municipal, taxes, duties, imposts, documentary stamps, assessments and charges arising out of or in connection with the execution and delivery of, this Mortgage, any Mortgage supplemental hereto, any security instrument with respect to the Mortgaged Property or any instrument of further assurance, except where prohibited by law so to do.  Mortgagor shall hold harmless and indemnify Mortgagee, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making or recording of this Mortgage.

10.    **Right to Cure Defaults**.  Upon the occurrence and during the continuance of any Event of Default, Mortgagee may, but without any obligation to do so and without notice to or demand on Mortgagor except as expressly required hereunder or in the Loan Agreement, and without releasing Mortgagor from any obligation hereunder, perform the obligations in Default in such manner and to such extent as Mortgagee may deem necessary to protect the security hereof.  Mortgagee is authorized to enter upon the Mortgaged Property for such purposes or appear in, defend or bring any action or proceeding to protect its interest in the Mortgaged Property or to foreclose this Mortgage or collect the Debt, and the actual out-of-pocket cost and expense thereof (including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest thereon at the Default Rate for the period after notice from Mortgagee that such cost or expense was actually incurred to the date of payment to Mortgagee, shall constitute a portion of the Debt, shall be secured by this Mortgage and the other Loan Documents and shall be due and payable to Mortgagee upon demand.

11.    **Remedies**.

(a)    Upon the occurrence and during the continuance of any Event of Default, Mortgagee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Mortgaged Property, by Mortgagee itself or otherwise, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Mortgagee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Mortgagee:

(i)    declare the entire Debt to be immediately due and payable;

(ii)    institute a proceeding or proceedings, judicial or nonjudicial, to the extent permitted by law, by advertisement or otherwise, for the complete foreclosure of this Mortgage, in which case the Mortgaged Property may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(iii)    with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of

8

this Mortgage for the portion of the Debt then due and payable, subject to the continuing lien of this Mortgage for the balance of the Debt not then due;

(iv)    sell for cash or upon credit the Mortgaged Property and all estate, claim, demand, right, title and interest of Mortgagor therein and rights of redemption thereof, pursuant to the power of sale, to the extent permitted by law, or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(v)    institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein or in any other Loan Document;

(vi)    recover judgment on the Note either before, during or after any proceeding for the enforcement of this Mortgage;

(vii)    apply for the appointment of a trustee, receiver, liquidator or conservator of the Mortgaged Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Mortgagor or of any person, firm or other entity liable for the payment of the Debt;

(viii)    enforce Mortgagee's interest in the Ground Lease, Leases and Rents and enter into or upon the Mortgaged Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and employees therefrom, and thereupon Mortgagee may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with the Mortgaged Property and conduct the business thereat; (B) complete any construction on the Mortgaged Property in such manner and form as Mortgagee deems advisable; (C) make alterations, additions, renewals, replacements and improvements to or on the Mortgaged Property; (D) exercise all rights and powers of Mortgagor with respect to the Mortgaged Property, whether in the name of Mortgagor or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive Rents; and (E) apply the receipts from the Mortgaged Property to the payment of the Debt, after deducting therefrom all actual out-of-pocket expenses (including reasonable attorneys' fees and disbursements) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, insurance and other charges in connection with the Mortgaged Property, as well as just and reasonable compensation for the services of Mortgagee, and its counsel, agents and employees;

(ix)    require Mortgagor to pay monthly in advance to Mortgagee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of any portion of the Mortgaged Property occupied by Mortgagor, and require Mortgagor to vacate and surrender possession of the Mortgaged Property to Mortgagee or to such receiver, and, in default thereof, evict Mortgagor by summary proceedings or otherwise; or

9

(x)    pursue such other rights and remedies as may be available at law or in equity or under the UCC, including the right to receive and/or establish a lock box for all Rents and proceeds from the Intangibles and any other receivables or rights to payments of Mortgagor relating to the Mortgaged Property.

In the event of a sale, by foreclosure or otherwise, of less than all of the Mortgaged Property, this Mortgage shall continue as a lien on the remaining portion of the Mortgaged Property.

(b)    The proceeds of any sale made under or by virtue of this Section 10, together with any other sums which then may be held by Mortgagee under this Mortgage, whether under the provisions of this Section 10 or otherwise, shall be applied by Mortgagee to the payment of the Debt in such priority and proportion as Mortgagee in its sole discretion shall deem proper.

(c)    Mortgagee may adjourn from time to time any sale by it to be made under or by virtue of this Mortgage by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable law, Mortgagee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(d)    Upon the completion of any sale or sales pursuant hereto, Mortgagee, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold. Mortgagee is hereby irrevocably appointed the true and lawful attorney of Mortgagor, in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose Mortgagee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, Mortgagor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof.  Any sale or sales made under or by virtue of this Section 10, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Mortgagor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Mortgagor and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under Mortgagor.

(e)    Upon any sale made under or by virtue of this Section 10, whether made under a power of sale or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Mortgagee may bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Debt the net sales price after deducting therefrom the expenses of the sale and costs of the action and any other sums which Mortgagee is authorized to deduct under this Mortgage or any other Loan Document.

(f)    No recovery of any judgment by Mortgagee and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of Mortgagor shall

10

affect in any manner or to any extent the lien of this Mortgage upon the Mortgaged Property or any part thereof, or any liens, rights, powers or remedies of Mortgagee hereunder, but such liens, rights, powers and remedies of Mortgagee shall continue unimpaired as before.

(g)    Mortgagee may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in this Section 10 at any time before the conclusion thereof, as determined in Mortgagee's sole discretion and without prejudice to Mortgagee.

(h)    Mortgagee may resort to any remedies and the security given by this Mortgage or in any other Loan Document in whole or in part, and in such portions and in such order as determined by Mortgagee's sole discretion.  No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by any Loan Document.  The failure of Mortgagee to exercise any right, remedy or option provided in any Loan Document shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by any Loan Document.  No acceptance by Mortgagee of any payment after the occurrence of any Event of Default and no payment by Mortgagee of any obligation for which Mortgagor is liable hereunder shall be deemed to waive or cure any Event of Default, or Mortgagor's liability to pay such obligation.  No sale of all or any portion of the Mortgaged Property, no forbearance on the part of Mortgagee, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Mortgagee to Mortgagor, shall operate to release or in any manner affect the interest of Mortgagee in the remaining Mortgaged Property or the liability of Mortgagor to pay the Debt unless and until the Debt shall have been indefeasibly repaid in full.  No waiver by Mortgagee shall be effective unless it is in writing and then only to the extent specifically stated.   All actual out-of-pocket costs and expenses of Mortgagee in exercising its rights and remedies under this Section 10 (including reasonable attorneys' fees and disbursements to the extent permitted by law), shall be paid by Mortgagor within five (5) days following written demand therefor from Mortgagee, with interest at the Default Rate for the period after notice from Mortgagee, and such actual out-of-pocket costs and expenses shall constitute a portion of the Debt and shall be secured by this Mortgage.

(i)    The interests and rights of Mortgagee under the Loan Documents shall not be impaired by any indulgence, including (i) any renewal, extension or modification which Mortgagee may grant with respect to any of the Debt, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Mortgagee may grant with respect to the Mortgaged Property or any portion thereof or (iii) any release or indulgence granted to any maker, endorser, guarantor or surety of any of the Debt.

12.    **Right of Entry**.  In addition to any other rights or remedies granted under this Mortgage, Mortgagee and its agents shall have the right to enter and inspect the Mortgaged Property at any reasonable time during the term of this Mortgage in accordance with Section 5.3 of the Loan Agreement.  The cost of such inspections or audits shall be borne by Mortgagor should Mortgagee determine that an Event of Default has occurred and is continuing, including the actual out-of-pocket cost of all follow up or additional investigations or inquiries deemed reasonably necessary by Mortgagee.  The cost of such inspections, if not paid for by Mortgagor following five (5) days' written demand therefor, may be added to the principal balance of the

11

sums due under the Note and this Mortgage and shall bear interest thereafter until paid at the Default Rate.

**13.** **Security Agreement**. This Mortgage is both a real property mortgage and a "security agreement" within the meaning of the UCC. The Mortgaged Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Mortgaged Property. Mortgagor by executing and delivering this Mortgage has granted and hereby grants to Mortgagee, as security for the Debt, a security interest in the Mortgaged Property to the full extent that the Mortgaged Property may be subject to the UCC (such portion of the Mortgaged Property so subject to the UCC being called in this paragraph the "*Collateral*"). This Mortgage shall also constitute a "fixture filing" for the purposes of the UCC. As such, this Mortgage covers all items of the Collateral that are or are to become fixtures. Information concerning the security interest herein granted may be obtained from the parties at the addresses of the parties set forth in the first paragraph of this Mortgage. If an Event of Default shall occur and be continuing, Mortgagee, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the UCC, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Mortgagee may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Mortgagee, Mortgagor shall at its expense assemble the Collateral and make it available to Mortgagee at a convenient place acceptable to Mortgagee. Mortgagor shall pay to Mortgagee within five (5) days of written demand therefor any and all actual out-of-pocket expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Mortgagee in protecting the interest in the Collateral and in enforcing the rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Collateral, sent to Mortgagor in accordance with the provisions hereof at least ten (10) days prior to such action, shall constitute commercially reasonable notice to Mortgagor. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Mortgagee to the payment of the Debt in such priority and proportions as Mortgagee in its sole discretion shall deem proper. In the event of any change in name, identity or structure of Mortgagor, Mortgagor shall notify Mortgagee thereof and promptly after request shall execute, file and record such UCC forms as are necessary to maintain the priority of Mortgagee's lien upon and security interest in the Collateral, and shall pay all expenses and fees in connection with the filing and recording thereof. If Mortgagee shall require the filing or recording of additional UCC forms or continuation statements, Mortgagor shall, promptly after request, execute, file and record such UCC forms or continuation statements as Mortgagee shall deem necessary, and shall pay all actual out-of-pocket expenses and fees in connection with the filing and recording thereof, it being understood and agreed, however, that no such additional documents shall increase Mortgagor's obligations under the Loan Documents. Mortgagor hereby irrevocably appoints Mortgagee as its attorney-in-fact, coupled with an interest, to file with the appropriate public office on its behalf any financing or other statements signed only by Mortgagee, as secured party, in connection with the Collateral covered by this Mortgage.

**14.** **Actions and Proceedings**. Mortgagee has the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of Mortgagor, which Mortgagee, in its sole

12

discretion, decides should be brought to protect its or their interest in the Mortgaged Property. Mortgagee shall, at its option, be subrogated to the lien of any mortgage or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

15.    **Marshalling and Other Matters**.  Mortgagor hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Mortgaged Property or any part thereof or any interest therein.  Further, to the extent permitted pursuant to applicable law, Mortgagor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Mortgage on behalf of Mortgagor, and on behalf of each and every person acquiring any interest in or title to the Mortgaged Property subsequent to the date of this Mortgage and on behalf of all persons to the extent permitted by applicable law.  The lien of this Mortgage shall be absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever of Mortgagee and, without limiting the generality of the foregoing, the lien hereof shall not be impaired by (i) any acceptance by Mortgagee of any other security for any portion of the Debt, (ii) any failure, neglect or omission on the part of Mortgagee to realize upon or protect any portion of the Debt or any collateral security therefor or (iii) any release (except as to the property released), sale, pledge, surrender, compromise, settlement, renewal, extension, indulgence, alteration, changing, modification or disposition of any portion of the Debt or of any of the collateral security therefor; and Mortgagee may foreclose, or exercise any other remedy available to Mortgagee under other Loan Documents without first exercising or enforcing any of its remedies under this Mortgage, and any exercise of the rights and remedies of Mortgagee hereunder shall not in any manner impair the Debt or the liens of any other Loan Document or any of Mortgagee's rights and remedies thereunder.

16.    **Notices**.    All notices, consents, approvals and requests required or permitted hereunder shall be in writing, and shall be sent, and shall be deemed effective, as provided in the Loan Agreement.

17.    **Inapplicable Provisions**.   If any term, covenant or condition of this Mortgage is held to be invalid, illegal or unenforceable in any respect, this Mortgage shall be construed without such provision.

18.    **Headings**.  The paragraph headings in this Mortgage are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

19.    **Duplicate Originals**.  This Mortgage may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original.

20.    **Definitions**.   Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Mortgage may be used interchangeably in singular or plural form; and the word "***Mortgagor***" shall mean "each Mortgagor and any subsequent owner or owners of the Mortgaged Property or any part thereof or any interest therein," the word "***Mortgagee***" shall mean "Mortgagee and any subsequent holder

13

of the Note," the words "***Mortgaged Property***" shall include any portion of the Mortgaged Property and any interest therein, the word "***including***" means "including but not limited to" and the words "***attorneys' fees***" shall include any and all attorneys' fees, paralegal and law clerk fees, including fees at the pre-trial, trial and appellate levels incurred or paid by Mortgagee in protecting its interest in the Mortgaged Property and Collateral and enforcing its rights hereunder.

      **21.**    **Homestead**.  Mortgagor hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States and of any state, in and to the Mortgaged Property as against the collection of the Debt, or any part thereof.

      **22.**    **Assignments**.  Mortgagee shall have the right to assign or transfer its rights under this Mortgage without limitation.  Any assignee or transferee shall be entitled to all the benefits afforded Mortgagee under this Mortgage.

      **23.**    **Waiver of Jury Trial**.  EACH OF MORTGAGOR AND MORTGAGEE HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS MORTGAGE OR ANY OTHER LOAN DOCUMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY MORTGAGOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.

      **24.**    **Consents**.  Any consent or approval by Mortgagee in any single instance shall not be deemed or construed to be Mortgagee's consent or approval in any like matter arising at a subsequent date, and the failure of Mortgagee to promptly exercise any right, power, remedy, consent or approval provided herein or at law or in equity shall not constitute or be construed as a waiver of the same nor shall Mortgagee be estopped from exercising such right, power, remedy, consent or approval at a later date.  Any consent or approval requested of and granted by Mortgagee pursuant hereto shall be narrowly construed to be applicable only to Mortgagor and the matter identified in such consent or approval and no third party shall claim any benefit by reason thereof, and any such consent or approval shall not be deemed to constitute Mortgagee a venturer or partner with Mortgagor nor shall privity of contract be presumed to have been established with any such third party.  If Mortgagee reasonably deems it to be in its best interest to retain assistance of persons, firms or corporations (including attorneys, title insurance companies, appraisers, engineers and surveyors) with respect to a request for consent or approval, Mortgagor shall reimburse Mortgagee for all out-of-pocket costs reasonably incurred in connection with the employment of such persons, firms or corporations, in addition to any obligations of Mortgagor set forth in Section 5.29 of the Loan Agreement.

      **25.**    **Loan Repayment.**  Provided no Event of Default has occurred and is continuing, this Mortgage will be assigned or satisfied and discharged of record by Mortgagee

14

prior to the Maturity Date only in accordance with the terms and provisions set forth in Section 2.3 of the Loan Agreement.

### 26.    **Other Properties; No Election of Remedies**.

(a)    Mortgagor acknowledges that Mortgagee has made the Loan to Mortgagor upon the security of its collective interest in the Mortgaged Property and in reliance upon the aggregate of the Mortgaged Property taken together being of greater value as Mortgaged Property than the sum of the Premises taken separately.  Mortgagor covenants and agrees that upon the occurrence and during the continuance of an Event of Default, Mortgagee may proceed under this Mortgage against either the Mortgaged Property and/or any individual Premises and in such manner and order as Mortgagee shall elect.  Mortgagor hereby irrevocably waives and releases, to the extent permitted by law, and whether now or hereafter in force, any right to have the Mortgaged Property and/or any individual Premises marshaled upon any foreclosure of this Mortgage.

(b)    Without limiting the generality of the foregoing, and without limitation as to any other right or remedy provided to Mortgagee in this Mortgage or the other Loan Documents, following the occurrence and continuance of an Event of Default (i) Mortgagee shall have the right to pursue all of its rights and remedies under this Mortgage and the Loan Documents, at law and/or in equity, in one proceeding, or separately and independently in separate proceedings from time to time, as Mortgagee, in its sole and absolute discretion, shall determine from time to time, (ii) Mortgagee shall not be required to either marshal assets, sell the Mortgaged Property and/or any individual Premises in any particular order of alienation (and may sell the same simultaneously and together or separately), or be subject to any "one action" or "election of remedies" law or rule with respect to the Mortgaged Property and/or any individual Premises, (iii) the exercise by Mortgagee of any remedies against any one item of Mortgaged Property and/or any individual Premises will not impede Mortgagee from subsequently or simultaneously exercising remedies against any other item of Mortgaged Property and/or any individual Premises, (iv) all liens and other rights, remedies or privileges provided to Mortgagee herein shall remain in full force and effect until Mortgagee has exhausted all of its remedies against the Mortgaged Property and all Mortgaged Property has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt, and (v) Mortgagee may resort for the payment of the Debt to any security held by Mortgagee in such order and manner as Mortgagee, in its discretion, may elect and Mortgagee may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Mortgagee thereafter to foreclose this Mortgage.

(c)    Without notice to or consent of Mortgagor and without impairment of the lien and rights created by this Mortgage, Mortgagee may, at any time (in its sole and absolute discretion, but Mortgagee shall have no obligation to), execute and deliver to Mortgagor a written instrument releasing all or a portion of the lien of this Mortgage as security for any or all of the obligations of Mortgagor now existing or hereafter arising under or in respect of the Note, the Loan Agreement and each of the other Loan Documents, whereupon following the execution and delivery by Mortgagee to Mortgagor of any such written instrument of release, this Mortgage shall no longer secure such obligations of Mortgagor so released.

15

27. **Governing Law**.  With respect to matters relating to the creation, perfection and procedures relating to the enforcement of the Liens created pursuant to this Mortgage, this Mortgage shall be governed by, and construed in accordance with, the laws of the State in which the Mortgaged Property is located (without regard to conflict of law provisions thereof), it being understood that, except as expressly set forth above in this paragraph and to the fullest extent permitted by the law of such State, the law of the State of New York (without regard to conflict of law provisions thereof) shall govern all matters relating to this Mortgage and the other Loan Documents and all of the indebtedness or obligations arising hereunder or thereunder.  All provisions of the Loan Agreement incorporated herein by reference shall be governed by, and construed in accordance with, the laws of the State of New York, as set forth in the governing law provision of the Loan Agreement.

28. **Exculpation**.  The liability of Mortgagor hereunder is limited pursuant to Section 10.1 of the Loan Agreement.

29. **Intentionally Omitted**.

30. **Joint and Several Liability**.  If there is more than one party identified in this Security Instrument as a "Mortgagor", then each such party so identified shall be liable, jointly and severally, for all obligations of any Mortgagor hereunder.  As used herein, "Mortgagor" and "Mortgagors" shall also refer to any subsequent owners or lessees of all or any portion of the Mortgaged Property.

## PART II

## STATE-SPECIFIC PROVISIONS

31. **Conflicts With Part I**.  In the event of any conflict between the provisions of this Part II and any provision of Part I, then the provisions of this Part II shall control.

(a) The terms, covenants and conditions contained herein shall be construed as affording to Mortgagee rights additional to, and not exclusive of, the rights conferred under the provisions of Section 254 of the Real Property Law of the State of New York.

(b) In compliance with Section 13 and Article 3-A of the Lien Law of the State of New York, Mortgagor will receive all advances secured by this Mortgage and will hold the right to receive all such advances as a trust fund to be applied first for the purpose of paying the cost of improvements, and will apply all such advances first to the payment of the cost of improvements before using any part of such advances for any other purpose.  Mortgagor will indemnify and hold Mortgagee harmless from and against any actual loss, liability, cost or expense, including, without limitation, any judgments, reasonable attorneys' fees, costs of appeal bonds and printing costs, arising out of or relating to any proceeding instituted by any claimant alleging a violation by Mortgagor of any applicable lien law provisions including, without limitation, any section of Article 3-A of the New York Lien Law.

(c) NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS SECURED BY

16

THIS MORTGAGE AT THE TIME OF EXECUTION OR WHICH UNDER ANY CONTINGENCY MAY HEREAFTER BECOME SECURED HEREBY AT ANY TIME IS [_____ DOLLARS AND NO/100 ($_____)] PROVIDED THAT SUCH LIMITATION SHALL NOT LIMIT THE SECURITY OF THIS MORTGAGE WITH RESPECT TO (I) INTEREST ON THE AFORESAID MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS AT THE RATES SET FORTH IN THE NOTE, (II) SUMS TO PAY TAXES, (III) SUMS TO PAY PREMIUMS ON INSURANCE POLICIES COVERING THE MORTGAGED PROPERTY, (IV) EXPENSES INCURRED AFTER AN EVENT OF DEFAULT IN UPHOLDING OR ENFORCING THE LIEN OF THIS MORTGAGE, INCLUDING, BUT NOT LIMITED TO, THE EXPENSES OF ANY LITIGATION TO PROSECUTE OR DEFEND THE RIGHTS AND LIEN CREATED BY THIS MORTGAGE, (V) ANY REASONABLE AMOUNT, COST OR CHARGE TO WHICH MORTGAGEE BECOMES SUBROGATED, UPON PAYMENT, WHETHER UNDER RECOGNIZED PRINCIPLES OF LAW OR EQUITY, OR UNDER EXPRESS STATUTORY AUTHORITY, AND (VI) ANY OTHER AMOUNT SECURED BY THIS MORTGAGE WHICH, IF NOT LIMITED BY SUCH LIMITATION, WOULD NOT INCREASE THE AMOUNT OF MORTGAGE RECORDING TAXES, IF ANY, PAYABLE WITH RESPECT TO THIS MORTGAGE.

(d) This Mortgage does not cover real property principally improved or to be improved by one or more structures containing in the aggregate not more than six residential dwelling units, each having their own separated cooking facilities.

(e) Reference is made to Section 291-f of the Real Property Law of New York for purposes of obtaining the benefit of said Section in connection with this Mortgage.

(f) Upon the occurrence and during the continuance of an Event of Default and acceleration of the indebtedness secured hereby, Mortgagee shall have the right to sell the Mortgaged Property, including, without limitation, pursuant to Article 14 of the New York Real Property Actions and Proceedings Law, as same may have been or may hereafter be amended.

(g) Mortgagee shall, at the request of Mortgagor, deliver an assignment of this Mortgage (together with the Note) in lieu of a release or satisfaction hereof upon or in connection with the payment of the Debt in full, in accordance with Section 24 hereof, provided that (i) other than containing a representation that Mortgagee shall not have previously transferred its rights under the Mortgage and the amount of the then outstanding indebtedness secured by the Mortgage, the instrument of assignment shall be without representation or warranty by, or recourse to, Mortgagee, in any event whatsoever, (ii) the assignee shall be a third party that is refinancing the Loan, (iii) Mortgagee is permitted by law to deliver an assignment in lieu of recording a satisfaction and (iv) Mortgagor shall pay all reasonable out-of-pocket fees and expenses of Mortgagee in connection with such assignment.

[NO FURTHER TEXT ON THIS PAGE]

17

**GT DRAFT 10/1/19**

      IN WITNESS WHEREOF, Mortgagor has executed this instrument as of the day and year first above written.

**MORTGAGOR:**

[*BORROWER'S COUNSEL TO CONFIRM SIGNATURE BLOCK*],
a [_____]

By:    _____
      Name:
      Title:

[Signature Page to Project Leasehold Mortgage]

**GT DRAFT 10/1/19**

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )


On the _____ day of _____in the year 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


_____
Signature and Office of individual taking
acknowledgment


[Acknowledgment Page to Project Leasehold Mortgage]

# **EXHIBIT A**

## Legal Description

**<u>EXHIBIT P-13</u>**

GT DRAFT 9/27/19

## PLEDGE AND SECURITY AGREEMENT

This **PLEDGE AND SECURITY AGREEMENT** (this "*Pledge Agreement*"), is made as of [_____], 2019, by **CBCS WASHINGTON MEZZ BORROWER LP**, a Delaware limited partnership], having an address at c/o Caspi Development Company, 120 Bloomingdale Road Suite 105, White Plains, NY 10605, (together with its successors and assigns, "*Pledgor*"), for the benefit of [**HANA FINANCIAL INVESTMENT OR AFFILIATE**], a _____ limited liability company, having an address at [_____] (together with its successors and assigns, and such other co-lenders as may exist from time to time, the "*Lender*").

## RECITALS

A.      Pledgor is the (i) limited partner and owner of ninety-nine and ninety-nine hundredths percent (99.99%) of the partnership interests in **CBCS WASHINGTON STREET LP**, a Delaware limited partnership ("*Owner*") and (ii) sole member and owner of one hundred percent (100%) of the limited liability company interests in **CBCS WASHINGTON STREET GP LLC**, a Delaware limited liability company ("*GP*"), which is the general partner and owner of one hundredth percent (.01%) of the partnership interests in Owner.

B.      Pursuant to that certain Mezzanine Loan Agreement, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "*Loan Agreement*"), among Pledgor and Lender, Pledgor has become indebted to Lender with respect to a loan in the aggregate maximum principal amount of [_____ _____ **DOLLARS AND NO/100 ($_____)]** (the "*Loan*"). Initially capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

C.      As a condition precedent to making the Loan, Lender requires that Pledgor execute and deliver this Pledge Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor agrees as follows:

1.      **Defined Terms.**  As used herein, the following terms shall have the following meanings:

(a)      "*Assignment of Interest*" shall have the meaning ascribed thereto in Section 2 hereof.

(b)      "*Charter Documents*" means the agreements and instruments listed on Exhibit A hereto, as each of the same may hereafter be amended, restated, replaced, supplemented or otherwise modified from time to time.

(c)      "*Collateral*" shall have the meaning ascribed thereto in Section 2 hereof.

(d)    "***Pledgor Obligations***" shall mean the due payment, performance and observance by Pledgor of all of its obligations under the Loan Documents.

(e)    "***Pledged Interests***" shall have the meaning ascribed thereto in <u>Section 2</u> hereof.

(f)    "***Uniform Commercial Code***" means the Uniform Commercial Code as in effect from time to time in the State of New York except for matters which the Uniform Commercial Code of the State of New York provides shall be governed by the Uniform Commercial Code in effect in any state, in which case "***Uniform Commercial Code***" shall mean the Uniform Commercial Code as in effect from time to time in such other state.

## 2.    <u>Pledge and Delivery of Collateral.</u>

(a)    <u>The Pledge</u>.  As collateral security for the prompt payment and performance by Pledgor of the Pledgor Obligations, Pledgor hereby pledges and grants to Lender a security interest in all of Pledgor's right, title, interest, claim and estate in and to each and all of the following property, whether now owned by Pledgor or hereafter acquired and whether now existing or hereafter coming into existence (all being collectively referred to herein as "***Collateral***"):

(i)    all partnership interests of, or other equity interests in Owner, and all options, warrants and other rights and privileges of any type or nature now existing or hereafter acquired by Pledgor in respect of such partnership interests or other equity interests (whether in connection with any capital increase, recapitalization, reclassification or reorganization of Owner or otherwise), all investment property and all rights, preferences, privileges, dividends, distributions, redemption payments, or liquidation payments and general intangibles relating to the foregoing (all such partnership interests and other equity interests, and all such options, warrants, other rights, investment property, preferences, privileges, dividends, distributions, redemption payments, or liquidation payments and general intangibles and other rights being hereinafter collectively referred to as the "***Owner Pledged Interests***"), and (b) all limited liability company interests of, or other equity interests in GP, and all options, warrants and other rights and privileges of any type or nature now existing or hereafter acquired by Pledgor in respect of such limited liability company interests or other equity interests (whether in connection with any capital increase, recapitalization, reclassification or reorganization of GP or otherwise), all investment property and all rights, preferences, privileges, dividends, distributions, redemption payments, or liquidation payments and general intangibles relating to the foregoing; (all such limited liability company interests and other equity interests, and all such options, warrants, other rights, investment property, preferences, privileges, dividends, distributions, redemption payments, or liquidation payments and general intangibles and other rights being hereinafter collectively referred to as the "***GP Pledged Interests***" and together with the Owner Pledged Interests, the "***Pledged Interests***");

(ii)    all certificates, instruments, or other writings representing or evidencing the Pledged Interests, and all accounts, payment intangibles and general intangibles arising out of, or in connection with, the Pledged Interests;

2

(iii)    any and all moneys, payment intangibles or property due and to become due to Pledgor now or in the future in respect of the Pledged Interests, or to which Pledgor may now or in the future be entitled to in its capacity as a partner of Owner, whether by way of a dividend, distribution, return of capital, or otherwise

(iv)    any and all moneys, payment intangibles or property due and to become due to Pledgor now or in the future in respect of the Pledged Interests, or to which Pledgor may now or in the future be entitled to in its capacity as a member of GP, whether by way of a dividend, distribution, return of capital, or otherwise;

(v)    all other claims, causes of action, choses of action and other property of any type or nature which Pledgor now has or may in the future acquire in its capacity as a partner of Owner against Owner and its property, including general intangibles relating thereto in any manner or any respect;

(vi)    all other claims, causes of action, choses of action and other property of any type or nature which Pledgor now has or may in the future acquire in its capacity as a member of GP against GP and its property, including general intangibles relating thereto in any manner or any respect;

(vii)    all rights of Pledgor under the Charter Documents and/or applicable law, including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of the Pledged Interests, including general intangibles relating thereto in any manner or any respect; and

(viii)   to the extent not otherwise included in clauses (i) through (v), (A) all proceeds and products of any and all of the property of Pledgor described in clauses (i) through (vi) above, whether now owned and existing or hereafter acquired or arising, including, without limitation, (i) all rents, issues, royalties, distributions, revenues and profits of or from any of the foregoing, (ii) whatever is now or hereafter received by Pledgor upon the collection or sale, exchange, lease, transfer or other disposition (whether voluntary or involuntary) of, or otherwise with respect to, any item of Collateral, whether constituting accounts, general intangibles, equipment, inventory, money, deposit accounts, payment intangibles, goods, chattel paper, documents, instruments, insurance proceeds, securities, and any other tangible or intangible personal property, (iii) any such items that are now or hereafter acquired by Pledgor with any proceeds or products of Collateral, (iv) any amounts now or hereafter payable under any insurance policy by reason of any loss or damage to any Collateral or any proceeds or products thereof, and (v) the right to further transfer, including to pledge, mortgage, license, assign or sell, any of the Collateral or any interest therein , and (B) to the extent related to any property described in said clauses or such proceeds, all present and future books and records, files, invoices, papers and correspondence relating thereto, including, without limitation, books of account and ledgers of every kind and nature, computer programs, computer tapes, computer software, and all electronically recorded data relating to Pledgor or the business of Pledgor or to any or all of the Collateral, all equipment, receptacles, containers and cabinets for such books and records.

3

(b)    <u>Delivery of the Collateral</u>.    All certificates or instruments, if any, representing or evidencing any of the Collateral shall be delivered to and held by or on behalf of Lender pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer, stock powers endorsed by Pledgor in blank, or assignments in blank, all in form and substance reasonably satisfactory to Lender.  Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, at any time, in its discretion upon prior written notice to Pledgor, as applicable, to transfer to or to register in the name of Lender or its nominee any or all of the Collateral.  Prior to or concurrently with the execution and delivery of this Pledge Agreement, Pledgor shall deliver to Lender (i) an assignment of partnership interest endorsed by Pledgor in blank (an "***Owner Assignment of Interest***"), in the form set forth on <u>Exhibit B-1</u> hereto, for the Owner Pledged Interests, transferring all of such Owner Pledged Interests in blank, duly executed by Pledgor and undated and (ii) an assignment of limited liability company interest endorsed by Pledgor in blank (a "***GP Assignment of Interest***" and together with the Owner Assignment of Interests, each and collectively an "***Assignment of Interest***"), in the form set forth on <u>Exhibit B-2</u> hereto, for the GP Pledge Interests, transferring all of such GP Pledged Interests in blank, duly executed by Pledge and undated.  Lender shall have the right, at any time in its discretion upon the occurrence and during the continuance of an Event of Default, to transfer to, and to designate on each Pledgor's Assignment of Interest, as applicable, any Person to whom the Pledged Interests are sold in accordance with the provisions hereof.  In addition, Lender shall have the right at any time to exchange any Assignment of Interest representing or evidencing the Pledged Interests or any portion thereof for one or more additional or substitute Assignments of Interest representing or evidencing smaller or larger percentages of the Pledged Interests represented or evidenced thereby, subject to the terms thereof.

(c)    <u>Obligations Unconditional</u>.    The obligations of Pledgor hereunder are absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the Loan Agreement, the Note or any other Loan Documents, or any substitution, release or exchange of any guarantee of or security for any of the Pledgor Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or Pledgor, it being the intent of this <u>Section 2(c)</u> that the obligations of Pledgor hereunder shall be absolute and unconditional under any and all circumstances.  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following, by itself, shall not affect the liability of Pledgor hereunder:

(i)    at any time or from time to time, without notice to Pledgor, the time for any performance of or compliance with any of the Pledgor Obligations shall be extended, or such performance or compliance shall be waived;

(ii)    the commission or omission of any of the acts mentioned in any of the provisions of the Loan Agreement, the Note, or any other Loan Documents;

(iii)    the maturity of any of the Pledgor Obligations shall be accelerated, or any of the Pledgor Obligations shall be modified, supplemented or amended in any respect, or any right under the Loan Agreement, the Note, or any other Loan Documents, or any other agreement or instrument referred to herein or therein shall be waived or any other guarantee of any of the Pledgor Obligations or any security or

4

collateral therefor shall be terminated, released or exchanged in whole or in part or otherwise dealt with; or

       (iv)    any lien or security interest granted to, or in favor of Lender as security for any of the Pledgor Obligations shall fail to be perfected or shall be released.

       (d)    <u>Financing Statements</u>.  Pledgor hereby authorizes Lender to file at any time or times, one or more UCC financing statements covering and/or describing the Collateral and UCC assignment financing statements assigning the UCC financing statements which constitute part of the Collateral to any party to whom the Pledged Interests are assigned.

       **3.**    **<u>Reinstatement</u>**.  The obligations of Pledgor under this Pledge Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Pledgor in respect of the Pledgor Obligations is rescinded or must be otherwise restored by any holder of any of the Pledgor Obligations, whether as a result of any proceedings in bankruptcy, reorganization, insolvency or otherwise, and Pledgor agrees that it will indemnify Lender on demand for all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable fees of counsel) incurred by Lender in connection with such rescission or restoration.

       **4.**    **<u>Representations, Warranties of Pledgor</u>**.  Pledgor represents and warrants that, as of the date hereof:

       (a)    <u>Existence; Capacity</u>. Pledgor is: (i) is a limited partnership duly organized and validly existing under the laws of the State of Delaware; (ii) has all requisite power, and has all governmental licenses, authorizations, consents and approvals required to own its assets and carry on its business as now being or as proposed to be conducted; and (iii) is qualified to do business in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary under applicable law.

       (b)    <u>Litigation</u>.  There are no legal or arbitral proceedings or any proceedings by or before any Governmental Authority or other agency, now pending or (to the knowledge of Pledgor) threatened in writing against Pledgor, the Collateral, GP and/or Owner.

       (c)    <u>No Breach</u>.  None of the execution and delivery of this Pledge Agreement, the consummation of the transactions herein or therein contemplated and compliance with the terms and provisions hereof or thereof will conflict with or result in a breach of, or require any consent under (except such consents that have been obtained on or prior to the date hereof), any organizational documents of Pledgor, GP or Owner, any applicable law or regulation, or any order, writ, injunction or decree of any court or Governmental Authority, or any agreement or instrument to which Pledgor is a party or by which it is bound or to which it is subject or constitute a default under any such agreement or instrument, or (except for the security interest granted pursuant to this Pledge Agreement) result in the creation or imposition of any lien upon any assets or revenues of Pledgor.

       (d)    <u>Necessary Action</u>.  Pledgor has all requisite power and authority to execute, deliver and perform its obligations under this Pledge Agreement; the execution, delivery and performance by Pledgor of this Pledge Agreement has been duly authorized by all necessary

5

action; and this Pledge Agreement has been duly and validly executed and delivered by Pledgor and constitutes its legal, valid and binding obligation, enforceable against Pledgor in accordance with its terms, subject to bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights in general and to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(e)    Approvals.  No authorizations, approvals and consents of, and no filings and registrations with, any governmental or regulatory authority or agency or under the organizational documents of Pledgor, GP or Owner or any other Person are necessary for (i) the execution, delivery or performance by Pledgor of this Pledge Agreement or for the validity or enforceability thereof, (ii) the grant by Pledgor of the assignments and security interests granted hereby, or the pledge by Pledgor of the Collateral pursuant hereto, (iii) the perfection or maintenance of the pledge, assignment and security interest created hereby (including, without limitation, the first priority nature of such pledge, assignment and security interest) except for the filing of financing statements under the Uniform Commercial Code or any other requirements under Article 8 of the UCC or (iv) the exercise by Lender of all or any of the rights and remedies in respect of the Collateral pursuant to this Pledge Agreement (and upon such exercise, for the purchaser of such Collateral to be admitted as a partner or owner of Owner or a member or owner of GP, as applicable, to the full extent of the Pledged Interests).

(f)    Ownership.  Pledgor owns (i) ninety-nine and ninety-nine hundredths percent (99.99%) of the outstanding partnership interests in Owner and (ii) one hundred percent (100%) of the outstanding limited liability company interest in GP, which owns one hundredth percent (.01%) of the outstanding partnership interests in Owner, and pursuant to this Pledge Agreement, Lender has received a pledge of one hundred percent (100%) of the outstanding partnership interests in Owner and membership interests in GP.  Pledgor has good title to the Collateral, as applicable, free and clear of all pledges, liens, mortgages, hypothecations, security interests, charges, options or other encumbrances whatsoever, except the lien and the security interest created by this Pledge Agreement.  The Pledged Interests are not and will not be subject to any contractual restriction upon the transfer thereof (except for any such restrictions contained herein or in the other Loan Documents).  The organizational chart attached as Exhibit A to that certain Confirmation Statement and Control Agreement delivered to Lender by Owner on the date hereof (a form of which is attached hereto as Exhibit D-1) is true, correct and complete, and accurately reflects the ownership interest of Pledgor in Owner, as of the date hereof.  The organizational chart attached as Exhibit A to that certain Confirmation Statement and Control Agreement delivered to Lender by GP on the date hereof (a form of which is attached hereto as Exhibit D-2) is true, correct and complete, and accurately reflects the ownership interest of Pledgor in GP, as of the date hereof.

(g)    Principal Place of Business.  Pledgor's principal place of business is as set forth in the introductory paragraph of this Pledge Agreement.  Pledgor will not change Pledgor's principal place of business or state of organization/formation unless Pledgor has previously notified Lender thereof not less than thirty (30) days prior thereto and taken such action as may be requested by Lender in its reasonable discretion to cause the security interest of Lender in the Collateral to be continuously perfected.

6

(h)    <u>Valid Security Interest</u>.  This Pledge Agreement creates a valid security interest in the Collateral, securing the Pledgor Obligations, and upon the filing in the appropriate filing offices of the financing statements to be filed in accordance with this Pledge Agreement and the delivery and possession of the security certificates which evidence the Pledged Interests (in accordance with the provisions of Article 8 of the UCC), along with each Assignment of Interest executed in blank, such security interests will be perfected, first priority security interests, and all filings and other actions necessary to perfect such security interests will have been taken.

(i)    <u>Authorization</u>.  Upon delivery of the certificated Pledged Interests to Lender pursuant to Section 2(b) hereof, Pledgor authorizes Lender to store, deposit and safeguard the Collateral.  Any obligation of Lender for the reasonable care of the Collateral in Lender's or Lender's respective possession shall be limited to the same degree of care which Lender uses for similar property pledged to Lender by other Persons.

(j)    <u>Delivery</u>.  Pledgor has delivered to Lender a true, correct and complete copy of Owner's and GP's Charter Documents, as in effect on the date hereof.

(k)    <u>Article 8 Election.</u> The limited partnership agreement of Owner provides that the limited partnership interests in Owner are "securities" governed by and within the meaning of Article 8 of the Uniform Commercial Code, as from time to time amended and in effect, in the jurisdiction in which Owner is organized. The limited liability company agreement of GP provides that the limited liability company membership interests in GP are "securities" governed by and within the meaning of Article 8 of the Uniform Commercial Code, as from time to time amended and in effect, in the jurisdiction in which GP is organized.

5.    <u>**Covenants of Pledgor**</u>.  Pledgor covenants that:

(a)    <u>No Transfer</u>.  Except as otherwise expressly permitted under the Loan Agreement, Pledgor has not and will not (i) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Collateral or any interest therein, (ii) create, incur or permit to exist any pledge, lien, mortgage, hypothecation, security interest, charge, option or any other encumbrance with respect to any Collateral, or any interest therein, or any proceeds thereof, except for the security interest provided for by this Pledge Agreement, (iii) vote to enable, or take any other action to permit, Owner to issue any partnership interests, or to issue any other securities convertible into or granting the right to purchase or exchange for any partnership interests in Owner or (iv) vote to enable, or take any other action to permit, GP to issue any limited liability company interests, or to issue any other securities convertible into or granting the right to purchase or exchange for any limited liability company interests in GP.

(b)    <u>No Waiver, Amendment, Etc</u>.  Pledgor shall not directly or indirectly, without the prior written consent of Lender, attempt to waive, alter, amend, modify, supplement any provision of the Charter Documents in any manner that would reasonably be expected to result in a material adverse effect on the Collateral.  Pledgor agrees that all rights to do any and all of the foregoing have been collaterally assigned to Lender, but Pledgor agrees that, upon a reasonable request from Lender from time to time, Pledgor shall do any of the foregoing or shall join Lender in doing so or shall confirm the right of Lender to do so and shall execute such instruments and undertake such actions as Lender may reasonably request in connection therewith.

7

(c)    <u>Settlement and Release</u>.  Pledgor shall not make any election, compromise, adjustment or settlement in respect of any of the Collateral.

(d)    <u>Preservation of Collateral</u>.  Lender may, in its discretion, for the account and expense of Pledgor pay any amount or do any act required of Pledgor hereunder or reasonably requested by Lender to preserve, protect, maintain or enforce the Pledgor Obligations, the Collateral or the security interests granted herein, provided Pledgor has failed to pay such amount or take such action within ten (10) Business Days after written demand by Lender.  Any such payment shall be deemed an advance by Lender to Pledgor and shall be payable by Pledgor within ten (10) Business Days after written demand together with interest thereon at the Default Rate from the date expended by Lender until paid.

(e)    <u>Warranty of Title</u>.  Pledgor shall warrant and defend the right, title and interest of Lender in and to the Collateral and the proceeds thereof against the claims and demands of all persons whomsoever other than Lender pursuant to this Pledge Agreement and the Loan Documents.  Any interest, securities, Lien or option with respect to the Pledged Interests issued in violation of this Pledge Agreement shall be void *ab initio*.

(f)    <u>Files and Records</u>.  Pledgor shall maintain, at its principal office, and, upon reasonable request, make available to Lender the originals, or copies in any case where the originals have been delivered to Lender of the instruments, documents, policies and agreements constituting the Collateral (to the extent not held by Lender) and related documents and instruments, and, to the extent applicable, all files, surveys, certificates, correspondence, appraisals, computer programs, tapes, discs, cards, accounting records and other information and data relating to the Collateral.

(g)    <u>Litigation</u>.  Pledgor shall promptly give to Lender notice of all pending legal or arbitration proceedings, and of all proceedings pending by or before any governmental or regulatory authority or agency or, if Pledgor obtains knowledge of such threat, threatened, against any Pledgor, Owner or GP or which relates to the Collateral which, if adversely determined, is reasonably likely to materially adversely affect Pledgor's, Owner's or GP's condition (financial or otherwise) or business or the Collateral.

(h)    <u>Existence, Etc</u>.  Pledgor shall and shall cause Owner and GP to preserve and maintain its existence and all of its material rights, privileges and franchises.  Pledgor shall comply and cause Owner and GP to comply with the requirements of all applicable laws, rules, regulations and orders of governmental or regulatory authorities; and pay and discharge or cause Owner and GP to pay or discharge all taxes, assessments and governmental charges or levies imposed on it or on its income or profits or on any of their property prior to the date on which penalties attach thereto, except for any such tax, assessment, charge or levy the payment of which is being contested in good faith and by proper proceedings.

(i)    <u>Charter Documents</u>.  Pledgor shall, at its expense:

(i)    perform and observe in all material respects all the terms and provisions of the Charter Documents to be performed or observed by it, maintain the Charter Documents in full force and effect, enforce the Charter Documents in accordance

8

with their respective terms, and to take all such action to such end relating to the Charter Documents as may be from time to time reasonably requested by Lender; and

(ii)    furnish to Lender reasonably promptly upon receipt thereof copies of all notices, requests and other documents received by Pledgor under or pursuant to the Charter Documents, and from time to time furnish to Lender such information and reports regarding the Collateral as Lender may reasonably request.

(j)    <u>Principal Place of Business and State of Organization</u>.  Pledgor will not change Pledgor's principal place of business or state of organization unless Pledgor has previously notified Lender thereof and taken such action as is reasonably requested by Lender to cause the security interest of Lender in the Collateral to continue to be perfected.

(k)    <u>Acknowledgements of Parties</u>.  If Pledgor shall, as a result of its ownership of the Pledged Interests, become entitled to receive or shall receive any new or additional partnership certificate (including, without limitation, any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any shares of the Pledged Interests, or otherwise in respect thereof, Pledgor shall accept the same as Lender's agent, hold the same in trust for Lender and promptly deliver the same forthwith to Lender in the exact form received, duly endorsed by Pledgor to Lender, if required, together with an undated regular partnership interest power covering such certificate duly executed in blank and with, if Lender so requests, signature guaranteed, to be held by Lender hereunder as additional security for the Pledgor Obligations.  Until the Pledgor Obligations are indefeasibly paid and performed in full, any sums paid to Pledgor upon or in respect of the Pledged Interests upon the liquidation or dissolution of Owner or GP shall be paid over to Lender to be held by it hereunder as additional security for the Pledgor Obligations, and in case any distribution of capital shall be made on or in respect of the Pledged Interests or any property shall be distributed upon or with respect to the Pledged Interests pursuant to the recapitalization or reclassification of the capital of Owner or GP or pursuant to the reorganization thereof, the property so distributed shall be delivered to Lender to be held by it, subject to the terms hereof, as additional security for the Pledgor Obligations.  If any sums of money or property so paid or distributed in respect of the Pledged Interests shall be received by Pledgor, Pledgor shall, until such money or property is paid or delivered to Lender, hold such money or property in trust for Lender, segregated from other funds of Pledgor, as additional security for the Pledgor Obligations.

**6.    <u>Certain Understandings of Parties; Registration of Pledge; Control of Collateral, Etc</u>**.  The parties acknowledge and agree that the terms of the Pledged Interests do and will provide that they shall constitute a "security" within the meaning of Article 8 of the Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of New York, and Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.  The parties acknowledge and agree that the Pledged Interests, and the Certificates of Pledgor in Owner and GP which have been delivered to Lender on the date hereof, constitute and will constitute "certificated

9

securities" (as defined in the Code).  Pledgor therefor covenants and agrees that Pledgor shall not, directly or indirectly, without the prior written consent of Lender, alter, amend modify, supplement or change in any way, the partnership agreement of Owner or the operating agreement of GP, both as in effect on the date hereof.

       7.    **Further Assurances; Remedies**.  In furtherance of the grant of the pledge and security interest pursuant to <u>Section 2</u> hereof, Pledgor hereby agrees with Lender as follows:

       (a)    Delivery and Other Perfection.  Pledgor shall:

       (i)    if any of the above-described Collateral required to be pledged by Pledgor under <u>Section 2(a)</u> hereof is received by Pledgor, forthwith either (x) transfer and deliver to Lender such Collateral so received by Pledgor (together with the certificates (if any) for any such Collateral, including assignments duly endorsed in blank) all of which thereafter shall be held by Lender, pursuant to the terms of this Pledge Agreement, as part of the Collateral or (y) take such other action as Lender shall deem reasonably necessary or appropriate to duly file on record the security interest created hereunder in such Collateral referred to in said <u>Section 2(a)</u>;

       (ii)    give, execute, deliver, file and/or record any financing statement, notice, instrument, document, agreement or other papers that may be necessary or desirable (in the reasonable judgment of Lender) to create, preserve, perfect or validate the security interest granted pursuant hereto or to enable Lender to exercise and enforce its rights hereunder with respect to such pledge and security interest, including, without limitation, upon the occurrence and during the continuance of an Event of Default causing any or all of the Collateral to be transferred of record into the name of Lender or its nominee; and

       (iii)    permit representatives of Lender, upon reasonable prior notice, at any time during normal business hours to inspect and make abstracts from its books and records pertaining to the Collateral, and permit representatives of Lender to be present at Pledgor's place of business to receive copies of all written communications and remittances relating to the Collateral, and forward copies of any written notices or written communications received by Pledgor with respect to the Collateral, all in such manner as Lender may reasonably require.

       (b)    <u>Preservation of Rights</u>.  Except in accordance with applicable law, Lender shall not be required to take steps necessary to preserve any rights against prior parties to any of the Collateral.

       (c)    Pledged Collateral.

       (i)    Pledgor shall not and shall not have the right to directly or indirectly, without the prior written consent of Lender, attempt to waive, alter, amend, modify, supplement or change in any manner that would be reasonably expected to result in a material adverse effect on the Collateral, Lender's rights therein, or release, subordinate, terminate or cancel in whole or in part, or give any consent under, any of the instruments, documents, policies or agreements constituting the Collateral or exercise any of the rights, options or interests of Pledgor as party, holder, mortgagee or beneficiary thereunder except

10

as otherwise expressly permitted under the Loan Agreement or hereunder.  Pledgor agrees that all rights to do any and all of the foregoing have been collaterally assigned to and may be exercised by Lender (subject to the terms and conditions and notice requirements, if any, set forth herein and in the other Loan Documents) but Pledgor agrees that, upon reasonable request from Lender from time to time, Pledgor shall do any of the foregoing or shall join Lender in doing so or shall confirm the right of Lender to do so and shall execute such instruments and undertake such actions as Lender may reasonably request in connection therewith; provided, however, that Pledgor's obligations and liabilities under the Loan Documents shall not be increased, nor its rights thereunder decreased in any non de minimis respect.  Pledgor shall not make any election, compromise, adjustment or settlement in respect of any of the Collateral.  Notwithstanding anything herein to the contrary, so long as no Event of Default shall have occurred and be continuing, Pledgor shall have the right to exercise all of Pledgor's rights under the Charter Documents to which it is a party for all purposes not prohibited by any of the terms of this Pledge Agreement, the Note, the Loan Agreement or any other Loan Document, provided that Pledgor agrees that it will not take any action in any manner that is prohibited by the terms of this Pledge Agreement, the Note, the Loan Agreement or any other Loan Document.

(ii)     Anything to the contrary notwithstanding, (i) Pledgor shall remain liable under the Charter Documents to perform all of its duties and obligations thereunder to the same extent as if this Pledge Agreement had not been executed, (ii) the exercise by Lender of any of the rights hereunder shall not release Pledgor from any of its duties or obligations under the Charter Documents, and (iii) Lender shall have no obligation or liability for Pledgor's actions or omissions under the Charter Documents by reason of this Pledge Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Pledgor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(d)     Events of Default, Etc.  During any period in which an Event of Default has occurred and is continuing:

(i)     Lender shall have all of the rights and remedies with respect to the Collateral of a secured party under the Uniform Commercial Code (whether or not said Uniform Commercial Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if Lender were the sole and absolute owner thereof (and Pledgor agrees to take all such action as may be appropriate to give effect to such right);

(ii)     Lender in its discretion may, in its name or in the name of Pledgor or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so; provided, however, that, notwithstanding the foregoing, Lender shall not be permitted to bring suit in the name of Pledgor under this subsection 7(d)(ii);

11

(iii)    Lender may, at its option, apply all or any part of the Collateral in accordance with Section 7(f);

(iv)    Lender may with respect to the Collateral or any part thereof which shall then be or shall thereafter come into the possession, custody or control of Lender or any of its agents, sell, assign or otherwise dispose of all or any part of such Collateral, at such place or places as Lender deems best, and for cash or on credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of time or place thereof (except such notice as is required above or by applicable statute and cannot be waived) and Lender or anyone else may be the purchaser, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale), and thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of Pledgor, any such demand, notice or right and equity being hereby expressly waived and released. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) Business Days before such sale or other disposition. Unless prohibited by applicable law, Lender may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned;

(v)    Subject to the terms of this Agreement, Lender may exercise all partnership rights and limited liability company rights, as applicable, powers and privileges to the same extent as Pledgor is entitled to exercise such rights, powers and privileges;

(vi)    Lender may, in connection with a sale of all or any of the Owner Pledged Interests, without any further action of any party, cause any purchaser or transferee of all or any part of any Owner Pledged Interests to be admitted as a new partner or owner of Owner to the extent of such Owner Pledged Interests, and cause Pledgor to withdraw as a partner or owner of Owner to the extent such Owner Pledged Interests are sold or transferred, and complete by inserting the Effective Date (as defined therein) and the name of the assignee thereunder and deliver to such assignee the Owner Assignment of Interest executed and delivered by Pledgor and, if appropriate, cause one or more amended or restated certificates of limited partnership to be filed with respect to Owner;

(vii)    Lender may, in connection with a sale of all or any of the GP Pledged Interests, without any further action of any party, cause any purchaser or transferee of all or any part of any GP Pledged Interests to be admitted as a new member or owner of GP to the extent of such GP Pledged Interests, and cause Pledgor to withdraw as a member or owner of GP to the extent such GP Pledged Interests are sold or transferred, and complete by inserting the Effective Date (as defined therein) and the name of the assignee thereunder and deliver to such assignee the GP Assignment of Interest executed and delivered by Pledgor and, if appropriate, cause one or more amended or restated certificates of limited partnership to be filed with respect to GP;

12

(viii)   Lender may exercise any and all rights and remedies of Pledgor under or in connection with the Charter Documents or otherwise in respect of the Collateral, including, without limitation, any and all rights of Pledgor to demand or otherwise require payment of any amount under, or performance of any provisions of, the Charter Documents; and

(ix)   all payments received, directly or indirectly, by Pledgor under or in connection with the Charter Documents or otherwise in respect of the Collateral shall be received in trust for the benefit of Lender, shall be segregated from other funds of Pledgor and shall be forthwith paid over to Lender in the same form as so received (with any necessary endorsement).

The proceeds of any collection, sale or other disposition under this Section 7(d) shall be applied by Lender pursuant to Section 7(f) hereof.

Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws, Lender may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof.  Pledgor acknowledges that any such private sales may be at prices and on terms less favorable to Lender than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, Pledgor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Lender shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for public sale.

(e)   Private Sale.  Lender shall not incur any liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to Section 7(d) hereof conducted in a commercially reasonable manner.  Pledgor hereby waives any claims against Lender arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Pledgor Obligations, even if Lender accepts the first offer received and does not offer the Collateral to more than one offeree.

(f)   Application of Proceeds.  Except as otherwise herein expressly provided, the proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by Lender under this Section 7, shall be applied by Lender:

First, to the payment of the out-of-pocket costs and expenses actually incurred in connection with such collection, sale or other realization, including reasonable out-of-pocket costs and expenses of Lender (including the fees and expenses of its counsel), and all third party costs and expenses actually made or incurred by Lender in connection therewith;

Next, to the payment in full of the Pledgor Obligations; and

13

_Finally_, to the payment to Pledgor, or its successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining.

As used in this Section 6, "*proceeds*" of Collateral shall mean cash, securities and other property realized in respect of, and distributions in kind of, Collateral, including any thereof received under any reorganization, liquidation or adjustment of debt of Pledgor or any issuer of or obligor on any of the Collateral.

(g)    Attorney-in-Fact.    Without limiting any rights or powers granted by this Pledge Agreement to Lender, Lender is hereby appointed the attorney-in-fact of Pledgor for the sole purpose of, upon the occurrence and during the continuance of an Event of Default, carrying out the provisions of this Section 7 and taking any action and executing any instruments which Lender may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest.  Without limiting the generality of the foregoing, so long as Lender shall be entitled under this Section 7 to make collections in respect of the Collateral, Lender shall have the right and power to receive, endorse and collect all checks made payable to the order of Pledgor representing any payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same.

(h)    Confirmation Statement; Control Agreement.    To better assure the perfection of the security interest of Lender in the Pledged Interests, concurrently with the execution and delivery of this Pledge Agreement, Pledgor shall send written instructions in the form of Exhibit C-1 and C-2 hereto to Owner and GP, respectively, and shall cause Owner and GP to, and Owner and GP shall, deliver to Lender the Confirmation Statement and Control Agreement in the form of Exhibit D-1 and D-2, respectively, hereto pursuant to which Owner and GP will confirm that each has registered the pledge effected by this Pledge Agreement on its books and agrees, upon the occurrence and during the continuation of an Event of Default, to comply with the instructions of Lender in respect of the Pledged Interests without further consent of Pledgor or any other Person.  Notwithstanding anything in this paragraph, neither the written instructions nor the Confirmation Statement and Control Agreement shall be construed as expanding the rights of Lender to give instructions with respect to the Collateral beyond such rights set forth in this Pledge Agreement.

(i)    Opinion of Counsel.    Pledgor shall cause to be delivered to Lender concurrently herewith, an opinion of counsel to Pledgor, acceptable to Lender in its reasonable discretion, with respect to the authority of, and due execution and delivery by, Pledgor, and the enforceability of the Pledge Agreement.

## 8.    **Termination**.

This Pledge Agreement shall survive the exercise of remedies following an Event of Default under the Loan Agreement or the other Loan Documents, and/or the foreclosure of the Mortgage against the Property by Mortgage Lender, and shall remain in full force and effect until all Pledgor Obligations and other sums due under the Loan Agreement and the other Loan Documents have been indefeasibly paid in full to Lender.  Upon the indefeasible payment and performance in full of all Pledgor Obligations under the Loan Documents to Lender this Pledge Agreement shall terminate, and Lender shall forthwith cause to be assigned, transferred and

14

delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of Pledgor. Lender's obligation to so assign, transfer and deliver shall survive the termination of this Agreement. Lender shall, upon the written request and at the expense of Pledgor, upon payment in full of the Pledgor Obligations in accordance with the Loan Agreement and the other Loan Documents, release the Liens of this Pledge Agreement and cause to be delivered to Pledgor, without any recourse, warranty or representation whatsoever (except that Lender has the full power and authority to deliver the same, and has not sold or encumbered the same in favor of any third party, other than any encumbrances released as of such delivery) any membership interest and/or limited partner interest certificates evidencing the Collateral delivered to Lender hereunder, to Pledgor and authorize the filing of, UCC-3 termination statements (in form and substance reasonably acceptable to Lender) to terminate all of Lender's rights under this Pledge Agreement. If Lender cannot locate one or more of the original certificates evidencing the Collateral, Lender shall deliver to Pledgor an affidavit of Lender that (i) Lender has made a search for such original certificates and cannot locate the same, (ii) loss of custody of the same was not the result of a transfer by Lender (iii) Lender has not sold, assigned or transferred such certificates nor pledged, hypothecated or encumbered the same.

9.    **Miscellaneous.**

(a)    <u>No Waiver</u>.  No failure on the part of Lender or any of its agents to exercise, and no course of dealing with respect to, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by Lender or any of its agents of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  The remedies provided herein are cumulative and are not exclusive of any remedies provided by law.

(b)    <u>Governing Law</u>.  The provisions of Section 10.6 of the Loan Agreement shall apply mutatis mutandis to this Pledge Agreement and are hereby incorporated by reference into this Pledge Agreement to the same extent and with the same force as if fully set forth herein.

(c)    <u>Notices</u>.  All notices, demands, requests, consents, approvals or other communications required, permitted or desired to be given hereunder shall be given to Pledgor at the address for Pledgor and in accordance with Section 6.1 of the Loan Agreement.

(d)    <u>Waivers, etc</u>.  The terms of this Pledge Agreement may be waived, altered or amended only by an instrument in writing duly executed by Pledgor and Lender.  Any such amendment or waiver shall be binding upon Lender and Pledgor.

(e)    <u>Successors and Assigns</u>.  This Pledge Agreement shall be binding upon the successors and assigns of Pledgor and inure to the benefit of the successors and assigns of Lender (provided, however, that Pledgor shall not assign or transfer its rights hereunder without the prior written consent of Lender).  Without limiting the foregoing, but in accordance with the provisions of the Loan Documents, Lender may at any time and from time to time without the consent of Pledgor, assign or otherwise transfer all or any portion of its rights and remedies under this Pledge Agreement to any other person or entity, either separately or together with other property of Pledgor for such purposes in connection with a transfer of Lender's interest in the Loan (*i.e.*, in

15

connection with a transfer of all or any portion of Lender's interest in and to all or any portion of any Note). Without limiting the foregoing, in connection with any assignment of the Loan in accordance with the Loan Agreement, Lender may assign or otherwise transfer all of its rights and remedies under this Pledge Agreement to the assignee and such assignee shall thereupon become vested with all of the rights and obligations in respect thereof granted to Lender herein or otherwise. Each representation and agreement made by Pledgor in this Pledge Agreement shall be deemed to run to, and each reference in this Pledge Agreement to Lender shall be deemed to refer to, Lender and each of its successors and assigns.

(f)     No Liability on Part of Lender.  Lender, by its acceptance of this Pledge Agreement, the Collateral and any payments on account thereof, shall not be deemed to have assumed or to have become liable for any of the obligations or liabilities of Pledgor. Lender shall not have any duty to collect any sums due in respect of any of the Collateral in its possession or control, or to enforce, protect or preserve any rights pertaining thereto, and Lender shall not be liable for failure to collect or realize upon the Collateral, or any part thereof, or for any delay in so doing, nor shall Lender be under any obligation to take any action whatsoever with regard thereto. Lender shall, if requested by the payor of any revenue payment, give receipts for any payments received by Lender on account of the Collateral.

(g)     Expenses, Indemnification.

(i)     Pledgor agrees to pay or reimburse Lender, or cause to be paid or reimbursed, for paying:  (A) all reasonable out-of-pocket expenses of Lender (including, without limitation, the reasonable fees and expenses of counsel to Lender), in connection with (1) the negotiation, preparation, execution and delivery of this Pledge Agreement and (2) any amendment, modification or waiver of any of the terms of this Pledge Agreement requested or initiated by Pledgor; (B) all out-of-pocket costs and expenses of Lender (including reasonable counsel's fees) in connection with any enforcement or collection proceedings resulting from an Event of Default; and (C) all costs, expenses, taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by this Pledge Agreement or any document referred to herein and, subject to the terms of the Loan Documents, all transfer, stamp, documentary or other similar taxes, assessments or charges levied by any governmental or revenue authority in respect of this Pledge Agreement, or any other document referred to herein.

(ii)     Pledgor hereby agrees to indemnify Lender and its directors, officers, employees and agents from, and hold each of them harmless against, any and all actual losses, liabilities, claims, damages or out-of-pocket expenses incurred by any of them arising out of or by reason of any claim of any Person (A) relating to or arising out of the acts or omissions of Pledgor under this Pledge Agreement or, after Lender has exercised any rights in accordance herewith and the Loan Documents, the Charter Documents (but excluding any such losses, liabilities, claims, damages or expenses incurred by reason of the gross negligence or willful misconduct of the Person to be indemnified), or (B) resulting from the ownership of or security interests in any Collateral, including, without limitation, the reasonable fees and disbursements of counsel incurred in connection with any such investigation or litigation or other proceedings (but excluding

16

any such losses, liabilities, claims, damages or expenses incurred by reason of the gross negligence or willful misconduct of Lender or the Person to be indemnified).

(h)    Further Assurances.  Pledgor agrees that, from time to time upon the written request of Lender, Pledgor will execute and deliver such further documents and do such other acts and things as Lender may reasonably request in order fully to effect the purposes of this Pledge Agreement; provided, however, Pledgor's obligations under the Loan Documents shall not be increased, nor its rights thereunder decreased in any non de minimis respect.

(i)    Delay Not a Waiver.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.

(j)    Counterparts.  This Pledge Agreement may be executed by facsimile or other electronic means, and in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Pledge Agreement by signing any such counterpart.

(k)    Severability.  If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of Lender in order to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

(l)    Recitals.  The recital and introductory paragraphs hereof are a part hereof, form a basis for this Pledge Agreement and shall be considered prima facie evidence of the facts and documents referred to therein.

(m)    Gender; Number.  As used in this Pledge Agreement, the masculine, feminine or neuter gender shall be deemed to include the others, and the singular shall include the plural (and vice versa), whenever the context so requires.

(n)    Irrevocable Proxy.  Solely with respect to Article 8 Matters, so long as any Obligation remains outstanding, Pledgor hereby unconditionally and irrevocably grants and appoints Lender, from the date of this Agreement until the termination of this Agreement in accordance with its terms, as Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead to vote the Owner Pledged Interests in Owner by Pledgor and the GP Pledged Interests in GP by Pledgor, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters.  The proxy and powers granted to Lender by Pledgor pursuant to this Agreement are coupled with an interest and are given to secure the performance of Pledgor's obligations under this Agreement. The proxy granted and appointed in this Section 9(n) shall include the right to sign Pledgor's name (as a partner of the related Owner, and as a member of the related GP) to any consent, certificate or other document relating to an Article 8 Matter and the Pledged Interests that applicable law may permit or require, to cause the

17

Pledged Interests to be voted in accordance with the preceding sentence. Pledgor hereby represents and warrants that there are no other proxies and/or powers of attorney with respect to any Article 8 Matter and the Pledged Interests that Pledgor may have granted or appointed. Pledgor will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Interests with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter shall be void and of no effect. As used herein, an "***Article 8 Matter***" means any actions, decision, determination or election by (i) Owner or its partner that its partnership interests or other equity interests be, or cease to be, a "security" or (ii) GP or its member that its membership interests or other equity interest be, or cease to be, a "security, as applicable, within the meaning of Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of New York and Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995, and all other matters related to any such action, decision, determination or election.

(o)      Incorporation by Reference.  To the extent that any provisions or defined terms contained in any other Loan Document (including, without limitation, the Loan Agreements) are used herein or incorporated herein by reference, and such other Loan Document is terminated or otherwise satisfied prior to the termination of this Pledge Agreement, then, for the avoidance of doubt, such provisions and/or defined terms shall survive until the satisfaction of the Pledgor Obligations without regard to the fact that the Loan Document originally containing the same has been otherwise terminated or satisfied.

**10.      Third Party Waivers.**

(a)      Rights of Lender.  Subject to the terms of this Agreement, Pledgor authorizes Lender to perform any or all of the following acts at any time in its sole discretion, all without notice to Pledgor, without affecting Pledgor's obligations under this Pledge Agreement or any other Loan Documents and without affecting the liens and encumbrances against the Collateral in favor of Lender:

(i)      Lender may take and hold security for the Pledgor Obligations, accept additional or substituted security, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect and sell or otherwise dispose of any such security;

(ii)      Upon the occurrence and during the continuance of an Event of Default, Lender may direct the order and manner of any sale of all or any part of any security now or later to be held for the Pledgor Obligations, and Lender (or its nominees or designees) may also bid at any such sale;

(iii)      Upon the occurrence and during the continuance of an Event of Default, Lender may apply any payments or recoveries from Pledgor, any Pledgor Affiliate

or any other source, and any proceeds of any security, to the Pledgor Obligations in such manner, order and priority as Lender may elect;

(iv)    Lender may release Pledgor or any other Person from its liability for the Pledgor Obligations or any part thereof;

(v)    Lender may substitute, add or release any one or more guarantors, pledgors or endorsers; and

(vi)    In addition to the Pledgor Obligations, Lender may extend other credit to Pledgor or any Pledgor Affiliate, and may take and hold security for the credit so extended, all without affecting Pledgor's liability hereunder or under the other Loan Documents and without affecting the liens and encumbrances against the Collateral hereunder or under the other Loan Documents.

(b)    _Absolute Obligations_.  Pledgor expressly agrees that until all Pledgor Obligations are paid and performed in full and each and every term, covenant and condition of this Pledge Agreement and the other Loan Documents is fully satisfied and performed, Pledgor shall not be released of its obligations, waivers and agreements set forth herein, in any other Loan Document nor shall the validity, enforceability or priority of the liens and encumbrances against the Collateral in favor of Lender be affected in any manner by or because of:

(i)    Any act or event which might otherwise discharge, reduce, limit or modify any Pledgor's obligations hereunder or under the other Loan Documents or the liens and encumbrances against the Collateral in favor of Lender, other than payment in full of the Pledgor Obligations;

(ii)    Any waiver, extension, modification, forbearance, delay or other act or omission of Lender or any failure to proceed promptly or otherwise as against Pledgor or any other Person or any security;

(iii)    Any action, omission or circumstance which might increase the likelihood that Lender might enforce the rights granted under this Pledge Agreement or under the other Loan Documents or which might affect the rights or remedies of Pledgor as against any other Person; or

(iv)    Any dealings occurring at any time between Pledgor or any of its Affiliates and Lender, whether relating to the Pledgor Obligations or otherwise.

Pledgor hereby expressly waives and surrenders any defense to the performance of the obligations under this Pledge Agreement and under all other Loan Documents or to the enforcement of the liens and encumbrances against the Collateral in favor of Lender based upon any of the foregoing acts, omissions, agreements, waivers or matters described in this subsection (other than the defense that payment has been made).  It is the purpose and intent of this Pledge Agreement that the obligations of Pledgor under this Pledge Agreement and under all other Loan Documents shall be absolute and unconditional under any and all circumstances.

(c)    _Pledgor's Waivers_.  Pledgor waives:

19

(i)     Any right it may have to require Lender to proceed against Pledgor or any other Person, proceed against or exhaust any security held from Pledgor or any Person, or pursue any other remedy in Lender's power to pursue until the indefeasible payment of the Loan in full;

(ii)     Any defense based on any claim that Pledgor's obligations exceed or are more burdensome than those of Pledgor or any other Person;

(iii)     Any defense:  (A) based on any legal disability of any other Person, (B) based on any release, discharge, modification, impairment or limitation of the liability of any other Person to Lender from any cause, whether consented to by Lender or arising by operation of law, (C) arising out of or able to be asserted as a result of any case, action or proceeding before any governmental authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of any other Person or any of their affiliates, or any general assignment for the benefit of creditors, composition, marshaling of assets for creditors or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case as undertaken under any U.S. Federal or State law (each of the foregoing described in this clause (C) being referred to herein as an "Insolvency Proceeding"); or (D) arising from any rejection or disaffirmance of the Pledgor Obligations, or any part thereof, or any security held therefor, in any such Insolvency Proceeding;

(iv)     Any defense based on any action taken or omitted by Lender in any Insolvency Proceeding involving any other Person, including any election to have Lender's claim allowed as being secured, partially secured or unsecured, any extension of credit by Lender to any other Person in any Insolvency Proceeding, and the taking and holding by Lender of any security for any such extension of credit;

(v)     Except as otherwise provided herein, all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of intention to accelerate, notices of acceleration, notices of acceptance of this Pledge Agreement, any other Loan Document and of the existence, creation, or incurring of new or additional indebtedness, and demands and notices of every kind; and

(vi)     Any defense based on or arising out of any defense that Pledgor or any of its affiliates may have to the payment or performance of the Pledgor Obligations, other than the defense of payment of the Pledgor Obligations.

(d)     <u>Waiver of Subrogation and Other Rights</u>.

(i)     Upon the occurrence and during the continuance of any Default, in its sole discretion, without prior notice to or consent of Pledgor, Lender may elect to:  (A) foreclose against any collateral for the Pledgor Obligations, (B) accept a transfer of any such collateral for the Pledgor Obligations in lieu of foreclosure, (C) compromise or adjust the Pledgor Obligations or any part thereof or make any other accommodation with Pledgor or any other Person, or (D) exercise any other remedy against Pledgor or any other Person or any collateral for the Pledgor Obligations.  No such action by Lender shall release or

20

limit Lender's rights hereunder, under the other Loan Documents, even if the effect of the action is to deprive Pledgor of any subrogation rights, rights of indemnity, or other rights to collect reimbursement from any other Person for any sums paid to Lender, whether contractual or arising by operation of law or otherwise.  Pledgor expressly agrees that under no circumstances shall Pledgor be deemed to have any right, title, interest or claim in or to any Collateral to be held by Lender or any third party after any foreclosure or transfer in lieu of foreclosure of the Collateral.

Regardless of whether Pledgor may have made any payments to Lender, until repayment in full of all of the Pledgor Obligations, Pledgor waives:  (A) upon the occurrence and during the continuance of a Default all rights of subrogation, all rights of indemnity, and any other rights to collect reimbursement from any other Person on account of the Collateral encumbered by this Pledge Agreement, whether contractual or arising by operation of law (including the United States Bankruptcy Code or any successor or similar statute) or otherwise; (B) all rights to enforce any remedy that Pledgor may have against any Person granting collateral for the Pledgor Obligations; and (C) all rights to participate in any Collateral now or later to be held by Lender.

**11.**     **Exculpation.**  The liability of Pledgor hereunder is limited pursuant to Section 10.1 of the Loan Agreement.

[BALANCE OF PAGE INTENTIONALLY BLANK;
SIGNATURE PAGE FOLLOWS]

21

IN WITNESS WHEREOF, Pledgor has executed this Pledge Agreement as of the day and year first above written.

**PLEDGOR:**

**CBCS WASHINGTON MEZZ BORROWER LP**, a Delaware limited partnership

By:_____
Name:
Title:

**[SIGNATURES CONTINUE ON NEXT PAGE]**

[Signature Page to Pledge and Security Agreement]

**<u>ACCEPTED BY LENDER</u>:**

[**HANA FINANCIAL INVESTMENT OR AFFILIATE,** a
_____ limited liability company

By:_____
Name:
Title:]

## CONSENT OF OWNER
### (Pledge and Security Agreement)

### [_____], 2019

Owner hereby (a) acknowledges receipt of a copy of the executed Pledge Agreement to which this Consent of Owner is attached, (b) consents to the Pledge Agreement, (c) agrees to comply with the terms and provisions thereof, (d) agrees not to do anything or cause, permit or suffer anything to be done which is prohibited by, or contrary to, the terms of the Pledge Agreement, and (e) agrees to register on its books and records Lender's security interest in the Owner Pledged Interests as provided in the Pledge Agreement.

Without limiting the foregoing (and notwithstanding anything to the contrary in any charter document of Owner), from and after the date hereof, Owner agrees:

(a)    to deliver directly to Lender any and all instruments and/or certificates evidencing any right, option or warrant, and all new, additional or substituted securities issued to, or to be received by, any Pledgor by virtue of its ownership of the Owner Pledged Interests issued by Owner or upon exercise by any Pledgor of any option, warrant or right attached to such Owner Pledged Interests;

(b)    to recognize Lender's or any other successful bidder's automatic right to become a partner in, Owner following a sale of the Owner Pledged Interests in accordance with Section 7(d) of the Pledge Agreement, which admission shall be automatic upon the conclusion of a disposition pursuant to the Uniform Commercial Code and shall not require any further action on the part of Owner or any other person; and

(c)    in the event of a sale of the Owner Pledged Interests in accordance with Section 7(d) of the Pledge Agreement, Owner will, upon Lender's request and at Pledgor's expense: (i) provide Lender with such other information in Owner's possession and financial projections as may be necessary or, in Lender's reasonable opinion, advisable to enable Lender to effect the sale of the Owner Pledged Interests; and (ii) do or cause to be done all such other acts and things as may be reasonably necessary to make the sale of the Owner Pledged Interests or any part thereof valid and binding and in compliance with applicable law.

Owner further acknowledges and agrees that it shall do all of the foregoing without any further notice from or consent or agreement of Pledgor.

### [SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, Owner has executed this Consent as of the date first set forth above.

**OWNER:**

**CBCS WASHINGTON STREET LP**,
a Delaware limited partnership


By:_____
Name:
Title:]

**CONSENT OF GP**
**(Pledge and Security Agreement)**

**[_____], 2019**

GP hereby (a) acknowledges receipt of a copy of the executed Pledge Agreement to which this Consent of GP is attached, (b) consents to the Pledge Agreement, (c) agrees to comply with the terms and provisions thereof, (d) agrees not to do anything or cause, permit or suffer anything to be done which is prohibited by, or contrary to, the terms of the Pledge Agreement, and (e) agrees to register on its books and records Lender's security interest in the GP Pledged Interests as provided in the Pledge Agreement.

Without limiting the foregoing (and notwithstanding anything to the contrary in any charter document of GP), from and after the date hereof, GP agrees:

(a)    to deliver directly to Lender any and all instruments and/or certificates evidencing any right, option or warrant, and all new, additional or substituted securities issued to, or to be received by, any Pledgor by virtue of its ownership of the GP Pledged Interests issued by GP or upon exercise by any Pledgor of any option, warrant or right attached to such GP Pledged Interests;

(b)    to recognize Lender's or any other successful bidder's automatic right to become a member in GP following a sale of the GP Pledged Interests in accordance with Section 7(d) of the Pledge Agreement, which admission shall be automatic upon the conclusion of a disposition pursuant to the Uniform Commercial Code and shall not require any further action on the part of Owner or any other person; and

(c)    in the event of a sale of the GP Pledged Interests in accordance with Section 7(d) of the Pledge Agreement, GP will, upon Lender's request and at the applicable Pledgor's expense: (i) provide Lender with such other information in GP's possession and financial projections as may be necessary or, in Lender's reasonable opinion, advisable to enable Lender to effect the sale of the GP Pledged Interests; and (ii) do or cause to be done all such other acts and things as may be reasonably necessary to make the sale of the GP Pledged Interests or any part thereof valid and binding and in compliance with applicable law.

GP further acknowledges and agrees that it shall do all of the foregoing without any further notice from or consent or agreement of Pledgor.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, GP has executed this Consent as of the date first set forth above.

**GP:**

**CBCS WASHINGTON STREET GP LLC**,
a Delaware limited liability company

By:_____
Name:
Title:]

*ACTIVE 45810908v5*

## EXHIBIT A
## CHARTER DOCUMENTS
***[All documents dated as of the Effective Date unless otherwise indicated]***

1. Certificate of Limited Partnership of Owner
2. Fourth Amended and Restated Limited Partnership Agreement of Owner
3. Certificate of Formation of GP
4. Limited Liability Company Agreement of GP

## EXHIBIT B-1

### FORM OF ASSIGNMENT OF PARTNERSHIP INTEREST

THIS ASSIGNMENT OF PARTNERSHIP INTEREST (this "*Assignment of Partnership Interest*"), dated as of [_____], 2019 (the "*Effective Date*"), is made by **CBCS WASHINGTON MEZZ BORROWER LP**, a Delaware limited partnership (together with its successors and assigns, the "*Assignor*") to _____ _____ (the "*Assignee*").

### RECITALS

Assignor has entered into a certain Pledge and Security Agreement dated as of [_____], 2019 (such Agreement, as it may be amended or otherwise modified from time to time, the "*Pledge Agreement*") with [**HANA FINANCIAL INVESTMENT OR AFFILIATE**, a _____ limited liability company] (together with its successors and assigns, the "*Lender*"). Unless otherwise noted, terms defined in the Pledge Agreement are used herein as defined therein.

The Assignor is the ninety-nine and ninety-nine hundredths percent (99.99%) owner of the limited partnership interests in **CBCS WASHINGTON STREET LP**, a Delaware limited partnership (the "*Owner*"), existing under and evidenced by the Fourth Amended and Restated Limited Partnership Agreement of Owner, dated as of [_____], 2019 (such agreement, as it may be amended, supplemented or otherwise modified from time to time, the "*Partnership Agreement*"). Under the Partnership Agreement, the Assignor has certain rights, title and interest in and to Owner and its assets and distributions (collectively, the "*Interest*").

Lender has required that the Assignor shall have executed and delivered this Assignment of Partnership Interest.

NOW THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

Section 1. Assignment and Acceptance of Assigned Interest. As of the Effective Date, the Assignor hereby sells, transfers, conveys and assigns (without recourse and, except as set forth herein, representation or warranty) to the Assignee all of the Assignor's right, title and interest in and to the Interest and of its rights under the Partnership Agreement, including, without limitation, all its (a) rights to receive moneys due and to become due under or pursuant to the Partnership Agreement, (b) rights to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Partnership Agreement, (c) claims for damages arising out of or for breach of or default under the Partnership Agreement, and (d) rights to perform thereunder and to compel performance, and otherwise exercise all rights and remedies thereunder. The Assignor's right, title and interest in the Interest and of the Assignor's rights under the Partnership Agreement that are being assigned to the Assignee pursuant to the Pledge Agreement are hereinafter referred to as the "*Assigned Interest*". The Assignee, upon the execution of this Assignment of Partnership Interest, hereby accepts from the Assignor the Assigned Interest and agrees to become a successor partner of Owner in the place and stead of the Assignor to the extent of the Assigned Interest and to be bound by the terms and provisions of the Partnership Agreement.

*ACTIVE 45810908v5*

Section 2.  <u>Capital Account</u>.  On or prior to the Effective Date, the Assignee shall notify each of the other partners in Owner required to be so notified under the terms of the Partnership Agreement and thereafter, the portion of all profits and losses, and all other items of income, gain, loss, deduction or credit, allocable to the Assigned Interest shall be credited or charged, as the case may be, to the Assignee and the Assignee shall be entitled to the portion of all distributions, payments or other allocations payable in respect of the Assigned Interest, regardless of the source of such distributions, payments or other allocations or the date on which they were earned.

Section 3.  <u>Representations and Warranties of the Assignor</u>.  The Assignor represents to Assignee, as of the Effective Date of this Assignment of Partnership Interest, and to Lender as of the Effective Date of the Pledge Agreement, that:

(a)  This Assignment of Partnership Interest has been duly executed and delivered by the Assignor and is a valid and binding obligation of the Assignor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity; and

(b)  The Assignor is the sole owner of the Assigned Interest free and clear of any liens, except for the liens created by the Pledge Agreement.

Section 4.  <u>Filings</u>.  On or as soon as practicable after the Effective Date, the Assignee shall file and record or cause to be filed and recorded with all proper offices or agencies all documents and instruments required to effect the terms herein, if any, including, without limitation, (a) this Assignment of Partnership Interest and (b) any limited partnership and assumed or fictitious name certificate or certificates and any amendments thereto.

Section 5.  <u>Future Assurances</u>.  Each of the Assignor and the Assignee mutually agrees to cooperate at all times from and after the date hereof with respect to any of the matters described herein, and to execute such further deeds, bills of sale, assignments, releases, assumptions, notifications or other documents as may be reasonably requested for the purpose of giving effect to, evidencing or giving notice of the assignment evidenced hereby.

Section 6.  <u>Successors and Assigns</u>.  This Assignment of Partnership Interest shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

Section 7.  <u>Modification and Waiver</u>.  No supplement, modification, waiver or termination of this Assignment of Partnership Interest or any provisions hereof shall be binding unless executed in writing by all parties hereto and the original or a copy of such writing has been delivered to Assignee.

Section 8.  <u>Counterparts</u>.  Any number of counterparts of this Assignment of Partnership Interest may be executed.  Each counterpart will be deemed to be an original instrument and all counterparts taken together will constitute one agreement.  Delivery of an executed counterpart of a signature page to this Assignment of Partnership Interest by facsimile, telecopier or other electronic means shall be as effective as delivery of a manually executed counterpart of this Assignment of Partnership Interest.

Exhibit B-1

Section 9.  Execution; Effective Date.  This Assignment of Partnership Interest will be binding and effective and will result in the assignment of the Assigned Interest on the Effective Date.

Section 10. Governing Law.  This Assignment of Partnership Interest will be governed by the laws of the State of New York.

[SIGNATURE PAGE FOLLOWS]

Exhibit B-1

IN WITNESS WHEREOF, the parties hereto have caused this Assignment of Partnership Interest to be executed and delivered.

**<u>ASSIGNOR:</u>**

**CBCS WASHINGTON MEZZ BORROWER LP**, a Delaware limited partnership

By:_____
Name:
Title:

**ASSIGNEE:**

[_____]

By:    _____
Name:  _____
Title: _____

## EXHIBIT B-2

## FORM OF ASSIGNMENT OF MEMBERSHIP INTEREST

THIS ASSIGNMENT OF MEMBERSHIP INTEREST (this "*Assignment of Membership Interest*"), dated as of [_____], 2019 (the "*Effective Date*"), is made by **CBCS WASHINGTON MEZZ BORROWER LP**, a Delaware limited partnership (together with its successors and assigns, the "*Assignor*") to _____ _____ (the "*Assignee*").

## RECITALS

Assignor has entered into a certain Pledge and Security Agreement dated as of [_____], 2019 (such Agreement, as it may be amended or otherwise modified from time to time, the "*Pledge Agreement*"), with [**HANA FINANCIAL INVESTMENT OR AFFILIATE**, a _____ limited liability company] (together with its successors and assigns, the "*Lender*"). Unless otherwise noted, terms defined in the Pledge Agreement are used herein as defined therein.

The Assignor is the sole member of **CBCS WASHINGTON STREET GP LLC**, a Delaware limited liability company (the "*GP*"), existing under and evidenced by the Limited Liability Company Agreement of GP dated as of [_____], 2019 (such agreement, as it may be amended, supplemented or otherwise modified from time to time, the "*LLC Agreement*"). Under the LLC Agreement, the Assignor has certain rights, title and interest in and to GP and its assets and distributions (collectively, the "*Interest*").

Lender has required that the Assignor shall have executed and delivered this Assignment of Membership Interest.

NOW THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

Section 1.  Assignment and Acceptance of Assigned Interest.  As of the Effective Date, the Assignor hereby sells, transfers, conveys and assigns (without recourse and, except as set forth herein, representation or warranty) to the Assignee all of the Assignor's right, title and interest in and to the Interest and of its rights under the LLC Agreement, including, without limitation, all its (a) rights to receive moneys due and to become due under or pursuant to the LLC Agreement, (b) rights to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the LLC Agreement, (c) claims for damages arising out of or for breach of or default under the LLC Agreement, and (d) rights to perform thereunder and to compel performance, and otherwise exercise all rights and remedies thereunder.  The Assignor's right, title and interest in the Interest and of the Assignor's rights under the LLC Agreement that are being assigned to the Assignee pursuant to the Pledge Agreement are hereinafter referred to as the "*Assigned Interest*".  The Assignee, upon the execution of this Assignment of Membership Interest, hereby accepts from the Assignor the Assigned Interest and agrees to become a successor member of GP in the place and stead of the Assignor to the extent of the Assigned Interest and to be bound by the terms and provisions of the LLC Agreement.

*ACTIVE 45810908v5*

Section 2.  Capital Account.  On or prior to the Effective Date, the Assignee shall notify each of the other members in GP required to be so notified under the terms of the LLC Agreement and thereafter, the portion of all profits and losses, and all other items of income, gain, loss, deduction or credit, allocable to the Assigned Interest shall be credited or charged, as the case may be, to the Assignee and the Assignee shall be entitled to the portion of all distributions, payments or other allocations payable in respect of the Assigned Interest, regardless of the source of such distributions, payments or other allocations or the date on which they were earned.

Section 3.  Representations and Warranties of the Assignor.  The Assignor represents to Assignee, as of the Effective Date of this Assignment of Membership Interest, and to Lender as of the Effective Date of the Pledge Agreement, that:

(a)  This Assignment of Membership Interest has been duly executed and delivered by the Assignor and is a valid and binding obligation of the Assignor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity; and

(b)  The Assignor is the sole owner of the Assigned Interest free and clear of any liens, except for the liens created by the Pledge Agreement.

Section 4.  Filings.  On or as soon as practicable after the Effective Date, the Assignee shall file and record or cause to be filed and recorded with all proper offices or agencies all documents and instruments required to effect the terms herein, if any, including, without limitation, (a) this Assignment of Membership Interest and (b) any limited liability company and assumed or fictitious name certificate or certificates and any amendments thereto.

Section 5.  Future Assurances.  Each of the Assignor and the Assignee mutually agrees to cooperate at all times from and after the date hereof with respect to any of the matters described herein, and to execute such further deeds, bills of sale, assignments, releases, assumptions, notifications or other documents as may be reasonably requested for the purpose of giving effect to, evidencing or giving notice of the assignment evidenced hereby.

Section 6.  Successors and Assigns.  This Assignment of Membership Interest shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

Section 7.  Modification and Waiver.  No supplement, modification, waiver or termination of this Assignment of Membership Interest or any provisions hereof shall be binding unless executed in writing by all parties hereto and the original or a copy of such writing has been delivered to Assignee.

Section 8.  Counterparts.  Any number of counterparts of this Assignment of Membership Interest may be executed.  Each counterpart will be deemed to be an original instrument and all counterparts taken together will constitute one agreement.  Delivery of an executed counterpart of a signature page to this Assignment of Membership Interest by facsimile, telecopier or other electronic means shall be as effective as delivery of a manually executed counterpart of this Assignment of Membership Interest.

*ACTIVE 45810908v5*

Section 9.  Execution; Effective Date.  This Assignment of Membership Interest will be binding and effective and will result in the assignment of the Assigned Interest on the Effective Date.

Section 10. Governing Law.  This Assignment of Membership Interest will be governed by the laws of the State of New York.

[SIGNATURE PAGE FOLLOWS]

*ACTIVE 45810908v5*

IN WITNESS WHEREOF, the parties hereto have caused this Assignment of Membership Interest to be executed and delivered.

**<u>ASSIGNOR:</u>**

**CBCS WASHINGTON MEZZ BORROWER LP**, a Delaware limited partnership

By:_____
Name:
Title:

[Signature Page to Assignment of Membership Interest]

**ASSIGNEE:**

[_____]

By: _____
Name: _____
Title: _____

**EXHIBIT C-1**
**FORM OF INSTRUCTION TO REGISTER PLEDGE**

[_____], 2019

To:     [_____]

In accordance with the requirements of that certain Pledge and Security Agreement, dated of even date herewith (as amended, supplemented or otherwise modified from time to time, the "*Pledge Agreement*"), between [**HANA FINANCIAL INVESTMENT OR AFFILIATE**, a _____ limited liability company ("*Pledgee*") and **CBCS WASHINGTON MEZZ BORROWER LP**, a Delaware limited partnership ("*Pledgor*"), you are hereby instructed, to assure the perfection of the security interest of Lender in the partnership interests described below, to register the pledge of the following interests in the name of Pledgee as follows:

All of the partnership interests of Pledgor in **CBCS WASHINGTON STREET LP**, a Delaware limited partnership (the "*Owner*"), including without limitation, all of the following property now owned or at any time hereafter acquired by Pledgor or in which Pledgor now has or at any time in the future may acquire any right, title or interest:

(a)     all partnership interests of, or other equity interests in, Owner and options, warrants, and other rights hereafter acquired by Pledgor in respect of such partnership interests or other equity interests (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of Owner or otherwise) (all such partnership interests and other equity interests, and all such options, warrants and other rights being hereinafter collectively referred to as the "*Pledged Interests*");

(b)     all certificates, instruments, or other writings representing or evidencing the Pledged Interests, and all accounts and general intangibles arising out of, or in connection with, the Pledged Interests;

(c)     any and all moneys or property due and to become due to Pledgor now or in the future in respect of the Pledged Interests, or to which Pledgor may now or in the future be entitled to in its capacity as a partner of Owner, whether by way of a dividend, distribution, return of capital, or otherwise;

(d)     all other claims which Pledgor now has or may in the future acquire in its capacity as a partner of Owner against Owner and its property;

(e)     all rights of Pledgor under the Charter Documents, including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of the Pledged Interests; and

(f)     to the extent not otherwise included in clauses (a) through (e), all proceeds of and to any of the property of Pledgor described in clauses (a) through (e) above and, to the

Exhibit C-1

extent related to any property described in said clauses or such proceeds, all books, corre-spondence, credit files, records, invoices and other papers.

You are hereby further authorized and instructed to execute and deliver to Pledgee a Confirmation Statement and Control Agreement, substantially in the form of Exhibit D to the Pledge Agreement and, to the extent provided more fully therein, to comply with the instructions of Pledgee in respect of the Collateral without further consent of, or notice to, the undersigned. Notwithstanding anything in this paragraph, this instruction shall not be construed as expanding the rights of Pledgee to give instructions with respect to the Collateral beyond such rights set forth in the Pledge Agreement.  Initially capitalized terms used herein and not otherwise defined shall have the meanings given to such words in the Pledge Agreement.

**[SIGNATURES CONTINUE NEXT PAGE]**

Exhibit C-1

Very truly yours,

**PLEDGOR:**

**CBCS WASHINGTON MEZZ BORROWER LP**,
a Delaware limited partnership


By:_____
Name:
Title:

**PLEDGEE:**

**[HANA FINANCIAL INVESTMENT OR AFFILIATE**,
a _____ limited liability company

By:_____
Name:
Title:]

[Signature Page to Instruction to Register Pledge]

**EXHIBIT C-2**
**FORM OF INSTRUCTION TO REGISTER PLEDGE**

[_____], 2019

To:      [_____]

         In accordance with the requirements of that certain Pledge and Security Agreement, dated of even date herewith (as amended, supplemented or otherwise modified from time to time, the "*Pledge Agreement*"), between [**HANA FINANCIAL INVESTMENT OR AFFILIATE**, a _____ limited liability company ("*Pledgee*") and **CBCS WASHINGTON MEZZ BORROWER LP**, a Delaware limited partnership ("*Pledgor*"), you are hereby instructed, to assure the perfection of the security interest of Lender in the membership interests described below, to register the pledge of the following interests in the name of Pledgee as follows:

         All of the membership interests of Pledgor in **CBCS WASHINGTON STREET GP LLC**, a Delaware limited liability company (the "*GP*"), including without limitation, all of the following property now owned or at any time hereafter acquired by Pledgor or in which Pledgor now has or at any time in the future may acquire any right, title or interest:

         (a)      all limited liability company membership interests of, or other equity interests in, GP and options, warrants, and other rights hereafter acquired by Pledgor in respect of such membership interests or other equity interests (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of GP or otherwise) (all such partnership interests and other equity interests, and all such options, warrants and other rights being hereinafter collectively referred to as the "*Pledged Interests*");

         (b)      all certificates, instruments, or other writings representing or evidencing the Pledged Interests, and all accounts and general intangibles arising out of, or in connection with, the Pledged Interests;

         (c)      any and all moneys or property due and to become due to Pledgor now or in the future in respect of the Pledged Interests, or to which Pledgor may now or in the future be entitled to in its capacity as a member of GP, whether by way of a dividend, distribution, return of capital, or otherwise;

         (d)      all other claims which Pledgor now has or may in the future acquire in its capacity as a member of GP against GP and its property;

         (e)      all rights of Pledgor under the Charter Documents, including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of the Pledged Interests; and

         (f)      to the extent not otherwise included in clauses (a) through (e), all proceeds of and to any of the property of Pledgor described in clauses (a) through (e) above and, to the extent related to any property described in said clauses or such proceeds, all books, correspondence, credit files, records, invoices and other papers.

Exhibit C-2

You are hereby further authorized and instructed to execute and deliver to Pledgee a Confirmation Statement and Control Agreement, substantially in the form of Exhibit D-2 to the Pledge Agreement and, to the extent provided more fully therein, to comply with the instructions of Pledgee in respect of the Collateral without further consent of, or notice to, the undersigned. Notwithstanding anything in this paragraph, this instruction shall not be construed as expanding the rights of Pledgee to give instructions with respect to the Collateral beyond such rights set forth in the Pledge Agreement.  Initially capitalized terms used herein and not otherwise defined shall have the meanings given to such words in the Pledge Agreement.

**[SIGNATURES CONTINUE NEXT PAGE]**

Exhibit C-2

Very truly yours,

**PLEDGOR:**


**CBCS WASHINGTON MEZZ BORROWER LP**,
a Delaware limited partnership


By:_____
Name:
Title:

[Signature Page to Instruction to Register Pledge]

**PLEDGEE:**

**HANA FINANCIAL INVESTMENT OR AFFILIATE**,
a _____ limited liability company

By:_____
Name:
Title:

*ACTIVE 45810908v5*

<u>**EXHIBIT D-1**</u>

**FORM OF CONFIRMATION STATEMENT AND CONTROL AGREEMENT**

Date: [_____], 2019

To:    [HANA FINANCIAL INVESTMENT OR AFFILIATE]
[_____]
[_____]
Attention: [_____]

Pursuant to the requirements of that certain Pledge and Security Agreement dated of even date herewith (as amended, supplemented or otherwise modified from time to time, the "***Pledge Agreement***"), between [**HANA FINANCIAL INVESTMENT OR AFFILIATE**, a _____ limited liability company ("***Lender***") and **CBCS WASHINGTON MEZZ BORROWER LP**, a Delaware limited partnership ("***Pledgor***"), this Confirmation Statement and Control Agreement relates to those partnership interests described in the Pledge Agreement (the "***Pledged Interests***"), and the issuer thereof ("***Owner***").

For purposes of perfecting the security interest of Lender in the Pledged Interests of Pledgor, Owner agrees that the organizational chart attached as <u>Exhibit A</u> hereto is true, correct and complete, and accurately reflects the ownership of Owner, as of the date of this Confirmation Statement and Control Agreement.

The registered pledgee of the Pledged Interests is [_____], together with its successors and assigns.

Owner has registered the Pledged Interests in the name of the registered pledgee on the date hereof. No other pledge or other interest adverse to that of the registered pledgee is currently registered on the books and records of Owner with respect to the Pledged Interests of Pledgor.

Until the Obligations are indefeasibly paid in full, Owner agrees: (i) upon the occurrence and during the continuation of an Event of Default, to comply with the instructions of Lender, without any further consent from Pledgor or any other Person, in respect of the Pledged Interests of Pledgor; and (ii) upon the occurrence and during the continuation of an Event of Default, to disregard any request made by Pledgor or any other person which contravenes the instructions of Lender with respect to the Pledged Interests of Pledgor; and (iii) to recognize Lender's or any other successful bidder's right to become a partner in Owner following a sale of the Pledgor's Pledged Interests in accordance with Section 7(d) of the Pledge Agreement. Notwithstanding anything in this paragraph, this Confirmation Statement and Control Agreement shall not be construed as expanding the rights of Lender to give instructions with respect to Pledgor's Pledged Interests beyond such rights as are set forth in the Pledge Agreement. Initially

*ACTIVE 45810908v5*

capitalized terms used herein and not otherwise defined shall have the meanings given to such terms in the Pledge Agreement.

[SIGNATURE PAGE FOLLOWS]

*ACTIVE 45810908v5*

Very truly yours,

**CBCS WASHINGTON STREET LP**,
a Delaware limited partnership


By:_____
Name:
Title:]

**ACKNOWLEDGED AND AGREED:**


**LENDER:**


[HANA FINANCIAL INVESTMENT OR AFFILIATE,
a _____ limited liability company

By:_____
Name:
Title:]

**EXHIBIT A TO EXHIBIT D-1**

EXHIBIT A

ORGANIZATIONAL CHART

(see attached)

*ACTIVE 45810908v5*

**<u>EXHIBIT D-2</u>**

**FORM OF CONFIRMATION STATEMENT AND CONTROL AGREEMENT**

Date: [_____], 2019

To:    **[HANA FINANCIAL INVESTMENT OR AFFILIATE]**
       [_____]
       [_____]
       Attention: [_____]

Pursuant to the requirements of that certain Pledge and Security Agreement dated of even date herewith (as amended, supplemented or otherwise modified from time to time, the "*Pledge Agreement*"), between [**HANA FINANCIAL INVESTMENT OR AFFILIATE**, a _____ limited liability company] ("*Lender*") and **CBCS WASHINGTON MEZZ BORROWER LP**, a Delaware limited partnership ("*Pledgor*"), this Confirmation Statement and Control Agreement relates to those membership interests described in the Pledge Agreement (the "*Pledged Interests*"), and the issuer thereof ("*GP*").

For purposes of perfecting the security interest of Lender in the Pledged Interests of Pledgor, GP agrees that the organizational chart attached as <u>Exhibit A</u> hereto is true, correct and complete, and accurately reflects the ownership of GP, as of the date of this Confirmation Statement and Control Agreement.

The registered pledgee of the Pledged Interests is [_____], together with its successors and assigns.

GP has registered the Pledged Interests in the name of the registered pledgee on the date hereof.  No other pledge or other interest adverse to that of the registered pledgee is currently registered on the books and records of GP with respect to the Pledged Interests of Pledgor.

Until the Obligations are indefeasibly paid in full, GP agrees: (i) upon the occurrence and during the continuation of an Event of Default, to comply with the instructions of Lender, without any further consent from Pledgor or any other Person, in respect of the Pledged Interests of Pledgor; and (ii) upon the occurrence and during the continuation of an Event of Default, to disregard any request made by Pledgor or any other person which contravenes the instructions of Lender with respect to the Pledged Interests of Pledgor; and (iii) to recognize Lender's or any other successful bidder's right to become a partner in GP following a sale of the Pledgor's Pledged Interests in accordance with Section 7(d) of the Pledge Agreement. Notwithstanding anything in this paragraph, this Confirmation Statement and Control Agreement shall not be construed as expanding the rights of Lender to give instructions with respect to the Pledged Interests beyond such rights as are set forth in the Pledge Agreement.  Initially capitalized terms used herein and not otherwise defined shall have the meanings given to such terms in the Pledge Agreement.

Exhibit D-2

[SIGNATURE PAGE FOLLOWS]

*ACTIVE 45810908v5*

Very truly yours,

**CBCS WASHINGTON STREET LP**,
a Delaware limited partnership


By:_____
Name:
Title:]

[Signature Page to Confirmation Statement and Control Agreement]

**ACKNOWLEDGED AND AGREED:**

**LENDER:**

[**HANA FINANCIAL INVESTMENT OR AFFILIATE**,
a _____ limited liability company

By:_____
Name:
Title:]

*ACTIVE 45810908v5*

**EXHIBIT A TO EXHIBIT D-2**

EXHIBIT A

ORGANIZATIONAL CHART

(see attached)

**<u>EXHIBIT P-14</u>**

GT Draft 9/23/19

---

MEZZANINE LOAN AGREEMENT

Dated as of _____ __, 2019

Between

CBCS WASHINGTON MEZZ BORROWER LP
as Borrower

And

[HANA FINANCIAL INVESTMENT OR AFFILIATE]
as Lender

---

# TABLE OF CONTENTS

1.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION .................................................... 1
    1.1    Specific Definitions .................................................................................... 1
    1.2    Principles of Construction ......................................................................... 27

2.    GENERAL LOAN TERMS ....................................................................................... 27
    2.1    The Loan ..................................................................................................... 27
    2.2    Interest; Monthly Payments ...................................................................... 28
        2.2.1    Generally ..................................................................................... 28
        2.2.2    Default Rate ................................................................................ 28
        2.2.3    Taxes ............................................................................................ 28
        2.2.4    Breakage Indemnity ................................................................... 31
        2.2.5    New Payment Date ...................................................................... 31
        2.2.6    Requirements of Law .................................................................. 31
    2.3    Loan Repayment ........................................................................................ 33
        2.3.1    Repayment .................................................................................. 33
        2.3.2    Mandatory Prepayments ............................................................ 33
        2.3.3    Optional Prepayments ................................................................ 33
    2.4    Release ........................................................................................................ 34
    2.5    Payments and Computations ..................................................................... 34
        2.5.1    Making of Payments ................................................................... 34
        2.5.2    Computations .............................................................................. 34
        2.5.3    Late Payment Charge .................................................................. 34
    2.6    Interest Rate Protection Agreements ........................................................ 35
        2.6.1    Interest Rate Protection Agreement ........................................... 35
        2.6.2    Execution of Documents ............................................................ 38
        2.6.3    No Obligation of Lender ............................................................. 38
        2.6.4    Receipts from Interest Rate Protection Agreements .................. 38
        2.6.5    Downgrade of Counterparty ....................................................... 38
    2.7    Fees ............................................................................................................ 38
        2.7.1    Prepayment Fee .......................................................................... 38
        2.7.2    Minimum Multiple Payment ...................................................... 38
        2.7.3    Reserved ...................................................................................... 39
    2.8    Extension Option ....................................................................................... 39
    2.9    Advances .................................................................................................... 41
        2.9.1    Conditions to Advances .............................................................. 41
        2.9.2    Amount, Timing and Procedure of Advances ............................ 44
        2.9.3    Requisitions ................................................................................ 46
        2.9.4    Cost Overruns ............................................................................. 46
        2.9.5    Budget Reallocation ................................................................... 47
        2.9.6    Construction Contingency .......................................................... 47
        2.9.7    Loan Balancing ........................................................................... 47
        2.9.8    Trust Funds ................................................................................. 48
        2.9.9    Stored Materials; Deposits ......................................................... 48
        2.9.10    Quality of Work ........................................................................ 49
        2.9.11    Requisition as Affirmation ....................................................... 49

i

      2.9.12  Advance Not Waiver ................................................................ 50
      2.9.13  Conditions to Final Advance ................................................ 50
      2.9.14  Reserved ................................................................................ 51
      2.9.15  Advances to Pay Fees and Expenses .................................... 51
      2.9.16  Unfunded Portions of the Loan ............................................ 51
      2.9.17  Miscellaneous ....................................................................... 51
   2.10  Rate Conversion ................................................................................ 51

3.      CASH MANAGEMENT AND RESERVES; MORTGAGE LOAN RESERVES. ........ 52
   3.1  Cash Management Arrangements ....................................................... 52
      3.1.2  Mortgage Loan Reserve Funds. ............................................ 53
      3.1.3  Mezzanine Deposit Account. ................................................ 53
   3.2  Rebalancing Reserve Account ........................................................... 54
   3.3  Mezzanine Collateral Account ........................................................... 54
   3.4  Intentionally Omitted ........................................................................ 54
   3.5  Intentionally Omitted ........................................................................ 54
   3.6  Intentionally Omitted ........................................................................ 54
   3.7  Intentionally Omitted ........................................................................ 54
   3.8  Grant of Security Interest; Application of Funds............................... 55
   3.9  Property Cash Flow Allocation .......................................................... 55

4.      REPRESENTATIONS AND WARRANTIES............................................ 55
   4.1  Organization; Special Purpose .......................................................... 56
   4.2  Proceedings; Enforceability .............................................................. 56
   4.3  No Conflicts ...................................................................................... 56
   4.4  Litigation ........................................................................................... 57
   4.5  Agreements ........................................................................................ 57
   4.6  Title; Pledged Collateral ................................................................... 57
   4.7  No Bankruptcy Filing......................................................................... 58
   4.8  Full and Accurate Disclosure ............................................................ 58
   4.9  Tax Filings ......................................................................................... 59
   4.10  No Plan Assets .................................................................................. 59
   4.11  Compliance ....................................................................................... 59
   4.12  Contracts ........................................................................................... 60
   4.13  Federal Reserve Regulations; Investment Company Act ................... 60
   4.14  Easements; Utilities and Public Access ............................................. 60
   4.15  Physical Condition ............................................................................ 60
   4.16  Leases................................................................................................ 61
   4.17  Fraudulent Transfer ........................................................................... 61
   4.18  Ownership of Borrower and Borrower Representative....................... 61
   4.19  Purchase Options ............................................................................... 62
   4.20  Management Agreement ..................................................................... 62
   4.21  Hazardous Substances........................................................................ 62
   4.22  Name; Principal Place of Business .................................................... 62
   4.23  Other Debt.......................................................................................... 63
   4.24  Anti-Money Laundering .................................................................... 63
   4.25  Project Loan; Building Loan.............................................................. 63

4.26  Ground Lease Representations................................................................. 63
4.27  Hotel Management Agreement ................................................................ 65
4.28  Liquor License ....................................................................................... 65
4.29  Additional Representations ..................................................................... 65
      4.29.1  Construction Manager's Agreement................................................ 65
      4.29.2  Architect's Agreement.................................................................... 66
      4.29.3  Plans and Specifications ................................................................ 66
      4.29.4  Construction Budget ...................................................................... 66
      4.29.5  Current Construction Licenses ...................................................... 66
      4.29.6  Construction Manager Payment and Performance Bond ........................ 66
      4.29.7  Construction Schedule ................................................................... 67

5.    COVENANTS ................................................................................................. 67
      5.1   Existence ............................................................................................... 67
      5.2   Taxes and Other Charges ...................................................................... 67
      5.3   Access to Property ................................................................................. 68
      5.4   Repairs; Maintenance and Compliance; Alterations............................. 68
            5.4.1  Repairs; Maintenance and Compliance ........................................ 68
            5.4.2  Alterations ..................................................................................... 69
      5.5   Performance of Other Agreements ........................................................ 69
      5.6   Cooperate in Legal Proceedings ........................................................... 70
      5.7   Further Assurances................................................................................ 70
      5.8   Environmental Matters.......................................................................... 70
            5.8.1  Hazardous Substances ................................................................... 70
            5.8.2  Environmental Monitoring ........................................................... 70
            5.8.3  Intentionally Omitted.................................................................... 72
      5.9   Title to the Property; Liens ................................................................... 72
      5.10  Leases.................................................................................................... 72
            5.10.1  Generally ..................................................................................... 72
            5.10.2  Approval of Leases...................................................................... 73
            5.10.3  Additional Covenants with respect to Leases.............................. 73
      5.11  Estoppel Statement ............................................................................... 74
      5.12  Property Management ........................................................................... 74
            5.12.1  Management Agreements ............................................................. 74
            5.12.2  Termination of Manager .............................................................. 75
      5.13  Special Purpose Bankruptcy Remote Entity ......................................... 75
      5.14  Subordination of Agreements................................................................ 75
      5.15  Change in Business or Operation of Property........................................ 75
      5.16  Debt Cancellation................................................................................. 76
      5.17  Affiliate Transactions ........................................................................... 76
      5.18  Zoning ................................................................................................... 76
      5.19  No Joint Assessment ............................................................................. 76
      5.20  Principal Place of Business ................................................................... 76
      5.21  Change of Name, Identity or Structure ................................................. 76
      5.22  Indebtedness.......................................................................................... 77
      5.23  Licenses................................................................................................. 77
      5.24  Compliance with Restrictive Covenants, Etc........................................ 77

iii

5.25  ERISA ................................................................................................................ 77
5.26  Prohibited Transfers ........................................................................................ 78
5.27  Liens .................................................................................................................. 78
5.28  Dissolution ........................................................................................................ 78
5.29  Expenses ............................................................................................................ 78
5.30  Indemnity .......................................................................................................... 79
5.31  Patriot Act Compliance .................................................................................... 80
5.32  Minimum Cash Equity ...................................................................................... 81
5.33  Anti-Money Laundering .................................................................................... 81
5.34  Construction Manager's Agreement; Contracts, Subcontracts .......................... 81
5.35  Architect's Contract .......................................................................................... 82
5.36  Application of Loan Proceeds .......................................................................... 82
5.37  Costs of Construction ........................................................................................ 83
5.38  Substantial Completion; Final Completion of Construction .............................. 83
        5.38.1  Substantial Completion ........................................................................ 83
        5.38.2  Final Completion of Construction ........................................................ 84
5.39  Inspection of Property ...................................................................................... 84
5.40  Construction Consultant .................................................................................... 85
5.41  Construction Consultant/Duties and Access ...................................................... 85
5.42  Correction of Defects ........................................................................................ 86
5.43  Approval of Change Orders .............................................................................. 86
5.44  Laborers, Subcontractors and Materialmen ...................................................... 86
5.45  Payment and Performance Bonds ...................................................................... 87
5.46  Ownership of Personalty .................................................................................... 87
5.47  Purchase of Material Under Conditional Sale Contract ...................................... 87
5.48  Assignment of Claims ........................................................................................ 87
5.49  Ground Lease .................................................................................................... 87
5.50  Hotel Management Agreement .......................................................................... 92
        5.50.1  Affirmative Covenants .......................................................................... 92
        5.50.2  Negative Covenants .............................................................................. 92
        5.50.3  Rights of Lender; Termination of Franchise .......................................... 93
        5.50.4  Default; Right to Cure .......................................................................... 93
        5.50.5  Expiration or Termination of Hotel Management Agreement .................. 94
5.51  Hotel Operation ................................................................................................ 94
5.52  Cooperation with Regard to Liquor Licenses .................................................... 94
5.53  Mortgage Borrower Covenants .......................................................................... 95
5.54  Curing ................................................................................................................ 95
5.55  Special Distributions ........................................................................................ 95
5.56  Certain Distributions Matters ............................................................................ 95
5.57  Limitations on Distributions .............................................................................. 96
5.58  Other Limitations .............................................................................................. 96
5.59  Contractual Obligations .................................................................................... 96
5.60  Awards .............................................................................................................. 96

6.      NOTICES AND REPORTING ...................................................................................... 97
        6.1  Notices ............................................................................................................ 97
        6.2  Borrower Notices and Deliveries .................................................................... 97

iv

    6.3   Financial Reporting .................................................................... 97
        6.3.1   Bookkeeping ................................................................ 97
        6.3.2   Annual Reports ............................................................ 98
        6.3.3   Monthly/Quarterly Reports.......................................... 98
        6.3.4   Other Reports ............................................................... 99
        6.3.5   Annual Budget ............................................................. 99
        6.3.6   Business Plan ............................................................. 100
        6.3.7   Major Milestones ....................................................... 100
        6.3.8   Breach ........................................................................ 100
        6.3.9   Inspection................................................................... 100
        6.3.10  Mortgage Loan Records ............................................. 101

7.      INSURANCE; CASUALTY; AND CONDEMNATION ............................................ 101
    7.1   Insurance .................................................................................. 101
        7.1.1   Coverage .................................................................... 101
        7.1.2   Policies....................................................................... 102
        7.1.3   Miscellaneous Insurance Provisions........................... 103
    7.2   Casualty .................................................................................. 104
        7.2.1   Notice; Restoration .................................................... 104
        7.2.2   Settlement of Proceeds ............................................... 104
    7.3   Condemnation .......................................................................... 105
        7.3.1   Notice; Restoration .................................................... 105
        7.3.2   Collection of Award ................................................... 105
    7.4   Application of Proceeds or Award; Waived Restoration Provisions................... 105
        7.4.1   Application of Proceeds or Award ............**Error! Bookmark not defined.**
        7.4.2   Waived Restoration Provisions ..................**Error! Bookmark not defined.**

8.      DEFAULTS ..................................................................................... 106
    8.1   Events of Default ..................................................................... 106
    8.2   Remedies ................................................................................. 110
        8.2.1   Acceleration............................................................... 110
        8.2.2   Remedies Relating to Project Improvements .............. 111
        8.2.3   Remedies Cumulative................................................. 112
        8.2.4   Severance ................................................................... 113
        8.2.5   Delay.......................................................................... 113
        8.2.6   Lender's Right to Perform .......................................... 113

9.      SPECIAL PROVISIONS ..................................................................... 113
    9.1   Sale of Note and Secondary Market Transaction............................... 113
        9.1.1   General; Borrower Cooperation .................................. 113
        9.1.2   Severance of Loan ...................................................... 115

10.    MISCELLANEOUS ........................................................................... 115
    10.1  Exculpation ............................................................................. 115
    10.2  Brokers and Financial Advisors ................................................ 120
    10.3  Retention of Servicer ............................................................... 120
    10.4  Survival .................................................................................. 120

v

10.5   Lender's Discretion ................................................................................................ 121
10.6   Governing Law ..................................................................................................... 121
10.7   Modification, Waiver in Writing .......................................................................... 122
10.8   Trial by Jury ......................................................................................................... 122
10.9   Headings/Exhibits ................................................................................................ 122
10.10  Severability .......................................................................................................... 122
10.11  Preferences ........................................................................................................... 122
10.12  Waiver of Notice .................................................................................................. 123
10.13  Remedies of Borrower .......................................................................................... 123
10.14  Prior Agreements .................................................................................................. 123
10.15  Offsets, Counterclaims and Defenses ................................................................... 123
10.16  Publicity ............................................................................................................... 123
10.17  No Usury ............................................................................................................... 124
10.18  Conflict; Construction of Documents ................................................................... 124
10.19  No Third Party Beneficiaries ................................................................................ 124
10.20  Minimum Multiple Payment ................................................................................. 124
10.21  Assignment ........................................................................................................... 125
10.22  Certain Additional Rights of Lender ..................................................................... 125
10.23  Set-Off .................................................................................................................. 126
10.24  Counterparts .......................................................................................................... 126
10.25  Proof of Claim ...................................................................................................... 126
10.26  Waiver of Stay ...................................................................................................... 127

11.    PROJECT LOAN ............................................................................................................. 127
11.1   Compliance with Mortgage Loan Documents ....................................................... 127
11.2   Mortgage Loan Defaults ....................................................................................... 127
11.3   Mortgage Loan Estoppels ..................................................................................... 128
11.4   No Amendment to Mortgage Loan Documents ..................................................... 129
11.5   Acquisition of the Mortgage Loan. ....................................................................... 129
11.6   Deed in Lieu of Foreclosure .................................................................................. 129
11.7   Refinancing or Prepayment of the Mortgage Loan ............................................... 129
11.8   Independent Approval Rights .. ............................................................................. 129

12.    INTERCREDITOR AGREEMENT ................................................................................ 130

Schedule 1 -   Form of Anticipated Costs Report
Schedule 2 -   Form of Requisition
Schedule 3 -   Architect's Completion Certificate
Schedule 4 -   Form of Lien Waiver
Schedule 5 -   Exceptions to Representations and Warranties
Schedule 6 -   Intentionally Omitted
Schedule 7 -   Organization of Borrower
Schedule 8 -   Definition of Special Purpose Bankruptcy Remote Entity
Schedule 9 -   Dual Obligee and Modification Rider to Dual Obligee Payment and Performance
               Bonds
Schedule 10 -  Reserved
Schedule 11 -  Consultant's Reports

vi

Schedule 12 -  Forms of U.S. Tax Compliance Certificate
Schedule 13 -  Major Milestones
Schedule 14 -  [Credit Card Direction Letter]
Schedule 15 -  Bankruptcy Conditions to Lend

*ACTIVE 45870927v3*

# MEZZANINE LOAN AGREEMENT

MEZZANINE LOAN AGREEMENT dated as of [_____], 2019 (as the same may be modified, supplemented, amended or otherwise changed, this "**_Agreement_**") between **CBCS WASHINGTON MEZZ BORROWER LP**, a [_____] [_____] (together with its permitted successors and assigns, "**_Borrower_**"), and **[HANA FINANCIAL INVESTMENT OR AFFILIATE]**, a [_____] [_____] (together with its successors and assigns, "**_Lender_**").

## 1.  **DEFINITIONS; PRINCIPLES OF CONSTRUCTION**

**1.1**  **Specific Definitions**.  The following terms have the meanings set forth below:

*Advance* **or** *Advances*:  any disbursement of the proceeds of the Loan by Lender pursuant to the terms of this Agreement.

*Affiliate*:  as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

*Agreement*:  shall mean as described in the introductory paragraph.

*Alternate Index*:  a floating rate index determined by Lender (a) that is commonly accepted by market participants in similarly situated loans as an alternative to LIBOR and (b) that is publicly recognized by the International Swaps and Derivatives Association, or any successor organization, as an alternative to LIBOR.

*Alternate Rate*:  with respect to each Interest Period, the per annum rate of interest of the Alternate Index, determined as of the Determination Date related to such Interest Period.

*Alternate Rate Loan*:  the Loan at such time as interest thereon accrues at a per annum rate of interest equal to (a) the greater of (i) the Alternate Rate and (ii) the LIBOR Floor plus (b) the Alternate Rate Spread following a conversion in accordance with Section 2.10 hereof.

*Alternate Rate Spread*:  in connection with any conversion of the Loan from a LIBOR Loan to an Alternate Rate Loan, the difference (expressed as the number of basis points) between (a) LIBOR, averaged for the last three (3) Interest Periods, as of the Determination Date for which LIBOR was last available, plus the Spread minus (b) the Alternate Rate as of such Determination Date; provided, however, that if such difference is a negative number, then the Alternate Rate Spread shall be zero.

*Annual Budget*:  shall mean as described in Section 6.3.5.

*Applicable Taxes*:  shall mean as described in Section 2.2.3(a).

*Approved Annual Budget:*  shall mean as described in Section 6.3.5.

*Approved Business Plan*:  shall mean as described in Section 6.3.6.

1 — 1

*Approved Capital Budget:*  shall mean as described in Section 6.3.5.

*Approved Capital Expenses*:  Capital Expenses incurred by Borrower which Capital Expenses shall either be (i) included in the Approved Capital Budget for the current calendar year, (ii) expressly permitted under this Agreement or (iii) approved by Lender, such approval not to be unreasonably withheld, conditioned or delayed.

*Approved Operating Budget*:  shall mean as described in Section 6.3.5.

*Approved Operating Expenses*:  operating expenses incurred by Borrower which (i) are included in the Construction Budget or, following Final Completion, the Approved Operating Budget for the current calendar month, (ii) are for Taxes, Insurance Premiums, Leasehold Rents, electric, gas, oil, water, sewer or other utility service to the Property or (iii) have been approved by Lender.

*Architect*:  shall mean, collectively, Stephen B. Jacobs Group P.C. and Andi Pepper Interior Design, as described in Schedule 3.

*Architect's Agreement*:  shall mean that certain Agreement between Owner and Architect, dated as of December 17, 2014, between Borrower and Architect.

*Award*:  shall mean as described in Section 7.3.2.

*Bankruptcy Code*:  shall mean as described in the Mortgage.

*Bankruptcy Proceeding*:  shall mean as described in Section 4.7.

*Borrower*:  shall mean as described in the introductory paragraph.

*Borrower's Recourse Liabilities*:  shall mean as described in Section 10.1.

*Borrower Representative*:  shall mean, individually or collectively, as the context so requires, (i) Mortgage Borrower Representative and (ii) CBCS Washington Mezz GP LLC, a Delaware limited liability company.

*Broker*:  shall mean as described in Section 10.2.

*Building Costs*:  all direct and indirect costs and expenses of designing and constructing the Project Improvements, including, without limitation, Hard Costs and Soft Costs, together with all Debt Service, Project Loan Debt Service, Mortgage Loan Debt Service, Operating Expenses and all other costs and expenses associated with the Property during the Construction Period.

*Building Loan*:  the loan in the original principal amount of $[_____] made by Mortgage Lender to Mortgage Borrower pursuant to the Building Loan Documents.

*Building Loan Agreement*:  shall mean that certain Building Loan Agreement, dated as of the date hereof, made by and between Mortgage Borrower and Mortgage Lender.

2

**Building Loan Security Instrument**: shall mean that certain Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of the date hereof, made by Mortgage Borrower in favor of Mortgage Lender executed and delivered by Mortgage Borrower as security for the Building Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions thereof.

**Building Loan Budget**: that portion of the Construction Budget that includes only Building Loan Costs.

**Building Loan Costs**: all Building Costs that are Cost of the Improvements.

**Building Loan Debt Service**: shall mean the "Debt Service" as defined in the Building Loan Agreement.

**Building Loan Undisbursed Loan Proceeds**: shall mean the "Undisbursed Loan Proceeds" as defined in the Building Loan Agreement.

**Building Permits**: shall mean as described in Section 4.29.5.

**Business Day**: any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York are authorized or required to close.

**Business Plan**: shall mean as described in Section 6.3.6.[1]

**Capital Expenses**: the amounts expended for items capitalized under GAAP, including, without limitation, expenditures for building improvements or major repairs.

**Carrying Costs**: the sum of the following costs associated with the Property for any specified period: (i) Taxes, (ii) Other Charges, (iii) Insurance Premiums and (iv) other Operating Expenses.

**Cash Management Accounts**: shall mean as described in Section 3.8.

**Casualty**: shall have the meaning set forth in the Mortgage Loan Agreement.

**Closing Business Plan**: means the business plan presented to Lender and approved by Lender as of the Closing Date.

**Closing Date**: the date of this Agreement.

**Closing Fee**: shall mean as described in Section 2.7.

---

[1] Construction financial model and hotel operation forecast model to be attached as exhibits.

*ACTIVE 45870927v3*

**Code**:  the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

**Collateral**: shall mean all collateral securing or intended to secure the Debt, including the Pledged Collateral.

**Completion Date**:  a date which is [DATE THIRTY-SIX (36) MONTHS FOLLOWING THE CLOSING DATE].[2]

**Condemnation**: shall have the meaning set forth in the Mortgage Loan Agreement.

**Connection Income Taxes**:  Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise taxes or branch profits taxes.

**Construction Budget**:  the budget setting forth all Building Costs, as approved by Lender as of the Closing Date and the Construction Consultant and for which the Construction Manager has provided a guaranteed maximum price, as the same may be amended from time to time in accordance with the terms and provisions of this Agreement.

**Construction Consultant**:  such Person as Lender may designate and engage to inspect the Property as construction progresses.

**Construction Documents**:  the Construction Manager's Agreement, the Architect's Agreement, each Contract, the Construction Budget and each other document relating to and/or executed in connection with the construction of the Project Improvements.

**Construction Period**:  the period commencing on the date hereof and ending on the earliest to occur of (i) the Maturity Date, whether by acceleration or otherwise, (ii) the Completion Date and (iii) the final Advance.

**Construction Schedule**:  the schedule, broken down by trade, of the estimated dates of commencement and completion of the Project Improvements, as certified by Borrower and approved by Lender and the Construction Consultant as of the Closing Date, as the same may be amended from time to time in accordance with the terms and provisions of this Agreement.

**Construction Consultants' Reports**:  the reports described on Schedule 11 hereof and shall mean as described in Section 2.9.1(r).

**Construction Manager**:  Tishman Construction Company Inc. d/b/a Aecom Tishman.

---

[2] Note:  Per term sheet, closing contingent on Borrower obtaining from Ground Lessor an extension of the project completion date under the Ground Lease to the date 36 months from the Closing Date.

*ACTIVE 45870927v3*

*Construction Manager's Agreement*:  that certain Guaranteed Maximum Price Contract dated as of December 15, 2017, by and between Mortgage Borrower and the Construction Manager, as amended by [_____].

*Construction Manager Payment and Performance Bond*:  the unconditional dual obligee payment and performance bond relating to the Construction Manager, as approved by Lender. [NEED TO DISCUSS REQUEST WITH CLIENT AND CONSULTANT]

*Contract*:  any agreement entered into by Mortgage Borrower or by Construction Manager, in which the Contractor or Subcontractor thereunder agrees to provide services, labor and/or materials in connection with the Project Improvements.

*Contractor*:  any contractor supplying services, labor and/or materials in connection with the Project Improvements.

*Contractual Obligation*: shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of its property is bound, or any provision of the foregoing.

*Control*:  with respect to any Person, either (i) ownership directly or indirectly of forty-nine percent (49%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise.

*Converted Interest Rate Protection Agreement*:  shall mean as described in Section 2.6.1(e)(i).

*Costs*:  collectively, Hard Costs and Soft Costs.

*Cost of the Improvement*:  those items defined as an "improvement" and/or a "cost of improvement" under Section 2 of Article 1 of the Lien Law.

*Current Construction Licenses*:  shall mean, with respect to any phase or portion of the Project Improvements for which work is then being performed and/or for which Borrower is then requesting an Advance, all Licenses and approvals from all Governmental Authorities then required by law to commence and complete such phase or portion of the Project Improvements in accordance with the Plans and Specifications. or any part thereof or the commencement or continuance of construction thereof, as the case may be, including but not limited to, building permits, environmental permits, certificates of appropriateness, landmarks approvals and special use permits necessary for the construction of the Project Improvements.

*Debt*:  the Outstanding Principal Balance, all interest accrued and unpaid thereon, all Prepayment Fees, Minimum Multiple Payments, Extension Exit Fees (if applicable) and all other sums due to Lender in respect of the Loan or under any Loan Document.

*Debt Service*:  with respect to any particular period, the interest payments due under the Note in such period.

5

***Debt Service Coverage Ratio***:  as of any date, the ratio calculated by Lender of (i) the Net Operating Income for the three (3) month period ending with the most recently completed calendar month to (ii) the sum of (a) the Debt Service with respect to such period, plus (b) the Mortgage Loan Debt Service with respect to such period.

***Default***:  the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

***Default Rate***:  a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above then applicable Interest Rate, compounded monthly.

***Deposit Account***:  shall mean as described in Section 3.1.3 of this Agreement.

***Deposit Account Agreement***:  shall mean as described in Section 1.1 (Definition of Loan Documents).

***Deposit Bank***:  [_____], or such other bank or depository selected by Lender in its discretion.

***Determination Date***:  shall mean as described in the definition of LIBOR.

***Draw Request***:  with respect to each Advance, Borrower's Requisition for such Advance, along with such other documents required by this Agreement to be furnished to Lender as a condition to such Advance.

***Easements***:  shall mean as described in Section 4.14.

***Eligible Account***:  a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts (A) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (B) as to which Lender has received a Rating Comfort Letter from each of the applicable Rating Agencies with respect to holding funds in such account, or (ii) a segregated trust account or accounts maintained with the corporate trust department of a federal depository institution or state chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations §9.10(b), having in either case corporate trust powers, acting in its fiduciary capacity, and a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authorities.  An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

***Eligible Institution***:  a depository institution insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's and F-1+ by Fitch, in the case of accounts in which funds are held for thirty (30) days or less or, in the case of letters of credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's.

***Environmental Laws***:  shall mean as described in Section 4.21.

6

*Environmental Report*:  [_____].

*Equipment*:  shall mean as described in Mortgage.

*ERISA*:  the Employment Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

*ERISA Affiliate*:  all members of a controlled group of corporations and all trades and business (whether or not incorporated) under common control and all other entities which, together with Borrower, are treated as a single employer under any or all of Section 414(b), (c), (m) or (o) of the Code.

*Eurodollar Business Day*:  shall mean as described in Section 1.1 (Definition of LIBOR).

*Event of Default*:  shall mean as described in Section 8.1.

*Excluded Taxes*:  any of the following Applicable Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to any Recipient: (i) Applicable Taxes imposed on or measured by net income (however denominated), franchise Applicable Taxes, and branch profits Applicable Taxes, in each case, (a) imposed as a result of such Recipient being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Applicable Tax (or any political subdivision thereof), or (b) that are Other Connection Taxes, (ii) in the case of a Lender, Applicable Taxes that are U.S. federal withholding taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (a) any Lender acquires such interest in the Loan or (b) any Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.2.3, amounts with respect to such Applicable Taxes were payable either to Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) Applicable Taxes attributable to a Recipient's failure to comply with Section 2.2.3(d) and (iv) any Applicable Taxes imposed under FATCA.

*Existing Proceeding*:  shall mean as described in Section 4.7.

*Extended Maturity Date*:  shall mean, collectively, the First Extended Maturity Date and the Second Extended Maturity Date.

*Extension Exit Fee*:  an amount equal to one percent (1%) of the Outstanding Principal Balance.

*Extension Option DSCR*:  shall mean as described in Section 2.8(a)(viii).

*F&B Agreements*:  shall mean any food and beverage agreements or other agreements which Borrower may cause or permit Mortgage Borrower enter into with respect to the Hotel or the Property (or with respect to which Borrower has the right to cause Mortgage Borrower to grant or withhold approval pursuant to the Hotel Management Agreement).

7

**FATCA**:  Sections 1471 through 1474 of the Code, as in effect on the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with and any current or future regulation or official interpretation thereof), or any Treasury regulations promulgated thereunder or official administrative interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code.

**FF&E**:  all machinery, furniture, furnishings, equipment, fixtures (including, without limitation, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), inventory and articles of personal property, and all accessions, renewals, replacements and substitutions thereof (including, without limitation, beds, bureaus, chiffonniers, chests, chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies, venetian blinds, screens, paintings, hangings, pictures, divans, couches, luggage carts, luggage racks, stools, sofas, chinaware, linens, pillows, blankets, glassware, foodcarts, cookware, dry cleaning facilities, dining room wagons, keys or other entry systems, bars, bar fixtures, liquor and drink dispensers, ice makers, radios, clock radios, television sets, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, Wi-Fi systems, reservation systems, medical equipment, potted plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washer and dryers), and all other customary hotel equipment and other tangible property of every kind and nature whatsoever owned by Mortgage Borrower, or in which Mortgage Borrower has or shall have an interest, now or hereafter located at the Property, or appurtenant thereto, and useable in connection with the present or future operation and occupancy at the Property and all building equipment, material and supplies of any nature whatsoever owned by Mortgage Borrower, or in which Mortgage Borrower has or shall have an interest, now or hereafter located at the Property, or appurtenant thereto, and useable in connection with the present or future operation, enjoyment and occupancy of the Property.

**Final Completion**:  shall be deemed to have occurred when, in addition to the Substantial Completion of the Project Improvements, (i) all Punch List Items shall have been completed substantially in accordance with the Plans and Specifications, all Legal Requirements, the Loan Documents and the Project Loan Documents, and (ii) Borrower shall have delivered to Lender evidence satisfactory to Lender that all other Governmental Approvals have been issued and all other Legal Requirements have been satisfied so as to allow the Property to be used and operated in accordance with the Loan Documents.

**First Extended Maturity Date**:  shall mean as described in Section 2.8(a).

**Fitch**:  shall mean as described in Section 1.1 (Definition of Rating Agency).

8

**Force Majeure Delay Cap**: one hundred twenty (120) days in the aggregate with respect to any and all delays caused by any Force Majeure Events.

**Force Majeure Event**: any event or condition beyond the reasonable control of Borrower and Mortgage Borrower, including, without limitation, strikes, labor disputes, acts of God, the elements, governmental restrictions, regulations or controls, enemy action, civil commotion, fire, casualty, accidents, mechanical breakdowns or shortages of, or inability to obtain, labor, utilities or materials, which causes an actual delay; provided, however, that (i) with respect to any of the foregoing circumstances, any period of Force Majeure shall apply only to such Person's performance of the obligations necessarily affected by such circumstance and shall continue only so long as such Person is continuously and diligently using all reasonable efforts to minimize the effect and duration thereof, and (ii) notwithstanding the foregoing, Force Majeure shall not include (a) any lack of funds, i.e., the same shall not be deemed to be a condition beyond the control of Borrower and Mortgage Borrower, (b) any breach of contract or default by the Architect, the Construction Manager or any Contractor or Subcontractor under their respective contracts and agreements concerning the Project Improvements, or (c) any event, condition or delay (A) within Borrower's and Mortgage Borrower's reasonable control or (B) caused by any action or inaction (including, without limitation, payment of any required fees) by Borrower, Mortgage Borrower or Persons, directly or indirectly, under Borrower's or Mortgage Borrower's control or under common control with Borrower; and provided, further, that, in all cases, (I) Borrower shall have delivered to Lender, by not later than five (5) Business Days after Borrower or Mortgage Borrower knows of same, a written notice of the occurrence of an Force Majeure Event, together with an explanation of the Force Majeure Event, in order to extend the applicable time period, (II) the time limit for performance shall be extended for a period equal to the period of any such Force Majeure Event, subject, in all cases, to the Force Majeure Delay Cap, and (III) Borrower shall, from time to time, upon Lender's request, keep Lender informed, in writing, of all developments (other than *de minimis* matters) concerning any such Force Majeure Event.

**Foreign Lender**: any Lender that is not a U.S. Person.

**GAAP**: generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

**Governmental Authority**: the government of the United States or any other nation, or of any political subdivision thereof, including any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) now or hereafter in existence.

**Government Lists**: shall mean as described in Section 5.31(b).

**Gross Income**: shall mean all income, computed in accordance with GAAP, derived from the ownership and operation of the Property from whatever source, including, but not limited to, the Rents, utility charges, escalations, service fees or charges, license fees, parking fees, rent concessions or credits, and other required pass-throughs, but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, Insurance Proceeds (other than business interruption or other loss of income

9

insurance), Awards, security deposits, utility and other similar deposits, interest on the Subaccounts, and any disbursements to Borrower from the Mortgage Loan Cash Management Accounts or any Cash Management Accounts.

*Ground Lease*:  shall mean that certain Agreement of Lease dated June 19, 2013 between 445 Washington LLC, as ground lessor, and CBCS Washington Street LLC (which subsequently merged into Mortgage Borrower), as ground lessee, as such lease was amended by (i) that certain First Amendment to Agreement of Lease dated January 9, 2017, (ii) that certain Second Amendment to Agreement of Lease, dated October 16, 2018, (iii) that certain Third Amendment To Agreement of Lease dated October 16, 2018, (iv) that certain Fourth Amendment of Agreement of Lease, dated December 28, 2018[, and (v) that certain Fifth Amendment of Agreement of Lease, dated as of [the Closing Date]][3], together with all documents and agreements ancillary and incidental thereto.

*Ground Lessor*:  445 Washington LLC.

*Guarantor*:  individually and collectively, jointly and severally, Joshua Caspi and [James Parks],[4] and, after a Special Guarantor Assumption has occurred, Special Guarantor.

*Guarantor Financial Covenants*:  means those covenants specified in Section 6 of the Guaranty.

*Hard Costs*:  those Building Loan Costs which are for labor, materials, equipment and fixtures.

*Hazardous Substances*:  shall mean as described in Section 4.21.

*Hotel Management Agreement***:**  that certain Hotel Management Agreement, dated as September 14, 2015, by and between Mortgage Borrower and Hotel Manager, pursuant to which the Property is operated as a hotel.

*Hotel Manager*:  Hotel Barriere Management USA Company LLC, a Delaware limited liability company.

*Hotel SNDA*: that certain Subordination, Non-Disturbance, and Attornment Agreement, dated as of the Closing Date, by and among Mortgage Borrower, Lender and Hotel Manager.

*Immediate Family Members*:  shall mean parents, spouses, siblings, children, other lineal descendants and any spouses of such siblings, children or other lineal descendants.

*Improvements*:  shall mean as described in the Mortgage.

*Indemnified Liabilities*:  shall mean as described in Section 5.30.

---

[3] Required per term sheet.
[4] To be confirmed.

*Indemnified Party*:  shall mean as described in Section 5.30.

*Indemnified Taxes*:  (a) Applicable Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

*Independent Director*:  shall mean as described in Schedule 8.

*Initial Advance*:  the first advance of the Loan proceeds to be made hereunder.

*Insurance Premiums*:  shall mean as described in Section 7.1.2.

*Insured Casualty*:  shall mean as described in Section 7.2.2.

*Intercreditor Agreement*:  shall mean the Intercreditor Agreement by and between Mortgage Lender and Lender dated as of the date hereof, as the same may be amended, restated, supplemented or otherwise modified from time to time.

*Interest Period*:  (i) the period from the Closing Date through the last day of a calendar month in which the Closing Date occurs and (ii) each period thereafter from the first day of each calendar month through the last day of each such calendar month; except that the Interest Period, if any, that would otherwise commence before and end after the Maturity Date shall end on the Maturity Date.  Notwithstanding the foregoing, if Lender exercises its right to change the Payment Date to a New Payment Date in accordance with Section 2.2.5, then from and after such election, each Interest Period shall be the period from the New Payment Date in each calendar month through the day in the next succeeding calendar month immediately preceding the New Payment Date in such calendar month.

*Interest Rate*:  for any Interest Period, the Spread plus the greater of (i) LIBOR for such Interest Period and (ii) the LIBOR Floor (or, when applicable pursuant to this Agreement or any other Loan Document, the Default Rate).

*Interest Rate Protection Agreement*:  shall mean as described in Section 2.6.1.

*Inventory:*  as defined in the UCC, and including items which would be entered on a balance sheet under the line items for "Inventories" or "china, glassware, silver, linen and uniforms" under USALI.

*JVA*:    that certain [_____] of [_____], dated as of [_____], between [_____] and [_____].

*Key Principal(s)*:  Joshua Caspi, [James Parks][5] and [_____], each, an individual.

*Late Payment Charge*:  shall mean as described in Section 2.5.3.

---

[5] NTD:  Lender to confirm.

*ACTIVE 45870927v3*

***Leasehold Rents***: all rent, additional rent, percentage rent, payments-in-lieu-of-tax or other charges mentioned in or made payable to the Ground Lessor by Mortgage Borrower pursuant to the terms of the Ground Lease.

***Leasehold Rents Subaccount***: shall mean as described in Section 3.4.

***Leases***: all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property or the Improvements, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder, and any F&B Agreements.

***Legal Requirements***: statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower, Mortgage Borrower any Loan Document or all or part of the Property or the Collateral or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower or Mortgage Borrower, at any time in force affecting all or part of the Property.

***Lender***: shall mean as described in the introductory paragraph.

***Lender's Consultant***: shall mean as described in Section 5.8.1.

***LIBOR***: with respect to any Interest Period, a floating interest rate per annum (rounded upwards to the next 1/8 of 1%) equal to the rate for U.S. dollar deposits with one month maturities which appears on Reuters Screen LIBOR 01 Page as of 11:00 am, London time on the related Determination Date; provided, however, that if such rate does not appear on Reuters Screen LIBOR 01 Page, "LIBOR" shall mean a rate per annum equal to the rate at which U.S. dollar deposits in an amount approximately equal to the Loan, and with one month maturities, are offered in immediately available funds in the London Interbank Market to the London office of National Westminster Bank, Plc by leading banks in the Eurodollar market at 11:00 a.m., London time. "***Reuters Screen LIBOR 01 Page***" means the display designated as "LIBOR 01 Page" on the Reuters Service (or such other page as may replace LIBOR 01 Page on the Reuters Service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Banker's Association interest settlement rates for U.S. Dollar deposits). Any LIBOR determined on the basis of the rate displayed on Reuters Screen LIBOR 01 Page in accordance with the provisions hereof shall be subject to corrections, if any, made in such rate and displayed by the Reuters Service within one (1) hour of the time when such rate is first displayed by such Service. For purposes hereof, (i) "***Determination Date***" shall mean, with respect to any Interest Period, the date which is two Eurodollar Business Days prior to the commencement of such Interest Period; and (ii) "***Eurodollar Business Day***" shall mean any day other than a Saturday, Sunday or other day on which banks in the City of London, England are closed for interbank or foreign exchange transactions.

***LIBOR Conversion***: shall mean as described in Section 2.6.1(e).

***LIBOR Floor***: One percent (1.0%).

12

**LIBOR Loan**:  the Loan at such time as interest thereon accrues at a rate of interest based upon LIBOR.

**Licenses**:  shall mean all certifications, permits, licenses and approvals, including certificates of completion and occupancy permits (including, without limitation, any applicable liquor license or hotel operator licenses) required for the legal use, occupancy and operation of the Property.

**Lien**:  any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting (i) all or any part of the Property, the Collateral or any interest therein or (ii) any direct or indirect interest in Borrower, Mortgage Borrower, and/or Borrower Representative, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

**Lien Law:**  the Lien Law of the State of New York.

**Liquidation Event**: shall mean (i) a Casualty, (ii) a Condemnation, (iii) a Transfer of the Property in connection with realization thereon following an Event of Default under the Mortgage Loan, including, without limitation, a foreclosure sale, or (iv) any refinancing or payoff of the Property or the Mortgage Loan permitted hereunder (including any refund of reserves on deposit with Mortgage Lender (but not disbursements therefrom).

**Loan**:  shall mean as described in Section 2.1.

**Loan Documents**:  this Agreement, the Pledge Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender by Borrower, Borrower Representative and/or Guarantor in connection with the Loan, including the following, each of which is dated as of the date hereof:  (i) the Mezzanine Loan Promissory Note made by Borrower to Lender in the aggregate principal amount equal to the Loan (the "**Note**"), (ii) the Mezzanine Guaranty of Recourse Obligations, Debt Service and Carry made by Guarantor (the "**Guaranty**"), (iii) the Mezzanine Consent and Subordination of Manager by Borrower and Manager in favor of Lender, (iv) the Mezzanine Completion Guaranty made by Guarantor in favor of Lender (the "**Completion Guaranty**"), (v) the [Deposit Account Agreement], by and among Borrower, Lender and Deposit Bank (the "**Deposit Account Agreement**") and (v) the Mezzanine Interest Rate Cap Assignment and Security Agreement, as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time.

**Major Contractor**:   any Contractor hired by Mortgage Borrower, including, without limitation, the Construction Manager, and any Subcontractor, in each case, supplying services, labor and/or materials in connection with the Project Improvements which either (a) is for an aggregate contract price equal to or greater than $300,000.00 whether pursuant to one contract or agreement or multiple contracts or agreements, after taking into account all change

13

orders, and/or (b) relates to excavation, foundation, superstructure, window/curtain wall, steel, concrete, and any other structural mechanical electrical and/or plumbing work.

*Major Contracts*:  any contract with a Major Contractor.

*Major Milestones*:    individually and collectively, the milestones set forth on Schedule 13.

*Management Agreement*:   means any property management agreement to be entered into by Mortgage Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

*Manager*:  shall mean any Qualified Manager engaged by Mortgage Borrower with respect to the property management of all or any portion of the Property in accordance with the terms hereof.

*Material Agreement*:  shall mean as described in Section 5.24.

*Material Alteration*:   any alteration affecting (A) structural elements of the Property, (B) a roof of the Property or (C) any building system of the Property, or (ii) non-structural alteration the cost of which exceeds $300,000; provided, however, that in no event shall (i) any tenant improvement work performed pursuant to any Lease existing on the date hereof or entered into hereafter in accordance with the provisions of this Agreement, (ii) alterations performed as part of a Restoration or (iii) alterations expressly permitted by, and performed in accordance with, this Agreement and the Mortgage Loan Agreement or otherwise approved in writing by Lender, constitute a Material Alteration.

*Maturity Date*:   the date on which the final payment of principal of the Note becomes due and payable as therein provided, whether at the Stated Maturity Date, or if applicable, the First Extended Maturity Date or the Second Extended Maturity Date, by declaration of acceleration, or otherwise.

*Maximum Loan Commitment Amount*:  $[_____].[6]

*Mezzanine Collateral Account*:  shall have the meaning set forth in Section 3.3 hereof.

*Mezzanine Collateral Funds*:  shall have the meaning set forth in Section 3.3 hereof.

*Milestone Non-Compliance*:  failure of Borrower to satisfy (or to cause Mortgage Borrower to satisfy) any Major Milestone as of the date set forth for the compliance with such Major Milestone on Schedule 13.

---

[6] Aggregate of mortgage and mezzanine loan amount shall be the lesser of (i) up to $135,000,000, (ii) 80.0% of Lender-approved project costs based upon an estimated total project cost of $185,000,000 and (iii) 65% of loan-to-stabilized appraised value determined by Lender.   Include allocation of a portion to a term loan if applicable.

***Minimum Multiple Payment***:  the positive amount, if any, that shall cause the aggregate sum of (i) the repaid or prepaid Principal, (ii) all interest paid on the Principal (excluding any interest at the Default Rate), plus (iii) the Minimum Multiple Payment paid, to be equal to 115% of the Loan (including any Undisbursed Loan Proceeds but excluding the Closing Fee, Prepayment Fees, Extension Exit Fee, and any interest paid at the Default Rate); provided, however, that in the event repayment of the Loan is required in connection with Lender's declaration of acceleration of the Loan following the occurrence of any Event of Default described in Sections 8.1(c), (e), (h), (i), (l), (m), (n), (p), (q), (r), (s), (t), (u), (v), (w), (y), (aa), (bb), (cc), (dd), (ee), (ff), (gg), (hh), (ii), (jj), (kk), (ll), (mm) or (nn), then 110% of the Loan (including any Undisbursed Loan Proceeds but excluding the Closing Fee, Prepayment Fees, Extension Exit Fees, and any interest paid at the Default Rate).

***Moody's***:  shall mean as described in Section 1.1 (Definition of Rating Agency).

***Mortgage***:  shall mean, collectively, the Building Loan Security Instrument and the Project Loan Security Instrument.

***Mortgage Borrower***:  CBCS Washington Street LP, a Delaware limited partnership.

***Mortgage Borrower Company Agreement***:  means that certain [Amended and Restated] Limited Partnership Agreement of Mortgage Borrower, dated as of the date hereof.

***Mortgage Borrower Representative***:  CBCS Washington St. GP LLC, a Delaware limited liability company.

***Mortgage Lender***: shall mean _____, in its capacity as the holder of the Mortgage Loan, and any subsequent holder of the Mortgage Loan to whom the Mortgage Loan has been assigned or transferred pursuant to the terms of the Mortgage Loan Agreement.

***Mortgage Loan***: shall mean, collectively, the Building Loan and the Project Loan.

***Mortgage Loan Advances***:  shall mean "Advances" as such term is defined in the Mortgage Loan Agreement.

***Mortgage Loan Agreement***:  shall mean, collectively, the Building Loan Agreement and the Project Loan Agreement.

***Mortgage Loan Cash Management Accounts***: shall mean, whether individually or collectively, the "Tax and Insurance Subaccount", the "Leasehold Rents Subaccount", the "Monthly Debt Service Account", the Mortgage Loan Rebalancing Reserve Account, the "Security Deposit Subaccount", the "FF&E Reserve Subaccount", the "Casualty/Condemnation Subaccount" and the "Operating Expense Subaccount", each as defined in the Mortgage Loan Agreement.

15

*Mortgage Loan Cash Management Provisions*: shall mean the terms and conditions of the Mortgage Loan Documents relating to cash management (including, without limitation, Article III of the Mortgage Loan Agreement).

*Mortgage Loan Documents*: shall mean, collectively, (i) the "Loan Documents" as defined in the Building Loan Agreement and (ii) the "Loan Documents" as defined in the Project Loan Agreement.

*Mortgage Loan Debt Service*:  shall mean, collectively, the Building Loan Debt Service and the Project Loan Debt Service.

*Mortgage Loan Event of Default*: shall mean an "Event of Default" under and as defined in the Mortgage Loan Agreement.

*Mortgage Loan Rebalancing Reserve Account*:  shall mean the "Rebalancing Reserve Account" as such term is defined in the Mortgage Loan Agreement.

*Mortgage Loan Reserve Funds*: shall mean, with respect to any Mortgage Loan Cash Management Account, individually or collectively, as applicable, amounts deposited and/or required to be deposited by Mortgage Borrower in the applicable Mortgage Loan Cash Management Account in accordance with the terms of the Mortgage Loan Agreement.

*Mortgage Loan Shortfall*:  shall mean a "Shortfall" as such term is defined in the Mortgage Loan Agreement.

*Mortgage Loan Undisbursed Loan Proceeds*:  whether individually or collectively, the Building Loan Undisbursed Loan Proceeds and the Project Loan Undisbursed Loan Proceeds.

*Mortgagee Title Policy*:  the ALTA mortgagee title insurance policy issued with respect to Mortgage Borrower's interest in the Property and insuring the Lien of the Mortgage.

*New Ground Lease*:  shall mean as described in Section 4.26(i).

*New Payment Date:*  shall mean as described in Section 2.2.5.

*Net Liquidation Proceeds After Debt Service*: shall mean, with respect to any Liquidation Event, all amounts paid to or received by or on behalf of Mortgage Borrower in connection with such Liquidation Event, including, without limitation, proceeds of any sale, refinancing or other disposition or liquidation, less (i) Lender's and/or Mortgage Lender's reasonable costs incurred in connection with the recovery thereof, (ii) in the case of Casualty or Condemnation, the costs incurred by Mortgage Borrower in connection with a Restoration made in accordance with the Mortgage Loan Documents, (iii) amounts required or permitted to be deducted therefrom and amounts paid pursuant to the Mortgage Loan Documents to Mortgage Lender, (iv) in the case of a foreclosure sale, disposition or Transfer of the Property in connection with realization thereon following an Event of Default under the Mortgage Loan, such reasonable and customary costs and expenses of sale or other disposition (including reasonable attorneys' fees and brokerage commissions), (v) in the case of a foreclosure sale, such costs and expenses incurred

16

by Mortgage Lender under the Mortgage Loan Documents as Mortgage Lender shall be entitled to receive reimbursement for under the terms of the Mortgage Loan Documents and (vi) in the case of a refinancing of the Mortgage Loan, such costs and expenses (including reasonable attorneys' fees) of such refinancing as shall be approved by Lender.

*Net Operating Income*:  shall mean, for any period, the amount obtained by subtracting (i) Operating Expenses and (ii) reserves required under the Mortgage Loan Agreement (or, as and when required pursuant to Section 3.1.1 of this Agreement or Article III of the Mortgage Loan Agreement) from Gross Income.

*Note*:  shall mean as described in Section 1.1 (Definition of Loan Documents).

*Notice*:  shall mean as described in Section 6.1.

*OFAC*:  shall mean as described in Section 5.31(b).

*Officer's Certificate*:  a certificate delivered to Lender by Borrower which is signed by a senior executive officer of Borrower Representative.

*Open Date*:  the date that is sixty (60) days prior to the Stated Maturity Date or, if extended pursuant to this Agreement, the Extended Maturity Date

*Operating Expenses*:  shall mean the total of all expenditures, computed in accordance with GAAP, of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, Taxes, Other Charges, Insurance Premiums, Leasehold Rents, electric, gas, oil, water, sewer and other utility service to the Property, ordinary repairs and maintenance, insurance premiums, license fees, property taxes and assessments, advertising and marketing expenses, legal fees, third-party management and/or franchise fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation, Debt Service, Capital Expenses and contributions to the Subaccounts.

*Other Charges*:  all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

*Other Connection Taxes*:  with respect to any Lender, Applicable Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Applicable Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

*Other Taxes*:  all present or future stamp, court or documentary, intangible, recording, filing or similar Applicable Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of

17

a security interest under, or otherwise with respect to, any Loan Document, except any such Applicable Taxes that are Other Connection Taxes imposed with respect to an assignment.

**Outside Advance Date**:  shall mean the earlier to occur of (i) [_____][7] and (ii) the Stated Maturity Date.  Notwithstanding the foregoing terms, conditions and provisions of this definition of "Outside Advance Date" to the contrary, if the Loan is accelerated pursuant to the terms, conditions and provisions of this Agreement, the Outside Advance Date shall mean the date of acceleration.

**Outstanding Principal Balance**:  shall mean, as of the date of determination, the outstanding principal amount of the Loan as evidenced by the Note.

**Owner's Title Policy**:  shall mean Mortgage Borrower's ALTA title insurance policy(ies) issued with respect to the Property and insuring fee simple title to the Property, together with such endorsements and affirmative coverages as Lender may require and with mezzanine endorsements for the benefit of Lender.

**Patriot Act**:  shall mean as described in Section 5.31(a).

**Patriot Act Offense**:  shall mean as described in Section 5.31(b).

**Payment and Performance Bond**:  a dual-obligee payment and performance bond insured through Subguard or issued by a surety company or companies having a rating of no less than AA by S&P and Aa2 by Moody's and authorized to do business in the State and in form and substance reasonably acceptable to Lender and the Construction Consultant together with a dual obligee and modification rider substantially in the form attached hereto as <u>Schedule 9</u> subject to only such changes as may be approved by Lender and Construction Consultant in their sole discretion.

**Payment Date**:  the first (1st) day of each calendar month or, upon Lender's exercise of its right to change the Payment Date in accordance with Section 2.2.5, the New Payment Date (in either case, if such day is not a Business Day, the Payment Date shall be the first Business Day thereafter).  The first Payment Date hereunder shall be [_____] 1, 2019.

**Permitted Encumbrances**:  (i) the Liens created by the Loan Documents, (ii) the Liens created by the Mortgage Loan Documents, (iii) all Liens and other matters disclosed in the Mortgagee Title Policy, (iv) Liens, if any, for Taxes or Other Charges not yet due and payable and not delinquent, (v) any workers', mechanics' or other similar Liens on the Collateral or the Property, provided that any such Lien is bonded or discharged within forty-five (45) days after Borrower and/or Mortgage Borrower first receives notice of such Lien, (vi) the Liens created by the Mortgage Loan Documents and (vi) such other title and survey exceptions as Lender approves in writing in Lender's reasonable discretion.

**Permitted Indebtedness**:  shall mean as described in Section 5.22.

---

[7] LENDER TO CONFIRM.

*ACTIVE 45870927v3*

***Permitted Investments***:  shall mean as described in Section [___] of the Deposit Account Agreement.

***Permitted Transfers***:  (i) a Lease entered into in accordance with the Loan Documents and the Mortgage Loan Documents, (ii) a Permitted Encumbrance, (iii) provided that no Event of Default shall then exist, a Transfer of an interest in Borrower other than the interests in Borrower held by Borrower Representative, or a Transfer of an interest in Borrower Representative to any Person, provided that (A) such Transfer shall not (x) cause the transferee (together with its Affiliates) to acquire Control of Borrower or Borrower Representative, (y) result in Sponsor or, [subject to Section(s) [_____] of the JVA,] the Key Principal(s) (or, following a Special Guarantor Assumption, the Special Guarantor) no longer possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower, Mortgage Borrower, Mortgage Borrower Representative and/or Borrower Representative through the ownership of voting securities, by contract or otherwise or (z) result in the Sponsor no longer owning, directly or indirectly, at least fifty-one percent (51%) of all equity interests (direct or indirect) in Borrower or Borrower Representative, (B) after giving effect to such Transfer, [subject to Section(s) [_____] of the JVA,] Key Principal(s) shall continue to own at least twenty percent (20%) of all equity interests (direct or indirect) in Borrower [and Special Guarantor shall continue to own at least [_____] percent ([__]%) of all equity interests (direct or direct) in Borrower], (C) Borrower shall give Lender notice of such Transfer together with copies of all instruments effecting such Transfer not less than ten (10) days prior to the date of such Transfer, (D) the legal and financial structure of Borrower, Mortgage Borrower and each Borrower Representative and the single purpose nature and bankruptcy remoteness of Borrower, Mortgage Borrower and each Borrower Representative and its members and partners after such Transfer, shall satisfy Lender's then current applicable underwriting criteria and requirements, (E) if, immediately following any such Transfer, the transferee owns twenty percent (20%) or more of the direct or indirect ownership interests in Borrower and/or Mortgage Borrower then, to the extent such transferee does not own twenty percent (20%) or more of the direct or indirect ownership interests in Borrower and/or Mortgage Borrower on the date hereof, Borrower shall deliver, or cause to be delivered, at Borrower's sole cost and expense, such searches (including credit, negative news, OFAC, litigation, judgment, lien and bankruptcy searches) as Lender may reasonably require with respect to such transferee, its owners and controlling Persons, the results of which must be reasonably acceptable to Lender, and such transferee, its owners and controlling Persons shall otherwise satisfy (in Lender's reasonable discretion) Lender's then current applicable underwriting criteria and requirements, and (F) [subject to Section(s) [_____] of the JVA,] an Affiliate of the Key Principal(s) shall, directly or indirectly, at all times be the managing, operating or administrative member of Borrower, (iv) a Transfer for estate planning purposes of any Key Principal's or Special Guarantor's direct or indirect interests in Borrower and/or Mortgage Borrower to an Immediate Family Member of such Key Principal or Special Guarantor's, or to a trust for the benefit of such Key Principal or Special Guarantor or for the benefit of the Immediate Family Member of such Key Principal or Special Guarantor so long as Key Principal (or, following a Special Guarantor Assumption, Special Guarantor) continues to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower and/or Mortgage Borrower through the ownership of voting securities, by contract or otherwise, or (v) a Special Guarantor Assumption.  Notwithstanding the foregoing, any Permitted Transfer must be expressly permitted under the Hotel Management Agreement, and/or Borrower shall have obtained (or shall have caused Mortgage Borrower to obtain) any consents required from Hotel Manager in

19

connection with such Permitted Transfer, otherwise such Permitted Transfer shall not be allowed under this Agreement without Lender's prior written consent.][8]

*Person*:  any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

*Plan*:  (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is subject to Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

*Plans and Specifications*:  collectively, the plans and specifications for the Project Improvements, delivered to Lender and the Construction Consultant as of the Closing Date, as the same may be amended and/or supplemented, from time to time, in Lender's sole but reasonable discretion. Lender and the Construction Consultant have approved the Plans and Specifications in form attached as Schedule [__] to the Project Loan Agreement as of the Closing Date.

*Policies*:  shall mean as described in Section 7.1.2.

*Pledge Agreement*:  shall mean that certain Mezzanine Pledge and Security Agreement, dated as of the date hereof, made by Borrower in favor of Lender, and the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

*Pledged Collateral*:  shall mean the Collateral (as defined in the Pledge Agreement).

*Prepayment Fee*:  with respect to any prepayment of Principal prior to the then-applicable Open Date or repayment of Principal following the continuance of an Event of Default, an amount equal to one percent (1%) of the amount of Principal being prepaid or repaid.

*Principal*:  shall mean as described in Section 2.1.

*Proceeds*:  shall mean as described in Section 7.2.2.

*Project Improvements*:  the construction at the Property which will consist of a [97]-room full-service hotel with a total of [approximately 98,218] square feet located on an approximately [12,079] square foot parcel; and which will be shown in detail on the Plans and Specifications.[9]

*Project Loan*:  the loan in the original principal amount of $[_____] made by Mortgage Lender to Mortgage Borrower pursuant to the Project Loan Documents.

---

[8] NTD: SUBJECT TO LENDER'S REVIEW OF THE JVA AND BORROWER'S ORGANIZATIONAL STRUCTURE.

[9] To be confirmed by consultant and land use counsel; numbers provided by Borrower differ from final term sheet.

*ACTIVE 45870927v3*

**Project Loan Agreement**:  the Project Loan Agreement dated as of the date hereof, made by Mortgage Borrower in favor of Mortgage Lender.

**Project Loan Budget**:  that portion of the Construction Budget that includes only Project Loan Costs.

**Project Loan Costs**:  all Building Costs that are not Cost of the Improvements as well as costs incurred in connection with the leasing of space at the Property, in each case, whether or not any such costs are incurred during or after the Construction Period.

**Project Loan Debt Service**:  the "Debt Service" as defined in the Project Loan Agreement.

**Project Loan Documents**:  the "Loan Documents" as defined in the Project Loan Agreement.

**Project Loan Security Instrument**: shall mean that certain Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of the date hereof, executed and delivered by Mortgage Borrower as security for the Project Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions thereof.

**Project Loan Undisbursed Loan Proceeds**:  the "Undisbursed Loan Proceeds" as defined in the Project Loan Agreement.

**Property**:  a leasehold interest in and all of Mortgage Borrower's rights to that certain parcel of real property and Improvements thereon known as 456 Greenwich Street and located in New York, New York pursuant to the terms of the Ground Lease; together with all other collateral for the Loan, as more particularly described in the Granting Clauses of the Mortgage and referred to therein as the Mortgaged Property.

**Proposed Lease**:  shall mean as described in Section 5.10.2.

**Provided Information**:  shall mean as described in Section 9.1.1.

**Punch List Items**:  such details of construction, decoration, mechanical adjustment or installation which, in the professional judgment of the Architect, do not hinder or interfere with the use, occupancy, operation or maintenance of the Property for its intended use or the ability to obtain a temporary certificate of occupancy with respect thereto.

**Qualified Manager**:  a manager approved by Lender in its sole but reasonable discretion.

**Quality Assurance Report**:  any quality assurance reports of inspection or compliance from a Hotel Manager under a Hotel Management Agreement with respect to the Property.

21

**Rating Agency**:   each of Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("**S&P**"), Moody's Investors Service, Inc. ("**Moody's**"), and Fitch, Inc., a division of Fitch Ratings Ltd. ("**Fitch**") or any other nationally-recognized statistical rating organization acceptable to Lender.

**Rebalancing Reserve Account**:   shall mean as described in Section 3.2.

**Recipient**:   any Lender.

**Remedial Work**:   shall mean as described in Section 5.8.2(c).

**Rents**:   all rents, rent equivalents, amounts payable to Borrower pursuant to the Hotel Management Agreement, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, tax refunds or tax credits (received by Borrower, Mortgage Borrower or any direct or indirect owner of Borrower or Mortgage Borrower on behalf of the Property) and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower, Mortgage Borrower, Manager or any of their agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Mortgage Borrower, Manager or any of their agents or employees and proceeds with respect to the Property, if any, from business interruption or other loss of income insurance.

**Requested Advance Date**:   shall mean as described in Section 2.9.3(a).

**Required Records**:   shall mean as described in Section 6.3.8.

**Requisition**:   with respect to each Advance, Borrower's request for such Advance together with all documents required by this Agreement to be furnished to Lender as a condition to such Advance.

**Restoration**:   shall mean as described in Section 7.4.1.

**Retainage**:   with respect to each Contract and Subcontract, (a) upon execution of such Contract or Subcontract, the greater of (i) ten percent (10%) of all Costs funded to the Contractor or Subcontractor under such Contract or Subcontract and (ii) the actual retainage required under such Contract or Subcontract and (b) upon completion of fifty percent (50%) of the work required to be performed under such Contract or Subcontract, the Retainage with respect to such work may be reduced to not less than five percent (5%) until Substantial Completion; provided, however, that Lender acknowledges and agrees that no Retainage shall be required for the following Contract or Subcontract expressly requires Retainage for such items, (2) Soft Costs or (3) general conditions, Construction Manager's insurance, bonding premiums and/or "Sub-Guard" insurance costs under the Construction Manager Agreement.

22

**Reuters Screen LIBOR 01 Page**:  shall mean as described in the definition of LIBOR.

**RevPAR**:  shall mean for any period of time, the revenue per available room as reasonably determined by Lender based upon the estimated or actual average daily room rate for such period of time, multiplied by the estimated or actual occupancy rate during the same period of time.

**S&P**:  shall mean as described in Section 1.1 (Definition of Rating Agency).

**Sale or Pledge**:  shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest.

**Second Extended Maturity Date**:  shall mean as described in Section 2.8(b).

**Secondary Market Transaction**:  shall mean as described in Section 9.1.1.

**Security Deposit**:  shall mean as described in the Mortgage Loan Agreement.

**Security Documents**:  shall mean, collectively, (i) the Pledge Agreement, (ii) Acknowledgement of Pledge by Mortgage Borrower, (iii) all UCC financing statements required by this Agreement to be filed with respect to the security interests in personal property created pursuant to the Security Documents, and (iv) all other documents and agreements executed or delivered to Lender by Borrower in connection with any of the foregoing documents.

**Servicer**:  a servicer selected by Lender to service the Loan.

**Servicing Fee**:  shall mean as described in Section 10.3.

**Shortfall**:  shall mean as described in Section 2.9.7.

**Shortfall Notice**:  shall mean as described in Section 2.9.7.

**Significant Casualty**:  shall mean as described in Section 7.2.2.

**Soft Costs**:  those Building Loan Costs which are not Hard Costs, including, without limitation, architect's, engineer's, surveyor's and Construction Manager's fees, interest on the Loan, recording taxes and title charges in respect of the Mortgage and such other non-construction costs as are part of the Cost of the Improvements.

**Special Guarantor**:  Sam Chang, an individual.

**Special Guarantor Assumption**:  shall mean, following the occurrence of a Special Guarantor Assumption Trigger Event, the satisfaction of all Special Guarantor Assumption Conditions.

**Special Guarantor Assumption Conditions**:  shall mean [_____].

23

*Special Guarantor Assumption Trigger Event*:  shall mean the failure by Borrower to cure any Event of Default described in Sections 8.1[__] of the Loan Agreement (or the failure by Borrower to cure any Event of Default described in Sections 8.1[__] of the Mortgage Loan Agreement [and under Section [____] of the Ground Lease] within ninety (90) days following notice from Lender [and Ground Lessor].

*Special Purpose Bankruptcy Remote Entity*:  shall mean as described in Section 5.13.

*Sponsor*:  Caspi Development and its Affiliates.

*Spread*:  shall mean, from an after the Closing Date through and including the Original Stated Maturity Date, (i) eight percent (8.0%) and (ii) if applicable, commencing upon the day following the Original Stated Maturity Date through the First Extended Maturity Date (and, if applicable, through the Second Extended Maturity Date), four and one half of one percent (4.5%).

*Springing Recourse Event*:  shall mean as described in Section 10.1.

*State*:  the state in which the Property is located.

*Stated Maturity Date*:  **[_____, 201_][INSERT DATE THIRTY SIX (36) MONTHS FROM CLOSING DATE]** (the "*Original Stated Maturity Date*"), and as such date may be changed in accordance with Section 2.2.5 and extended in accordance with Section 2.8.

*Stored Materials*:  shall mean as described in Section 2.9.9.

*Subaccounts*:  shall mean as described in Section 3.1 of this Agreement.

*Subcontract:*  any agreement (other than the Architect's Contract and the Construction Manager's Agreement) entered into by Mortgage Borrower or by Construction Manager in which the Subcontractor thereunder agrees to provide services, labor and/or materials in connection with the Project Improvements.

*Subcontractor:*  any subcontractor supplying services, labor and/or materials in connection with the Project Improvements.

*Substantial Completion*:  collectively, (i) the occurrence of substantial completion of the Project Improvements (other than Punch List Items) substantially in accordance with the Plans and Specifications (as the same may be amended in accordance with this Agreement), all applicable Legal Requirements, all Permitted Encumbrances and this Agreement, (ii) Borrower has delivered to Lender an AIA Form G704 (Certificate of Substantial Completion) executed by the Architect and Construction Manager in connection with the Project Improvements, (iii) the Project Improvements shall contain all fixtures, furniture and equipment required for the use and operation of the Improvements for their intended use or which may be required by any Governmental Authority or under any Legal Requirement and (iv) all utilities necessary to serve the Property have been connected and are in operation, with completion of such requirements set forth in (i) through (iv) above to be evidenced to the satisfaction of Lender, together with the

24

delivery to Lender of a temporary certificate of occupancy with regard to the Project Improvements as a whole (other than the retail component of the Project Improvements) and with no conditions to the future issuance of a permanent certificate of occupancy for the same, other than those approved by Lender acting in its reasonable discretion; together with evidence that all other applicable governmental approvals, to the extent required under applicable Legal Requirements, have been issued and all other applicable Legal Requirements have been satisfied to the extent necessary so as to allow the Project Improvements to be used, operated and/or sold in accordance with the Loan Documents.

***Substantial Completion Date***:    [INSERT DATE THIRTY (30) MONTHS FOLLOWING CLOSING DATE], as the same may be extended from time to time as a result of the occurrence of any Force Majeure Event, such extensions, together with all extensions of any deadlines with respect to any other Major Milestones due to the occurrence of any Force Majeure Events, collectively not to exceed the Force Majeure Delay Cap.

***Substitute Interest Rate Protection Agreement***:  shall mean as described in Section 2.6.1(e)(ii).

***Substitute Cash Management Accounts***:  shall have the meaning set forth in Section 3.1.1(b) hereof.

***Substitute Reserves***: shall have the meaning set forth in Section 3.1.2(b) hereof.

***Survey***: [_____].

***Taxes***:  all real estate and personal property taxes, assessments, water rates or sewer rents, maintenance charges, impositions, vault charges and license fees, now or hereafter levied or assessed or imposed against all or part of the Property.

***Term***:  the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

***Title Company***:  [_____].

***Total Undisbursed Loan Proceeds***:  shall mean, as of the date of determination, the sum of the Undisbursed Loan Proceeds and the Mortgage Loan Undisbursed Loan Proceeds.

***Toxic Mold***:  shall mean as described in Section 4.21.

***Transfer***:  (i) any sale, conveyance, transfer, lease, assignment or preferred equity investment, or the entry into any agreement to sell, convey, transfer, lease or assign, whether by law or otherwise, of, on, in or affecting (x) all or any part of the Collateral, or (y) all or part of the Property (including any legal or beneficial direct or indirect interest therein), any direct or indirect interest in Borrower or Mortgage Borrower (including any profit interest) or (ii) any change of Control of a Borrower, Mortgage Borrower or any Borrower Representative.  For purposes hereof, (i) a Transfer of an interest in Borrower shall be deemed to include (A) if Borrower or Borrower Representative or controlling shareholder of Borrower or any Borrower Representative is a

25

corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock in one or a series of transactions by which an aggregate of more than 10% of such corporation's stock shall be vested in a party or parties who are not now stockholders or any change in the control of such corporation and (B) if Borrower, any Borrower Representative or controlling shareholder of Borrower or any Borrower Representative is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a general partner, managing partner, limited partner, joint venturer or member or the transfer of the partnership interest of any general partner, managing partner or limited partner or the transfer of the interest of any joint venturer or member and (ii) a change of Control of a Borrower, Mortgage Borrower or any Borrower Representative shall be deemed to have occurred if (A) there is any change in the identity of any individual or entity or any group of individuals or entities who have the right, by virtue of any partnership agreement, articles of incorporation, by-laws, articles of organization, operating agreement or any other agreement, with or without taking any formative action, to cause a Borrower, Mortgage Borrower (or any Borrower Representative) to take some action or to prevent, restrict or impede a Borrower or Mortgage Borrower (or any Borrower Representative) from taking some action which, in either case, a Borrower or Mortgage Borrower (or any Borrower Representative) could take or could refrain from taking were it not for the rights of such individuals or (B) the individual or entity or group of individuals or entities that Control a Borrower and Mortgage Borrower (and each Borrower Representative) as described in clause (A) ever cease to own at least fifty percent (50%) of all equity interests (direct or indirect) in such Borrower (and Borrower Representative).

*UCC*:  the Uniform Commercial Code as in effect in the State of New York and the State of Delaware or the state in which any of the Accounts are located, as the case may be; provided, that if, by reason of mandatory provisions of law, the validity or perfection of Lender's security interest in the Collateral or any part thereof is governed by the Uniform Commercial Code or other similar law as in effect in a jurisdiction other than New York or Delaware, as applicable, the term "UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code or such similar law as in effect in such other jurisdiction for purposes of the provisions hereof relating to such validity or perfection.

*UCC Policy*: means that certain UCC title insurance policy in form acceptable to Lender issued by the UCC Policy Title Company with respect to the Collateral and insuring the lien of the Pledge Agreement encumbering such Collateral.

*UCC Policy Title Company*: shall mean [_____], or any successor title company or companies licensed to issue title insurance in the State and approved by Lender in its sole discretion.

*USALI*:  shall mean the Uniform System of Accounts for the Lodging Industry, 11th edition (or most current edition).

*Undisbursed Loan Proceeds*:   A portion of the Loan proceeds equal to $[_____] not disbursed to Borrower on the Closing Date, less any amounts disbursed to Borrower pursuant to Section 2.9.

26

***U.S. Person*** means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

***Waived Cash Management Accounts***: shall have the meaning set forth in Section 3.1.1(b) hereof.

***Waived Cash Management Provisions***: shall have the meaning set forth in Section 3.1.1(b) hereof.

***Waived Reserve Funds***:  shall have the meaning set forth in Section 3.1.2(b) hereof.

***Welfare Plan***:  an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

### 1.2      Principles of Construction.

(a)   Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP.

(b)   With respect to any cross-reference to the Mortgage Loan Documents or the Loan Documents or any combination thereof, as the case may be, for terms defined therein or provisions set forth therein or Schedules or Exhibits thereto, such cross-references shall be deemed to refer to defined terms or provisions or Schedules or Exhibits, as the case may be, as the same are set forth in the Mortgage Loan Documents or the Loan Documents or any combination thereof, as the case may be, as of the date hereof, and as the same may be amended, modified, supplemented, extended, replaced or restated or any combination thereof from time to time with the consent of Lender pursuant to Section 11.4 of this Agreement (and no modifications, amendments, supplements, extensions, replacements or restatements (or any combinations thereof) to the Mortgage Loan Documents shall have the effect of changing any such definition, provisions, Schedules, Exhibits for the purposes of this Agreement unless Lender expressly approves of the same pursuant to Section 11.4 of this Agreement) and shall survive the repayment or satisfaction of the Loan or the Project Loan, as the case may be, or the termination of the Project Loan Agreement or this Agreement or any combination thereof, as the case may be, for so long as the Loan remains outstanding.

## 2.      GENERAL LOAN TERMS

**2.1**    **The Loan**.  Lender is making a loan (the "***Loan***") to Borrower on the date hereof, in the original principal amount (the "***Principal***") up to the Maximum Loan Commitment Amount, which shall mature on the Stated Maturity Date.  Borrower acknowledges that the proceeds of the Loan are to be used to make capital contributions to Mortgage Borrower for the payment of Building Costs actually incurred by Mortgage Borrower in connection with the construction of the Project Improvements if and to the extent that such Building Costs are reflected in the Construction Budget, subject to reallocation pursuant to Sections 2.9.4, 2.9.5 and 2.9.6 (or other reallocations

27

approved by Lender in accordance therewith).  Notwithstanding anything herein to the contrary, prior to and as a condition precedent to the closing of the Loan, (i) all of the conditions set forth on <u>Schedule 15</u> attached hereto shall have been satisfied and (ii) all of the documents and other closing deliveries set forth on Lender's closing checklist shall have been delivered by Borrower and/or Guarantor, <u>provided</u>, <u>however</u>, that if Lender closes the Loan and funds the initial Advances on the Closing Date, the foregoing conditions shall be deemed satisfied.

     2.2     **<u>Interest; Monthly Payments</u>**.

     2.2.1     **Generally**.  From and after the date hereof, interest on the Outstanding Principal Balance shall accrue at the Interest Rate and be payable as hereinafter provided.  On the date hereof, Borrower shall pay interest on the Outstanding Principal Balance from the date hereof through and including [_____], 2019.  On [_____] 1, 2019 and each Payment Date thereafter through and including the Maturity Date, Borrower shall pay interest on the Outstanding Principal Balance which has accrued through the last day of the Interest Period immediately preceding such Payment Date.  All accrued and unpaid interest shall be due and payable on the Maturity Date.

     2.2.2     **Default Rate**.  After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, and shall be payable upon demand from time to time, to the extent permitted by applicable law.  If interest at the Default Rate is not paid currently, then the amount of such unpaid interest at the Default Rate will be added to the Principal and will itself bear interest thereafter at the Default Rate.

     2.2.3     **Taxes**.

     (a)   Any and all payments by Borrower hereunder and under the other Loan Documents shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on Lender's income, and franchise taxes imposed on Lender by the law or regulation of any Governmental Authority (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to in this Section 2.2.3 as "***Applicable Taxes***").  If Borrower shall be required by law to withhold or deduct (as determined in the good faith discretion of Borrower) any Applicable Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply:  (i) if such Applicable Tax is an Indemnified Tax, the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.2.3), Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such withholding or deductions and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.  In addition, Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.  Payments pursuant to this Section 2.2.3 shall be made within thirty (30) days after the date Lender makes written demand therefor.

     (b)   Borrower shall indemnify Lender, within thirty (30) Business after written demand therefore, for the full amount of any Applicable Taxes paid by Lender on or with

28

respect to any payment by or on account of any obligation of Borrower under this Agreement or the Note (including Applicable Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Applicable Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.

(c)    As soon as practicable after any payment of Applicable Taxes by Borrower to a Governmental Authority, Borrower shall deliver to Lender the original or a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(d)    (a) Lender shall furnish to Borrower, at the time or times reasonably requested by Borrower, such properly completed and executed forms, certifications, statements and other documents as Borrower may reasonably request from time to time to evidence Lender's exemption from such withholding taxes or to enable Borrower to comply with any applicable laws relating thereto.  In addition, Lender, if reasonably requested by Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not Lender is subject to backup withholding or information reporting requirements.  Borrower shall not be obligated to make any payments hereunder to Lender in respect of the Loan until Lender shall have furnished to the Borrower the requested form, certification, statement or document pursuant to this Section 2.2.3(d).

(i)    Without limiting the generality of the forgoing:

(A)    any Lender that is a U.S. Person shall deliver to Borrower on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), executed copies of IRS Form W-9 certifying that such Lender is a U.S. Person and is exempt from U.S. federal backup withholding Tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower (in such number of copies as shall be requested by Borrower) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), whichever of the following is applicable:

1.    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

2.    executed copies of IRS Form W-8ECI;

29

3.       in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Schedule 12-A to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Schedule 12-B or Schedule 12-C, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit C-4 on behalf of each such direct and indirect partner;

(C)       any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower (in such number of copies as shall be requested by Borrower) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower), executed copies of any other form prescribed by applicable legal requirements as a basis for claiming exemption from or a reduction in U.S. federal withholding Applicable Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable legal requirements to permit Borrower to determine the withholding or deduction required to be made;

(D)       if a payment made to Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), Lender shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower such documentation prescribed by legal requirements (including as prescribed by Section 1471(b)(3) (C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with its obligations under FATCA and to determine that Lender has complied with Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.

Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower in writing of its legal inability to do so.

(e)       Lender shall promptly notify Borrower in writing of any event of which it has knowledge, occurring after the date of this Agreement, which will entitle Lender to compensation pursuant to this Section 2.2.3.  If Lender requests compensation under Section 2.2.3, or requires Borrower to pay any Indemnified Taxes or additional amounts to  Lender or any Governmental Authority for the account of Lender pursuant to this Section 2.2.3, then Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another

30

of its offices, branches or affiliates, if, in the good faith judgment of Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to this Section 2.2.3, in the future, and (ii) would not subject Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to Lender.

(f)     If Lender determines, in its reasonable discretion, that it has received a refund of any Applicable Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section, it shall pay over such refund to Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this Section with respect to the Applicable Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses incurred by Lender in connection with receipt of such refund and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided, that Borrower, upon the request of Lender, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Lender in the event Lender is required to repay such refund to such Governmental Authority.  This Section shall not be construed to require Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to Borrower or any other Person, but Lender otherwise agrees to reasonably cooperate with Borrower hereunder.

(g)     The agreements in this Section 2.2.3 shall survive the termination of this Agreement and the payment of the Loan and all other amounts payable hereunder for a period of sixty (60) days.

**2.2.4     Breakage Indemnity.**  Borrower shall indemnify Lender against any actual loss or out-of-pocket expense which Lender may actually sustain or incur in liquidating or redeploying deposits from third parties acquired to effect or maintain the Loan or any part thereof as a consequence of (i) any payment or prepayment of the Loan or any portion thereof made on a date other than a Payment Date and (ii) any default in payment or prepayment of the Principal or any part thereof or interest accrued thereon, as and when due and payable (at the date thereof or otherwise, and whether by acceleration or otherwise).  Lender shall deliver to Borrower a statement for any such sums which it is entitled to receive pursuant to this Section 2.2.4, which statement shall be binding and conclusive absent manifest error.  Borrower's obligations under this Section 2.2.4 are in addition to Borrower's obligations to pay any Prepayment Fee and Minimum Multiple Payment applicable to a payment or prepayment of Principal.

**2.2.5     New Payment Date.**  Lender shall have the right to be exercised not more than once during the term of the Loan, to change the Payment Date to a date other than the first day of each month (a "***New Payment Date***"), on thirty (30) days' written notice to Borrower; provided, however, that any such change in the Payment Date:  (i) shall not modify the amount of regularly scheduled monthly interest payments, except that the first payment of interest payable on the New Payment Date shall be accompanied by interest at the interest rate herein provided for the period from the Payment Date in the month in which the New Payment Date first occurs to the New Payment Date, and (ii) shall extend the Stated Maturity Date to the New Payment Date occurring in the month set forth in the definition of Stated Maturity Date.

**2.2.6     Requirements of Law.**

31

(a)    If any Legal Requirement or any change in the interpretation or application thereof or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)    shall subject Lender to any tax of any kind whatsoever with respect to this Agreement, the Note or the Loan (other than (A) Indemnified Taxes, (B) Taxes described in clauses (ii) through (iv) of the definition of Excluded Taxes and (C) Connection Income Taxes) or change the basis of taxation of payments to Lender in respect thereof;

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances or other extensions of credit by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of the LIBOR hereunder;

(iii)    shall impose on Lender any other condition;

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender deems to be material, of making or maintaining the Loan or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall, from time to time, upon receipt of prior written notice of not less than thirty (30) days of such fact and a reasonably detailed description of the circumstances, promptly pay Lender such additional amount or amounts as will compensate Lender for such increased cost or reduced amount receivable (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally) and are not prohibited by such Legal Requirement to be charged back.

(b)    If Lender shall have determined that the adoption of or any change in any Legal Requirement regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on Lender's or such corporation's capital as a consequence of its obligations hereunder by an amount deemed by Lender to be material (taking into consideration Lender's or such corporation's policies with respect to capital adequacy), then from time to time, Borrower shall within thirty (30) days of written notice from Lender, pay to Lender such additional amount or amounts as will compensate Lender for such reduction (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally).

(c)    If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.6, it shall promptly notify Borrower of the event by reason of which it has become so entitled.  A certificate as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error or the provision of immediate proof by Borrower to the contrary. Notwithstanding anything to the contrary contained herein, Lender shall only require payment from Borrower under this Section 2.2.6 to the extent Lender also requires payment from similarly-situated borrowers in comparable loans.

32

**2.3**    **Loan Repayment**.

**2.3.1**    **Repayment**.  Borrower shall repay the entire Outstanding Principal Balance in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents.  Except during the continuance of an Event of Default, all proceeds of any repayment, including any prepayments of the Loan, shall be applied by Lender as follows in the following order of priority:  *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal; and *Third,* to the Minimum Multiple Payment, Extension Exit Fees (if applicable) and any other amounts then due and owing under the Loan Documents.  If prior to the Stated Maturity Date the Debt is accelerated by reason of an Event of Default, then Lender shall be entitled to receive, in addition to the Outstanding Principal Balance and accrued interest and other sums due under the Loan Documents, an amount equal to the Minimum Multiple Payment, Extension Exit Fees (if applicable) and the Prepayment Fee applicable to such Principal so accelerated.  During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on the Collateral (or any portion thereof (whether through foreclosure, assignment-in-lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

**2.3.2**    **Mandatory Prepayments**.

(a)    In the event of (i) subject to the terms of the Mortgage Loan Documents, a Casualty or Condemnation or (ii) any other Liquidation Event, Borrower shall cause the related Net Liquidation Proceeds After Debt Service to be deposited with Lender, which proceeds shall then be applied by Lender on the next Business Day towards the amount necessary to fully repay the Loan, including all interest accrued to the date of prepayment, the Minimum Multiple Payment (other than with respect to the payment of Net Proceeds resulting from any Casualty or Condemnation), all Extension Exit Fees (if applicable) and, prior to the then-applicable Open Date, the Prepayment Fee, and any other sums then due and payable by Borrower to Lender.  Any amounts of Net Liquidation Proceeds After Debt Service in excess of the Debt shall be paid to Borrower.

(b)    Borrower shall (or shall cause Mortgage Borrower to) notify Lender of any Liquidation Event not later than three (3) Business Days following the first date on which Borrower (or Mortgage Borrower) has knowledge of such event.  Borrower shall be deemed to have knowledge of (i) a sale (other than a foreclosure sale) of the Property on the date on which a contract of sale for such sale is entered into, and a foreclosure sale, on the date notice of such foreclosure sale is given, and (ii) a refinancing of the Property, on the date on which a commitment for such refinancing has been entered into by Mortgage Borrower.  The provisions of this Section 2.3.2 shall not be construed to contravene in any manner the restrictions and other provisions regarding refinancing of the Mortgage Loan or Transfer of the Property set forth in this Agreement and the other Loan Documents.

**2.3.3**    **Optional Prepayments**.  Provided no Event of Default has occurred and is continuing, Borrower shall have the right to prepay the Loan in whole but not in part on any Payment Date provided that Borrower gives Lender at least thirty (30) days prior revocable written notice thereof and such prepayment is accompanied by the Minimum Multiple Payment, the

33

Extension Exit Fee (if applicable) and, prior to the then-applicable Open Date, the Prepayment Fee; provided that if Borrower subsequently revokes such notice, Borrower shall be responsible for Lenders' reasonable out-of-pocket costs and expenses actually incurred in connection with the same. If any such prepayment is not made on a Payment Date, Borrower shall also pay interest that would have accrued on such prepaid Principal to but not including the next Payment Date.

**2.4** **Release**. Lender shall, upon the written request and at the expense of Borrower, upon payment in full of the Debt in accordance herewith, release the Liens of the Pledge Agreement and the other Security Documents and cause to be delivered to Borrower, without any recourse, warranty or representation whatsoever (except that Lender has the full power and authority to deliver the same, and has not sold or encumbered the same in favor of any third party, other than any encumbrances released as of such delivery) any membership interest and/or limited partner interest certificates evidencing the Pledged Collateral, to Pledgor and authorize the filing of, UCC-3 termination statements (in form and substance reasonably acceptable to Lender) to terminate all of Lender's rights under this Agreement and all other Loan Documents. If Lender cannot locate one or more of the original certificates evidencing the Pledged Collateral, Lender shall deliver to Borrower an affidavit of Lender that (i) Lender has made a search for such original certificates and cannot locate the same, (ii) loss of custody of the same was not the result of a transfer by Lender (iii) Lender has not sold, assigned or transferred such certificates nor pledged, hypothecated or encumbered the same.

**2.5** **Payments and Computations**.

**2.5.1** **Making of Payments**. Each payment by Borrower shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 3:00 p.m. New York City time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower. Whenever any such payment shall be stated to be due on a day that is not a Business Day, such payment shall be made on the first Business Day thereafter. All such payments shall be made irrespective of, and without any deduction, set-off or counterclaim whatsoever and are payable without relief from valuation and appraisement laws and with all costs and charges incurred in the collection or enforcement thereof, including attorneys' fees and court costs.

**2.5.2** **Computations**. Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over a 360-day year.

**2.5.3** **Late Payment Charge**. If any Principal, interest or other sum due under any Loan Document (other than the payment of Principal due on the Maturity Date) is not paid by Borrower within five (5) days of the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law (the "***Late Payment Charge***"), in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Such amount shall be secured by the Loan Documents.

34

**2.6**    **Interest Rate Protection Agreements**.

**2.6.1**    **Interest Rate Protection Agreement**.  As of the date hereof, Borrower has entered into, made all payments required under, and satisfied all conditions precedent to the effectiveness of, an interest rate protection agreement in the form of the assignment of interest rate protection agreement being entered on the date hereof that satisfies all of the following conditions (such interest rate protection agreement together with (i) any extension thereof or (ii) any other interest rate protection agreement entered into pursuant to Section 2.8, being referred to herein as the "***Interest Rate Protection Agreement***"):

(a)    the Interest Rate Protection Agreement is with a financial institution having a long term, unsecured and unsubordinated debt rating of at least (i) "AA" by S&P and "Aa2" by Moody's or, (ii) if such financial institution is an Affiliate of Lender, "A" by S&P or "A2" by Moody's; has a term ending no earlier than the Stated Maturity Date; is an interest rate cap in respect of a notional amount not less than the maximum principal amount of the Loan that shall have the effect of capping LIBOR at 4% per annum; and provides that the only obligation of Borrower thereunder is the making of a single payment upon the execution and delivery thereof.

(b)    Borrower's interest in such Interest Rate Protection Agreement has been assigned to Lender pursuant to documentation satisfactory to Lender in form and substance, and  the counterparty to such Interest Rate Protection Agreement has executed and delivered to Lender an acknowledgment of such assignment, which acknowledgment shall be satisfactory to Lender in form and substance and, without limitation, shall include such counterparty's agreement to (i) pay directly into the Subordinate Deposit Account, if and when established, all sums payable by such counterparty pursuant to the Interest Rate Protection Agreement and (ii) designate a successor counterparty under the Interest Rate Protection Agreement, which successor counterparty shall satisfy the criteria set forth in subsection (a) above and this subsection (b), not later than ten (10) Business Days after the long term, unsecured and unsubordinated debt rating of such counterparty is downgraded below (i) "A" by S&P or "A2" by Moody's or, (ii) if such counterparty is an Affiliate of Lender, "A–" by S&P or "A3" by Moody's, unless, in either case, such counterparty deposits with Lender collateral, in form, value and substance acceptable to Lender in its sole discretion and pursuant to documentation acceptable to Lender in its sole discretion.

(c)    Notwithstanding anything in herein to the contrary, prior to purchasing an Interest Rate Protection Agreement, Borrower shall send a written notification to Lender (which notice shall contain the price and other applicable terms relating to the proposed Interest Rate Protection Agreement) and Lender or its Affiliate shall be permitted to submit a bid. If another financial institution submits a lower bid, prior to purchasing the Interest Rate Protection Agreement from such financial institution, Lender or its Affiliate shall have the right to provide an Interest Rate Protection Agreement to Borrower at the same (or lower) price and upon substantially similar terms and conditions as proposed by the other financial institution.  If Lender or its Affiliate declines to provide the Interest Rate Protection Agreement to Borrower, Borrower may proceed to purchase the Interest Rate Protection Agreement from any financial institution having a rating of at least that specified in Section 2.6.1(a) above.

35

(d)    In connection with an Interest Rate Protection Agreement entered into pursuant to Section 2.8 or Section 2.6.1(e), Borrower shall obtain and deliver to Lender an opinion of counsel from counsel for the counterparty (which counsel may be in–house counsel for the counterparty) (upon which Lender and its successors and assigns and the Rating Agencies may rely) which shall provide, in relevant part, that:

(i)    the counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation or organization and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Protection Agreement;

(ii)    the execution and delivery of the Interest Rate Protection Agreement by the counterparty, and any other agreement which the counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by–laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)    all consents, authorizations and approvals required for the execution and delivery by the counterparty of the Interest Rate Protection Agreement, and any other agreement which the counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)    the Interest Rate Protection Agreement, and any other agreement which the counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the counterparty and constitutes the legal, valid and binding obligation of the counterparty, enforceable against the counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(e)    Notwithstanding anything to the contrary contained in this Section 2.6.1 or elsewhere in this Agreement, if, at any time, Lender converts the Loan from a LIBOR Loan to an Alternate Rate Loan in accordance with Section 2.10 (each, a "*LIBOR Conversion*"), then:

(i)    within thirty (30) days after such LIBOR Conversion, Borrower shall either (A) enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of, a Substitute Interest Rate Protection Agreement (and in connection therewith, but not prior to Borrower taking all the actions described in this clause (i), Borrower shall have the right to terminate any then-existing Interest Rate Protection Agreement) or (B) cause the then-existing Interest Rate Protection Agreement to be modified such that such then-existing Interest Rate Protection Agreement satisfies the requirements of a Substitute Interest Rate

36

Protection Agreement as set forth below in the definition thereof (a "***Converted Interest Rate Protection Agreement***"); and

(ii)    following such LIBOR Conversion (provided Lender has not converted the Loan back to a LIBOR Loan in accordance with Section 2.10 hereof), in lieu of satisfying the condition described in Section 2.8(a)(vii) or Section 2.8(b)(vi) with respect to any extension option, Borrower shall instead enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of a Substitute Interest Rate Protection Agreement on or prior to the exercise of such extension option.

(f)    As used herein, "***Substitute Interest Rate Protection Agreement***" shall mean an interest rate cap agreement between a counterparty and Borrower, obtained by Borrower and collaterally assigned to Lender pursuant to this Agreement that contains each of the following:

(i)    a term expiring no earlier than the end of the Interest Period related to the then-applicable Maturity Date;

(ii)    the notional amount of the Substitute Interest Rate Protection Agreement shall be equal to or greater than the then Outstanding Principal Balance;

(iii)    it provides that the only obligation of Borrower thereunder is the making of a single payment to the counterparty thereunder upon the execution and delivery thereof;

(iv)    it provides to Lender and Borrower (as determined by Lender in its sole but good faith discretion), for the term of the Substitute Interest Rate Protection Agreement, a hedge against rising interest rates that is no less beneficial to Borrower and Lender than (A) in the case of clause (e)(i) above, that which was provided by the Interest Rate Protection Agreement being replaced by the Substitute Interest Rate Protection Agreement and (B) in the case of clause (e)(ii) above, that which was intended to be provided by the Interest Rate Protection Agreement that, but for the operation of this Section 2.6.1(f), would have been required to have been delivered by Borrower pursuant to Section 2.8(a)(vii)  or 2.8(b)(vi) below as a condition to the requested extension period; and

(v)    without limiting any of the provisions of the preceding clauses (i) through (iv) above, it satisfies all of the requirements set forth in Section 2.6.1(a), (b) and (d) hereof.

From and after the date of any LIBOR Conversion, all references to "***Interest Rate Protection Agreement***" herein (other than in the definition of "***Interest Rate Protection Agreement***") shall be deemed to refer or relate, as applicable, to a Substitute Interest Rate Protection Agreement or a Converted Interest Rate Protection Agreement, as the case may be.

Notwithstanding anything to the contrary set forth in Section 2.6.1(e) and (f), Borrower shall not be required to obtain a Substitute Interest Rate Protection Agreement or Converted Interest Rate Protection Agreement, as applicable, during any period when the Loan is outstanding as an Alternate Rate Loan, as applicable, if such a Substitute Interest Rate Protection Agreement

37

or Converted Interest Rate Protection Agreement, as the case may be, is not then commercially available, in which event Borrower and Lender shall work together to find a mutually agreeable alternative to a Substitute Interest Rate Protection Agreement or Converted Interest Rate Protection Agreement that would afford Lender substantially equivalent protection from increases in the interest rate.

      **2.6.2    Execution of Documents**.  Borrower shall promptly execute and deliver to the counterparty of the Interest Rate Protection Agreement such confirmations and agreements as may be requested by such counterparty in connection with such Interest Rate Protection Agreement.

      **2.6.3    No Obligation of Lender**.  Borrower agrees that Lender shall not have any obligation, duty or responsibility to Borrower or any other Person by reason of, or in connection with, any Interest Rate Protection Agreement (including any duty to provide or arrange any Interest Rate Protection Agreement, to consent to any mortgage or pledge of the Property or any portion thereof as security for Borrower's performance of its obligations under any Interest Rate Protection Agreement, or to provide any credit or financial support for the obligations of Borrower or any other Person thereunder or with respect thereto).  No Interest Rate Protection Agreement shall alter, impair, restrict, limit or modify in any respect the obligation of Borrower to pay interest on the Loan as and when the same becomes due and payable in accordance with the provisions of the Loan Documents.

      **2.6.4    Receipts from Interest Rate Protection Agreements**.  All payments made by the counterparty to the Interest Rate Protection Agreement shall be deposited into the Subordinate Deposit Account, if and when established, and applied in the same manner as Rents are applied under Section 3.9.

      **2.6.5    Downgrade of Counterparty**.  Borrower shall cause any counterparty under any Interest Rate Protection Agreement to be replaced with a successor counterparty, which successor counterparty shall satisfy the criteria set forth in Section 2.6.1(a), not later than ten (10) Business Days after the long term unsecured and unsubordinated debt rating of such counterparty is downgraded below (i) "A" by S&P or "A2" by Moody's or, (ii) if such counterparty is an Affiliate of Lender, "A–" by S&P or "A3" by Moody's.

    **2.7    Fees**.  On the date hereof, Borrower shall pay to Lender a closing fee of $_____ **[1% of the entire amount of the Loan]** (the "*Closing Fee*").

      **2.7.1    Prepayment Fee.**  Upon any prepayment of Principal prior to the then-applicable Open Date or repayment of Principal following the continuance of an Event of Default prior to the then applicable Open Date, Borrower shall pay to Lender, on the date of such prepayment or repayment, the Prepayment Fee.  All Prepayment Fees hereunder shall be deemed to be earned by Lender upon the funding of the Loan.

      **2.7.2    Minimum Multiple Payment**.  Upon any repayment or prepayment of Principal (including in connection with an acceleration of the Loan), Borrower shall pay to Lender on the date of such repayment or prepayment the Minimum Multiple Payment applicable thereto.

38

All Minimum Multiple Payment hereunder shall be deemed to be earned by Lender upon the funding of the Loan.

### 2.7.3 **Reserved**.

### 2.8 **Extension Option**.

(a) Borrower shall have the right, at its option, to extend the Term until [ _____ ] 1, 201__ [INSERT DATE TWELVE (12) MONTHS FOLLOWING ORIGINAL STATED MATURITY DATE] (the "***First Extended Maturity Date***") by giving revocable notice of such extension to Lender at least ninety (90) days prior to the Original Stated Maturity Date; provided that if Borrower subsequently revokes such notice, Borrower shall be responsible for Lenders' reasonable out-of-pocket costs and expenses actually incurred in connection with the same. Upon receipt of such request to extend the Term until the First Extended Maturity Date Lender shall promptly confirm to Borrower in writing whether or not the Stated Maturity Date will be so extended, which extension shall be granted upon the satisfaction of the following conditions:

(i) no Event of Default exists at the time such request is made and on the Original Stated Maturity Date;

(ii) Borrower delivers to Lender an Officer's Certificate confirming the accuracy of the information contained in clause (i) above;

(iii) if the option to extend the Term until First Extended Maturity Date is exercised, Borrower agrees to pay to Lender upon the subsequent repayment of the Principal an extension exit fee in an amount equal to one percent (1.0%) (the "***Extension Exit Fee***") of any repayment of the Outstanding Principal Balance which shall be deemed earned on the date that the Term of the Loan is so extended.

(iv) Borrower has made, or has caused Mortgage Borrower to have made a deposit in the Mortgage Loan Cash Management Accounts, the Rebalancing Reserve Account and each other Cash Management Accounts hereunder any and all amounts required pursuant to the Mortgage Loan Agreement and this Agreement in amounts determined by Lender so that after such deposit there are sufficient funds in the Mortgage Loan Cash Management Accounts, the Rebalancing Reserve Account and/or the applicable Cash Management Accounts hereunder to pay all Taxes, Other Charges and Insurance Premiums, Leasehold Rents, Debt Service, Mortgage Loan Debt Service, Mortgage Loan Shortfalls and/or Shortfalls, respectively, through the First Extended Maturity Date;

(v) Mortgage Borrower has extended the term of the Building Loan pursuant to Section 2.8(a) of the Building Loan Agreement and the term of the Project Loan pursuant to Section 2.8(a) of the Project Loan Agreement to a date that is conterminous with the Loan;

(vi) Mortgage Borrower has achieved Substantial Completion of the Project Improvements;

39

(vii)    on or prior to the Original Stated Maturity Date, Borrower either (i) extends the term of the Interest Rate Protection Agreement until _____ or (ii) enters into a new interest rate protection agreement which expires on _____ , and which extension or new agreement is on the same terms set forth in Section 2.6.1 and has the effect of capping LIBOR at _____% per annum; and

(viii)    on the Original Stated Maturity Date the Debt Service Coverage Ratio is at least 1.10 to 1.00 (the "***Extension Option DSCR***"), as measured as of the end of the calendar month immediately preceding the Original Stated Maturity Date, provided that if the Debt Service Coverage Ratio is less than 1.10 to 1.00, provided that in order to satisfy such requirement, Borrower shall be permitted to post cash collateral in an account controlled by Lender (and in which account Borrower shall grant a security interest in favor of Lender), in either case in an amount necessary to satisfy the Extension Option DSCR.

If Borrower is unable to satisfy all of the foregoing conditions within the applicable time frames for each, Lender shall have no obligation to extend the Stated Maturity Date hereunder.

(b)    Borrower shall have the right, at its option, to extend the Term until [ _____] 1, 201__  [INSERT DATE TWELVE (12) MONTHS FOLLOWING FIRST EXTENDED MATURITY DATE] (the "***Second Extended Maturity Date***") by giving revocable notice of such extension to Lender at least ninety (90) days prior to the First Extended Maturity Date; provided that if Borrower subsequently revokes such notice, Borrower shall be responsible for Lenders' reasonable out-of-pocket costs and expenses actually incurred in connection with the same.  Upon receipt of such request to extend the Term until the Second Extended Maturity Date Lender shall promptly confirm to Borrower in writing whether or not the First Extended Maturity Date will be so extended, which extension shall be granted upon the satisfaction of the following conditions:

(i)    no Event of Default exists at the time such request is made and on the First Extended Maturity Date;

(ii)    Borrower delivers to Lender an Officer's Certificate confirming the accuracy of the information contained in clause (i) above;

(iii)    if the option to extend the Term until the Second Extended Maturity Date is exercised, Borrower agrees to pay to Lender upon the subsequent repayment of the Principal the Extension Exit Fee of any repayment of the Outstanding Principal Balance with respect to the second extension which shall be deemed earned on the date that the term of the Loan is so extended. For the avoidance of doubt the Extension Exit Fee paid in connection with the second extension of the Loan shall be in addition to the Extension Exit Fee paid in connection with the first extension of the Loan;

(iv)    Borrower has made, or has caused Mortgage Borrower to have made a deposit in the Mortgage Loan Cash Management Accounts, the Rebalancing Reserve Account and each other Cash Management Accounts hereunder any and all amounts required pursuant to the Mortgage Loan Agreement and this Agreement in amounts determined by Lender

40

so that after such deposit there are sufficient funds in the Mortgage Loan Cash Management Accounts, the Rebalancing Reserve Account and/or the applicable Cash Management Accounts hereunder to pay all Taxes, Other Charges and Insurance Premiums, Leasehold Rents, Debt Service, Mortgage Loan Debt Service, Mortgage Loan Shortfalls and/or Shortfalls, respectively, through the First Extended Maturity Date;

(v)    Mortgage Borrower has extended the term of the Building Loan pursuant to Section 2.8(b) of the Building Loan Agreement and the term of the Project Loan pursuant to Section 2.8(b) of the Project Loan Agreement to a date that is conterminous with the Loan;

(vi)    on or prior to the First Extended Maturity Date Borrower either (i) extends the term of the Interest Rate Protection Agreement until _____ or (ii) enters into a new interest rate protection agreement which expires on _____ , and which extension or new agreement is on the same terms set forth in Section 2.6.1 and has the effect of capping LIBOR at ____% per annum; and

(vii)    on the First Extended Maturity Date the Debt Service Coverage Ratio is at least 1.10 to 1.00, as measured as of the end of the calendar month immediately preceding the originally scheduled Stated Maturity Date, provided that if the Debt Service Coverage Ratio is less than 1.10 to 1.00, provided that in order to satisfy such requirement, Borrower shall be permitted to post cash collateral in an account controlled by Lender (and in which account Borrower shall grant a security interest in favor of Lender), in either case in an amount necessary to satisfy the Extension Option DSCR.

If Borrower is unable to satisfy all of the foregoing conditions within the applicable time frames for each, Lender shall have no obligation to extend the Stated Maturity Date hereunder.

###### 2.9    **Advances**.

###### 2.9.1    **Conditions to Advances.**  Lender's obligation to make each Advance shall be subject to the satisfaction of the following conditions on the date of each Advance:

(a)    no monetary Default, material non-monetary Default or Event of Default shall exist, nor shall any monetary Default, material non-monetary Default or Event of Default result from the making of the Advance;

(b)    the representations and warranties made to Lender herein, in the other Loan Documents and in any other document, certificate or statement executed or delivered to Lender in connection with the Loan shall be true and correct in all material respects on and as of the date of the advance with the same effect as if made on such date, (except to the extent that any representations and warranties are not true due to a change in facts or circumstances, the occurrence of any event and/or the existence of any conditions which is permitted to have occurred pursuant to this Agreement or which does not and will not result in a Default);

(c)    Lender shall have received a written continuation report to the date of such Advance with respect to the Mortgagee Title Policy and an endorsement to the Mortgagee Title Policy, which endorsement shall increase the coverage of the Mortgagee Title Policy by the

41

amount of such Advance (but not the overall policy amount which shall be for the full amount of the Loan), amend the effective date of the Mortgagee Title Policy to the date of such Advance and continue to insure the first lien of the Mortgage subject to no additional exceptions (including survey exceptions) except those exceptions expressly approved in writing by Lender's counsel, together with other evidence reasonably satisfactory to Lender that no mechanic's Liens or other Liens have been filed and remain filed with respect to the Property which have not been bonded or discharged of record;

(d)    Lender and the Construction Consultant shall have received a Requisition, together with such other documentation and information as either of them may reasonably require, including, without limitation, copies of all invoices evidencing the costs and expenses in respect of which such Advance is being requested;

(e)    all fees and expenses payable to Lender, including, without limitation, the fees and expenses described in Section 5.29, to the extent then due and payable, and all title and survey charges shall have been paid in full (or paid contemporaneously are being from the Advance in question);

(f)    Lender shall have received such other documents relating to the Advance or the Property and/or the Collateral as Lender may reasonably request;

(g)    Lender and Construction Consultant shall have received certificates of the Construction Manager stating that (i) all of the work which is the subject of the Advance has been done in a good and workmanlike manner in compliance with the Plans and Specifications and all applicable Legal Requirements, (ii) the disbursement of such Advance is required to reimburse payments of Building Costs incurred or to pay Building Costs incurred and due to, Contractors and Subcontractors, engineers, architects or other Persons providing services, labor and/or materials or paying for such work and identifying each Person that provided services, labor and/or materials with respect to such work and (iii) each such Person has been or upon receipt of the requested Advance will be paid in full for work for which the Advance has been made or is being requested;

(h)    all work performed through the date on which the requested Advance is made shall have been performed in compliance with this Agreement and the other Loan Documents;

(i)    Borrower shall (or shall have caused Mortgage Borrower to) have delivered to Lender lien waivers (which may provide that they shall become effective immediately upon payments made from the Advance), duly executed and delivered by the Construction Manager and Contractors, Subcontractors and other Persons requested by Lender for all work for which an Advance has previously been made and for which the Advance in question is being requested;

(j)    Unless approved by Lender in accordance with Section 2.9.5 or Section 2.9.6 hereof, the aggregate amount of Advances on account of any line item shall not exceed the budgeted amount for such line item without the prior written consent of Lender;

42

(k)    in no event shall the aggregate amount of all Advances under Section 2.9 exceed the amount of the Undisbursed Loan Proceeds;

(l)    Lender shall have received evidence satisfactory to Lender that there are adequate funds remaining from the Undisbursed Loan Proceeds hereunder and the Mortgage Loan Undisbursed Proceeds, in the aggregate, to complete the Project Improvements and to cover all Building Costs;

(m)    the Project Improvements shall not have been injured or damaged by fire, explosion, accident, floor or other casualty, unless insurance proceeds sufficient in Lender's reasonable judgment, to effect the satisfactory restoration of the Project Improvements and to permit the Final Completion prior to the Stated Maturity Date (subject to Borrower's right to extend the Stated Maturity Date pursuant to Section 2.8) shall be made available for such restoration in accordance with Section 7.4 hereof;

(n)    Lender shall have received a Construction Manager Affirmation of Payment (AIA Form G706);

(o)    Lender shall have received an anticipated cost report substantially in the form attached hereto as <u>Schedule 1</u> executed by the Construction Manager which sets forth the anticipated costs to complete construction of the Project Improvements, after giving effect to costs incurred during the previous month and any anticipated change orders;

(p)    Lender shall have received evidence that all Government Approvals necessary for the construction of the phase of the work then being undertaken as contemplated by the Plans and Specifications have been obtained, including, without limitation, a building permit and that Borrower shall have complied with all Legal Requirements in all material respects, including all land use, building, subdivision, zoning and similar ordinances and regulations promulgated by any Governmental Authority and applicable to the construction of the phase of the work then being undertaken and to permit construction to continue and be completed substantially in accordance with the timelines set forth in the Construction Schedule;

(q)    Lender shall have received evidence that the Construction Manager Payment and Performance Bond and any other payment and performance bonds that Lender may, from time to time, require pursuant to Section 5.45 hereof are in full force and effect;

(r)    Lender shall have received a written report (each, a "***Construction Consultant's Report***") from the Construction Consultant as to Construction Consultant's determination based on on-site inspections of the Project Improvements and the date submitted to and reviewed by it as part of Borrower's Requisition, in which the Construction Consultant shall (i) indicate the value of the labor and materials in place, (ii) confirm that the construction of the Project is proceeding satisfactorily and according to the Construction Schedule, (iii) verify that the work on account of which the Advance is sought has been or will be completed in a good and workmanlike manner to the Construction Consultant's reasonable satisfaction substantially in accordance with the Plans and Specifications, (iv) state its estimate of (A) the percentages of the construction of the Project Improvements completed as of the date of such site observation, on the basis of work in place as part of the Project Improvements and the Construction Budget, (B) the

43

Hard Costs actually incurred for work in place as part of the Project Improvements as of the date of such site observation, (C) the sum necessary to complete construction of the Project Improvements in accordance with the Plans and Specifications; and (D) the amount of time from the date of such inspection that will be required to achieve Final Completion of the Project Improvements.  The Construction Consultant shall complete its on-site inspection promptly after Lender's request therefore and shall deliver the Construction Consultant's Report with respect to each such inspection within five (5) Business Days after such inspection;

(s)   each request for an Advance shall include wiring instructions for each Person to whom any portion of such Advance is to be paid; and

(t)   Borrower shall have complied with the provisions of Section 2.9.7.

(u)   With respect to the Initial Advance, Borrower shall (or shall have caused Mortgage Borrower to) have entered into executed contracts, in form and substance satisfactory to Lender, with respect to Subcontracts for at least eighty (80%) of the Hard Costs set forth in the Construction Budget approved by Lender as of the Closing Date, and pertaining to no less than ninety percent (90%) of the final Plans and Specifications.

(v)   with respect to the Initial Advance, Borrower shall (or shall have caused Mortgage Borrower to) have paid, with funds other than proceeds of this Loan or the Mortgage Loan, in the aggregate, not less than twenty percent (20%) of the total cost of the Project Improvements, including amounts spent prior to the Closing Date, which costs are not intended to be, and shall not be, funded by Lender;

(w)   Mortgage Borrower shall be current in the payment of all Mortgage Loan Debt Service and Carrying Costs and Borrower shall be current in the payment of all Debt Service, which payments, unless contemplated under this Agreement to be paid from the proceeds of the Loan and the Mortgage Loan, shall be made with funds other than the proceeds of this Loan and the Mortgage Loan;

(x)   Lender shall have received, and Lender and the Construction Consultant shall have approved, the Plans and Specifications for the Project Improvements; and

(y)   With respect to the Initial Advance, Lender shall have received the UCC Policy and the Owner's Policy, each dated as of the Closing Date.  The UCC Policy shall (i) provide coverage in the amount of the Loan, (ii) insure Lender that the Pledge Agreement creates a valid first priority security interest in the Collateral, free and clear of all exceptions from coverage other than the Permitted Encumbrances, and (iii) name Lender, its successors and assigns, as insured. The Owner's Title Policy shall include a mezzanine endorsement naming Lender, its successors and assigns, for the ratable benefit of the Lender, as the "Mezzanine Lender" entitled to the rights and benefits set forth in such endorsement.  Lender also shall have received evidence that all premiums in respect of the UCC Policy and the Owner's Title Policy have been paid.

**2.9.2    Amount, Timing and Procedure of Advances.**  Lender's obligation to make each Advance shall be subject to the satisfaction of the following conditions on the date of each Requisition and on the date of each Advance:

44

(a)    Lender shall not be required to Advance funds hereunder for any category or line item of Building Costs in excess of the amount specified for such category or line item in the Construction Budget, subject to Sections 2.9.4, 2.9.5, 2.9.6 or 2.9.7 (or other reallocations approved by Lender in accordance therewith).  Any fees or payments to be made pursuant to any contract with any Affiliate of Borrower or Guarantor shall only be disbursed hereunder at such times provided under and otherwise in accordance with said contract (but in no event shall such payments exceed from time to time the amount allocated therefor in the Construction Budget).

(b)    In no event shall any Advance exceed the full amount of Building Loan Costs theretofore paid or to be paid with the proceeds of such Advance plus any Building Loan Costs incurred by Borrower through the date of the Draw Request for such Advance minus (i) the applicable Retainage for each Contract and Subcontract and (ii) the aggregate amount of any Advances previously made by Lender.  It is further understood that the Retainage is intended to provide a contingency fund protecting Lender against the failure of Borrower or Guarantor to fulfill any of their respective obligations under the Loan Documents, and that Lender may charge amounts to pay for Building Loan Costs against such Retainage in the event Lender is required or elects to expend funds to cure any Event of Default.

(c)    The Retainage shall be advanced on a contract-by-contract basis upon completion of performance by the applicable Contractor or Subcontractor of all of its obligations under the applicable Contract or Subcontract, subject to approval thereof by the Construction Consultant and receipt by Lender of final lien waivers for such Contract or Subcontract.

(d)    Lender shall have no obligation to make Advances more often than once in each calendar month, except that Lender, in its sole discretion, shall have the right, but not the obligation, to make additional advances per month for interest, fees and expenses due under the Loan Documents.

(e)    All Advances shall be in minimum amounts of $50,000.00 (with the exception of the final Advance for which there shall be no minimum).

(f)    Lender shall not be obligated to make any disbursement of the Loan unless Lender is satisfied that the conditions precedent to the making of such disbursement, as set forth in this Agreement, have been satisfied by the Borrower.

(g)    Each Advance shall be made by Lender by wire transfer to such account of Borrower, Construction Manager or the applicable Contractor or Subcontractor as specified to Lender in writing or as provided in clause (h) below.  All proceeds of all Advances shall be used by Borrower only for the purposes for which such Advances were made as set forth in the Requisition.

(h)    Lender may make, at Lender's option, any or all Advances directly or through the Title Company to Construction Manager or any Contractor or Subcontractor, as applicable, for Building Costs which shall theretofore have been approved by Lender and for which Borrower shall have failed to make payment after receipt by Borrower of such applicable Advance.

45

The execution of this Agreement by Borrower shall, and hereby does, constitute an irrevocable authorization so to advance the proceeds of the Loan directly to any such Person or through the Title Company to such Persons in accordance with this Section 2.9.2 as amounts become due and payable to them hereunder and any portion of the Loan so disbursed by Lender shall be deemed disbursed as of the date on which the Person to whom payment is made receives the same. No further authorization from Borrower shall be necessary to warrant such direct Advances to such relevant Person, and all such Advances shall satisfy pro tanto the obligations of Lender hereunder and shall be secured by the Mortgage and the other Loan Documents as fully as if made directly to Borrower.

Notwithstanding anything to the contrary contained in this Agreement, the Project Loan Agreement, Lender shall not be obligated to make any Advance after the Outside Advance Date.

### 2.9.3 **Requisitions**.

(a) At least ten (10) Business Days prior to the date on which Borrower shall request an Advance be made (the "***Requested Advance Date***"), Borrower shall complete, execute and deliver to Lender and the Construction Consultant a Requisition which shall be in the form attached hereto as Schedule 2. Each Requisition shall be for Advances for Building Loan Costs and shall be accompanied by a completed and itemized Application and Certificate for Payment (AIA Document No. G702) or similar form reasonably approved by Lender, containing the certification of the Construction Manager or Contractor or Subcontractor to whom such payment is to be made, as applicable, together with invoices relating to all items of Building Loan Costs covered thereby and accompanied by a cost breakdown showing the cost of work on, and the cost of materials incorporated into, the Project Improvements to the date of the Requisition. The cost breakdown shall also show the percentage of completion of each line item, and the accuracy of the cost breakdown shall be certified by Borrower and by the Architect. All such applications for payment shall also show all Contractors and Subcontractors, including Major Contractors, by name and trade, the total amount of each Contract or Subcontract, the amount theretofore paid to each Contractor or Subcontractor as of the date of such application, and the amount to be paid from the proceeds of the Advance to each Contractor and Subcontractor.

(b) Lender shall make the requested Advance on the Requested Advance Date so long as all conditions to such Advance are satisfied or waived.

(c) Each Requisition shall be accompanied by (i) copies of all executed change orders, (ii) to the extent requested by Lender, copies of all inspection or test reports and other documents relating to the construction of the Project Improvements, in either case, not previously delivered to Lender and (iii) such other information, documentation and certifications as Lender may request.

### 2.9.4 **Cost Overruns**.

(a) If at any time, the budgeted amount for any category or line item is, in Lender's reasonable judgment, excessive or deficient, the excess or deficiency may be reallocated to or from any other category or line item which Lender deems to be excessive or insufficient, as the case may be.

46

(b)  If Borrower becomes aware of any change in actual or projected Building Costs which will increase a category or line item reflected in the Construction Budget, Borrower shall immediately notify Lender in writing and promptly thereafter submit to Lender for its approval a revised Construction Budget.  Any reallocation of any category or line items in the Construction Budget in connection with cost overruns shall be subject to Lender's approval in Lender's sole but reasonably exercised discretion, except with respect to reallocations expressly permitted under, and made in accordance with, Sections 2.9.5, 2.9.6 or 5.43; provided, however, that under no circumstances shall Borrower be permitted, or Lender obligated to approve, the reallocation of line items from the Building Loan Budget to the Project Loan Budget.  Lender shall have no obligation to make any further Advances unless and until the revised Construction Budget so submitted by Borrower is approved by Lender in accordance with the standards set forth in the preceding sentence with respect to reallocations.  Lender reserves the right to approve or disapprove any revised Construction Budget in its sole but reasonably exercised discretion (except with respect to reallocations expressly permitted under, and made in accordance with, Sections 2.9.5, 2.9.6 and 5.43.

2.9.5    **Budget Reallocation.**  Borrower may, with the prior written approval of Lender in its sole but reasonably exercised discretion, allocate verifiable cost savings actually achieved (via completion of work or other verifiable means reasonably satisfactory to Lender) in any line item of the Building Loan Budget to the contingency line item or to other line items of the Building Loan Budget which Borrower reasonably determines are underfunded, provided that Borrower shall provide evidence of such costs savings to Lender, which evidence shall be reasonably satisfactory to Lender; provided further, that Borrower shall in no event or under any circumstances have the right to reallocate (A) any portion of the interest and fees line item(s) to any other line item, (B) any savings in a Hard Costs line item to a Soft Costs line item (unless Lender consents in its sole and absolute discretion) or (C) any line item to any other line item of the Building Loan Budget that in the opinion of Lender, its counsel or the Title Company may be in contravention of the Lien Law, or that in the opinion of Lender, its counsel or the Title Company may adversely affect or impair in any manner whatsoever the Lien or the priority of the Lien of the Mortgage.

2.9.6    **Construction Contingency.**  Subject to the prior written approval of Lender in its sole but reasonably exercised discretion, Borrower may revise the Building Loan Budget to move (a) amounts available under any line item for Hard Costs that are designated "contingency" to other line items for Hard Costs in the Building Loan Budget, or (b) amounts available under any line item for Soft Costs that are designated "contingency" to other line items for Soft Costs in the Building Loan Budget.  Borrower shall promptly deliver to Lender a revised Building Loan Budget reflecting such reallocations.  In no event may the contingency line item of the Building Loan Budget be reallocated to any line item in the Project Loan Budget.  The contingency line item in the Building Loan Budget for Hard Costs shall contain at least an amount equal to the greater of (i) two and one-half percent (2.5%) of the Building Loan Budget for Hard Costs and (ii) Two Million Three Hundred Thousand and 00/100 ($2,300,000.00), separate from the contingency line items in the Project Loan Budget.

2.9.7    **Loan Balancing.**  Lender shall be obligated to fund Advances only at such times as the Loan is "in balance".  The Loan shall be "in balance" only at such times as the Total Undisbursed Loan Proceeds are sufficient, as determined by Lender in its sole discretion, in

47

the aggregate and individually as to each line item in the Construction Budget, to pay all Building Costs. If at any time and from time to time, Lender determines, in its sole discretion, that the cost of completing or satisfying any line item in the Construction Budget exceeds the Total Undisbursed Loan Proceeds allocated to such line item in the Construction Budget ("**Shortfall**") and Lender notifies Borrower of same in writing (a "**Shortfall Notice**"), Lender shall have the right to cease making any further Advances, until Borrower has (i) deposited an amount equal to the Shortfall in the Rebalancing Reserve Account in accordance with Section 3.2 hereof (but without duplication of any amounts in the Mortgage Loan Rebalancing Reserve Account deposited by Mortgage Borrower on account of any Mortgage Loan Shortfall, to the extent, as a result of, such deposit, the Shortfall no longer exists) and (ii) has caused Mortgage Borrower to deposit any Mortgage Loan Shortfall in accordance with Section 3.2 of the Mortgage Loan Agreement.

2.9.8     **Trust Funds.** All proceeds advanced hereunder shall be subject to the trust fund provisions of Section 13 of the Lien Law. Borrower covenants that (i) it will receive all advanced proceeds and will hold the right to receive such proceeds as trust funds to be first applied to the payment of trust claims as defined in Section 71 of the New York Lien Law and (ii) it will apply all such advanced proceeds to the payment of trust claims (as so defined) only, before using any part of such advanced proceeds for any other purpose.

2.9.9     **Stored Materials; Deposits.**

Lender shall not be required to disburse any funds for any materials, machinery or other Personal Property not yet incorporated into the Project Improvements (the "**Stored Materials**"), unless the following conditions are satisfied:

(i)     Borrower shall (or shall cause Mortgage Borrower to) deliver to Lender bills of sale or other evidence satisfactory to Lender of the cost of, and, subject to the payment therefor, Borrower's (or Mortgage Borrower's) title in and to such Stored Materials;

(ii)     The Stored Materials are identified as relating to the Property, Borrower and Mortgage Borrower, are segregated so as to adequately give notice to all third parties of Borrower's or Mortgage Borrower's title in and to such materials, and are components in substantially final form ready for incorporation into the Project Improvements within no more than one hundred twenty (120) days from the date on which such Stored Materials are received by Borrower or Mortgage Borrower;

(iii)     The Stored Materials are stored at the Property or at such other third-party owned and operated site as Lender shall approve in its sole discretion, and are protected against theft and damage in a customary manner;

(iv)     The Stored Materials will be paid for in full with the funds to be disbursed, and all lien rights or claims of the supplier will be released upon full payment;

(v)     Lender has or will have upon payment with disbursed funds a perfected security interest in the Stored Materials, subject only to the security interests of Mortgage Lender;

48

(vi)     The Stored Materials are insured for an amount equal to their replacement costs in accordance with Section 7.1 of this Agreement;

(vii)     The aggregate cost of Stored Materials stored at the Property is approved by the Construction Consultant and, if required by Lender, the Construction Consultant shall certify that it has inspected such Stored Materials and they are in good condition and suitable for use in connection with the Project; and

(viii)     The cost of Stored Materials stored at the Property, in the aggregate at any time, is not more than $[_____] and the aggregate cost of Stored Materials stored off-site of the Property at any one time shall not exceed $[_____].

(b)     Lender agrees that, subject to Borrower's compliance with all of the other requirements of this Agreement governing Advances, and Mortgage Borrower's compliance with all of the other requirements of the Mortgage Loan Agreement governing Mortgage Loan Advances, Lender will make an Advance of the Loan for deposits on materials to be purchased under Trade Contracts, provided that the following conditions are satisfied:

(i)     such deposits are Building Costs and are in commercially reasonable and customary amounts by Lender;

(ii)     no Event of Default shall have occurred and be continuing under this Agreement; and

(iii)     Construction Consultant determines such deposit is commercially reasonable and customary.

**2.9.10    Quality of Work.**  No Advance or any portion thereof shall be made with respect to defective work that has not been cured or to any Contractor or Subcontractor that has performed work that is defective and that has not been cured, as confirmed by the report of the Construction Consultant, provided that Lender may disburse all or part of any Advance before the sum shall become due if Lender believes it advisable to do so, and all such Advances or parts thereof shall be deemed to have been made pursuant to this Agreement.

**2.9.11    Requisition as Affirmation.**  Each Requisition shall constitute an affirmation by Borrower that it has caused Mortgage Borrower to have paid or actually incurred Building Costs in the amount of the requested advance and that such Building Costs have not been made the basis for any other request for an advance of Loan proceeds, and shall be accompanied by such documentary evidence (including paid bills, conditional lien waivers and contractors' certifications) as Lender shall require.  Each Requisition shall also constitute Borrower's representation and warranty to Lender that (a) any completed construction has been performed in accordance with the Plans and Specification and the Construction Budget, (b) all of the representations and warranties contained herein and in the other Loan Documents are true and correct in all material respects, (except to the extent that any representations and warranties are not true due to a change in facts or circumstances, the occurrence of any event and/or the existence of any conditions which is permitted to have occurred pursuant to this Agreement or which does not and will not result in a Default);.

49

**2.9.12    Advance Not Waiver.**  No Advance made prior to or without the fulfillment by Borrower of all of the conditions precedent thereto (and the fulfillment by Mortgage Borrower of all of the conditions precedent to the Mortgage Loan Advances), whether or not known to Lender, shall constitute a waiver by Lender of the requirement that all conditions, including the non-performed conditions, shall be required with respect to all future advances nor, in the event that Borrower is unable to satisfy any such condition, shall any Advance have the effect of precluding Lender from thereafter declaring the inability to satisfy such condition to be an Event of Default hereunder.

**2.9.13    Conditions to Final Advance.**  In addition to the conditions set forth in Section 2.9.1 above, Lender's obligation to make the final Advance of Retainage pursuant to this Agreement shall be subject to receipt by Lender of the following:

(a)   Evidence satisfactory to Lender of the Final Completion of the Project Improvements, which shall be satisfied by written notification from the Construction Consultant that Final Completion of the Project Improvements has occurred.

(b)   A certificate of the Architect substantially in the form (but containing the substance) of the Architect's Completion Certificate attached hereto as Schedule 3.

(c)   Duly executed final lien waivers substantially in the form attached hereto as Schedule 4 from all Contractors (including, without limitation, the Construction Manager) and Subcontractors who have performed work, for the work so performed, and/or who have supplied labor and/or materials for the labor and/or materials so supplied.

(d)   Evidence reasonably satisfactory to Lender that all sums due in connection with the construction of the Project Improvements have been paid in full (or will be paid out of the funds requested to be advanced) and that no party claims or has a right to claim any statutory or common law lien arising out of the construction of the Project Improvements or the supplying of labor, material, and/or services in connection therewith.

(e)   A full and complete set of final Plans and Specifications certified to as final by the Architect.

(f)   Completed AIA Forms G704 (Certificate of Substantial Completion) from each of the Architect and the Construction Manager and completed AIA Form G707 (Consent of Surety to Final Payments) from each surety issuing any of Payment and Performance Bonds in respect of the Project Improvements (including, without limitation, the Construction Manager Payment and Performance Bond).

(g)   A final as-built survey for the Property certified to Lender in form reasonably satisfactory to Lender showing all Improvements.

(h)   An endorsement to the Mortgagee Title Policy deleting any exception pertaining to construction of improvements.

(i)    Lender may commission an appraisal of the Property upon substantial completion of the Project Improvements or at such other times required by legal requirements or accounting policy from an appraiser reasonably satisfactory to Lender.

**2.9.14    Reserved.**

**2.9.15    Advances to Pay Fees and Expenses.**    Borrower hereby irrevocably authorizes Lender to make Advances (without requisition by Borrower) to any and all fees and expenses under the Loan Documents that are then due to Lender and/or Construction Consultant, as applicable.    Notwithstanding anything to the contrary contained in this Agreement, Lender shall have no obligation to make any disbursement for fees if the conditions set forth in Section 2.9.2, if applicable, are not satisfied, or (iii) if a Default or Event of Default shall have occurred and be continuing.    The provisions of this Section 2.9.15 are not intended to limit or derogate from Borrower's absolute and unconditional obligation to pay such fees, regardless of whether Loan proceeds are available or advanced therefore.

**2.9.16    Unfunded Portions of the Loan.**    If any Undisbursed Loan Proceeds remain on the Outside Advance Date, Lender will not make any further Advances under this Agreement, and Lender's commitment to make any Advances hereunder shall be deemed to have terminated.

**2.9.17    Miscellaneous**.

(a)    The making of an Advance by Lender shall not constitute Lender's approval or acceptance of the construction theretofore completed.    Lender's inspection and approval of the Plans and Specifications, the construction of the Project Improvements, or the workmanship and materials used therein, shall impose no liability of any kind on Lender, the sole obligations of Lender as the result of such inspection and approval being to make the Advances if and to the extent required by this Agreement.

(b)    ALL POTENTIAL LIENORS ARE HEREBY CAUTIONED TO EXERCISE SOUND BUSINESS JUDGMENT IN THE EXTENSION OF CREDIT TO BORROWER.    NO POTENTIAL LIENOR SHOULD EXPECT LENDER TO MAKE ADVANCES OF THE LOAN IN AMOUNTS AND AT TIMES SUCH THAT IT WILL NOT BE NECESSARY FOR EACH SUCH POTENTIAL LIENOR TO EXERCISE SOUND BUSINESS JUDGMENT IN THE EXTENSION OF CREDIT TO BORROWER.    MOREOVER, ALL POTENTIAL LIENORS ARE REMINDED THAT SUBDIVISION (3) OF SECTION 13 OF THE NEW YORK LIEN LAW PROVIDES THAT "NOTHING IN THIS SUBDIVISION SHALL BE CONSIDERED AS IMPOSING UPON LENDER ANY OBLIGATION TO SEE TO THE PROPER APPLICATION OF SUCH ADVANCES BY THE BORROWER," AND LENDER DOES NOT IMPOSE SUCH AN OBLIGATION ON ITSELF.

**2.10    Rate Conversion**.    If at any time the Loan is outstanding as a LIBOR Loan and Lender has determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that LIBOR cannot be determined and LIBOR has been succeeded by an Alternate Index, then the Loan shall be converted from a LIBOR Loan to an Alternate Rate Loan. Lender shall provide notice of the foregoing conversion to an Alternate Rate Loan to Borrower at

51

least one (1) Eurodollar Business Day prior to the next succeeding Determination Date, with a written confirmation of such determination promptly thereafter. If such notice is given, the Loan shall be converted, as of the first day of the Interest Period for which LIBOR was unavailable, to an Alternate Rate Loan. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert a LIBOR Loan to an Alternate Rate Loan. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to elect to have the Loan bear interest either based on LIBOR or based on the Base Rate or the Alternate Rate.

## 3. CASH MANAGEMENT AND RESERVES; MORTGAGE LOAN RESERVES.

### 3.1 Cash Management Arrangements.

#### 3.1.1 Mortgage Loan Cash Management Provisions.

(a) Borrower shall cause Mortgage Borrower to comply with the Mortgage Loan Cash Management Provisions and shall not (and shall not cause Mortgage Borrower) without Lender's prior written consent, to amend, restate, replace and/or otherwise modify the same. If requested by Lender, Borrower will promptly provide evidence reasonably acceptable to Lender of compliance with the foregoing. Borrower grants to Lender a first-priority perfected security interest in Borrower's interest, if any, in each of the Mortgage Loan Cash Management Accounts, if any, subject to the prior rights of Mortgage Lender, and any and all monies now or hereafter deposited in each Mortgage Loan Cash Management Accounts as additional security for payment of the Debt to the extent Borrower has an interest in same. Subject to the qualifications regarding Mortgage Lender's interest in the Mortgage Loan Cash Management Accounts, if any, (i) until expended or applied in accordance with the Mortgage Loan Documents or the Loan Documents, Borrower's interest in the Mortgage Loan Cash Management Accounts, if any, shall constitute additional security for the Debt and (ii) upon the occurrence of an Event of Default, Lender may, in addition to any and all other remedies available to Lender, apply any sums then present in any or all of the Mortgage Loan Cash Management Accounts to the payment of the Debt in any order in its sole discretion.

(b) Notwithstanding anything to the contrary contained in this Agreement, if at any time and for any reason the Mortgage Loan Cash Management Accounts are no longer being maintained and/or the Mortgage Loan Cash Management Provisions cease to exist or are reduced, waived or modified in any material respect (in each case, including, without limitation, due to any waiver, amendment or refinancing) (such accounts, the "*Waived Cash Management Accounts*" and such provisions, the "*Waived Cash Management Provisions*"), including, without limitation, any waiver, amendment or modification of the then-Approved Capital Expenses and then-Approved Operating Expenses that occurs without the prior written approval of Lender, Borrower shall promptly (i) notify Lender of the same and establish and maintain with Lender and for the benefit of Lender in replacement and substitution thereof substitute accounts (the "*Substitute Cash Management Accounts*"), which Substitute Cash Management Accounts shall be subject to all of the same terms and conditions applicable under the Mortgage Loan Documents, (ii) execute any amendments to this Agreement and/or the Loan Documents implementing the Waived Cash Management Provisions as may be reasonably required by Lender (provided such amendments are substantially similar to the provisions set forth

52

in the Mortgage Loan Agreement relating to the same) and shall cause Mortgage Borrower to acknowledge and agree to the same and (iii) to the extent applicable, remit to the applicable Substitute Cash Management Accounts (and shall cause Mortgage Borrower to remit to the applicable Substitute Cash Management Accounts) any funds remaining in the Waived Cash Management Accounts.

### 3.1.2    Mortgage Loan Reserve Funds.

(a)    Borrower shall cause Mortgage Borrower to deposit and maintain each of the Mortgage Loan Reserve Funds as required under the Mortgage Loan Documents and to perform and comply with all the terms and provisions relating thereto.  If requested by Lender, Borrower will promptly provide evidence reasonably acceptable to Lender of compliance with the foregoing.  Borrower grants to Lender a first-priority perfected security interest in Borrower's interest, if any, in each of the Mortgage Loan Reserve Funds, if any, subject to the prior rights of Mortgage Lender, and any and all monies now or hereafter deposited in each Mortgage Loan Cash Management Account as additional security for payment of the Debt to the extent Borrower has an interest in same.  Subject only to the qualifications regarding Mortgage Lender's interest in the Mortgage Loan Reserve Funds, if any, until expended or applied in accordance with the Mortgage Loan Documents or the Loan Documents, Borrower's interest in the Mortgage Loan Reserve Funds, if any, shall constitute additional security for the Debt and, upon the occurrence of an Event of Default, Lender may, in addition to any and all other remedies available to Lender, apply any sums then present in any or all of the Mortgage Loan Reserve Funds to the payment of the Debt in any order in its sole discretion.

(b)    Notwithstanding anything to the contrary contained in this Agreement, if at any time and for any reason the Mortgage Loan Reserve Funds are no longer being maintained and/or are reduced, waived or modified in any material respect (in each case, including, without limitation, due to any waiver, defeasance, amendment or refinance) (such Mortgage Loan Reserve Funds, the "*Waived Reserve Funds*"), Borrower shall promptly (i) notify Lender of the same and establish and maintain with Lender and for the benefit of Lender reserves complete in replacement and substitution thereof (the "*Substitute Reserves*"), which Substitute Reserves shall be subject to all of the same terms and conditions applicable under the Mortgage Loan Documents, (ii) execute any amendments to this Agreement and/or the Loan Documents relating to the Substitute Reserves reasonably required by Lender (provided such amendments are substantially similar to the provisions set forth in the Mortgage Loan Agreement relating to the same) and shall cause Mortgage Borrower to acknowledge and agree to the same, (iii) remit to the applicable Substitute Reserves (and shall cause Mortgage Borrower to remit to the applicable Substitute Reserves) any Mortgage Loan Reserve Funds remaining in the Waived Reserve Funds and (iv) upon request by Lender, replenish the Substitute Reserves as and when such replenishment of any applicable Mortgage Loan Reserves may have been required to be replenished in accordance with the terms of the Mortgage Loan Agreement. In no event shall the amount of any Substitute Reserve required by Lender exceed the amount of the Mortgage Loan Reserve Funds required to have been on deposit with the Mortgage Lender under the Mortgage Loan Documents as of the applicable date of determination prior to the waiver, modification or reduction thereof.

### 3.1.3    Mezzanine Deposit Account.  On the Closing Date, Borrower shall establish an account maintained at the Servicer and controlled by Lender (the "*Deposit Account*").

Funds in the Deposit Account shall be invested at Lender's discretion only in Permitted Investments. Lender will also establish subaccounts of the Deposit Account which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "***Subaccounts***"). The Deposit Account and any Subaccount will be under the sole control and dominion of Lender, and Borrower shall have no right of withdrawal therefrom. Borrower shall pay for all expenses of opening and maintaining all of the above accounts. Funds deposited into the Deposit Account and applied and disbursed in accordance with this Agreement.

**3.2**      **Rebalancing Reserve Account**. In the event Lender there is a Shortfall, Borrower shall promptly establish with Lender or Servicer an account (the "***Rebalancing Reserve Account***") (which may be a Subaccount of the Deposit Account) into which Borrower shall make any and all deposits on account of any Shortfall, as required under Section 2.9.7 of this Agreement, within thirty (30) days after receipt of a Shortfall Notice from Lender, but without duplication of any amounts in the Mortgage Loan Rebalancing Reserve Account deposited by Mortgage Borrower on account of any Mortgage Loan Shortfall, to the extent, as a result of, such deposit, the Shortfall no longer exists. Provided no Event of Default shall have occurred and be continuing, amounts on deposit in the Rebalancing Reserve Account from time to time shall be disbursed to pay for Building Costs pursuant to and in accordance with the same terms and conditions for the making of Advances.

**3.3**      **Mezzanine Collateral Account**. Borrower has established with Lender or Servicer an account (the "***Mezzanine Collateral Account***") (which may be a Subaccount of the Deposit Account) into which [reserves for Debt Service], Net Liquidation Proceeds after Debt Service and all payments made on account of the Debt hereunder and under the other Loan Documents are to be deposited. Payments by Borrower into the Mezzanine Collateral Account shall be deemed payments to Lender for all purposes hereof. The funds on deposit in the Mezzanine Collateral Account shall be referred to herein as the "***Mezzanine Collateral Funds***". The Mezzanine Collateral Funds shall be applied in the accordance with Section 3.9 provided no Event of Default has occurred and is continuing, in which case such funds shall be applied to the Debt in such order and priority as Lender shall determine in its sole discretion. The insufficiency of funds on deposit in the Mezzanine Collateral Account shall not relieve Borrower from the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever. Borrower agrees that Lender may give written direction to Mortgage Lender pursuant to the Mortgage Loan Cash Management Provisions to pay any sums due and owing under the Loan Documents into the Mezzanine Collateral Account.

      **3.4**      **Intentionally Omitted**.

      **3.5**      **Intentionally Omitted**.

      **3.6**      **Intentionally Omitted**.

      **3.7**      **Intentionally Omitted**.

54

**3.8**    **Grant of Security Interest; Application of Funds**.  As security for payment of the Debt and the performance by Borrower of all other terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all of Borrower's right, title and interest in and to all funds and in and to all payments to or monies held in the Deposit Account and all accounts and Subaccounts created pursuant to this Agreement (including, without limitation, any Substitute Cash Management Accounts, the Rebalancing Reserve Account and the Mezzanine Collateral Account (collectively, the "***Cash Management Accounts***").  Subject to the rights of Mortgage Lender, Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all Rents in its possession prior to the (i) payment of such Rents to Lender or (ii) deposit of such Rents into the Deposit Account.  Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Cash Management Account, or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC financing statements, except those naming Lender as the secured party, to be filed with respect thereto.  This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC.  Upon the occurrence and during the continuance of an Event of Default, Lender may apply any sums in any Cash Management Account in any order and in any manner as Lender shall elect in Lender's discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the Lien of the Pledge Agreement and the other Security Documents or exercise its other rights under the Loan Documents.  Cash Management Accounts shall not constitute trust funds and may be commingled with other monies held by Lender.  Borrower shall be entitled to receive on a semi–annual basis interest on any balance in the Deposit Account and any Subaccounts other than Subaccounts established for the collection of reserves at a rate equal to the U.S. and Regional Composite National Bank Average Retail Savings Money Market CD Yield, from time to time.  All interest which accrues on the funds in any Subaccount shall be taxable to Borrower.  Upon repayment in full of the Debt, all remaining funds in the Subaccounts, if any, shall be promptly disbursed to Borrower or credited against the Debt.

**3.9**    **Property Cash Flow Allocation**.  So long as no Event of Default has occurred and is continuing, all amounts deposited into the Deposit Account up to and including the Business Day prior to a Payment Date shall be applied on such Payment Date as follows in the following order of priority: (i) First, to the monthly portion of the fees charged by the Deposit Bank in accordance with the Deposit Account Agreement; and (ii) second, to Lender into the Mezzanine Collateral Account, to pay the Debt Service due on such Payment Date (plus, if applicable, interest at the Default Rate and all other amounts, other than those described under other clauses of this Section 3.9 then due to Lender under the Loan Documents). The failure of Borrower to make all of the payments required under clauses (i) and (ii) in Section 3.9 in full on each Payment Date shall constitute an Event of Default under this Agreement; provided, however, if adequate funds are available in the Deposit Account for such payments, the failure by the Deposit Bank to allocate such funds into the appropriate Subaccounts shall not constitute an Event of Default. Notwithstanding anything to the contrary contained in this Section 3.9, after the occurrence of an Event of Default, Lender may apply the amounts deposited into the Deposit Account to the Debt in such order and in such manner as Lender shall elect in Lender's sole and absolute discretion. Lender's right to so apply such funds shall be in addition to all other rights and remedies provided to Lender under the Loan Documents.

**4.**    **REPRESENTATIONS AND WARRANTIES**

55

Borrower represents and warrants to Lender as of the date hereof that, except to the extent (if any) disclosed on Schedule 5 with reference to a specific Section of this Article 4:

**4.1** **Organization; Special Purpose**.    Each of Borrower, Mortgage Borrower, Mortgage Borrower Representative and Borrower Representative has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses (including, without limitation, any applicable liquor license or hotel operator licenses), permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged.  Each of Borrower, Mortgage Borrower, Mortgage Borrower Representative and Borrower Representative is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations.  Each of Borrower, Mortgage Borrower, Mortgage Borrower Representative and Borrower Representative is a Special Purpose Bankruptcy Remote Entity.

**4.2** **Proceedings; Enforceability**.  Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents.  The Loan Documents have been duly executed and delivered by Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity.  The Loan Documents are not subject to, and Borrower has not asserted, any right of rescission, set-off, counterclaim or defense, including the defense of usury. No exercise of any of the terms of the Loan Documents, or any right thereunder, will render any Loan Document unenforceable. Borrower has taken all necessary action to authorize Mortgage Borrower to execute, deliver and perform the Mortgage Loan Documents.  The Mortgage Loan Documents have been duly executed and delivered by Mortgage Borrower and constitute legal, valid and binding obligations of Mortgage Borrower enforceable against Mortgage Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity.  The Mortgage Loan Documents are not subject to, and Mortgage Borrower has not asserted, any right of rescission, set-off, counterclaim or defense, including the defense of usury.  No exercise of any of the terms of the Mortgage Loan Documents, or any right thereunder, will render any Mortgage Loan Document unenforceable.

**4.3** **No Conflicts**.  The execution, delivery and performance of the Loan Documents by Borrower and/or of the Mortgage Loan Documents by Mortgage Borrower and the transactions contemplated hereby will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents and the Mortgage Loan Documents) upon any of the property of Borrower and/or Mortgage Borrower, as applicable, pursuant to the terms of, any agreement or instrument to which Borrower or Mortgage Borrower, as applicable, is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower, Mortgage Borrower or any of its or their respective properties.  Mortgage Borrower's rights under the Licenses, the Current Construction Licenses and the Management Agreement will not be adversely affected by the execution and delivery by Borrower of the Loan Documents and/or Mortgage Borrower's delivery of the Mortgage Loan Documents, Borrower's performance under

56

the Loan Documents and/or Mortgage Borrower's performance under the Mortgage Loan Documents, the execution and delivery of the Pledge Agreement, recordation of the Mortgage Loan, or the exercise of any remedies by Lender or Mortgage Lender, as applicable. Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of the Loan Documents and/or Mortgage Borrower of the Mortgage Loan Documents has been obtained and is in full force and effect.

**4.4    Litigation**. There are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or threatened (in writing) against or affecting Borrower, Mortgage Borrower, Borrower Representative, or the Property, which, if adversely determined, might materially and adversely affect the condition (financial or otherwise) or business of Borrower or Mortgage Borrower (including the ability of Borrower to carry out its obligations under the Loan Documents and of Mortgage Borrower to carry out its obligations under the Mortgage Loan Documents), Borrower Representative, or the use, value, condition or ownership of the Property or the Collateral.

**4.5    Agreements**. Neither Borrower nor Mortgage Borrower is a party to any agreement or instrument or subject to any restriction which might adversely affect Borrower, the Collateral, Mortgage Borrower, the Property, or Borrower's or Mortgage Borrower's respective business, properties, operations or condition, financial or otherwise. Neither Borrower nor Mortgage Borrower is in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance, Construction Document or any other agreement or instrument to which it is a party or by which it or any of the Collateral or the Property is bound.

**4.6    Title; Pledged Collateral**.

(a)    Mortgage Borrower has good, insurable and indefeasible leasehold title to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances. The Pledge Agreement, together with the delivery to Lender of the Security Documents and of all certificates representing the Pledged Collateral and any UCC financing statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on the Borrower's interest in the Collateral, all in accordance with the terms thereof, in each case, subject only to any applicable Permitted Encumbrances. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Mortgage Borrower and the Pledged Collateral to Borrower have been paid. The Mortgage, when properly recorded in the appropriate records, together with any UCC financing statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on the Borrower's interest in the Property and (ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case, subject only to any applicable Permitted Encumbrances. All mortgage, recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid. The Permitted Encumbrances do not materially and adversely affect the value,

57

operation or use of the Pledged Collateral, the Property or Borrower's ability to repay the Loan. No Condemnation or other proceeding has been commenced or, to the best of Borrower's knowledge, is contemplated with respect to all or part of the Property or for the relocation of roadways providing access to the Property. There are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents. There are no outstanding options to purchase or rights of first refusal affecting all or any portion of the Property or the Pledged Collateral. The Survey for the Property delivered to Mortgage Lender does not fail to reflect any matters affecting the Property or the title thereto. No improvement on an adjoining property encroaches upon the Property. Each parcel comprising the Property is a separate tax lot and is not a portion of any other tax lot that is not a part of the Property. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, or any contemplated improvements to the Property that may result in such special or other assessments.

(b)     (i) Borrower is the sole beneficial owner of the Pledged Collateral and no Lien exists or will exist (except the Permitted Encumbrances) upon the Pledged Collateral at any time (and no right or option to acquire the same exists in favor of any other Person); (ii) the Pledged Collateral is not and will not be subject to any contractual restriction upon the transfer thereof (except for any such restriction contained in the Pledge Agreement, the organizational documents of Mortgage Borrower on the date hereof or as set forth in this Agreement); (iii) the chief place of business of Borrower and the office where Borrower keeps its records concerning the Pledged Collateral will be located at all times at the address specified as Borrower's address in Section 6.1 hereof and subject to the term and conditions hereof; (iv) the Pledged Collateral is represented by instruments or certificates and Borrower has delivered all certificates or instruments representing such securities as collateral to Lender to effect the transfer thereof as required by the Pledge Agreement; and (v) the Security Documents create a valid security interest in the Pledged Collateral, securing the payment of the Debt, and upon the filing in the appropriate filing offices of the financing statements to be executed and delivered pursuant to this Agreement and the receipt of the original certificates evidencing such interests in the Pledged Collateral, such security interests will be perfected, first priority security interests, and all filings and other actions necessary to perfect such security interests will have been duly taken.

**4.7**     **No Bankruptcy Filing**. Neither Borrower, Mortgage Borrower nor any Borrower Representative is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of its property (a "***Bankruptcy Proceeding***"), and Borrower has no knowledge of any Person contemplating the filing of any such petition against it, which has not been disclosed in the filings and proceedings in the Mortgage Borrower's chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, In re CBCS Washington Street LP, Chapter 11 Case No. 19-22607 (RDD) (the "***Existing Proceeding***"). In addition, other than the Existing Proceeding, neither Borrower, Mortgage Borrower nor any Borrower Representative nor any principal nor Affiliate of either has been a party to, or the subject of a Bankruptcy Proceeding for the past ten (10) years.

**4.8**     **Full and Accurate Disclosure**. No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading. There is no material fact presently known to Borrower that has not been disclosed to Lender which adversely affects, or, is

58

reasonably likely to materially adversely affect, the Property, the Collateral or the business, operations or condition (financial or otherwise) of Mortgage Borrower or Borrower. All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Mortgage Borrower, Borrower, each Borrower Representative, the Property, the Collateral (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower, Mortgage Borrower, each Borrower Representative, the Property and the Collateral as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP consistently applied throughout the periods covered, except as disclosed therein. None of Borrower, Mortgage Borrower or any Borrower Representative has any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement or the Mortgage Loan Agreement, as applicable. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower, Mortgage Borrower, any Borrower Representative, the Property or the Collateral from that set forth in said financial statements.

**4.9    Tax Filings**. To the extent required, Borrower and Mortgage Borrower have filed (or have obtained effective extensions for filing) all federal, state and local tax returns required to be filed and have paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower and Mortgage Borrower. Each of Borrower and Mortgage Borrowers believes that its tax returns (if any) properly reflect the income and taxes of Borrower and Mortgage Borrowers for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**4.10    No Plan Assets**. As of the date hereof and throughout the Term (i) neither Mortgage Borrower nor Borrower is nor will be an "employee benefit plan," as defined in Section 3(3) of ERISA, (ii) none of the assets of Borrower or Mortgage Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, (iii) None of Borrower or Mortgage Borrower is or will be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with Borrower and/or Mortgage Borrower are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans. As of the date hereof, neither Borrower, Mortgage Borrower nor any member of a "controlled group of corporations" (within the meaning of Section 414 of the Code) maintains, sponsors or contributes to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA).

**4.11    Compliance**. Borrower, Mortgage Borrower, the Property and the use thereof comply in all material respects with all applicable Legal Requirements (including with respect to parking and applicable zoning and land use laws, regulations and ordinances), Licenses and Current Construction Licenses. Neither Borrower nor Mortgage Borrower is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially and adversely affect the condition (financial or otherwise) or business of Borrower and/or Mortgage Borrower. The Property is vacant and zoned for both Use Group 5A (Transient Hotel) and Use Group 6A (Retail and Service Establishments). Following Completion, in the event that all or any part of the Project Improvements are destroyed or damaged, said Project

59

Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits based on current Legal Requirements in effect on the date hereof. No legal proceedings are pending or, to the best of Borrower's knowledge, threatened with respect to the zoning of the Property. Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property.

      **4.12**   **Contracts**. There are no service, maintenance or repair contracts affecting the Property that are not terminable on one month's notice or less without cause and without penalty or premium. All service, maintenance or repair contracts affecting the Property have been entered into at arms-length in the ordinary course of the business of Mortgage Borrower and provide for the payment of fees in amounts and upon terms comparable to existing market rates. Borrower has delivered (or has caused Mortgage Borrower to deliver) to Lender true, correct and complete copies of all Construction Documents, each of which is full force and effect and has not been amended, restated, supplemented or otherwise modified except as delivered to Lender. There is no default, breach or violation existing under any Construction Document, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto.

      **4.13**   **Federal Reserve Regulations; Investment Company Act**. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

      **4.14**   **Easements; Utilities and Public Access**. All easements, cross easements, licenses, air rights and rights-of-way or other similar property interests (collectively, ***"Easements"***), if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are described in the Owner's Title Policy and are in full force and effect without default thereunder. The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service it for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid easement. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

      **4.15**   **Physical Condition**. Neither Borrower nor Mortgage Borrower has received notice from any insurance company or bonding company of any defect or inadequacy in the

Property, or any part thereof, which would adversely affect its insurability or cause the imposition of extraordinary premiums or charges thereon or any termination of any policy of insurance or bond. Except as disclosed on Schedule 5 attached hereto, no portion of the Property is located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards. The Improvements have suffered no material casualty or damage which has not been fully repaired and the cost thereof fully paid.

4.16    **Leases**.  The Property is not subject to any Leases and there are no tenants or other parties in possession of the Property.

4.17    **Fraudulent Transfer**.  Neither Borrower nor Mortgage Borrower has entered into the Loan, any Loan Document, the Mortgage Loan or any Mortgage Loan Document with the actual intent to hinder, delay, or defraud any creditor, and each of Borrower and Mortgage Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents and the Mortgage Loan Documents, as applicable.  Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total probable liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

4.18    **Ownership of Borrower and Borrower Representative**.    Borrower Representative is the owner of one hundred percent (100%) of the issued and outstanding general partner ownership interests in Borrower, free and clear of all Liens and encumbrances. Tribeca Hotel Equity LP is the owner of one hundred percent (100%) of the issued and outstanding limited partner ownership interests in Borrower, free and clear of all Liens and encumbrances. Mortgage Borrower Representative is the owner of one hundred percent (100%) of the issued and outstanding general partner ownership interests in Mortgage Borrower, free and clear of all Liens and encumbrances. Borrower is the owner of one hundred percent (100%) of the issued and outstanding limited partner ownership interests in Mortgage Borrower, free and clear of all Liens and encumbrances.   No other ownership interests in Borrower or Mortgage Borrower have been issued or are issuable.  All of the ownership interests in Borrower and Mortgage Borrower have been duly and validly issued, have been fully paid for and are non-assessable.  There are no options or rights to acquire any ownership interests in Borrower.  Washington Street Hotel GP LLC is the owner of one hundred percent (100%) of the issued and outstanding membership interests in Borrower Representative and the membership interests in Borrower Representative are owned free and clear of all Liens, warrants, options and rights to purchase.  Borrower has no obligation to any Person to purchase, repurchase or issue any ownership interest in it.  The organizational chart attached hereto as Schedule 7 is complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Borrower.

61

**4.19    Purchase Options**.  Neither the Property nor the Collateral nor any part thereof is subject to any purchase options or other similar rights in favor of third parties.

**4.20    Management Agreement**.  As of the Closing Date, no Management Agreement (other than the Hotel Management Agreement) is in effect with respect to the Property.

**4.21    Hazardous Substances**.  Except as disclosed in the Environmental Report:  (i) the Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right-to-Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any state super-lien and environmental clean-up statutes (including with respect to Toxic Mold), any local law requiring related permits and licenses and all amendments to and regulations in respect of the foregoing laws (collectively, "***Environmental Laws***"); (ii) the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic and/or dangerous substances, toxic mold or fungus of a type that may pose a risk to human health or the environment or would negatively impact the value of the Property (***"Toxic Mold"***) or any other substances or materials which are included under or regulated by Environmental Laws (collectively, "***Hazardous Substances***"), provided that "Hazardous Substances" shall not include commercially reasonable amounts of such materials used in the ordinary course of the operation of the Property and Improvements which are used and stored in accordance with all applicable environmental laws, ordinances and regulations, including, without limitation, cleaning solvents and gasoline present in vehicles parked on the Property; (iii) to the best of Borrower's knowledge, no Hazardous Substances are or have been (including the period prior to Borrower's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) to the best of  Borrower's knowledge, after due inquiry no Hazardous Substances are present in, on or under any adjoining or adjacent real property which could migrate to or otherwise affect the Property; (v) to the best of  Borrower's knowledge, no Toxic Mold is on or about the Property which requires remediation; (vi) no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vii) to Borrower's knowledge, there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower which have not been provided to Lender.

**4.22    Name; Principal Place of Business**.  Borrower does not use and will not use any trade name and has not done and will not do business under any name other than its actual name set forth herein. Mortgage Borrower does not, nor will Borrower will suffer or permit Mortgage Borrower to (i) use any trade name or (ii) do business under any name other than its actual name set forth in the Mortgage Loan Agreement. Borrower does not use any trade name nor do any business under any name other than "CBCS Washington Mezz Borrower LP".    Mortgage Borrower does not use any trade name nor do any business under any name other than "CBCS Washington Street LP".  The principal place of business of Borrower and Mortgage Borrower is the primary address for notices as set forth in Section 6.1, and neither Borrower nor Mortgage Borrower has any other place of business.

**4.23    Other Debt**.  There is no indebtedness with respect to the Property or any excess cash flow or any residual interest therein, whether secured or unsecured, other than "Permitted Encumbrances" and "Permitted Indebtedness", each as defined in the Mortgage Loan Agreement. There is no indebtedness with respect to the Collateral or any excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness

**4.24    Anti-Money Laundering**.  None of the funds of Borrower, Mortgage Borrower, any Borrower Representative or any Guarantor, as applicable, that are used to consummate this transaction are derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, Mortgage Borrower, any Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan or Mortgage Loan is in violation of law or may cause any of the Property or the Collateral to be subject to forfeiture or seizure.  Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and Mortgage Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

**4.25    Project Loan; Building Loan**

(a)    Project Loan.  $[_____] of the Project Loan has been advanced as of the date hereof.  The outstanding principal balance of the Project Loan as of the date hereof is $[_____].  No default, breach, violation or event of default has occurred under the Project Loan Documents which remains uncured or unwaived and no circumstance, event or condition has occurred or exists which, with the giving of notice and/or the expiration of the applicable period would constitute a Mortgage Loan Event of Default under the Project Loan Documents.  Each and every representation and warranty of Mortgage Borrower and/or any guarantor or indemnitor under any of the Project Loan Documents, made to Mortgage Lender contained in any one or more of the Project Loan Documents is true, correct, complete and accurate in all material respects as of the date hereof.

(b)    Building Loan.  $[_____] of the Building Loan has been advanced as of the date hereof.  The outstanding principal balance of the Building Loan as of the date hereof is $[_____].  No default, breach, violation or event of default has occurred under the Building Loan Documents which remains uncured or unwaived and no circumstance, event or condition has occurred or exists which, with the giving of notice and/or the expiration of the applicable period would constitute a Mortgage Loan Event of Default under the Building Loan Documents.  Borrower has delivered to Lender true, correct and complete copies of all Building Loan Documents.  The Building Loan Documents delivered to Lender (i) represent all agreements between Mortgage Lender and Mortgage Borrower related to the Property, (ii) are in full force and effect and (iii) have not been modified, amended or supplemented.

**4.26    Ground Lease Representations**.

(a)    There is no and shall not be any mortgage or deed of trust now or hereafter placed on the fee title to the Property held by Ground Lessor that is not subject to the terms of the Ground Lease;

63

(b)    Intentionally Omitted;

(c)    if there shall be a casualty under the Ground Lease, subject to Mortgage Borrower's right to terminate such Ground Lease contained therein (which right Mortgage Borrower shall not be permitted to exercise without the prior written consent of Lender and Mortgage Lender which each of Lender or Mortgage Lender may provide or deny in its sole and absolute discretion), either there is an obligation to use insurance proceeds for a restoration of the Improvements or Mortgage Borrower is entitled to receive insurance proceeds attributable to such destruction or damage;

(d)    Intentionally Omitted;

(e)    Mortgage Borrower has the right under the Ground Lease to mortgage the leasehold estate thereby created without the prior notice to or the consent of Ground Lessor, and such mortgage may be further transferred by Mortgage Lender without the prior notice to or the consent of Ground Lessor;

(f)    Intentionally Omitted;

(g)    if any default by Mortgage Borrower shall occur under the Ground Lease, Mortgage Lender is entitled under the Ground Lease to receive written notice of such default from Ground Lessor an opportunity to cure any such default as provided in the Ground Lease;

(h)    Intentionally Omitted;

(i)    if the Ground Lease is terminated by reason of a default by Mortgage Borrower, then Mortgage Lender or its designee is entitled under the Ground Lease to enter into a new lease (the "***New Ground Lease***") with Ground Lessor for the remainder of the term of the Ground Lease upon the same terms, covenants, conditions and agreements as are contained in the Ground Lease;

(j)    the Ground Lease requires the Ground Lessor to give copies of all notices of default which are given under the Ground Lease to Mortgage Borrower to Mortgage Lender;

(k)    the Ground Lease represents the entire agreement between Ground Lessor and Mortgage Borrower related to the Property and is in full force and effect and has not been modified, amended or supplemented;

(l)    the Ground Lease cannot be canceled solely by Ground Lessor and requires Mortgage Lender's consent for all modifications and amendments;

(m)    the Ground Lease is in full force and effect; there is no default, breach or violation existing thereunder, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto.

64

(n)    Intentionally Omitted;

(o)    Intentionally Omitted;

(p)    Intentionally Omitted;

(q)    the Ground Lease or a memorandum thereof has been duly recorded;

(r)    Intentionally Omitted;

(s)    Mortgage Borrower's interest in the Ground Lease is not subject to any Liens other than Permitted Encumbrances; and

(t)    the Ground Lease requires the Ground Lessor to enter into a New Ground Lease upon termination of the Ground Lease for any reason, including rejection of the Ground Lease in a bankruptcy proceeding.

**4.27    Hotel Management Agreement.**    Borrower has delivered (and has caused Mortgage Borrower to deliver) to Lender and Mortgage Lender a true, correct and complete copy of the Hotel Management Agreement, which is full force and effect and has not been amended, restated, supplemented or otherwise modified except as delivered to Lender and Mortgage Lender. The Hotel Management Agreement is in full force and effect.  All management fees, reservation fees, royalties and other sums due under the Hotel Management Agreement have been paid in full to date, there is no default, breach or violation existing under the Hotel Management Agreement, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation under the Hotel Management Agreement, by either party thereto.  All sums due under the Hotel Management Agreement, and the terms and provisions of the Hotel Management Agreement, are subordinate to the Loan Documents and the Mortgage Loan Documents.  The Loan and the encumbrance of the Collateral as security for the Loan will not cause Mortgage Borrower to violate any covenants in the Hotel Management Agreement. The Mortgage Loan and the encumbrance of the Property as security for the Mortgage Loan will not cause Mortgage Borrower to violate any covenants in the Hotel Management Agreement.  The current expiration date of the Hotel Management Agreement is [_____ __, 20__].

**4.28    Liquor License.**  Neither Mortgage Borrower nor Borrower, as of the date hereof, has a Liquor License.

**4.29    Additional Representations.**

**4.29.1    Construction Manager's Agreement.**  Borrower has delivered (and has caused Mortgage Borrower to deliver) to Lender and Mortgage Lender a true, correct and complete copy of the Construction Manager's Agreement.  The Construction Manager's Agreement is in full force and effect and each of Mortgage Borrower and the Construction Manager is in compliance in all material respects with its obligations under the Construction Manager's Agreement.  The work to be performed by the Construction Manager under the Construction Manager's Agreement includes the work delineated by the Plans and Specifications.  All work on the Project Improvements that has heretofore been completed, if any, has been completed

65

substantially in accordance with the Plans and Specifications in a good and workmanlike manner and free of any defects.

4.29.2    **Architect's Agreement .**    Borrower has delivered (and has caused Mortgage Borrower to deliver) to Lender and Mortgage Lender a true, correct and complete copy of the Architect's Agreement.  The Architect's Agreement is in full force and effect and each of Mortgage Borrower and the Architect is in compliance in all material respects with its obligations under the Architect's Agreement.   All architectural services required to design the Project Improvements and all architectural services required to complete the Project Improvements in accordance with the Plans and Specifications is provided for under the Architect's Agreement.

4.29.3    **Plans and Specifications.**    Borrower has delivered (and has caused Mortgage Borrower to deliver) to Lender and Mortgage Lender true, correct and complete copies of the Plans and Specifications.  The Plans and Specifications will comply with all applicable Legal Requirements and the requirements of the Hotel Management Agreement, the Leases, if any, and will be required to be approved by the Construction Manager, the Architect and each Governmental Authority as is required for the construction and development of the Project.

4.29.4    **Construction Budget.**    Borrower has delivered (and has caused Mortgage Borrower to deliver) to Lender and Mortgage Lender a true, correct and complete copy of the Construction Budget.  The Construction Budget accurately reflects all anticipated Costs. Borrower is not aware of any event or condition which could prevent the construction of the Project Improvements from being completed in accordance with the Construction Budget.

4.29.5    **Current Construction Licenses.**  Borrower has obtained, or will obtain (or has caused or will cause Mortgage Borrower to obtain) prior to the Initial Advance, all Current Construction Licenses necessary for the construction of the Project Improvements pursuant to and in accordance with the Plans and Specifications or any part thereof or the commencement or continuance of construction thereof., All Current Construction are and will remain in full force and effect, and no Current Construction License has expired, been revoked, or has or will be subject to any revocation, amendment, release, suspension, forfeiture or the like, or has expired or will have expired prior to completion of the portion of the Project Improvements for which such Current Construction License is required.  Neither Borrower nor Mortgage Borrower is in violation of any of the terms, provisions, covenants or conditions of any of the Current Construction Licenses.  Borrower has delivered (and has caused Mortgage Borrower to deliver) to Lender and Mortgage Lender true, complete and correct copies of all Current Construction Licenses. Borrower has obtained (or has caused Mortgage Borrower to obtain) all approvals from, and has given all such notices to, and has taken all such other actions with respect to such Governmental Authority as may be required under applicable Legal Requirements for the commencement of the construction of the Project Improvements.

4.29.6    **Construction Manager Payment and Performance Bond.**  Borrower has delivered to Lender a true, correct and complete copy of the Construction Manager Payment and Performance Bond.  The Construction Manager Payment and Performance Bond is in full force and effect.

66

     **4.29.7    Construction Schedule.**  Borrower has delivered (and has caused Mortgage Borrower to deliver) to Lender and Mortgage Lender a true, correct and complete copy of the Construction Schedule.  Borrower is not aware of any event or condition which could prevent the construction of the Project Improvements from being completed in accordance with the Construction Schedule.

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender, unless Borrower specifically notifies Lender in writing of any material change therein prior to the funding of each Advance (or any portion thereof), such funding shall constitute an affirmation that the same remain true and correct in all material respects on the applicable date of the Advance, and shall survive for as long as the Debt remains owing by Borrower to Lender, unless a longer survival period is expressly stated in a Loan Document with respect to a specific representation or warranty, in which case, the same shall survive for such longer period, and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in Section 4.21 shall survive in perpetuity.

## 5.    **COVENANTS**

     Until the end of the Term, Borrower hereby covenants and agrees with Lender that:

     **5.1    Existence**.  Each of Borrower and Borrower Representative shall and shall cause Mortgage Borrower and Mortgage Borrower Representative to  (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights and franchises, (ii) continue to engage in the business presently conducted by it, (iii) obtain and maintain all Licenses and Current Construction Licenses, and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case, as and to the extent required for the ownership, maintenance, management and operation of the Property and the Collateral.

     **5.2    Taxes and Other Charges**.  Borrower shall (or shall cause Mortgage Borrower to) pay all Taxes and Other Charges as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes and Other Charges have been so paid no later than thirty (30) days before they would be delinquent if not paid (provided, however, that Borrower need not pay (or cause Mortgage Borrower to pay) such Taxes and Other Charges nor furnish such receipts for payment of Taxes and Other Charges paid by Mortgage Lender pursuant to Section 3.3 of the Mortgage Loan Agreement or by Lender pursuant to Section 3.1 hereof or as part of the Advances made hereunder or by Mortgage Lender pursuant to the Mortgage Loan Agreement).  Borrower shall promptly pay (and/or shall cause Mortgage Borrower to pay) for all franchise fees, income taxes and other impositions and taxes imposed by Governmental Authorities on Borrower and/or Mortgage Borrower, subject to Borrower's right to protest the same in accordance with this Section 5.2.  Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien against the Collateral, and shall not suffer Mortgage Borrower to suffer and shall promptly cause Mortgage Borrower to pay or discharge any Lien on the Property, and shall promptly cause Mortgage Borrower to pay for all utility services provided to the Property.  After prior notice to Lender, Borrower, at its own expense, may contest (or cause or permit Mortgage Borrower to contest) by appropriate legal proceedings, promptly initiated and

conducted in good faith and with due diligence, the amount or validity or application of any Taxes or Other Charges, provided that (i) no Event of Default has occurred and is continuing, (ii) such proceeding shall suspend the collection of the Taxes or such Other Charges, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or Mortgage Borrower is subject, and shall not constitute a default thereunder, (iv) no part of or interest in the Property or the Collateral will be in danger of being sold, forfeited, terminated, canceled or lost, (v) Borrower shall have furnished such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges (unless such amounts have been paid and Borrower or Mortgage Borrower is seeking a refund thereof), together with all interest and penalties thereon, which shall not be less than one hundred ten percent (110%) of the Taxes and Other Charges being contested, and (vi) Borrower shall promptly upon final determination thereof pay (or cause Mortgage Borrower to pay) the amount of such Taxes or Other Charges, together with all costs, interest and penalties, and (vi) Borrower shall promptly upon final determination thereof pay the amount of such Taxes or Other Charges, together with all costs, interest and penalties. Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the reasonable judgment of Lender, the entitlement of such claimant is established.

      **5.3**    <u>**Access to Property**</u>.  Subject to the rights of tenants under the Leases and the Hotel Management Agreement, Borrower shall cause Mortgage Borrower to permit agents, representatives, consultants and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice, and provided that such inspections do not unreasonably interfere with the construction of the Project Improvements or the operation of the Property and such agents, representatives and employees of Lender and Construction Consultant comply with all safety and other reasonable rules and requirements instituted by Borrower (and/or Mortgage Borrower) or Construction Manager with respect to the Project Improvements and the Property.

      **5.4**    <u>**Repairs; Maintenance and Compliance; Alterations**</u>.

      **5.4.1**    **Repairs; Maintenance and Compliance**.  Borrower shall, and shall cause Mortgage Borrower to, at all times maintain, preserve and protect all franchises and trade names, and Borrower shall cause Mortgage Borrower to cause the Property to be maintained in a good and safe condition and repair and shall not remove, demolish or alter the Improvements or Equipment (except in connection with the Project Improvements in accordance with this Agreement or for alterations performed in accordance with Section 5.4.2 and normal replacement of Equipment with Equipment of equivalent value and functionality).  Borrower shall, and shall cause Mortgage Borrower to, promptly comply with all Legal Requirements and immediately cure properly any violation of a Legal Requirement.  Borrower shall notify Lender in writing within three (3) Business Days after Borrower or Mortgage Borrower first receives notice of any such non-compliance.  Borrower shall cause Mortgage Borrower to promptly repair, replace or rebuild any part of the Property that becomes damaged, worn or dilapidated and shall complete and pay for any Improvements at any time in the process of construction or repair. Notwithstanding anything to the contrary contained herein, provided that no Event of Default has occurred and is continuing, after prior notice to Lender, Borrower, at its own expense, may contest (or cause or permit Mortgage Borrower to contest) by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the validity or application of any Legal

68

Requirement, provided that (i) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower and/or Mortgage Borrower, as applicable, is subject, and shall not constitute a default thereunder, (ii) Borrower shall (or, if applicable, shall cause Mortgage Borrower to) post such bonds and security in connection with such dispute as Lender (or, if applicable, Mortgage Lender) may reasonably require, not to exceed (without duplication) 110% of the amount in controversy, and (iii) during the pendency of such dispute, no part of or interest in the Property or the Collateral will be in danger of being sold, forfeited, terminated, canceled or lost.

　　　　5.4.2　　**Alterations**.  Borrower may, without Lender's consent,  cause or permit Mortgage Borrower perform alterations to the Improvements and Equipment which (i) do not constitute a Material Alteration, (ii) do not adversely affect Borrower's or Mortgage Borrower's financial condition or the value or net operating income of the Property, (iii) constitute the work contemplated by the Construction Budget, to the extent approved by Lender under, and performed in accordance with, this Agreement and/or the Mortgage Loan Agreement, and (iv) are in the ordinary course of Mortgage Borrower's business.  Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower to perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that Lender may, in its sole and absolute discretion, withhold consent to any alteration, the cost of which is reasonably estimated to exceed the thresholds for Material Alterations.  Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deliver to Lender security for payment of the cost of such Material Alteration in an amount equal to one hundred ten percent (110%) of the cost of the Material Alteration as estimated by Lender.  Upon substantial completion of any Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) such Material Alteration was constructed in accordance with applicable Legal Requirements and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld, conditioned or delayed), (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of lien, and (iii) all material Licenses necessary for the use, operation and occupancy of such Material Alteration (other than those which depend on the performance of tenant improvement work) have been issued.  Borrower shall reimburse Lender upon demand for all out-of-pocket costs and expenses (including the reasonable fees of any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.4.2.

　　　　5.5　　**Performance of Other Agreements**.  Borrower shall, and shall cause Mortgage Borrower to, observe and perform, or cause to be observed and performed, each and every term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property and the Collateral, including the Construction Documents, the Loan Documents and the Mortgage Loan Documents.  Borrower shall not, without the prior written consent of Lender (not to be unreasonably withheld, conditioned or delayed), enter into, or cause, suffer or permit Mortgage Borrower to enter into, any agreement relating to the operation of the

Property (or replacements thereof), which has a value in excess of $[_____]¹⁰ (except for agreements to which Section 5.4.2(iii) in the first grammatical sentence thereof applies).

5.6    **Cooperate in Legal Proceedings**.  Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which may in any way adversely affect the rights of Lender under any Loan Document.

5.7    **Further Assurances**.  Borrower shall, at Borrower's sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Debt and/or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time; and (ii) upon Lender's request therefor given from time to time after the occurrence of any Event of Default, pay for (a) reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to Borrower and Borrower Representative and (b) searches of title to the Property, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

5.8    **Environmental Matters**.

5.8.1    **Hazardous Substances**.  So long as Borrower owns or is in possession of the Collateral and so long as Mortgage Borrower owns or is in possession of the Property, Borrower shall (or shall cause Mortgage Borrower to) (i) keep the Property free from Hazardous Substances and in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower or Mortgage Borrower shall become aware that (A) any Hazardous Substance is on or adjacent to or adjoining the Property, (B) the Property is in violation of any Environmental Laws or (C) any condition on or adjacent to or adjoining the Property shall pose a threat to the health, safety or welfare of humans and (iii) remove such Hazardous Substances and/or cure such violations and/or remove such threats, as applicable, as required by Environmental Law (or as shall be required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer or other qualified environmental consulting firm engaged by Lender ("***Lender's Consultant***")), promptly after Borrower and/or Mortgage Borrower becomes aware of same, at Mortgage Borrower's sole expense.  Nothing herein shall prevent Borrower (or Mortgage Borrower) from recovering such expenses from any other party that may be liable for such removal or cure.

5.8.2    **Environmental Monitoring**.

(a)    Borrower shall give prompt written notice to Lender of (i) any proceeding or inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened (in writing) by any third party (including any Governmental Authority) against Borrower, Mortgage Borrower or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's or Mortgage

---

¹⁰ LENDER TO CONFIRM.

*ACTIVE 45870927v3*

Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law. Upon becoming aware of the presence of mold or fungus at the Property, Borrower shall cause Mortgage Borrower to (i) undertake an investigation to identify the source(s) of such mold or fungus and shall develop and implement an appropriate remediation plan to eliminate the presence of any Toxic Mold, (ii) perform or cause to be performed all acts reasonably necessary for the remediation of any Toxic Mold (including taking any action necessary to clean and disinfect any portions of the Property affected by Toxic Mold, including providing any necessary moisture control systems at the Property), and (iii) provide evidence reasonably satisfactory to Lender of the foregoing. Borrower shall permit Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance, and Borrower shall (or shall cause Mortgage Borrower to) pay all reasonable attorneys' fees and disbursements incurred by Lender in connection therewith.

(b)    Upon Lender's request, at any time and from time to time, Borrower shall provide an inspection or audit of the Property prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm approved by Lender assessing the presence or absence of Hazardous Substances on, in or near the Property, and if Lender in its good faith judgment determines that reasonable cause exists for the performance of such environmental inspection or audit, then the cost and expense of such audit or inspection shall be paid by Borrower. Such inspections and audit may include soil borings and ground water monitoring. If Borrower fails to provide any such inspection or audit within thirty (30) days after such request, Lender may order same, and, subject to Section 5.3 hereof, Borrower hereby grants to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit.

(c)    If any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for any Hazardous Substance, whether such Hazardous Substance existed prior to the ownership of the Property by Borrower, or presently exists or is reasonably suspected of existing, Borrower shall cause such operations and maintenance plan to be prepared and implemented at its expense upon request of Lender, and with respect to any Toxic Mold, Borrower shall take all action necessary to clean and disinfect any portions of the Improvements affected by Toxic Mold in or about the Improvements, including providing any necessary moisture control systems at the Property. If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law ("***Remedial Work***"), Borrower shall cause Mortgage Borrower to commence all such Remedial Work within thirty (30) days after written demand by Lender and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law. All Remedial Work shall be performed by licensed contractors approved in advance by Lender and under the supervision of a consulting engineer approved by Lender. All costs of such Remedial Work shall be paid by Borrower, including Lender's reasonable attorneys' fees and disbursements incurred in connection with the monitoring or review of such Remedial Work. If Borrower does not timely cause Mortgage Borrower to commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense. Notwithstanding the foregoing, Borrower

71

shall not be required to cause Mortgage Borrower to commence such Remedial Work within the above specified time period: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in Borrower or such Remedial Work violating any Environmental Law, or (z) if Borrower, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work. Borrower shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrower is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower fails to promptly perform the Remedial Work being contested, and if Borrower fails to prevail in contest, Borrower would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrower has not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished additional security as provided in clause (4) below, as a result of the failure to perform such Remedial Work, and (4) Borrower shall have furnished to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrower's failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than one hundred ten percent (110%) of the cost of such Remedial Work as estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrower's failure to prevail in such contest.

(d)    Borrower shall not suffer, cause or permit Mortgage Borrower to install or permit to be installed on the Property any underground storage tank.

**5.8.3    Intentionally Omitted**.

**5.9    Title to the Property; Liens**.    Borrower will warrant and defend the title to the Collateral (and shall cause Mortgage Borrower to warrant and defend title to the Property), and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents (or given to Mortgage Lender under the Mortgage Loan Documents), subject only to Permitted Encumbrances, against the claims of all Persons. Without Lender's prior written consent, Borrower shall not c(and shall not suffer Mortgage Borrower to) create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Collateral, the Property or any Lien on any direct or indirect legal or beneficial ownership interest in Borrower, Mortgage Borrower or any Borrower Representative, except Liens in favor of Lender and/or Mortgage Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within forty-five (45) days after Borrower first receives notice of such Lien.

**5.10    Leases**.

**5.10.1    Generally**.    Upon request, Borrower shall furnish (or shall cause Mortgage Borrower to furnish) Lender with executed copies of all Leases then in effect. All renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to existing local market rates and shall be arm's length transactions with bona fide, independent third-party tenants.

72

**5.10.2    Approval of Leases**.  Borrower shall not (and shall not cause, suffer or permit Mortgage Borrower to) enter into a proposed Lease or a proposed renewal, extension or modification of an existing Lease without the prior written consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld, conditioned or delayed.  Prior to seeking Lender's consent to any Lease, Borrower shall deliver to Lender a copy of such proposed lease (a "***Proposed Lease***") blacklined to show changes from the standard form of Lease approved by Lender and then being used by Mortgage Borrower, if any.  Lender shall approve or disapprove (with reasonable explanation for such disapproval) each Proposed Lease or proposed renewal, extension or modification of an existing Lease (unless such existing Lease expressly provides for such renewal, extension or modification) within ten (10) Business Days of the receipt by Lender of a written request for such approval (the "***First Lease Notice***"), accompanied by a final copy of the Proposed Lease or proposed renewal, extension or modification of an existing Lease, if applicable.  If requested by Borrower, Lender will grant conditional approvals of Proposed Leases or proposed renewals, extensions or modifications of existing Leases (unless such existing Lease expressly provides for such renewal, extension or modification) at any stage of the leasing process, from initial "term sheet" through negotiated lease drafts, provided that Lender shall retain the right to disapprove any such Proposed Lease or proposed renewal, extension or modification of an existing Lease if, subsequent to any preliminary approval, material changes are made to the terms previously approved by Lender or additional material terms are added that had not previously been considered and approved by Lender in connection with such Proposed Lease or proposed renewal, extension or modification of an existing Lease. If Lender has failed to timely provide to Borrower its approval or disapproval as set forth above, and no earlier than the date that is ten (10) Business Days following the delivery of the First Lease Notice, Borrower has delivered to Lender a second notice containing the applicable documents, with the notation "SECOND NOTICE:  IMMEDIATE RESPONSE REQUIRED, FAILURE TO RESPOND TO THIS APPROVAL REQUEST WITHIN FIVE (5) BUSINESS DAYS FROM RECEIPT SHALL BE DEEMED TO BE LENDER'S APPROVAL" prominently displayed in bold, all caps and fourteen (14) point or larger font in the transmittal letter requesting approval (the "***Second Lease Notice***"), and Lender does not approve or disapprove (with a reasonable explanation) the applicable request within five (5) Business Days from the date Lender receives the Second Lease Notice as evidenced by a certified mail return receipt or confirmation by a reputable national overnight delivery service that the same has been delivered, then such failure shall be deemed to be the consent and approval of Lender.

**5.10.3    Additional Covenants with respect to Leases**.  Borrower shall (i) cause Mortgage Borrower to observe and perform the material obligations imposed upon the lessor under the Leases and shall not suffer or permit Mortgage Borrower to do or permit anything to impair the value of the Leases as security for the Debt; (ii) cause Mortgage Borrower to promptly send copies to Lender of all notices of default that Borrower or Mortgage Borrower shall send or receive under any Lease; (iii) cause Mortgage Borrower to enforce, in accordance with commercially reasonable practices for properties similar to the Property, the terms, covenants and conditions in the Leases to be observed or performed by the lessees, short of termination thereof; (iv) not suffer or permit Mortgage Borrower to collect any of the Rents more than one (1) month in advance (other than security deposits); (v) not cause, suffer or permit Mortgage Borrower execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents and/or the Mortgage Loan Documents); (vi) not modify or cause, suffer or permit Mortgage Borrower to modify any Lease in a manner inconsistent with the Loan Documents and/or

73

the Mortgage Loan Documents; (vii) not, and shall not cause, suffer or permit Mortgage Borrower to convey or transfer or suffer or permit a conveyance or transfer of the Collateral or the Property so as to effect a merger of the estates and rights of, or a termination of diminution of the obligations of, lessees under Leases; (viii) not consent or cause, suffer or permit Mortgage Borrower to consent to any assignment of or subletting under any Lease unless required in accordance with its terms without the prior consent of Lender, which, with respect to a subletting, may not, so long as no Event of Default is continuing, be unreasonably withheld, conditioned or delayed; and (ix) not, nor shall cause Mortgage Borrower to, cancel or terminate any Lease or accept a surrender thereof without the prior consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed.

**5.11    Estoppel Statement**.   After request by Lender, Borrower shall, within ten (10) days, furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal under the Loan and the Mortgage Loan, (ii) the Interest Rate under the Loan and the Mortgage Loan, (iii) the date installments of interest and/or Principal were last paid under the Loan and the Mortgage Loan, (iv) any offsets or defenses to the payment of the Debt and the Mortgage Loan, and (v) that the Loan Documents and the Mortgage Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

**5.12    Property Management**.

    **5.12.1    Management Agreements**.  Borrower shall not, without the prior written approval of Lender, which may be granted or withheld in Lender's sole and absolute discretion, enter into (or cause, suffer or permit Mortgage Borrower to enter into) any management agreement, property management agreement or similar agreement with respect to the Property, other than, with respect to Mortgage Borrower, the Hotel Management Agreement. In the event Mortgage Borrower enters into any Management Agreement, Borrower shall cause Mortgage Borrower to (i) cause the Property to be managed and operated pursuant to the Management Agreement; (ii) promptly perform and observe all of the covenants required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its rights thereunder; (iii) promptly notify Lender of any default under the Management Agreement of which it is aware; (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditure plan, and property improvement plan and any other material notice, report and estimate received by Mortgage Borrower under the Management Agreement; and (v) cause Mortgage Borrower to promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement. Without Lender's prior written consent, not to be unreasonably withheld, conditioned or delayed, Borrower shall not cause, suffer or permit Mortgage Borrower to (a) surrender, terminate, cancel, extend or renew the Management Agreement or otherwise replace the Manager or enter into any other management agreement (except pursuant to Section 5.12.2); (b) reduce or consent to the reduction of the term of the Management Agreement; (c) increase or consent to the increase of the amount of any charges under the Management Agreement; (d) otherwise modify, change, supplement, alter or amend in any material respect, or waive or release any of its rights and remedies under, the Management Agreement; (e) permit or knowingly suffer the occurrence and continuance of a default beyond any applicable cure period under the Management Agreement (or any successor management agreement or development agreement) if such default permits the

74

Manager to terminate the Management Agreement (or such successor management agreement); or (f) knowingly suffer or permit the ownership, management or control of the Manager to be transferred to a Person other than an Affiliate of Borrower or Key Principal.

**5.12.2    Termination of Manager**.  If (i) there is a change in Control of Manager, (ii) an Event of Default shall be continuing, (iii) Manager is in default under the Management Agreement, or (iv) upon the gross negligence, malfeasance, willful misconduct of Manager, or misappropriation of funds by the Manager, Borrower shall at the request of Lender, cause Mortgage Borrower to terminate the Management Agreement and replace Manager with a Qualified Manager or another replacement manager acceptable to Lender in Lender's reasonable discretion, on terms and conditions reasonably satisfactory to Lender.  Borrower's failure to cause Mortgage Borrower to appoint an acceptable manager within thirty (30) days after Lender's request of Borrower to cause Mortgage Borrower to terminate the Management Agreement shall constitute an immediate Event of Default.  Borrower may from time to time cause Mortgage Borrower to appoint a successor manager to manage and develop the Property, provided that such successor manager and Management Agreement shall be approved in writing by Lender in Lender's reasonable discretion.  If at any time Lender consents to the appointment of a new manager, such new manager and Borrower shall, as a condition of Lender's consent, cause Mortgage Borrower and Manager to execute a mezzanine acknowledgement and consent to management agreement substantially in the form [attached hereto as Schedule [__].

**5.13    Special Purpose Bankruptcy Remote Entity**.  Each of Borrower, Mortgage Borrower and each Borrower Representative shall at all times be a Special Purpose Bankruptcy Remote Entity.  None of Borrower, Mortgage Borrower nor any Borrower Representative shall directly or indirectly make any change, amendment or modification to its organizational documents, or otherwise take any action which could result in Borrower, Mortgage Borrower or any Borrower Representative not being a Special Purpose Bankruptcy Remote Entity.  A "*Special Purpose Bankruptcy Remote Entity*" shall have the meaning set forth on Schedule 8 hereto.

**5.14    Subordination of Agreements**.  Except as otherwise expressly set forth in this Agreement, all agreements, including the management affecting or encumbering the Property, the Collateral or the Project Improvements shall be subject to Lender's review and approval, not to be unreasonably withheld; shall, upon Lender's request, include customary lender protection rights reasonably acceptable to Lender, including assignability, "will-serve" provisions, and termination rights for the benefit of Lender (and shall cause Mortgage Borrower to include the same in the applicable agreements); and Borrower shall cause Mortgage Borrower deliver to Mortgage Lender an assignment and subordination agreement with respect to each management agreement and in form reasonably satisfactory to Lender.

**5.15    Change in Business or Operation of Property**.  Borrower shall not purchase or own any property other than the Collateral and shall not cause, suffer or permit Mortgage Borrower to purchaser or own any real property other than the Property and shall not enter into any line of business other than the ownership of the Collateral and shall no cause, suffer or permit Mortgage Borrower to enter into any line of business other than the operation of the Property, or suffer or permit Mortgage Borrower to materially change Mortgage Borrower's Closing Business Plan, or make (or suffer or permit Mortgage Borrower to make) any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other

75

than the continuance of its present business or otherwise cease to operate the Property as a hotel and retail property or terminate such business for any reason whatsoever, or cease to own and manage its interest in the Collateral.

**5.16    Debt Cancellation**.  Borrower shall not, and shall not suffer or permit Mortgage Borrower to, cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower or Mortgage Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's and Mortgage Borrower's business.

**5.17    Affiliate Transactions**.  Borrower shall not, and shall not suffer or permit Mortgage Borrower to, enter into, or be a party to, any transaction with an Affiliate of Borrower, Mortgage Borrower, any Borrower Representative or limited partner of the foregoing, except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower, Mortgage Borrower or such Affiliate of Borrower, Mortgage Borrower, Borrower Representative or limited partner of the foregoing than would be obtained in a comparable arm's-length transaction with an unrelated third party.

**5.18    Zoning**.  Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower to, initiate, permit or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

**5.19    No Joint Assessment**.  Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower to, initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**5.20    Principal Place of Business**.  Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower, change its or Mortgage Borrower's principal place of business or chief executive office without first giving Lender thirty (30) days' prior notice.

**5.21    Change of Name, Identity or Structure**.  Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower to, change its or Mortgage Borrower's name, identity (including its trade name or names) or Borrower's or Mortgage Borrower's corporate, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's or Mortgage Borrower's structure, without first obtaining the prior written consent of Lender.  Borrower shall, and shall cause Mortgage Borrower to, execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein and pursuant to the Security Documents.  At the request of Lender, Borrower shall, and shall cause Mortgage Borrower to, execute a certificate in

76

form satisfactory to Lender listing the trade names under which Borrower or Mortgage Borrower, as applicable, intends to operate the Property, and representing and warranting that neither Borrower nor Mortgage Borrower does business under any other trade name with respect to the Collateral or Property, as applicable.

**5.22**    **Indebtedness**.  Borrower shall not directly or indirectly create, incur or assume any indebtedness other than the (i) Debt and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Collateral which (A) are not evidenced by a note, (B) do not exceed, at any time, $25,000 and (C) are paid within thirty (30) days of the date incurred (collectively, "***Permitted Indebtedness***"). Borrower shall not cause, suffer or permit Mortgage Borrower, directly or indirectly create, incur or assume any indebtedness other than the (i) the Mortgage Loan, and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property which (A) are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of one percent (1%) of the original amount of the aggregate Outstanding Principal Balance of the Mortgage Loan and (C) are paid within thirty (30) days of the date incurred.

**5.23**    **Licenses**.  Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower to, Transfer any License required for the operation of the Property.

**5.24**    **Compliance with Restrictive Covenants, Etc.**  Borrower will not, and will not cause, suffer or permit Mortgage Borrower to, enter into, modify, waive in any material respect or release any Easements, restrictive covenants or other Permitted Encumbrances, or suffer, consent to or permit the foregoing, without Lender's prior written consent, which consent may be granted or denied in Lender's sole discretion.  Subject to Sections 5.10 and 5.34, Borrower will not, and will not cause, suffer or permit Mortgage Borrower to, enter into or modify any Material Agreement without the consent of Lender.  A "***Material Agreement***" shall be any agreement that materially affects the use and operation of the Property (except for the Construction Documents, Hotel Management Agreement and the Ground Lease (but without limiting Borrower's obligations and Lender's rights under in this Agreement, the other Loan Documents or any other agreement of Borrower or Lender concerning the same)).

**5.25**    **ERISA**.

(a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower to, maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Borrower, Mortgage Borrower or any Borrower Representative to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower or Mortgage Borrower to become "plan assets," whether by operation of law or under regulations promulgated under ERISA.

(c) Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender in its sole discretion, that (A) neither Borrower or Mortgage Borrower is and or maintains an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(3) of ERISA; (B) neither Borrower nor Mortgage Borrower is subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) the assets of Borrower and/or Mortgage Borrower do not constitute "plan assets" within the meaning of 29 C.F.R. Section 2510.3-101.

**5.26    Prohibited Transfers**.  Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower, directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer.

**5.27    Liens**.  Without Lender's prior written consent, Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower to, create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Collateral or the Property or any direct or indirect legal or beneficial ownership interest in Borrower, Mortgage Borrower or any Borrower Representative, except Liens in favor of Lender (and Mortgage Lender, in accordance with the Mortgage Loan Documents) and Permitted Encumbrances, unless such Lien is bonded or discharged within forty-five (45) days after the earlier of (i) Borrower first receives notice of such Lien or (ii) the date the Lien is filed.

**5.28    Dissolution**.  Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower to, (i) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership and operation of the Collateral or the Property or (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower or Mortgage Borrower except to the extent expressly permitted by the Loan Documents and the Mortgage Loan Documents.

**5.29    Expenses**.  Borrower shall reimburse Lender upon receipt of notice for all reasonable, out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender or Servicer in connection with the Loan, including, (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions by counsel for Borrower; (ii) Borrower's and Lender's ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Lender; (iv) filing and recording of any Loan Documents; (v) title insurance, mezzanine endorsements, the UCC Policy, surveys, inspections and appraisals; (vi) the creation, perfection or protection of Lender's Liens in the Collateral and the Cash Management Accounts (including fees and expenses for title and lien searches, intangibles taxes, mortgage recording taxes, personal property taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against,

78

under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan; (viii) fees charged by Servicer in connection with the Loan or any modification thereof and (ix) enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Collateral or in connection with any refinancing or restructuring of the Loan in the nature of a "work-out", or any insolvency or bankruptcy proceedings, (x) the making of Advances hereunder (including, without limitation, costs, fees and expenses of inspecting construction consultants, architects and engineers) and (xi) other amounts customarily charged by lenders in connection with similar mezzanine loans; provided, however, Lender shall not seek reimbursement of duplicative third-party and internal costs with respect to the same review, approval or other action of Lender of the same type.  Any costs and expenses due and payable by Borrower hereunder which are not paid by Borrower within twenty (20) days after demand may be paid from any amounts in the Substitute Deposit Account, with notice thereof to Borrower.  The obligations and liabilities of Borrower under this Section 5.29 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Collateral by foreclosure or a conveyance in lieu of foreclosure.

      **5.30**   **Indemnity**.  Borrower shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "***Indemnified Party***"), from and against any and all liabilities, obligations, losses, damages, (excluding punitive, special and consequential damages, except to the extent of reimbursement to Lender for any such punitive, special and consequential damages actually incurred by Lender in connection with third party claims), penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "***Indemnified Liabilities***") in any manner, relating to or arising out of or by reason of the Loan, including:  (i) any breach by Borrower of its obligations under, or any misrepresentation by Borrower contained in, any Loan Document; (ii) the use or intended use of the proceeds of the Loan; (iii) any information provided by or, on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Security Documents, the Collateral or any interest therein, or receipt of any Rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of the Property to comply with any Legal Requirement;

79

(xiii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Collateral, the Property or any part thereof, or any liability asserted against Lender with respect thereto; and (xiv) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder to the extent that it is finally judicially determined that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.  Any amounts payable to any Indemnified Party by reason of the application of this paragraph shall be payable on demand and shall bear interest at the Default Rate from the date that is twenty (20) days following the date demanded in writing by any Indemnified Party until paid.   The obligations and liabilities of Borrower under this Section 5.30 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Collateral by foreclosure or a conveyance in lieu of foreclosure.  This Section 5.30 shall not apply with respect to Applicable Taxes other than any Applicable Taxes that represent losses, claims, damages, etc. arising from any non-tax claim.

### 5.31    Patriot Act Compliance.

(a)    Borrower will (and will cause Mortgage Borrower to) use its good faith and commercially reasonable efforts to comply with the Patriot Act (as defined below) and all applicable requirements of governmental authorities having jurisdiction over Borrower, Mortgage Borrower, the Collateral and the Property, including those relating to money laundering and terrorism.  Lender shall have the right to audit Borrower's and Mortgage Borrower's compliance with the Patriot Act and all applicable requirements of governmental authorities having jurisdiction over Borrower, Mortgage Borrower, the Collateral and the Property, including those relating to money laundering and terrorism.  In the event that Borrower or Mortgage Borrower fails to comply with the Patriot Act or any such requirements of governmental authorities, then Lender may, at its option, cause Borrower to comply (and cause Mortgage Borrower to comply) therewith and any and all reasonable costs and expenses incurred by Lender in connection therewith shall be secured by the Security Documents and the other Loan Documents and shall be immediately due and payable.  For purposes hereof, the term *"Patriot Act"* means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

(b)  Neither  Borrower  Mortgage  Borrower,  any  Borrower Representative or member or partner of the foregoing nor any owner of a direct or indirect interest in Borrower (a) is listed on any Government Lists (as defined below), (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense (as defined below), or (d) is currently under investigation by any governmental authority for alleged criminal activity.  For purposes hereof, the term *"Patriot Act Offense"* means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a

80

criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (a) the criminal laws against terrorism; (b) the criminal laws against money laundering, (c) the Bank Secrecy Act, as amended, (d) the Money Laundering Control Act of 1986, as amended, or the (e) Patriot Act.  "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.  For purposes hereof, the term "***Government Lists***" means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by Office of Foreign Assets Control ("***OFAC***"), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Governmental Lists", or (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Governmental Lists".

       **5.32**    **Minimum Cash Equity**.  Borrower represents and warrants that on the date hereof it has caused Mortgage Borrower and shall at all times cause Mortgage Borrower during the term of the Loan to maintain a minimum cash equity in the Property of $[_____], which is not less than twenty percent (20%) of the total cost of the Project Improvements, including amounts spent prior to the Closing Date.   As part of all quarterly and annual financial statements delivered to Lender pursuant to Section 6.3 hereof, Borrower shall deliver to Lender a certificate of Mortgage Borrower's cash equity in the Property as well as evidence reasonably acceptable to Lender supporting such certification.

       **5.33**    **Anti-Money Laundering**.  At all times throughout the Term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, none of the funds of Borrower, Mortgage Borrower, any Borrower Representative or any Guarantor, as applicable, that are used to consummate this transaction or to repay the Loan shall be derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, Mortgage Borrower, any Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure.  Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

       **5.34**    **Construction Manager's Agreement; Contracts, Subcontracts**.  Borrower shall (a) enforce and cause Mortgage Borrower to enforce the Construction Manager's Agreement in a commercially reasonable manner, (b) not cause, and shall not cause, suffer or permit Mortgage Borrower to waive any of the obligations of any of the parties thereunder, (c) not, and shall not cause, suffer or permit Mortgage Borrower to take any action or fail to take any action which would relieve the Construction Manager from its obligations to construct the Project Improvements substantially in accordance with the Plans and Specifications, and (d) not, and shall not cause, suffer or permit Mortgage Borrower to make no amendments to or change orders under the Construction Manager's Agreement without the prior written approval of Lender, except to the extent permitted under Section 5.43 hereof.  The Construction Manager's Agreement shall provide that the work to be performed by Construction Manager under the Construction Manager's Agreement is the work called for by the Plans and Specifications; and that all work on the

81

Improvements shall be completed in accordance with the Plans and Specifications in a good and workmanlike manner and shall be free of any defects. Borrower shall, from time to time, upon request by Lender, cause Mortgage Borrower to use commercially reasonable efforts to cause Construction Manager to provide Lender with reports in regard to the status of construction of the Project Improvements, in such form and detail as requested by Lender. Borrower shall not suffer or permit Mortgage Borrower to, and shall not cause, suffer or permit Mortgage Borrower to permit the Construction Manager to, enter into, or extend or modify an existing Major Contract in any manner which is not immaterial, any Major Contract without Lender's prior written consent, except to the extent permitted under Section 5.43 hereof. Provided that no Event of Default is continuing, if Borrower delivers (or causes Mortgage Borrower to deliver) the proposed Major Contract to Lender and Construction Consultant for its review and provides Lender with a written request for approval (which written request shall specifically refer to this Section 5.34(B) and shall explicitly state that failure by Lender to approve or disapprove within five (5) Business Days will constitute a deemed approval) and Lender fails to reject the request in writing delivered to Borrower within five (5) Business Days after receipt by Lender of the request, the proposed Major Contract, or proposed extension or modification of an existing Major Contract shall be deemed approved by Lender, and Borrower shall be entitled to cause or permit Mortgage Borrower to enter into such Major Contract or proposed extension or modification of an existing Major Contract. Borrower shall promptly deliver copies of all executed Contracts to Lender. Borrower shall (a) cause Mortgage Borrower to (and cause Mortgage Borrower to cause Construction Manager to) enforce the Contracts and Subcontracts in a commercially reasonable manner, (b) not, and shall not cause, suffer or permit Mortgage Borrower to cause (or cause, suffer or permit Construction Manager to) waive any of the obligations of any of the parties thereunder, (c) not, and shall not cause, suffer or permit Mortgage Borrower to (or cause, suffer or permit Construction Manager to) cause, take any action or fail to take any action which would relieve the Contractor or the Subcontractor from its obligations to construct the Project Improvements substantially in accordance with the Plans and Specifications, and (d) not make, and shall not cause, suffer or permit Mortgage Borrower to make (or cause, suffer or permit Construction Manager to make) any change orders under the Contracts or Subcontracts without the prior written approval of Lender. The Contractors and Subcontractors shall provide that the work to be performed by such Contractor or Subcontractor, as applicable, under its Contract or Subcontract, respectively, is the work called for by the Plans and Specifications; and that all work being performed by such Contractor or Subcontractor on the Improvements shall be completed in accordance with the Plans and Specifications in a good and workmanlike manner and shall be free of any defects. **Architect's Contract**. Borrower shall (a) enforce (and cause Mortgage Borrower to enforce) the Architect's Contract in a commercially reasonable manner, (b) not waive (or cause, suffer or permit Mortgage Borrower to waive) any of the obligations of Architect(s) thereunder, (c) not take (or cause, suffer or permit Mortgage Borrower to take) any action or fail to take any action which would relieve the Architect from its or their obligations under the (applicable) Architect's Contract and (d) make (or cause, suffer or permit Mortgage Borrower to make) any amendments to the Architect's Contract without the prior written approval of Lender. Borrower shall, from time to time, upon the request by Lender, use commercially reasonable efforts to cause Mortgage Borrower to cause the Architect to provide Lender with reports in regard to the status of construction of the Improvements, in such form and detail as requested by Lender.

     **5.36**   **Application of Loan Proceeds**. Borrower shall use the Undisbursed Loan Proceeds solely and exclusively for the purposes of paying Building Costs in accordance herewith

and in accordance with the Construction Budget which shall be subject to no change except as permitted hereby. Borrower shall cause Mortgage Borrower to use the Mortgage Loan Undisbursed Loan Proceeds solely and exclusively for the purposes of paying Building Loan Costs in accordance herewith and in accordance with the Building Loan Budget (in accordance with the Building Loan Agreement) and for the purposes of paying Project Loan Costs in accordance with the Project Loan Budget (in accordance with the Project Loan Agreement), which shall be subject to no change except as permitted hereby and pursuant to the Mortgage Loan Agreement. Borrower will receive, and shall cause Mortgage Borrower to receive, as applicable, the Advances to be made hereunder and pursuant to the Mortgage Loan Agreement and, in accordance with Section 2.9.8 hereof and Section 2.9.8 of each Mortgage Loan Agreement, will hold the right to receive the same in trust for the purpose of paying the Building Costs and it will apply the same (and shall cause the same to be applied) first to such payment before using any part thereof for any other purpose.

**5.37    Costs of Construction**.  Borrower shall, and shall cause Mortgage Borrower to, promptly pay when due all Building Costs.  Borrower may contest the amounts due to Contractors and Subcontractors in good faith provided that (a) such amounts are not the subject of an Advance (or if such funds are escrowed), (b) no Event of Default has occurred and is continuing; (c) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost as determined by Lender; (d) Borrower shall not, and shall not cause, suffer or permit) permit or suffer and shall promptly discharge any Lien (other than Permitted Encumbrances) against the Property, by payment, bonding or otherwise; and (e) Borrower shall, and shall cause Mortgage Borrower to, promptly upon final determination thereof pay the amount due such Contractor or Subcontractor, together with all costs, interest and penalties which may be payable in connection therewith.

**5.38    Substantial Completion; Final Completion of Construction**.

**5.38.1    Substantial Completion**.

(a)    Borrower shall cause Mortgage Borrower to cause the Substantial Completion of the Project Improvements to occur on or before the Substantial Completion Date.

(b)    Borrower shall cause Mortgage Borrower to diligently pursue the Substantial Completion of the Project Improvements on or prior to the Substantial Completion Date in accordance with the Plans and Specifications and in compliance with all applicable Legal Requirements and all Licenses, Building Permits, governmental approvals, all restrictions, covenants and easements affecting the Property, and all terms and conditions of this Agreement and the other Loan Documents; pay all sums and perform such duties as may be necessary to complete such construction of the Project Improvements substantially in accordance with the Plans and Specifications and in compliance with all applicable Legal Requirements and all Licenses, Building Permits, governmental approvals, restrictions, covenants and easements affecting the Property, and all terms and conditions of this Agreement, the other Loan Documents and the Mortgage Loan Documents, all of which shall be completed by the Completion Date, free from any liens, claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith.  Evidence of satisfactory compliance with the foregoing shall be furnished by Borrower to Lender on or before the

83

Substantial Completion Date.  In addition, Borrower shall cause Mortgage Borrower to diligently pursue construction of the Project Improvements to Substantial Completion in accordance with the Construction Schedule.

### 5.38.2     **Final Completion of Construction**.

(a)    Borrower shall cause Mortgage Borrower to cause the Final Completion of the Project Improvements to occur on or before the Completion Date.

(b)    Borrower shall cause Mortgage Borrower to diligently pursue the Final Completion of the Project Improvements on or prior to the Completion Date (subject only to Force Majeure and extensions approved by Lender in writing in its sole and absolute discretion) substantially in accordance with the Plans and Specifications and in compliance with all applicable Legal Requirements and all Licenses, Building Permits, governmental approvals, all restrictions, covenants and easements affecting the Property, and all terms and conditions of this Agreement and the other Loan Documents; pay all sums and perform such duties as may be necessary to complete such construction of the Project Improvements substantially in accordance with the Plans and Specifications and in compliance with all applicable Legal Requirements and all Licenses, Building Permits, governmental approvals, restrictions, covenants and easements affecting the Property, and all terms and conditions of this Agreement, the other Loan Documents and the Mortgage Loan Documents, all of which shall be completed by the Substantial Completion Date, free from any liens, claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith.  Evidence of satisfactory compliance with the foregoing shall be furnished by Borrower to Lender on or before the Completion Date.  In addition, Borrower shall cause Mortgage Borrower to diligently pursue construction of the Project Improvements to Final Completion in accordance with the Construction Schedule.

(c)    Borrower shall obtain Lender's prior written consent in connection with any and all material design aspects of the Project Improvements to the extent same has not been approved by Lender prior to the Closing Date or not included in the Closing Business Plan, any other Annual Business Plan approved by Lender in accordance with this Agreement or Plans and Specifications previously approved by Lender; provided, however, that, subject to the provisions of Section 5.43, Borrower shall have the right to cause or permit Mortgage Borrower make certain immaterial changes to and further develop the Plans and Specifications so long as such modifications are consistent in all material respects with the Plans and Specifications previously approved by Lender and Borrower promptly delivers copies of such modified Plans and Specifications to Lender.  Borrower shall submit proposed modified Plans and Specifications to Lender and the Construction Consultant in connection with any design decisions requiring Lender's approval in this Section 5.38(c) and Lender shall use reasonable efforts to respond to such written requests for approvals required under this Section 5.38(c) within ten (10) Business Days of receipt of such request.

### 5.39     **Inspection of Property**.  Subject to the rights of Tenants, if any, Borrower shall, and shall cause Mortgage Borrower to, permit Lender, the Construction Consultant and their respective representatives, to enter upon the Property, inspect the Project Improvements and all materials to be used in the construction and renovation thereof and to examine the Plans and

84

Specifications which are or may be kept at the construction site at all reasonable times and with advance notice and will cooperate, and use reasonable efforts to cause the Construction Manager, the Major Contractors to cooperate with the Construction Consultant to enable him or her to perform his or her functions hereunder.

      **5.40**    <u>**Construction Consultant**</u>.    Borrower acknowledges that (a) the Construction Consultant has been retained by Lender, at Borrower's sole cost and expense (not to exceed [$_____][11] per month) in accordance with the Construction Budget and Section 5.41 below to act as a consultant and only as a consultant to Lender in connection with the construction of the Improvements and has no duty to Borrower, (b) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Lender, (c) Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Lender under this Agreement and to accept or not accept any matter or thing required to be accepted by Lender under this Agreement, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto, (d) Lender reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Lender or any other person or party, and (e) Lender reserves the right to replace the Construction Consultant with another construction consultant at any time and without prior notice to or approval by Borrower.

      **5.41**    <u>**Construction Consultant/Duties and Access**</u>.    Lender shall have the right to retain the Construction Consultant, at Borrower's sole cost and expense, to perform the following services on behalf of Lender:

        (a)    To review and advise Lender whether, in the opinion of the Construction Consultant, the Plans and Specifications are satisfactory;

        (b)    To review Requisitions and change orders;

        (c)    To review design modifications to the Project Improvements as described in Section 5.38(c); and

        (d)    To make periodic inspections for the purpose of assuring that construction of the Improvements to date is substantially in accordance with the Plans and Specifications and to approve Borrower's then current Requisition as being consistent with Borrower's obligations under this Agreement, including *inter alia*, an opinion as to Borrower's continued compliance with the provisions of Section 2.9.1.

      Borrower shall pay the fees of the Construction Consultant within thirty (30) days after billing therefor and expenses incurred by Lender on account thereof shall be reimbursed to Lender within thirty (30) days after request therefor, but neither Lender nor the Construction Consultant shall have any liability to Borrower on account of (i) the services performed by the

---

[11] Lender to provide.

Construction Consultant, (ii) any neglect or failure on the part of the Construction Consultant to properly perform its services or (iii) any approval by the Construction Consultant of construction of the Project Improvements. Neither Lender nor the Construction Consultant assumes any obligation to Borrower or any other Person concerning the quality of construction of the Project Improvements or the absence therefrom of defects.

**5.42** **Correction of Defects**. Borrower shall (and shall cause Mortgage Borrower to) promptly correct all defects in the Project Improvements or any deviation from the Plans and Specifications not previously approved or deemed approved by Lender to the extent required hereunder. Borrower agrees that the advance of any proceeds of the Loan whether before or after such defects or departures from the Plans and Specifications are discovered by, or brought to the attention of, Lender shall not constitute a waiver of Lender's right to require compliance with this covenant.

**5.43** **Approval of Change Orders**. Borrower shall not permit any deviations from the Plans and Specifications without Lender's prior written consent (which consent shall be given or withheld in Lender's sole but reasonable discretion); provided, however, that Borrower may cause or permit Mortgage Borrower to make changes without Lender's prior written consent so long as (a) such changes do not exceed, in the case of any Contract or Subcontract, two percent (2%) of the amount of the applicable Contract or Subcontract, (b) such changes do not exceed the greater of (i) $300,000 and (ii) two and one half percent (2.5%) of the amount of the Construction Budget in the aggregate, (c) such changes do not increase any line item in the Construction Budget in excess of $150,000 (after taking into account use of the contingency line item to the extent permitted under and reallocations under Sections 2.9.4, 2.9.5 and 2.9.6 and other reallocations approved by Lender in its sole and absolute discretion), (d) the total Construction Budget does not increase, (e) Borrower uses reasonable efforts to deliver (or cause Mortgage Borrower to deliver) to Lender and Construction Consultant prior notice of such change orders or, if Borrower is unable to deliver (or cause to be delivered) prior notice, Borrower shall submit to Lender and Construction Consultant copies of all change orders entered into with respect to the Improvements within ten (10) days after the same are entered into, irrespective of whether the same require the prior approval of Lender and Construction Consultant pursuant to this Agreement, (f) such changes will not (i) decrease or increase (other than in a de minimis respect) the gross square feet or the net rentable square feet of the office or retail space to be contained in the Project Improvements, (ii) materially change the basic layout or material design aspects of the Project Improvements except as expressly permitted in Section 5.38(c), or (iii) involve the use of materials, furniture, fixtures and equipment that are not at least equal in quality to the materials, furniture, fixtures and equipment originally specified in or required by the approved Plans and Specifications and (g) such changes will not prevent Borrower from causing Mortgage Borrower to complete the Project Improvements on or prior to the Completion Date. Lender shall use reasonable efforts to respond to written requests for approval of change orders within ten (10) days of receipt of such request.

**5.44** **Laborers, Subcontractors and Materialmen**. Borrower shall notify Lender promptly, and in writing, if Borrower or Mortgage Borrower receives any default notice, notice of lien or demand for past due payment, written or oral, from any laborer, subcontractor or materialmen.

86

**5.45    Payment and Performance Bonds**.  Borrower shall cause Mortgage Borrower to maintain in full force and effect the Construction Manager Payment and Performance Bond and any other Payment and Performance Bonds required by Lender pursuant to this Agreement and by Mortgage Lender pursuant to the Mortgage Loan Agreement.  All Major Contractors shall be required to obtain and maintain a Payment and Performance Bond and Borrower shall deliver (or cause Mortgage Borrower to deliver) such Payment and Performance Bond to Lender prior to the performance of any work at the Property by such Major Contractor.  In the event that any payments under any Payment and Performance Bond (including the Construction Manager Payment and Performance Bond) are issued jointly to Borrower (or Mortgage Borrower) and Lender, Borrower shall (and shall cause Mortgage Borrower to) endorse any such jointly issued payments to the order of Lender upon Lender's request.  Provided no Default or Event of Default shall have occurred and be continuing, Lender shall, at Lender's option, either (a) apply any payment received in respect of any Payment and Performance Bond to pay for the unpaid work, labor or services giving rise to such payment or (b) make such payment available for disbursement to Borrower in the same manner as Loan proceeds are disbursed to Borrower pursuant to and in accordance with Section 2.9 hereof, subject to Borrower's compliance with the terms and provisions of said Section.

**5.46    Ownership of Personalty**.  Borrower shall furnish to Lender photocopies of the fully executed contracts, bills of sale, receipted vouchers and agreements, or any of them, under which Mortgage Borrower claims title to the materials, articles, fixtures and other personal property used or to be used in the construction or operation of the Project Improvements.

**5.47    Purchase of Material Under Conditional Sale Contract**.  Borrower shall not permit, and shall not cause, suffer or permit Mortgage Borrower to permit any materials, equipment, fixtures or any other part of the Project Improvements to be purchased or installed under any security agreement or other arrangements wherein the seller reserves or purports to reverse the right to remove or to repossess any such items or to consider them personal property after their incorporation in the Property, unless authorized by Lender in writing and in advance.

**5.48    Assignment of Claims**.  Borrower hereby collaterally assigns to Lender, as additional security for the Loan, to the extent permitted, all rights and claims Borrower may have against all Contractors and Subcontractors, provided that Lender may not pursue any such right or claim unless an Event of Default has occurred and is continuing.

**5.49    Ground Lease**.

(a)    Borrower will, and will cause Mortgage Borrower to, comply in all respects with the terms and conditions of the Ground Lease.  Borrower will not do or permit, or suffer or permit Mortgage Borrower to do or permit, anything to be done, the doing of which, or refrain from doing anything, the omission of which, will impair or is reasonably likely to impair the security of the Property under the Ground Lease or will be grounds for declaring a forfeiture of the Ground Lease.

(b)    Borrower shall cause Mortgage Borrower enforce in a commercially reasonable manner the Ground Lease and will not, without the prior written consent of Lender, cause, suffer or permit Mortgage Borrower to terminate, modify, cancel, change, supplement, alter or amend the Ground Lease, or waive, excuse, condone or in any way release or discharge Ground

87

Lessor of or from any of the material covenants and conditions to be performed or observed by the Ground Lessor under the Ground Lease. Borrower hereby expressly covenants with Lender not to cause, suffer or permit Mortgage Borrower to suffer cancel, surrender, amend, modify or alter in any way the terms of the Ground Lease without Lender's prior written consent. Subject to the rights of Mortgage Lender, upon the occurrence and during the continuance of an Event of Default, Borrower hereby assigns to Lender, as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of this Loan Agreement, all of the rights, privileges and prerogatives of Mortgage Borrower, as tenant under the Ground Lease, to surrender the leasehold estate created by the Ground Lease or to terminate, cancel, modify, change, supplement, alter or amend the Ground Lease, and any such surrender of the leasehold estate created by the Ground Lease or termination, cancellation, modification, change, supplement, alteration or amendment of the Ground Lease without the prior written consent of Lender shall be void and of no force and effect.

(c)    Borrower will give Lender prompt (and in all events within five (5) Business Days) written notice of any default under the Ground Lease or of the receipt by Borrower or Mortgage Borrower of any notice of default from Ground Lessor. Borrower will promptly (and in all events within five (5) Business Days) furnish to Lender copies of all information furnished to Ground Lessor by the terms of the Ground Lease or the provisions of this Section. Borrower will provide to Lender an exact copy of any written notice, material notice or material communication, plan, specification or other instrument or document received or given by Borrower or Mortgage Borrower in any way relating to or affecting the Ground Lease which may concern or affect the estate of Ground Lessor or Mortgage Borrower thereunder in or under the Ground Lease or in the real estate thereby demised.

(d)    Subject to the rights of Mortgage Lender, Lender shall have the right upon Mortgage Borrower's failure (or Borrower's causing, suffering or permitting Mortgage Borrower's failure), but not the obligation, to perform any obligations of Mortgage Borrower under the terms of the Ground Lease. All out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) so incurred, shall be treated as an advance secured by this Loan Agreement, shall bear interest thereon at the Default Rate from the date of payment by Lender until paid in full and shall be paid by Borrower to Lender within twenty (20) days after demand. No performance by Lender of any obligations of Mortgage Borrower (or of Borrower's obligations to cause Mortgage Borrower to perform its obligations) shall constitute a waiver of any default arising by reason of Borrower's failure to perform (or cause Mortgage Borrower to perform) the same. If Lender shall make any payment or perform any act or take action in accordance with this Section, Lender will notify Borrower of the making of any such payment, the performance of any such act, or the taking of any such action. In any such event, subject to the rights of lessees, sublessees and other occupants under the Leases or the Hotel Management Agreement, Lender and any person designated by Lender shall have, and are hereby granted, the right to enter upon the Property, subject to Section 5.3 hereof, at any time and from time to time for the purpose of taking any such action.

(e)    To the extent permitted by law, the price payable by Borrower, Mortgage Borrower or any other person or entity in the exercise of any right of redemption following foreclosure of the Property shall include all rents paid and other sums advanced by Lender, together with interest thereon at the Default Rate as lessee under the Ground Lease, on

88

behalf of Mortgage Borrower on account of the Property and Borrower on account of the Collateral.

(f)    Unless Lender shall otherwise consent in writing, the fee and leasehold estates in the Property shall not merge but shall always be kept separate and distinct, notwithstanding the union of said estates either in Ground Lessor or in Mortgage Borrower, or in a third party, by purchase or otherwise.

(g)    If the Ground Lessor shall deliver to Lender a copy of any notice of default sent by the Ground Lessor to Mortgage Borrower, as lessee under the Ground Lease, such notice shall constitute full protection to Lender and against Borrower, Mortgage Borrower, each Borrower Representative, Guarantor or any of their Affiliates for any action taken or omitted to be taken by Lender in reliance thereon.

(h)    To the extent there are any renewal terms under the Ground Lease, Borrower shall cause Mortgage Borrower to exercise each individual option, if any, to extend or renew the term of the Ground Lease promptly (and in all events within five (5) days) after written demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised, and Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower to cause Mortgage Borrower to so exercise such option if Borrower fails to cause Mortgage Borrower to exercise as herein required, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.

(i)    Each Lease hereafter made and each renewal of any existing Lease shall provide that, (i) in the event of the termination of a Ground Lease, the Lease shall not terminate or be terminable by the lessee; (ii) in the event of any action for the foreclosure of the Mortgage, the Lease shall not terminate or be terminable by the subtenant by reason of the termination of the Ground Lease unless the lessee is specifically named and joined in any such action and unless a judgment is obtained therein against the lessee; and (iii) in the event that a Ground Lease is terminated as aforesaid, the lessee under the Lease shall attorn to the lessee under the Ground Lease or to the purchaser at the sale of the Property on such foreclosure, as the case may be.

(j)    Borrower hereby assigns, transfers and sets over to Lender all of Borrower's claims and rights to the payment of damages arising from any rejection by the Ground Lessor of the Ground Lease under the Bankruptcy Code. Borrower shall, and shall cause Mortgage Borrower to, promptly notify Lender in writing (and in any event within ten (10) days) of any claim, suit action or proceeding relating to the rejection of the Ground Lease. Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the Ground Lessor under the Bankruptcy Code during the continuance of any default. Borrower may (or may cause Mortgage Borrower to) make any compromise or settlement in connection with such proceedings (subject to Lender's prior written approval, which may be granted or withheld in Lender's sole and absolute discretion); provided, however, that Lender shall be authorized and entitled to compromise or settle any such proceeding if such compromise or settlement is made after the

89

occurrence and during the continuance of any Event of Default, and following an Event of Default, Borrower shall not, without the prior written approval of Lender, which may be granted or withheld in Lender's sole and absolute discretion, make (or cause, suffer or permit Mortgage Borrower to make) any such compromise or settlement.  Borrower shall promptly execute and deliver to Lender any and all instruments reasonably required in connection with any such proceeding after request therefor by Lender.

(k)    Borrower shall not, without Lender's prior written consent, elect (or cause, suffer or permit Mortgage Borrower to elect) to treat the Ground Lease as terminated under Section 365(h)(l) of the Bankruptcy Code.  Any such election made without Lender's prior written consent shall be void.

(l)    If pursuant to Section 365(h)(1)(B) of the Bankruptcy Code, Borrower seeks (or causes or permits Mortgage Borrower to seek) to offset against the rent reserved in the Ground Lease the amount of any damages caused by the non-performance by the Ground Lessor of any of the Ground Lessor's obligations under the Ground Lease after the rejection by the Ground Lessor of the Ground Lease under the Bankruptcy Code, Borrower shall (or shall cause Mortgage Borrower to), prior to effecting such offset, notify Lender of its intention to do so, setting forth the amounts proposed to be so offset and the basis therefor.  If Lender has failed to object as aforesaid within ten (10) days after notice from Borrower in accordance with the first sentence of this Section, Borrower may (or may cause Mortgage Borrower to) proceed to effect such offset in the amounts set forth in Borrower's notice.  Neither Lender's failure to object as aforesaid nor any objection or other communication between Lender, Borrower and/or Mortgage Borrower relating to such offset shall constitute an approval of any such offset by Lender.  Borrower shall indemnify and save Lender harmless from and against any and all claims, demands, actions, suits, proceedings, damages (excluding punitive, special and consequential damages unless asserted against Lender by Ground Lessor or any other third party), losses, and actual of-of-pocket costs and expenses of every nature whatsoever (including, without limitation, reasonable attorneys' fees and disbursements) arising from or relating to any such offset by Borrower or Mortgage Borrower against the rent reserved in the Ground Lease.

(m)    If any action, proceeding, motion or notice shall be commenced or filed in respect of the Ground Lease, Borrower or Mortgage Borrower or, after the occurrence and during the continuance of any Event of Default, the Property in connection with any case under the Bankruptcy Code, Lender shall have the option, subject to the Intercreditor Agreement, to the exclusion of Borrower (or Mortgage Borrower, as applicable), exercisable upon notice from Lender to Borrower (and Mortgage Borrower), to conduct and control any such litigation with counsel of Lender's choice.  Lender may proceed in its own name or in the name of Borrower (or of Mortgage Borrower) in connection with any such litigation, and Borrower agrees to execute any and all powers, authorizations, consents and other documents required by Lender in connection therewith.  Borrower shall pay to Lender all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) paid or incurred by Lender in connection with the prosecution or conduct of any such proceedings within five (5) days after notice from Lender setting forth such costs and expenses in reasonable detail.  Any such costs or expenses not paid by Borrower as aforesaid shall be secured by the lien of the Security Documents, this Agreement and the other Loan Documents, shall be added to the principal amount of the Debt and shall bear interest at the Default Rate.  Borrower shall not, and shall not cause, suffer or permit Mortgage

90

Borrower to, commence any action, suit, proceeding or case, or file any application or make any motion, in respect of the Ground Lease in any such case under the Bankruptcy Code without the prior written consent of Lender, which, consent or approval shall not be unreasonably withheld, conditioned or delayed, other than with respect to the Existing Proceeding, with respect to which Lender's consent may be granted or withheld in Lender's sole and absolute discretion.

(n)    Borrower shall, and shall cause Mortgage Borrower to, promptly, but in no event later than (1) Business Day after obtaining knowledge thereof, notify Lender of any filing by or against the Ground Lessor of a petition under the Bankruptcy Code.  Borrower shall, and shall cause Mortgage Borrower to, thereafter forthwith give written notice of such filing to Lender, setting forth any information available to Borrower (or Mortgage Borrower, as applicable) as to the date of such filing, the court in which such petition was filed, and the relief sought therein.  Borrower shall, and shall cause Mortgage Borrower to, promptly deliver to Lender following receipt any and all notices, summonses, pleadings, applications and other documents received by Borrower or Mortgage Borrower in connection with any such petition and any proceedings relating thereto.

(o)    If there shall be filed by or against Borrower or Mortgage Borrower a petition under the Bankruptcy Code, and Mortgage Borrower, as the lessee under the Ground Lease, shall determine (or if Borrower shall cause Mortgage Borrower to determine) to reject the Ground Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than thirty (30) days' prior notice of the date on which Mortgage Borrower shall apply to the bankruptcy court for authority to reject the Ground Lease.  Subject to the Intercreditor Agreement, Lender shall have the right, but not the obligation, to serve upon Mortgage Borrower within such 30-day period a notice stating that (i) Lender demands that Mortgage Borrower assume and assign the Ground Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of prompt cure of all defaults and provide adequate assurance of future performance under the Ground Lease.  If Lender serves upon Mortgage Borrower the notice described in the preceding sentence, Borrower shall not cause, suffer or permit seek Mortgage Borrower to reject the Ground Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

(p)    Effective upon the entry of an order for relief in respect of Borrower or Mortgage Borrower under the Bankruptcy Code, Borrower hereby assigns and transfers to Lender, in the event Mortgage Borrower fails (or Borrower fails to cause Mortgage Borrower) to promptly file a motion under Section 364(d)(4) to extend the Debtor's time to assume or reject the Ground Lease, then in such event, a non-exclusive right to apply to the Bankruptcy Court under Section 365(d)(4) of the Bankruptcy Code for an order extending the period during which the Ground Lease may be rejected or assumed.

(q)    Subject to the rights of Mortgage Lender, to the extent any purchase option exists under the Ground Lease, Borrower hereby agrees that Lender shall have the right to exercise any option to purchase the Property held by Mortgage Borrower as lessee under the Ground Lease, and Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Mortgage Borrower to so exercise

91

such option if Mortgage Borrower fails (or Borrower fails to cause Mortgage Borrower) to exercise as herein required, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.

(r)    Borrower shall not cause, suffer or permit Mortgage Borrower, without the prior consent of Lender, to (i) surrender the leasehold estate created by the Ground Lease or terminate or cancel the Ground Lease or modify, change, supplement, alter or amend the Ground Lease, either orally or in writing, or (ii) consent to, acquiesce in, or fail to object to, any attempt by the Ground Lessor, as debtor in possession or by a trustee for Ground Lessor, to sell or transfer the fee estate of Ground Lessor free and clear of Ground Lease under section 363(f) of the Bankruptcy Code or otherwise.  Borrower shall cause Mortgage Borrower to any such attempt by the Ground Lessor, as debtor in possession or by a trustee for the Ground Lessor, to sell or transfer the fee estate of Ground Lessor free and clear of the Ground Lease under section 363(f) of the Bankruptcy Code or otherwise, and in such event shall affirmatively assert and pursue its right to adequate protection under section 363(e) of the Bankruptcy Code.

**5.50**    **Hotel Management Agreement**.[12]

**5.50.1**    **Affirmative Covenants**.  The Project Improvements shall be operated under the terms and conditions of the Hotel Management Agreement.  Borrower shall cause Mortgage Borrower to (i) pay all sums required to be paid by Mortgage Borrower under the Hotel Management Agreement, (ii) diligently perform, observe and enforce all of the terms, covenants and conditions of the Hotel Management Agreement on the part of Mortgage Borrower to be performed, observed and enforced to the end that all things shall be done which are necessary to keep unimpaired the rights of Mortgage Borrower under the Hotel Management Agreement, (iii) promptly notify Lender of any default under the Hotel Management Agreement of which it is aware and notify Lender of the giving of any notice to Mortgage Borrower of any default by Mortgage Borrower in the performance or observance of any of the terms, covenants or conditions of the Hotel Management Agreement on the part of Mortgage Borrower to be performed and observed and deliver to Lender a true copy of each such notice, (iv) promptly deliver to Lender a copy of each financial statement, budget, projection, business plan, property improvement plan, capital expenditure plan, notice, report (including but not limited to Pace reports), Quality Assurance Report and estimate received by it under the Hotel Management Agreement, (v) promptly enforce in a commercially reasonable manner the performance and observance of all of the material covenants required to be performed and observed by the Hotel Manager under the Hotel Management Agreement, and (vi) deliver to Mortgage Lender the Hotel SNDA and any other subordination, non-disturbance and attornment agreements reasonably requested by Lender and/or Mortgage Lender in form and substance reasonably acceptable to Lender.

**5.50.2**    **Negative Covenants**.  Borrower shall not, without the prior consent of Lender, cause, suffer or permit Mortgage Borrower to (a) surrender, terminate or cancel the Hotel Management Agreement; (b) reduce or consent to the reduction of the term of the Hotel Management Agreement; (c) increase or consent to the increase of the amount of any charges under the Hotel Management Agreement; (d) otherwise materially modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Hotel Management

---

[12] Subject to review of Franchise Agreement.

Agreement or (e) suffer or permit the occurrence of continuance a default beyond any applicable cure period under the Hotel Management Agreement if such default permits the franchiser to terminate or cancel the Hotel Management Agreement. Following the occurrence and during the continuance of an Event of Default, Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower to, exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Hotel Management Agreement without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.

      **5.50.3**　　**Rights of Lender; Termination of Franchise**. Subject to the rights of Mortgage Lender, Borrower hereby assigns to Lender as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of this Agreement, all the rights, privileges and prerogatives of Mortgage Borrower to surrender the Hotel Management Agreement or to terminate, cancel, modify, change, supplement, alter or amend the Hotel Management Agreement, and any such surrender of the Hotel Management Agreement or termination, cancellation, modification, change, supplement, alteration or amendment of the Hotel Management Agreement without the prior consent of Lender shall be void and of no force and effect. Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower, enter into any franchise, hotel management agreement or similar agreement other than the Hotel Management Agreement without the prior written consent of Lender, which may be granted or withheld in Lender's sole and absolute discretion. If (i) an Event of Default has occurred and is continuing (ii) Hotel Manager shall become insolvent or the subject of any proceeding under any state or federal bankruptcy or insolvency law or for the liquidation of all or a major portion of its property, or (iii) a default by Hotel Manager occurs under the Hotel Management Agreement, or Hotel Manager is grossly negligent or commits malfeasance, provided Borrower shall not cause, suffer or permit Mortgage Borrower to exercise any termination right under the Hotel Management Agreement, it being understood that Borrower shall only be permitted to cause or permit Mortgage Borrower to exercise any termination or other right or remedy upon the written request of Lender, and Lender shall, subject to the rights of Mortgage Lender, have the sole right to designate any replacement Hotel Manager or hotel manager in Lender's sole and absolute discretion.

      **5.50.4**　　**Default; Right to Cure**. If Mortgage Borrower shall default in the performance or observance of any material term, covenant or condition of the Hotel Management Agreement on the part of Mortgage Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of the Hotel Management Agreement on the part of Mortgage Borrower to be performed or observed to be promptly performed or observed on behalf of Mortgage Borrower, to the end that the rights of Mortgage Borrower in, to and under the Hotel Management Agreement shall be kept unimpaired and free from default. Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time, subject to Section 5.3, for the purpose of taking any such action. If Hotel Manager shall deliver to Lender a copy of any notice sent to Borrower or Mortgage Borrower of default under the Hotel Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon. Borrower shall, from time to time, cause Mortgage Borrower to use commercially reasonable efforts to obtain from Hotel Manager such certificates of estoppel with respect to

93

compliance by Mortgage Borrower with the terms of the Hotel Management Agreement as Hotel Manager is required to deliver by the terms Hotel Management Agreement, and shall cause Mortgage Borrower to use reasonable efforts to deliver such other certificates of estoppel with respect to compliance by Mortgage Borrower as may be requested by Lender.  Borrower shall cause Mortgage Borrower to exercise each individual option, if any, to extend or renew the term of the Hotel Management Agreement upon demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised, and, subject to the rights of Mortgage Lender, Borrower hereby expressly authorizes and appoints Lender as its attorney-in-fact to, upon and during the continuance of an Event of Default, exercise any such option in the name of and upon behalf of Mortgage Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.  Any sums expended by Lender pursuant to this paragraph shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, shall be deemed to constitute a portion of the Debt, shall be secured by the Lien of the Pledge Agreement and the other Loan Documents and shall be due and payable within twenty (20) days following demand by Lender therefor.

        5.50.5    **Expiration or Termination of Hotel Management Agreement**.  In the event that the Hotel Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination, surrender, cancellation, release, amendment, or modification of the Hotel Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall not cause, suffer or permit Mortgage Borrower to replace or enter into a new Hotel Management Agreement or any hotel management agreement with any Person without the prior written consent of Lender, which may be granted or withheld in Lender's sole and absolute discretion, including, without limitation, the identity of any Hotel Manager or hotel manager and all terms and conditions of any agreement with the same, and such approval may further be conditioned upon, among other things, a requirement by such Hotel Manager or hotel manager to deliver to Mortgage Lender a Hotel SNDA in form and substance acceptable to Lender in its sole and absolute discretion.

        5.51    **Hotel Operation**.  Without in any way limiting the covenants set forth elsewhere in the Loan Documents, Borrower shall cause Mortgage Borrower to:  (i) cause the hotel located on the Property to be operated, repaired and maintained as a well-maintained "first-class hotel" which shall mean a hotel providing amenities, services and facilities substantially equivalent or superior to hotels of similar average room rate and targeted market segment from time to time operating in the same or comparable geographic area of the Property, taking into consideration the age and location of the hotel located on the Property and (ii) maintain Inventory in amounts sufficient to meet the hotel industry standard for hotels comparable to the hotel located on the Property and at levels sufficient for the operation of the hotel located on the Property at full occupancy levels.

        5.52    **Cooperation with Regard to Liquor Licenses**.  To the extent permitted by applicable Legal Requirements, Borrower shall, and shall cause Mortgage Borrower to (and shall cause Hotel Manager and/or any applicable Affiliates of Borrower to) execute and deliver to Lender such additional documents, instruments, certificates, assignments and other writings, and otherwise provide and cause Mortgage Borrower to provide (and cause Hotel Manager and/or any applicable Affiliates of Borrower to provide) such cooperation, in each case as may be necessary to transfer any liquor licenses or other Licenses with respect to the Property into, or obtain the

94

issuance of new Licenses in, the name of Mortgage Lender or its designee (or, subject to the rights of Mortgage Lender, the name of Lender or its designee) after the occurrence of an Event of Default and/or completion of a foreclosure, in each case to the extent permitted by Legal Requirements applicable thereto.  Such cooperation shall include, without limitation, completing transfer requests, surrendering or cancelling any existing Licenses, and making representatives of Borrower, Mortgage Borrower, Hotel Manager, and their respective Affiliates available for meetings with any applicable Governmental Authority in connection with the transfer or issuance of such Licenses, subject in all instances to applicable Legal Requirements.  Furthermore, neither Borrower nor any of its Affiliates shall (or cause, suffer or permit Mortgage Borrower to) intentionally hinder or interfere to with the License transfers or issuances made or contemplated by this Agreement, or with efforts of Mortgage Lender or Lender or their respective successors and assigns to obtain temporary or permanent Licenses.  Subject to the rights of Mortgage Lender and applicable Legal Requirements, effective during the existence of an Event of Default, Borrower hereby irrevocably appoints Lender as its agent and attorney-in-fact to execute all such documents and instruments as Lender shall require or deem advisable in order to cause the transfer or issuance of such Licenses as Lender may require (and to the extent permitted by applicable Legal Requirements) and to cause a cancellation of such existing Licenses as Lender may require. The foregoing power of attorney is coupled with an interest and shall be irrevocable.  In addition to all other remedies which Lender may have at law or in equity for the enforcement of the terms and provisions of this Agreement, Borrower expressly agrees that Lender shall have the right to bring an action in specific performance to enforce each and every term and provision of this Section 5.52.

5.53    **Mortgage Borrower Covenants**.  Unless otherwise consented to in writing by Lender, Borrower shall cause Mortgage Borrower to comply with and not to breach any covenants and agreements contained in the Mortgage Loan Documents.

5.54    **Curing**.  Lender shall have the right, but shall not have the obligation, to exercise Borrower's rights under the Mortgage Borrower Company Agreement (a) to cure an "Event of Default" (as defined under the Mortgage Loan Documents) and (b) to satisfy any liens, claims or judgments against the Property (i) other than liens permitted by the Mortgage Loan Documents and (ii) any liens, claims or judgments (a) not diligently contested by Borrower or Mortgage Borrower in accordance with all applicable terms hereof and of the Mortgage Loan Agreement and (b) in any event not discharged and removed a record (whether by payment, bonding or otherwise) within forty-five (45) days following the filing and/or recordation thereof).  Borrower shall reimburse Lender on demand for any and all reasonable costs incurred by Lender in connection with the foregoing.

5.55    **Special Distributions**.  On each date on which amounts are required to be disbursed to the Mezzanine Collateral Account pursuant to the terms of this Agreement or are required to be paid to Lender under any of the Loan Documents, Borrower shall exercise its rights under the Mortgage Borrower Company Agreement to cause Mortgage Borrower to make to Borrower a distribution in an aggregate amount such that Lender shall receive the amount required to be disbursed to the Mezzanine Collateral Account or otherwise paid to Lender on such date.

5.56    **Certain Distributions Matters**.  Any transfer of Mortgage Borrower's funds from any account or other sources to or for the benefit of Lender pursuant to this Agreement or any

95

other Loan Document, is intended by the parties to constitute, and shall constitute, distributions from Mortgage Borrower to Borrower and shall be treated as such on the books and records of each party.  Any transfer of Mortgage Borrower's funds from any account or other sources to or for the benefit of Borrower pursuant to this Agreement or any other Loan Document, is intended by the parties to constitute, and shall constitute, distributions from Mortgage Borrower to Borrower, and shall be treated as such on the books and records of each party.  All such distributions must comply with the requirements of Section 18-607 of the Delaware Limited Liability Company Act.  No provisions of the Loan Documents are intended to nor shall they create a debtor-creditor relationship between Mortgage Borrower and Lender.

5.57    **Limitations on Distributions**.  Borrower shall not make any distributions to any direct or indirect owner of any equity interests in Borrower to the extent that any Event of Default exists hereunder (i) relating to any scheduled payments hereunder and/or under the other Loan Documents and/or (ii) with respect to which Borrower has received written notice from Lender.

5.58    **Other Limitations**.  Neither Borrower nor any of its Affiliates shall, without the prior written consent of Lender (which may be furnished or withheld in its sole and absolute discretion), give its consent or approval to any of the following actions or items:

(a)    except in connection with any repayment in full of the Debt in accordance with the terms hereof, any Sale or Pledge of any or all of the Property or any portion thereof or any action in connection with or in furtherance of the foregoing;

(b)    creating, incurring, assuming or suffering to exist any additional liens on any portion of the Property (other than Permitted Encumbrances);

(c)    the distribution to the partners, members or shareholders of Mortgage Borrower of property other than cash;

(d)    except as required by the Mortgage Loan Documents, any determination to restore the Property after a Casualty or Condemnation; or

(e)    any material modification, amendment, restatement, supplement or termination of the Owner's Title Policy and Borrower shall not (and shall not permit Mortgage Borrower and/or any of its Affiliates to) take any actions or fail to take any actions, in each case, which would invalidate or otherwise materially impair the coverage provided under the Owner's Title Policy.

5.59    **Contractual Obligations**.  Other than the Loan Documents and the Mortgage Borrower Company Agreement, neither Borrower nor any of its assets shall be subject to any Contractual Obligations and Borrower shall not enter into any agreement, instrument or undertaking by which it or its assets are bound, except for such liabilities, not material in the aggregate, that are incidental to its activities as a limited partner of Mortgage Borrower and sole member of Mortgage Borrower Representative.

5.60    **Awards**.  Subject to the Mortgage Loan Documents and the rights of Mortgage Lender thereunder, Borrower shall reasonably cooperate with Lender in obtaining for Lender the benefits of any Awards or insurance proceeds lawfully or equitably payable in connection with the

Property, and Lender shall be reimbursed for any reasonable expenses incurred in connection therewith (including reasonable, actual attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of a Casualty or Condemnation affecting the Property or any part thereto) out of such Awards or insurance proceeds.

## 6.    NOTICES AND REPORTING

**6.1    Notices**.   All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "*Notice*") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by notice to the other party):  If to Lender:  [_____], Attention:  [_____];with a copy to: Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166, Attention:  Howard S. Schochet, Esq.; if to Borrower:  c/o Caspi Development Company, 120 Bloomingdale Road Suite 105, White Plains, NY 10605, with a copy to:  Rosenberg & Estis, P.C., 733 Third Avenue, New York, New York 10017, Attention: Michael E. Lefkowitz, Esq.  A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of overnight delivery, upon the first attempted delivery on a Business Day.

**6.2    Borrower Notices and Deliveries**.   Borrower shall (a) give prompt written notice to Lender of:  (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower, Mortgage Borrower or any Borrower Representative which might materially and adversely affect Borrower's, Mortgage Borrower or any Borrower Representative's condition (financial or otherwise) or business, the Property or the Collateral; (ii) any material and adverse change in Borrower's, Mortgage Borrower's or any Borrower Representative's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and provide to Lender:  (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, Mortgage Borrower or any Borrower Representative or any Affiliate of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender in the possession or control of Borrower or Mortgage Borrower.  In addition, after request by Lender (but no more frequently than twice in any year), Borrower shall furnish to Lender (x) within ten (10) days, a certificate addressed to Lender, its successors and assigns reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes, and (y) within thirty (30) days, tenant estoppel certificates addressed to Lender, its successors and assigns from each tenant at the Property in form and substance reasonably satisfactory to Lender.

**6.3    Financial Reporting**.

**6.3.1    Bookkeeping**.   Borrower shall (and shall cause Mortgage Borrower to) keep on a calendar year basis, in accordance with GAAP (and the Uniform System of Accounts

97

for Hotels, current edition), proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and Mortgage Borrower all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property, whether such income or expense is realized by Borrower, Mortgage Borrower, Hotel Manager, any Manager or any Affiliate of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall desire.  Upon the occurrence and during the continuance of an Event of Default, Borrower shall pay any out-of-pocket costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

6.3.2    **Annual Reports**.  Borrower shall furnish to Lender annually, within one hundred twenty (120) days after each calendar year, a complete copy of Borrower's and Mortgage Borrower's annual financial statements prepared by an independent certified public accountant (accompanied by an unqualified opinion from such accounting firm or other independent certified public accountant) reasonably acceptable to Lender, each in accordance with GAAP (and the Uniform System of Accounts for Hotels, current edition), and containing balance sheets and statements of profit and loss for Borrower, Mortgage Borrower and the Property in such detail as Lender may request.  Each such statement (x) shall be in form and substance reasonably satisfactory to Lender, (y) shall set forth the financial condition and the income and expenses for the Property for the immediately preceding calendar year, including statements of annual net operating income as well as [(1) a list of tenants, if any, occupying more than twenty percent (20%) of the rentable space of the Property, (2) a breakdown showing (a) the year in which each Lease then in effect expires, (b) the percentage of rentable space covered by such Lease, (c) the percentage of base rent with respect to which Leases shall expire in each such year, expressed both on a per year and cumulative basis] and (z) shall be accompanied by an Officer's Certificate certifying (1) that such statement is true, correct, complete and accurate and presents fairly the financial condition of the Property and has been prepared in accordance with GAAP and (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

6.3.3    **Monthly/Quarterly Reports**.  Borrower shall furnish to Lender within twenty (20) days after the end of each calendar month or calendar quarter (as indicated below) the following items:  (i) monthly and year-to-date operating statements, noting net operating income and other information necessary and sufficient under GAAP (and the Uniform System of Accounts for Hotels, current edition) to fairly represent the financial position and results of operation of the Property during such calendar month, all in form satisfactory to Lender; (ii) a balance sheet for such calendar month; (iii) a comparison of the budgeted income and expenses and the actual income and expenses for each month and year-to-date for the Property, together with a detailed explanation of any variances of ten percent (10%) or more between budgeted and actual amounts for such period and year-to-date; (iv) a statement of the actual Capital Expenses made by Borrower or Mortgage Borrower during each calendar quarter as of the last day of such calendar quarter; (v) a statement that neither Borrower nor Mortgage Borrower has incurred any indebtedness other than indebtedness permitted hereunder and under the Mortgage Loan Agreement detailing all accounts payable and how long they have been outstanding; (vi) an aged receivables report, (vii) from and after the execution of any Lease (other than an F&B Agreement) by Mortgage

98

Borrower rent rolls identifying the leased premises, names of all tenants, units leased, monthly rental and all other charges payable under each Lease, date to which paid, term of Lease, date of occupancy, date of expiration, material special provisions, concessions or inducements granted to tenants, and a year by year schedule showing by percentage the rentable area of the Improvements and the total base rent attributable to Leases expiring each year and a delinquency report for the Property, (viii)  monthly occupancy statistics for the Property (including an average daily room rate and RevPAR calculations), and (ix) monthly, the most current Smith Travel Research Reports (or, if Smith Travel Research Reports are no longer produced, a replacement thereof reasonably acceptable to Lender) then available to Borrower or Mortgage Borrower, reflecting market penetration and relevant hotel properties competing with the Property.  Each such statement shall be accompanied by an Officer's Certificate certifying (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with GAAP (and the USALI) (subject to normal year-end adjustments) and (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

      **6.3.4**    **Other Reports**.  Borrower shall furnish to Lender, within ten (10) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower, Mortgage Borrower or any Borrower Representative as may be reasonably requested by Lender.  All monthly and other operating statements to be delivered by Borrower hereunder shall be (and all accompanying Officer's Certificates shall state that they have been) prepared in accordance with GAAP or based upon the Uniform System of Accounts for Hotels, current edition.

      **6.3.5**    **Annual Budget**.  Borrower shall cause Mortgage Borrower to prepare and submit to Lender by November 30th of each year during the Term following Substantial Completion, for approval by Lender, which approval shall not be unreasonably withheld, conditioned or delayed, a proposed pro forma budget for the Property for the succeeding calendar year (the "***Annual Budget***", and each Annual Budget approved by Lender is referred to herein as the ***"Approved Annual Budget"***)), and, promptly after preparation thereof, any revisions to such Annual Budget.  The Annual Budget shall consist of (i) an operating expense budget showing, on a month-by-month basis, in reasonable detail, each line item of the Mortgage Borrower's anticipated operating income and operating expenses (on an accrual basis), including amounts required to establish, maintain and/or increase any monthly payments required hereunder (and once such Annual Budget has been approved by Lender, such operating expense budget shall be referred to herein as the "***Approved Operating Budget"***), and (ii) a Capital Expense budget showing, on a month-by-month basis, in reasonable detail, each line item of anticipated Capital Expenses (and once such Annual Budget has been approved by Lender, such Capital Expense budget shall be referred to herein as the "***Approved Capital Budget***").  Until such time that any Annual Budget has been approved by Lender, the prior Approved Annual Budget shall apply for all purposes hereunder; provided that, such Approved Annual Budget shall be adjusted to reflect increases in Taxes, Insurance Premiums, utilities expenses, expenses under the Hotel Management Agreement (and, if applicable, any Management Agreement approved by Lender in accordance with this Agreement), and such other adjustments as reasonably determined by Lender (including increases for any non-discretionary expenses)).

99

6.3.6    **Business Plan**.   Lender has approved the Closing Business Plan. Borrower shall cause Mortgage Borrower prepare and submit to Lender, for approval by Lender, not to be unreasonably withheld or delayed, a proposed updated business plan for the Property and the Project Improvements, in form substantially similar to the Closing Business Plan (the "***Business Plan***", and each Business Plan approved by Lender is referred to herein as the "***Approved Business Plan***"), at any time Borrower or Mortgage Borrower has knowledge of any facts or circumstances which will materially affect the then-current Approved Business Plan, and promptly after preparation thereof, any revisions to such Business Plan, and without limiting the foregoing, delivery to Lender of such updates and revisions shall occur no less frequently than each anniversary of the Closing Date that occurs during the Term of the Loan, unless during the preceding 12-month period, no failure to achieve the projections set forth in the Approved Business Plan or other material underperformance of the Approved Business Plan that was in effect for such 12-month period has occurred.  Borrower shall not, and shall not cause, suffer or permit Mortgage Borrower to, amend, restate, supplement or otherwise modify an Approved Business Plan without Lender's approval, not to be unreasonably withheld or delayed, except as otherwise permitted under Sections 2.9.5, 2.9.6 and 5.43.  Until such time that any proposed Business Plan has been approved by Lender, the prior Approved Business Plan shall apply for all purposes (subject to Sections 2.9.5, 2.9.6 and 5.43).

6.3.7    **Major Milestones**.   Borrower shall cause Mortgage Borrower to comply with the Major Milestones on or before the dates set forth therefor on Schedule 13.

6.3.8    **Breach**.   If Borrower fails to provide (or cause Mortgage Borrower to provide) to Lender or its designee any of the financial statements, certificates, reports or information (the "***Required Records***") required by this Section 6.3.8 within thirty (30) days after the date upon which such Required Record is due and continues to fail to provide such Required Record for five (5) days after notice of such failure from Lender, such failure at the option of Lender shall constitute an Event of Default under this Agreement.

6.3.9    **Inspection**.   Borrower shall permit any authorized representatives designated by Lender to visit, examine, audit, and inspect, upon reasonable notice and during normal business hours, the Property and the Collateral, subject to Section 5.3 hereof, including Borrower's, Mortgage Borrowers and each Borrower Representative's financial and accounting records, and to make copies and take extracts therefrom, and to discuss its and their affairs, finances and business with its and their officers and independent public accountants (with Borrower's representative(s) present in all instances), at such reasonable times during normal business hours, as often as reasonably requested by Lender, but in no event more than once per quarter prior to the continuance of an Event of Default.  Borrower shall cause its Affiliates to make all books of account and records so available at the office where the same are regularly maintained. Lender shall have the right to copy, duplicate and make abstracts from such books and records as Lender may reasonably require, at Lender's sole cost and expense and accompanied by a representative of Borrower.  During the continuance of an Event of Default, Borrower shall pay any costs incurred by Lender to examine such books, records and accounts.    Borrower acknowledges and agrees that (i) all of such audits, inspections and reports shall be made for the sole benefit of Lender, and not for the benefit of Borrower or any third party, and neither Lender nor Lender's auditors or inspectors or any of Lender's representatives, agents or contractors assumes any responsibility or liability (except to Lender) by reason of such audits, inspections or

100

reports, (ii) Borrower will not rely upon any of such audits, inspections or reports for any purpose whatsoever, and (iii) the performance of such audits, inspections and reports will not constitute a waiver of any of the provisions of this Agreement or any other Loan Document or any of the obligations of Borrower hereunder or thereunder. Borrower further acknowledges and agrees that neither Lender nor Lender's inspector, representatives, agents or contractors shall be deemed to be in any way responsible for any matters related to design or construction of the Improvements or any construction work. At any time during the term of the Loan, Borrower shall reasonably cooperate with Lender and use reasonable efforts to assist Lender in obtaining an appraisal of the Property, provided that prior to the existence of an Event of Default Borrower shall not be required to pay for more than one (1) appraisal per year at a cost not to exceed $20,000. Such cooperation and assistance from Borrower shall include but not be limited to the obligation to provide Lender or Lender's appraiser with the following: (i) reasonable access to the Property, subject to Section 5.3 hereof, (ii) from and after the execution of any Lease (except an F&B Agreement) by Mortgage Borrower, a current certified rent roll for the Property in form and substance reasonably satisfactory to Lender, including current asking rents and a history of change in asking rents and historical vacancy for the period commencing on the Closing Date, (iii) current and budgeted income and expense statements for the period commencing on the Closing Date, (iv) the then existing site plan and survey of the Property, (v) the building plans and specifications, including typical elevation and floor plans; (vi) the current and prior year real estate tax bills, (vii) a detailed list of past and scheduled capital improvements and the costs thereof, (viii) all environmental reports and other applicable information relating to the Property, subject to Section 5.3 hereof, and (ix) copies of all recent appraisals/property description information or brochures, including descriptions of amenities and services relating to the Property. The appraiser performing any such appraisal shall be engaged by Lender and Lender shall be responsible for any fees payable to said appraiser in connection with an appraisal of the Property. Borrower shall, and shall cause Mortgage Borrower to, reasonably cooperate with Lender with respect to any proceedings before any Governmental Authority which may in any material way affect the rights of Lender hereunder or of Mortgage Lender pursuant to the Mortgage Loan Agreement or any rights obtained by Lender under any of the Loan Documents and, in connection therewith, not prohibit Lender, at its election, from participating in any such proceedings.

      **6.3.10**   **Mortgage Loan Records**. Unless otherwise delivered to Lender pursuant to the provisions of this Section 6.3, Borrower will deliver (or cause Mortgage Borrower to deliver) to Lender all of the financial statements, reports, certificates and related items delivered or required to be delivered by Mortgage Borrower to Mortgage Lender under the Mortgage Loan Documents as and when due under the Mortgage Loan Documents.

## 7.   <u>INSURANCE; CASUALTY; AND CONDEMNATION</u>

      **7.1**   <u>Insurance</u>. [SUBJECT TO INSURANCE CONSULTANT REVIEW]

      **7.1.1**   **Coverage**. Borrower shall cause Mortgage Borrower to (a) maintain at all times during the term of the Loan the Policies (as defined in the Mortgage Loan Agreement) required under the Mortgage Loan Agreement and (b) otherwise satisfy all covenants related thereto as provided in the Mortgage Loan Agreement. Subject to applicable law and the prior rights of Mortgage Lender under the Mortgage Loan, Borrower shall cause Lender to (i) be named as an additional named insured under such of the Policies as may be designated by Lender, (ii)

receive such protections and benefits afforded Mortgage Lender under the applicable terms and conditions of the Mortgage Loan Agreement relating to the Policies as may be designated by Lender and (iii) be entitled to such notice and consent rights afforded Mortgage Lender under the applicable terms and conditions of the Mortgage Loan Agreement relating to the Policies as may be designated by Lender.  Borrower shall not permit the Policies to be canceled without at least thirty (30) days' prior notice to Lender and any other party named therein as an additional insured. Borrower shall provide Lender with evidence of all such insurance required hereunder and with the other related notices required under the Mortgage Loan Documents, in each case, on or before the date on which Mortgage Borrower is required to provide the same to Mortgage Lender.  If at any time Lender is not in receipt of written evidence that the Policies are in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and, until paid, shall be secured by the Security Documents and shall bear interest at the Default Rate.

> **7.1.2      Policies**.  All policies of insurance (the "***Policies***") required pursuant to Section 7.1.1 shall (i) be issued by companies approved by Lender and licensed to do business in the State, with a claims paying ability rating of "A+" or better by S&P (and the equivalent by any other Rating Agency) and a rating of A:X or better in the current Best's Insurance Reports; (ii) contain a waiver of subrogation against Lender; (iii) be assigned and the originals thereof delivered to Lender; (iv) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither Borrower, Mortgage Borrower, Lender nor any other party shall be a co-insurer under the Policies, (B) that Lender shall receive at least thirty (30) days' prior written notice of any modification, reduction or cancellation of any of the Policies, (C) an agreement whereby the insurer waives any right to claim any premiums and commissions against Lender, provided that the policy need not waive the requirement that the premium be paid in order for a claim to be paid to the insured and (D) providing that Lender is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums; (v) in the event any insurance policy (except for general public and other liability and workers compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (vi) be satisfactory in form and substance to Lender and approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds.  Borrower shall cause Mortgage Borrower to pay the premiums for such Policies (the "***Insurance Premiums***") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Mortgage Lender pursuant to Section 3.3 of the Mortgage Loan Agreement or as part of the Advances made hereunder) receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender.  If Borrower does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums

102

therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate. Within thirty (30) days after written request by Lender, Borrower shall (or shall cause Mortgage Borrower to) obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.

### 7.1.3      **Miscellaneous Insurance Provisions**.

(i)      Policy Endorsements:  All endorsements of the Policies or attachments to certificates of insurance, shall reflect the terms and conditions of the insurance requirements and administration provisions and shall indicate the effective date, policy number, insurance company, and shall be appropriately executed by authorized representatives of the insurance companies so as to confirm their validity.

(ii)      Loss Payable and/or Additional Insured Provisions:  As respects the following policies (i) All property (including but not limited to separate property policies such as flood, terrorism), business income, boiler & machinery and builders risk policies shall name the Borrower as the named insured (except with respect to environmental liability) and shall include a New York State standard mortgagee clause, or its equivalent, which is acceptable to Lender, it's successors and/or assigns as their interests may appear, as mortgagee and loss payee, (ii) the environmental liability policy shall name the Lender and it's successors and/or assigns as their interests may appear, as sole named insured and loss payee; (iii) commercial general liability and umbrella liability policies shall name the Borrower as the named insured, and shall include the Lender and it's successors and/or assigns as their interests may appear, as additional insureds: (iv) employee dishonesty policies shall name the Borrower as named insured and shall include Lender as loss payee.

(iii)      Mortgage and/or Additional Insured Clauses:  (i) all original or certified copies of the original property, business income, boiler & machinery, terrorism, federal flood and employee dishonesty policies shall be provided to the Lender including required Lender and/or additional named insured and/or loss payable clauses, as noted above; (ii) all original or certified copies of the original commercial general liability and umbrella liability policies shall be provided to the Lender including required additional insured endorsements; (iii) original environmental liability policies shall be provided to Lender, written in the name of Lender as named insured; (iv) certificates of Insurance, complying with all terms of this agreement, shall be provided to the Lender with respect to the workers compensation and employee dishonesty policies.

(iv)      Certificates of Insurance:  Where appropriate, and at the sole discretion of the Lender certificates of insurance satisfactory to Lender may be accepted, in lieu of original or certified original policies.

(v)      Policy Term and Premium Payment:  (i) with the exception of the environmental policy (if required), every policy must be written for a term of not less than one year.  An existing policy with fewer than 12 months remaining on its term on the Closing Date may be, at Lender sole discretion, acceptable on a case by case basis; (ii) the environmental policy

103

must be written for a term equal to the lesser of (A) the term of the loan or (B) ten (10) years, and must be paid in full at inception by Borrower; and (iii) Borrower must provide evidence that all policies have been paid in full prior to the Closing Date.

(vi)    Blanket Policies:    The Borrower may comply with and satisfy the requirements of this insurance section through the use of a blanket or package policy (or policies) of insurance covering the Property and other properties and liabilities of the Borrower, provided that the (i) policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder or shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions contained herein; and (ii) property is listed and identifiable in the policy and it contains the required Lender and additional insured clauses, naming Lender specifically to the applicable Property.  In addition, if not shown on the policy itself, a schedule of all values reported for the specific property shall be provided as part of the blanket property policies.

    **7.2**    **Casualty**.[13]

        **7.2.1**    **Notice; Restoration**.  If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "***Casualty***"), Borrower shall give prompt notice thereof to Lender.  Following the occurrence of a Casualty, subject to the requirements of the Mortgage Loan Documents, Borrower, regardless of whether insurance proceeds are available, shall (or shall cause Mortgage Borrower to) promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

        **7.2.2**    **Settlement of Proceeds**.  If a Casualty covered by any of the Policies (an "***Insured Casualty***") occurs where the loss does not exceed $2,000,000, provided no Default or Event of Default has occurred and is continuing, Borrower may (or may cause Mortgage Borrower to) settle and adjust any claim without the prior consent of Lender; provided such adjustment is carried out in a competent and timely manner, and Borrower is hereby authorized to collect and receipt for the insurance proceeds (the "***Proceeds***").  In the event of an Insured Casualty where the loss equals or exceeds $2,000,000 (a "***Significant Casualty***") Lender may, in its discretion, but subject to the rights of Mortgage Lender, settle and adjust any claim without the consent of Borrower or Mortgage Borrower, and agree with the insurer(s) on the amount to be paid on the loss, and the Proceeds shall be due and payable solely to Lender and held by Lender in the Mezzanine Collateral Account and disbursed in accordance herewith.  If Borrower or any party other than Lender is a payee on any check representing Proceeds with respect to a Significant Casualty, Borrower shall promptly endorse, and cause all such third parties to endorse, such check payable to the order of Lender.  Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to endorse such check payable to the order of Lender.  The out-of-pocket expenses incurred by Lender in the settlement, adjustment and collection of the Proceeds shall become part of the Debt and shall be reimbursed by Borrower to Lender within twenty (20) days of Lender's written demand therefor.  Notwithstanding anything to the contrary contained herein, if in connection with a Casualty any insurance carrier makes a payment under a property insurance Policy that Borrower proposes be treated as business or rental interruption insurance,

---

[13] SUBJECT TO REVIEW OF THE GROUND LEASE AND HOTEL MANAGEMENT AGREEMENT.

then, notwithstanding any designation (or lack of designation) by the insurance carrier as to the purpose of such payment, as between Lender and Borrower, such payment shall not be treated as business or rental interruption insurance proceeds unless Borrower has demonstrated to Lender's satisfaction that the remaining net Proceeds that will be received from the property insurance carriers are sufficient to pay one hundred percent (100%) of the cost of fully restoring the Improvements or, if such net Proceeds are to be applied to repay the Debt in accordance with the terms hereof, that such remaining net Proceeds will be sufficient to pay the Debt in full.

**7.3** **Condemnation**.[14]

   **7.3.1** **Notice; Restoration**. Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "**Condemnation**") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation. Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall (or shall cause Mortgage Borrower to) promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character (and to have the same utility) as prior to such Condemnation.

   **7.3.2** **Collection of Award**. Subject to the rights of Mortgage Lender, Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power on behalf of Borrower and Mortgage Borrower to collect, receive and retain any award or payment in respect of a Condemnation (an "**Award**") and to make any compromise, adjustment or settlement in connection with such Condemnation. Notwithstanding any Condemnation (or any transfer made in lieu of or in anticipation of such Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Loan Documents, and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of the Award sufficient to pay the Debt. Subject to the rights of Mortgage Lender, Borrower shall cause any Award that is payable to Mortgage Borrower to be paid directly to Lender. Lender shall hold such Award in the Mezzanine Collateral Account and disburse such Award in accordance with the terms hereof.

   **7.4** **Application of Proceeds or Award**. If, pursuant to the Mortgage Loan Documents, Mortgage Borrower is ever entitled to receive any portion of any Proceeds or Awards (i.e., such amounts are not required to be used from Restoration or to be applied to repayment of the Mortgage Loan), Borrower shall cause such portion of such Proceeds or Award to be deposited into the Mezzanine Collateral Account and all such amounts shall then be applied to the payment of the

---

[14] SUBJECT TO REVIEW OF THE GROUND LEASE.

Debt, which prepayment shall not be subject to the Prepayment Fee, but shall be subject to the Extension Exit Fee (if applicable).

## 8.    **DEFAULTS**

**8.1    <u>Events of Default</u>**.  An "Event of Default" shall exist with respect to the Loan if any of the following shall occur:

(a)    any portion of (i) the Debt is not paid in full on the Maturity Date or (ii) any regularly scheduled monthly payment of interest hereunder or any other amount under Sections 3.1, 3.2, 3.3 or 3.9 of this Agreement is not paid in full on each Payment Date; provided, however, that no Event of Default under this clause (ii) shall be deemed to have occurred if no other Event of Default exists and the funds reserved hereunder for the payment of regularly scheduled monthly interest are sufficient to pay the same and Lender fails to pay the same when due and when Borrower is otherwise entitled to receive the funds;

(b)    any of the Taxes, Other Charges or Insurance Premiums are not paid when due (unless Lender is paying same pursuant to Section 3.1 or 3.9 hereof or as part of the Advances), subject to Borrower's right to contest Taxes in accordance with Section 5.2; *provided*, that no Event of Default under this clause (b) shall be deemed to have occurred if no other Event of Default then exists and the funds reserved hereunder for the payment of Taxes, Other Charges or Insurance Premiums are sufficient to pay the same and Lender fails to pay the same when due;

(c)    the Policies are not kept in full force and effect or are not delivered to Lender upon request;

(d)    a Transfer other than a Permitted Transfer occurs;

(e)    any representation or warranty made by Borrower, Mortgage Borrower and/or Guarantor or in any Loan Document and/or Mortgage Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower, Mortgage Borrower and/or Guarantor in connection with any Loan Document and/or Mortgage Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made, which breach, to the extent the same was not intentional on the part of Borrower, Mortgage Borrower and/or Guarantor, as applicable, as determined by Lender in its sole, but good faith judgment, is not cured within ten (10) Business Days after notice of such breach from Lender (provided such ten (10) Business Day cure period shall only apply if the nature of the breach is one that is reasonably susceptible of being cured within such ten (10) Business Day period).  For the avoidance of doubt, in order to cure such breach, Borrower or Guarantor, as applicable, shall be required to cure (and Borrower shall cause Mortgage Borrower to cure) the underlying state of facts and circumstances which caused such representation or warranty to be false or misleading as of the date made;

(f)    Borrower, Mortgage Borrower, any Borrower Representative or Guarantor shall (i) make an assignment for the benefit of creditors or admit in writing its inability to pay its own debts as they become due, or (ii) shall generally not be paying its debts as they become due;

106

(g)    a receiver, liquidator or trustee shall be appointed for Borrower, Mortgage Borrower, any Borrower Representative or Guarantor; or Borrower, Mortgage Borrower, any Borrower Representative or Guarantor shall be adjudicated a bankrupt or insolvent; or any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Mortgage Borrower, any Borrower Representative or Guarantor, as the case may be; or any proceeding for the dissolution or liquidation of Borrower, Mortgage Borrower, any Borrower Representative or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Mortgage Borrower, any Borrower Representative or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within ninety (90) days;

(h)    Borrower breaches any covenant contained in Sections 5.13, 5.15, 5.21, 5.22, 5.25, 5.27, 5.28, 5.31 or 5.32;

(i)    except as expressly permitted hereunder, the actual alteration, improvement, demolition or removal of all or any portion of the Improvements without the prior written consent of Lender, except in connection with and in the ordinary course of the construction of the Project Improvements;

(j)    an Event of Default as defined or described elsewhere in this Agreement or in any other Loan Document occurs;

(k)    a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(l)    the occurrence of a Milestone Non-Compliance;

(m)    a default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this Section 8.1, for ten (10) days after notice to Borrower (or Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after written notice from Lender in the case of any other default; provided, however, that if such non-monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period, and Borrower (or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for an additional period of time as is reasonably necessary for Borrower (or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed sixty (60) days;

(n)    voluntary abandonment of the construction of the Project Improvements by Borrower, Mortgage Borrower, any Borrower Representative, Guarantor or any Affiliate thereof;

(o)    if a Mortgage Loan Event of Default shall occur;

107

(p)  if Substantial Completion has not occurred on or before the Substantial Completion Date;

(q)  if Borrower fails to cause Mortgage Borrower to comply with the Construction Schedule, subject to delays as a result of the occurrence of any Force Majeure Event, provided same shall be subject to the Force Majeure Delay Cap;

(r)  if Final Completion of the Improvements has not occurred on or prior to the Completion Date;

(s)  if any voucher or invoice is fraudulently submitted by Borrower or in connection with any Advance for services performed or for materials used in or furnished for the Property;

(t)  if other than as a result of Force Majeure; the construction of the Project Improvements is, at any time, (i) discontinued due to acts or matters within Borrower's control for a period of thirty (30) or more consecutive days; (ii) not carried on with reasonable dispatch; (iii) if Borrower is unable to satisfy any condition of Borrower's right to receive Advances hereunder (or is unable to cause Borrower to satisfy any condition of Mortgage Borrower's right to receive "Advances" under the Mortgage Loan Agreement) for a period in excess of thirty (30) days after Lender's refusal to make any further Advances; or (iv) the Construction Consultant determines that the construction of the Improvements will not be completed on or before the Substantial Completion Date;

(u)  if Borrower expressly confesses in writing to Lender its inability to cause Mortgage Borrower to continue or complete construction of the Project Improvements in accordance with this Agreement; or if Mortgage Borrower expressly confesses in writing to Lender or Mortgage Lender its inability to continue or complete construction of the Project Improvements in accordance with this Agreement;

(v)  if Lender, the Construction Consultant or their representatives are not permitted at all reasonable times upon not more than two (2) Business Days' notice to enter upon the Property, inspect the Improvements and the construction thereof and all materials, fixtures and articles used or to be used in the construction and to examine all the Plans and Specifications, or if Borrower shall fail to furnish to Lender or its authorized representative, when requested upon not more than three (3) Business Days' notice, copies of the Plans and Specifications;

(w)  intentionally omitted;

(x)  failure of Guarantor to maintain at all times the Guarantor Financial Covenants;

(y)  Borrower fails to comply fully, completely and timely with the covenants and agreements set forth in Article 9;

108

(z)    Mortgage Borrower shall (or Borrower shall cause, suffer or permit Mortgage Borrower to) fail, beyond any applicable grace or cure period, in the payment of any Leasehold Rents payable under the Ground Lease;

(aa)  there shall occur (or Borrower shall cause, suffer or permit the occurrence of) any default by Mortgage Borrower under the Ground Lease, in the observance or performance of any term, covenant or condition of the Ground Lease on the part of Mortgage Borrower, to be observed or performed, and said default is not cured prior to the expiration of any applicable grace period therein provided;

(bb)  there shall occur any one or more of the events referred to in the Ground Lease which would permit the Ground Lessor to terminate the Ground Lease without notice or action by the Ground Lessor or which would permit the Ground Lessor to terminate the Ground Lease and the term thereof by giving notice to Mortgage Borrower;

(cc)  if the leasehold estate created by the Ground Lease shall be surrendered or merged into the fee estate, or the Ground Lease shall be terminated or canceled for any reason or under any circumstances whatsoever without the prior written consent of Lender;

(dd)  if any of the terms, covenants or conditions of the Ground Lease shall in any manner be modified, changed, supplemented, altered or amended without the prior written consent of Lender;

(ee)  if one or more judgments or decrees shall be entered against Borrower or Mortgage Borrower involving in the aggregate a liability in excess of $1,000,000 or Guarantor involving in the aggregate a liability that would cause Guarantor to fail to satisfy the Guarantor Financial Covenants, and in either case, the same shall not have been vacated, bonded, satisfied or stayed pending appeal within sixty (60) days from the date of entry of such judgment (or within sixty (60) days after the termination of any stay thereon obtained within such aforementioned sixty (60) day period);

(ff)  if, after appointment and retention of a Manager, (i) a default by Mortgage Borrower has occurred and continues beyond any applicable notice and cure periods under the Management Agreement, such default permits the Manager to terminate or cancel the Management Agreement, and the Manager so terminates or cancels the Management Agreement or (ii) the Management Agreement is terminated by Mortgage Borrower or required by Lender to be caused by Borrower to be terminated in accordance with the terms hereof, and, in either such case, a replacement manager approved by Lender in accordance with the terms hereof is not timely appointed pursuant to the provisions of this Agreement following such termination; or

(gg)  a default beyond all applicable grace or notice and cure periods occurs under any term, covenant or provision set forth in the Hotel Management Agreement or Hotel SNDA, which default permits a party to terminate or cancel the Hotel Management Agreement or Hotel SNDA;

(hh)  Borrower causes, suffers or permits Mortgage Borrower to (i) voluntarily terminate or cancel the Hotel Management Agreement, or (ii) amend or modify the Hotel Management Agreement in a manner that decreases, adversely impacts or impair Mortgage

109

Borrower's rights thereunder, or (iii) enter in any new Hotel Management Agreement or hotel management agreement, in each case, without Lender's prior written consent, or (iv) operate the Property under the name of any hotel chain or system other than "Hotel Barrière Le Fouquet's New York" without Lender's prior written consent;

(ii) without Lender's prior written consent, any hotel and/or other material license relating to the operation of the Property as a hotel (including, but not limited to, any liquor licenses) ceases to be in full force and effect;

(jj) the termination of the Hotel Management Agreement by Hotel Manager prior to the expiration date of the Hotel Management Agreement, or (ii) the expiration of the term of the Hotel Management Agreement prior to the Maturity Date.

(kk) Borrower's failure to pay (or cause Mortgage Borrower to pay) any transfer or assignment fees required under or in connection with the Hotel Management Agreement and/or Hotel SNDA [*open pending review of management agreement*];

(ll) If after the initial opening to the public of the hotel component of the Project Improvements, Mortgage Borrower ceases (or Borrower causes, suffers or permits Mortgage Borrower to cease) to continuously operate the Property or any material portion thereof as a hotel for any reason whatsoever (other than temporary cessation in connection with any repair or renovation thereof undertaken with the consent of Lender);

(mm)    If after the initial opening to the public of the hotel component of the Project Improvements, any liquor license relating to the Property ceases to be in full force and effect, and such liquor license is not restored within thirty (30) days, except with Lender's prior written consent; or

(nn) If Borrower fails to obtain or maintain the Interest Rate Protection Agreement, the Converted Interest Rate Protection Agreement or the Substitute Interest Rate Protection Agreement, as applicable, in accordance with the terms and provisions of this Agreement, and such failure continues for ten (10) Business Days after written notice thereof from Lender to Borrower.

**8.2    Remedies**.

**8.2.1    Acceleration**. Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in paragraph (f) or (g) of Section 8.1), and at any time and from time to time thereafter, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Collateral; including declaring the Debt to be immediately due and payable (including unpaid interest, Default Rate interest (as applicable), Late Payment Charges, Minimum Multiple Payment, Extension Exit Fee (if applicable), Prepayment Fee and any other amounts owing by Borrower), without notice or demand (other than notice of the amounts due); and upon any Event of Default described in paragraph (f) or (g) of Section 8.1, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges, Minimum Multiple Payment, Extension Exit Fee (if applicable), Prepayment Fee and any other amounts owing by Borrower)

110

shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

### 8.2.2   Remedies Relating to Project Improvements.

(a)   Upon the occurrence and during the continuation of an Event of Default, subject to the rights of Mortgage Lender, Lender may (but shall not be obligated to) cause the Project Improvements to be completed and may enter upon the Property and construct, equip and complete the Improvements in accordance with the Plans and Specifications, with such changes therein as Lender may, from time to time, and in its sole discretion, deem appropriate.  In connection with any construction of the Project Improvements undertaken by Lender pursuant to the provisions of this Section, Lender may:

(i)   use any funds of Borrower or Mortgage Borrower, including any balance which may be held by Lender or Mortgage Lender as security or in escrow and any Undisbursed Loan Proceeds or Mortgage Loan Undisbursed Proceeds, as applicable;

(ii)   employ existing Contractors and Subcontractors, agents, architects, engineers, and the like, or terminate the same and employ others;

(iii)   employ security watchmen to protect the Property;

(iv)   make such additions, changes and corrections in the Plans and Specifications as shall, in the judgment of Lender, be necessary or desirable;

(v)   take over and use any and all personal property contracted for, leased or purchased by Mortgage Borrower, if appropriate, or dispose of the same as Lender sees fit;

(vi)   execute all applications and certificates on behalf of Borrower and/or Mortgage Borrower which may be required by any Governmental Authority or Legal Requirement or contract documents or agreements;

(vii)   pay, settle or compromise all existing or future bills and claims which are or may be Liens against the Property, or may be necessary for the completion of the Improvements or the clearance of title to the Property, including all Taxes and Other Charges;

(viii)   complete the marketing, sale and leasing of saleable or leasable space in the Improvements, enter into leases and modify or amend existing leases, all as Lender shall deem to be necessary or desirable and all on terms acceptable to Lender;

(ix)   prosecute and defend all actions and proceedings in connection with the construction of the Project Improvements or in any other way affecting the Property, the Improvements and take such action and require such performance as Lender deems necessary under the Payment and Performance Bonds; and

111

(x)    take such other action under any Loan Document, or refrain from acting under any Loan Document, as Lender may, in its sole and absolute discretion, from time to time determine, and without any limitation whatsoever, to carry out the intent of this Section.  Borrower shall be liable to Lender for all costs paid or incurred for the construction, completion and equipping of any of the Improvements, whether the same shall be paid or incurred pursuant to the provisions of this Section or any other provisions hereof or of any other Loan Document, and all payments made or liabilities incurred by Lender hereunder of any kind whatsoever shall be deemed Advances made to Borrower under this Agreement and shall be secured by the Security Documents and the other Loan Documents.

(b)    To the extent that any costs so paid or incurred by Lender, exceed the original principal amount of the Loan, such excess costs shall be paid by Borrower to Lender on demand, with interest thereon at the Default Rate until paid; and Borrower shall execute such notes or amendments to the Note as may be requested by Lender to evidence Borrower's obligation to pay such excess costs and until such notes or amendments are so executed by Borrower, Borrower's obligation to pay such excess costs shall be deemed to be evidenced by this Agreement. In the event Lender takes possession of the Collateral and assumes control of the construction of the Project Improvements as aforesaid, Lender shall not be obligated to continue such construction longer than Lender shall see fit and may thereafter, at any time, change any course of action undertaken by it or abandon such construction and decline to make further payments for the account of Borrower or Mortgage Borrower whether or not the Project Improvements shall have been completed.

**8.2.3    Remedies Cumulative**.    Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Collateral or pursuant to the Security Documents, the Borrower's rights under the Pledge Agreement have been foreclosed, and the Collateral has been sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.  To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Collateral for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Collateral or any part thereof, in its discretion.

112

**8.2.4      Severance**.  Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, pledges and other security documents in such denominations and priorities of payment and liens as Lender shall determine in its discretion for purposes of evidencing and enforcing its rights and remedies.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.

**8.2.5      Delay**.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon.  Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of Borrower's rights under the Pledge Agreement to the extent necessary to foreclose on all or any portion of the Collateral, the Rents, any Cash Management Accounts or any other collateral.

**8.2.6      Lender's Right to Perform**.  If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of five (5) Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Pledge Agreement, the other Security Documents and the other Loan Documents) and shall bear interest thereafter at the Default Rate.  Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

# 9.      SPECIAL PROVISIONS

## 9.1      Sale of Note and Secondary Market Transaction.

**9.1.1      General; Borrower Cooperation**.  Lender shall have the right at any time and from time to time, at no cost or expense to Borrower other than the fees and expenses of its own counsel, (i) to sell or otherwise transfer the Loan or any portion thereof or the Loan Documents or any interest therein to one or more investors or (ii) to sell participation interests in the Loan to one or more investors (each such sale, assignment, participation, is referred to herein as a "*Secondary Market Transaction*").  In connection with any Secondary Market Transaction, Borrower shall, at Borrower's reasonable expense, use all reasonable efforts and cooperate fully and in good faith with Lender and otherwise assist Lender in satisfying the market standards to

113

which Lender customarily adheres or which may be reasonably required in the marketplace in connection with any such Secondary Market Transactions, including: (a) to (i) to provide such financial and other information with respect to the Collateral, the Property, Borrower, Mortgage Borrower, Guarantor and their Affiliates, (ii) provide business plans and budgets relating to the Property and (iii) perform or permit or cause to be performed or permitted such site inspection, appraisals, surveys, market studies, environmental reviews and reports, engineering reports and other due diligence investigations of the Property, as may be reasonably requested from time to time by Lender or as may be necessary or appropriate in connection with a Secondary Market Transaction (the items provided to Lender pursuant to this paragraph (a) being called the "***Provided Information***"), together, if customary, with appropriate verification of and/or consents to the Provided Information through letters of auditors or opinions of counsel of independent attorneys acceptable to Lender; (b) at Borrower's expense, cause counsel to render opinions as to non-consolidation and any other opinion customary in transactions with respect to the Property, Borrower and its Affiliates, which counsel and opinions shall be reasonably satisfactory to Lender; (c) make such representations and warranties as of the closing date of any Secondary Market Transaction with respect to the Property, Borrower and the Loan Documents as are customarily provided in such transactions and as may be reasonably requested by Lender and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents; (d) provide current certificates of good standing and qualification with respect to Borrower, Mortgage Borrower and each Borrower Representative from appropriate Governmental Authorities; and (e) execute such amendments to the Loan Documents and Borrower's organizational documents, as may be requested by Lender or otherwise to effect a Secondary Market Transaction, provided that nothing contained in this subsection (e) shall result in a material economic change in the transaction. The Secondary Market Transaction shall be undertaken at no cost or expense to Borrower other than the fees of its own counsel. Borrower's cooperation obligations set forth herein shall continue until the Loan has been paid in full.

The initial Lender, acting solely for this purpose as an agent of Borrower, shall maintain such books and records as are necessary for the recordation of the names and addresses of Lenders, the amount of each Lender's proportionate share of the Loan and the name and address of each Lender's agent for service of process (the "***Register***"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and Lender may treat each person or entity whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection and copying by the Borrower or any Lender during normal business hours upon reasonable prior notice to the initial Lender.

If Lender sells participation interests in the Loan, Lender shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loan or other obligations under the Loan Documents (the "***Participant Register***"). Lender shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in the Loan or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall

*ACTIVE 45870927v3*

be conclusive absent manifest error, and Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

**9.1.2    Severance of Loan**.  Lender shall have the right, at any time (whether prior to, in connection with, or after any Secondary Market Transaction), with respect to all or any portion of the Loan, to modify, split and/or sever all or any portion of the Loan as hereinafter provided.  Without limiting the foregoing, Lender may (i) cause the Note and the Pledge Agreement to be split into a first and second loan and first and second lien, as applicable, (ii) create one more senior and subordinate notes (*i.e.*, an A/B or A/B/C structure), (iii) create multiple components of the Note or Notes (and allocate or reallocate the principal balance of the Loan among such components) or (iv) otherwise sever the Loan into two or more loans secured by pledges of partnership or membership interests (directly or indirectly) in Borrower (*i.e.,* a senior mezzanine loan/junior mezzanine loan structure), in each such case, in whatever proportion and whatever priority Lender determines; provided, however, in each such instance the outstanding principal balance of all the Notes evidencing the Loan (or components of such Notes) immediately after the effective date of such modification equals the Outstanding Principal Balance immediately prior to such modification and the weighted average of the interest rates for all such Notes (or components of such Notes) immediately after the effective date of such modification equals the interest rate of the original Note immediately prior to such modification.  If requested by Lender, Borrower (and Borrower's constituent members, if applicable, and Guarantor) shall execute within three (3) Business Days after such request, such documentation as Lender may reasonably request to evidence and/or effectuate any such modification or severance.

This Section 9.1 shall be construed so that this Agreement and the Note are at all times maintained in "registered form" within the meanings of the Code Sections 163(f), 871(h)(2) and 881(c)(2) and any related United States Treasury Regulations.

# 10.    <u>MISCELLANEOUS</u>

**10.1    <u>Exculpation</u>**.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest and rights under the Loan Documents, the Security Documents or in the Collateral or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Loan Documents, the Security Documents or in the Collateral or any other collateral given to Lender, and Lender shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document.  The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Pledge Agreement; (iii) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the

115

right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) constitute a prohibition against Lender to commence any other appropriate action or proceeding in order for Lender to fully realize the security granted by the Pledge Agreement or any other Security Documents or to exercise its remedies against the Collateral; or (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any actual losses, damages (excluding punitive, special and consequential damages unless asserted against Lender by a third party), out-of-pocket costs and expenses, liabilities, claims or other obligations actually incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "***Borrower's Recourse Liabilities***"):

(a)    Fraud or intentional misrepresentation by Borrower, Mortgage Borrower, any Borrower Representative, or Guarantor in connection with the Loan;

(b)    intentional physical waste of the Property or any portion thereof, or after an Event of Default, the removal or disposal of any portion of the Property;

(c)    any Proceeds paid by reason of any Insured Casualty or any Award received in connection with a Condemnation or other sums or payments attributable to the Property and/or the Collateral not applied in accordance with the provisions of the Loan Documents (except to the extent that Borrower did not have the legal right, because of a bankruptcy, receivership or similar judicial proceeding, to direct disbursement of such sums or payments);

(d)    all Rents of the Property received or collected by or on behalf of the Borrower and/or Mortgage Borrower after an Event of Default and/or a Mortgage Loan Event of Default and not applied to payment of Principal and interest due under the Note and/or to the Principal (as defined in the Mortgage Loan Agreement) and interest due under the Note (as defined in the Mortgage Loan Agreement), and to the payment of actual and reasonable operating expenses of the Property, as they become due or payable (except to the extent that such application of such funds is prevented by bankruptcy, receivership, or similar judicial proceeding in which Borrower is legally prevented from directing the disbursement of such sums); the making by Borrower or Mortgage Borrower of any assignment of Rents for the benefit of another Person not permitted hereunder;

(e)    misappropriation (including failure to turn over to Lender on demand following an Event of Default and/or Mortgage Lender following a Mortgage Loan Event of Default) of tenant security deposits and rents collected in advance, or of funds held by Borrower (or Mortgage Borrower) for the benefit of another party; the willful failure to adhere to the cash management system or any of the provisions of Article III of this Agreement or Article III of the Mortgage Loan Agreement;

(f)    the failure to pay or cause Mortgage Borrower to pay Taxes and Other Charges, provided Borrower shall not be liable to the extent funds to pay such amounts are to be paid by Mortgage Lender pursuant to the Mortgage Loan Agreement and Mortgage Lender failed to pay same upon the satisfaction by Mortgage Borrower of the conditions to release same;

116

(g)   the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including Sections 4.21 and 5.8, and clauses (viii) through (xi) of Section 5.30; provided, that the obligations and liabilities pursuant to this Section 10.1(g) shall fully survive the repayment in full of the Debt until the date (the "**Termination Date**") that is two (2) years from the repayment of the Loan in full accordance with the terms of the Loan Documents (the "**Qualified Anniversary**") provided that Lender receives an environmental report (and any follow up recommended reports or actions) satisfactory to the Lender in the Lender's sole discretion regarding the Property (the "**Report**"), which Report must: (i) be obtained at Borrower's sole cost and expense, (ii) dated no earlier than 60 days following the Qualified Anniversary; (iii) be from an environmental engineer or consultant that is on the Lender's then-current approved list and engaged under an engagement agreement with Indemnitee; (iv) show that the Property is free from Hazardous Substances (except those previously disclosed in the Environmental Report and as may be otherwise permitted under the terms and conditions of this Agreement or the other Loan Documents); (v) not identify any condition or circumstance that could reasonably be expected to lead to contamination by Hazardous Substances; and (vi) not identify any threat of any Hazardous Substances on the Property or of the Property contaminating adjacent properties with Hazardous Substances in Lender's sole discretion, and *provided*, *however*, that to the extent that, as of the Termination Date, there shall be pending or overtly threatened any environmental claim, investigation, violation or action related to the Property, or related to this Agreement or Section 4.21, 5.8 or clauses (viii) through (xi) of Section 5.30 of this Agreement, then the Termination Date will be extended until the date upon which all such claims, investigations, violations and actions have been resolved to the satisfaction of Lender in its sole discretion. Notwithstanding the provisions of this Agreement to the contrary, the liabilities and obligations of Borrower under this clause (g) shall not apply to the extent that Borrower can prove that such liabilities and obligations (i) first arose (as distinguished from arising prior to but first discovered) solely from the introduction and initial release of Hazardous Substances on the Property subsequent to the date that Lender or its nominee acquired title to the Property, whether at a foreclosure sale, private power of sale or Lender's acceptance of a tender of a deed in lieu of foreclosure by Borrower and (ii) were not the result of any act or omission of Borrower or any of Borrower's affiliates, agents or contractors in, on, under or near the Property.

(h)   the gross negligence, willful misconduct, criminal acts of Borrower or Mortgage Borrower;

(i)   failure to pay (or cause Mortgage Borrower to pay) charges for labor or materials or other charges that can create Liens on any portion of the Property unless such charges are the subject of a bona fide dispute in which Borrower or Mortgage Borrower is contesting the amount or validity thereof;

(j)   a breach of the covenants set forth in Section 5.13;

(k)   the failure of Borrower to maintain the Interest Rate Protection Agreement, the Converted Interest Rate Protection Agreement or the Substitute Interest Rate Protection Agreement, as applicable, in accordance with the terms and provisions of this Agreement;

117

(l)    any amendment, modification, change, supplement, alteration, termination or cancellation of the Management Agreement without Lender's consent;

(m)    the appointment of a Manager by Borrower or Mortgage Borrower without the prior written consent of Lender;

(n)    the failure to pay any recording taxes, documentary stamp and intangible taxes, if any, due in connection with Lender's exercise of its remedies hereunder in accordance with this Agreement;

(o)    all amounts paid by Lender in connection with any transfer or assignment fees payable under or in connection with the Hotel Management Agreement and/or Hotel SNDA;

(p)    (1) the termination of the Hotel Management Agreement by either Mortgage Borrower or Hotel Manager prior to the expiration date of the Hotel Management Agreement without Lender's consent, (2) any amendment or modification of the Hotel Management Agreement by Mortgage Borrower or Hotel Manager without Lender's consent, or (3) the expiration of the term of the Hotel Management Agreement prior to the Maturity Date;

(q)    Any transfer fees required to be paid by Lender or its Affiliates pursuant to the terms of the Ground Lease in connection with any enforcement action, foreclosure or subsequent transfer of the Property after a foreclosure;

(r)    [ADDITIONAL GROUND LEASE RECOURSE CARVEOUTS MAY BE REQUIRED];

(s)    any contract entered into by Mortgage Borrower or Borrower to dispose of or sell any assets (other than the sale of personal property in the normal course of business), provided that in the event there is a foreclosure of all or any portion of the Collateral, Lender shall take reasonable efforts to cause Mortgage Borrower to terminate the applicable sale contract to the extent permitted hereunder;

(t)    any liabilities and obligations of Borrower, Mortgage Borrower or any Borrower Representative arising out of any obligation of Borrower or any Affiliate of Borrower (collectively, a "***Borrower Affiliate***") accruing prior to, on or after any acquisition of title to the Collateral pursuant to a UCC foreclosure sale, a UCC strict foreclosure, an assignment in lieu of foreclosure or other enforcement action under the Loan Documents (collectively, an "***Equity Collateral Enforcement Action***"; and the date on which an Equity Collateral Enforcement Action is consummated, an "***Equity Collateral Transfer Date***") to pay (A) legal fees to legal counsel engaged by any Borrower Affiliate prior to the Equity Collateral Transfer Date (other than legal fees to legal counsel engaged by Mortgage Borrower with respect to ordinary course operations at the Property, including leasing counsel), (B) amounts due under any agreement between the Borrower or Mortgage Borrower, on the one hand, and any Borrower Affiliate, on the other hand (unless such agreement has been assumed in writing by the Person acquiring the Collateral on or after the Equity Collateral Transfer Date or the Person acquiring the Collateral accepts performance under such agreement) or (C) amounts due for 60 days or more under any agreement (other than a Lease) between the Borrower or Mortgage Borrower, on the one hand,

118

and any Person not Affiliated with Borrower, on the other hand, that has been entered into without the prior written approval of Lender to the extent such prior written approval was required under the Loan Documents (unless such agreement has been assumed in writing by the Person acquiring the Collateral on or after the Equity Collateral Transfer Date or the Person acquiring the Collateral accepts performance under such agreement), but in all events excluding any liability or obligation in connection with the Mortgage Loan;

(u)   any distribution or other payments made in connection with any part of the Collateral in contravention of the terms hereof (including, without limitation, with respect to any Net Proceeds); or

(v)   the failure by Borrower or any borrower Affiliate or the failure by the title insurer to pay over to Lender the proceeds of any owner's policy of title insurance insuring Mortgage Borrower (including, without limitation, the Owner's Title Policy).

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower in the event that one or more of the following occurs (each, a "***Springing Recourse Event***"):  (i) an Event of Default described in Section 8.1(d) shall have occurred or (ii) a breach of the covenants set forth in Section 5.13 which results in the substantive consolidation of Borrower or Mortgage Borrower with another entity, or (iii) the occurrence of any condition or event described in either Section 8.1(f)(i) or Section 8.1(g) with respect to Borrower, Mortgage Borrower or any Borrower Representative and, with respect to such condition or event described in Section 8.1(g), either Borrower, Mortgage or any Borrower Representative, Guarantor or any Person owning an interest (directly or indirectly) in Borrower, Mortgage Borrower or any Borrower Representative or Guarantor consents to, aids, solicits, supports, or otherwise cooperates or colludes to cause such condition or event, (iv) Borrower creates, incurs, assumes, permits or suffers to exist (or causes, suffers or permits Mortgage Borrower to create, incur, assume, permit or suffer to exist) any Lien on all or any portion of the Collateral, the Property or any direct or indirect legal or beneficial ownership interest in Borrower, excepting only the Permitted Encumbrances, or incurs any indebtedness other than the Permitted Indebtedness; (v) an act or omission of any of Borrower, Mortgage Borrower, any Borrower Representative or Guarantor or Affiliate of any thereof, taken or made in bad faith, which hinders, delays or interferes with Lender's enforcement of its rights hereunder or under any other Loan Document or the realization of the Collateral, including the assertion by any of Borrower, Mortgage Borrower or any Borrower Representative or Guarantor of defenses or counterclaims unless Borrower, Mortgage Borrower or any Borrower Representative or Guarantor, as the case may be, is the prevailing party in the action in which such defense or counterclaim is asserted; (vi) the amendment, modification or termination of the Ground Lease or the waiver of any terms or provision of the Ground Lease made without Lender's prior written consent; (vii) the Hotel Management Agreement (or the right to operate the Property thereunder) is cancelled, surrendered or terminated by, or as a result of, the acts or omissions of Borrower, Mortgage Borrower or an Affiliate of Borrower without the prior consent of Lender; (viii) any Borrower

Affiliate causes Borrower, Mortgage Borrower or any Borrower Representative to amend or otherwise modify its organizational documents in order to amend or repeal its election to be governed by Article 8 of the UCC, or any termination or cancellation of (x) the limited liability company membership certificate evidencing Borrower's one hundred percent (100%) ownership interest in Mortgage Borrower representative or (y) the limited partnership interest certificate evidencing Borrower's one hundred percent (100%) ownership of all limited partnership interests in Mortgage Borrower, as delivered to Lender on the Closing Date in connection with the Pledge Agreement; or (ix) any Borrower Affiliate acquires, directly or indirectly, any direct or indirect interest in the Mortgage Loan.

**10.2**    __Brokers and Financial Advisors__.  (1) Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loan other than Broker whose fees shall be paid by Borrower pursuant to a separate agreement.  Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person (including Broker) that such Person acted on behalf of Borrower in connection with the transactions contemplated herein.  The provisions of this Section 10.2 shall survive the expiration and termination of this Agreement and the repayment of the Debt.

(a)    Notwithstanding anything in Section 10.2(a) above to the contrary, Borrower hereby acknowledges that (i) at Lender's sole discretion, Broker may receive further consideration from Lender relating to the Loan or any other matter for which Lender may elect to compensate Broker pursuant to a separate agreement between Lender and Broker and (ii) Lender shall have no obligation to disclose to Borrower the existence of any such agreement or the amount of any such additional consideration paid or to be paid to Broker whether in connection with the Loan or otherwise.

**10.3**    __Retention of Servicer__.  Lender reserves the right to retain the Servicer to act as its agent hereunder with such powers as are specifically delegated to the Servicer by Lender, whether pursuant to the terms of this Agreement, any pooling and servicing agreement or similar agreement entered into as a result of a Secondary Market Transaction, the Deposit Account Agreement or otherwise, together with such other powers as are reasonably incidental thereto.  Borrower shall pay any reasonable fees and expenses of the Servicer (the "*Servicing Fee*") payable in monthly installments on each Payment Date in addition to the payment of any interest and Principal due under the Note on such Payment Date, provided, however, that prior to the continuance of an Event of Default, the servicing fee shall equal not less than 0.10% of the Maximum Loan Commitment Amount per annum.

**10.4**    __Survival__.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement.  All Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender, but not any third party purchaser at any foreclosure sale.

120

**10.5    Lender's Discretion**.  Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

**10.6    Governing Law**.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE VALIDITY AND THE ENFORCEABILITY OF ALL LOAN DOCUMENTS AND THE DEBT.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO § 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE, AT LENDER'S ELECTION, INSTITUTED IN ANY FEDERAL OR STATE COURT IN (I) NEW YORK COUNTY, NEW YORK, (II) THE STATE IN WHICH THE PROPERTY IS LOCATED, (III) THE STATE OF DOMICILE OF THE BORROWER OR (IV) THE STATE OF DOMICILE OF THE GUARANTOR AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, NEW YORK.

121

**10.7    Modification, Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount.

**10.8    Trial by Jury**.  BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**10.9    Headings/Exhibits**.  The Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The Exhibits attached hereto, are hereby incorporated by reference as a part of the Agreement with the same force and effect as if set forth in the body hereof.

**10.10    Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**10.11    Preferences**.  Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Debt.  To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be

satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.  This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**10.12    Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly requires the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to Borrower.

**10.13    Remedies of Borrower**.  If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf.

**10.14    Prior Agreements**.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**10.15    Offsets, Counterclaims and Defenses**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents.  Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**10.16    Publicity**.  All news releases, publicity or advertising by Borrower, Lender or any of their respective Affiliates through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender or any affiliate of Lender, a Loan purchaser, the Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of the other party, such approval not to be unreasonably withheld, delayed or conditioned.

*ACTIVE 45870927v3*

**10.17    No Usury**.  Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 10.17 shall control every other agreement in the Loan Documents.  If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the Outstanding Principal Balance and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.  Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**10.18    Conflict; Construction of Documents**.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation and drafting of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them.

**10.19    No Third Party Beneficiaries**.  The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than the Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**10.20    Minimum Multiple Payment**.  Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents and (b) if payments of Principal are made to Lender prior to the Stated Maturity Date, for any reason whatsoever, whether voluntary, as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs.  For these reasons, and to induce Lender to make the Loan, Borrower agrees that, all prepayments, if any, whether voluntary or involuntary, will be accompanied by the Minimum Multiple Payment provided, notwithstanding the foregoing to the contrary, no Minimum Multiple Payment shall be due in connection with any prepayment of the Loan with Net Proceeds resulting from any Casualty or Condemnation.  Such Minimum Multiple Payment shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may

124

be included in any bid by Lender at such sale. Borrower further acknowledges that (A) it is a knowledgeable real estate developer and/or investor; (B) it fully understands the effect of the provisions of this Section 10.20, as well as the other provisions of the Loan Documents; (C) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay the Minimum Multiple Payment; and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions. Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Minimum Multiple Payment and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

10.21    **Assignment**.    The Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may be assigned by Lender and any of its successors and assigns to any Person at any time in its discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise. Upon such assignment, all references to Lender in this Loan Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender. Borrower may not assign its rights, title, interests or obligations under this Loan Agreement or under any of the Loan Documents.

10.22    **Certain Additional Rights of Lender**.    Notwithstanding anything to the contrary which may be contained in this Agreement, Lender shall have:

(i)    the right to routinely consult with Borrower's management regarding the significant business activities and business and financial developments of Borrower and Mortgage Borrower, provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances. Consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times;

(ii)    the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower and Mortgage Borrower at any time upon reasonable notice;

(iii)    the right, in accordance with the terms of this Agreement, to receive monthly, quarterly and year-end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding indebtedness;

(iv)    the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict financing to be obtained with respect to the Property so long as any portion of the Debt remains outstanding;

(v)    the right, without restricting any other right of Lender under this Agreement or the other Loan Documents (including any similar right), to restrict, upon the

125

occurrence of an Event of Default, Borrower's and Mortgage Borrower's payments of management, consulting, director or similar fees to Affiliates of Borrower from the Rents;

(vi)    the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any operating budget and/or capital budget of Borrower and/or Mortgage Borrower;

(vii)    the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower and/or Mortgage Borrower of any other significant property (other than personal property required for the day to day operation of Property); and

(viii)    the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict the transfer of interests in Borrower, Mortgage Borrower and any Borrower Representative held by their respective members, limited partners and/or general partners, and the right to restrict the transfer of interests in any such Person except for any transfer that is a Permitted Transfer.

The rights described above may be exercised directly or indirectly by any Person that owns substantially all of the ownership interests in Lender.  The provisions of this Section are intended to satisfy the requirement of management rights for purposes of the Department of Labor "plan assets" regulation 29 C.F.R., Section 2510.3-101.

**10.23    Set-Off**.  In addition to any rights and remedies of Lender provided by this Loan Agreement and by law, Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

**10.24    Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

**10.25    Proof of Claim**.    In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other proceedings affecting Borrower, Mortgage Borrower or Guarantor, or any of their respective creditors or property, Lender, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have the claims of Lender allowed in such proceedings for the entire Debt at the date of the institution of such proceedings and for any additional amount which may become due and payable by Borrower hereunder after such date.

126

**10.26** **Waiver of Stay**.  Borrower agrees (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury or other law wherever enacted, now or at any time hereafter in force, which would prohibit or forgive Borrower from paying all or any portion of the Debt or which may affect the covenants or the performance of this Agreement; and Borrower (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the holders, but will suffer and permit the execution of every such power as though no such law had been enacted.

## 11.    **MORTGAGE LOAN; CERTAIN COVENANTS**

**11.1** **Compliance with Mortgage Loan Documents**:  Borrower shall (or shall cause Mortgage Borrower to):  (a) pay all principal, interest and other sums required to be paid by Mortgage Borrower under and pursuant to the provisions of the Mortgage Loan Documents; (b) diligently perform and observe all of the terms, covenants and conditions of the Mortgage Loan Documents on the part of Mortgage Borrower to be performed and observed, unless such performance or observance shall be waived in writing by Mortgage Lender; (c) promptly notify Lender of the giving of any notice by Mortgage Lender to Mortgage Borrower or Borrower of any default by Mortgage Borrower in the performance or observance of any of the terms, covenants or conditions of the Mortgage Loan Documents on the part of Mortgage Borrower to be performed or observed and deliver to Lender a true copy of each such notice; (d) deliver a true, correct and complete copy of all notices, demands, requests or material correspondence (including electronically transmitted items) given or received by Mortgage Borrower or any Guarantor to or from the Mortgage Lender or its agent; and (e) not enter into or be bound by any Mortgage Loan Documents that are not approved by Lender.  Without limiting the foregoing, Borrower shall cause Mortgage Borrower, as applicable, to fund all reserves required to be funded pursuant to the Mortgage Loan Documents.  In the event of a refinancing of the Mortgage Loan permitted by the terms of this Agreement, Borrower will cause all reserves on deposit with Mortgage Lender to be utilized by Mortgage Borrower to reduce the amount due and payable to the Mortgage Lender or alternatively shall be remitted to Lender as a mandatory prepayment of the Loan.

**11.2** **Mortgage Loan Defaults**.

(a)    Without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, if any Event of Default shall occur under the Mortgage Loan Documents, Borrower hereby expressly agrees that Lender shall have the immediate right, without prior notice to Borrower, but shall be under no obligation:  (x) to pay all or any part of the Mortgage Loan and any other sums that are then due and payable, and to perform any act or take any action on behalf of Borrower and/or Mortgage Borrower as may be appropriate, to cause all of the terms, covenants and conditions of the Mortgage Loan Documents on the part of Mortgage Borrower to be performed or observed thereunder to be promptly performed or observed; and (y) to pay any other amounts and take any other action as Lender, in its sole and absolute discretion, shall deem advisable to protect or preserve the rights and interests of Lender in the Loan and/or the Collateral.  All sums so paid and the costs and expenses incurred by Lender in exercising rights under this Section 11.2 (including attorneys' fees) (i) shall constitute additional advances of the Loan to Borrower, (ii) shall increase

127

the then unpaid principal, (iii) shall bear interest at the Default Rate for the period from the date that such costs or expenses were incurred to the date of payment to Lender, (iv) shall constitute a portion of the Debt, and (v) shall be secured by the Security Documents.

(b)    Borrower hereby indemnifies Lender from and against all liabilities, obligations, actual losses, actual damages, penalties, assessments, actions, or causes of action, judgments, suits, claims, demands, costs and expenses actually incurred (including attorneys' and other professional fees, whether or not suit is brought, and settlement costs) and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Lender as a result of the foregoing actions.  Lender shall have no obligation to Borrower, Mortgage Borrower, any Borrower Representative or any other party to make any such payment or performance.  Borrower shall not impede, interfere with, hinder or delay, and Borrower shall not permit Mortgage Borrower to impede, interfere with, hinder or delay, any effort or action on the part of Lender to cure any default or asserted default under the Mortgage Loan, or to otherwise protect or preserve Lender's interests in the Loan and the Collateral following a default or asserted default under the Mortgage Loan.

(c)    Any default or breach by Mortgage Borrower under the Mortgage Loan Documents which is not cured prior to the expiration of any applicable grace, notice or cure period afforded to Mortgage Borrower under the Mortgage Loan Documents shall constitute an Event of Default hereunder. Lender shall have the right to communicate with Mortgage Lender with respect to any Mortgage Loan defaults, without prior notice to, or consent from, Borrower.  Lender shall have no obligation to complete any cure or attempted cure undertaken or commenced by Lender.

(d)    If Lender shall receive a copy of any notice of default under the Mortgage Loan Documents sent by Mortgage Lender to Mortgage Borrower, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon.  As a material inducement to Lender's making the Loan, Borrower hereby absolutely and unconditionally releases and waives all claims against Lender arising out of Lender's exercise of its rights and remedies provided in this Section 11.2, except for Lender's gross negligence or willful misconduct.  In the event that Lender makes any payment in respect of the Mortgage Loan, Lender shall be subrogated to all of the rights of Mortgage Lender under the Mortgage Loan Documents against the Property, in addition to all other rights it may have under the Loan Documents.

**11.3**    __Mortgage Loan Estoppels__.  Borrower shall (or shall cause Mortgage Borrower to), from time to time, use reasonable efforts to obtain from Mortgage Lender such certificates of estoppel with respect to compliance by Mortgage Borrower with the terms of the Mortgage Loan Documents as may be reasonably requested by Lender.  In the event or to the extent that Mortgage Lender is not legally obligated to deliver such certificates of estoppel and is unwilling to deliver the same, or is legally obligated to deliver such certificates of estoppel but breaches such obligation, then Borrower shall not be in breach of this provision so long as Borrower furnishes to Lender an estoppel executed by Borrower and Mortgage Borrower expressly representing to Lender the information requested by Lender regarding compliance by Mortgage Borrower with the terms of the Mortgage Loan Documents.  Borrower hereby indemnifies Lender from and against all liabilities, obligations, losses, damages, penalties, assessments, actions, or causes of action, judgments, suits, claims, demands, costs, expenses (including attorneys' and other

128

professional fees, whether or not suit is brought and settlement costs) and disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against Lender based in whole or in part upon any fact, event, condition, or circumstances relating to the Mortgage Loan which was misrepresented in, or which warrants disclosure and was omitted from such estoppel executed by Borrower and Mortgage Borrower.

**11.4    No Amendment to Mortgage Loan Documents**. Without obtaining the prior written consent of Lender, Borrower shall not cause or permit Mortgage Borrower to (i) enter into any amendment or modification of any of the Mortgage Loan Documents, (ii) grant to Mortgage Lender any consent or waiver or (iii) exercise any remedy available to Mortgage Borrower under the Mortgage Loan Documents or any right of election under the Mortgage Loan Documents. Borrower shall cause Mortgage Borrower to provide Lender with a copy of any amendment or modification to the Mortgage Loan Documents within five (5) Business Days after the execution thereof.

**11.5    Acquisition of the Mortgage Loan**.  Neither Borrower nor Mortgage Borrower nor any Borrower Representative nor any Affiliate of any of them shall acquire or agree to acquire the Mortgage Loan, or any portion thereof or any interest therein, or any direct or indirect ownership interest in the holder of the Mortgage Loan, via purchase, transfer, exchange or otherwise, and any breach or attempted breach of this provision shall constitute an Event of Default hereunder.  If, solely by operation of applicable subrogation law, Borrower, Mortgage Borrower or any Borrower Representative or any Affiliate of any of them shall have failed to comply with the foregoing, then Borrower:  (i) shall immediately notify Lender of such failure; (ii) shall cause any and all such prohibited parties acquiring any interest in the Mortgage Loan Documents:  (A) not to enforce the Mortgage Loan Documents; and (B) upon the request of Lender, to the extent any of such prohibited parties has or have the power or authority to do so, to promptly:  (1) cancel the promissory note evidencing the Mortgage Loan, (2) reconvey and release the lien securing the Mortgage Loan and any other collateral under the Mortgage Loan Documents, and (3) discontinue and terminate any enforcement proceeding(s) under the Mortgage Loan Documents.

**11.6    Deed in Lieu of Foreclosure**. Without the express prior written consent of Lender, Borrower shall not, and Borrower shall not cause, suffer or permit Mortgage Borrower to, enter into any deed-in-lieu or consensual foreclosure with or for the benefit of Mortgage Lender or any of its affiliates.  Without the express prior written consent of Lender, Borrower shall not, and Borrower shall not cause, suffer or permit Mortgage Borrower to, enter into any consensual sale or other transaction in connection with the Mortgage Loan which could diminish, modify, terminate, impair or otherwise adversely affect the interests of Lender or Borrower, the Collateral or any portion thereof or any interest therein or of Mortgage Borrower in the Property owned by such Mortgage Borrower or portion thereof or any interest therein.

**11.7    Refinancing or Prepayment of the Mortgage Loan**. Neither Borrower, Mortgage Borrower nor any Borrower Representative shall make any partial or full prepayments of amounts owing under the Mortgage Loan or refinance the Mortgage Loan without the prior written consent of Lender, unless such refinancing results in the concurrent payment in full of the Debt.

**11.8    Independent Approval Rights**.  If any action, proposed action or other decision is consented to or approved by Mortgage Lender, such consent or approval shall not be binding or

129

controlling on Lender.  Borrower hereby acknowledges and agrees that (i) the risks of Mortgage Lender in making the Mortgage Loan are different from the risks of Lender in making the Loan, (ii) in determining whether to grant, deny, withhold or condition any requested consent or approval, Mortgage Lender and Lender may reasonably reach different conclusions, and (iii) Lender has an absolute independent right to grant, deny, withhold or condition any requested consent or approval based on its own point of view, but subject to the standards of consent set forth herein.  Furthermore, the denial by Lender of a requested consent or approval shall not create any liability or other obligation of Lender if the denial of such consent or approval results directly or indirectly in a Mortgage Loan Event of Default, and Borrower hereby waives any claim of liability against Lender arising from any such denial unless Lender has not complied with any applicable standard for consent.

12.    **INTERCREDITOR AGREEMENT**.  Borrower hereby acknowledges and agrees that the Intercreditor Agreement and any other intercreditor agreement entered into between Lender and Mortgage Lender will be solely for the benefit of Lender and Mortgage Lender, and that Borrower shall not be intended third-party beneficiary of any of the provisions therein, shall have no rights thereunder and shall not be entitled to rely on any of the provisions contained therein. Lender and Mortgage Lender shall have no obligation to disclose to Borrower the contents of the Intercreditor Agreement or any other intercreditor agreement.  Borrower's obligations hereunder are and will be independent of the Intercreditor Agreement and any other intercreditor agreement and shall remain unmodified by the terms and provisions thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

*ACTIVE 45870927v3*

**IN WITNESS WHEREOF**, the parties hereto have caused this Mezzanine Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**

**CBCS WASHINGTON MEZZ BORROWER LP**,

By: _____
     Name:
     Title:

**LENDER**

**[HANA FINANCIAL INVESTMENT OR AFFILIATE]**,

By: _____
     Name:
     Title:

131

**Schedule 1**

**FORM OF ANTICIPATED COST REPORT (ACR)**

132

GT Draft 9/23/19

## Schedule 2

### Form of Requisition

FORM OF BORROWER'S REQUISITION

**BORROWER'S REQUISITION**
**(MEZZANINE LOAN)**

[Letterhead of Borrower]

_____ __, 20__

[_____]
c/o [_____].
[_____]
[_____]

     Re:    [_____], New York, New York

Ladies and Gentlemen:

     In accordance with that certain Mezzanine Loan Agreement (the "**Loan Agreement**") dated as of _____ __, 201__, between [_____], a [_____] ("**Lender**"), and [_____], a [_____] ("**Borrower**"), this letter will serve as the Borrower's Requisition requesting the sum of $_____ under the Loan Agreement. All capitalized terms used herein, and not otherwise defined herein, have the same meaning as in the Loan Agreement.

The draw amount for this month is as follows:

| | |
|---|---|
| Current Total Draw Amount: | $_____ |
|    less interest/fees already capitalized this period: | ($_____) |
| Amount of New loan proceeds: | $_____ |
|    less Lender holdbacks for reimbursements: | ($_____) |
| Net Amount of Wire: | $_____ |

Please wire the funds on **[DATE]** as follows:

     Amount:
     Bank:
     ABA#:
     Account:
     Account Number:

     The support for the above Advance is provided in the attached draw schedules. In addition, attached hereto as Schedule 1 is a true, correct and complete Construction Budget Status

2 — 1

Report as of the date hereof.  Please advise the undersigned as soon as the Advance has been credited.

Borrower hereby acknowledges that it has no outstanding defenses, claims, counterclaims or offsets against Lender under the Loan Documents.

Borrower represents and warrants to Lender as of the date hereof as follows:

(i)      All amounts shown on all previous Borrower's Requisitions have been paid in full and all amounts requested herein have been paid or will be paid in full from the proceeds of the disbursement requested hereby.

(ii)     All work on the Property to the date of this Requisition has been performed in accordance with the Plans and Specifications, as defined in the Loan Agreement, and there have been no changes to the Plans and Specifications except as approved by Lender or as authorized by the Loan Agreement.

(iii)    All labor, materials, and/or services shown on each draw schedule, for which funds have been or are requested, are incorporated into the Property, as defined in the Loan Agreement, at this date, or in the case of Stored Materials, have been stored and/or deposited in accordance with, and otherwise satisfy the requirements of, the Loan Agreement.

(iv)     None of the amounts for which payment is requested in this Requisition have been included in any prior Borrower's Requisition.

(v)      All required Governmental Approvals of the Plans and Specifications by any Governmental Authority have been obtained.

(vi)     There have been obtained all required Governmental Approvals by all Governmental Authorities required to complete the work described in the Plans and Specifications which work is now in progress or was previously completed.

(vii)    All work on the Property, which has been completed or which is in progress as of this date and which is described on the Plans and Specifications, does not violate any applicable Legal Requirement.

(viii)   There is no Event of Default under the Loan Agreement.

(ix)     The representations and warranties reaffirmed by this request for disbursement of Loan proceeds pursuant to the Loan Agreement are true and correct in all material respects on and as of the date of this Borrower's Requisition and will be true and correct in all material respects on and as of the date of such disbursement (except to the extent that any representations and warranties are not true due to a change in facts or circumstances, the occurrence of any event and/or the existence of any conditions which is permitted to have occurred pursuant to this Agreement or which does not and will not result in a Default);.

(x)      The Improvements have not been injured or damaged by fire, explosion, accident, flood or other casualty, except as previously disclosed in writing to Lender.

2 — 2

2 — 3

Very truly yours,

[_____],
a [_____]

By:_____
Name:  [_____]
Title:  [_____]

2 — 4

GT Draft 9/23/19

## Schedule 3

## ARCHITECT'S COMPLETION CERTIFICATE

[Letterhead of Borrower's Architect]

[_____]
c/o [_____].
[_____]
[_____]

Re:    [_____], New York, New York

Ladies and Gentlemen:

The undersigned ("**Architect**") understands that [_____], a [_____ _____] ("**Lender**") has made a loan (the "**Loan**") to [_____], a [_____ _____] ("**Borrower**"), which Loan, among other things, was used to finance construction and renovation by CBCS Washington Street LP, a direct subsidiary of Borrower, of the improvements (the "**Improvements**") on the premises more particularly described in **Exhibit A** hereto (the "**Land**") and was advanced pursuant to that certain Mezzanine Loan Agreement entered into by Lender and Borrower as of _____, 2019 ("**Mezzanine Loan Agreemen**t"). Capitalized terms not defined herein shall have the meanings ascribed to them in the Mezzanine Loan Agreement.

Architect prepared certain Plans and Specifications in connection with the construction and renovation of the Improvements. In addition, Architect has been engaged to act as the Architect for the Improvements and such engagement has been confirmed by that certain Agreement for Architectural Services between Borrower and Architect dated [_____].

Based on its on-site observation of the Improvements, including, without limitation, the review of the Plans and Specifications, each to the date of this Certificate, to its best professional knowledge, Architect states to Lender that except as the same relates to Punch List Items (as hereinafter defined), the Improvements and its contemplated uses, as identified to us by Borrower (that is, as a [_____]), comply with all applicable building codes and all other governmental rules, laws and regulations relating to its design and engineering, to the extent applicable and in effect as of the date hereof.

To the best of its professional knowledge, Architect states to Lender that the Improvements comply (and after the completion of the Punch List Items will comply) with all applicable requirements of the applicable zoning and building laws and ordinances which are in effect as of the date hereof.

To the best of its professional knowledge, there is (and after the completion of the Punch Line Items will be) sufficient access and egress to and from the Land and the Improvements for their use for their intended purposes.

3 — 1

Architect hereby certifies to the best of its professional knowledge to Lender that subject only to the completion of the Punch List Items, the Improvements have been completed in a good and workmanlike manner in accordance with the Plans and Specifications.  The term "Punch List Items" shall mean the work set forth on **Exhibit B** hereto, the completion of which will not cost in excess of $**[X]** in the aggregate, and such work shall be limited to site work, interior finishes, mechanical adjustments, landscaping and decorative work.  If the completion of the Punch List Items is diligently pursued, completion of all Punch List Items is expected within [_____(__)] months from the date hereof.

Signed this ___ of __ 20_.

**[Architect]**

By:_____
        Name:
        Title:

By signing below, [_____] hereby estimates, to the best of its professional knowledge, that the cost to complete the Punch List Items will not exceed $**[X]** in the aggregate.

**[Construction Manager]**

By:_____
        Name:
        Title:

3 — 2

## **Exhibit A**

## **(Legal Description of Land)**

3 — 3

### Schedule 4

### FORM OF LIEN WAIVER

### *FORM OF LIEN WAIVER BY TRADE CONTRACTOR*

**WAIVER OF LIEN** dated as of _____, 20__, made by _____, a _____ having an office at _____ ("**Contractor**") to and for the benefit of **[INSERT FULL NAME OF CONSTRUCTION MANAGER]**, a _____ [corporation] having an office at _____ ("**Construction Manager**"), [_____] LLC a [_____ _____] having an office at c/o [_____], [_____], [_____], [_____] ("**Owner**") and [_____], a [_____ _____] ("**Lender**"), pursuant to that certain Trade contract dated as of _____, 20__, between Contractor and Construction Manager (as amended and supplemented from time to time, the "**Contract**"). Words and phrases defined in that certain [Guaranteed Maximum Price Contract] dated as of _____, 20__, between Construction Manager and Owner, as amended and supplemented from time to time, shall have the same meanings in this instrument.

This waiver of lien is given in connection with the construction of the Project and the payment to Contractor of sums in the amount of $_____ requisitioned by Contractor pursuant to its Requisition No. _____ dated _____, 20__ (the "**Requisition**") for Work supplied, furnished, or performed for the Project to the date of the Requisition.

For the benefit of Construction Manager, Owner and Lender, Contractor does hereby certify and acknowledge that:

(a) Contractor has supplied Construction Manager with a list of all subcontractors of Contractor supplying, furnishing, or performing Work or services, or furnishing materials or equipment, for the Project, and that such list is true and complete as of the date of the Requisition;

(b) Contractor has received all sums due and owing to Contractor, other than sums (if any) withheld by Construction Manager pursuant to the Contract, for Work, materials and equipment performed, furnished, or supplied for the Project to the date of the Requisition immediately prior to the Requisition (the "**Prior Requisition Date**");

(c) in consideration of such payment, Contractor (for itself and its subcontractors and their respective successors and assigns) does hereby forever release and waive any and all rights, claims and demands which Contractor has, or may have, to file any Lien or notice of Lien against the Project or any property of Construction Manager or Owner, on account of, or deriving from, Work, materials and/or equipment supplied, furnished and/or performed for the Project to the Prior Requisition Date; and

(d) Contractor hereby agrees to indemnify and hold harmless Construction Manager, Owner and Lender from and against any and all rights, claims and demands of any of Contractor's subcontractors on account of, or deriving from, Work,

*ACTIVE 45870927v3*

materials and/or equipment supplied, furnished and/or performed by any of them for the Project to the Prior Requisition Date.

(e)    the following amounts are true and accurate as of the date hereof:

| | |
|---|---|
| Original Contract Amount: | $_____ |
| Change Order Amount: | $_____ |
| Adjusted Contract Amount: | $_____ |
| Amount of Work Done to Date: | $_____ |
| Retainage Amount Not Yet Due: | $_____ |
| Net Amount Due to Date: | $_____ |
| | |
| Total Payments Received to Date: | $_____ |

**IN WITNESS WHEREOF**, Contractor has caused this Waiver of Lien to be duly executed, and the seal of Contractor to be affixed, as of the date of the Requisition, by the undersigned officer of Contractor, who is duly authorized to do so.

_____

By:_____
     Name:
     Title:

Subscribed and sworn to before
me this __ day of _____,200__.


Notary Public

4— 2

GT Draft 9/23/19

## **Schedule 5**

## **Exceptions to Representations and Warranties**

*ACTIVE 45870927v3*

GT Draft 9/23/19

## Schedule 6

## Intentionally Omitted

*ACTIVE 45870927v3*

GT Draft 9/23/19

## Schedule 7

## Organization of Borrower

[Attached Hereto]

*ACTIVE 45870927v3*

GT Draft 9/23/19

## Schedule 8

## Definition of Special Purpose Bankruptcy Remote Entity

A "***Special Purpose Bankruptcy Remote Entity***" means (x) a limited liability company that is a Single Member Bankruptcy Remote LLC or (y) a corporation, limited partnership or limited liability company which at all times since its formation and at all times thereafter

(i)    was and will be organized solely for the purpose of (A) owning the Property or (B) acting as a general partner of the limited partnership that owns the Property or member of the limited liability company that owns the Property;

(ii)    has not engaged and will not engage in any business unrelated to (A) the ownership of the Property, (B) acting as general partner of the limited partnership that owns the Property or (C) acting as a member of the limited liability company that owns the Property, as applicable;

(iii)    has not had and will not have any assets other than those related to the Property or its partnership or member interest in the limited partnership or limited liability company that owns the Property, as applicable;

(iv)    except with respect to the Existing Proceeding, has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable);

(v)    if such entity is a limited partnership, has and will have, as its only general partner, a Special Purpose Bankruptcy Remote Entity;

(vi)    if such entity is a corporation, has and will have at least one (1) Independent Director, and has not caused or allowed and will not cause or allow the board of directors of such entity to take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless all of the directors and all Independent Directors shall have participated in such vote; the Independent Director may not be replaced on less than five (5) days prior written notice to Lender accompanied by a certification which includes the name of the successor Independent Director certifying that such Person meets the requirements of an Independent Director;

(vii)    if such entity is a limited liability company, has and will have at least one member that has been and will be a Special Purpose Bankruptcy Remote Entity that is the managing member of such limited liability company;

(viii)    if such entity is a limited liability company, has and will have articles of organization, a certificate of formation and/or an operating agreement, as applicable, providing that (A) such entity will dissolve only upon the bankruptcy of the managing member, (B) the vote of a majority-in-interest of the remaining members is sufficient to continue the life of the limited liability company in the event of such bankruptcy of the managing member and (C) if the vote of

8 — 1

a majority-in-interest of the remaining members to continue the life of the limited liability company following the bankruptcy of the managing member is not obtained, the limited liability company may not liquidate the Property without the consent of the Lender for as long as the Loan is outstanding;

(ix)    except with respect to the Existing Proceeding, has not, and without the unanimous consent of all of its partners, directors or members (including all Independent Directors and/or Independent Managers), as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest, take any Bankruptcy Action;

(x)    has remained and intends to remain solvent and has maintained and intends to maintain adequate capital in light of its contemplated business operations provided the foregoing shall not be construed to require any Member or other Person to contribute additional capital to Borrower;

(xi)    has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(xii)    has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns except to the extent that it (a) has been or is required to file consolidated tax returns by law or (b) is treated as a disregarded entity for federal or state tax purposes;

(xiii)    has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)    has not commingled and will not commingle its funds or assets with those of any other Person;

(xv)    has held and will hold its assets in its own name;

(xvi)    has conducted and will conduct its business in its name only, and has not and will not use any trade name,

(xvii)    has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person except as permitted by GAAP, *provided* that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(xviii)    has paid and will pay its own liabilities, including the salaries of its own employees (if any), out of its own funds and assets;

(xix)    has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(xx)    has maintained and will maintain an arm's-length relationship with its Affiliates;

8 — 2

(xxi)    (a)    if such entity owns the Property, has and will have no indebtedness other than the Permitted Indebtedness, or

(b)    if such entity acts as the general partner of a limited partnership which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as general partner of the limited partnership which owns the Property which (1) do not exceed, at any time, $25,000 and (2) are paid within thirty (30) days of the date incurred, or

(c)    if such entity acts as the general partner of a limited partnership which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as a member of the limited liability company which owns the Property which (1) do not exceed, at any time, $25,000 and (2) are paid within thirty (30) days of the date incurred;

(xxii)    has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except for the Loan;

(xxiii)    has not and will not acquire obligations or securities of its partners, members or shareholders;

(xxiv)    has allocated and will allocate fairly and reasonably shared expenses, including shared office space;

(xxv)    except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xxvi)    has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxvii)    has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxviii)    has not made and will not make loans to any Person;

(xxix)    has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it;

(xxx)    has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party;

(xxxi)    has and will have no obligation to indemnify its partners, officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully

8 — 3

subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation; and

(xxxii) will consider the interests of its creditors in connection with all corporate, partnership or limited liability company actions, as applicable and its Independent Directors or Independent Managers shall owe duties to such entity as a stand-alone business entity, shall not consider the interests of the member or any direct or indirect beneficial owner of the member and shall consider the interests of the Lender;

(xxxiii) its organizational documents shall provide upon the occurrence of a Bankruptcy Action, relief from the automatic stay arising under section 362 of the Bankruptcy Code shall automatically be granted in favor of the Lender, its successors and/or assigns, and such entity (a) shall consent to and not contest or oppose any motion made by the Lender for such relief and shall not seek to reinstate the automatic stay pursuant to section 105 or any other provision of the Bankruptcy Code, and (b) acknowledges and agrees that the occurrence or existence of an event of default under any of the Loan Documents shall, in and of itself, constitute "cause" for relief from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code.

"*Independent Director*" means in the case of a corporation, a natural person who, is employed by a Corporate Service Provider and for the five (5) year period prior to his or her appointment as Independent Director has not been, and during the continuation of his or her service as Independent Director is not, directly or indirectly:

(i)        an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the corporation or any of its Affiliates (other than his or her service as an Independent Director of the corporation),

(ii)        a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the corporation or any of its shareholders or Affiliates (other than his or her service as an Independent Director if such Person has been provided by a nationally-recognized company that provides professional independent managers),

(iii)        a Person controlling or under common control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

(iv)        any member of the immediate family (including a grandchild or sibling) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the foregoing definition shall not be disqualified from serving as an Independent Director of the corporation because such person is an independent director of a "Special Purpose Bankruptcy Remote Entity" affiliated with the corporation that does not own a direct or indirect equity interest in the corporation or any entity that is a co-borrower with the corporation if such individual is an independent director provided by a nationally-recognized company that provides professional independent directors.

"*Independent Manager*" means in the case of a limited liability company, (a) a member that is a Special Purpose Bankruptcy Remote Entity, (b) a Special Purpose Bankruptcy Remote Entity that is not a member or (c) a natural person who is employed by a Corporate Service Provider and for

the five (5) year period prior to his or her appointment as Independent Manager is not, directly or indirectly:

      (i)      an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the limited liability company or any of its Affiliates (other than his or her service as an Independent Manager or Special Member of the limited liability company),

      (ii)      a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the limited liability company or any of its members or Affiliates (other than his or her service as an Independent Manager if such Person has been provided by a nationally-recognized company that provides professional independent managers),

      (iii)      a Person controlling or under common control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

      (iv)      any member of the immediate family (including grandchildren or siblings) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the foregoing definition shall not be disqualified from serving as an Independent Manager of the limited liability company because such person is an independent manager of a "Special Purpose Bankruptcy Remote Entity" affiliated with the limited liability company that does not own a direct or indirect equity interest in the limited liability company or any entity that is a co-borrower with the limited liability company if such individual is an independent manager provided by a nationally-recognized company that provides professional independent managers.

"***Corporate Service Provider***" means one of the following nationally-recognized companies that provides professional independent managers, directors and or trustees:  (i) Corporation Service Company, (ii) CT Corporation, (iii) National Registered Agents, Inc., and (iv) Independent Directors Services, Inc. (provided that the Borrower and the Lender may add or replace, by mutual agreement, any one or more of the foregoing Corporate Service Providers with other nationally-recognized companies that have been used by other borrowers for commercial mortgage loans).

"***Single Member Bankruptcy Remote LLC***" means a limited liability company organized under the laws of the State of Delaware which at all times since its formation and at all times thereafter

      (i)      complies with the following clauses of the definition of Special Purpose Bankruptcy Remote Entity above: (i)(A), (ii)(A), (iii), (iv), (ix), (x), (xi) and (xiii) through (xxxii);

      (ii)      has maintained and will maintain its accounts, books and records separate from any other person;

      (iii)      has and will have an operating agreement which provides that the business and affairs of Borrower shall be managed by or under the direction of

            (a)      a board of one (1) or more directors designated by the sole member of the Single Member Bankruptcy Remote LLC (the "***Sole Member***"), and at all times there shall be at least one (1) duly appointed Independent Director on the board of directors, and the board of directors will not take any action requiring the unanimous affirmative vote of one hundred percent

8 — 5

(100%) of the members of its board of directors unless, at the time of such action there is at least one (1) member of the board of directors who is Independent Director, and all of the directors and all Independent Directors shall have participated in such vote or

       (b)    Sole Member, provided that at all times there shall be at least one (1) Independent Manager designated by Sole Member and the operating agreement provides that Sole Member shall not take any Bankruptcy Actions without the unanimous affirmative vote of one hundred percent (100%) of the Independent Managers;

       (iv)    has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding,

       (a)    upon the occurrence of any event that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), one of the Independent Managers shall, without any action of any Person and simultaneously with Sole Member ceasing to be a member of Borrower, automatically be admitted as the sole member of Borrower (the "Special Member") and shall preserve and continue the existence of Borrower without dissolution,

       (b)    no Special Member may resign or transfer its rights as Special Member unless (x) a successor Special Member has been admitted to Borrower as a Special Member, and (y) such successor Special Member has also accepted its appointment as an Independent Manager and

The Independent Managers or Directors as applicable may not be replaced on less than five (5) days prior written notice to Lender accompanied by a certification which includes the name of the successor Independent Manager or Independent Director and certifying that such Person meets the requirements of an Independent Manager or Independent Director as the case may be.

       (c)    except as expressly permitted pursuant to the terms of this Agreement, Sole Member may not resign and no additional member shall be admitted to Borrower;

       (v)    has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding,

       (a)    Borrower shall be dissolved, and its affairs shall be would up only upon the first to occur of the following:  (x) the termination of the legal existence of the last remaining member of Borrower or the occurrence of any other event which terminates the continued membership of the last remaining member of Borrower in Borrower unless the business of Borrower is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "*Act*") or (y) the entry of a decree of judicial dissolution under Section 18-802 of the Act;

       (b)    upon the occurrence of any event that causes the last remaining member of Borrower to cease to be a member of Borrower or that causes Sole Member to cease to be a member

8 — 6

of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), to the fullest extent permitted by law, the personal representative of such member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing to continue the existence of Borrower and to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of such member in Borrower;

(c)      the bankruptcy of Sole Member or a Special Member shall not cause such member or Special Member, respectively, to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution;

(d)      in the event of dissolution of Borrower, Borrower shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of Borrower in an orderly manner), and the assets of Borrower shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and

(e)      to the fullest extent permitted by law, each of Sole Member and the Special Members shall irrevocably waive any right or power that they might have to cause Borrower or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of Borrower, to compel any sale of all or any portion of the assets of Borrower pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of Borrower.

"*__Bankruptcy Action__*" means, with respect to any Person, if such Person

(i)      makes an assignment for the benefit of creditors,

(ii)      files a voluntary petition in bankruptcy,

(iii)      is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings,

(iv)      consents to or files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation,

(v)      files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any bankruptcy or insolvency proceeding,

(vi)      seeks, consents to or acquiesces in the appointment of a trustee, receiver, liquidator, sequestrator, custodian or any similar official of or for such Person or of all or any substantial part of its properties,

8 — 7

(vii)    one hundred twenty (120) days after the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed,

(viii)    within ninety (90) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated or

(ix)    takes any action in furtherance of any of the foregoing.

8 — 8

GT Draft 9/23/19

## **Schedule 9**

### **Dual Obligee and Modification Rider to Dual Obligee Payment and Performance Bonds**

*ACTIVE 45870927v3*

SIGNED, SEALED AND DATED this    day of _____, 200__.

SURETY:                          CONTRACTOR:


Countersigned by:                OWNER:



Name:
Title:

9 — 2

GT Draft 9/23/19

## **Schedule 10**

Reserved

*ACTIVE 45870927v3*

GT Draft 9/23/19

## **Schedule 11**

## **Consultant's Reports**

*ACTIVE 45870927v3*

### Schedule 12 -A

### Forms of U.S. Tax Compliance Certificate

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Agreement dated as of [     ] (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among [   ], and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.12(d) of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished Administrative Agent and Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform Borrower and Administrative Agent, and (2) the undersigned shall have at all times furnished Borrower and Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF LENDER]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

12 — 1

## Schedule 12 -B

FORM OF

### U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Agreement dated as of [    ] (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among [   ], and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.12(d) of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF PARTICIPANT]

By:_____
Name:
Title:

Date: _____ __, 20[  ]

12 — 2

### Schedule 12 -C

FORM OF

## U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Agreement dated as of [     ] (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among [   ], and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.12(d) of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF PARTICIPANT]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

*ACTIVE 45870927v3*

FORM OF

## U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Agreement dated as of [     ] (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among [   ], and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.12(d) of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Loan Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished Administrative Agent and Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform Administrative Agent and Borrower, and (2) the undersigned shall have at all times furnished Administrative Agent and Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF LENDER]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

12 — 4

## Schedule 13

## Major Milestones

|     | Major Milestone | Major Milestone Deadline |
| --- | --- | --- |
| 2. | Building top-off for the Project Improvements shall have been completed. | [October 15, 2020][15], as the same may be extended from time to time as a result of the occurrence of any Force Majeure Event, such extensions, together with all extensions of any deadlines with respect to any other Major Milestones due to the occurrence of any Force Majeure Events, collectively not to exceed the Force Majeure Delay Cap. |
| 3. | Substantial Completion shall have occurred. | Substantial Completion Date |
| 5. | The opening of the Hotel (without any material conditions subsequent) | [April 15, 2022][16] |

---

[15] Lender to confirm.
[16] Lender to confirm.

13 — 1

*ACTIVE 45870927v3*

## Schedule 15

## Bankruptcy Conditions to Lend[17]

1.      The Bankruptcy Court enters an order (the "Confirmation Order"), in form and substance acceptable to Lender, in the Existing Proceeding confirming Mortgage Borrower's plan of reorganization (the "Bankruptcy Plan").  Any amendments or modifications to the Bankruptcy Plan filed as docket number 135 shall be in form and substance acceptable to Lender.

2.      The Confirmation Order shall be a "*Final Order*" -- an order which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such Confirmation Order.

3.      The Confirmation Order and Plan shall, among other things:

a)      authorize the Mortgage Borrower's assumption of the Ground Lease, with findings of the Bankruptcy Court that:  (i) the Mortgage Borrower has cured all defaults under the Ground Lease and provided adequate assurance of future performance thereunder; (ii) the completion guaranty and the third party guarantee under the sections 39 and 10.03 of the Ground Lease, respectively, are deemed fully satisfied; and (iii) as of the Effective Date of the Bankruptcy Plan, the leasehold interest in the Ground Lease and all other of the Mortgage Borrower's assets constituting the Property (as such term is defined in the Mortgage being executed contemporaneously herewith) are held by the Mortgage Borrower free and clear of all liens, claims and encumbrances (other than the Mortgage Lender's liens); and

b)      Bankruptcy Court findings that:  (i) the Mortgage Borrower did not enter into this Agreement and related Mortgage Loan Documents and the equity infusions contemplated by the Bankruptcy Plan with the actual intent to hinder, delay, or defraud any creditor; (ii) the Mortgage Borrower has received reasonably equivalent value in exchange for its obligations under the Mortgage Loan Documents; (iii) giving effect to the transactions contemplated by the Mortgage Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Mortgage Borrower's total probable liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured; (iv) Mortgage Borrower's assets do not and, immediately following

---

[17] Subject to further review by Lender's bankruptcy counsel.

the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted, and (v) Mortgage Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Mortgage Borrower).

# **EXHIBIT R**

**After recording please mail to:**

## RECOGNITION AGREEMENT AND LANDLORD ESTOPPEL

THIS RECOGNITION AGREEMENT AND LANDLORD ESTOPPEL (this "Agreement") made as of the __ day of _____ 2019 by and among [_____], a [_____], having an office at [_____] ("Mortgagee"), [_____], a [_____], having an office at [_____] ("Mezzanine Lender") and 445 WASHINGTON LLC, a New York limited liability company, having an address at 60 Vestry Street, New York, New York 10013 ("Landlord") and CBCS WASHINGTON STREET LP (as successor by merger with CBCS Washington Street LLC), a New York limited partnership, having an address c/o Caspi Development, 120 Bloomingdale Road, Suite 105, White Plains, NY 10605 ("Tenant").

W I T N E S S E T H :

**WHEREAS**, Landlord is the fee owner of the Premises;

**WHEREAS**, pursuant to that certain Agreement of Lease dated as of June 19, 2013 (the "Original Lease") between Landlord, as ground lessor, and CBCS Washington Street LLC, as ground lessee, a memorandum of which, dated as of June 19, 2013, was recorded in the Office of the City Register of the City of New York on July 31, 2013, as CRFN 2013000300828 (the "Memorandum of Lease"), as such Original Lease was amended by First Amendment To Agreement of Lease dated January 9, 2017 (the "First Amendment"); by Second Amendment To Agreement of Lease dated October 16, 2018 (the "Second Amendment"); by Third Amendment to Agreement of Lease dated October 16, 2018 (the "Third Amendment"); by Fourth Amendment to Agreement of Lease dated December 28, 2018 (the "Fourth Amendment"; and by Fifth Amendment to Agreement of Lease dated as of the date hereof (the "Fifth Amendment"); the Original Lease, the First Amendment, the Second Amendment, the Third Amendment, the Fourth Amendment and the Fifth Amendment collectively being referred to herein as the "Lease"), Landlord leased to Tenant certain land being more particularly described in Exhibit A annexed hereto and made a part hereof (the "Premises");

**WHEREAS**, on the date hereof, Mortgagee is making certain loans to Tenant in the aggregate principal amount of _____ Million and 00/100 Dollars ($___0,000,000.00) (collectively, the "Loan"), which Loan shall be secured by, among other things, those certain leasehold building loan and project loan mortgages, assignments of leases and rents and security agreements encumbering, inter alia, Tenant's leasehold estate in and to the Premises (the leasehold building loan and project loan mortgages, together with all amendments, renewals, increases, modifications, replacements, substitutions, extensions, spreaders and consolidations

{01028516.DOC;1 }
*ACTIVE 46071975v2*

*ACTIVE 46124558v1*

thereof and all re-advances thereunder and additions thereto, is referred to, collectively, as the "<u>Mortgage</u>");

   **WHEREAS**, on the date hereof, Mezzanine Lender is making a certain loan to [_____] ("<u>Mezzanine Borrower</u>") in the aggregate principal amount of _____ Million and 00/100 Dollars ($___0,000,000.00) (collectively, the "<u>Mezzanine Loan</u>"), which Mezzanine Loan shall be secured by, among other things, the equity interests in Tenant;

   **WHEREAS**, Mortgagee, Mezzanine Lender, Tenant and Landlord wish to confirm certain understandings and agreements with respect to the Lease, the Loan and the Mortgage, and their respective rights and obligations with respect thereto; and

   **WHEREAS**, Mortgagee and Mezzanine Lender each requires the execution and delivery of this Agreement by the parties hereto as a condition to Mortgagee and Mezzanine Lender making the Loan to Tenant and the Mezzanine Loan to Mezzanine Borrower, respectively, on the date hereof.

   **NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, and of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Mortgagee, Mezzanine Lender, Landlord and Tenant hereby agree and covenant as follows:

   1. <u>Defined Terms</u>.  Unless otherwise defined herein, all initially capitalized terms shall have the meanings assigned to such terms in the Lease.

   2. <u>No Modification to Ground Lease</u>.  Landlord, Tenant, Mortgagee and Lender acknowledge and agree that nothing contained in this Agreement shall modify the provisions of the Lease or affect the rights of Landlord or the obligations of Tenant thereunder.

   3. <u>Recognized Mortgagee</u>.  Landlord, Tenant, Mortgagee and Mezzanine Lender hereby acknowledge and agree that:

   (a) As of the date hereof, and for so long as Mortgagee and Mezzanine Lender are controlled (as used herein "controlled" shall have the meaning set forth in the definition of "Affiliate" in the Lease) by Hana Financial Investment ("Hana") Mortgagee and Mezzanine Lender shall each be deemed Recognized Mortgagees under the terms and provisions of the Lease, including, but not limited to the provisions of Article 11 of the Original Lease, and shall be entitled to all of the rights and privileges of a Recognized Mortgagee set forth therein and Mortgagee is the sole Designated Mortgagee under the provisions of Article 11 of the Lease unless Mezzanine Lender and Mortgagee advise Landlord otherwise;

   (b) As of the date hereof, the Mortgage and Mezzanine Loan are and shall continue to be a Recognized Mortgage under the terms and provisions of the Lease including, but not limited to the provisions of Article 11 of the Original Lease, for so long as

*ACTIVE 46071975v2*

*ACTIVE 46124558v1*

Mortgagee and Mezzanine Lender are controlled by Hana, and shall be entitled to all of the rights and privileges of a Recognized Mortgage set forth therein; and

(c)     Notwithstanding any provision of the Lease to the contrary, the parties' execution and delivery of this Agreement constitutes Mortgagee's and Mezzanine Lender's compliance with all of the requirements under the Lease, including, but not limited to the provisions of Section 11.01 of the Original Lease, regarding notification to Landlord of the existence of the Mortgage and Mezzanine Loan and Landlord's agreement that Mortgagee and Mezzanine Lender are Recognized Mortgagees as of the date hereof and for so long as they are controlled by Hana.

(d)     The Mezzanine Loan shall be treated as a Mortgage and entitled to all rights that pertain to a Mortgage pursuant to the terms of the Lease.

4.     Landlord's Estoppel.  Landlord hereby certifies for the benefit of the Mortgagee and Mezzanine Lender that:

(a)     The Lease, a true and correct copy of which is attached hereto as Exhibit C, is in full force and effect and, except as set forth in Exhibit C, has not been further assigned, amended, modified or extended. The Lease represents the entire agreement between Landlord and Tenant with respect to the leasing by Landlord to Tenant of the Premises and no other understandings (oral or written) exist with respect thereto.

(b)     Each of the payments required to be made by Tenant to Landlord pursuant to Section 3.01, Section 3.01A, Section 3.02, Section 3.03 and Section 3.04 of the Lease have been timely made by Tenant to Landlord and no further payments are due under any of those Sections.

(c)     Neither Landlord nor, to the best of Landlord's knowledge, Tenant is in default of their respective obligations under the Lease, nor has any event or condition occurred or failed to occur which, with the giving of notice or passage of time, or both, would constitute a default or Event of Default under the Lease by Tenant or by Landlord.  Landlord has neither received nor given any notice of an Event of Default or notice of termination under the Lease.

(d)     The current term of the Lease will expire on June 30, 2112.

(e)     Tenant has paid in full all Rental and other sums due and payable under the Lease through the date hereof.

(f)     To the best of Landlord's knowledge, there are no actions, voluntary or otherwise, pending against Landlord under any bankruptcy or insolvency law of the United States or of any state thereof.

*ACTIVE 46071975v2*

*ACTIVE 46124558v1*

(g)    Landlord is the sole owner of the fee estate in the Premises and is the landlord under the Lease.  As of the date hereof, Landlord has not mortgaged the fee estate in the Premises and there are currently no mortgages encumbering the fee estate in the Premises.

(h)    Landlord acknowledges that there is no option or right of first refusal granted to Tenant to purchase or acquire fee title to the Premises either contained in the Lease or otherwise granted by Landlord to Tenant.

(i)    Landlord has received no written notice of any pending or threatened eminent domain proceedings.

(j)    Landlord has received no notices that any Impositions remain unpaid.

(k)    Landlord has not as of this date created an escrow under Section 5.01 of the Lease.

(l)    The undersigned is authorized to execute this certificate on behalf of Landlord.

5.    Casualty.    Notwithstanding anything to the contrary contained in the Lease, Landlord and Tenant agree that all insurance proceeds with respect to the Premises shall be deposited with a Depository reasonably satisfactory to each of Recognized Mortgagee and Landlord, and the same shall be applied and disbursed solely in accordance with the terms and provisions set forth in the Lease.

6.    Amendment to Lease.    Landlord agrees that so long as Mortgagee and Mezzanine Lender are each a Recognized Mortgagee, and the Mortgage and the Mezzanine Loan remain in effect.  Landlord shall not amend the Lease in any material respect without the prior written consent of Mortgagee and Mezzanine Lender in each instance, which consent may be granted or withheld in Mortgagee's or Mezzanine Lender's sole discretion.

7.    Notice.    Any notice which may be given hereunder shall be deemed given (a) when personally delivered with receipt therefor, (b) if by mail or via a nationally recognized overnight courier (such as Federal Express), upon the earlier to occur of (x) three (3) business days after deposited in the United States mail certified or registered mail, postage prepaid return receipt requested, or (y) actual receipt thereof, properly addressed to the party to receive such notice at the address of such party set forth below.

To Mortgagee:        [_____]
                     _____
                     _____
                     _____

with a copy to:      _____
                     _____

{01028516.DOC;1 }4

_____
Attention: _____, Esq.

To Landlord:        445 Washington LLC
                    60 Vestry Street
                    New York, New York 10013
                    Attention:  Vincent J. Ponte

with a copy to:     Kramer Levin Naftalis & Frankel LLP
                    1177 Avenue of the Americas
                    New York, New York 10036
                    Attention:  Jay Neveloff, Esq.

To Tenant           CBCS WASHINGTON STREET LP
                    c/o Caspi Development
                    120 Bloomingdale Road
                    Suite 105
                    White Plains, NY 10605

                    With a copy to:
                    Rosenberg & Estis, P.C.
                    733 Third Avenue
                    New York, New York  10017
                    Attention: Michael E. Lefkowitz

                    [_____]
                    _____
                    _____

Mezzanine Lender:   _____

                    _____
                    _____
                    _____
with a copy to:     Attention: _____, Esq.

 

        Any party may at any time and from time to time (by providing notice to the other party in the manner set forth above) designate a different address or person, or both, to whom such notices shall be sent.  Notices by a party may be given by an attorney on behalf of that party.

{01028516.DOC;1 }5

8.    <u>Miscellaneous</u>.  This Agreement may be modified only by an agreement in writing signed by the parties hereto, or their respective successors-in-interest.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their respective successors and assigns.  The term "person" shall mean an individual, joint venture, corporation, partnership, trust, unincorporated association or other entity.  The provisions of this Agreement shall supersede any inconsistent provisions contained in the Lease, and in the event to any inconsistency between the Lease and the provisions of this Agreement, such shall be resolved, to the extent of such inconsistency, in favor of this Agreement.

9.    <u>Governing Law.</u>  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

10.    <u>Counterparts.</u>  This Agreement may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.

11.    <u>Assignment by Mortgagee</u>.  After the origination of the Loan and the Mezzanine Loan, Mortgagee may sell, assign and/or transfer the Loan as a whole loan and Mezzanine Lender may, sell, assign and/or transfer the Mezzanine Loan as a whole loan provided that for the respective loan to remain a Recognized Mortgage,  the transferee of the Loan and the Mezzanine Loan, as the case may be,  must be an Institutional Lender (as such term is defined in the Lease except that solely for purposes of this Section 10, the "$350 million" net worth requirement of an Institutional Lender shall be deemed to be a "$150 million" net worth requirement), but all other requirements of "Institutional Lender" as defined in the Lease, remain in effect.  Once such transferee has provided Landlord with satisfactory evidence that it is an Institutional Lender with a net worth of not less than $150 million and notifies Landlord in accordance with Section 11.01 of the Original Lease, then such transferee shall be entitled to the benefits of the relevant Mortgagee under this Agreement.  Nothing in the Lease or in this Agreement is intended to inhibit (i) Mortgagee from making participations of the Loan so long as, prior to an event of default, Mortgagee continues to service the Loan or (ii) Mezzanine Lender from making participations of the Mezzanine Loan so long as, prior to an event of default, Mezzanine Lender continues to service the Mezzanine Loan, provided that with respect to any participations Mortgagee or Mezzanine Lender, as the case may be, or an administrative agent, trustee, servicer or special servicer, continues to administer the applicable Loan and acts as agent for all participants.

12.    <u>Enforceability</u>.  If any provision under this Agreement or the application thereof to any entity, person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application of the provisions hereof to other entities, persons or circumstances shall not be affected thereby and shall be enforced to the fullest extent permitted by law.

13.    <u>Covenants of Mortgagee</u>.    Mortgagee and Mezzanine Lender each covenant as follows:

*ACTIVE 46071975v2*

*ACTIVE 46124558v1*

(a)     that it shall comply with Section 7.01(c) of the Lease;

(b)     that, subject to Section 5 of this Agreement, it shall comply with Section 11.01(c)(iii) of the Original Lease.

14.     <u>Estoppel</u>. With respect to any request made by Tenant under Section 28.02 of the Lease for a statement in connection with any future Mortgage or Mezzanine Loan, Landlord agrees to provide such estoppel statement in the form attached to the Fifth Amendment.

15.     <u>Options</u>. Landlord, Tenant, Mezzanine Lender and Mortgagee agree that any Recognized Mortgagee may exercise any options of Tenant under the Lease on behalf of Tenant to extend the Hotel Opening Deadline pursuant to Section 6 of the Second Amendment, as supplemented by the Fifth Amendment, provided the Recognized Mortgagee otherwise meets all conditions to the exercise of such option including the payment of any extension fees.

**[No further text on this page; signature page follows]**

*ACTIVE 46071975v2*

*ACTIVE 46124558v1*

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the day and year first above written.

<u>**LANDLORD**</u>:

**445 WASHINGTON LLC**, a New York limited liability company

By: Ponte Steak House, its sole member


By: _____
       Name: Vincent J. Ponte
       Title: President

<u>**TENANT**</u>:

**CBCS WASHINGTON STREET LP**,
a New York limited partnership


By: _____
       Name:
       Title:

<u>**MORTGAGEE**</u>:

[_____], a [_____] limited liability company


By: _____
       Name:
       Title:


<u>**MEZZANINE LENDER**</u>:

[_____], a [_____] limited liability company


By: _____
       Name:
       Title:

## **ACKNOWLEDGMENTS**

STATE OF NEW YORK     )
                               )   ss.:
COUNTY OF _____  )

         On the ___ day of _____ 2019, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

                                     _____
                                     Notary Public

(Affix Notarial Stamp)

STATE OF NEW YORK     )
                               )   ss.:
COUNTY OF _____  )

         On the ___ day of _____ 2019, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

                                     _____
                                     Notary Public

(Affix Notarial Stamp)

STATE OF NEW YORK        )
                                  )   ss.:

COUNTY OF _____  )

             On the ___ day of _____ 2019, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

(Affix Notarial Stamp)

STATE OF NEW YORK        )
                                  )   ss.:

COUNTY OF _____  )

             On the ___ day of _____ 2019, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

(Affix Notarial Stamp)

**EXHIBIT A**

**Legal Description of Premises**

[*Follows Immediately*]

**EXHIBIT B**

**<u>Definition of Debt</u>**

{01028516.DOC;1 }
*ACTIVE 46071975v2*

*ACTIVE 46124558v1*

**EXHIBIT C**

**<u>The Lease (follows immediately)</u>**

# **<u>EXHIBIT S</u>**

## FIFTH AMENDMENT TO AGREEMENT OF LEASE

THIS FIFTH AMENDMENT TO AGREEMENT OF LEASE (this "Agreement") made as of the __ day of _____ 2019 by and among 445 WASHINGTON LLC, a New York limited liability company, having an address at 60 Vestry Street, New York, New York 10013 ("Landlord") and CBCS WASHINGTON STREET LP (as successor by merger with CBCS Washington Street LLC), a New York limited partnership, having an address c/o Western Management Corp., 589 Fifth Avenue, New York, New York 10017 ("Tenant").

W I T N E S S E T H :

**WHEREAS**, Landlord is the fee owner of the Premises;

**WHEREAS**, pursuant to that certain Agreement of Lease dated as of June 19, 2013 (the "Original Lease") between Landlord, as ground lessor, and CBCS Washington Street LLC ("Original Tenant"), as ground lessee, a memorandum of which, dated as of June 19, 2013, was recorded in the Office of the City Register of the City of New York on July 31, 2013, as CRFN 2013000300828, as such Original Lease was amended by First Amendment To Agreement of Lease dated January 9, 2017, a memorandum of which was recorded in the Office of the City Register of the City of New York (the "First Amendment"), as further amended by Second Amendment To Agreement of Lease dated as of October 16, 2018, a memorandum of which was be recorded in the Office of the City Register of the City of New York (the "Second Amendment"); as further amended by Third Amendment To Agreement of Lease dated as of October 16, 2018, a memorandum of which was recorded in the Office of the City Register of the City of New York (the "Third Amendment"); and as further amended by Fourth Amendment to Lease dated December 28, 2018, a memorandum of which was recorded in the Office of the City Register of the City of New York (the "Fourth Amendment") the Original Lease, the First Amendment, the Second Amendment, the Third Amendment and the Fourth Amendment as modified by this Agreement collectively being referred to herein as the "Lease"), Landlord leased to Tenant certain land being more particularly described in the Original Lease (the "Premises");

**WHEREAS**, on the date hereof, _____ ("[LENDER]") is making certain loans to Tenant in the aggregate principal amount of _____ (collectively, the "Loan"), which Loan shall be secured by, among other things, those certain leasehold building loan and project loan mortgages, [mezzanine loan], assignments of leases and rents and security agreements encumbering, inter alia, Tenant's leasehold estate in and to the Premises demised by the Lease (the leasehold building loan and project loan mortgages, together with all amendments, renewals, increases, modifications, replacements, substitutions, extensions, spreaders and consolidations thereof and all re-advances thereunder and additions thereto, is referred to, collectively, as the "[LENDER] Mortgage");

**WHEREAS**, Tenant and Landlord wish to amend certain provisions of the Lease, all in accordance with the terms and conditions set forth in this Agreement; and

**WHEREAS**, [LENDER] requires the execution and delivery of this Agreement by the parties hereto as a condition to [LENDER] making the Loan to Tenant on the date hereof.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, and of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Mortgagee, Landlord and Tenant hereby agree and covenant as follows:

1.     Monetary Nullification Notice.  Section 11.02(c) of the Original Lease is hereby amended, so that the thirty (30) day period granted to a Recognized Mortgagee for the delivery of the Monetary Nullification Notice and the cure of a Monetary Event of Default (the "Cure Period") shall be extended on a one-time basis to sixty (60) days but only with respect to the first Monetary Event of Default occurring subsequent to the date hereof for which a Monetary Pre-Termination Notice is delivered by Landlord to [LENDER] (except as provided in the next sentence).  For avoidance of doubt, the first Monetary Nullification Notice shall provide for a sixty (60) day cure period, and any subsequent Monetary Nullification Notice (to any Mortgagee at any time during the Term) shall provide for a thirty (30) day cure period, as set forth in Section 11.02 of the Original Lease.  Notwithstanding the foregoing, the Cure Period shall be enlarged, solely as to [LENDER] but not as to any other Recognized Mortgagee, to one hundred eighty (180) days for any Monetary Event of Default relating to any failure to pay a transfer fee under Section 10.03(c) of the Original Lease.

2.     Depository.  Landlord agrees that notwithstanding anything contained in Section 8.02 of the Original Lease or the definition of "Depository" in the Lease, Landlord's approval of the Depository during any period that the Loan remains outstanding shall not be unreasonably withheld, conditioned or delayed, provided that the Depository is an Institutional Lender, If the proposed Depository is not an Institutional Lender, Landlord may withhold its consent in its sole discretion.

3.     Confirmation of Completion Guaranty.  Confirmation of guarantees have been obtained from all guarantors of this Lease and delivered to Landlord upon execution hereof.

4.     Modification to Section 10.03(b) of the Lease.  Section 10.03(b) of the Original Lease shall be deleted in its entirety and replaced with the following:

"(b)     Notwithstanding anything to the contrary contained herein, but subject to the other provisions of this Section 10.03, Tenant (or a court-appointed referee in a foreclosure action) may assign Tenant's entire interest in this Lease to a Mortgagee (or its assignee, nominee or designee) pursuant to a foreclosure action (or an assignment in lieu of foreclosure) or otherwise), enter into a Major Sublease, or other Transfer, without Landlord's consent, provided that (I) either (i) such Transfer, by its terms, shall not be or become effective until Substantial Completion of the New Building to be constructed by Tenant pursuant to Article 12, or (ii) (A) the Obligations (as such term is defined in the Completion Guaranty) are guaranteed pursuant to a guaranty substantially in the form annexed hereto as Exhibit "_" (a "Third Party Guaranty") which is in form and substance satisfactory to Landlord), by an entity (a "Third Party Guarantor") which shall have a Net Worth as of the effective date of the assignment, Major Sublease or other Transfer equal to no less than Fifty Million and 00/100 Dollars ($50,000,000.00) and (B) the then current financial statements of the Third Party Guarantor evidencing the required

minimum Net Worth, to the reasonable satisfaction of Landlord, are delivered to Landlord at the time of the effective date of the Transfer, and (II) on the effective date of any proposed assignment of this Lease, proposed Major Sublease or other Transfer, no Event of Default shall exist hereunder (but subject to the provisions of Section 11.02(e) with respect to a Non-Monetary Event of Default). Nothing contained herein, and no proposed assignment of this Lease, proposed Major Sublease or other Transfer, shall be deemed to waive, modify, affect or otherwise release Sam Chang or APW Avenue Limited from their respective Completion Guarantees. If the foregoing conditions are not satisfied, Landlord's consent, which may be withheld in its sole discretion, shall be required. Notwithstanding the foregoing, no assignment of this Lease, Major Sublease, nor other Transfer shall be or be deemed to be effective, unless and until Tenant shall have delivered to Landlord (i) a fully executed counterpart of the instrument of assignment of this Lease, of the Major Sublease, or other Transfer, in form and substance reasonably acceptable to Landlord, (ii) a fully executed counterpart of the instrument of assumption of Tenant's obligations under this Lease by such assignee, Major Subtenant, or Transferee, in form reasonably acceptable to Landlord, effective from and after the date of the assignment, Major Sublease, or other Transfer, (iii) an affidavit of the assignee, Major Subtenant or other Transferee (or a principal officer, general partner or managing member thereof) setting forth the names and addresses of all persons having a ten (10%) percent or greater direct or indirect interest (as stockholder, partner, member, beneficiary or otherwise) in the assignee, Major Subtenant, or other Transferee (other than any persons owning such interest through beneficial interests in a publicly traded company) and of all directors and officers of any corporate assignee, Major Subtenant, or other Transferee, (iv) the applicable payment, referred to in Section 10.03(c), (v) to the extent applicable, the documents referred to above in this Section 10.03(b), and (vi) if applicable, the Third Party Guaranty. Nothing contained in this Section 10.03(b) shall be deemed to affect the rights of any Mortgagee to foreclose its Mortgage, but the purchaser (including such Mortgagee) at any foreclosure sale or sale of this Lease under any instrument of assignment or transfer in lieu of the foreclosure shall be deemed to be an assignee or Transferee within the meaning of Articles 10 and 11 of the Lease. If (a) the purchaser, assignee or transferee is Mortgagee or its affiliate, and (b) the Net Worth of APW Avenue Limited is not less than $50,000,000 as of the date of the foreclosure or assignment or transfer in lieu of foreclosure, then the requirement for the Third Party Guaranty will be deferred until such time as the Mortgagee or it affiliate assigns or transfers the Lease to a third party."

     5.    <u>Modification of Hotel Opening Deadline</u>.  Section 6 of the Second Amendment is hereby supplemented with the following language, which shall be inserted at the end thereof:

"In addition to the foregoing, if Tenant has duly exercised its right to extend the Hotel Opening Deadline from March 31, 2021 to the Extended Hotel Opening Deadline (i.e. March 31, 2022), then Tenant shall have a one time right, on notice to Landlord given at any time after the date hereof but no later than January 31, 2022 to further extend the Extended Hotel Opening Deadline to a date no later than December 31, 2022. In order to exercise Tenant's further right,

Tenant must in its notice set forth the new date for the Extended Hotel Opening Deadline (which date shall be at least six (6) months after the March 31, 2022 deadline, but no more than nine months after March 31, 2022, it being understood that the Hotel Opening Deadline shall in no event be later than December 31, 2022) and must pay to Landlord on or before January 31, 2022 a non-refundable amount equal to $57,812.50 for every month beyond March 31, 2022 that the Extended Hotel Opening Deadline is extended. If Tenant exercises its right under this paragraph and makes the required payment then the date set forth in such notice shall be the date by which the Hotel Opening Date must occur, subject to Unavoidable Delays."

6.    <u>Miscellaneous</u>.  This Agreement may be modified only by an agreement in writing signed by the parties hereto, or their respective successors-in-interest.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their respective successors and assigns.  The provisions of this Agreement shall supersede any inconsistent provisions contained in the Original Lease, the First Amendment and the Second Amendment, and in the event to any inconsistency between such Agreements and the provisions of this Agreement, such shall be resolved, to the extent of such inconsistency, in favor of this Agreement.

7.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

8.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.

9.    <u>Enforceability</u>.  If any provision under this Agreement or the application thereof to any entity, person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application of the provisions hereof to other entities, persons or circumstances shall not be affected thereby and shall be enforced to the fullest extent permitted by law.

**[No further text on this page; signature page follows]**

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the day and year first above written.

**LANDLORD:**

**445 WASHINGTON LLC**, a New York limited liability company

By: Ponte Steak House Inc., its sole member

By:    _____
         Name: Vincent J. Ponte
         Title: President

**TENANT:**

**CBCS WASHINGTON STREET LP**, a New York limited partnership

By:    _____
         Name:
         Title:

## **ACKNOWLEDGMENTS**

STATE OF NEW YORK       )
                              )   ss.:

COUNTY OF _____   )

On the ___ day of _____ 2019, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

(Affix Notarial Stamp)

STATE OF NEW YORK       )
                              )   ss.:

COUNTY OF _____   )

On the ___ day of _____ 2019, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

(Affix Notarial Stamp)

## **EXHIBIT A**

## **Legal Description of Premises**

**[Follows immediately]**

{01028517.DOCX;1 }RE\50256\0002\2184078v4
KL3 3134835.3
RE\50256\0002\2249427v1
KL3 3268024.5

# **EXHIBIT B**

## **Form of Confirmation of Guaranty**

**[Follows immediately]**